## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

                    Complainant,

    v.

KENNETH HARRELSON
KELLY MEGGS

                  Accused

Criminal Case No.

1:21-cr-00028 (APM)

Come now Counsels for Kenneth Harrelson and Kelly Meggs[1] hereby requesting this Court's intervention, based on humanitarian, Constitutional and International Law grounds, involving medical experiments on humans without Informed Consent ("IC") and, when voluntary vaccinations are refused, and with no process for exemption requests, penalties are imposed amounting to cruel and unusual punishments under the Eighth Amendment.

Based on information and belief, there are 38 prisoners housed at the Department of Corrections for the District of Columbia ("DOC") Jail (aka D.C. Central Treatment Facility (["CTF"]) at 1901 D St SE, Washington, DC 20003, who are alleged to be involved with alleged crimes during the January 6, 2021, Capitol demonstrations ("January 6th Defendants"). CTF is

---

[1] Jonathon Moseley for Kelly Meggs joins in the motion in part because Moseley is the son of a physician who died in June, and counsel believes that among other problems the role doctors play in providing medical advice is being widely denigrated and ignored. Kelly Meggs reports a medical condition that precludes receiving a vaccine. If released on bail, however, Meggs could make a medical appointment, receive a full in-office examination for a doctor's opinion or perhaps second opinion, receive full and meaningful informed consent and follow medical guidance the same as any other member of society.

segregated from DOC's Central Detention Facility ("CDF") and noteworthy for confinement conditions even more coercive than CDF's.[2]  Based on information and belief, 4 out of 38 prisoners chose to receive the C19 Vaccine.  This Court must order immediate release of January 6th Defendants from pretrial detention in light of widely criticized double standards.[3]In any normal case, defined by an absence of double standards, these Defendants would have been released on bail.  Thus, the risk of Covid-19 ("C19") by concentrating them in the over-crowded D.C. Jails is materially augmented due to a double-standard, that is, the holding of these particular Defendants when similarly-situated Defendants would have been released.[4]  Case in point: interrupting the confirmation hearings of now U.S. Supreme Court Justice Brett Kavanaugh, in September and October 2018, in a clearly orchestrated, pre-planned conspiracy to obstruct official proceedings in Congress,[5] thousands of protestors (organized in advance)

---

[2] As just one example, inmates in CDF, if they submit to receiving a Covid-19 vaccine, are provided access to private video kiosks where they can see their family members and their family members can see them.

[3] The First Step Act and the CARES ACT each expanded the "compassionate release" authority and mandate to the BOP in the face of C19.  Official authorities do not put the puzzle altogether in explaining this, so we cite to the general explanation at:  News Release, "FAMM, NACDL and Washington Lawyers' Committee Launch CARES Act Home Confinement Clearinghouse," National Association of Criminal Defense Lawyers, NACDL, August 19, 2021, accessible at: https://www.nacdl.org/newsrelease/081921CARESActHomeConfinementClearinghouse; last accessed:  November 12, 2021.  Walter Pavlo, "Federal Inmates Eligible For Home Confinement Under CARES Act Pled For Their Release From Prison," Forbes Magazine, July 21, 2021, accessible at:  https://www.forbes.com/sites/walterpavlo/2021/07/21/federal-inmates-eligible-for-home-confinement-under-cares-act-pled-for-their-release-from-prison/?sh=5556319c4afc; last accessed: November 4, 2021.

[4] The evidence in this case is only of planning a peaceful trip to D.C. to listen to speakers, provide volunteer security for speakers and dignitaries, and possibly to demonstrate under the First Amendment. Defendants had no practical ability to, and did not, obstruct official proceedings.

[5] While here, Defendants deny and there is no evidence of violating 18 U.S.C. 1512(c)(2),  2018 organized conspiracy to obstruct official proceedings that was gleefully admitted to and celebrated by participants and the news media alike—physically entering the U.S. Senate Judiciary Committee hearings and disrupting them.

stormed the U.S. Supreme Court, [6] attempting to enter forcibly by banging on the front doors.

Thousands entered Congressional office buildings and demonstrated vociferously and

aggressively enough to disrupt official business and to cause the U.S. Capitol Police to order

Congressional staff to lock themselves inside their offices. [7]  Dozens shouted in protest and

unfurled banners in the middle of the U.S. Senate confirmation hearings and were arrested – but

released the same day. [8]

　　　After engaging in conduct identical to that reflected by the charges and descriptions of

conduct (that are grossly exaggerated) in this case, those demonstrators were merely charged

with demonstrating and released the same day (after being held for about five (5) hours) upon

paying a $35 fine. [9]  In contrast, this class of Defendants, including the captioned co-Defendants,

have been incarcerated for many months and housed under severe conditions, with normal pre-

trial release rules improperly suspended in some cases.  These Defendants alternate in lockup for

25.5 hours and 11.5 hours, separated by 5.5 hours in an alcove area.  When "locked up," it's

---

[6] Alex Pappas, "Kavanaugh protesters arrested at Capitol, after thousands march on Supreme Court," Fox News, Oct 4, 2018, accessible at:  https://www.foxnews.com/politics/kavanaugh-protesters-arrested-at-capitol-after-thousands-march-on-supreme-court **EXHIBIT A**

[7] Emily Birnbaum, "Over 200 protesters arrested during Kavanaugh hearings," September 6, 2018, accessible at:  https://thehill.com/homenews/senate/405500-212-protesters-total-arrested-during-kavanaugh-hearings **EXHIBIT B**

[8] In contrast, 2018 demonstrators proudly admitted their conspiracy to obstruct congressional proceedings: "It's sort of a coordinated dance, **but the performers are an organized group of protesters** and a dozen or so uniformed Capitol Police officers. And the stage is this week's Senate confirmation hearings for Supreme Court nominee Brett Kavanaugh." One by one, the protesters, many wearing T-shirts reading 'I am what's at stake,' interrupt the proceedings by shouting slogans like 'You're making a mockery of democracy!' or 'Senators: Do your jobs and stop this hearing!' The police then warn that further disruption will result in arrests. Minutes later, the person shouts again and is hustled out a side door…**the protesters are part of a nationwide campaign to disrupt the confirmation process**." Ashraf Khalil, "Protesters continue to interrupt Kavanaugh hearings," Associated Press, 09/06/2018, accessible at: https://apnews.com/article/3f4ddaec0ee946fe817329b065af3408; accessed Nov 6, 2021; *emphasis added.* **EXHIBIT C**

isolation in a bare, estimated 8' x 12' cell with a 3 inch slit for a window.  A treasured "privilege" are their family member photos.  Their only sustenance is an unhealthy, high carbohydrate diet with limited protein, and a typical dinner might be four slices of "enriched" white bread and two slices of cheese.  Unvaccinated Defendants have an array of additional conditions placed on them.  Outside time is denied to these Defendants.

There is a policy in place at the jail which increases outdoor time based on positive vaccination status, ignoring all requests of consideration for exemptions for medical or religious reasons, in spite of the fact that science demonstrates that the virus' risk of transmission is far lower outdoors.[10]  Based on information and belief, 34 unvaccinated Defendant inmates have been denied a shave or a haircut [11] since they arrived.[12]  Unvaccinated Defendant inmates are prohibited from seeing family members (who must themselves provide proof of vaccination); at least two inmates capitulated to the pressure to be vaccinated because they are believed to have been "driven crazy" by not being able to see their families, ever.[13]  Thus, the children of unvaccinated Defendant inmates (if they can even make what is often a long and expensive trip) are prohibited from seeing their parent.  Unvaccinated Defendant inmates find their access to educational and physical education programs terminated and are prohibited from attending

---

[10] Outdoor Transmission of SARS-CoV-2: *The Journal of Infectious Diseases*, Vol. 223, Issue 4, 02/15/2021, Pages 550–561; https://doi.org/10.1093/infdis/jiaa742; https://academic.oup.com/jid/article/223/4/550/6009483; both last accessed Oct 26, 2021

[11] Clearly, just as regularly washing clothes can reduce the spread of a virus like COVID-19, so likewise would regular showers and shaving beards and trimming hair help reduce the spread; see: see https://www.consumerreports.org/laundry/prevent-spread-of-covid-19-while-doing-laundry-a3919570368; last accessed: Nov 6, 2021. Yet such grooming has been reduced from normal. The protocols here seem almost designed, inadvertently, to spread C19.

[12] DOC COVID Policy, **Exhibit D** at 4: "Barbering and cosmetology services have resumed for residents with upcoming jury trials. Barbering and cosmetology will resume for all residents on June 1, 2021 contingent upon having contractors and participating residents able to demonstrate they have been fully vaccinated for COVID-19 and appropriate social distancing is maintained."

[13] Id. at 5.

religious services.  Defendants who capitulate to coerced vaccinations are rewarded with free commissary items in a free commissary gift bag.  By contrast, in a reflection of the broader-scale medical apartheid unfurling in society-at-large, unvaccinated Defendants are required to pay for these essential items.  Among the 34 Defendants referenced above are veterans, many of whom are decorated, and at least one of whom is permanently disabled because of injuries sustained in the service of our Country.  Many of the unvaccinated Defendants are churchgoing men who have been stripped of their rights to worship, unless alone, without the fellowship of other worshippers (a vital element of their religious creed akin to the minyan of Judaism).  These requirements have not been established as obligations or impacts pursuant to the Administrative Procedures Act, and these policies conflict with *Griswold v. Connecticut*, 381 U.S. 479 (1965).

## I. INTRODUCTION

Defendants petition for immediate release and for this Court to prohibit the DOC from punishing those who do not receive Covid-19 ("C19") "vaccines" in order to ensure that any of the three currently available experimental drugs on its menu—or indeed any other experimental drugs that may yet be added thereunto—will not be injected into Defendants without their informed and completely uninfluenced consent.  To date, there is only one C19 "vaccine" able to claim FDA approval, Comirnaty®, which is presently unavailable in the United States.  All other C19 "vaccines" are experimental, as evidenced by their availability **being qualified by and conditioned upon Emergency Use Authorization (EUA), an authorization which carries grave (albeit ignored) statutory meaning and caution**.  Thus, to describe this mRNA vaccine program as experimental is a simple, honest truth—not hyperbolic language.  mRNA technology

is completely new and dramatically different from any known vaccines in our past.[14]

The FDA classifies all vaccines available on the C19 menu on the date of this filing as investigational (or experimental) vaccines, aka unapproved drugs under FDCA § 564(e)(2)(A) and 21 U.S.C. 360bbb-3.  Defendants are in federal custody but are currently held at DOC. Specific points of law and authority supporting this motion include the FDCA law, which has its roots in the 1964 Declaration of Helsinki ("DH"); the 1947 Nuremberg Code ("NC"); Article 7 of the United Nation's 1966 International Covenant on Civil and Political Rights (ICCPR); the 1993 Religious Freedom and Restoration Act, Pub. L. No. 103-141, 107 Stat. 1488, codified at 42 U.S.C. § 2000bbb*, et seq.,* (RFRA"); the 1981 Federal Policy for Protecting Human Subjects ("The Common Rule") ("CR"); the 1938 Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3 *et seq.* ("FDCA"); the 1964 Civil Rights Act;[15] the 1980 Civil Rights of Institutionalized Persons Act ("CRIPA"); the 2021 Public Health Service Act (PHSA);[16] as well as the Free Exercise and Establishment Clauses of the First Amendment, the Due Process and Equal Protection Clauses of the Fifth Amendment, and the Eighth Amendment of the U.S. Constitution.  Some of these go to affirmative duties under human rights generally and the doctrine of Informed Consent (("IC)") specifically; others go to observations of a profound inhumanity in the conduct of DOC that denies inmates their dignity as US citizens, all under color and delegation by the Bureau of Prisons, Department of Justice.  While the punishment of

---

[14] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8103517/
https://www.yalemedicine.org/news/covid-19-vaccine-comparison
Because there are no time machines there can be no or medium or long term studies and, future health effects can only be based on hollow assurances, with massive undisclosed conflicts and financial interests, that at best may qualify as informed speculation.
[15] Title VII of the Civil Rights Act of 1964; https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964; last accessed: October 28, 2021.
[16] https://www.govinfo.gov/content/pkg/COMPS-8773/pdf/COMPS-8773.pdf; last accessed: Oct 28, 2021.

inmates who do not volunteer to test experimental mRNA technology on themselves (fully FDA-approved or not), poses glaring legal issues, the objectively sounder alternative to its prohibition, as a matter of public health policy, would be for DOC to follow the Federal Bureau of Prisons (BOP) lead in recommending the transfer of inmates to home confinement[17] which also happens to be warranted for its own sake, strictly on the legal merits.[18]

### A.  DOC Policy

The current DOC policy, not issued under any Rule Making Authority under the Administrative Procedures Act, as stated by the Government of the District of Columbia, is that:

> DOC will continue to follow DC Department of Health (DOH) and CDC [Centers for Disease Control and Prevention (CDC)] guidelines, as well as complying with the U.S. District Court order, to ensure the health and well-being of all its residents and staff.[19]

Yet the DOC Policy failed to follow CDC guidelines.  The CDC web page, "Myths and Facts about COVID-19 Vaccines" states: "No. The federal government does not mandate (require) vaccination for people."[20]  It also acknowledges the legal right to refuse:  "If you have concerns about C19 vaccination, talk with your…doctor, nurse, or clinic."[21]  The policy also states that "[b]eginning May 15, 2021, the DOC will expand outdoor recreation to a minimum of

---

[17] Memo: https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf; published April 3, 2021; accessed: Oct 26, 2021.

[18] Because BOP, which is within the DOJ, seems generally unaware of conditions at CTF which is under delegated authority, we include for the record **ATTACHMENTS 1 and 2** that lay out a sample of the background CTF conditions as alleged by prisoners and defense counsel on other cases.

[19] District of Columbia Department of Corrections Policies on Coronavirus Prevention (DOC COVID Policies), attached as **EXHIBIT E;** available at: https://doc.dc.gov/page/coronavirus-prevention (last visited September 29, 2021; last accessed: Oct 17, 2021.

[20] Myths and Facts about COVID-19 Vaccines, Updated July 7, 2021; https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html (last visited September 29, 2021); last accessed: Oct 17, 2021.

[21] *Id.*

1.5 hours per week for each…unit"[22] despite outdoor transmission being rare;[23] the average indoor transmission rate is 18.7 times higher.[24]  But DOC pledges to "review further increases as…vaccinations increase."[25]  This policy is also punitive with respect to Barbering:

> Barbering and cosmetology services have resumed for residents with upcoming jury trials. Barbering and cosmetology will resume for all residents on June 1, 2021 contingent upon having contractors and participating residents able to demonstrate they have been fully vaccinated for COVID-19 and appropriate social distancing is maintained.[26]

These Defendants face prejudicial impact from having to appear in court hearing appearances looking disheveled, unshaven, and slovenly (although the policy for trials seems to have been expanded).[27]  DOC represents that it "continues to adjust movement restrictions within DOC facilities in a manner consistent with medical stay-in-place orders and Center for Disease Control and Prevention (CDC) guidelines."[28]  The policy limits access to family or friends' visits, and states: "[b]y June 7, 2021, DOC will begin limited video visitation, which will be dependent on staff availability, *modification to movement to maintain public health guidelines*, and installation of tablets/IT equipment...[29]"  DOC claims that "The medical stay in

---

[22] DOC COVID Policy, **EXHIBIT E**. At 4; https://doc.dc.gov/page/coronavirus-prevention; last accessed: Oct 28, 2021.

[23] "**Outdoor transmission of the virus is rare.** You might have heard that less than 10 percent of documented viral transmission happens in outdoor settings. That "10 percent" figure has been tossed around a lot, even by the CDC. It comes from a comprehensive analysis of relevant research published last November, but most experts, including the authors of that paper, believe that the actual risk of outdoor transmission is far lower — *likely less than one percent*."
*How safe are outdoor activities?* Kim Schive MIT MEDICAL, August 30, 2021
https://medical.mit.edu/covid-19-updates/2021/08/how-safe-outdoor-activities (emphasis added).

[24] Outdoor Transmission of SARS-CoV-2 and Other Respiratory Viruses: A Systematic Review; *The Journal of Infectious Diseases*, Volume 223, Issue 4, 15 February 2021, Pages 550–561; https://doi.org/10.1093/infdis/jiaa742; last accessed: Oct 26, 2021

[25] Footnote 19

[26] DOC COVID Policy, **EXHIBIT E**, *page 3*.

[27] DOC COVID Policy, **EXHIBIT D**, *page 3*.

[28] DOC COVID Policy, **EXHIBIT E**, *page 3*.

[29] *Id. page 5*

place is not designed to be punitive in nature…"[30]  As set forth, it is nothing but punitive. Barbering and cosmetology or movement outside their cells (let alone outdoors) is part of general human well-being and daily hygiene, but has been restricted for Defendants in Pre-Trial Detention (who must be presumed innocent), unless they have voluntarily consented to be "fully vaccinated" for Covid-19—by an unapproved drug and biological product, in violation of federal law.[31]

### B.  Informed Consent (IC)—A Right Enshrined in US History

In 2009, the Second Circuit found, *in a case involving Pfizer*, where it was alleged that eleven (11) Nigerian children died from an experimental drug, that Informed Consent ("IC") is FDA law, with a history resting on international standards:

> *The history of the norm in US law demonstrates that it has been firmly embedded for more than 45 years and—except for our dissenting colleague—its validity has never been seriously questioned by any court. Congress mandated patient-subject consent in drug research in 1962. Bassiouni et al., supra[32]*, at 1624 (*citing* 21 U.S.C. § 355(i) (1976)). In response, the FDA promulgated its first regulations requiring the IC of human subjects. Tellingly, the sources on which our government relied in outlawing non-consensual human medical experimentation were the NC and DH, signifying that the government conceived of these sources' articulation of the norm as binding legal obligation. *Bassiouni et al.*, supra, at 1625-26 (*citing* 21 C.F.R. § 310.102(h) (1980)). *Today, FDA regulations require IC to U.S. investigators' research, whether conducted domestically or in a foreign country, used to support applications for the approval of new drugs.* See 21 C.F.R. §§ 50.20, 50.23-.25, 50.27, 312.20, 312.120 (2008); 45 C.F.R. §§ 46.111, 46.116-.117 (2008).
> *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 182 (2nd Cir. 2009)(emphasis added).

---

[30]  DOC COVID Policy, **EXHIBIT D** at 1; https://doc.dc.gov/page/coronavirus-prevention; last accessed: Oct 17, 2021.

[31]  See FDCA 201(g), 21 U.S.C. 321(g); 42 USC 262(i)(l).

[32]  *Id*. (*citing* M. Cheriff Bassiouni et al., An Appraisal of Human Experimentation in International Law and Practice: The Need for International Regulation of Human Experimentation, 72 J. Crim. L. & Criminology 1597, 1640 & n.220 (1981) (*internal quotation marks omitted*)).

IC is the global standard for ethical medicine.  Without it, the law may presume an unlawful battery.[33]  IC ensures participation is voluntary and protects against undue inducement,[34] such that even the appearance of coercion is dispelled.  Inducement diminishes or eliminates voluntariness through feelings of obligation or other influential power dynamics, either or both commonly manifest in jail settings with incarcerated populations.  A humane jailor must make deliberate, conscious efforts to minimize their impact.  Yet we note in the DOC's conduct that free will and IC are seemingly optional.

Even if DOC staff were injecting FDA-approved drugs, they should be "walking on pins and needles" at the very thought that an observer might determine their conduct was out of bounds from an IC point of view.  Incredibly, even though the conditions are far less favorable—no FDA-approved drugs to speak of—DOC is flagrantly engaging in what could only be deemed coercion under any reasonable standard.  No medical practitioner may have peace of mind that whatever consent may have been established for the record will certainly avoid legal liability. This is highlighted by the California Supreme Court: "One cannot know with certainty whether a consent is valid until a lawsuit has been filed and resolved."[35]  All he/she can do is maintain due diligence, such that no one might claim that standards of care were lacking, or basic precautions spurned.  Is DOC in the category of such medical practitioners?  No, DOC seems intent on vitiating consent; it has been, and continues to be, subject to and in gross violation of:

1.  The CR, 45 CFR part 46 subpart A

---

[33] Code of the District of Columbia
§ 7–1305.06a. Informed consent. https://code.dccouncil.us/us/dc/council/code/sections/7-1305.06a.html; last accessed: November 12, 2021.
[34] See, Hyun, I. (2006). Fair payment or undue inducement? Nature, 442(7103), 629-630; Macklin, R. (1981). On paying money to research subjects: 'Due' and 'undue' inducements. *IRB: A Review of Human Subjects Research*, 3(5), 1-6.
[35] Moore *v. Regents of the University of California.* 51 Cal.3d 120, 165, 793 P. 2d 479, 271 Cal. Raptr. 147, note 41 (1990) Cross ref. supra 3 at p.67

2. The Nuremberg Code (NC):  Every medical intervention requires Informed Consent (IC).
3. The Declaration of Helsinki (DH)
4. Article 7 of the UN's 1966 International Covenant on Civil and Political Rights (ICCPR), which specifies that "No one shall … be subjected without his free consent to medical or scientific experimentation."[36]

The law today requires that practitioners not just obtain the patient's assent but provide sufficient information, ensure the patient understands, recognize quite specifically what the patient agrees to or does not agree to, respect any refusals and take extra caution to avoid even a hint of duress or deception, as these would vitiate consent.  There are grave IC pitfalls associated with administering to free citizens, fully FDA-approved vaccines, and these dramatically compound as soon as they are administered to inmates:  The presumption of involuntariness and invalidity of IC—which it is every medical practitioner's affirmative duty to overcome at every step of any medical intervention—is a much more delicate proposition when dealing with prisoners.  These detainees lack the freedom to make medical appointments, receive proper physical exams in a physician's office, or to seek second opinions.  The already elevated level of IC precariousness produced by administering drugs to humans lacking freedom of movement is further intensified once that vaccine is available only under EUA.

When one combine's prisoners, an EUA, and a sudden (and extremely dangerous) promulgation of the vaccines being coerced—even if only outside of jail walls—then truly you have a "perfect storm" of liabilities and ethical challenges, not limited to IC.  Yet the DOC seems very unconcerned with upholding the most basic standards of medical care.  (U.S. District Judge Royce C. Lamberth of Washington on Oct 13, 2021 held Warden Quincy Booth of the DC

---

[36] ICCPR; p.5 of the PDF; p. 175 of the original document; https://treaties.un.org/doc/publication/unts/volume%20999/volume-999-i-14668-english.pdf; last accessed: October 20, 2021.

jail and director of the DC Department of Corrections in contempt of court,[37] stating: "I find that the civil rights of the defendant have been abused. I don't know if it's because he's a January 6th defendant or not, but I find this matter should be referred to the attorney general of the United States for a civil rights investigation into whether the D.C. Department of Corrections is violating the civil rights of January 6th defendants . . . in this and maybe other cases."[38]   DOC staff had repeatedly failed to turn over information needed to approve wrist surgery recommended over four months previous for Christopher Worrell).

Free citizens are currently assaulted by a steady stream of propaganda, incentives and mandates directed towards their vaccination.  In such a coercive climate, the rights of refusal or withdrawal of consent are, in essence, ineffective, and impossible to enforce.  Though the C19 vaccine is now mandatory—or believed to be—in large swaths of society, within DOC walls reigns a face-off in its own right between individual freedom and the illegitimate authority of co-opted "public health" representatives.  Even if DOC's conduct toward Defendants were perfectly ethical—i.e. did not feature coercion, strip searches as forms of punishment, or medical apartheid—the very availability of C19 vaccine drugs existing under a marketing campaign aimed at glossing over their risks would still poison IC.  In such conditions, no matter how convincingly a patient self-attests to IC, there is still a problem that ought to be—and has not been—properly articulated by, and of utmost concern to, the judiciary.

## II. The C19 Vaccine: Regulatory Status, Sleights of Hand and Risk Signals

---

[37] https://www.washingtonpost.com/local/legal-issues/dc-jail-conditions-contempt-investigation/2021/10/13/65292cd0-2ba1-11ec-985d-3150f7e106b2_story.html last accessed: Nov 16, 2021.

[38] Id.

There are currently three vaccines against SARS-CoV-2 now called SARS-CoV-19 of relevance to (e.g. availability in) the U.S. marketplace. These vaccines and their corresponding pharmaceutical companies are the BioNTech mRNA Vaccine by Pfizer; the Moderna-Lonza mRNA-1273 Vaccine by Moderna; and the Janssen C19 Vaccine, manufactured by Janssen Biotech Inc.[39] The FDA has made clear: "There is no adequate, approved, and available alternative to the emergency use of [the BioNTech] C19 Vaccine to prevent C19."[40] The only vaccine that has received FDA approval is Comirnaty®, *yet it is unavailable in the United States.* Thus, there is no FDA-approved vaccine that can be administered, in practical availability. This is relevant to January 6th Defendants because, while DOC is not mandating participation in the C19 vaccine, nevertheless, its unlawful coercion is *influenced* by the regulatory agencies' "Three-card Monte" outlined below.

On August 23, 2021, FDA approved the biologics license application (BLA) submitted by BioNTech Manufacturing GmbH for Comirnaty® (COVID-19 Vaccine, mRNA) to prevent COVID-19 caused by SARS-CoV-2 in individuals 16 years of age and older.[41] While Pfizer's Comirnaty® approval letter states that its two vaccines share the same formulation, the FDA concedes that the products are "legally distinct with certain differences."[42] To date, neither the FDA nor Pfizer has revealed, nor have counsels been able to obtain, information regarding what those "certain differences" might be. The public assuredly accepts on faith that there are some differences, and that these are not particularly important and can remain a mystery. But despite

---

[39] (a Janssen Pharmaceutical Company of Johnson & Johnson).
[40] *Id.*
[41] FDA News: "FDA Approves First COVID-19 Vaccine." Dated August 23, 2021; Last Accessed Oct. 10, 2021: https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine; last accessed: Oct 15, 2021.
[42] *Id.*

acknowledged (yet also mysterious) differences, the FDA asserts that the two formulations can be used interchangeably.  The FDA's fact sheet[43] for recipients and caregivers reads, "The FDA-approved Comirnaty® (COVID-19 Vaccine, mRNA) and the FDA-authorized Pfizer-BioNTech COVID-19 Vaccine under EUA have the same formulation and can be used interchangeably to provide the COVID-19 vaccination series."[44]  Two products can't have differences yet also, as the FDA falsely asserts, equal have the "same formulation."  "[T]he licensed vaccine…has the same formulation as the EUA-authorized vaccine…and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns." *Id.* This is a false and dangerous statement.  "Interchangeable" and "interchangeability" are specifically defined terms in § 351 of the PHSA, 42 U.S.C. § 262, in relation to a "reference product," which is a biological product licensed under § 351(a) of the PHSA. 42 U.S.C. § 262(a). For the purpose of determining "interchangeability," the "reference product" must be an FDA-licensed product; in this case, the FDA-licensed Comirnaty® Vaccine.  But the "interchangeable" product, the EUA BioNTech Vaccine, must be the subject of an "abbreviated" application under 42 U.S.C. § 262(k), *and there is no indication that any such application was ever filed by BioNTech*, much less reviewed or approved by the FDA.  Reference product licensing under 42 U.S.C. § 262(a) is the first licensed product, and therefore the basis for determining interchangeability of the later product.  In a subsequent press release,[45] Pfizer wrote,

---

[43] The Food and Drug Administration, *Vaccine Information Fact Sheet for Recipients and Caregivers about COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)* (Aug. 23, 2021); https://www.fda.gov/media/144414/download; last accessed: Oct 15, 2021

[44] *Id.*

[45] Pfizer, *Pfizer and BioNTech Announce Collaboration with Brazil's Eurofarma to Manufacture COVID-19 Vaccine Doses for Latin America* (Aug. 26, 2021), available at: https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-announce-collaboration-brazils; last accessed: October 15, 2021; *see* **EXHIBIT F**.

"Comirnaty® (COVID-19 Vaccine, mRNA) is an FDA-approved C19 vaccine made by Pfizer

for BioNTech" and "Pfizer-BioNTech COVID-19 Vaccine has received EUA from FDA."  The

press release continued: "This emergency use of the product has not been approved or licensed

by FDA, but has been authorized…under an EUA to prevent…C19..."[46]  A September 6, 2021

press release contained virtually identical language.[47]  Anyone confused on the issue need only

read the FDA's original August 23rd letter to Pfizer, wherein it states: "The Pfizer-BioNTech

COVID-19 Vaccine vial label and carton labels are clearly marked for 'Emergency Use

Authorization.'"[48]  The CDC asserts that "FDA approved the licensure of Comirnaty® (COVID-

19 Vaccine, mRNA), made by Pfizer for BioNTech."[49]  The *FDA did not approve* the Pfizer-

BioNTech vaccine.  Despite knowing the BioNTech vaccine is not approved, the CDC stated that

because "[t]he FDA-approved Pfizer-BioNTech product Comirnaty® and the FDA-authorized

Pfizer-BioNTech COVID-19 vaccine have the same formulation[,] [they] can be used

interchangeably to provide the COVID-19 vaccination series…"  The CDC further stated that

vaccination providers could "use doses distributed under EUA [(e.g., the non-FDA approved

Pfizer-BioNTech vaccine)] to administer the vaccination series as if the doses were the licensed

vaccine.[50]  This offends the EUA statute, 21 U.S.C. § 360bbb-3, which explicitly states that

---

[46] *Id.*

[47] Press Release, *Pfizer and BioNTech Submit a Variation to EMA with the Data in Support of a Booster Dose of COMIRNATY®*, BIONTECH (Sept. 6, 2021), available at: https://investors.biontech.de/node/10581/pdf; last accessed: October 15, 2021. *see* **EXHIBIT G**.

[48] Food and Drug Administration, Pfizer-BioNTech COVID-19 EUA LOA reissued August 23, 2021, (Oct 29, 20201), available at: https://www.fda.gov/media/150386/download; last accessed: November 9, 2021. *see* **Exhibit H**.

[49] 10 Centers for Disease Control and Prevention, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the US;* https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html; last accessed: October 15, 2021. *see* **Exhibit I**.

[50] *Id.*

anyone to whom an EUA product is administered must be informed of the option to accept or to refuse it, as well as alternatives to the product and the risks and benefits of receiving it.  This is an EUA-specific, higher order safeguard separate from the "IC 101" environment any consumer should expect to experience in the administration of approved drugs.  The CDC's assertion that EUA vaccines can be administered as though they were fully licensed (a) muddies the waters such that John Q. Public is led to believe his injection is approved—that is plainly the intent— and also (b) fails—again on purpose—to recognize the most important difference between COMIRNATY® and BioNTech of all: their availability in the U.S.  If a EUA drug is the only thing on the national menu, that's what will be dispensed.  This is a problem if John Q. Public, ignoring the Theory of Regulatory Capture and the economic reality of paid media advertising, fails to research what he hears in the news media, and thus accepts headlines on their face as the ultimate and unequivocal truth: "FDA fully approves Pfizer vaccine!"  The FDA's Comirnaty® approval letter (1) states Comirnaty® is approved and BioNTech is *not* FDA-approved but under EUA; (2) asserts Comirnaty® and BioNTech have the same "formulation;" (3) alleges BioNTech can be used interchangeably with Comirnaty® despite "certain differences" between the two; and then audaciously advises that "though Comirnaty® is approved…there is not sufficient…available for distribution to this population…at the time of reissuance of [the BioNTech] EUA."[51]  Thus, we have two similar vaccines, one under EUA and another under FDA approval.  The approved vaccine is now manufactured in Germany by Pfizer and BioNTech, a company that works in partnership with Pfizer, and is not available in the U.S. Although the other vaccines not under the Pfizer-BioNTech partnership are likewise under EUA, in the case of Pfizer, the public thinks it is getting an approved vaccine under the legal

---

[51] *Id.*

requirements for an approved vaccine, but it is really receiving a vaccine under EUA, with all the serious risks and vulnerabilities carried with and delivered by an EUA-only drug.  Consider, again, the fact that these two vaccines have the same basic formula, are made by the same company, and yet are being treated differently.  The only plausible explanation for this (without further clarification by the government, with convincing proof not presently available to counsel, that is) would be that Pfizer and the FDA are working in concert to facilitate headlines regarding an approved vaccine (to substantially increase public demand, vaccination rates, vaccine mandate palatability, and Pfizer profits), while at the same time concealing that the actual approved vaccine is not available to the American public, and all without upsetting other vaccines currently available under EUA.  In a Machiavellian bait and switch, the FDA approved a vaccine (Comirnaty®) is not available in the US.  If Comirnaty® were made available, every single drug currently available on the C19 vaccine menu (or, if the Honorable Court prefers, all EUA vaccines, since as of the date of this filing, those are one and the same) would be removed from the market.  In this scenario, Moderna's business model would be severely impacted as their C19 vaccine is the first product they have ever sold.  Trillions of dollars are at stake, for the various acolytes of vaccine corporatism.  One of the legal requirements for EUA under 21 U.S.C. § 360bbb–3(c)(3)[52] is "that there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition."  Such alternatives include early treatment protocols which remain actively suppressed; thus even if no competition existed in the vaccine marketplace, the well-documented successes of such treatments—aimed at achieving full recovery, instead of being neurologically beholden to an endless series of experimental shots—are in fact legal grounds for revoking EUA.  Albert Bourla, Chief Executive

---

[52] https://www.law.cornell.edu/uscode/text/21/360bbb-3; last visited: October 20, 2021.

Officer of Pfizer, hinted at the reason for approval of a vaccine with the same formula as an identical vaccine that remains unapproved: "I am hopeful this approval will help increase confidence in our vaccine."[53]  The approval of Comirnaty® is directed to increase confidence in the Pfizer-BioNTech COVID-19 vaccine being administered under EUA and to encourage the mistaken belief that it is FDA-approved even though it is under EUA.  A footnote in the FDA approval letter states: "The products are legally distinct with certain differences that do not impact safety or effectiveness."  Maintaining separate legal identities for two vaccines with the same formula means those injured by the EUA vaccine will be subjected to the exacting standards and limited compensation of the 2005 Prep Act, which authorizes the Countermeasures Injury Compensation Program (CICP) to provide benefits to injured parties.  But Renée Gentry, director of the Vaccine Injury Litigation Clinic at the George Washington University Law School, has rightly said that C19 vaccine claimants have two rights: "You have the right to file…[a]nd you have the right to lose."[54]  Altom Maglio, who specializes in vaccine injury cases, also affirms there is no avenue, in case of C19 vaccine-induced injuries, for receiving injury compensation.[55]  The New York Times eagerly encouraged the lie of an available, approved vaccine for those 16 and older[56] by reporting that FDA approval was opening the way for the military, corporate employers, hospitals and school districts to announce vaccine mandates for

---

[53] Pfizer's Covid-19 Vaccine Becomes First to Receive Full FDA Approval; August 23, 2021. https://www.smithsonianmag.com/smart-news/pfizer-first-coronavirus-vaccine-receive-full-fda-approval-180978504; last accessed: October 28, 2021.

[54] Injured by a COVID Vaccine? Want Financial Compensation? Too Bad, Says Injury Compensation Law Firm: https://childrenshealthdefense.org/defender/covid-vaccine-injury-no-compensation-program; last accessed: Oct 15, 2021.

[55] Id.

[56] https://www.nytimes.com/live/2021/08/23/world/covid-delta-variant-vaccine/fda-approval-pfizer-vaccine; last accessed: Oct 15, 2021.

their employees.[57]  This was a false statement, since Pfizer-BioNTech—the only formulation that

was then, and now remains available in the US—was still under EUA.  But within hours of the

announcement, the Pentagon, CVS, the State University of New York system and New York

City school system, and many others, announced they would now enforce mandates they had

made contingent upon FDA approval.[58]  On August 25, 2021, MSNBC screeched: "Pfizer's

Covid vaccine is FDA approved[!] Let's start mandating it[!]"[59]  MSNBC followed up on

September 16, 2021 with this gleefully bullying headline directed towards the vaccine hesitant:

## Anti-vaxxers will have to pay up if they want to reject public health guidance

Bucking CDC guidance on Covid-19 could cost you your job and more.

VAERS reports that C19 vaccines, through Nov 5, 2021, have caused 18,461 deaths.[60]

But a DHHS-funded 2011 study conducted by Harvard Pilgrim Healthcare found that VAERS

reports "*fewer than 1%*" of all adverse events:[61]  "[F]ewer than 1% of vaccine adverse events are

reported.  Low reporting rates preclude…identification of "problem"…vaccines that endanger

---

[57] https://www.nytimes.com/live/2021/08/24/world/covid-delta-variant-vaccine#corporate-vaccine-mandates; last accessed: October 26, 2021.
[58] FDA Approves Pfizer Vaccine: The New York Times: https://www.nytimes.com/live/2021/08/23/world/covid-delta-variant-vaccine; last accessed: October 26, 2021.
[59] https://www.msnbc.com/opinion/pfizer-s-covid-vaccine-fda-approved-let-s-start-mandating-n1277561; last accessed: October 26, 2021.
[60] VAERS HHS releases C19 vaccine data every Friday, but it is last week's data; thus updates always lag one week behind. Administrators of https://openvaers.com/covid-data (last accessed November 14, 2021) aggregate and via graphs report on the raw data in VAERS, in primary categories of deaths, hospitalizations, urgent care, doctor visits, Anaphylaxis, and Bell's Palsy.
[61] Harvard Pilgrim Health Care, Inc., Electronic System for Public Health VAERS, *AHRQ* 2011: https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf; last accessed: Oct 26, 2021.

public health.  New surveillance methods for…adverse effects are needed."[62]  Counsels invite

the Honorable Court to extrapolate, on the basis of HPH findings, that 18,078 deaths reported in

VAERS could actually represent a figure closer to ~ 1,846,100 deaths.  The HPH's conclusion

does not account for other findings that health workers are being dissuaded from reporting C19

vaccination side effects.[63]  Thus adding a couple zeroes to the number of VAERS reports is just a

bare minimum adjustment to get us slightly closer to an accurate accounting.  Nevertheless, even

if there were no underreporting at all, the death spike is still staggering:



Based on this, we know: 1. Whichever C19VHE menu item DOC administers to inmates

is under EUA; 2. Such injections would not be without serious risks, known and unknown; 3.

Such injections, under such conditions, would violate national and international laws, including

the NC and the DH; and 4. In seeking to protect prisoners from unjust treatment, this motion not

---

[62] *Id.*

[63] The Expose: Hospital Whistleblower says she was not allowed to report adverse reactions to the Covid-19 vaccines suffered by patients; October 21, 2021; https://theexpose.uk/2021/10/21/hospital-whistleblower-says-she-was-not-allowed-to-report-adverse-reactions-to-the-covid-19-vaccines-suffered-by-patients/; last accessed: Nov. 14, 2021.

only serves the interests of these Defendants, but also protects the DOC and its personnel from further and future criminal liability under international law.

A. **Mandates and _Jacobson_**

_Jacobson v. Massachusetts_, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) ("_Jacobson_") involved the State police power of the State of Massachusetts, which the Federal government does not possess. _Jacobson_ is dead letter and bad law in light of the U.S. Supreme Court's discovery of a sacred zone of privacy in _Griswold v. Connecticut_, 381 U.S. 479 (1965). _Griswold_ established the right of individuals to make their own decisions, free from government interference, to take medication or use medical devices to prevent conception due to the inherent integrity of their rights over their own bodies. _Griswold_'s zone of privacy emanating from the penumbras of the U.S. Constitution is now the one "super right" above all others. As the foundation of _Roe v. Wade_ and its progeny concerning abortion, and even the unconstitutionality of laws governing private sexual conduct; see _Lawrence v. Texas_, 539 U.S. 558 (2003), no more thorough rejection of _Jacobson_ since 1905 could be imagined. _Jacobson_ is utterly and undeniably in conflict with the foundation of modern precedents particularly.

We also have mandates on a scale and scope never before seen in the world. This is not just a _grotesque_ failure but threatens a full collapse of our public health system, because despite the serious risk signals, C19 vaccines have not only remained on the market, but are now even "mandated" across enormous swaths of society.[64] These mandates are unconstitutional. On this basis alone, the presumptions on which _Jacobson_ was decided can no longer be valid. Chief among them was that there were positively no interests at stake other than the promotion of

---

[64] In response, many argue the importance to public health, but this is a decision for doctors, not bureaucrats. Doctors must evaluate the actual medical history, circumstances, and risk factors of individuals. That's why we have doctors.

public health.  Today, and for many decades, profiteering from drugs—vaccine robber baron

corporatism—has been a known, obvious, additional, and severely conflicting interest which the

Honorable Court should not ignore.  The *Jacobson* court in 1905 conditioned its decision on the

belief that the vaccine in question was safe and effective, and would prevent Mr. Jacobson from

catching and transmitting the disease to others—those most basic benefits one expects to derive

from a vaccine. Yet today, it is admitted that the C19VHE mRNA drugs will not prevent

infection or transmission of the C19 virus unto others.[65]  Pharmaceutical companies engaged in

the production and sale of such vaccines were well aware that the large-scale use of their

experimental drugs could be spurred by manipulating public perception to believe their drugs

were not experimental, but fully FDA-approved.  Under the above extensively documented and

difficult to dispute (given current publicly available evidence) conditions, IC is glaringly invalid.

**Material Differences In Diseases, Vaccines and Risks: "Then v. Now"**

Courts have frequently—and incorrectly—analyzed C19-related restrictions using a

"rational basis review" based on the Supreme  Court's 1905 decision in *Jacobson v.*

*Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) ("*Jacobson*"), a case decided

before the development of substantive due process and bodily integrity and privacy doctrines.

There are numerous material differences between the smallpox vaccine mandate at issue in

*Jacobson* and the coercion to which Americans are now subject, with respect to vaccines, risks,

consequences of non-compliance, and legal (non-)bases for enacting mandates.  The Supreme

Court has recently rejected *Jacobson*'s "rational basis review" standard in favor of "strict

---

[65] "Vaccinated people can still become infected and have the potential spread the virus to
others…" CDC Science Brief: COVID-19 Vaccines and Vaccination:
https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-
people.html; last accessed: Oct 26, 2021.

scrutiny" analysis where, as here, C19 restrictions impinge on fundamental rights.  See *Roman Catholic Diocese of Brooklyn v. Cuomo*, U.S. 141 S.Ct. 63, 67, 208 L.Ed. 2d 206 (2020). *See, also Skinner v. State of Oklahoma, ex rel. Williamson*, 316 U.S. 535 (1942) ("strict scrutiny" used to determine law permitting the compulsory sterilization of criminals unconstitutional under the 14th Amendment's Equal Protection Clause, as well as the Due Process Clause).

The vaccine mandate at issue in *Jacobson* was enacted pursuant to State legislation under "inherent police power."  See *Klaassen v. Trustees of Indiana University*, No. 1:21-CV-238 DRL, 2021 WL 3073926, at 17 (citing *Jacobson*, 197 U.S. at 24-25).  By contrast, the mandate to which Americans are increasingly subjected are unlawful administrative orders that exceed the limits to the authority of the Federal government.  Unlike the *Jacobson* plaintiff, forced to choose between a smallpox vaccine or paying a $5 fine (about $140 today), Defendants must choose between being injected with an experimental drug or being segregated, denied privileges, and discriminated against as second-class citizens.  Moreover, "Smallpox has been a scourge…for at least the past 1500 years," and "inarguably shaped the course of human history by killing" hundreds of millions over the centuries.  Smallpox killed at least 300 million people in the Twentieth Century.  See *Klaassen*, 2021 WL 3073926, at 17.  The mortality rate for smallpox is "about 30%," *id*., compared to less than one percent (<<1%) for C19.[66]  The smallpox vaccine was also known to work for over a century prior to *Jacobson*.  It worked so well that smallpox was eradicated in the US in the first half of the Twentieth Century, and, once the United States and the international community decided to act, smallpox was eradicated worldwide by 1980.  No one suggests that the mandated C19 vaccines could eliminate C19;

---

[66] Stanford researchers estimate individual risks of COVID-19-associated hospitalization and death using publicly available data: https://www.medrxiv.org/content/10.1101/2020.06.06.20124446v3; accessed Oct. 10, 2021.

instead, the scientific consensus is that C19 will mutate like the flu and, according to WHO, is "here to stay with us."[67]

**<ins>Significant Events and Considerations Rendering *Jacobson* Obsolete</ins>**

Advancements in human understanding (and codification) of moral responsibility and specific duties in medical ethics have changed the world for the better. The most important breakthrough of and evidence for that is the NC, which, at WWII's conclusion, shone as a beacon of hope from southwestern Germany unto the world: "Never Again." Its principles are so moving and timeless that no economic conditions, states of emergency, social movements or changes in technology have ever nor could ever impeach, diminish, or impugn its majesty. Death camp survivors, some of whom were victims of involuntary experimentation, are keenly aware of what the 1905 *Jacobson* court could not have predicted: that when totalitarian regimes operate within a permissive environment, horrific outcomes are sure to result. No matter how many centuries pass, NC principles remain true, which is reflected in all the laws that have oriented themselves around them. But in the last two years, we have seen *grotesque* human rights abuses under the illusion of legal immunity provided by a declared public health emergency. Participants in various medical abuses have thrown the NC to the wind, knowing it addresses every conceivable ethical dilemma related to experimentation on human subjects, *and thus condemns them.* They also make false appeals to *Jacobson*, knowing it has long since been overturned by the NC, and conveniently neglect to mention that the court itself explains that its holding is limited to the circumstances of that particular case, suggesting that it would be entirely different under circumstances of the present day:

---

[67] The Michigan Daily; October 27, 2021: Dr. Tedros Adhanom Ghebreyesus presents global perspectives on public health; https://www.michigandaily.com/michigan-in-color/dr-tedros-adhanom-ghebreyesus-presents-global-perspectives-on-public-health; accessed Oct 28, 2021.

"Before closing this opinion we deem it appropriate, in order, to prevent misapprehension as to our views, to observe - perhaps to repeat a thought already sufficiently expressed, namely - that the police power of a State, whether exercised by the legislature, or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression. Extreme cases can be readily suggested."
*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) at 38

### Undisclosed Ingredients ("UIs")

The Supreme Court in *Griswold v. Connecticut*, 381 U.S. 479 (1965) recognized the right to personal privacy as a fundamental liberty—the highest category of liberty in the constitutional pantheon; just one rung below the Founders actually enshrining it in the sacred, original document.  This right is aggrieved in nondisclosure of drug ingredients.  The three pharma companies have withheld complete FDA disclosures on their insert fact sheets or labels. As seen below, 20% of Comirnaty® formula consists of unidentified ingredients (UI's).  What the UI's are comprised of remains uncertain, but Japanese researchers found unexplained contaminants in C19 vaccines.[68]



https://www.fda.gov/media/151733/download

**Table 2. Composition of COMIRNATY Multiple Dose Vial**

| Ingredients | Quantity after Dilution (per vial) | Function |
|---|---|---|
| SARS-CoV-2 spike glycoprotein mRNA (UNII: 5085ZFP6SJ) | 225 µg | Active Ingredient |
| (b) (4)  [4-hydroxybutyl)azanediyl)bis (hexane-6,1-diyl)bis(2-hexyldecanoate) (UNII: (b) (4) | 3.23 mg | Lipid component |
| (b) (4)  [2-(polyethylene glycol 2000)-N,N-ditetradecylacetamide] (UNII (b) (4)          ) | 0.4 mg | Lipid component |
| DSPC [1,2-distearoyl-sn-glycero-3-phosphocholine] (UNII: 043IPI2M0K) | 0.7 mg | Lipid component |
| Cholesterol (UNII: 97C5T2UQ7J) | 1.4 mg | Lipid component |
| Potassium chloride (UNII: 660YQ98I10) | 0.07 mg | Excipient |
| Monobasic potassium phosphate (UNII: 4J9FJ0HL51) | 0.07 mg | Excipient |
| Sodium Chloride (UNII: 451W47IQ8X) | 2.7 mg | Excipient |
| Dibasic sodium phosphate dihydrate (UNII: GR686LBA74) | 0.49 mg | Excipient |
| Sucrose (UNII: C151H8M554) | 46.0 mg | Excipient |
| (b) (4) (UNII: (b) (4)          ) | 0.450 mL | Excipient |

UNII: Unique Ingredient Identifier

Graphene oxide is an anxiolytic and given SARS-CoV-2 Spike's propensity to infiltrate the blood-brain barrier and increase its permeability, it is the perfect protein for preparing brain tissue for extravasation of nanoparticles from the bloodstream into the brain.[69]  The C19 vaccine

---

[69] 521. SARS-CoV-2 Spike Proteins Disrupt the Blood-Brain Barrier, Potentially Raising Risk of Neurological Damage in COVID-19 Patients. Temple Health. Accessed Sept 28, 2021. https://www.templehealth.org/about/news/sars-cov-2-spike-proteins-disrupt-the-blood-brain-barrier-potentially-raising-risk-of-neurological-damage-in-covid-19-patients
522. NEUROMODULATORY EFFECTS OF SARS-COV-2 ON THE BLOOD-BRAIN BARRIER. CROI Conference. https://www.croiconference.org/abstract/neuromodulatory-effects-of-sars-cov-2-on-the-blood-brain-barrier; last accessed: October 16, 2021. *See also:* Ohta S, Kikuchi E, Ishijima A, Azuma T, Sakuma I, Ito T. Investigating the optimum size of nanoparticles for their delivery into the brain assisted by focused ultrasound-induced blood–brain barrier opening. *Sci Rep.* 2020;10(1):18220. doi:10.1038/s41598-020-75253-9; https://www.nature.com/articles/s41598-020-75253-9; last accessed: October 16, 2021.  See also: Vu MN, Rajasekhar P, Poole DP, et al. Rapid Assessment of Nanoparticle Extravasation in a Microfluidic Tumor Model. *ACS Appl Nano Mater.* 2019;2(4):1844-1856. doi:10.1021/acsanm.8b02056; https://pubs.acs.org/doi/10.1021/acsanm.8b02056; and

experiment does not deliver "vaccines" but complexed GO nano particulate aggregates of varying nano elements attached to genetically modified nucleic acids of mRNA.[70]  This mRNA derives from both animal (or vero) cells and human fetal cells.  The C19 vaccine delivers ingredients known to be magneticotoxic, cytotoxic and genotoxic[71] to plant, insect, bird, animal and human life (i.e. cell membranes), and their genetics have caused thousands of cases of serious injuries and death.[72]  While the GO ingredient is not disclosed, it is nevertheless patented,[73] including in this Korean vaccine patent containing **solely** GO.[74]  The undeniable existence and composition of the UI's and nondisclosure is problematic in the light of *Griswold v. Connecticut,* which recognizes personal privacy as an inalienable right.  Nevertheless, these EUA "vaccines" are being administered to millions of people worldwide.  If full ingredient disclosure is a moral and legal requirement with fully approved drugs, how much obviously more so with EUA drugs.  As a human right under the 1947 NC, the 1964 DH, Article 7 of the

---

https://pubs.acs.org/doi/pdf/10.1021/acsanm.8b02056; last accessed: Oct 16, 2021.  See also: Saraiva C, Praça C, Ferreira R, Santos T, Ferreira L, Bernardino L. Nanoparticle-mediated brain drug delivery: Overcoming blood–brain barrier to treat neurodegenerative diseases. *J Controlled Release*. 2016;235:34-47. doi:10.1016/j.jconrel.2016.05.044; https://pubmed.ncbi.nlm.nih.gov/27208862; last accessed: Oct 16, 2021.

[70] Wanjun Cao, Lin He, Weidong Cao, Xiaobing Huang, Kun Jia, Jingying Dai, Recent progress of graphene oxide as a potential vaccine carrier and adjuvant, Acta Biomaterialia, Volume 112, 2020, pp. 14-28, ISSN 1742-7061; https://doi.org/10.1016/j.actbio.2020.06.009.; https://www.sciencedirect.com/science/article/pii/S1742706120303305

[71] The modality of cell–particle interactions drives toxicity of nanosized CuO and TiO2 in human cells: Toxicology Letters, 2013; https://www.academia.edu/13627621; accessed Oct 15, 2021.

[72] Nanomaterials toxicity and cell death modalities: https://pubmed.ncbi.nlm.nih.gov/23304518; last accessed: Oct 15, 2021. https://www.academia.edu/13627621/; last accessed: Oct 15, 2021.

[73] "Nano coronavirus recombinant vaccine taking graphene oxide as carrier." https://patents.google.com/patent/CN112220919A/en. (Last accessed Oct 10, 2021)

[74] "Physiological saline containing graphene dispersion and corona virus vaccine using the same" https://patents.google.com/patent/KR20210028065A/en. (Last accessed Oct 10, 2021)

ICCPR,[75] and the United Nations' 2005 Universal Declaration of Bioethics and Human Rights,[76] vaccine-specific ingredient information must be known as a precondition for IC for C19 vaccine participation.  EUAs have been issued worldwide despite C19 vaccine UIs; thus the C19 vaccine operates outside the realm of human rights observance.

A. **The Legal Standard For Pretrial Detention**

Judge Bates recently set out the legal standard for Pretrial Detention of persons who are presumed innocent, in a case captioned the *United States v. Federico Guillermo Klein*, *also known as "Freddie Klein,"* Case 1:21-cr-00236-JDB, 2021 WL 1377128 (D.D.C. Apr. 12, 2021) ("*Freddie Klein*").  The Honorable Judge Bates, before releasing Freddie Klein on home release, held:[77]

> …As the D.C. Circuit recently stated in *United States v. Munchel*, "[t]o justify detention on the basis of dangerousness*, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'"* 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021) (quoting 18 U.S.C. § 3142(f)). That requires the government to establish that the defendant poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. *Id*. (*quoting Salerno*, 481 U.S. at 751); *see also id*…. ("[P]retrial detention under the Bail Reform Act is regulatory, not penal."). *Id.*, 2021 WL 1377128, at *4.

---

[75] ICCPR; p.5 of the PDF; p. 175 of the original document; ""No one shall…be subjected without his free consent to medical or scientific experimentation." https://treaties.un.org/doc/publication/unts/volume%20999/volume-999-i-14668-english.pdf; last accessed: Oct 26, 2021.

[76] http://portal.unesco.org/en/ev.php-URL_ID%3D31058%26URL_DO%3DDO_TOPIC%26URL_SECTION%3D201.html; last accessed: October 25, 2021.

[77] Other defendants in this category have also been ordered released without further appeal thus far from the government. See, e.g., Statement of Facts (Jan. 13, 2021), ECF No. 1-1 & Min. Entry (Mar. 2, 2021), *United States v. Sanford*, 21-CR-86 (D.D.C.) (defendant hurled a fire extinguisher that struck one officer and ricocheted off two other officers' helmets); Statement of Facts (Feb. 16, 2021), ECF No. 1-1 & Min. Entry (Apr. 9, 2021), United States v. Coffee, 21-MJ-236 (D.D.C.) (defendant pushed a crutch into an officer's body at the archway to the tunnel and then charged at several officers in the tunnel with the crutch).  *See Freddie Klein*, 2021 WL 1377218, at *12 n.10.

This sets forth the legal standard that is supposed to apply to pretrial defendants who are presumed innocent.

> [A] defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety. *Munchel*, 991 F.3d at 1280.

The current DOC COVID Policy, and its punitive conditions, violates the due process pretrial Defendants are entitled to.  Defendants (1) have suffered some actual or threatened injury; (2) the injury can fairly be traced to the challenged actions of Defendants; and (3) the injury is likely to be redressed by a favorable decision of this Court. *N.H. Lottery Comm'n v. Rosen*, 2021 U.S. App. LEXIS 1526 *15-17, *quoting Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Once this experiment is administered to Defendants, there exists no opportunity for reversing potential associated harms, and DOC must be protected through immediate release of the co-Defendants.

B.  **Current Standards Required in Federal Custody**

Defendants are currently held in DOC but are federal inmates, in federal custody, and to whom USMS Required Detention Standards and the 2017 Update to Federal Performance Based Detention Standards (FPBDS) apply.  These standards[78] mandate IC and set forth that detainees may refuse medical and other care.[79]  Further USMS Policy Directive 9.6, effective date,

---

[78] 2017 Update of the Federal Performance Based Detention Standards (FPBDS)(Nov. 2017); https://www.usmarshals.gov/prisoner/detention-standards.pdf; last accessed: October 30, 2021
[79] Id. p. 17

03/17/2020 addresses treatment standards for infectious disease. The DOC Covid Policy violates

Federal Detention Standards, wherein detainees may refuse care.  The US Supreme Court stated:

> The logical corollary of the doctrine of Informed Consent is that the patient generally possesses the right not to consent, that is, to refuse treatment.

*Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 270, 110 S. Ct. 2841, 2847, 111 L. Ed. 2d 224, 236, (1990) ("*Cruzan*").  The *Cruzan* court goes on to explain:

> At common law, even the touching of one person by another without consent and without legal justification was a battery.  *See* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 9, pp. 39-42 (5th ed. 1984). Before the turn of the century, this Court observed that "no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 35 L. Ed. 734, 11 S. Ct. 1000 (1891). This notion of bodily integrity has been embodied in the requirement that IC is generally required for medical treatment. Justice Cardozo, while on the Court of Appeals of New York, aptly described this doctrine: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914). The IC doctrine has become firmly entrenched in American tort law. See Keeton, Dobbs, Keeton, & Owen, supra, § 32, pp. 189-192; F. Rozovsky, Consent to Treatment, A Practical Guide 1-98 (2d ed. 1990).

*Id.* at 497 U.S. 269, 110 S. Ct. 2846-2847, 111 L. Ed. 2d 236, (1990).

This applies to prisoners who have been convicted of a crime, who also possess "a

significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under

the Due Process Clause of the Fourteenth Amendment." *Id.* at 497 U.S. 278, 110 S. Ct. 2851,

111 L. Ed. 2d 242 (*citing Washington v. Harper*, 494 U.S. 210, 221-222, 108 L. Ed. 2d 178, 110

S. Ct. 1028 (1990) ("*Harper*")).  In *Harper*, the High Court noted that "[t]he forcible injection of

medication into a nonconsenting person's body represents a substantial interference with that

person's liberty." *Washington v. Harper*, 494 US at 229.  Similarly, in *Riggins v. Nevada*, the

High Court held that forced antipsychotic medications violated a prisoner's 14th Amendment

30

due process rights because the state failed to show both "an overriding justification and a determination of medical appropriateness." *Riggins v. Nevada*, 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992).  As the Court of Appeals for the District of Columbia Circuit also observed, the key to the *Cruzan* case—and the right at issue before this Court—is "the patient's right to make the decision about her life free from government interference."  *Abigail Alliance v. Von Eschenbach*, 445 F.3d 470, 472 (DC Cir. 2006).

### DOJ SLIP Opinion Disparages Constitutional Right to IC

DOJ's Office of Legal Counsel (OLC) recently issued a Slip Opinion, dated July 6, 2021,[80] addressing the question of whether "Section 564 of the Food, Drug and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization" (EUA).[81]  As of the date of this filing, all C19 vaccines available in the US are still under EUA, and the OLC argument set forth around the statutory language governing EUAs is circuitous because the OLC EUA Vaccine Opinion recognizes that:

> Federal law generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" *unless and until FDA has approved the drug or product* as safe and effective for its intended uses." See, e.g., FDCA §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C § 262(a). A vaccine is both a drug and a biological product. See FDCA § 201(g), 21 U.S.C § 321(g); 42 U.S.C. § 262(i)(1).
> Id. at 2.

OLC concludes that the "option to accept or refuse" language in § 564 "specifies only that certain information be provided to potential vaccine recipients," but that this language "does not prohibit entities from imposing vaccination requirements."  *Id.*  The necessary predicate to

---

[80] *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization* ("OLC EUA Vaccine Opinion") Department of Justice; OLC, 45 Op. O.L.C. July 6, 2021; https://www.justice.gov/olc/file/1415446/download; last visited: October 27, 2021. **EXHIBIT J**
[81] Id.

this further discussion is that EUA C19 vaccines constitute "unapproved products" by FDA definition.  OLC's conclusion that § 564 permits mandatory vaccination requirements for EUA vaccines fails to reconcile this necessary predicate:  Federal law prohibits delivery or introduction of a "'new drug' or 'biological product' unless the FDA has approved the drug or product as safe and effective." *Id.* (*citing* FDCA §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C § 262(a)).  OLC posits that the FDCA makes an exception for EUA vaccines, wherein "unapproved product" are authorized, but it is impossible to overstate the difference between (a) merely introducing, delivering, marketing or authorizing use of; and (b) mandating or coercing injection of a drug.  The FDCA criminalizes "[t]he introduction or delivery for introduction into interstate commerce of any . . . drug . . . that is . . . misbranded." FDCA § 331.  In *United States v. Stepanets*, 989 F.3d 88 (1st Cir. 2021), the First Circuit upheld criminal convictions for violations of this FDCA provision where defendants "dispensed" FDA-approved drugs "for patient use without a valid prescription." *Stepanets*, 989 F.3d at 94 (*citing* FDCA §353(b)(1)).[82] But the OLC opinion recognizes that these "vaccines" are also drugs; unapproved drugs.[83]

> Subsection (e)(l) applies to a product that FDA has not approved as safe and effective for any intended use, whereas subsection (e)(2) applies to an unapproved use of an otherwise approved product. The COVID-19 vaccines fall under the former category, but the statute applies the condition at issue here to the latter category as well. See FDCA §564(e)(2)(A).

OLC EUA Vaccine Opinion at 4 n.6.

If the FDCA criminalizes failure to follow branding requirements in dispensing FDA-approved drugs, the OLC EUA Vaccine Opinion contradicts federal criminal law by simply

---

[82] That subsection provides that "[t]he act of dispensing a drug" meeting certain criteria without a written or oral prescription by a licensed practitioner "shall be deemed to be an act which results in the drug being misbranded while held for sale." *Id.* at 94 (citing § 353(b)(1)).

[83] A vaccine is both a drug and a biological product. *See* FDCA § 201(g), 21 U.S.C § 321(g); 42 U.S.C. § 262(i)(l) (OLC Slip Op. at p. 2).

concluding (without citation) that dispensing C19 vaccine *unapproved drugs* is not expressly

prohibited.[84] This OLC position is untenable and its folly magnified by the C19 vaccine not

offering vaccines in the proper meaning and definition of the word,[85] as it has been historically

understood and expected to prevent infection.  That has ever been the most basic measure of

efficacy, and if any vaccine fail this basic test, why indeed inquire as to safety, when the

"vaccine" has not even demonstrated a compelling reason for its existence.  The OLC EUA

Vaccine Opinion further attempts to distinguish this Court's decisions in *Doe v. Rumsfeld*, 297 F.

Supp. 2d 119 (D.D.C. 2003) ("*Rumsfeld I*") and *Doe v Rumsfeld* cases at 341 F. Supp. 2d 1

(D.D.C. 2004) ("*Rumsfeld II*") (relying on 10 U.S.C. § 1107) and (same).  But the OLC opinion

failed to address this Court's 2005 decision in *Doe v. Rumsfeld*, 2005 WL 1124589 (D.D.C. Apr.

6, 2005) ("*Rumsfeld III*") where this Court modified the injunction granted in *Rumsfeld II*:

> ORDERED that the Court's injunction of Oct 27, 2004, is modified by the
> addition of the following language: "This injunction, however, shall not preclude
> defendants from administering AVA, **on a voluntary basis, pursuant to the
> terms of a lawful emergency use authorization ("EUA") pursuant to section
> 564 of the Federal Food, Drug, and Cosmetic Act [FDCA],** without prejudice
> to a future challenge to the validity of any such EUA. The Court expressly makes
> no finding as to the lawfulness of any specific EUA that has been or may be
> approved by the Department of Health and Human Services."
> *Rumsfeld III*, 2005 WL 1124589, at *1

The *Rumsfeld* decisions explicitly recognized the option to refuse to take an unauthorized

vaccine under federal law governing EUAs, and enjoined the mandatory use of unapproved

anthrax vaccines. *id.*, In *Rumsfeld I,* this Court found the U.S. government could not mandate use

of an unapproved vaccine in accordance with labeling requirements (CFR § 201.56) in addition

to 10 U.S.C. § 1107.  *See Rumsfeld I*, 297 F.Supp.2d at 134.  Requirements on content and

format of labeling for human prescription drug and biological products further supports the

---

[84] Id. at p. 7-8.

position that experimental vaccines cannot be forced on people.  21 CFR 201.56.[86]  A vaccine is

both a drug and biological product.  See FDCA 201(g), 21 U.S.C. 321(g); 42 USC 262(i)(l).

### i.  IRREPARABLE INJURY.

A person cannot be un–vaccinated.  Once a person in violation of informed consent and

with possible medical risks – not merely for the average person but for an individual with

specific, personalized medical history and medical conditions – the vaccine cannot be removed.

Defendants face a profound variety of irreparable potential harms.  In the case of C19

EUAs, long-term side effects, severe or minor, are unknown because there are no PRIOR

approved mRNA vaccine in the U.S.  In 2020, the University of Pennsylvania conducted an

mRNA Review, which addresses the lack of sufficient data on mRNA vaccines in 2020:

> While there is not sufficient data to statistically test these observations, a few
> trends are seen in the data.  First, the rate of adverse events and the rate of serious
> adverse events were higher after a subject's second injection compared to the first
> one.  Second, subjects receiving higher doses of the vaccine reported more
> adverse events and more severe adverse events.  There is a possible trend towards
> a reduced rate of adverse events in older subjects than in younger ones.  There is
> not sufficient data to permit any conclusions about the comparative safety of
> specific vaccines.  While one study reported on mRNA influenza vaccines and
> another reported on a respiratory syncytial virus vaccine, there is not sufficient
> evidence to draw more generalized comparisons of the safety of mRNA vaccines
> compared to other types of vaccines.[87]

---

[86] "The FDA, the only agency that this Court could properly defer to in determining AVA's status as an investigational drug, has failed to provide formal opinion as to AVA's investigational status. Having made that determination, the Court is required to make its own inquiry and determination regarding AVA's investigational status. The Court looked at the labeling requirement, 21 C.F.R. § 201.56, which mandates that "no implied claims or suggestions of drug use may be made if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness." Doe # 1 v. Rumsfeld, 297 F. Supp. 2d 119, 133, (D.D.C. 2003).

[87] Adverse Effects of mRNA Vaccines: An Evidence Review from the Penn Medicine Center for Evidence-based, Practice December 2020, director Nikhil K. Mull, MD  (CEP) Lead analyst: Matthew D. Mitchell, PhD (CEP) Clinical review Patrick J. Brennan, MD. CMO) http://www.uphs.upenn.edu/cep/COVID/mRNA%20vaccine%20review%20final.pdf at p.11, *Primary Studies*; accessed November 6, 2021

The above review supports the undisputable fact that all of the truly reliable data for both short-term and long-term negative side effects, including myocarditis, blood clotting, Guillain-Barré Syndrome (GBS), and death, has yet to be collected.  It will be based on the results observed during the mass human experiment now being conducted and in which humanity is participating unwittingly, without IC.  The FDA admits that safety data is lacking—data now being collected with every injection.[88]  In an FDA advisory committee meeting convened October 26, 2021 to debate if C19 vaccines should also be given to children aged 5-11, Dr. Eric Ruben, Editor-in-Chief of the New England Journal of Medicine (NEJM), opined: "We're never going to learn about how safe a vaccine is unless we start giving it."[89]  His honesty conflicts with assurances by regulatory bodies and the media that the vaccine is thoroughly safe and effective for all.

The loss of a constitutional right, "for even [a] minimal period of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "When reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); see also *Newsome v. Norris,* 888 F.2d 371, 378 (6th Cir. 1989)  ("The Supreme Court has unequivocally admonished that

---

[88] "The number of participants in the current clinical development program is too small to detect any potential risks of myocarditis associated with vaccination.  Long-term safety of COVID-19 vaccine in participants 5 to <12 years of age will be studied in 5 post-authorization safety studies, including a 5-year follow-up study to evaluate long term sequelae of post-vaccination myocarditis/pericarditis."  From the FDA's Vaccines and Related Biological Products Advisory Committee Meeting Document.  October 26, 2021; Accessible at: https://www.fda.gov/media/153409/download; last accessed: November 12, 2021.

[89] YouTube: Vaccines and Related Biological Products Advisory Committee – 10/26/2021; Streamed live on October 26, 2021; https://youtu.be/laaL0_xKmmA?t=24751; last accessed: October 30, 2021.

even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing Elrod).  Because "a constitutional right is being threatened or impaired" in this case, "a finding of irreparable injury is mandated."  "[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008).  Because intangible injuries lack adequate legal remedy, "intangible injuries [may] qualify as irreparable harm." *Ibid*. *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Furthermore once the mRNA injection is in the body, <u>there is no way to remove it</u> or to reverse the processes whereby spike proteins are generated, a process which innumerable doctors have been steadily reporting is a most dangerous enterprise.  Irreparable harm is one that "cannot be undone," and an injunction is appropriate if "anticipated injury is imminent and irreparable." *ADT v. Capital Connect*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015).  As the court is aware, discussing currently available C19 treatment options or asking whether there exists legitimate basis for an EUA[90] are both haram—haram despite our knowing that, for example, myocarditis is a big risk factor in mRNA experimental shots.[91]  So much so that countries like Iceland have halted certain of these C19Vs.[92]  The CDC is aware of the substantial risk.[93]

---

[90] See "the Association of American Physicians and Surgeons (AAPS) presents a frequently updated table of studies that report results of treating COVID-19 with the anti-malaria drugs chloroquine (CQ) and hydroxychloroquine (HCQ, Plaquenil®)."
[91] Myocarditis after Covid-19 mRNA Vaccination; Sept 30, 2021. https://www.nejm.org/doi/full/10.1056/NEJMc2109975; last accessed Oct. 15, 2021)
[92] Iceland Halts Moderna Jabs: https://californianewstimes.com/iceland-halts-moderna-jabs-over-heart-inflammation-fears/552346/; last accessed: Oct 15, 2021.
[93] Myocarditis Occurring After Immunization With mRNA-Based COVID-19 Vaccines; 6/21/21. https://jamanetwork.com/journals/jamacardiology/fullarticle/2781600; accessed Oct. 10, 2021)

Inflamed heart tissue following vaccination[94] has caused the CDC to update its risk

guidance.[95]  Severe allergic reactions, including anaphylaxis, have also been reported

following the Pfizer-BioNTech C19V during mass vaccination outside of clinical trials.[96]

Blood Clotting[97] and clotting-induced amputations[98] are also common, but Covid public

health experimental therapy promoters know to call such incidents "rare" regardless of

how frequently they occur.[99]  Another known problem is Antibody Dependent

Enhancement (ADE) resulting from the vaccine "enhanc[ing] the infectivity.[100]  As of the

day of this filing, there have been 18,461 C19 vaccine-induced deaths reported to

VAERS,[101] compared to 8,673 for the preceding 30 years for ALL other vaccines,[102] and

the World Health Organization has recorded 2,510,797 adverse drug reactions from the

C19VHE as of November 5, 2021.[103]  It is hard for inmates paying a daily price in terms

of prejudicial custodial conditions to understand how people can look at this data and not

---

[94] FDA News Release Coronavirus (COVID-19) Update: June 25, 2021
https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-june-25-2021; last accessed Oct. 10, 2021.

[95]  Myocarditis and Pericarditis Following mRNA COVID-19 Vaccination; Updated June 23, 2021: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/myocarditis.html; accessed Oct. 10, 2021

[96] https://www.fda.gov/media/144413/download; last accessed Oct. 10, 2021.

[97] Doctor Tells How Moderna COVID Injections Killed And Disabled Indigenous People:
https://www.globalresearch.ca/canadian-doctor-defies-gag-order-tells-public-how-moderna-covid-injections-killed-permanently-disabled-indigenous-people/5743695; Oct. 10, 2021

[98] https://www.dailymail.co.uk/health/article-9826739/Minnesota-woman-legs-AMPUTATED-contracting-COVID-19-days-receiving-vaccine.html; last accessed Oct. 10, 2021.

[99] https://www.thegatewaypundit.com/2021/10/nba-player-got-blood-clots-covid-vaccine-ends-season-nba-told-keep-quiet-video/; last accessed: Oct 16, 2021.

[100] The SARS-CoV-2 Delta variant is poised to acquire complete resistance to wild-type spike vaccines: https://www.biorxiv.org/content/10.1101/2021.08.22.457114v1.full; last accessed: Oct 20, 2021.

[101] https://www.cdc.gov/vaccinesafety/ensuringsafety/monitoring/vaers/access-VAERS-data.html; https://openvaers.com; both last accessed November 5, 2021.

[102] VAERS death counts must be multiplied by at least 100 to arrive at the true and accurate number; See Footnote 66.

be concerned.  Some people suggest the number of reports is due to the massive number
of experimental shots administered, but even after accounting for this, the number of
reports are still astronomical compared to previous years.  When comparing deaths <u>per
million vaccine doses</u> (a) from 2010-2020; and (b) for we see nearly 40 deaths per
million C19VHE injection, versus an average of 1.6 per million for <u>all other vaccine
injections</u> from the previous 10 years:[104]



No matter how one looks at the data, or what specific types of adverse events one
focuses on, the horrifying spike in C19V adverse reaction reports does not go away.
Separate from VAERS, the WHO maintains its own repository of reported adverse drug
reactions (ADRs).  In 2020, there were 2,264 ADRs[105] from the C19 vaccine, because it
was not available for participation until December that year.  As maximum participation
was urged, <u>ADRs shot up to 2,510,797, a 110,851.96% increase from 2020 to 2021</u>, so

---

[104] The Defender.  September 29, 2021.  Safety Signals for COVID Vaccines Are Loud and
Clear. Why Is Nobody Listening?  Accessible at:
<u>https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda</u>; last accessed: November 12, 2021.
[105] See Footnote 57

far, as of November 14, 2021.  The Honorable Court, when not relying on the news

media as a healthy gauge of reality, can see that the human experiment is not going

well.[106]  Even if it were going very well, this would not be invitation to discard IC or

human rights.  Among the risks Inmates want to avoid are cancer and autoimmune

diseases.  A doctor found a "20 times increase" of cancers in C19 vaccine-injected

patients.[107]  He said the C19 vaccine caused auto-immune harm via a "reverse HIV"

response."[108]  Even if a truth seeker schizophrenically ignored data showing significant

injury and death, she would still be stuck with the problem of the known extremely

negligible and dubious efficacy of the drug.  The Pfizer Fact-Sheet on makes clear, under

Benefits of the PFIZER-BIONTECH COVID-19 vaccine: "*The duration of protection*

*against COVID-19 is currently unknown.*"[109]  Counsels also invite the Court's attention

to a study conducted by the DOD and Joint Artificial Intelligence Center (JAIC) using an

Artificial Intelligence program called "Project Salus," which analyzed data on 5.6

million Medicare beneficiaries aged 65 and older.[110]  Salient points include that C19

vaccine effectiveness is confirmed to wane over time, that prior infection and the

immunity it confers is superior, and that real-world efficacy of mRNA vaccines is

(unsurprisingly) lower than was reported in fraudulent "clinical trials."  This is also borne

out by Dr. David Bauer of the Francis Crick Institute, a vaccine expert and vaccine

proponent who explains that C19 vaccines decimate the body's natural ability to fight not

---

[106] *Id.*
[107] twitter.com/ToTheLifeboats/status/1430589141344034816; last accessed: Oct 15, 2021.
[108] *Id.*
[109] Vaccine Information Sheet; https://www.fda.gov/media/153716/download; accessed 10/15/21
[110] Artificial Intelligence Analysis from US Department of Defense shows vaccines causing ADE: https://www.humetrix.com/powerpoint-vaccine.html; last accessed: Oct 15, 2021.

just C19 itself, but likewise other viruses and diseases in the wild, because the mRNA

C19 vaccine destroys the "gold standard" of natural immunity, whether just a normal

baseline immunity or one ultra-enhanced and strengthened through prior C19

infection.[111]

Attorney Elizabeth Brehm recently requested from the CDC "[d]ocuments

reflecting any documented case of an individual who: (1) never received a COVID-19

vaccine; (2) was infected with COVID-19 once, recovered, and then later become

infected again; and (3) transmitted SARC-CoV-2 to another person when reinfected."

The CDC responded on November 5, 2021 that "a search of our records failed to reveal

any documents pertaining to your request."  If the CDC could show that the vaccinated

have a lower transmission rate, it assuredly would do so, and would be loudly touting that

evidence.  By its response, it is reasonable to conclude the CDC is either completely

disinterested in natural immunity (*even if it delivers superior results*, as already shown by

the most advanced artificial intelligence system available to our DOD), or perfectly

aware of and suppressing such data.[112]

### IV. Balance of Equities (Hardships) and the Public

---

[111] Recipients of Pfizer jab have 5-6 times lower antibodies for Delta Variant of Covid; David Bauer, PhD.  Accessible at:  https://www.crick.ac.uk/research/find-a-researcher/david-lv-bauer; last accessed: Oct. 16, 2021; https://youtu.be/duVymoB95T0; last viewed: November 8, 2021. See also Dr. Peter McCullough Affidavit filed in 8:21-cv-01367-JVS-KES McCullough **EXHIBIT K**

[112] Becker News: CDC Unable to Document Covid Transmission Among Previously Infected. November 14, 2021: https://beckernews.com/busted-cdc-unable-to-document-a-single-case-of-covid-transmitted-from-a-previously-infected-person-to-another-42990; last accessed: November 14, 2021.

There are presently no licensed C19 vaccines in the U.S.[113]  The C19 "vaccine" is

strictly experimental and "not licensed for any indication."[114]  A vaccine is a drug and

biological product.  See FDCA 201(g), 21 U.S.C. 321(g); 42 USC 262(i)(l).  This is a

first for mRNA technology and Lipid Nanoparticles used to transport it:  "The vaccines…

are…a milestone for the nanoparticle field..."[115]  Historically, this research has been

unsuccessful, and the current lack of C19 vaccine transparency is alarming.  The FDA's

EUA guidance states: *"There are currently no licensed mRNA vaccines in the U.S.*"  In

its May 25, 2021-issued document, EUA Guidance for Industry,[116] the FDA explains:

> This guidance describes FDA's current recommendations regarding the data and
> information needed to support the issuance of an *Emergency Use Authorization
> (EUA) under section 564 of the FD&C Act (21 U.S.C. 360bbb-3) for an
> investigational vaccine* to prevent COVID-19, including chemistry, manufacturing,
> and controls information (CMC); nonclinical data and information; and clinical
> data and information, as well as administrative and regulatory information.  *Id.* at
> f.n. 5, (emphasis added).

According to § 564 of the Federal Food, Drug, and Cosmetic Act, lawful application of

the terms of a lawful emergency use authorization ("EUA") includes a Refusal Option and the

Right to IC.  Both these are set forth under: (e) <u>Conditions of authorization</u>.

(1) **<u>Unapproved product:</u>**

---

[113] "There are currently no licensed mRNA vaccines in the United States." Understanding
mRNA COVID-19 Vaccines, Updated Mar. 4, 2021; at:
https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/mRNA.html; last
accessed: October 20, 2021.

[114] Letter to Pfizer; https://www.fda.gov/media/144412/download; accessed Nov 6, 2021.
See FDA letters granting EUA to Moderna, Pfizer, and Janssen, 2/25/21; 02/25/21; and 02/27/21
respectively; attached as **EXHIBIT L.**

[115] *Without these lipid shells, there would be no mRNA vaccines for COVID-19,* by Ryan Cross,
Chemical & Engineering News, March 6, 2021;
https://cen.acs.org/pharmaceuticals/drug-delivery/Without-lipid-shells-mRNA-vaccines/99/i8;
last accessed: Nov 9, 2021.

[116] Emergency Use Authorization for Vaccines to Prevent COVID-19: Guidance for Industry
(May 25, 2021) https://www.fda.gov/media/142749/download; last accessed: Nov. 12, 2021.

(A) **Required conditions.** *With respect to the emergency use of an unapproved product,* the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), *shall,* for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, **including the following**:
(ii) **Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—**
(I) **that the Secretary has authorized the emergency use of the product;**
(II) **of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and**
(III) o**f the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.**

21 USCS § 360bbb-3(e)(1)(A)(i) (emphasis added).

See also the FDA's guidance on the right to IC and the option to refuse:
***How will vaccine recipients be informed about the benefits and risks of any vaccine that receives an EUA?***
FDA must ensure that recipients of the vaccine under an EUA are informed, to the extent practicable given the applicable circumstances, that FDA has authorized the emergency use of the vaccine, of the known and potential benefits and risks, the extent to which such benefits and risks are unknown, **that they have the option to accept or refuse the vaccine, and of any available alternatives to the product.** Typically, this information is communicated in a patient "fact sheet." The FDA posts these fact sheets on our website.

FDA.gov.[117] (emphasis added).

## V.   **Forced or Coerced Medical Experimentation on Prisoners is Forbidden**

The Nuremberg Tribunal birthed the NC, a statement delimiting permissible medical experiments on human subjects, wherein experimentation is justified only if carried out under principles satisfying "moral, ethical, and legal concepts."[118]  IC is applicable to every vaccine ever marketed, but is even more relevant here, as there does not exist, and thus DOC cannot

---

[117] Emergency Use Authorization for Vaccines Explained: https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained; last accessed Oct. 19, 2021.
[118] "Permissible Medical Experiments." Trials of War Criminals before the Nuremberg Military Tribunals under Control Council Law No. 10. Nuremberg Oct 1946 – Apr 1949, Washington. U.S. Government Printing Office (n.d.), vol. 2. pp. 181-182.

administer, any FDA-approved drug.  No person, whether bonded or free, may be forced to

submit to medical experiments sans IC.  The NC and DH condemns doctors and others not just

for trivializing IC, but also for standing in the way of life-saving medication.  No person may be

forced to commit a crime, and whomsoever commits crimes is personally responsible.

## VII.    CONCLUSION

Courts must not defer to false statements by the news media or anyone simply because

powerful institutions argue for them, or because a political climate encourages acceptance of

daunting absurdities; but rather, courts must be consistent and reliable in applying strict scrutiny

where government action violates the Due Process Clause and the Equal Protection Clause of the

14th Amendment with regard to classifications burdening certain fundamental rights. *Skinner v.*

*State of Oklahoma, ex rel. Williamson, 316 U.S. 535 (1942).*  Robust and durable natural

immunity[119] is a scientific fact, and it is impossible to reverse the effects of a genetic vaccine

experimental injection.  Constitutional protections are not meant to be suspended in times of

crisis.  They may only be changed by the people, and they have not been changed.  Crises—

whether real or artificially manufactured—are not an invitation to throw Constitutional

protections to the wind, but to take extra care that they be observed to exactness.  Known

dangers, including risk of death, violate bodily integrity and personal autonomy of Defendants

held in DOC custody, have Constitutional and statutory rights to refuse this medical intervention

without punitive consequences.  The DOC C19 Policy and OLC EUA Vaccine Opinion are

interpretive guidance, not the product of notice, comment rulemaking or adjudication, nor of

reasoned decision making supported by substantial evidence, and thus are unsupported by

---

[119] https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf
https://www.msn.com/en-us/health/medical/dr-makary-says-natural-immunity-is-more-effective-then-vaccine-immunity/ar-AAMX3sM last accessed: Nov. 16, 2021

reasonable interpretations of US law, outweighed by Constitutional protections, and owed no

deference by this Court.  Further, Defendants should not be required to exhaust administrative

remedies to challenge the DOC policy and OLC opinion.  In fact, the DOC Covid Policy violates

standards required by the USMS.  A "governmental purpose to control or prevent activities

constitutionally subject to state regulation may not be achieved by means which sweep

unnecessarily broadly and thereby invade the area of protected freedoms." *Griswold v.*

*Connecticut*, 381 U.S. 479, 485, 85 S. Ct. 1678, 1682, 14 L. Ed. 2d 510, 516, (1965) (*citing*

*NAACP v. Alabama*, 377 U.S. 288, 307.  But Defendants, presumed innocent, have remained in

custody in punitive conditions instituted upon unsupported predicates.  The NC remains "the

most complete and authoritative statement of the law of IC to human experimentation.[120]  It is

enshrined in "international common law and may be applied in both civil and criminal cases, by

state, federal and municipal courts in the United States."[121]  US Courts afford almost mythical

qualities to *Jacobson*—a decision issued before the genocide and Holocaust of WWII, horrors so

profound that all civilized nations came together and promulgated Nuremberg protocols,

unanimously adopted at every level of society and affirmed and reaffirmed in international law.

How profoundly sad that US Courts, in humanity's hour of greatest need, have not stood more

strongly against an evil that has sought to return to the era of forced medical experimentation

while making IC optional and appealing to a century-old Supreme Court decision predating

penicillin that provided previous justification for horrendous medical experiments prior to NC.

The post-WWII world cried with a terrible cry, "Never again!" yet courts have thus far

spectacularly failed in their charge, and American jurisprudence must redeem itself in the face of

---

[120] G. Annas, L Glantz, Informed Consent; The Subject's Dilemma 21 (1977).
[121] *Id.*

great peril.  We have seen the CDC recommend easing lockdown measures and granting privileges to C19 vaccine recipients.  Those who opt out, including those with natural immunity, or those known to be at even higher risk of harm than the <u>astronomical baseline level of risk already evident from VAERS and VigiAccess</u>—*are denied such privileges*.  Just as in dark former times dehumanized minority groups have been singled out and marked as second-class citizens, so also do "vaccine passports" in numerous jurisdictions manifest the same apartheid today.  Legislatures and regulatory agencies only recently (and insanely) felled two foundational western principles in medicine and law: natural immunity and IC.  Our society has been captured by a cartel, with no resistance or strong inclination to defend western civilization expressed thus far by the judiciary.  The DOC's coercion mirrors the broader unconstitutional medical segregation now being seen in society-at-large—hospitals are starting to deny not just organ transplants but basic medical care to the unvaccinated.[122]  Taken in sum, these despicable practices take inspiration from 1930's era efforts to segregate "unclean" or "diseased" members of society who at first were just shunned, but eventually, confined and then…much worse.  This Honorable Court has an opportunity to come down strongly in favor of humanity and to manifest the wisdom and prophecies of our Founders—that the judicial branch would rein in deceit and betrayal of other actors, that truth, justice, liberty, humanity, and the hope of a bright future for our children and future generations of Americans might prevail.  We respectfully request that the Court release the above Messrs. Harrelson and Meggs to home confinement.

---

[122] "Hospital system says it will deny transplants to the unvaccinated" The Washington Post; October 5, 2021. https://www.washingtonpost.com/health/2021/10/05/uchealth-transplant-unvaccinated; last accessed October 16, 2021; *See also:* Becker Hospital Review: "One physician's case for refusing to treat unvaccinated patients in person." September 9, 2021. https://www.beckershospitalreview.com/hospital-physician-relationships/one-physician-s-case-for-refusing-to-treat-unvaccinated-patients-in-person.html; last accessed November 15, 2021.

Dated:  November 16, 2021                    RESPECTFULLY SUBMITTED

                                              /s/ Brad Geyer
                                              Bradford L. Geyer, PHV
                                              PA 62998
                                              NJ 022751991
                                              Suite 141 Route 130 S.
                                              303
                                              Cinnaminson, NJ 08077
                                              Brad@FormerFedsGroup.Com
                                              (856) 607-5708

                                              /s/ Jonathon Alden Moseley
                                              Jonathon Alden Moseley, Esq.
                                              DC Bar No. VA005
                                              Virginia State Bar No. 41058
                                              Mailing address only:
                                              5765-F Burke Centre Parkway, PMB #337
                                              Burke, Virginia 22015
                                              Telephone:  (703) 656-1230
                                              Contact@JonMoseley.com
                                              Moseley391@gmail.com


## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2021, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

                                              /s/ Brad Geyer
                                              Bradford L. Geyer, PHV
                                              PA 62998
                                              NJ 022751991
                                              Suite 141 Route 130 S.
                                              303
                                              Cinnaminson, NJ 08077
                                              Brad@FormerFedsGroup.Com
                                              (856) 607-5708