**IN THE UNITED STATES DISTRICT COURTFOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) **Criminal No. 1:22-cr-00015-APM** |
| **v.** | ) |
| **THOMAS CALDWELL,** | ) |
| **And** | ) |
| **UNITED STATES OF AMERICA,** | ) **Criminal No. 1:21-cr-00028-APM** |
| **v.** | ) |
| **CONNIE MEGGS,** | ) |
| **Defendant** | ) |

**REPLY IN SUPPORT DEFENDANTS'
JOINT MOTION TO TRANSFER VENUE**

I.     **The D.C. jury pool has been prejudiced against the Oath Keepers**.

Just this week, President Biden accused the "MAGA crowd" of being the "most extreme political organization that's existed."[1]  The President previously called J6 "[t]he worst attack on our democracy since the Civil War."[2]  .  As noted in previous filings, the Attorney General of the United States has publicly suggested that Oath Keeper members are part of a "domestic terrorist" organization.  The entire city was impacted either personally or tangentially as a result of the events of J6.  The effect on D.C. has been profound and a jury, *even if they honestly tried*, could be fair and impartial against the *Rhodes* and *Crowl* defendants.

The burden is not on the defendants to prove that every single resident of D.C. cannot be fair and impartial.  The standard is not to whittle down the D.C. jury pool to the point of finding 12

---

[1] Brooke Singman, *Biden says 'MAGA crowd' is most extreme political organization that existed in recent American history* (May 4, 2022).  www.foxnews.com/politics/biden-maga-most-extreme-political-organization.
[2] State of the Union Address (Apr. 22, 2022).

individuals who will try their best to be fair and impartial.  The D.C. jury pool has been irreparably prejudiced by the events of J6 and the general political environment in D.C.  The surveys that have been conducted on behalf of these defendants and others convincingly prove the obvious:  the potential DC jury pool is highly predisposed against these Defendants.

The results of three different polls in addition to the Skilling Factors, are compelling proof that overwhelming prejudice exists in D.C.  Even more compelling:  16 defendants have joined the instant motion, and others who have now pleaded guilty had previously joined a prior request to transfer venue.  Many of these defendants are represented by experienced defense counsel from the greater D.C. area.  It is no secret to prosecutors and defense attorneys who have practiced both within and outside the District that the D.C. jury pool is defendant-friendly in federal cases.[3]  That 16 experienced defense attorneys would seek a litigation refuge away from the D.C. jury pool is powerful proof that the potential *venire* is hostile to their clients, including the Survey commissioned by the Federal Public Defenders' Office.  \

## II.      **Changing Venue to Virginia is Appropriate**.

The *Crowl* and *Rhodes* defendants would prefer to have their cases heard far-away from the District, as pretrial publicity and a politically active jury pool will not result in a fair trial.  However, with a venue transfer, the defendants want to limit the inconvenience to the Court, the government, D.C.-based witnesses, and others.  Accordingly, the defendants have suggested that the Court move the case a whopping eight miles from D.C. to the U.S. District Court for the Eastern District of Virginia ("EDVA").  These defendants would agree to this move, which would greatly enhance their chances for a fair trial.  The jury pool makeup in the EDVA according to the defense survey, is far less prejudiced against the defendants than a potential D.C. jury pool, and

---

[3] In fact, undersigned counsel contacted the Federal Public Defender's Office in the District and requested sample motions to transfer venue.  The response:  "I asked around our office but nobody has ever heard of a defendant trying to transfer their case out of D.C."

peremptory strikes will allow the defense to ferret out biased jurors.

###### III.     The January 6 Committee's activities require a venue transfer.

In *Skilling v. United States*, the Supreme Court distinguished *Rideau*, where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. This factor weighs heavily in favor transferring venue. On top of the incessant negative publicity regarding J6 defendants, Congress has convened the Select Committee to Investigate the January 6th Attack on the United States Capitol ("J6 Committee"), which is running parallel to the instant court proceedings. Rep. Kinzinger has admitted that the J6 Committee is engaged in a criminal investigation to determine whether laws were broken on January 6, 2021.[4] And Rep. Adam Schiff, a member of the J6 Committee, revealed on national television that "all [the J6 Committee] can do is expose all the malefactors, follow the evidence, wherever it leads, tell the American people the story of what went into January 6th, all the planning that went into it, who was behind it in terms of the money."[5] The J6 Committee will be holding hearings all summer and is expected to release its report in September, just before the first *Rhodes* trial is set to begin.

In its opposition, the government did not address *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952), which held that the trial court abused its discretion in not granting a lengthy continuance in light of prejudicial congressional committee hearings. Last week, this Court expressed skepticism that the D.C. Circuit would follow the holding in *Delaney*. However, the

---

[4] ABC News, 'This Week' Transcript 12-19-21: Rep. Adam Kinzinger, ABC News (Dec. 19, 2021), https://abcnews.go.com/Politics/week-transcript-12-12-21-dr-anthony-fauci/story?id=81833124; CNN Politics, *Kinzinger says January 6 panel is investigating Trump's involvement in insurrection* (Dec. 19, 2021) https://www.cnn.com/2021/12/19/politics/adam-kinzinger-trump-investigation-insurrection-cnntv/index.html

[5] Late Night with Seth Meyers, *Rep. Adam Schiff Says It Was Torture Listening to Kevin McCarthy's Speech*, YouTube (Nov. 22, 2021), https://www.youtube.com/watch?v=mPvKNFC615o.

D.C. Circuit in a Watergate-era case, after reviewing the conduct of the trial below, specifically cited *Delaney* in a footnote after stating:  "Our close examination of the procedures followed by the trial judge has satisfied us that he properly made the determinations required of him under the controlling decisions of this court."  *United States v. Ehrlichman*, 546 F.2d 910, 916 n. 8 (D.C. Cir. 1976) (distinguishing *Delaney* on the grounds that the Senate Watergate hearings ended almost a year before the trial commenced and "the defendants were not under indictment at the time of the hearings.").  *United States v. Haldeman* also cited *Delaney*, but distinguished it on similar grounds as in *Ehrlichman*.  *See United States v. Haldeman*, 559 F.2d 31, 63, n.40 (D.C. Cir. 1976).

Respectfully, Ms. Meggs and Mr. Caldwell ask:  Does the Court want to risk a possible retrial of the *Crowl* and *Rhodes* defendants based upon a percentage chance that the D.C. Circuit would refuse to follow *Delaney*, a case that it has previously cited in two cases as required, but distinguished?  *Delaney* held:

> [I]n being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, *we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity*.

*Delaney v. United* States, 199 F.2d at 114 (emphasis added).[6] [7]

---

[6] *See also Marshall v. United States*, 360 U.S. 310, 312 (1959) "The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence.");  *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012) ( holding that where pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding);  *Mu'Min v. Virginia*, 500 U.S. 415, 429-430 (1991) (*citing Patton*, *supra*, at 1035) ("Under the constitutional standard, on the other hand, 'the relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.'").  .

[7] *See also Pamplin v. Mason*, 364 F.2d 1, 5 (5th Cir. 1966) ("*Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue,*

Additionally, it is not the defendants' fault that Congress has decided to publicly engage in high-profile committee hearings or that Members of Congress and other prominent officials continue to unleash prejudicial comments. The comments made by these parties are far more prejudicial than the statements made by former Acting U.S. Attorney Michael Sherwin, which prompted the Court to conduct an emergency hearing in March of 2021. In fact, these comments, especially in a politically active city like the District, are continuous body-blows to the defense.

The Court can avoid any possibility of a potential retrial by, with the consent of the defendants, transferring these cases to the Eastern District of Virgina. Additionally, a transfer to the Eastern District of Virginia, Alexandria would likely allow the Court to try all defendants in each trial at the same time, thus conserving judicial resources. The Eastern District of Virginia, courthouse in Alexandria has a massive ceremonial courtroom that can accommodate large trials. Additionally, the Eastern District of Virgnia has multiple military bases that could be used for trials, including Ft. Belvoir (Fairfax, Va.), Ft. Myer (Arlington, Va.), and Ft. A.P. Hill (Bowling Green, Va.), which have large buildings and are outfitted with "brigs" that can house detained defendants during recesses in trial. In short, a trial outside of the District, in the eyes of the Defendants, would not be nearly as impacted as a trial in the District. If the Court agreed to such a transfer, the Defendants would agree to not seek continuances of their cases based on *Delaney*.

IV.     **The instant case is different than single-defendant cases**.

While the government is correct that venue transfer motions have been rejected in other cases, *Crowl* and *Rhodes* are distinguishable as they involve multi-defendant conspiracies. Potential D.C. jurors would be hard-pressed to name minor defendants or have any specific information regarding individual defendants. By contrast, the "Oath Keepers" have been all over the news. These defendants have been slandered as "racists" and "domestic terrorists" by the local

_____

*to assure a fair and impartial trial*.").

press.  Caldwell, for example, was falsely accused of hunting down Members of Congress in a previous indictment.  Defendant Stewart Rhodes has been falsely accused in the press of having a backyard filled with underground bunkers.  It is beyond unfair for this slandered group of Defendants to have to be judged by a jury pool which has been poisoned to think that they are racists and domestic terrorists.

The government repeatedly has argued that this is an *extraordinary case*, but now attempts to argue that it is an ordinary case that a careful *voir dire* can address.  For example, President Joe Biden has called January 6th "[t]he worst attack on our democracy since the Civil War."[8]

The government's opposition to moving this case to Alexandria Virginia is lacking in substance where these defendants who are facing charges that expose them to over 20 years in prison, and raise genuine concerns of severe prejudice, as set forth in the Memorandum in further support of the Motion to Transfer Venue.

The government concludes by arguing against moving the case to Alexandria because they argue that the Alexandria Court pulls from seven counties, and is not as large as the Eastern District of Virginia, but ignores the fact that Defendants are attempting to confer, and raising an opportunity for the court to avoid severe prejudice by simply taking the case across the river, a de minis burden for this court, the government and the defendants simultaneously could face a jury panel who have not been personally impacted by the January 6th protests as DC residents have been.  In the duty to ensure equal protection of the law[9], rather than purely adversarial goals, such a move would insulate the government's own cases, assuming they prove their cases, based on a

---

[8] On April 28, 2021 in State of the Union Address.

[9] "Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints." *U.S. v. Batchelder*, 442 U.S. 114, 124-25 (1979). These constraints include the Fifth Amendment's Equal Protection Clause, which requires that "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Oyler v. Boles*, 368 U. S. 448, 456 (1962).

simple move across the river, (where there may even be some practical efficiencies, such as possibly the ability to try more than six or seven defendants at once).

**V.**       **The government's authorities are unconvincing**.

The government fails to counter the defendants citation to *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City (Western District of Oklahoma) would be constitutionally unfair). The *McVeigh* court observed that "[t]here is no disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. *The effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary.*" *Id*. at 1470 (emphasis added). Again, if J6 is equivalent to the Oklahoma City bombing, which Attorney General Garland supervised the prosecution of and agreed to McVeigh's request for a venue change, it would seem that a venue transfer is appropriate for the J6 defendants.

The government cites the Sixth Amendment as guaranteeing the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed" and *U.S. v. Cores*, 356 U.S. 405, 409 (noting that venue for § 252 (c) lies in any district where the alien crewman willfully remains after the permit expires), to assert that J6 trials must be held in D.C. However, the indictments in *Crowl* and *Rhodes* allege that the "QRF" and other portions of the charged conspiracy occurred in northern Virginia. Accordingly, the Eastern District of Virginia Alexandria would be a proper venue, as many overt acts allegedly occurred therein.

The government's reliance on *Morgan v. Illinois*, 504 U.S. 719, 729 (1992), to argue that *voir dire* is the proper tool for identifying unqualified jurors is misplaced. In *Morgan*, the Court actually reversed and remanded the jury's verdict "[b]ecause the inadequacy of voir dire leads us to doubt that petitioner was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment, his sentence cannot stand." *Id*. at 739 (citations omitted).

'The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is a protection against juror bias.'  *United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992) *(citing McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554, 78 L. Ed. 2d 663, 104 S. Ct. 845 (1984)).  In *Boney*, the D.C. Circuit remanded the case for an evidentiary hearing where one juror lied about his felony conviction. *See Id.*  The dissent therein cited and explained a holding that is more akin to the facts in the case at bar, "[i]n the bias context, the impaneling of a juror properly challenged for implied bias is reversible error. See, e.g., *Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1050-51 (4th Cir. 1984), so holding because the challenged juror held stock in the defendant corporation. *Cf. Peters v. Kiff*, 407 U.S. 493, 33 L. Ed. 2d 83, 92 S. Ct. 2163 (1972)." *Id*. at 643. (RANDOLPH, Circuit Judge, dissenting in part and concurring in part).

And it is for the convenience of the court and the parties, that the Defendants have raised transferring to the Eastern District of Virginia, and even to the Alexandria Courthouse, which is only 8.1 miles away, due to the fact that the personal profound impact of the incident itself is significantly reduced for residents outside of the District of Columbia, while being a reasonable alternative with a significantly reduced burden on the court or the government than transferring to other regions.  A motion to change the venue of a criminal trial invokes an application of the governing criteria to the trenchant facts of the particular case.  The government cites to *Jones v. Gasch*, 404 F.2d 1231, (id. at 5), which states that, 'Rule 21(b) "permits a transfer in any case on motion of the defendant on a showing that it would be for the convenience of parties and witnesses, and in the interest of justice."' *Id* at 1243.

The government repeatedly cites to *In United States v. Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015)(per curium)(rev'd by 142 S. Ct. 1024, 1034, 212 L. Ed. 2d 140, 151 (2022)), the Court addressed the standard of review in *voir dire*, and there was no discussion on a motion for change of venue.  *Id*.  The government also cited to *United States v. Youssef*, 327 F.3d 56, 155 (2d Cir.

2003), but that case is only on point to the extent that the venue was deemed appropriate based on location of the Defendant's arrest, which is not the case here.  It is undisputed that Defendants were arrested in their home states.  *See Id*. 114-115 ("Congress enacted 18 U.S.C. § 3238 under the above constitutional provisions to specify the applicable venue when a crime is committed outside the United States:  the trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought.")  Moreover, the government's citation to *U.S. v. Moussaoui*, 43 App'x 612, 613 (4th Cir. 2002) (per curium) (unpublished), appears misplaced because the court found that Defendants could only appeal a change of venue motion on direct appeal, wherein they appeared to have made procedural errors. ("An order denying a change of venue is also reviewable on direct appeal. id. at 614.)

## VI.    Size and Characteristics of the Community

The government argues that "[t]here is no reason to believe that the District's entire population of *nearly* 700,000 people was so affected by these events that the Court cannot seat an impartial jury here." (ECF 662 at p. 7, emphasis added)[10].  A significant finding in the ILR Survey was the elevated concern by D.C. residents vis-a-vis their safety concerns in light of J6.   (Ex. A). Respondents were asked:  Have you experienced increased concern about your own safety or the safety of people important to you due to the Events of January 6th?

The difference between the D.C. and the other areas is astounding:

---

[10] The government simply dismisses the evidence of bias (when the motion was initially brought the court dismissed saying in a nutshell that the defendants have no evidence to support their arguments) arguing that "[t]here is no reason to believe that the District's entire population of *nearly* 700,000 people was so affected by these events that the Court cannot seat an impartial jury here." (ECF 662 at p. 7, emphasis added).  The Jury Administrator has supplemented testimony to explain that on January 19, 2022 a new master wheel for juries to be drawn from is based upon 599, 237 names.  (See Letter of January 25, 2022 attached hereto as Exhibit D).  Obviously that pool systematically gets reduced by each set of jurors called for jury duty during the year.



The survey included four questions as to the personal impact J6 had on the respondents; the responses confirming personal impact on D.C. residents was almost double that of those surveyed in the Eastern District of Virginia.  (Exh. A at 4).

It cannot be seriously disputed that the majority of potential jurors in the District were personally impacted in some way by the events on J6.  This factor weighs heavily in favor of transferring the instant cases to the EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA D.C. is a city that, as a whole, feels that it has been the victim of a crime.  J6 was substantially more impactful than Enron's collapse, which personally affected a few hundred families in a city of 4.5 million residents, who could easily be stricken from the jury pool.

## A.  <u>Nature and Extent of Pretrial Publicity</u>

The instant case involved a barrage of local and national media on J6.  Hundreds of stories covering the Oath Keepers have been published. Additionally, prejudicial statements by Mayor

Bowser[11] and other local DC politicians[12] have poisoned the jury pool.  The defendants have raised two additional areas of prejudice in addition to the news media:  first, the profound personal impact of the events of January 6th on the DC Community; and, second, the J6 Committee, which is running parallel to the court proceedings.  The J6 Committee investigation involves relevant witnesses and investigation, including subpoenas issued to all Oath Keeper defendants for their phone records.

The ILR Study asked respondents four questions related to news coverage in the tested areas.  The survey revealed that D.C. is an outlier when it comes to saturation coverage.  Only 4.83% percent of DC respondents said "never or almost never" in regard to following news coverage, compared to 13.40% said in the Eastern District of Virginia.  (Ex. A, fig. 6).  The survey demonstrates that far fewer potential jurors outside the beltway are taking a personal interest in J6 as compared to their D.C. counterparts.

### VII.    Presumed Prejudice

In *Skilling*, the Supreme Court explained presumed prejudice, and observed why it was lacking in that case:

> Finally, and of prime significance, Skilling's jury *acquitted him* of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. In *Rideau*, *Estes*, and *Sheppard*, in marked contrast, the jury's verdict did not undermine in any way the supposition of

---

[11] *D.C. Mayor Bowser Says Focus Must Shift To 'Domestic White Terrorism'* Politico, https://www.politico.com/news/2021/01/17/bowser-muriel-domestic-white-terrorism-459945

[12] D.C.'s Police Chief also said his officers are stationed across the city and prepared to handle anything that could arise Thursday in light of the anniversary of the insurrection.  And he made a plea to the public for information about the person who planted "not one but two real pipe bombs" in the nation's capital ahead of the insurrection.  One year after the insurrection at the U.S. Capitol, which saw the seat of democracy stormed by supporters of then-President Donald Trump, D.C.'s mayor, police chief and fire chief praised the bravery of the District's first responders.

*DC Mayor, Police And Fire Chiefs Praise First Responders On Jan. 6 Riot Anniversary*, Will Vitka, WTOP News, 01/06/2022  https://wtop.com/dc/2022/01/dc-mayor-police-and-fire-chiefs-praise-first-responders-on-jan-6-riot-anniversary/

juror bias. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.

*Skilling*, 561 U.S. at 383 (emphasis added).  Unlike *Skilling*, four J6 trials before juries have resulted in unanimous jury verdicts promptly returned.  Most recently, on May 2, 2022 Thomas Webster was convicted on all six counts after a jury deliberated about three hours:  "[f]ederal juries in Washington have now found all four defendants who have gone to trial on felony charges guilty in the rioting that began after President Donald Trump urged supporters to go to the Capitol where Congress was confirming Joe Biden's 2020 election victory."[13]

In *Marshall v. United States*, 360 U.S. 310, 312 (1959)), the Court held that the harm to petitioner that resulted when prejudicial information denied admission into evidence was brought before jurors through newspapers required that a new trial be granted. *Id.* at 310-313.

> The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. *Cf. Michelson v. United States*, 335 U.S. 469, 475. It may indeed be greater for it is then not tempered by protective procedures.
>
> *Id*. at 312-313.

The Supreme Court has also held "[w]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 362-363, 86 S. Ct. 1507, 1522, 16 L. Ed. 2d 600, 620, (1966).[14] The case at bar contains a

---

[13] Thomas Webster, retired NYPD officer, found guilty of Jan. 6 assault on police - The Washington Post, May 2, 2022.
https://www.washingtonpost.com/dc-md-va/2022/05/02/webster-guilty-police-assault-jan6/

[14] The government also generally argues that the 'best course when faced with pretrial publicity is *ordinarily* "to proceed to voir dire to ascertain  whether the prospective jurors have, in fact, been influenced by pretrial publicity"' *citing U.S. v Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006)(emphasis added)(discussed the safeguards against prejudice and said "*[w]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, **the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity**.*"); *Pamplin v. Mason*, 364 F.2d 1, 5 (5th Cir. 1966) ("*Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting*

barrage of local media, and some national media, on January 6 as an "insurrection" and then there are individual stories covering the Oath Keepers, as well as political statements by the DC Mayor[15] and other local DC politicians[16].

### a. The ILR Study

The government emphasizes that "a full 70.13% of D.C. respondents said that they "could" render a fair verdict, despite affirmatively admitting to bias." The ILR Survey shows that "91% of DC Community respondents who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case, while other [areas] admit doing so at rates from 49% to 63%." And 30% of D.C. residents admitted to making every prejudicial prejudgment, double the rate of the next highest area. This is damning evidence that a substantial percentage of potential jurors in the District either don't recognize that they cannot be fair and impartial or, more worrisome, that they might feign impartiality to be empaneled on a jury.

The large percentage of D.C. residents who admitted prejudice is shocking and is obvious proof of presumed prejudice. *See, e..g.*, *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) (explaining the standard in addressing profound community prejudice: "[I]n a community where most veniremen

---

probability of unfairness requires suitable procedural safeguards, **such as a change of venue, to assure a fair and impartial trial.**").

[15] *D.C. Mayor Bowser Says Focus Must Shift To 'Domestic White Terrorism*' Politico, https://www.politico.com/news/2021/01/17/bowser-muriel-domestic-white-terrorism-459945

[16] D.C.'s Police Chief also said his officers are stationed across the city and prepared to handle anything that could arise Thursday in light of the anniversary of the insurrection. And he made a plea to the public for information about the person who planted "not one but two real pipe bombs" in the nation's capital ahead of the insurrection. One year after the insurrection at the U.S. Capitol, which saw the seat of democracy stormed by supporters of then-President Donald Trump, D.C.'s mayor, police chief and fire chief praised the bravery of the District's first responders.

 *DC Mayor, Police And Fire Chiefs Praise First Responders On Jan. 6 Riot Anniversary*, by Will Vitka, WTOP News, 01/06/2022  https://wtop.com/dc/2022/01/dc-mayor-police-and-fire-chiefs-praise-first-responders-on-jan-6-riot-anniversary/

will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are *part of a community deeply hostile to the accused*, and more likely that they may unwittingly have been influenced by it."); *Jackson v. Denno*, 378 U.S. 368 (1964) (reaching beyond law and evidence and considering the "psychological reality" of a jury's functioning).  The Government nit-picks at the ILR Study but misses the point.  The defense does not dispute that most prospective DC jurors will try to be fair. What the ILR Study shows is that they *will not* be fair despite claiming and even wanting to be fair. To the point:  *voir dire* cannot cure this issue.

The government ignores the ILR Survey findings that show preconceived beliefs that the J6 defendants pre-planned to go into the Capitol:



(Exh. A, fig. 1).  Well over the majority, 71% of D.C. residents believe that J6 was pre-planned, whereas discovery has produced no evidence that the Defendants planned the Capitol breach.  This result is significant on the issue of intent, which is an essential element of a number of the charges.

The ILR Survey also confirms substantial bias in D.C.'s potential jury pool:



(Exh. A, fig. 2).

The government therefore cites to Irvin, 366 U.S. 717, 723 (1960), (id. at 16), to argue that "the survey does not indicate that D.C. residents are substantially less able to be fair than prospective jurors from other jurisdictions," however, it is the Supreme Court in Irvin that vacated the judgement of the jury finding:

> …No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see."

*Irvin v. Dowd*, 366 U.S. at 728 (emphasis added)(citing Shepherd v. Florida, 341 U.S. 50 (concurring opinion); Moore v. Dempsey, 261 U.S. 86).

The Supreme Court in *Murphy v. Fla.*, 421 U.S. 794, 802 (1975), *citing Irvin*, 366 U.S. at 803, explained the standard in addressing profound community prejudice, "[i]n a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it."

*Murphy*, 421 U.S. at 803.  The *Marshall* Court, *supra,* 360 U.S. at 312, like the *Irvin* Court, *Irvin v. Dowd*, 366 U.S. at 728 and *Murphy v. Florida*, 421 U.S. at 803 recognized that the presumption of prejudice overrides juror declarations of impartiality during voir dire because such attestations may be insufficient to protect a defendant's rights in particularly charged cases.  *See Id.*

The United States Court of Appeals for the District of Columbia speaks more generally to the danger of prejudice to a criminal defendant. "The courts need not rest on the assumption that juries can compartmentalize their minds and hear things for one purpose and not for another. The Supreme Court took the lead in *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), by going behind the historic assumptions of the law of evidence and considering the psychological reality of the jury's functioning, in that case as it related to its consideration of the voluntariness of confessions." *Awkard v. United States*, 352 F.2d 641, 645-646 (D.C. Cir. 1965)("The trial judge in the instant case clearly abused his discretion in permitting the prosecuting attorney to cross-examine defendant's character witnesses on appellant's prior arrests." (emphasis added).

As suggested by the Guidelines, more specific questions, including a hypothetical question about the respondent's potential performance as a juror for a J6 defendant were asked later in the survey. For the earlier questions, respondents did not have any clues that their potential for fairness as a juror was being tested.

Again, over 70% literally just said they would find any j6 def guilty of unspecified crimes with no evidence. They have revealed that they expect to find any J6 Def guilty of unspecified charges without any evidence. It must be presumed that there is prejudicial bias.

**b.  <u>Analysis by the Federal Public Defenders' Office</u>:**

The government attempts to dispute the credibility of the Federal Public Defenders' Commissioned Survey by arguing that it failed to provide an option of saying the respondent was "unsure," but the questions, nonetheless, did give other options.  When asked whether they thought

the "people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them," 71% say "guilty" and 3% say "not guilty." About one of every six volunteer that "it depends," while only 10% offer no opinion as to the guilt of those arrested. (Case No. 1:21-cr-00024-EGS, ECF 101-1, Select Litigation Report commissioned for the PD, D.C., with appendices).   (Attached Mot. Exh. B at p.3, par. 10).

And this result corroborates the ILR Survey, which is not significantly disputed by the government, which found that,

> "Q3. 72% of DC Community respondents said that they are likely to find Defendants guilty – even when given the choice, "It is too early to decide." The median in the Study was 48%.
>
> • Q5. 85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question. The median in the Study was 54%.
>
> • Q6. 71% of the DC Community believes that all who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. The median in the Study was 49%.
>
> • Q9. Over 40% of the DC Community stated they believe all the Events of January 6th were racially motivated, even when offered options to reserve judgment on that question. The median in the Study was 20%.

The government also ignores that the Select Litigation Survey commissioned by the Federal Public Defender retained the services of a media research firm to analyze aspects of news coverage concerning J6.  (Exh. B).  The FPD Survey found that most D.C. residents prejudged the defendants as generally "guilty" and prejudged the element essential to intent. (Exh. B, ¶¶14, 10, 15, 18).   Significant majorities in the District characterized J6 protestors as "criminals" (62%) and have already formed the opinion that these individuals are "guilty" of the charges brought against them (71%).  (Exh. B, at ¶¶ 14, 10).

**c.  <u>Analysis by Zogby Polling Co.</u>**

Defendant Garcia filed a Motion to Transfer Venue and attached a Survey for the District of

Columbia by Zogby, Inc., hardly a Trump-friendly pollster.   (Case 1:21-cr-00129-ABJ, ECF 54-1

Filed 02/01/22, attached hereto as Exhibit C).  The government disputes the findings by Zogby, but

these findings are clearly stated in the attached document to the Motion, Exh. C.  Zogby found that:

> --88% of registered D.C. voters believe that if Garcia went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder;
> --73% of respondents believed that anyone who merely entered the Capitol building on J6 is guilty of insurrection;
> --A majority (64%) of respondents believe that anyone who entered the Capitol building on J6 is responsible for other protestors' violence and destruction of property;
> --70% of respondents believe that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president.

The government's attempt to dispute the results of this survey is without merit.  In support

of his motion, Garcia directed the Court's attention to the Harrison Hickman survey of D.C.

residents commissioned by the Federal Defender, and used in support of a change of venue motion

in the J6 case of *United States v. Gieswein*, 21-CR-24-EGS, which was filed after Garcia's.

(Attached here as Exhibit A). The results and conclusions parallel Zogby's survey.  The ILR Study

commissioned by the Undersigned corroborates the Zogby poll findings, as does the report

commissioned by the Federal Public Defenders.  The "science" is irrefutable:  the D.C. jury pool is

heavily saturated with bias against the defendants.

## **CONCLUSION**

Simply put, the Defendants cannot receive a fair trial in the District.  Nobody disputes that

D.C. jurors are highly intelligent and are fair-minded regarding 99.9% of cases that arise in this

Court.  J6 is radically different.  That is why J6 defense attorneys are asking this Court to move the

trials in these matters to the Eastern District of Virginia, Alexandria, or another venue, despite the

District's reputation for defense-friendly juries.  Not only has the local community been saturated

with non-stop negative press, but the community has been personally affected by the presence of

fences, the National Guard, road closures, and the events of J6 themselves.  The Oath Keepers cases are different than other cases that have proceeded to trial.  Those cases involved anonymous individuals, whereas the instant cases involve identified groups of people who have been slandered in the media with monikers such as "racists," "white supremacists," "domestic terrorists," etc.  The Defendants should not have to prove that they are not racists and domestic terrorists.

It is clear that the multiple factors of prejudice are evident in this case, it is not only about pretrial publicity, but it includes pretrial publicity, and the statements of local DC Politicians who conclude that it was an "insurrection" on January 6th which presume all of the elements of planning and intent to go forcibly into the Capitol.  It is also the statements from the Congressional Committee which is run a parallel investigation and similarly has made pronouncements on findings of guilt of those who were present on January 6th protest.  By definition Congress has called it an "attack" – or forcible entry, and even terrorism.  All defendants who have gone to jury trials to date have been convicted of all the felony charges brought in less than 3 hours.  We further submit that three different surveyors issued reports finding bias in the DC jury especially when compared to other jurisdictions, like the comparison by the Federal Public Defenders to Atlanta.

By moving the trial outside of D.C.—with the full consent of the Defendants, who will agree not to raise the *Delaney* issue as grounds for a postponement if such a venue change is made—the Court will save resources by being able to combine trial groups, and will have more predictability with trial dates certain.  The Court will also ensure the Defendants a fairer venue, which will be far less impacted by the daily political back-and-forth on Capitol Hill.

In the duty to ensure equal protection of the law[17], rather than purely adversarial goals, such

---

[17] "Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints." *U.S. v. Batchelder*, 442 U.S. 114, 124-25 (1979). These constraints include the Fifth Amendment's Equal Protection Clause, which requires that "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Oyler v. Boles*, 368 U. S. 448, 456 (1962).

a move would insulate the government's own cases, assuming they prove their cases, based on a simple move across the river, (where there may even be some practical efficiencies, such as possibly the ability to try more than six or seven defendants at once). Alternatively, not granting the instant request will risk the possibility of multiple retrials. The arguments and evidence put forth by the defense of pervasive prejudgment in the jury pool is substantial. One might ask: If the J6 case of the Oath Keeper defendants does not merit a venue change, what case would? The Eastern District of Virginia is Moreover, the Court is certain to confront a *Delaney* issue close to the trial date, as the J6 Committee will be releasing its report on the eve of the first trial date in this matter. The Court can avoid this issue by granting the reasonable request put forth by the defense to transfer this matter to the Eastern District of Virginia, Alexandria.

Respectfully submitted,

By Counsel:

_____*/s/* David W. Fischer_____
David W. Fischer, Esq.
Fischer & Putzi, P.A.
7310 Ritchie Hwy., #300
Glen Burnie, MD 21061
(410) 787-0826
fischerandputzi@hotmail.com

and

_____*/s/* Juli Z. Haller_____
Juli Z. Haller, DC 466921
The Law Offices of Julia Haller
601 Pennsylvania Avenue, N.W.
S. Building, Suite 900
Washington, DC 20004
Telephone: (202) 729-2201
HallerJulia@outlook.com

Counsel for Connie Meggs

## Certificate of Electronic Service

I hereby certify that on May 12, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties of record.

_____*/s/* David W. Fischer_____

and

*/s/* Juli Z. Haller_____
Juli Z. Haller, DC 466921