**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-cr-28 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **DONOVAN CROWL,** | : | |
| | : | |
| **SANDRA PARKER,** | : | |
| | : | |
| **BENNIE PARKER,** | : | |
| | : | |
| **LAURA STEELE,** | : | |
| | : | |
| **CONNIE MEGGS,** | : | |
| | : | |
| **WILLIAM ISAACS,** | : | |
| | : | |
| **JAMES BEEKS, and** | : | |
| | : | |
| **MICHAEL GREENE,** | : | |
| | : | |
| **Defendants.** | | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT MICHAEL GREENE'S**
**MOTION TO TRANSFER VENUE**

Defendant Michael Greene has moved to, and/or has renewed his co-defendants' prior motions to, transfer venue outside of this district.  ECF No. 786.  Defendants Bennie Parker, Laura Steele, and William Isaacs have joined this motion.  ECF Nos. 795, 796, 800.  This Court has already denied two prior motions to change venue, after extensive briefing on the issue each time. *See* ECF Nos. 415, and Minute Order dated June 30, 2022 (adopting reasons set forth in the Court's Memorandum Opinion and Order denying an identical motion to change venue filed in the related matter of *United States v. Elmer Stewart Rhodes*, et al., 22-cr-15-APM, ECF No. 176).  For the same reasons detailed in the Court's prior Opinions and Orders on this issue, Defendant Greene's motion to change venue should be denied.  The defendants have failed to establish that they

"cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a).  If anything, the case against transfer of venue has grown stronger since this Court has presided over two separate voir dire processes in the related *Rhodes* case.

## I.    Legal Standard

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

"The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 6654, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or

innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in the 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished

somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts" and "earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to the defendant's contention, these factors do not support a presumption of prejudice in this case.

**II.      Analysis**

The government adopts the arguments it made in its oppositions to the defendants' prior motions for change of venue. ECF Nos. 312, 662. Since the Court addressed those prior motions, it has presided over the jury selection process in two trials in the related *Rhodes* case. Those experiences, along with the results in the first *Rhodes* trial, provide additional evidence that these defendants can be assured a fair trial in this district.

   a. The *Voir Dire* Processes in Previous Trials Involving the Oath Keepers Have
      Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in
      the D.C. Venire

One trial involving members and associates of the Oath Keepers has already taken place, and one is currently taking place. In each of these trials, *voir dire* has efficiently produced a jury of unbiased jurors. In *Rhodes*, 47 out of 94 prospective jurors were qualified after *voir dire*. *United States v. Rhodes*, Case No. 21-cr-15 (APM) (D.D.C.), 10/03/22AM Tr. at 1035. Prospective jurors were asked a series of questions regarding potential prejudice or bias. Question 45 asked "whether [the juror] had [any] sort of bias with respect to January 6th." *Id*. at 1036. Of those qualified, only 5 (or 11%) answered affirmatively. *Id*. Question 46 asked "whether [the juror had] heard about

the Oath Keepers." *Id*.  Of those qualified, 25 indicated that they had.  *Id*.  Question 47 asked whether the juror "had such views about the Oath Keepers or preconceptions that they [could not] be fair and impartial." *Id*.  "Only four, that is 9 percent, answered that question." *Id*.  And Question 48 asked whether the juror "had heard of any of the defendants." *Id*.  Of those qualified, only three (or 6%) indicated they had heard of the defendants, and none of the three said "they had such strong views about these defendants that they would not be able to fairly judge [the] case." *Id*.

The parties and the Court, through *voir dire*, ultimately selected a "jury that, by and large, has no preconceived bias or prejudice as to both the Oath Keepers or any of [the] defendants." *Id*. at 1037.  Of the impaneled 16 jurors, exactly zero said they had such "strong feelings about January 6th that they could not be fair and impartial." *Id*.  None of the jurors had ever heard of the specific defendants on trial in that matter.  *Id*.  Nine of the sixteen (or 56%) had heard of the Oath Keepers. Of those who had heard of the organization, many "barely knew anything about the group." *Id*. at 1038.  Further, all of them said they could "be fair and impartial based upon what they heard." *Id*. at 1037.  Nine of the 16 (or 56%) indicated that they had viewed parts of the January 6th Committee hearings, but the "vast majority . . .had very little recollection of those hearings." *Id*. at 1038.  As this Court observed, the numbers clearly showed that "*voir dire* has done its job." *Id*.

The *voir dire* process in the second trial of the *Rhodes* Indictment, referred to as *United States v. Minuta*, produced similar results.  It revealed a jury pool that was not "so hopelessly infected by news and information about the events of January the 6th, and, in particular, Oath Keepers and these defendants, that [the court] could not pick a fair and impartial jury." *United States v. Minuta*, Case No. 22-cr-15 (APM) (D.D.C.), 12/09/22AM Tr. at 771.  Of 90 prospective jurors, 42 were qualified.  *Id*. at 770.  Only roughly a "third of [those excused] were excused for bias reasons." *Id*. at 771.

6

In his motion for change of venue, Defendant Greene notes that "the press and conclusion of *United States v. Rhodes* has bolstered [the belief that prejudice is so great that he cannot obtain a fair and impartial trial]."  ECF No. 786 at 1.  However, the voir dire process in *Minuta* clearly shows that the D.C. venire is not predestined to any greater level of exposure to this information.  Many of those qualified jurors who indicated on their questionnaire that they had neither heard of the Oath Keepers nor of the defendants in *Rhodes* affirmed those answers during *voir dire*.[1]  And these jurors completed their questionnaires in the middle of the *Rhodes* trial and participated in the *voir dire* process just two weeks after the verdict was returned.  Further, many of those jurors who did report seeing media coverage of the *Rhodes* verdict stated that it was only cursory exposure to headlines.[2]

In other words, the jury selection process in the two related trials that have occurred thus far have shown that a fair and impartial panel can be drawn from the venire in this district.

     b.   <u>Additionally, the Results of the First *Rhodes* Trial Suggest that the Jury Pool in This District Is Capable of Fairly Adjudicating These Defendants' Guilt or Innocence.</u>

The Supreme Court noted in *Skilling* that the results of earlier prosecutions connected to the trial at hand can serve as a barometer for juror bias.  561 U.S. at 383 ("Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government.").  Here, the Court has seen a completed trial of a related matter that resulted in a verdict that showed thoughtful and unbiased deliberation by the jury.  The first *Rhodes* trial involved defendants who were co-conspirators of the defendants in this case and charged with offenses that arose from the

---

[1] *See*, *e.g.*, Voir Dire of Jurors 2635, 1468, 0322, 1662, 0591, 0207, and 1680.

[2] *See*, *e.g.*, Voir Dire of Jurors 0092, 1657, 1705, and 2510.

same conduct and events.  As in *Skilling*, the jury convicted the defendants in the first trial of some counts and acquitted them of others. *See Skilling*, 561 U.S. at 383 (noting that Skilling was acquitted of nine insider-trading counts).  The lack of jury prejudice in *Rhodes* is reinforced by the fact that convictions and acquittals varied between defendants—showing thoughtful consideration of each defendant's conduct—and no defendant was convicted on all counts.   The *Rhodes* defendants were also the subject of significantly more pre-trial publicity than the defendants here.

The fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

### III.  <u>Conclusion</u>

For the foregoing reasons, Defendant Greene's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: _____
Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Troy A. Edwards, Jr.
Jeffrey S. Nestler
Louis Manzo
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.

Washington, D.C. 20530

_/s/ Alexandra Hughes_
Alexandra Hughes
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20004