**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-28 (APM)** |
| | : | |
| **SANDRA PARKER,** | : | |
| **BENNIE PARKER,** | : | |
| **LAUARA STEELE,** | : | |
| **CONNIE MEGGS,** | : | |
| **WILLIAM ISAACS, and** | : | |
| **MICHAEL GREENE** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL**

The United States respectfully opposes the motions for judgment of acquittal and motions for a new trial filed by defendants Sandra Parker (ECF No. 944), Bennie Parker (ECF No. 938), Laura Steele (ECF Nos. 931, 935), Connie Meggs (ECF No. 933), and William Isaacs (ECF No. 932). The evidence presented in the government's case-in-chief established that these five defendants traveled to Washington, D.C., with the intent to stop the peaceful transfer of power. On January 6, 2021, the defendants acted on this motivation, and attacked the United States Capitol, delaying the certification of the Electoral College vote, preventing Members of Congress from discharging their duties, and contributing to damage to the Capitol in excess of $1,000. The evidence adduced at trial in the government's case-in-chief, viewed in the light most favorable to the government, is more than sufficient to permit a rational trier of fact to find the essential elements of the crimes charged in the Indictment with respect to each defendant beyond a reasonable doubt. Accordingly, the defendants' motions for judgment of acquittal and new trial should be denied.

## I.      BACKGROUND

### a.  Procedural Background

The Superseding Indictment charged all six defendants with conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count One); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Three); and entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) .  ECF No. 684.  Defendants Sandra Parker, Steele, Connie Meggs, and Isaacs were additionally charged with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count Four), for damage to the East Rotunda Doors entrance area.  *Id.*  Defendants Sandra Parker, Steele, and Isaacs were each charged with interfering with law enforcement officers incident to a civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2 (Counts Six through Seven). Finally, defendants Steele and Greene were charged with tampering with documents or other objects, in violation of 18 U.S.C. § 1512(c)(1) (Counts Eight through Nine).  *Id.*

With respect to the conspiracy charges, the Superseding Indictment alleged that beginning in late December 2020, via encrypted and private communications applications, the defendants planned and coordinated their travel to Washington, D.C., with other members of the Oath Keepers, to include the leader of the Oath Keepers, Elmer Stewart Rhodes.  *Id.* at ¶ 5.  On January 6, the defendants joined with the mob in attacking the Capitol.  Defendants Sandra Parker, Steele, Meggs, and Isaacs joined with their coconspirators in a stack formation ("Line One") to forcibly enter the building through the East Rotunda entrance.  *Id.* at ¶ 9.  While their

coconspirators were inside the building, Defendants Greene and Bennie Parker remained within the restricted perimeter.  *Id.* at ¶¶ 9, 109.

The trial of these defendants began with jury selection on February 3, 2023.  The government presented its evidence over an eleven-day period from February 10-27, 2023.  At the close of the government's case, all defendants moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and the Court deferred ruling.  02/27/23PM Tr. at 4637-38.  In the defense cases, Connie Meggs testified and presented four witnesses, Bennie Parker testified, Isaacs testified and presented two witnesses, and Greene testified and presented one witness.  All defendants then rested.  The government introduced the testimony of two rebuttal witnesses on March 8, 2023.  At the conclusion of the evidence, all defendants renewed their motions for judgment of acquittal, and the Court again deferred ruling.  03/08/23PM Tr. at 6723.

On March 20, 2023, the jury returned a partial verdict; they returned the remainder of their verdicts on March 21.  On Count One, conspiracy to obstruct an official proceeding, Sandra Parker, Bennie Parker, Steele, Meggs, and Isaacs were found guilty, while Greene was found not guilty.  On Count Two, obstruction of an official proceeding, Sandra Parker, Steele, Meggs, and Isaacs were found guilty, while Bennie Parker was found not guilty; the jury was unable to reach a verdict as to Greene.  On Count Three, conspiring to prevent an officer from discharging any duties, Sandra Parker, Steele, Connie Meggs, and Isaacs were found guilty, while Bennie Parker and Greene were found not guilty.  On Count Four, destruction of government property, Sandra Parker, Steele, Connie Meggs, and Isaacs were found guilty.  On Count Five, entering and remaining in a restricted building or grounds, all defendants were found guilty.  On Count Six, civil disorder, Isaacs was found guilty.  On Count Seven, civil disorder, Sandra Parker, Steele, and Isaacs were found guilty.  On Counts Eight and Nine, tampering with documents or

proceedings, Steele was found guilty while Greene was acquitted.   Sentencing hearings are scheduled to occur on July 21 for Greene, and August 30, 31, and September 1, for the remaining defendants.   ECF No. 924.

### b. Factual Background

The evidence presented by the government established that these defendants participated in a conspiracy with members and affiliates of a group known as the Oath Keepers to prevent, hinder, or delay Congress' certification of the 2020 Presidential Election on January 6, 2021, and to use force, intimidation, or threats to prevent members of Congress from discharging their duties that day.   Then, on the afternoon of January 6, they did prevent, hinder, and delay Congress' certification of the election by participating in and supporting an attack on the Capitol. As the riot began to unfold at the Capitol, defendants Sandra Parker, Steele, Meggs, and Isaacs joined with ten other Oath Keepers members and affiliates—many of whom were wearing paramilitary clothing and patches with the Oath Keepers name, logo, and insignia—and marched in a line or column formation up the east steps of the Capitol and breached the building through the East Rotunda Doors.

Once inside the Capitol, Line One entered the Rotunda and divided into two groups.  Half of the group—to include Sandra Parker, Steele, and Isaacs—tried to push their way through a line of law enforcement officers guarding a hallway that led to the Senate Chamber, but law enforcement officers forcibly repelled their advance.   The other half of Line One—which included Connie Meggs—headed toward the House of Representatives, in search of Speaker of the House Nancy Pelosi.   They did not find Speaker Pelosi and ultimately left the building. Meanwhile, Bennie Parker joined with the mob in the restricted area outside the building telling

a reporter that Americans were prepared to take up arms to stop what they perceived as election fraud.

### c.  Evidence of the Conspiracy

#### i.  Evidence prior to January 6, 2021

The evidence presented by the government established that the defendants were united in their opposition to the outcome of the 2020 Presidential Election and together acted on this shared sentiment to obstruct the election certification proceeding.   The leaders of the Oath Keepers—to include Stewart Rhodes and Kelly Meggs—believed that the time for peaceful opposition had come to an end.   Two days after the election, Rhodes pledged, "We aren't getting through this without a civil war.   Too late for that.   Prepare your mind, body, spirit."   Gov. Ex. 9726 (Msg. 1.S.696.12491).   Rhodes' calls for resistance and violence only escalated in the weeks that followed.   On December 31, 2020, Rhodes wrote, "On the 6th, they are going to put the final nail in the coffin of this Republic, unless we fight our way out.   With Trump (preferably) or without him, we have no choice.".   Gov. Ex. 9726 (Msg. 1.S.696.17678).   On December 22, Kelly Meggs similarly messaged the OKFL Hangout Signal group, "It's easy to chat here.   The real question is who's willing to DIE, that's what the Patriots did by the thousands.   We are worried about getting the day off."   Gov. Ex. 9728 (Msg. 1.S.656.9322).

These beliefs were shared and echoed by the defendants.   On November 5, 2020, Sandra Parker messaged other individuals, "They are stealing the election.   We the people must be prepared to fight to bring those guilty to justice!   I am not willing to watch this great nation fall to socialism!!"   Gov. Ex. 9803 (Msg. 2251.T.1.1).   Likewise, in the aftermath of the election, Sandra Parker wrote, "I have never seen the level and magnitude of fraud as I have in this election."   Gov. Ex. 9803 (Msg. 2521.3).   She followed this observation with, "If such fraud is

allowed to go unpunished, I fear that our great nation is lost and another civil war is in the offing." *Id.*

Bennie and Sandra Parker first connected with the Oath Keepers at a rally protesting the outcome of the 2020 election. Specifically, Bennie and Sandra Parker first met Jessica Watkins, a member of the Oath Keepers and the leader of her own separate militia, at an election protest in Columbus, Ohio, on November 7, 2020. 02/15/23PM Tr. at 2325. That rally was scheduled in response to the major news outlets declaring Joseph Biden the winner of the 2020 Presidential Election. *Id.* After the rally, Bennie Parker messaged Watkins, "Great meeting you guys on Saturday and looking forward to another meeting." Gov. Ex. 9802 (Msg. 192.T.543).

Laura Steele shared her coconspirators' outrage at the outcome of the presidential election. On November 6, 2020, she wrote on Facebook, "It's a Coup Trump won A Storm is Coming." Gov. Ex. 9730 (2008.T.206.A). Similarly, on December 5, 2020, Steele wrote, "Peaceful transition in January Trump to Trump." Gov. Ex. 9730 (Msg. 2008.T.278.C). That same day on Facebook she avowed, "No, Joe won't make to office," *id.* (Msg. 2008.T.142.C), and "Biden will never be the POTUS," *id.* (Msg. 2008.T.143.H). Significantly, Steele also evidenced an understanding of the presidential certification process. On November 8, 2020, she wrote, "the media can proclaim the winner all they want but, he has not been certified in any state. The battle for the legitimate President starts Monday." *Id.* (Msg. 2008.T.190.C). Her awareness of the certification procedure is significant, for it is this precise process that she obstructed on January 6, 2021. On December 7, 2020, she similarly avowed that "the only date that matters constitutionally is January 20. Trump Won." *Id.* (Msg. 2008.T.129.B).

Defendant Isaacs similarly viewed the outcome of the 2020 election as demanding forceful opposition. On December 23. 2020, he wrote, "Either Trump crosses the Rubicon or the

citizens cross the deleware," Gov Ex. 9735 (Msg. 280.T.1.46), referencing President Washington's crossing the Delaware River during the American Revolutionary War.  Similarly, on January 3, 2021, Isaacs shared an image of D.C. Mayor Muriel Bower with text embedded, stating, "she as ordered all hotels, restaurants, grocery stores, gas stations, and convenience stores, to close on jan 4th, 5th, and 6th to Discourage TRUMP supporters from gathering in D.C."  Gov. Ex. 9734 (Msg. 85.T.1.25 / 85.T.1.26).  Isaacs then wrote, "We should attack her upon arrival," referring to Mayor Bowser. *Id.* (Msg. 85.T.1.24).

### ii.  Travel to Washington, D.C.

A critical component of the Oath Keepers' preparation for January 6 was to have an organized quick reaction force ("QRF"), comprised of individuals positioned with a cache of weapons, who could be summoned into the city if ordered by Rhodes.  *See, e.g.*, Gov. Ex. 9750. The weapons were primarily stored at a Comfort Inn in Ballston, Virginia.  02/15/23PM Tr. at 2419.  Several of the defendants contributed to this effort by traveling to D.C. with weapons and staying at the same hotel as members of the quick reaction force.  For example, Sandra and Bennie Parker drove from Ohio to the Washington, D.C. area on January 4, 2021, with Watkins and Donovan Crowl, another coconspirator and member of Watkins' militia.  02/15/23PM Tr. at 2338.  With them, the Parkers brought three weapons, to include: one AR-15, one .45 caliber pistol, and one additional pistol.  *Id.*  The Parkers brought these weapons at Watkins' direction, following discussions with Watkins about the QRF.  On January 4, 2021, Watkins messaged Bennie Parker, "Weapons are ok now as well.  Sorry for the confusion."  Gov. Ex. 9750 (Msg. 192.T.1493).  Bennie Parker responded, "so I can bring my gun?"  *Id.* (Msg. 193.T.1494).

While en route to Washington, D.C., on January 4 at 2:28 p.m., Watkins messaged the OK FL DC Op Jan 6 Signal group, a group that included Kelly Meggs and William Isaacs, "We

will be in VA @ 8pm.  Where can we drop off weapons to the QRF team? I'd like to have the weapons secured prior to the Op tomorrow.  Our hotel is in Arlington, VA by the Metro station, but we don't check in until tomorrow.  Staying with family this evening in Winchester."  Gov. Ex. 9723 (Msg. 53.T.2.107).  There was no evidence Watkins received a response to her question and ultimately, they left their weapons in Winchester, Virginia.  02/15/23PM Tr. at 2338.  When they arrived in the D.C. area, however, Watkins, Crowl, and the Parkers stayed at the Comfort Inn Hotel where the QRF was staged.  Watkins reserved one room and another room was reserved under the name Sandra Parker.  02/16/23AM Tr. at 2517.

Connie Meggs also traveled with several weapons that were deposited at the QRF hotel. Connie Meggs traveled from Florida with several of her coconspirators, to include her husband Kelly Meggs, the leader of the Florida Oath Keepers; Joseph Hackett; and Caleb Berry. 02/16/23PM Tr. at 2810.  At trial, Berry testified that he helped load approximately ten firearms cases into the back of Kelly Meggs' open bed pickup truck and that the cases were of a substantial weight, suggesting they contained firearms.  *Id* at 2809.  Berry testified that these guns were deposited at the QRF hotel and that Connie Meggs had been in the car when the guns were loaded into Kelly Meggs' pickup.  02/17/23AM Tr. at 2864-65.  After January 6, these guns were retrieved and reloaded into the back of the truck.

Steele also coordinated with Oath Keepers in advance of her travel to Washington, D.C. Steele came to D.C. with her brother, Graydon Young.  02/16/23AM Tr. at 2570.  Prior to and during her travel to D.C., Steele was in contact with other members of the conspiracy, to include the leadership of the Florida Oath Keepers.  Specifically, on January 3, Steele submitted a vetting form to vettingOKFL@protonmail.com.   Gov. Ex. 2524.1.  In the body of the email, she explained that her brother, Young, told her to submit her application via email to "expedite the

process." *Id.* Steele also sent the same email to Kelly Meggs at okgator1@protonmail.com, explaining in the body of the email that she was sending the application so she could be "verified for the events this coming Tuesday and Wednesday," January 5 and 6. Gov. Ex. 2524.2 Steele likewise was a member of the OK FL Hangout Signal group and messaged the group on the evening of January 5, 2021. 02/14/23AM Tr. at 1838; Gov. Ex. 9728 (Msg. 1.S.656.11785).

Isaacs traveled to Washington, D.C., with his aunt, and stayed in the Holiday Inn from January 5 to January 7. Gov. Ex. 2604. Like Steele, Isaacs was also a member of an encrypted Oath Keepers Signal group, and he kept this group updated on his travels. On January 5, Isaacs messaged the OK FL DC Op Jan 6 group, "Me and Traci have arrived in D.C. and have unpacked . . . Is there anywhere specifically I should head to link up with other OK members?" Gov. Ex. 9731 (Msg. 50.S.7.331).

### iii.  January 6, 2021

On January 6, along with other coconspirators, the defendants gathered at the Ellipse in Washington, D.C. At 1:25 p.m., Rhodes sent a message to the DC OP: Jan 6 21Signal group, "Pence is doing nothing. As I predicted." Gov. Ex. 1500.4. Shortly thereafter, Watkins is captured on video ordering the members of Line One—including Sandra and Bennie Parker, Steele, Isaacs, and Connie Meggs—to "move!" *Id.* At 1:38 p.m., Rhodes sent another message to the same chat group, which included Watkins, writing, "All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." *Id.* The Line One members marched in a group down Pennsylvania Avenue toward the Capitol. As Line One marched toward the Capitol, Rhodes was on the Capitol grounds as of 2:24 p.m. From his position within the restricted grounds, Rhodes instructed Kelly Meggs, who was with the rest of Line One, to "Go to SOUTH side of US Capitol."

The testimony at trial established that while Line One was traveling to the Capitol, the group huddled multiple times as a group.  02/21/23AM Tr. at 3105; Gov. Ex. 1500.4.  In one huddle near the central steps on the east side of the Capitol, Kelly Meggs told the members of Line One that they were "going to try and stop the vote count," 02/21/23AM Tr. at 2879, referring to the certification of the 2020 Presidential Election.

This huddle occurred around the same time that Kelly Meggs had a three-way call with Rhodes and Greene.  At 2:32 p.m., Kelly Meggs called Rhodes, who was already on the phone with Greene.  Phone records show Rhodes merged them into a three-way call that lasted 90 seconds before Meggs dropped off the call and Rhodes and Greene continued talking.  Gov. Exs. 1500.4; 2409.1.  Sandra Parker captured this moment on her phone.  In her video recording, the group can be seen stationary at the base of the Capitol steps, before suddenly moving toward the center stairs.  Gov. Ex. 135.V.1.  Line One then moved in a single line, each individual with their hands on shoulders of the person in front of them.  *Id.* at 2880.

At 2:38 p.m., Isaacs was the first member of Line One to force his way through the East Rotunda entrance.  Gov. Ex. 1500.4.  Behind Isaacs, the rest of Line One entered the Capitol building, and together they moved to the Rotunda.  Gov. Ex. 1505.  From there, Line One spilt into two equal groups: with one group moving toward the Senate chamber and another toward the House.  Prior to moving down the Senate hallway, Isaacs was captured on video yelling, "the fight's not over," and pointing down the hallway.  *Id.*  In the Senate hallway, the rioters—to include Sandra Parker, Steele, and Isaacs—pushed forward against the outnumbered officers guarding the Senate chamber located just beyond them.  *Id.*  Sandra Parker was captured smiling as she followed Watkins down the hallways and was with Watkins as Watkins yelled "Push, push, push. Get in there. They can't hold us."  *Id.*  The rioters in the Senate Hallway were

eventually repelled by law enforcement using pepper spray, and Isaacs, who was at the very front of the line of rioters, was hit in the face by the spray. *Id.*

Meanwhile, the other half of the group pushed towards the House chamber, eventually stopping directly in front of then-Speaker of the House of Representatives Nancy Pelosi's Office. 02/23/23PM Tr. at 3995-96; Gov. Ex. 1674. This other group included Kelly Meggs, Connie Meggs, and Caleb Barry, among others. *Id.* at 3995. Normally, the Speaker of the House's office is identified with a sign above the doorway. *Id.* at 3996; Gov. Ex. 6725. By the time Connie Meggs and the rest of her coconspirators were positioned directly outside of the Speaker's offices, rioters had already removed this sign. *Id.* The evidence at trial suggested this sign removal was perhaps fortuitous as it prevented the coconspirators from knowing how close they came to her office. At 7:09 p.m. on the evening of January 6, Kelly Meggs received a text message, "Was hoping to see Nancy's head rolling down the front steps." Gov. Ex. 9553.1. Kelly Meggs responded ominously, "We looked forward her." *Id.*

Approximately thirty minutes after Line One breached the Capitol, another group of coconspirators ("Line Two") moved into the Capitol through the same doors Line One had, and in the same formation, with their hands on each other's shoulders or backs. Gov. Ex. 6740A; 1056.0933.0310. Led by Joshua James, once inside, members of Line One pushed against law enforcement while James screamed, "this is my fucking Capitol." Gov. Ex. 1508. Greene, who had been designated the operations leader for January 6 by Rhodes, was in communication with the leaders of Line One and Line Two moments before they both ascended the same stairway and entered through the East Rotunda doors. Gov. Ex. 6740A. Greene not only coordinated with Line One and Two the moments before they entered the Capitol, but he also took credit for what

was transpiring.   At 3:06 p.m., Greene texted an acquaintance, "Were storming the capital."
Gov. Ex. 9902 (Msg. 2400.T.1.273).

While his coconspirators were inside the building, Bennie Parker remained on the
outside, within the restricted perimeter, and near the steps Line One had summited shortly
before.   Gov. Ex. 9335.   Like the rest of his coconspirators, Bennie Parker was dressed in
military fatigues, with a helmet and goggles.   *Id.*   While at the base of the steps on the east side,
Bennie Parker gave an interview in which his true intent and agreement was clearly evidenced.
*Id*.   He told the interviewer that "what's happening right now is very chaotic" because "we just
had a presidential election and it was stolen from us."   *Id.*   When asked by the interviewer if
"getting inside the Congress" was "legal," Bennie Parker admitted he was aware it was not.   He
responded, "Not exactly but there's not a whole lot they can do with this many people," adding,
the "Capitol belongs to us."   *Id.*   Finally, Bennie Parker forecasted future violence, warning that
"it will come to a civil war" and that they were "willing to take up arms."   *Id.*

Lines One and Two eventually departed the building.   The larger group of coconspirators
then gathered on the East Plaza of the Capitol.   Gov. Ex. 5306.   There, Steele, Connie Meggs,
Isaacs, and Greene, along with the rest of their coconspirators, collected around Steward Rhodes.
*Id.*   Bennie Parker, Sandra Parker, Watkins, and Crowl, departed separately.

### iv.   Actions After January 6

During their assault on the Capitol and in the immediate aftermath of January 6, the
defendants celebrated and took credit for their actions that day.   On the evening of January 6,
Connie Meggs, echoing her husband's directive to "stop the vote," recounted to a friend via text
that she had "heard about mike pence being a faggot and everyone went to the capital to stop the
vote."   Gov. Ex. 9651 (Msg. Gov. Ex. 9651).   While inside the Capitol, at 2:41 p.m., Isaacs sent

a picture of himself with the text "I'm in." Gov. Ex. 9734 (Msg. 85.T.1.18).  The next day, William Isaacs reflected, "It was God damn glorious."  Gov. Ex. 9827 (Msg. 85.S.204229.D).

The defendants quickly learned, however, that law enforcement was investigating those who attacked the Capitol and took a variety of steps to obfuscate their involvement.  These actions were consistent with Rhodes' instruction to "DELETE ANY OF YOUR COMMENTS REGARDING WHO DID WHAT."  Gov. Ex. 9835 (Msg. 54.S.125.2878).  Laura Steele wrote on January 13, 2021, "I deleted FB yesterday Will be getting off messenger too sometime soon." Gov. Ex. 9838 (Msg. 2008.T.246.E).  On the same date, she advised an individual to "be chill" and "they are watching for this."  *Id.* (Msg. 2008.T.250.D, 2008.T.250.E).  She likewise wrote, "Be careful what you say and text It can be used against you." *Id.* (Msg. 2008.T.250.I).

William Isaacs similarly texted his aunt on January 15, 2021, "How to delete facebook profile?"  Gov. Ex. 9739 (Msg. 85.T.1.2).  Bennie and Sandra Parker deleted all their communications with Watkins from their cell phones.  02/27/23PM Tr. 4602-03.  On January 9, 2021, Bennie Parker also advised Jessica Watkins, "Just wanted you to check out duckduckgo can't be tracked."  Gov. Ex. 9840 (Msg. 192.T.1630).  And one of Connie Meggs' most incriminating messages, in which she confessed to going to stop the vote, was not found on her phone.  02/27/23PM Tr. at 4583-84.  The FBI only obtained that message through T-Mobile.  *Id.* at 4584.

### d.  Evidence of Obstruction of an Official Proceeding

As discussed above, the defendants and their coconspirators joined with thousands of other rioters in breaching the Capitol building and grounds on January 6.  United States Capitol Police Captain Jessica Baboulis presented testimony and video evidence demonstrating the way in which the rioters swarmed the building and overwhelmed law enforcement—including on

both the west and east sides of the Capitol, where the defendants and their coconspirators were engaged in their criminal acts in and around the building.  Gov. Ex. 1515.1; 02/21/23PM Tr. at 3356-3372.  Through the testimony and video admitted through Thomas Wickham, the former Parliamentarian of the United States House of Representatives, who was present at the Capitol in a consulting capacity on January 6, and United States Secret Service Inspector Lanelle Hawa, who was tasked with protecting the vice president on January 6, the government established that the conduct of the defendants and the other rioters caused Congress to recess the Certification proceeding and prevented Congress from being able to reconvene until late in the evening on January 6.  Gov. Ex. 1516; 02/22/23AM Tr. at 3520-3531; 02/21/23PM Tr. at 3295-3312.

## II.   LEGAL BACKGROUND

### a.  Rule 29

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  When ruling on a motion for judgment of acquittal, the Court must "consider[ ] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt."  *United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (quoting *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)).

A defendant "seeking to overturn a jury verdict for insufficient evidence bears an exceedingly heavy burden."  *United States v. Salamanca*, 990 F.2d 629, 637 (D.C. Cir. 1993). Sufficiency review "is highly deferential: [the Court] must accept the jury's verdict if any

rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016) (quotation marks omitted).  The Court "view[s] the evidence in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Id.* (quotation marks omitted).  The Court must "accord[] the government the benefit of all legitimate inferences," *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983), and deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  Put another way, the Court may grant a motion for judgment of acquittal only when "a reasonable juror must necessarily have had a reasonable doubt as to the defendant[']s guilt."  *Weisz*, 718 F.2d at 437 (citing *United States v. Singleton*, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)); s*ee also United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977); *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947) ("[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for judgment of acquittal] must be granted.").

In addition to the longstanding rule that a defendant may not upset an "inconsistent verdict," *United States v. Powell*, 469 U.S. 57, 65 (1984), the jury's verdict simply has no bearing on the adjudication of motions for acquittal under Rule 29.  *See, e.g.*, *United States v. Dykes*, 406 F.3d 717, 722 (D.C. Cir. 2005) ("We do not know what went through the jurors' minds. . . . But even if the [verdicts were inconsistent], a 'criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.'") (quoting *Powell*, 469 U.S. at 58).  The question before the Court is

focused exclusively on the sufficiency of the evidence and whether it could establish for a rational juror the elements of each offense.

Here, there was sufficient evidence to support the jury's finding all six defendants guilty on their respective counts of conviction.

### b. Elements of the Charged Offenses

#### i. Counts One and Two: Conspiracy to Obstruct and Substantive Obstruction of an Official Proceeding

Counts One and Two charge all the defendants with conspiracy to commit and substantive violations of 18 U.S.C. § 1512(c)(2). Section 1512(c)(2) makes it a crime to corruptly obstruct or impede an official proceeding, which includes the Certification of the Electoral College vote. *See United States v. Caldwell*, 581 F. Supp. 3d 1, 11-15 (D.D.C. 2021); *see also* Final Jury Instructions, at 24 (incorporating conspiracy principles for Count Two). A violation of Section 1512(c)(2) requires proof that the defendant (1) obstructed or impeded an official proceeding; (2) intended to obstruct or impede that proceeding; (3) acted knowingly, with awareness that the natural and probable effect of the defendant's conduct would be to obstruct or impede the official proceeding; and (4) acted corruptly. *Id.* at 20.

To prove that a defendant acted corruptly for purposes of Section 1512(c)(2), the government must establish that the defendant acted either "with a corrupt purpose" or through "independently corrupt means," or both. *See United States v. Sandlin*, 575 F. Supp. 3d 16, 31 (D.D.C. 2021) (quoting *United States v. North*, 910 F.2d 843, 942-43 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part), withdrawn and superseded in part by *United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam); *see also* Final Jury Instructions, at 26-27. The government must also prove that the defendant acted "with consciousness of wrongdoing," namely with "an understanding or awareness that what the

person is doing is wrong."  Final Jury Instructions, at 26; *see also United States v. Reffitt*, No. 21-cr-32, ECF No. 119 at 26 (D.D.C. Mar. 7, 2022); *see Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005) (faulting jury instructions in Section 1512 case for "fail[ing] to convey the requisite consciousness of wrongdoing").

### ii.  Count Three: Conspiracy to Prevent Members of Congress from Discharging Their Duties by Force, Intimidation, or Threat

Count Three charges all the defendants with conspiracy to prevent Members of Congress by force, intimidation, or threat from discharging the duties of an office, trust, or place of confidence under the United States, and with conspiracy to induce Members of Congress by force, intimidation, and threat to leave the place where their duties as officers were required to be performed, in violation of 18 U.S.C. § 372.  To prove a violation of Section 372, the government must prove (1) a conspiracy, (2) that the defendants voluntarily joined the conspiracy, and (3) that the conspirators agreed to prevent an officer of the United States from discharging his or her duties "by force, intimidation or threat," *United States v. Beale*, 620 F.3d 856, 864 (8th Cir. 2010), or to leave the place where the officer's duties are required to be performed, Final Jury Instructions, at 32.

### iii.  Count Four: Destruction of Government Property

Count Four charges Sandra Parker, Steele, Connie Meggs, and William Isaacs with destruction of government property, in violation of 18 U.S.C. § 1361.  Count Four also charges the defendants with attempting to injure, damage, or destroy the property of the United States and with aiding and abetting others.  To prove a violation of Section 1361, the government must prove that (1) the defendant injured, damaged, or destroyed property, (2) that the defendant did so willfully, (3) that the property involved was property of the United States, and (4) the damage or attempted damage exceeded $1,000.  *See Bryan v. United States*, 524 U.S. 184 (1998)

17

(quoting *Ratzlaf v. United States*, 510 U.S. 135, 137, (1994)); Final Jury Instructions at 29.

### iv.   Count Five: Entering and Remaining in a Restricted Building or Grounds

Count Five charges all defendants with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752.  To prove a violation of Section 1752, the government must prove (1) the defendant entered or remained in a restricted building or grounds without lawful authority to do so, and (2) the defendant did so knowingly.  Final Jury Instructions at 31-32.

### v.   Counts Six and Seven: Civil Disorder

Counts Six and Seven charge Sandra Parker, Steele, and Isaacs with obstructing, impeding, and interfering with law enforcement officers while they are lawfully engaged in the performance of their duties, incident to and during the commission of a civil disorder, in violation of 18 U.S.C. § 231  To prove a violation of Section 231, the government must prove that (1) the defendant knowingly committed an act, (2) the defendant intended to obstruct, impede, or interfere with law enforcement officers, (3) the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder, and (4) the civil disorder obstructed, delayed, or adversely affected either commerce or the performance of any federally protected function.  Final Jury Instructions at 33.

### vi.   Counts Eight and Nine: Tampering with Documents or Proceedings

Counts Eight and Nine charges Steele and Greene with tampering with documents, in violation of 18 U.S.C. § 1512(c)(1)  To prove a violation of Section 1512(c)(1), the government must prove that (1) the defendant altered, destroyed, mutilated, or concealed a record, document, or other object, (2) the defendant acted knowingly, (3) the defendant acted corruptly, and (4) the

defendant acted with the intent to impair the object's integrity or availability for use in an official proceeding. Final Jury Instructions at 36.

The jury was also instructed on attempt and aiding and abetting theories of liability for Counts Two, Four, Six, Seven, and Eight. For Count Two, the jury was instructed on the additional conspiracy theory of liability. For Count Nine, the jury was instructed only on attempt as an additional theory of liability.

### III.   ARGUMENT

Taking the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crimes charged in the Superseding Indictment beyond a reasonable doubt. The evidence adduced in the government's case-in-chief is more than sufficient to establish the elements as to each of the defendants on every charge in the Superseding Indictment. The defendants' motions for judgment of acquittal should be denied.

Isaacs joined Connie Meggs' Rule 29 and 33 motions (ECF No. 933) and Laura Steele's Rule 29 motion (ECF No. 935). ECF No. 937. Sandra Parker adopted and incorporated all arguments made by her codefendants and "any arguments made in prior two Oath Keeper trials." ECF No. 944 at 3. Bennie Parker likewise adopted certain arguments presented by Connie Meggs and incorporated by reference related motions filed in *United States v. Rhodes*, 22-CR-15 (ECF Nos. 426, 434). ECF No. 938 at 1. To the extent the defendants rely on their codefendants' motions in the two trials in 22-CR-15, their motions should be denied for the same reasons stated in the government's oppositions filed on November 3, 2022 (ECF No. 383); January 13, 2023 (ECF No. 440); April 5, 2023 (ECF No. 517); and on June 8, 2023 (ECF No. 613). Indeed, the Court rejected almost the entirety of these arguments in its oral ruling. *See* 5/24/23AM Tr. at 36-144.

### a.  Sandra Parker's Motion for Judgement of Acquittal Should be Denied

In support of her motion for judgement of acquittal, Sandra Parker argues that "there was no evidence presented that Bennie and Sandra Parker were members of the Oath Keepers."  ECF No. 944 at 4.  As an initial matter, membership in the Oath Keepers is not required for one to have joined the charged conspiracies.  However, Sandra Parker in fact attempted to connect with the Oath Keepers organization prior to January 6.  On November 10, 2020, Bennie Parker texted Watkins that his wife was trying to "make a database connecting other Militias for a more unified connection."  Gov. Ex. 9801 (Msg. 192.T.460/192.T.461).  Additionally, on December 29, 2020, Bennie Parker texted Watkins, "we need to get together and find out what we need to do to become member," referring to the Oath Keepers.  *Id.* (Msg. 192.T.1381/192.T.1382).  On January 6, Sandra Parker dressed in gear identical to her coconspirators, many of them Oath Keepers, told another individual on the Capitol grounds "*we're* Oath Keepers," just before joining this group in forcing her way inside the Capitol, and then told law enforcement officers when stopped on her way out of Washington, D.C. that "*we're* Oath Keepers."  Gov. Exs. 1500.4; 1503; 9745.1 (emphasis added).

Sandra Parker minimizes her coordination with her coconspirators by arguing her connection "was only based upon their involvement with Jessica Watkins and Donovan Crowl." ECF No. 944 at 4.  In fact, Sandra Parker's "involvement" with Watkins and Crowl was evidence of her conspiratorial agreement.  The evidence at trial established that Sandra Parker drove with Watkins and Crowl, dressed in fatigues, and together with Line One, forced her way into the Capitol.  *See* Gov. Ex. 1500.4.  Once inside Sandra Parker moved deeper into the Capitol building, and pushed down the Senate Hallway with Watkins and Crowl.  Gov. Ex. 1505.  In sum, Sandra Parker conspired with each of the members of Line One in forcing her way inside

the Capitol, but her coordination with Watkins and Crowl alone would be sufficient to support her conspiracy convictions.

Against this record, Sandra Parker argues that there was insufficient evidence that she heard Kelly Meggs' command to stop the vote.  ECF No. 944 at 4.  Further, she argues that she was captured on video separated from the group and carrying on a discussion at the time of Kelly Meggs' order.  *Id.* at 5.  The evidence recorded by Sandra Parker herself dispenses with this argument.  In that recording, Sandra Parker was at the base of the east steps together with the rest of Line One.  Gov. Ex. 135.V.1.  During the time when Kelly Meggs called on his coconspirators to stop the vote, Sandra Parker was captured on video immediately moving with Line One, before she summited the steps to the Capitol, pushed through the crowd, and ultimately forced her way inside the building.  Gov Ex. 1503.1.  Nevertheless, her conviction does not depend whether she heard Kelly Meggs' command.  There was ample evidence that she not only entered a conspiracy to obstruct the official proceeding, but in fact, obstructed the proceeding by forcibly entering the building.  Taken together, the record evidence was more than sufficient for a rational trier of fact to conclude beyond reasonable doubt that Sandra Parker joined the conspiracy to obstruct an official proceeding and impede officers from discharging their duties.  *See Kayode*, 254 F.3d at 212-13.

Sandra Parker also contends that there was insufficient evidence that she obstructed officers during a civil disorder.  ECF No. 944.  This argument is likewise belied by the record evidence and without merit.  Sandra Parker was clearly depicted on video pushing down the Senate Hallway with her conspirators and a phalanx of rioters.  Gov. Ex. 1505.  Indeed, Sandra Parker's own motion acknowledges that "she is seen in a video several rows behind officers who are stopping individuals from moving forward."  ECF No. 944 at 6.  By pushing against the

vastly outnumbered officers, Sandra Parker obstructed, impeded, and interfered with those officers while they were engaged in the lawful performance of their duties.  Sandra Parker does not contest that the officers were acting incident to a civil disorder that adversely affected commerce and the performance of a federally protected function.  *See, e.g.*, 02/21/23PM Tr. at 3327 (testimony of Edgar Tippett).  As such her motion for judgement of acquittal on Count Seven should be denied.[1]

In sum, none of the arguments Sandra Parker raises in support of her motion for judgement of acquittal have merit.  The evidence at trial was sufficient to establish Sandra Parker was guilty beyond a reasonable doubt of Counts One, Two, Three, Four, Five, and Seven.

### b. Bennie Parker's Motion for Judgement of Acquittal or for a New Trial Should be Denied

In support of his motion for judgement of acquittal or for a new trial, Bennie Parker argues that he was not aware of the Oath Keepers' plan to stop the vote count and that he could not have joined the conspiratorial agreement because he was separated from the rest of Line One when such an agreement was made.  ECF No. 938 at 4.  This argument is without merit.  There was ample evidence to support a jury's finding beyond a reasonable doubt that Bennie Parker was aware of Line One's intention to obstruct the official proceeding and that he joined in that criminal agreement.

First, the evidence established that Bennie Parker, along with Line One, traveled to the Capitol because Vice President Pence had not stopped the certification proceedings.  Bennie Parker was with the members of Line One when Rhodes alerted the DC OP: Jan 6 21 Signal group, a group that included Watkins, that Vice President Pence had not halted the certification

---

[1]     Sandra Parker additionally argues that her destruction of property conviction was not sufficiently supported.  ECF No. 944 at 6-8.  Her arguments regarding Count Four are identical to those raised by defendant Connie Meggs and are addressed below.

proceedings.   Gov. Ex. 1500.4.   He was likewise in the group when, as a result, Watkins commanded her group to "move," and they then collectively moved to the Capitol.  *Id.*  Watkins, who recruited and traveled with Bennie Parker from Ohio, provided updates on Zello, a push-to-talk application, as they marched to the Capitol.  On Zello, Watkins confirmed that "it has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol, all million of us."  Gov. Ex. 1502.  She further stated, "Trump's been trying to drain the swamp with a straw. We just brought a shop vac."  *Id.*  During this time, video and audio from Watkins' cellphone established that she was with Bennie Parker, marching down Pennsylvania Avenue.  *Id.* Moreover, Bennie Parker was still with Line One when the group reached the Capitol grounds and viewed rioters breaking through the restrictive barriers.  *See* Gov. Ex. 192.P.4.

Second, while Bennie Parker did not join with Line One in breaching the building, in his own words, he was aware of why rioters were forcibly entering the Capitol, he was aware their conduct was illegal, and he agreed with those actions.  *See* Gov. Ex. 9335.  When asked by a reporter if the rioters' actions were legal, Bennie Parker responded, "Not exactly but there's not a whole lot they can do with this many people," adding, the "Capitol belongs to us."  *Id.*  He also explained that their actions at the Capitol were tied to the certification proceedings taking place inside.  *Id.*  ("We just had a presidential election and it was stolen from us.").  Notably, when Bennie Parker gave this interview, he had entered into the restricted grounds of the Capitol, and positioned himself mere feet from the base of the steps Line One summited before entering the building.  Gov. Ex. 1675.  While in this location, Bennie Parker menacingly told the reporter that Americans were prepared to take up arms to stop the election fraud, having brought firearms himself to the D.C. area for this purpose.

In sum, the evidence established that the conspiracy to obstruct the proceeding began before Kelly Meggs gave his command, and existed at least by the time when the group began marching toward the Capitol. As Watkins foreshadowed as she marched with Bennie Parker and the rest of Line 1, she was going to "go silent" when she reached the Capitol because she was going to be "a little busy." Gov. Ex. 1502. Their intention was not to observe, it was to participate in the active obstruction they understood to be taking place. Accordingly, there was ample evidence upon which a jury could, and did, conclude beyond a reasonable doubt that Bennie Parker joined the conspiracy to obstruct the official proceeding, in violation of 18 U.S.C. § 1512(k) (Count One).

### c. Laura Steele's Motion for a Judgement of Acquittal and Motion for a New Trial Should Be Denied

#### i. Steele's Motion for Judgement of Acquittal Should be Denied

In support of her motion of acquittal, Steele raises several arguments attacking the sufficiency of the evidence against her. First, Steele argues there was insufficient evidence to support her destruction of property conviction. ECF No. 935 at 4. Second, she more broadly attacks the "charges relating to January 6th." *Id.* Her arguments regarding the destruction of property charge are similar to those raised by defendant Connie Meggs and are addressed below. Neither of her arguments are meritorious.

Ignoring the balance of statements and video footage introduced at trial, Steele claims she "was only identified or mentioned by two witnesses, and in both instances, she was only identified as being present." *Id.* Instead, the evidence at trial demonstrated Steele's efforts to connect with the Oath Keepers prior to January 6. Steele submitted her Oath Keepers vetting form on January 3, as preparations were underway for January 6. Gov. Ex. 2524.1. She later joined the OK FL Hangout Signal group, where she would have been able to view statements by

her coconspirators.  02/14/23AM Tr. at 1838; Gov. Ex. 9728 (Msg. 1.S.656.11785).  Steele's involvement with the Oath Keepers was a direct result of her fervent opposition to a Joseph Biden presidency and her belief that President Trump should remain in power.  *See, e.g.*, Gov. Ex. 9730 (Msg. 2008.T.278.C) ("Peaceful transition in January Trump to Trump").  And on January 6, she joined with the Line One coconspirators in forcing her way into the Capitol, where she followed Watkins down the Senate Hallway, and pushed toward the Senate Chamber. Gov. Ex. 1505.  Inexplicably, in her motion, Steele ignores this evidence entirely, which evidence more than supported the jury's verdict on Counts One, Two, Three, Four, Five, and Seven.

The evidence likewise supported the jury's guilty verdict as to Steele on Count Eight, regarding her destruction of evidence in violation of Section 1512(c)(1)—especially viewing the evidence in the light most favorable to the government and making all reasonable inferences in the governments' favor.  The evidence established that Steele stormed inside the Capitol and pushed down the Senate hallway with her Oath Keepers co-conspirators while wearing, in part, khaki pants, black shoes, black gloves, a black tactical vest, and a black "floppy hat" and a black shirt with yellow letters reading "Oath Keepers."  02/27/23AM Tr. at 4319-22.

As of January 6, and afterward, Steele and her brother Graydon Young were both participants on the "OKFL Hangout" Signal group chat with Kelly Meggs, Rhodes, and other co-conspirators.  Gov. Ex. 1558.  Immediately after January 6, on January 7, many of the OKFL Hangout participants, including co-conspirators Joseph Hackett, David Moerschel, and Caleb Berry left other Signal groups, including the OK FL DC OP Jan 6 group chat.  Gov. Ex. 9837. And, on January 8, Rhodes messaged his leadership (through Kellye SoRelle), including Kelly Meggs, on the OLD Leadership CHAT Signal group that "anything you say can and will be used

against you. . . . They WILL be coming after anyone they can identify as being in the building. Do not make it easier for them.  Make them do their own work."  Gov. Ex. 9835.  He instructed them "ALL" to delete "self-incriminating comments or those that can incriminate others."  *Id*. He noted that he would give these instructions to anyone "at risk of being accused and indicted." *Id*.

The evidence supports the reasonable inference that Kelly Meggs passed these instructions downward through his Florida Oath Keepers group.  Soon after January 6, Steele began messaging others about the need to avoid law enforcement, at times echoing Rhodes's warnings that law enforcement could read messages and use evidence "against" them.  She messaged another individual on January 10, for example, to contact her on a "landline."  Gov. Ex. 9838 (Msg. 2008.T.273.I).  And, on January 13, she messaged a different acquaintance, "Be chill.  They are watching for this.  Good guys or bad."  *Id*. (Msgs. 2008.T.250.D,E,F).  After learning this individual did not have a landline, Steele messaged, "Well, sometime maybe we can do lunch.  But, you know what they have said about cell phones.  Be careful what you say and text.  It can be used against you."  *Id*. (Msgs. 2008.T.250.G,H,I).  This evidence highlights Steele's awareness as early as January 13 that law enforcement could and would be using evidence "against" people involved in January 6—in other words, in criminal grand jury proceedings.  The next day, Steele messaged another individual, "I deleted FB yesterday.  Will be getting off messenger too sometime soon."  *Id*. (Msg. 2008.T.246.E).  Likewise, the evidence supported the inference that Kelly Meggs passed on Rhodes's warning that law enforcement would be coming after anyone they could "identify as being in the building."  As Special Agent Norm Kuylen testified, law enforcement searched Steele's North Carolina residence on February 17, 2021, where they found her bland black shoes and khaki pants but not her identifiable hat or

Oath Keepers shirt she wore while inside the Capitol.  02/27/23AM Tr. at 4322, 4334, and 4344.
He also testified that law enforcement discovered charred remains of certain items burned in a
burn pit behind Steele's house.  *Id*. at 4336-37.

That Steele was alleged to have destroyed evidence and not, as analyzed in past cases,
lied to law enforcement, is relevant.  The decisions in *Aguilar* and *Young* were inextricably tied
to the nature of the obstructive acts and the fact that they involved defendants lying to agents
without any reason for the defendants to believe that those lies would be passed along to a grand
jury.  As the Supreme Court noted in *Aguilar*:

> [T]he transcript citation relied upon by the Government would not enable a
> rational trier of fact to conclude that respondent knew that his false statement
> would be provided to the grand jury, and that the evidence goes no further than
> showing that respondent testified falsely to an investigating agent.  Such conduct,
> we believe, falls on the other side of the statutory line from that of one who
> delivers false documents or testimony to the grand jury itself. Conduct of the
> latter sort all but assures that the grand jury will consider the material in its
> deliberations.   But what use will be made of false testimony given to an
> investigating agent who has not been subpoenaed or otherwise directed to appear
> before the grand jury is far more speculative.

515 U.S. at 601.  Here, in contrast, Steele knew that by destroying evidence of her involvement
in the attack on the Capitol, she was removing the possibility that law enforcement would find
such material, because she was destroying it.  Destruction means necessarily unavailable.  *See*
*United States v. Johnson*, 655 F.3d 594, 606 (7th Cir. 2011) ("[The government] simply needed
to provide enough evidence that [defendant] foresaw that the contraband might be used in an
official proceeding and destroyed it with the intent of preventing that use.  But why else would
[defendant] aggressively destroy contraband while authorities were attempting to exercise a
search warrant, other than to prevent the discovery of that evidence?  And why would she want
to prevent that discovery, if not to minimize or eliminate the evidence that could be used against
her in a criminal prosecution?"); *United States v. Matthews*, 505 F.3d 698, 710-11 (7th Cir.

27

2007) (holding that evidence of a defendant's awareness that judicial proceedings would be more likely if he did not dispose of certain evidence was sufficient to support a 1512(c)(1) conviction). Indeed, as the Seventh Circuit held in *Johnson*:

> The evidence may not have been overwhelming. But that is often the case when attempting to prove what was in a defendant's mind. . . .  Given [defendant's] knowledge of [co-defendant's criminal conduct], the jury could reasonably believe that [defendant] foresaw that any contraband discovered in the search would be used against her and [co-defendant] in official proceedings. Therefore, the jury could reasonably conclude that she foresaw proceedings in the federal grand jury or the District Court for the Southern District of Illinois, and destroyed [evidence] to prevent that use.

655 F.3d at 607.

Like the defendant in *Johnson*, Steele destroyed evidence of her involvement in the attack on the Capitol as media reports were publicly reporting her co-conspirators' and others' involvement.  And she did so between January 6 and February 17, at a time when numerous co-conspirators were messaging about impending indictments, getting out of Signal chats, and destroying self-incriminating evidence.  In a hierarchical organization like the Oath Keepers, it is a wholly reasonable inference that Rhodes' order to his top leadership—including Kelly Meggs—to delete messages because of the prospect of indictments would then be disseminated down to other members of the conspiracy, including Steele.  Accordingly, as in *Johnson*, it would have been reasonable for the jury in this case to ask, "Why else would Steele conceal or destroy highly-identifiable evidence of Steele's identity in the Capitol on January 6, 2021?"  In other words, unlike the defendants in *Aguilar* and *Young*, Defendant Steele took an action that is more foreseeably harmful to a potential grand jury's investigation—she knew that by destroying evidence, she removed entirely any possibility that this evidence could be used by the grand jury "against" her, as she warned others on Facebook.

### ii. Laura Steele's Motion for a New Trial Should be Denied.

The Court should likewise deny Defendant Laura Steele's motion for a new trial, ECF No. 931. Steele's motion for a new trial is based on an interview a juror conducted after the verdict had been rendered. Specifically, on March 28, 2023, the C-PAN podcast Booknotes+[2] published online a one-hour and 45-minute interview with a juror. The same date, Politico[3] published an article about the interview. The next day, on March 29, the government alerted the Court and the parties that it had become aware of the interview and specified that it did not believe any further action from the Court was needed.

Federal Rule of Criminal Procedure 33(a) states, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. While "[t]rial courts enjoy broad discretion in ruling on a motion for a new trial," the D.C. Circuit has "held that granting a new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *United States v. Wheeler*, 753 F.3d 200, 208 (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)). Steele's motion is premised on the argument that a juror ignored or misapprehended the Court's instructions.[4] Her arguments mischaracterize both the juror's statements and the law.

---

[2]   Brian Lamb, *Oath Keepers Trial Juror*, Booknotes+ Podcast: Oath Keepers Trial Juror https://www.c-pan.org/podcasts/subpage/?series=booknotesplus.

[3]   Kyle Cheney, *Juror in Oath Keepers trial reveals secrets from the deliberation room*, Politico, (March 28, 2023, 4:43 PM), https://www.politico.com/news/2023/03/28/juror-oath-keepers-trial-cspan-00089277.

[4]   Defendant Isaacs adopted Steele's arguments with respect to the juror interview. ECF No. 932 at 4. In her motion for a new trial, Connie Meggs advanced the same arguments as Steele regarding the juror interview (ECF No. 933 at 18) and for the reasons stated herein, should likewise be denied.

Steele is not entitled to a new trial under Rule 33 or to an evidentiary hearing under Federal Rule of Evidence 606.

*First,* the juror's statements reflect an accurate understanding of the Court's clear instructions and, on their own, do not warrant a new trial under Rule 33.  As defendant Steele recognized, the juror expressly said that she knew it was "the *prosecution's job* [] to prove that a crime was committed, to prove these defendants are guilty."  ECF No. 931 at 6.  The juror even understood that it is "not the defendant's or defense's job to prove that they're innocent."  *See* Final Jury Instructions at 2 ("Burden of Proof – Presumption of Innocence").  And the juror explained that, despite the "prosecution case" taking "the majority of the time you're in trial," she still had to "hear the other side," consider "something that's going to sway you," "*or* you have to keep an open mind."  ECF No. 931 at 7.

Steele claims this statement illustrates that the juror inappropriately shifted the burden to the defense; in fact, it shows the juror followed the Court's instructions on how to consider the evidence at trial.  She understood she was required to carefully scrutinize the government's case, regardless of the amount of evidence.  Jury Instructions at 3-4 ("Number of Witnesses" and "Considering the Evidence in the Case").  And, in a case where some defendants testified and some did not, she understood she must hear the other side, if a defendant did testify, *or* consider something that may sway you and keep an open mind, if a defendant did not testify.  *Id*. at 8-9 ("Right of Defendant Not to Testify" and "Defendant as Witness").  The juror's statements reflect someone who waited until the end of the trial to consider her verdict, and that is what the Court instructed her to do.  *See id*. at 44 ("Juror's Duty to Deliberate" and "Attitude and Conduct of Jurors in Deliberations").

No new trial is warranted in the "interest of justice" under Rule 33, because there has been no Due Process violation.  ECF No. 931 at 7.  Likewise, a defendant's "allegations relating to juror confusion" do not satisfy Rule 33's "standard for 'newly discovered evidence' warranting a new trial or an evidentiary hearing." *United States v. Davis*, 377 F. App'x 19, 20 (D.C. Cir. 2010) (per curiam), *affirming United States v. Davis*, 612 F. Supp. 2d 48, 54 (D.D.C. 2009) ("Davis' allegation that a juror expressed confusion about the conspiracy instructions warrants neither an evidentiary hearing nor a new trial as it is wholly unsupported and Rule 606(b) bars inquiry into the jurors' mental impressions during deliberations.") (citing *Tanner v. United States*, 483 U.S. 107, 127 (1987)).

*Second*, Rule 606(b) prohibits further inquiry into the juror's "mental processes."  Fed. R. Crim. P. 606(b)(1) ("[A] juror may not testify about . . . the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."); *see United States v. Stover*, 329 F.3d 859, 865 (D.C. Cir. 2003) (holding that Rule 606(b) "prohibits jurors from giving evidence about any matter pertaining to their verdicts except extrajudicial influences"); *United States v. Campbell*, 684 F.2d 141, 151-52 (D.C. Cir. 1982) (affirming trial court's decision to not order a new trial or evidentiary hearing based on "a juror's post-trial report of what occurred in the course of deliberations" because the alleged misconduct "concerned only the discussion among the jurors and the way the jurors elected to make their decision"); *United States v. Brooks*, 677 F.2d 907, 913 (D.C. Cir. 1982) (affirming trial court's decision not to conduct an evidentiary hearing regarding alleged juror misconduct based on a subconscious memory, because courts should refuse to consider "the mental processes through which [the jurors] arrived at their verdict") (internal citation and quotation omitted).  Excluding such inquiries promotes several "values," including, "freedom of deliberation, stability and

finality of verdicts, and protection of jurors against annoyance and embarrassment."  Fed. R. Crim. P. 606 cmt. (citing *McDonald v. Pless*, 238 U.S. 264 (1915)).

Notably, Rule 606(b)'s prohibition insulates juror's specifically from inquiry regarding their understanding of the jury instructions.  "[N]obody may inquire into so-called 'inside' influences on the jury—such as pressure among jurors [or] misunderstanding of instructions." *United States v. Edelin*, 283 F. Supp. 2d 8, 13 (D.D.C. 2003), *aff'd sub nom. United States v. Bostick*, 791 F.3d 127 (D.C. Cir. 2015).  Simply put, "[w]hether the jury followed the court's instructions is not subject to inquiry by the defendant."  *United States v. Davis*, 402 F. Supp. 2d 252, 264 (D.D.C. 2005); *see id*. ("[I]t is a peculiar facet of the jury institution that once a verdict is rendered, no judicial inquiry is permitted into the jury's deliberative process to determine if in fact the court's instructions were properly followed.") (quoting *United States v. D'Angelo*, 598 F.2d 1002, 1004 (5th Cir. 1979); *Sparf v. United States*, 156 U.S. 51, 80 (1895)); *see also* Fed. R. Crim. P. 606 cmt. ("Under the federal decisions the central focus has been upon insulation of the manner in which the jury reached its verdict, and this protection extends to each of the components of deliberation," including "misinterpretations of instructions.")*.*  Steele does not allege that there were any "extrajudicial influences" on the juror.  Therefore, there can be no further inquiry or basis for a new trial.

### d.  Connie Meggs' Motion for Judgement of Acquittal and Motion for a New Trial Should be Denied

#### i.  The Government's Evidence Was More Than Sufficient To Prove That Connie Meggs was Guilty of Counts One, Two, Three, Four, and Five

The evidence at trial was more than sufficient to establish Connie Meggs' guilt and support her conviction.  Connie Meggs argues that the government's evidence amounts to "the mere fact she entered the Capitol Beuilding."  ECF No. 933 at 7.  Accordingly, Connie Meggs

argues that a judgement of acquittal is appropriate because (1) the government failed to prove that Connie Meggs obstructed an official proceeding or entered or remained in a restricted building or grounds; (2) the government failed to prove Connie Meggs acted with the corrupt intent; (3) the government failed to prove failed to prove Connie Meggs joined the alleged conspiracies; and (4) the government failed to prove Connie Meggs injured, damaged or destroyed government property. *Id.* at 6-7.  In so arguing, Connie Meggs ignores the balance of evidence introduced against her which established her guilt beyond a reasonable doubt.

> ### ii. The evidence was sufficient to establish Connie Meggs obstructed an official proceeding and entered and remained in a restricted building or grounds.

The evidence at trial established that the defendants, including Connie Meggs, and other rioters caused Congress to recess the certification proceeding and prevented Congress from being able to reconvene until late in the evening on January 6.  Connie Meggs inexplicably argues that the government presented no evidence that she intended to obstruct and/or impede the certification of the electoral college vote.  *Id.* at 7.  Indeed, Connie Meggs evidenced her intent through her own words when she texted that she went to the Capitol "to stop the vote."  Gov. Ex. 965 (Msg. Gov. Ex. 9651).  Without explanation, she argues that this message cannot "reasonably be interpreted as evidencing her intent at the time she attacked the Capitol," ECF No. 933 at 7, when that is precisely what her message established.  While not the only evidence of Connie Meggs' intent, her message, mere hours after leaving the Capitol building, explaining why she went to the Capitol, is alone sufficient evidence upon which a jury could rely in determining that she intended to obstruct the proceeding.

### iii. The evidence established Connie Meggs corruptly obstructed the official proceeding.

Connie Meggs further argues that the government failed to establish that she acted with the requisite corrupt intent, citing *United States v. Fischer*, 64 F.4th 329, 351 (D.C. Cir. 2023). The Court in *Fischer*, however, did not pronounce an authoritative holding on the meaning of "corruptly" in Section 1512(c)(2). Both the lead and dissenting opinions in *Fischer* acknowledged that the definition of "corruptly" was not squarely presented in that case and therefore was not resolved. *See id.* at 340-41 (opinion of Pan, J.) ("expressing [no] preference for any particular definition of 'corruptly'" because "the allegations against appellees appear to be sufficient to meet any proposed definition of 'corrupt' intent"); *id.* at 341 (noting that the dissent also "declines to settle on a precise meaning of 'corruptly' at this time" and thus "share[s] much common ground" with the lead opinion "on the issue of mens rea"); *id.* at 379-81 (Katsas, J., dissenting) (surveying possible definitions of "corruptly" but declining to adopt any particular one). Although the concurrence would have determined that "corruptly" means "a criminal intent to procure an unlawful benefit," *id.* at 352 (Walker, J., concurring), the resolution of that *mens rea* issue was not necessary to the court's holding concerning the actus reus of the offense—which Judge Walker joined by concurring in all but a section and a footnote in the lead opinion and concurring in the judgment—and his views on the meaning of "corruptly" were not adopted by the other judges on the panel.

Relatedly, treating the concurrence's "corruptly" definition in *Fischer* as a binding holding is in tension with the party-presentation principle, under which courts "rely on the parties to frame issues for decision and assign courts the role of neutral arbiter of matters the parties present." *Sineneng-Smith v. United States*, 140 S. Ct. 1575, 1579 (2020) (citing *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). The concurrence posited that the

defendants had "raised the issue below," *Fischer*, 64 F.4th at 352 n.1 (Walker, J. concurring), without acknowledging that the district court never adjudicated the vagueness challenge or defined "corruptly." And although the concurrence relied on "lengthy discussions by several district judges in similar cases," *id.*, those judges also declined to offer definitive interpretations of "corruptly" in those rulings. *See, e.g.*, *United States v. Montgomery*, 578 F. Supp. 3d 54, 84 n.5 (D.D.C. 2021) ("[B]ecause the Court has yet to hear from the parties on the proper jury instructions, the Court will leave for another day the question whether this formulation [of corruptly]—or a slightly different formulation—will best guide the jury."). In short, the concurrence's interpretation of "corruptly" did not result from the "crucible of litigation," *Fischer*, 64 F.4th at 340 (opinion of Pan, J.), and thus should not be treated as authoritative.

Indeed, almost every court involved in the January 6 litigation has provided an instruction similar to the one provided in the instant matter. *See, e.g.*, *United States v. Leo Christopher Kelly*, 21- cr-708-RCL (ECF No. 101); *United States v. Thomas Robertson*, 21-cr-34-CRC (ECF No.86); *United States v. Dustin Thompson*, 21-cr-161-RBW (ECF No. 83); *United States v. Anthony Williams*, 21-cr-377-BAH (ECF No.112); *United States v. Doug Jenson*, 21-cr-6-TJK (ECF No. 97). And consistent with the Court's instruction, there was abundant evidence that Connie Meggs acted corruptly; namely, that she used "unlawful means or ha[d] an improper purpose, or both," and acted with "consciousness of wrongdoing." Final Jury Instructions at 23. At the very least, by the time Connie Meggs was present on Capitol grounds she was aware her actions were unlawful. Prior to going up the center east stairs to the Capitol, she would have had to traverse multiple barriers. Indeed, by the first huddle she would have gone past two to five barriers, depending on her route. 02/21/23PM Tr. at 3348. From there, she proceeded with the group, despite visible "AREA CLOSED" signs posted on the intact fencing surrounding the

Capitol.  Gov. Ex. 194.P.4.  She was then part of Line One, pushing her way through the crowd to the top of the steps.  Once at the top of the steps, she continued with the group, forcing her way through the East Rotunda doors—the subject of her property damage and conviction under Section 1361 detailed below—and into the Capitol as alarms blared and officers cowered on each side of the East Rotunda Doors. Gov. Exs. 7077; 1503.  And as explained in greater detail in the following section, these actions were taken in furtherance of the conspiracy Connie Meggs had joined to obstruct the certification proceeding and prevent members of Congress from discharging their duties on January 6.  In total, there was overwhelming evidence from which a jury could conclude that Connie Meggs acted with "unlawful means" and "improper purpose," and with "consciousness of wrongdoing."  *See* Final Jury Instructions at 23.

### iv.  The evidence established Connie Meggs joined the charged conspiracies.

Connie Meggs additionally argues there was insufficient evidence she joined the charged conspiracies.  ECF No. 933.  Once again, ignoring the balance of evidence at trial, Connie Meggs argues the "only evidence" was her entry into the Capitol.  *Id.* at 10.  Instead, the evidence established the following.  On January 3, Kelly Meggs shared an illustration with the OK FL DC OP Jan 6 Signal group.  Gov. Ex. 9731 (Msg. 50.S.7.35).  The illustration depicted individuals in military gear in front of the White House, with certain individuals identified as "Gator One," Kelly Meggs, and "Gator 6," Kenneth Harrelson.  The illustration had the accompanying text, "We are coming Mr President!!"  After sending the photo, Kelly Meggs remarked that Connie Meggs was "pissed" because she was not in the photo, suggesting Kelly Meggs shared with Connie Meggs his communications with other coconspirators and their plans regarding traveling to Washington, D.C.  Gov. Ex. 9731 (Msg. 50.S.7.37).

Connie Meggs eventually travelled to Washington, D.C., with several of the coconspirators identified in that illustration, to include her husband.  02/16/23PM Tr. at 2810.  In the trunk of the open-backed truck she drove up in were approximately 10 weapons.  *Id* at 2809. Connie Meggs had previously trained on how to offensively use similar weapons with many of the coconspirators she drove to D.C. with.  Gov. Exs. 4802.1.4; 4804.1; 4802.1.2.  On January 5, Connie Meggs drove with her coconspirators to the QRF hotel, where they unloaded their weapons.  02/16/23PM Tr. at 2810.  On January 6, she marched with her coconspirators to the Capitol after hearing that Vice President Pence had failed to derail the proceedings.  Once there, she joined with Line One, snaking through the already congested riot to the top of the stairs before forcing her way inside.  Gov. Exs. 1500.4; 1503.  From this overwhelming evidence, a jury could, and did, conclude beyond a reasonable doubt that Connie Meggs had joined a criminal conspiracy to obstruct the official proceeding, in violation of 18 U.S.C. § 1512(k), and to prevent officers from discharging their duties, 18 U.S.C. § 372.

> ### v.  The evidence was sufficient to establish that Connie Meggs damaged or destroyed property of the United States.

Finally, Connie Meggs argues there is no evidence she damaged property.  As at trial, Connie Meggs argues that she never touched East Rotunda or Columbus Doors.  ECF No. 933 at 13.  Jason McIntyre from the Office of the Architect of the Capitol testified that there are in fact two sets of doors at the central East Rotunda entrance to the Capitol.  First, there is a modern set of doors with glass pains, referred to as the East Rotunda Doors.  02/22/23AM Tr. at 3541. Second, there are the Columbus Doors, which he described as a "work of art."  *Id.* at 3542. These bronze doors are adorned with three-dimensional reliefs with "small, intricate details to them."  *Id.*  Both sets of doors sustained damage on January 6, to include broken glass, missing door handles, a damaged door closer, and heavy scratching and damage from chemical irritants.

*Id.* at 3544.   In total, the necessary repairs to the East Rotunda doors cost $10,063, and the repairs to the Columbus Doors were $24,175.

In convicting Connie Meggs of destruction of property, the jury was not required to find that Connie Meggs *touched* the doors.   In its instructions, the Court outlined three ways a defendant might be guilty of destruction of property: (1) if the defendant damaged the property, (2) attempted to do so, or (3) aided and abetted others.   Final Jury Instructions at 31. Accordingly, the jury properly could have determined Connie Meggs was guilty of damaging the doors while also concluding she had no direct contact with the doors.   For example, the evidence at trial established that the rioters damaged the East Rotunda and the Columbus Doors by forcing them open and crowding through the entry.   Connie Meggs, along with the rest of the members of Line One, were at the top of the stairs and only a few feet back when the doors were reopened from the inside.   Gov. Ex. 1503.   By her proximity to the struggle over the doors, Connie Meggs knew the offense was being committed.   When she shoved forward with the rest of the riot, Connie Meggs performed acts in furtherance of the offense and for the purpose of encouraging others to commit the offense.   And finally, she did these acts with the intent that others commit the offense, namely, forcibly entering the building thereby damaging the doors that stood in her way.   Final Jury Instructions at 31.   Based on this evidence, a jury could have concluded beyond a reasonable doubt that Connie Meggs was guilty of destruction of government property under an aiding and abetting theory.

**b. Connie Meggs' motion for a new trial is unfounded and should likewise be denied.**

Connie Meggs further moves for new trial on two bases: (1) the submission of videos not in evidence to the jury[5] and (2) juror "misconduct." ECF No 933 at 13-18. Neither of the bases under which Connie Meggs moves for a new trial satisfy the exacting threshold required under Rule 33. *See Wheeler*, 753 F.3d at 208. As the interview with the juror has been addressed in detail above, only her first basis will be addressed here.

At 10:42 a.m. on the morning of Monday, March 13, 2023, government counsel emailed counsel for all defendants a copy of the government's final exhibit list and stated, "We are also making you a copy of all the government's admitted exhibits . . . Would one of you be at the courthouse today for [government counsel] to hand off the thumb drive?" *See* Exhibit A.1 Counsel for Connie Meggs (Mr. Woodward) responded, "I'm at my office but can come over to grab the thumb drive, which I will make available to all other defense counsel electronically." *See* Exhibit A.2 (attached). Government counsel and Mr. Woodward made efforts to find a time and place to meet but were not able to connect. *See* Exhibit A.3. Government counsel offered to find a time and place the next day to meet, but Counsel for Connie Meggs did not respond. Mr. Woodward's co-counsel (Julia Haller) offered concrete plans the next day (Tuesday, March 14, 2023) to meet, so government counsel provided her with the thumb drive of exhibits and notified all other counsel. *See* Exhibit A.4 (attached). Mr. Woodward voiced no objection to this plan.

On Wednesday, March 15, 2023, co-counsel for Connie Meggs (Ms. Haller) emailed the government and noted that there were component part video clips submitted to the jury "that I

---

[5]     Bennie Parker adopted arguments presented by Connie Meggs that "evidence was improperly placed before the jury." ECF No. 938 at 1. Isaacs likewise raised similar arguments in his motion for a new trial and the government addresses those here as well. ECF. No. 932 at 6.

don't recall coming in." *See* Exhibit A.5 (attached).  Counsel did not provide any file names for the clips that she believed were improperly included.  *Id.*  Counsel's concern also appeared, primarily, to be that the clips should not have been admitted as they featured individuals other than the defendants.  Government counsel responded and explained that the video was an overview montage, and the Court approved the inclusion of clips that did not feature the defendants and their coconspirators.  *Id.*

Government counsel did not receive an email response but asked Ms. Haller about this issue in court the next day, when the parties reported to discuss a response to a jury note on another issue.  As documented in the e-mail sent by the government after this conversation, *see* Exhibit A.6 (attached), Ms. Haller clarified her concerns (still without providing any file names for the component part video clips that she believed were improperly included).  Government counsel then re-watched all of the clips on the evening of Thursday, March 16 and the morning of Friday, March 17, 2023, and located two clips that had unintentionally been included with the government's admitted exhibits.  Upon realizing the mistake, counsel immediately emailed defense counsel to ask what they wanted to do.  *See* Exhibit A.6 (attached).  Some counsel responded with thoughts; the government did not receive an immediate response from counsel for Connie Meggs and the government notified the Court in the early afternoon of Friday, March 17, 2023.  *See* Exhibit A.7 (attached).  Mr. Woodward was among those counsel who objected to immediately taking the exhibits from the jurors and asked instead to wait until after a hearing on Monday at which they could be heard.  *Id.*

The component parts in question were originally included in Gov. Ex. 1515.1 and had been removed during trial one in *United States v. Rhodes*, 22-CR-15.  10/18/22 AM Tr. at 3965. One clip was Gov. Ex. 1056.0102.0212, which showed the first rioters to breach the building on

the west side.  Only the last seven seconds of this clip were excluded from the government's admitted montage.  03/20/23AM Tr. at 7291.  Those seven seconds simply captured more individuals streaming into the building, but nothing new in kind from the rest of the clip.  *Id.* The second clip, Gov. Ex. 1056.7206.0229, shows footage from the Visitors Center in the Capitol.  The clip depicts law enforcement trying to shut a gate as rioters attempt to open the gate.  This clip is 49 seconds long and was likewise excluded but inadvertently sent back to the jury.  In total, therefore, 56 second of footage was submitted to the jury that was excluded.

At trial, the defendants requested a mistrial citing, *United States v. Lentz*, 383 F.3d 191 (4th Cir. 2004).[6]  In *Lentz* the defendant was charged with one count of kidnapping resulting in the death of his ex-wife.  *Id.* at 195.  At the conclusion of trial, the ex-wife's entire day planner and pocket calendar were improperly provided to the jury during deliberations.  Both items detailed the defendants "harassing and threatening behavior," "notes concerning [the ex-wife's] efforts to obtain a protective order," and the "names and telephone numbers of police officers and a domestic violence support group," among other incriminating notes.  *Id.* at 205.  The trial court granted a new trial and the Fourth Circuit affirmed.  *Id.* at 221.

Distinguishing the instant matter from the case cited, the Court noted at a hearing on this issue, "this is not that."  03/20/23AM Tr. at 7298.  In particular, unlike in *Lentz*, the clips here did not directly depict the defendants.  *Id.* at 7299.  The Court noted that the clips in question were excluded because "A, it was not directly relevant to those defendants as it's not directly relevant to these defendants; but, B, also it showed more than I thought it needed to for the limited purposes that the government was introducing."  *Id.* at 7298.  The Court also correctly observed that the government did not in its closing refer to the montage exhibit.  *Id.*

---

[6]     Defendant Isaacs similarly relies on *Lentz* in his motion for a new trial, ECF No. 932 at 7, and for the reasons stated herein, this reliance is misplaced.

Accordingly, the Court provided the jury with a redacted copy of the government's exhibit list and admitted exhibits, with the two clips removed. The Court explained to the jury:

> [I]t has come to my attention that there are a couple of exhibits that were on the government's thumb drive that were sent back to you that were inadvertently sent back to you. They were exhibits that were not admitted into evidence and should not have been sent back . . . So the following is now going to happen. First and foremost, I am going to instruct you to ignore those exhibits. I'm not going to ask you whether you have reviewed them thus far, not my business; however, if you have not reviewed them, I'm going to ask you to ignore them. If you have reviewed them, I am also going to ask you to disregard them and put them out of your mind.

03/20/23AM Tr. at 7322-23. As the jury had already returned a partial verdict, the Court further instructed the jury that "I am going to ask you to disregard those two pieces of evidence and reconsider your verdicts; in other words, confirm that even without those exhibits, you have reached the verdicts that you have reached." *Id.* at 7323.

Connie Meggs nevertheless argues that the videos were inflammatory in nature and "there is a reasonable probability that the jury's verdict was influenced by the videos." ECF No. 933 at 17. Connie Meggs' own summary of the clips are fatal to her argument. As she acknowledges, the videos "depicted actions taken by unidentified individuals that were irrelevant to Mrs. Meggs." *Id.* Connie Meggs' contention that the jury's deliberations were impermissibly swayed by 56 seconds of video of unidentified rioters is implausible. Connie Meggs also argues that the clips are inflammatory in nature. *Id.* First, Connie Meggs mischaracterizes the videos: neither is from inside the tunnel as she alleges, instead they were from the west side point of entry and the Visitors Center. Her discussion of footage in connection with Mr. Caldwell is therefore irrelevant to the clips that were sent back.

The Court properly relied on *United States v. Roy*, 473 F.3d 1232 (D.C. Cir. 2007), to deny defendants' request for a mistrial. 03/20/23AM Tr. at 7308. In *Roy*, the defendant appealed

the district court's denial of his motion for a mistrial on the ground that an unredacted indictment was improperly submitted to the jury. *Roy*, 473 F.3d at 253.  In determining the extent of the unfair prejudice, the court considered "the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the admissible evidence that supports the verdict."  *Id.* (citations and quotations omitted).

As in *Roy*, there is not more the Court could have done to "cure" the submission in the instant matter.  *See Id.* at 255.  The Court removed the clips from the jury's possession and emphatically told the jury to disregard the clips.  *See Id.*  These instructions were sufficient as "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it."  *Id.* (citing *United States v. McLendon,* 378 F.1109, 1114 n.6 (D.C. Cir. 2004)).  Additionally, for all the reasons discussed herein, the case against the defendants, to include Connie Meggs, is strong.  *Id.* There was in fact abundant evidence, to include video evidence, of what the defendants did on January 6.  In sum, like in *Roy*, the Court "took great pains to cure any effect of the jury's inadvertent exposure . . .  and the prosecution's case was strong."  Connie Meggs' motion for a new trial should therefore be denied.

**e.   William Isaacs' Motion for a New Trial is unfounded and should be denied.**

William Isaacs raises two arguments, both of which are meritless, in support of his request for a new trial: (1) the introduction of video clips from his proffer session with the government and (2) the delivery of two unadmitted clips to the jury during deliberation were injustices that warrant a new trial.  ECF No. 932.  His arguments regarding the two clips were raised by defendant Connie Meggs and are addressed above.

As to the first argument in support of his motion for a new trial, Isaacs argues that the introduction of clips of a recording of his March 18, 2021, proffer was fatal error and grounds for

a new trial. *Id.* at 2. This issue was extensively briefed at trial, *see* ECF No. 879, and is not now

a proper basis to request a new trial under Fed. R. Crim. P. 33.  As an initial matter, it is unclear

under what basis Isaacs moves f

or a new trial.  The evidence cited is not newly discovered, nor was defendant Isaacs'

motion filed within 14 days, as required pursuant to Rule 33.  *See* Fed. R. Crim. P. 33(b).

Nevertheless, the Court properly ruled certain video footage from Isaacs' proffer was admissible

at trial and their admission is not a valid basis to move for a new trial.

On March 18, 2021, Defendant Isaacs and his counsel, Charles Greene, appeared for a

proffer meeting at the FBI's Orlando office. Both signed a proffer agreement, which prohibits the

government from using the statements made by the defendant directly against him in a criminal

proceeding. See ECF No. 874, Ex. 1 at 1, ¶1.  The government was expressly permitted to make

derivative use of the defendant's statements or to use the statements on cross-examination or in

rebuttal. *Id.* at 2.  The FBI recorded the March 18 proffer meeting by video and audio.  At the

outset of the meeting, an FBI agent present in the room said, in the presence of both the

defendant and Mr. Greene, "hopefully it's recording. We're good to go."  Later in the meeting,

just before the defendant and Mr. Greene stepped out to take a break, the agent said, "And we're

going to remain live, recording, just so everybody knows."

Three months later, on July 21, 2021, government counsel, via email, explicitly notified

defense counsel of the existence of the recording: "Chuck/Gene/Natalie: As I believe you know,

the FBI recorded the interview of Mr. Isaacs on March 18, 2021, when he came to the FBI's

office with Chuck pursuant to the debrief agreement.  What is your position on the government

disclosing the recording of that interview to counsel for the co-defendants?"  Defense counsel

initially objected to the government providing the recording in discovery to the co-defendants,

but after defense counsel failed to file a motion to prevent the government from disclosing the recording, the government provided the recording in discovery to all defendants on March 30, 2022.  Therefore, defendant Isaacs' continued claim that "there was no indication verbally or in writing that it would be a *recorded* event," ECF No. 932 at 2 (emphasis in original), is unambiguously false and the Court rejected this argument at trial, 03/07/23AM Tr. 6069 ("I made a finding that the government has not violated the proffer agreement either by videotaping the session or providing it to Dr. Askenazi.").

Isaacs further alleges that "[t]he use of the proffer in any form whatsoever was a manifest injustice" as well as a separate basis upon which to grant his motion for a new trial. ECF No. 932 at 3.  The signed proffer agreement between the government and defendant Isaacs, however, expressly provided that "in the event [Isaacs] is ever a witness or presents evidence or arguments through other witnesses, at trial or any other proceeding, and your client's statements or that evidence contradicts statements made" the government may use these statements in either cross-examination or in its pleadings.  ECF No. 874, Ex. 1 at 2, ¶3.  Accordingly, the Court correctly held that if defense intended to argue that based on Isaacs' demeanor on the stand the jury could "imagine what it was like for him" on January 6, then "the proffer agreement permits the government to bring in what his demeanor was like during the proffer session." 03/07/23PM Tr. 6399.  The Court further concluded that the "best evidence" of Isaacs' demeanor during the proffer session was the video itself and not an agent's description of Isaacs' demeanor.  *Id.* 6398.

Further, the Court was clear that "the door only gets opened if you're going to make arguments that contradicts statements of your client during the debriefing."  *Id* 6399.  Counsel for Isaacs (Mr. Rossi) then decided that "if the Court allows me to make those arguments in my closing . . . I think I'm willing to take the risk of having the video."  *Id.*  Therefore, as a result of

the defense's own decision, six limited clips of Mr. Isaacs' proffer session were introduced. 03/08/23AM Tr. 6505-12.

In sum, defense counsel elected to admit these precise clips in exchange for presenting certain arguments in closing. Although Isaacs perplexingly cites the juror interview as part of his arguments for a new trial, nothing in Juror 48's interview changes, or is even relevant to, the Court's proper determination that the proffer clips were admissible. Defendant Isaacs' motion for a new trial should be denied.

## IV.   CONCLUSION

The Court should deny the motions by defendants Sandra Parker, Bennie Parker, Laura Steele, Connie Meggs and William Isaac's for judgment of acquittal under Rule 29 and for a new trial under Rule 33.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   _____/s/_____

Alexandra Hughes
Assistant United States Attorney
DC Bar No. 1531596
Troy A. Edwards, Jr.
Jeffrey S. Nestler
Kathryn L. Rakoczy
Assistant United States Attorneys
Louis Manzo
Trial Attorney, U.S. Department of Justice

</div>