**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **SANDRA PARKER,** | **Case No. 21-cr-28-APM** |
| **BENNIE PARKER,** | |
| **LAURA STEELE,** | |
| **CONNIE MEGGS, and** | |
| **WILLIAM ISAACS,** | |
| **Defendants.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On January 6, 2021, the defendants joined together and with other members and affiliates of the Oath Keepers to breach the United States Capitol and stop Congress from certifying the 2020 presidential election.   For their role in this unprecedented attack on the peaceful transfer of power, the defendants deserve significant sentences of incarceration, consistent with the applicable United States Sentencing Guidelines calculations.

**TABLE OF CONTENTS**

I.     BACKGROUND ................................................................................................................. 3
   a.   Summary of Evidence ................................................................................................. 5
   b.   The Charges and Penalties ........................................................................................ 13
II.    SENTENCING GUIDELINES ....................................................................................... 15
   a.   Legal Standards ......................................................................................................... 15
      i.    *Preponderance of the Evidence* .......................................................................... 15
      ii.   *Relevant Conduct and Definition of "Offense"* ............................................. 16
   b.   Chapter Two: Offense Conduct .............................................................................. 20
      i.    *The Base Offense Level* ...................................................................................... 20
      ii.   *Specific Offense Characteristics* ....................................................................... 22
      1.   The "Administration of Justice" Specific Offense Characteristics .............................. 22

2. The "Extensive Scope, Planning, or Preparation" Specific Offense Characteristic ...... 28

3. Other Specific Offense Characteristics ........................................................................ 29

c. Chapter Three: Adjustments ........................................................................................ 30

   i. *Section 3B1.2 (Minor Role Adjustment)* ................................................................ 30

   ii. *Section 3C1.1 (Obstruction of Justice)* ................................................................. 32

   iii. *Section 3E1.1 (Acceptance of Responsibility)* ...................................................... 36

d. Grouping ....................................................................................................................... 37

e. Departures ..................................................................................................................... 41

   i. *Section 3A1.4, Note 4 (Terrorism)* ......................................................................... 41

   ii. *Alternative Bases for Upward Departure* ............................................................... 44

f. Applicable Sentencing Guidelines Ranges .................................................................. 46

**III. SECTION 3553(a) FACTORS** ......................................................................................... **47**

a. Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law ................................. 47

b. The History and Characteristics of Each Defendant and Their Roles in The Offense ..... 49

   i. *Sandra Parker* ........................................................................................................... 49

   ii. *Bennie Parker* ........................................................................................................... 50

   iii. *Laura Steele* .............................................................................................................. 51

   iv. *Connie Meggs* ........................................................................................................... 53

   v. *William Isaacs* ........................................................................................................... 55

c. Need for the Sentence to Afford Adequate General Deterrence .................................... 58

d. Need to Avoid Unwarranted Sentencing Disparities .................................................... 58

**IV. OTHER SENTENCING CONDITIONS** ......................................................................... **59**

a. Restitution ..................................................................................................................... 59

b. Fine ............................................................................................................................... 60

c. Supervised Release ....................................................................................................... 60

d. Special Conditions ....................................................................................................... 60

**V. CONCLUSION** .................................................................................................................. **62**

## I.    BACKGROUND

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the election, these five defendants donned paramilitary gear and clothing and marched with other Oath Keeper members and affiliates to the United States Capitol.   When they arrived on the Capitol grounds, a leader of the group—Kelly Meggs—announced that they were going inside to try to stop the vote count.   In response, defendants Sandra Parker, Laura Steele, Connie Meggs, and William Isaacs joined hands on shoulder with eight other members of their group ("Line One") and moved, in a coordinated and calculated fashion, up the steps of the Capitol:



At the top of the stairs, the defendants and their co-conspirators joined the mob that overcame officers guarding the door.   As they entered the building, alarm bells blared, and rioters chanted, "Treason!"

Once inside, the group entered the Rotunda and then split up.   Half of the group, including Defendant Connie Meggs, headed toward the House of Representatives.   Kelly Meggs would later say that they were looking for Speaker of the House Nancy Pelosi.   They did not find Speaker Pelosi and ultimately left the building.   The other half of the group—including Sandra Parker, Steele, and Isaacs—joined rioters who were trying to push their way through a line of D.C. Metropolitan Police Department officers guarding a hallway that led to the Senate Chamber.   The officers were forced to deploy chemical spray to hold back the mob.   Defendants Sandra Parker, Steele, and Isaacs then retreated, regrouped, exited the Capitol, and met up with the other Oath Keepers.

Meanwhile, Defendant Bennie Parker had waited outside the Capitol, where he explained to a foreign journalist that the riot was the result of American anger over the "stolen" election and ominously warned that "it will come to a civil war" and that many Americans were "willing to take up arms."   Bennie and Sandra Parker were among those Americans, having brought their firearms from Ohio for the events of January 6 at the direction of Ohio Oath Keepers leader Jessica Watkins.

These defendants' participation in the attack on the Capitol was not random; it was the culmination of weeks, if not months of plotting by the leader of the Oath Keepers, Elmer Stewart Rhodes III, and his regional deputies to oppose by force the lawful transfer of power from President Donald J. Trump to President-Elect Joseph R. Biden, Jr.   These five defendants each answered that call.   In the days before January 6, they traveled from all over the country, with battle gear and some with firearms, for the purpose of delaying the lawful transfer of presidential power.   On January 6, they joined with their co-conspirators and seized the opportunity to further this unlawful goal.

4

### a.  Summary of Evidence

The evidence presented at trial established that the defendants participated in a conspiracy with Oath Keepers members and affiliates to prevent, hinder, or delay Congress' certification of the 2020 election, and to use force, intimidation, or threats to prevent members of Congress from discharging their duties during that proceeding.   Then, on the afternoon of January 6, they marched to the Capitol and breached its restricted building and grounds in furtherance of this unlawful agreement.

#### i.  The Plot to Oppose by Force the Lawful Transfer of Power

In the days and weeks after the election, the leaders of the Oath Keepers—to include Rhodes, Kelly Meggs (the leader of the Florida chapter), and Jessica Watkins (an Oath Keepers leader from Ohio)—repeatedly told their followers that the time for peaceful opposition had come to an end.   Two days after the election, Rhodes pledged, "We aren't getting through this without a civil war.   Too late for that.   Prepare your mind, body, spirit."   Gov. Ex. 9726 (Msg. 1.S.696.12491).   Rhodes' and his deputies' calls for resistance and violence only escalated in the weeks that followed.   On December 31, 2020, Rhodes wrote, "On the 6th, they are going to put the final nail in the coffin of this Republic, unless we fight our way out.   With Trump (preferably) or without him, we have no choice."   Gov. Ex. 9726 (Msg. 1.S.696.17678).   On December 22, Kelly Meggs similarly messaged the OKFL Hangout Signal group, "It's easy to chat here.   The real question is who's willing to DIE, that's what the Patriots did by the thousands.   We are worried about getting the day off."   Gov. Ex. 9728 (Msg. 1.S.656.9322).   Watkins similarly told a recruit to her militia that she should prepare to fight to the death, warning that "if Biden get[s] the steal, none of us have a chance in my mind. We already have our neck in the noose. They just haven't kicked the chair yet."   Gov. Ex. 9801 (Msg. 192.T.984-988).

These beliefs were shared and echoed by the defendants and their co-conspirators.   On November 5, 2020, Sandra Parker messaged other individuals, "They are stealing the election. We the people must be prepared to fight to bring those guilty to justice!   I am not willing to watch this great nation fall to socialism!!"   Gov. Ex. 9803 (Msg. 2251.T.1.1).   Likewise, in the aftermath of the election, Sandra Parker wrote, "I have never seen the level and magnitude of fraud as I have in this election."   Gov. Ex. 9803 (Msg. 2521.3).   She followed this observation with, "If such fraud is allowed to go unpunished, I fear that our great nation is lost and another civil war is in the offing."   *Id.*

Sandra and Bennie Parker first connected with the Oath Keepers on November 7, at a rally protesting the outcome of the 2020 election, where they met Watkins.   02/15/2023 PM3PM Tr. at 2325.   After the rally, Bennie Parker messaged Watkins that he had mentioned meeting her to his own militia president and wanted to keep in touch, noting that he and his wife felt it was important to form "a more unified connection" with other militias.   Gov. Ex. 9801 (Msgs. 192.T.460-461). Watkins responded, "We need to connect now more than ever."   *Id.* (Msg. 192.T.464).

Laura Steele shared her co-conspirators' outrage at the outcome of the presidential election. On November 6, 2020, she wrote on Facebook, "It's a Coup Trump won A Storm is Coming." Gov. Ex. 9730 (2008.T.206.A).   Similarly, on December 5, 2020, Steele wrote, "Peaceful transition in January Trump to Trump."   *Id.* (Msg. 2008.T.278.C).   That same day on Facebook she avowed, "No, Joe won't make to office," *id.* (Msg. 2008.T.142.C), and "Biden will never be the POTUS," *id.* (Msg.   2008.T.143.H).   Significantly, Steele also evidenced an understanding of the presidential certification process.   On November 8, 2020, she wrote, "the media can proclaim the winner all they want but, he has not been certified in any state. The battle for the legitimate President starts Monday."   *Id.* (Msg. 2008.T.190.C).   Her awareness of the

certification procedure is significant, for it is this precise process that she obstructed on January 6, 2021.    On December 7, 2020, she similarly avowed that "the only date that matters constitutionally is January 20.   Trump Won."   *Id.* (Msg. 2008.T.129.B).

Defendant Isaacs similarly viewed the outcome of the 2020 election as demanding forceful opposition.   On December 23. 2020, he wrote, "Either Trump crosses the Rubicon or the citizens cross the deleware," Gov Ex. 9735 (Msg. 280.T.1.46), referencing President Washington's crossing the Delaware River during the American Revolutionary War.   Similarly, on January 3, 2021, Isaacs shared an image of D.C. Mayor Muriel Bower with text embedded, stating, "she as ordered all hotels, restaurants, grocery stores, gas stations, and convenience stores, to close on jan 4th, 5th, and 6th to Discourage TRUMP supporters from gathering in D.C."   Gov. Ex. 9734 (Msg. 85.T.1.25 / 85.T.1.26).   Isaacs then wrote, "We should attack her upon arrival," referring to Mayor Bowser. Id. (Msg. 85.T.1.24).

## ii.   Travel to Washington, D.C.

Having expressed their opposition to the peaceful transition of presidential power, all five of these defendants agreed to travel to D.C. with the Oath Keepers for January 6.   The Parkers traveled with Watkins and another member of her militia, 02/15/2023PM Tr. at 2338; Laura Steele traveled with her brother, Florida Oath Keeper Graydon Young, 02/16/2023AM Tr. at 2570; Connie Meggs traveled with her husband and other Florida Oath Keepers, 02/16/2023PM Tr. at 2810; and Isaacs traveled with his aunt—another Florida Oath Keeper, Gov. Ex. 2604.

A critical component of the Oath Keepers' preparation for January 6 was to have an organized quick reaction force ("QRF"), comprised of individuals positioned with a cache of weapons, who could be summoned into the city if ordered by Rhodes.   *See, e.g.*, Gov. Ex. 9750. The weapons were primarily stored at a Comfort Inn in Ballston, Virginia.   02/15/2023PM Tr. at

2419.   Several of the defendants contributed to this effort by traveling to D.C. with weapons and staying at the same hotel as members of the quick reaction force.

Sandra and Bennie Parker brought three weapons, to include: one AR-15, one .45 caliber pistol, and one additional pistol.   02/15/2023PM Tr. at 2338.   The Parkers brought these weapons at Watkins' direction, following discussions with Watkins about the QRF.   On January 4, 2021, Watkins messaged Bennie Parker, "Weapons are ok now as well.   Sorry for the confusion."   Gov. Ex. 9750 (Msg. 192.T.1493).   Bennie Parker responded, "so I can bring my gun?"   *Id.* (Msg. 193.T.1494).

While en route to Washington, D.C., on January 4 at 2:28 p.m., Watkins messaged the OK FL DC Op Jan 6 Signal group, a group that included Kelly Meggs and William Isaacs, "We will be in VA @ 8pm. Where can we drop off weapons to the QRF team? I'd like to have the weapons secured prior to the Op tomorrow. Our hotel is in Arlington, VA by the Metro station, but we don't check in until tomorrow. Staying with family this evening in Winchester."   Gov. Ex. 9723 (Msg. 53.T.2.107).   There was no evidence Watkins received a response to her question and ultimately, they left their weapons in Winchester, Virginia.   02/15/2023PM Tr. at 2338.   When they arrived in the D.C. area, however, Watkins and the Parkers stayed at the Comfort Inn Hotel where the QRF was staged.   Watkins reserved one room and another room was reserved under the name Sandra Parker.   02/16/2023AM Tr. at 2517.

Connie Meggs also traveled with several weapons that were deposited at the QRF hotel. Connie Meggs traveled from Florida with several of her co-conspirators, to include her husband Kelly Meggs, the leader of the Florida Oath Keepers; Joseph Hackett, and Caleb Berry. 02/16/2023PM Tr. at 2810.   At trial, Berry testified that he helped load approximately ten firearms cases into the back of Kelly Meggs' open bed pickup truck and that the cases were of a substantial

8

weight, suggesting they contained firearms.   *Id* at 2809.   Berry testified that these guns were deposited at the QRF hotel and that Connie Meggs had been in the car when the guns were loaded into Kelly Meggs' pickup.   02/17/2023AM Tr. at 2864-65.   After January 6, these guns were retrieved and reloaded into the back of the truck.

Steele also coordinated with Oath Keepers in advance of her travel to Washington, D.C. Prior to and during her travel to D.C., Steele was in contact with other members of the conspiracy, to include the leadership of the Florida Oath Keepers.   Specifically, on January 3, Steele submitted a vetting form to vettingOKFL@protonmail.com.   Gov. Ex. 2524.1.   In the body of the email, she explained that her brother, Young, told her to submit her application via email to "expedite the process."   *Id.*   Steele also sent the same email to Kelly Meggs at okgator1@protonmail.com, explaining in the body of the email that she was sending the application so she could be "verified for the events this coming Tuesday and Wednesday," January 5 and 6.   Gov. Ex. 2524.2   Steele likewise was a member of the OK FL Hangout Signal group and messaged the group on the evening of January 5, 2021.   02/14/2023AM Tr. at 1838; Gov. Ex. 9728 (Msg. 1.S.656.11785). According to Graydon Young, he and Steele brought firearms to the D.C. area but did not deposit them with the QRF.   10/31/22PM Tr. at 5771, 5804.

Like Steele, Isaacs was also a member of an encrypted Oath Keepers Signal group, and he kept this group updated on his travels.   On January 5, Isaacs messaged the OK FL DC Op Jan 6 group, "Me and Traci have arrived in D.C. and have unpacked . . . Is there anywhere specifically I should head to link up with other OK members?" Gov. Ex. 9731 (Msg. 50.S.7.331).

### iii.   January 6, 2021

On January 6, at 1:25 p.m., Rhodes sent a message to the "DC OP: Jan 6 21" Signal group, stating, "Pence is doing nothing.   As I predicted."   Gov. Ex. 1500.4.   Shortly thereafter, Watkins

ordered the members of "Line One" to "move!" *Id.* The Line One members—including all five of these defendants—then marched in a group down Pennsylvania Avenue toward the Capitol.

As the group began to march, Watkins made an announcement on the "Stop the Steal J6" channel on Zello: "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol . . . We have about 30-40 of us.   We are sticking together and sticking to the plan." Gov. Ex. 1500.4.   About ten minutes later, she provided an update on the channel: "Y'all, we're one block away from the Capitol right now.   I'm probably gonna go silent when we get there, because I'm gonna be a little busy." *Id.*

Once they reached the Capitol grounds, the members of Line One huddled together, and Kelly Meggs told the group that they were "going to try and stop the vote count," 02/17/2023AM Tr. at 2879, referring to certification of the 2020 Presidential Election.   This huddle occurred around the same time that Kelly Meggs had a three-way call with Rhodes and co-defendant Michael Greene, the operations leader of the Oath Keepers on January 6.   At 2:32 p.m., Kelly Meggs called Rhodes, who was already on the phone with Greene.   Phone records show Rhodes merged them into a three-way call that lasted 90 seconds before Meggs dropped off the call and Rhodes and Greene continued talking.   Gov. Exs. 1500.4; 2409.1.   Immediately thereafter, Kelly Meggs led Line One in a single line up the Capitol steps, each individual with their hands on shoulders of the person in front of them.   *Id.* at 2880; *see also* Gov. Ex. 135.V.1.

After breaching the Capitol, Line One spilt into two equal groups: one group moving toward the Senate chamber and another toward the House.   Prior to moving down the Senate hallway, Isaacs yelled, "the fight's not over," and pointed down the hallway.   Gov. Ex. 1504.   In the Senate hallway, the rioters—to include Oath Keepers Sandra Parker, Steele, and Isaacs—pushed forward against the outnumbered officers guarding the Senate chamber located just beyond

10

them.   Gov. Ex. 1505.   As members of the group followed Watkins down the hallways, Watkins yelled, "Push, push, push. Get in there. They can't hold us."   *Id.*   The rioters in the Senate Hallway were eventually repelled by law enforcement officers using chemical spray, and Isaacs, who was at the very front of the line of rioters, was hit in the face by the spray.   *Id.*

Meanwhile, the other half of the group pushed towards the House chamber, eventually stopping directly in front of then-Speaker of the House of Representatives Nancy Pelosi's Office. 02/23/2023PM Tr. at 3995-96; Gov. Ex. 1674.   This other group included Oath Keepers Kelly Meggs, Connie Meggs, and Caleb Berry, among others.   *Id.* at 3995.   At 7:09 p.m. on the evening of January 6, Kelly Meggs received a text message, "Was hoping to see Nancy's head rolling down the front steps."   Gov. Ex. 9553.1.   Kelly Meggs responded, "We looked forward her."   *Id.*

The members of Line One eventually departed the building and gathered on the East Plaza of the Capitol.   Gov. Ex. 5306.   There, co-conspirators to include Steele, Isaacs, and Connie Meggs gathered around Rhodes.   *Id.*

While his co-conspirators were inside the building, Bennie Parker remained on the outside, within the restricted perimeter, and near the steps Line One had summited shortly before.   Gov. Ex. 9335.   Like the rest of his co-conspirators, Bennie Parker was dressed in military fatigues, with a helmet and goggles.   *Id.*   While at the base of the steps on the east side, Bennie Parker gave an interview in which his true intent and agreement was clearly evidenced.   *Id.*   He told the interviewer that "what's happening right now is very chaotic" because "we just had a presidential election and it was stolen from us."   *Id.*   When asked by the interviewer if "getting inside the Congress" was "legal," Bennie Parker admitted he was aware it was not.   He responded, "Not exactly but there's not a whole lot they can do with this many people," adding, the "Capitol belongs

to us." *Id.*   Finally, Bennie Parker forecasted future violence, warning that "it will come to a civil war" and that they were "willing to take up arms." *Id.*

The conduct of the defendants, their co-conspirators, and the other rioters caused scores of law enforcement officers to suffer physical and emotional injuries; terrified congressional staff and others on scene that day, many of whom fled for their safety; and resulted in over a million dollars in damage to a historic and symbolic building.   Members of the House of Representatives and the Senate, including the President of the Senate, Vice President Michael R. Pence, were forced to evacuate their chambers, and the Joint Session was suspended.   The Joint Session was not able to resume until after 8:00 p.m. that evening, after the building was cleared and secured.   And the cost to our democracy and system of government was incalculable.   *See United States v. Gardner*, No. 21-cr-622 (Mar. 16, 2023), Sent. Tr. at 68 (identifying one of the "victims" on January 6 as "democracy itself").

### iv.   Actions After January 6

During their assault on the Capitol and in the immediate aftermath of January 6, the defendants and their co-conspirators celebrated and took credit for their actions that day.   On the evening of January 6, Greene, Rhodes, and others all celebrated their actions and the outcome of January 6 at a restaurant dinner.   Others bragged in messages.   Connie Meggs, for example, echoing her husband's directive to "stop the vote" after his call with Greene, recounted to a friend via text that she had "heard about mike pence being a faggot and everyone went to the capital to stop the vote."   Gov. Ex. 9651 (Msg. Gov. Ex. 9651).   While inside the Capitol, at 2:41 p.m., Isaacs sent a picture of himself with the text "I'm in." Gov. Ex. 9734 (Msg. 85.T.1.18).   The next day, William Isaacs reflected, "It was God damn glorious."   Gov. Ex. 9827 (Msg. 85.S.204229.D).

The defendant and his co-conspirators quickly learned, however, that law enforcement was investigating those who attacked the Capitol.   Rhodes instructed everyone to "DELETE ANY OF YOUR COMMENTS REGARDING WHO DID WHAT."   Gov. Ex. 9835 (Msg. 54.S.125.2878). The defendants all took steps towards deleting evidence of their involvement with these offenses. Laura Steele wrote on January 13, 2021, "I deleted FB yesterday Will be getting off messenger too sometime soon."   Gov. Ex. 9838 (Msg. 2008.T.246.E).   William Isaacs texted his aunt on January 15, 2021, "How to delete facebook profile?"   Gov. Ex. 9739 (Msg. 85.T.1.2).   Bennie and Sandra Parker deleted all their communications with Watkins from their cell phones. 02/27/2023PM Tr. 4602-03.   And Connie Meggs' most incriminating message, in which she confessed to going to stop the vote, was not found on her phone.   02/27/2023PM Tr. at 4583-84. The FBI only obtained that message through T-Mobile.   *Id.* at 4584.

**b. The Charges and Penalties**

The Indictment charged all five defendants with conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count One); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Three); and entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Five).   ECF 684.   Defendants Sandra Parker, Steele, Connie Meggs, and Isaacs were additionally charged with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count Four), for damage to the East Rotunda Doors entrance area.   *Id.*   Defendants Sandra Parker, Steele, and Isaacs were each charged with interfering with law enforcement officers incident to a civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2 (Counts Six through

Seven).   Finally, for destroying evidence in a burn pit, Steele was additionally charged with tampering with documents or other objects, in violation of 18 U.S.C. § 1512(c)(1) (Count Eight). *Id.*

The defendants were tried, along with co-defendant Greene, in a several-week jury trial that occurred in February and March of 2023.   The jury returned its verdicts on March 20 and 21, 2023.   Defendants Sandra Parker, Steele, Connie Meggs, and Isaacs were convicted of all the charges against them.   Defendant Bennie Parker was convicted of conspiracy to obstruct an official proceeding and entering or remaining in a restricted building or grounds.   The jury acquitted him of the other charges.

The Pre-Sentence Reports ("PSRs") correctly recount the statutory penalty for the offenses of conviction:

- *For Counts One, Two, and Eight*, conspiracy to obstruct an official proceeding, obstruction of an official proceeding, and tampering with documents or evidence, the maximum statutory penalty is twenty years of incarceration;

- *For Count Three*, conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, the maximum statutory penalty is six years of incarceration;

- *For Count Four*, destruction of government property, the maximum statutory penalty is ten years of incarceration;

- *For Count Five*, entering or remaining in a restricted building or grounds, the maximum statutory penalty is one year of incarceration; and

- *For Counts Six and Seven*, interfering with law enforcement officers incident to a civil disorder, the maximum statutory penalty is five years of incarceration.

II.     **SENTENCING GUIDELINES**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point" for determining a defendant's sentence. *Id.* The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline for each count; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. § 1B1.1(a)(1)-(3). Then, repeat each step for each count. U.S.S.G. § 1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id.*

a.  **Legal Standards**

*i.  Preponderance of the Evidence*

To apply a provision of the Guidelines that the jury did not necessarily already find beyond a reasonable doubt by virtue of its guilty verdict, the Court must make a finding by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 154 (1997); *see United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) ("[I]t is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted."); U.S.S.G. § 6A1.3, cmt.

The Court may consider any relevant information, without regard to whether the information would be admissible at trial. 18 U.S.C. § 3661. The Court may also consider acquitted conduct, *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008), including specifically an acquittal of a conspiracy charge, *United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014). In other words, the court may find by a preponderance of the evidence that a defendant was a member of "the very conspiracy that the jury acquitted [him] of participating in," and then

15

use that conduct to apply provisions of the Sentencing Guidelines to increase the defendant's sentence.  *Id.* at 1369.

### ii.   Relevant Conduct and Definition of "Offense"

In applying the Guidelines, the Court must consider all "relevant conduct."  And especially in a conspiracy case, "relevant conduct" is "broadly defined."  *United States v. Khatallah*, 41 F.4th 608, 645 n.23 (D.C. Cir. 2022).

Under Section 1B1.3(a)(1)(A), a defendant's "relevant conduct" encompasses both the defendant's own acts and those that the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused.  And under Section 1B1.3(a)(1)(B), in a "jointly undertaken criminal activity," such as a conspiracy, a defendant is responsible for all acts of others that were "within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity."  Finally, a defendant's "relevant conduct" under the Guidelines includes "all harm that resulted" from the defendant's acts or the acts of others engaged in the jointly undertaken criminal activity.   U.S.S.G. § 1B1.3(a)(3).

As laid out in greater detail in the background section above, the evidence at trial established by a preponderance of the evidence that the defendants participated in a conspiracy to obstruct an official proceeding and to use force, intimidation, or threats to prevent members of Congress from discharging their duties and to drive them from the place of their duties. Accordingly, they are responsible for the actions of their co-conspirators that fall within the parameters of Section 1B1.3(a)(1)(B).   It is true that "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."   U.S.S.G. § 1B1.3, cmt. n.3(B).   But

given the nature of the conspiracies here, the defendants' "relevant conduct" supports application of each of the Guidelines provisions discussed below.   *See United States v. Khatallah*, 314 F. Supp. 3d 179, 189 (D.D.C. 2018) (broadly applying Section 1B1.3 because, in part, "'[o]nce the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be vicariously liable for the substantive acts committed in furtherance of the conspiracy by his co-conspirators'") (quoting *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980)).

The Guidelines' definition of "offense" is, with exceptions not applicable here, "the offense of conviction *and all relevant conduct under § 1B1.3*."   U.S.S.G. § 1B1.1, n.1 (emphasis added). Therefore, in addition to determining the specific offenses for which each defendant was convicted, the Court must also determine the "relevant conduct" under Section 1B1.3 for which the defendant is criminally responsible under the Sentencing Guidelines.   In reaching this decision, the Court must look to the contours of the underlying scheme itself rather than the mere elements of the offense charged."   *United States v. Caballero*, 936 F.2d 1292, 1298-99 (D.C. Cir. 1991) (cleaned up).   The Court may consider a defendant's "role with respect to all crimes, charged or otherwise, 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"   *Bapack*, 129 F.3d at 1326 (quoting U.S.S.G. § 1B1.3(a)(2)).   Here, that "course of conduct" includes all of the actions and statements described in the background section above.

Although Defendant Bennie Parker was acquitted of one of the conspiracy counts and the obstruction of an official proceeding charge, the Court can and should still find by a preponderance that his "relevant conduct" includes all the actions of his co-conspirators because the jury convicted

Bennie Parker of conspiring to obstruct an official proceeding.[1]   To find him guilty of this charge, the jury must have necessarily found, at a minimum, that Bennie Parker agreed with the members of Line One at some point before they started ascending the steps of the Capitol to disrupt the certification of the election that was going on inside.   This verdict was supported by the evidence. In addition to all the evidence summarized above, Parker himself testified that he knew, after the first huddle on the Capitol grounds, that his co-conspirators were going to go inside the Capitol. 3/3/23AM Tr. at 5460-62.   And he told a reporter why:   "We just had a presidential election and it was stolen from us," and Americans like him were "willing to take up arms" and start a "civil war" to do something about it.   Gov. Ex. 9335.   The Court should find that Bennie Parker's relevant conduct includes the actions of his co-conspirators in furtherance of this agreement, because such actions would be "part of the same course of conduct or common scheme or plan as the offense of conviction.'"   *Bapack*, 129 F.3d at 1326 (quoting U.S.S.G. § 1B1.3(a)(2)).

The jury's "not guilty" verdicts on Counts Two and Three do not preclude such a finding. "[A defendant] was not 'acquitted' for conduct unless the jury necessarily determined that the facts underlying a charge or enhancement were not proved beyond a reasonable doubt."   *United States v. Khatallah*, 41 F.4th 608, 648 (D.C. Cir. 2022), cert. denied, No. 22-7065, 2023 WL 4163280 (U.S. June 26, 2023).   The jury's acquittal on Count Three, conspiracy to interfere with members of Congress, suggests they found insufficient evidence to conclude that Bennie Parker agreed specifically to interfere with members of Congress on January 6.   Aside from the evidence that certain co-conspirators may have gone looking for Speaker Pelosi, the government cannot think of

---

[1] Defendant Bennie Parker is thus in a very different position than co-defendant Greene, whom the jury acquitted of both conspiracy charges and for whom the jury could not reach a unanimous verdict regarding the obstruction of an official proceeding count.

any actions of co-conspirators that should be seen as acts in furtherance solely of a conspiracy to interfere with members of Congress.

With respect to Bennie Parker's acquittal on the obstruction of an official proceeding count, it is difficult to reconcile that verdict with the conviction on the conspiracy to obstruct an official proceeding charge, given that the jury was instructed on *Pinkerton* liability.   Courts have long cautioned against trying to reconcile "inconsistent verdicts."   *See, e.g.*, *United States v. Dykes*, 406 F.3d 717, 722 (D.C. Cir. 2005) ("We do not know what went through the jurors' minds. . . . But even if the [verdicts were inconsistent], a 'criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.'") (quoting *United States v. Powell*, 469 U.S. 57, 58 (1984)).   In any event, because of the guilty verdict on the conspiracy to obstruct Congress count, it is *not* the case that "the jury necessarily determined that the facts underlying [that] charge . . . were not proved beyond a reasonable doubt."   *Khatallah*, 41 F.4th at 648.   Because of the jury's conviction of Bennie Parker on the conspiracy to obstruct Congress count and the evidence that supported it, this Court can and should find that Bennie Parker agreed with his co-defendants to try to obstruct Congress' certification of the Electoral College vote, and the Court should hold Bennie Parker responsible for the relevant conduct of his co-conspirators in furtherance of this unlawful agreement.   This includes the risks posed by the co-conspirators' organization of an armed QRF to support their January 6 operation, the threats of injury and property damage caused by joining a riot around and inside the United States Capitol, and the substantial interference that this riot caused to Congress' certification of the Electoral College vote.   Such conduct supports the application of each of the specific offense characteristics discussed in greater detail below.

**b. Chapter Two: Offense Conduct**

The PSR applies the appropriate Sentencing Guidelines and specific offense characteristics, given the defendant's relevant conduct.

    *i.   The Base Offense Level*

The PSR correctly determines that the appropriate Chapter Two offense guidelines for the offenses of conviction are as follows:

- *Count One:* 18 U.S.C. § 1512(k), Conspiracy to Obstruct an Official Proceeding (Defendants Sandra Parker, Bennie Parker, Steele, Meggs, and Isaacs): Under U.S.S.G. § 2X1.1, the base offense for a conspiracy conviction is the guideline for the substantive offense, which is 18 U.S.C. § 1512(c)(2).   The applicable Chapter Two Guideline for this offense is U.S.S.G. § 2J1.2, "Obstruction of Justice." U.S.S.G. Appendix A.

- *Count Two:* 18 U.S.C. § 1512(c)(2), Obstruction of an Official Proceeding (Defendants Sandra Parker, Steele, Meggs, and Isaacs): The applicable Chapter Two Guideline for this offense is U.S.S.G. § 2J1.2, "Obstruction of Justice." U.S.S.G. Appendix A.

- *Count Three:* 18 U.S.C. § 372, Conspiracy to Prevent Officers of the United States from Discharging their Duties (Defendants Sandra Parker, Steele, Meggs, and Isaacs): Under U.S.S.G. § 2X1.1, cmt. n.3, for a conspiracy conviction for which the substantive offense is not covered by a specific guideline, use §2X5.1.   Under U.S.S.G. § 2X5.1, since there is no applicable Chapter Two Guideline for an offense of preventing officers of the United States from discharging their duties in the Statutory Appendix, use "the most analogous guideline."   The "officers" of the

20

United States who were the victims of this count were the Members of Congress. Therefore, the most analogous guideline is U.S.S.G. § 2J1.2, "Obstruction of Justice."

- *Count Four:* 18 U.S.C. § 1361, Destruction of Government Property (Defendants Sandra Parker, Steele, Meggs, and Isaacs): The applicable Chapter Two Guideline for this offense is U.S.S.G. § 2B1.1, "Destruction of Property." U.S.S.G. Appendix A.

- *Count Five:* 18 U.S.C. § 1752(a)(1), Entering or Remaining in a Restricted Building or Grounds (Defendants Sandra Parker, Bennie Parker, Steele, Meggs, and Isaacs): The applicable Chapter Two Guideline for this offense is U.S.S.G. § 2B21.3, "Trespass." U.S.S.G. Appendix A. However, because the offense was committed with the intent to commit a felony, the Court should apply the guideline for that felony (and all applicable specific offense characteristics), U.S.S.G. §§ 2B2.3(c)(1), 2X1.1. Here, as discussed above, a preponderance of the evidence at trial established that the defendants committed the offense of entering or remaining in a restricted building or grounds with the intent to commit a felony, to wit: obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). The applicable Chapter Two offense guideline for that offense is U.S.S.G. § 2J1.2 (Obstruction of Justice).

- *Counts Six and Seven:* 18 U.S.C. § 231(a)(3), Interference with Law Enforcement Officers During a Civil Disorder (Count Six: Defendant Isaacs; Count Seven: Defendants Sandra Parker, Steele, and Isaacs): Under U.S.S.G. § 2X5.1, since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix,

use "the most analogous guideline."   Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."   Under U.S.S.G. § 2X5.1, since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."   Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

- *Count Eight:* 18 U.S.C. § 1512(c)(1), Tampering with Documents or Other Objects (Defendant Steele): The applicable Chapter Two Guideline for this offense is U.S.S.G. § 2J1.2, "Obstruction of Justice."   U.S.S.G. Appendix A.

  ii.   *Specific Offense Characteristics*

1.   The "Administration of Justice" Specific Offense Characteristics

For Counts One, Two, and Three, an eight-level increase under Section 2J1.2(b)(1)(B) applies if the offense involved causing or threatening property destruction or injury to others "in order to obstruct the administration of justice."   A separate three-level increase under Section 2J1.2(b)(2) applies "if the offense resulted in substantial interference with the administration of justice."

A.  LEGAL APPLICABILITY

The phrase "administration of justice," as used in these two specific offense characteristics, is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), including a "proceeding before the Congress" such as the certification of the Electoral College vote.   *United States v. Matthew Wood*, 21-cr-223 (Nov. 28, 2022), Sent. Tr. at 35-38.   Indeed, as this Court held in sentencing the defendants' co-conspirators in the *Rhodes* matter, the eight-level increase under Section 2J1.2(b)(1)(B) and the three-level increase under Section 2J1.2(b)(2) both are applicable,

as a matter of law, to the circumstances presented by this conspiracy.  *See, e.g.*, 5/24/23 Tr. at 168-77; 5/25/23AM Tr. at 3-8, 73-74.

### B.  FACTUAL BASIS

These two specific offense characteristics also apply because, as a matter of fact, the defendants' and their co-conspirators' relevant conduct "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," U.S.S.G. § 2J1.2(b)(1)(B), and "resulted in substantial interference with the administration of justice," U.S.S.G. § 2J1.2(b)(2).

With respect to the threat of injury and property damage, as this Court recently summarized at the *Rhodes* sentencings, "The essence of the . . . agreement represented a threat to others, including members of Congress."  5/25/23AM Tr. at 73.

*First*, the defendant's co-conspirators in Line One were part of a mob of rioters that caused injuries to Capitol Police officers guarding the doors to the building.  *See* 2/10/23AM Tr. at 1376 (testimony of Officer Marc Carrion that some "officers were being sprayed with OC spray, basically mace," and "other officers were being hit with flagpoles," "we had batteries thrown at us," and "officers were being injured and had to come off the line"); Gov. Ex. 1096.5 (video showing the mob's assault on Officer Carrion and other officers at the east Rotunda doors); Gov. Ex. 7077.1 (video showing co-conspirator Isaacs forcing his way through the East Rotunda Doors as other rioters attempt to remove the mask of a Capitol Police officer).   Indeed, the jury's verdict convicting Isaacs of interfering with Officer Carrion during Stack One's breach of the Capitol building, *see* No. 21-cr-28, ECF 910 at 6, shows that the co-conspirators' offense involved causing or threatening to cause physical injury to a person, because Isaacs' offense is part of the "relevant conduct" under Section 1B1.3.

*Second*, the co-conspirators, in breaching the Capitol building, were part of a mob of rioters that caused damage to the Capitol Building's East Rotunda doors and Columbus doors.   2/22/23 Tr. at 3537-53.   Indeed, the jury convicted co-conspirators Isaacs, Connie Meggs, Steele, and Sandra Parker of destruction of government property for their criminal culpability for the damage to the doors.   *See* No. 21-cr-28, ECF 910 at 5.   And again, these co-conspirators' actions are "relevant conduct" for this defendant under Section 1B1.3(a)(1)(B).

*Third*, the co-conspirators, including co-defendants Isaacs, Steele, and Sandra Parker, pushed against a line of riot officers from the Metropolitan Police Department ("MPD") in an effort to breach the Senate chamber to physically access the senators and staffers doing their jobs inside, causing physical injury to those officers.   Officer Owens and Officer Jackson have both testified to the physical injuries they and their fellow officers suffered during this encounter. 2/27/23AM Tr. at 4346-79; *see also Rhodes, et al.*, 10/26/22AM Tr. at 5441 (Officer Owens: "When the lines collided . . . the surge of us against the surge of the rioters coming at us lifted me up off my feet. . . . I was just literally lifted up off the ground."); *id*. at 5453 ("My arms and legs were bruised and bloodied and battered."); 1/6/23AM Tr. at 3384 ("So the biggest thing was like the weight of all of them, like just pushing down on you. . . . And for a moment, I thought we were going to lose this fight.").   Indeed, co-conspirators Watkins, Steele, Isaacs, and Sandra Parker have all been convicted of violating 18 U.S.C. § 231 for interfering with law enforcement officers during this incident.   Accordingly, a jury has concluded beyond a reasonable doubt that some members of the conspiracy "caus[ed] or threaten[ed] to cause physical injury to a person . . . in order to obstruct the administration of justice," U.S.S.G. § 2J1.2(b)(1)(B).

*Fourth*, some co-conspirators, including Minuta and James, assaulted and pushed against MPD riot officers in the Rotunda in an effort to further penetrate into the Capitol building in search

24

of the legislators inside, causing physical injury to those officers. *See Rhodes, et al.*, 1/6/23AM Tr. at 3385 ("[T]he individuals in front of [MPD Officer Jose Mendoza] were trying to pull him into the crowd with them. . . . I knew I had to grab him so that he was not taken away."); *id*. at 3401 ("[T]hey seemed like they were very violent, they were intent on making their way into the Capitol by any means necessary, and I didn't want Officer Mendoza to be a victim in anything.").

*Fifth*, some co-conspirators, including Harrelson and Dolan, while breaching the building and marching through the Rotunda, chanted "Treason!" regarding those Members of Congress who were supposed to be inside the Capitol building performing their constitutional duties to meet to certify the election results.   Gov. Ex. 1503.1.   Those chants were threatening and intimidating. Indeed, in similar contexts related to the attack on the Capitol, other judges have applied this characteristic over a defendant's objection on the theory that a defendant's words and conduct were "threatening" even if the defendant did not "assault" an officer or staffer.   For instance, then-Chief Judge Howell held that while a defendant did not directly verbally threaten Capitol Police officers, his "physical movements . . . communicated threats to law enforcement."   *Rubenacker*, No. 21-cr-193, Sent. Tr. at 56.   "[The defendant's] pursuit of [an officer], in blatant disregard for this officer's instructions to stand back and leave, as the crowd of angry, yelling rioters swelled around him, constituted a clear and direct threat to the safety of [the officer] and could have led to [the officer's] physical injury."   *Id.* at 57.   "The defendant's yelling and taunting at the officers . . . in an agitated manner with his finger outstretched was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers." *Id.* at 58.

*Sixth*, the co-conspirators, including Vallejo and Caldwell, managed an arsenal of firearms at a hotel in Virginia as part of an armed Quick Reaction Force to support the other co-conspirators

on the ground at the Capitol building—a fact Vallejo made clear in his podcast comments on the morning of January 6.   Gov. Exs. 9750, 1500.4.   As discussed above, a preponderance of the evidence established that Greene was aware of these QRF plans.   The threat to use firearms to accomplish the co-conspirators' unlawful ends of halting the certification proceeding and stopping the transfer of presidential power was a "threat" to cause harm to a person or property within the meaning of Section 2J1.2(b)(1)(B), even if the threat was not communicated directly to the legislators or officers.   *See United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008) (in prosecution for interstate communications of threats, the "threat doesn't need to be communicated directly to its victim or specify when it will be carried out"); *United States v. Baker*, 514 F. Supp. 3d 1369, 1378 (N.D. Fla. 2021) ("[The] language of 18 U.S.C. § 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce.") (quoting *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001)).   Indeed, Judge Friedrich relied on this theory to apply the eight-level enhancement under Section 2J1.2(b)(1)(B) for a defendant's threatening words about Speaker Pelosi and Senator McConnell that he uttered to others but not the legislators' themselves.   *See Reffitt*, No. 21-cr-32 (Aug. 1, 2022), Sent. Tr. at 20-21.

Thus, as the PSR finds, each is subject to the characteristic in Section 2J1.2(b)(1)(B).

With respect to the substantial interference with the administration of justice, it is hard to imagine a more substantial interference with the administration of justice.   The defendant's relevant conduct resulted in the evacuation of an entire branch of the federal government and the suspension of a congressional proceeding that was required by the Constitution and federal statute to take place at a certain date, time, and location so that our country could peacefully transfer presidential power from one person to the next.   Indeed, as this Court recently observed at the

26

*Rhodes* sentencings, "[T]he fact that the proceedings had to be adjourned and then were adjourned for a period of time constitutes substantial interference."   5/25/23AM Tr. at 75.

The Guidelines define the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*."   U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added).

The events of January 6 indisputably resulted in the "unnecessary expenditure of substantial governmental . . . resources," with the latest estimate of damages from entities responsible for the United States Capitol[2] totaling approximately $2.9 million.   And the co-conspirators' offenses contributed to that "unnecessary expenditure" of substantial governmental resources: the deployment of hundreds of law enforcement officers to defend and then clear the Capitol building and grounds of those—such as the defendants here—whose conduct caused the evacuation of hundreds of lawmakers and the suspension of the certification proceedings.   The repair and clean-up costs were similarly extensive, and certainly "substantial."

The evidence established that the conduct of the co-conspirators in this case obstructed Congress' certification (delaying it by several hours, for example) and impeded the ability of the

---

[2] Including the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.   Additionally, as discussed in the government's Brief Regarding Restitution recently filed in *Rhodes*, see ECF No. 654 at 4 n. 3, the Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is a victim under the analysis set forth above. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million).

staff working for the Vice President (see the testimony of Secret Service Inspector Lanelle Hawa), the Speaker of the House (see the testimony of Jamie Fleet), and the House Parliamentarian (see the testimony of Thomas Wickham), among others, to complete their work related to that certification.   That delay caused the unnecessary expenditure of substantial governmental resources.   Therefore, the three-level enhancement under Section 2J1.2(b)(2) applies.

2.   The "Extensive Scope, Planning, or Preparation" Specific Offense Characteristic

For Counts One, Two, and Three, Section 2J1.2(b)(3) provides a two-level enhancement if the offense (A) involved the destruction of a substantial number of records; (B) involved the selection of an especially probative record to destroy; or (C) "was otherwise extensive in scope, planning, or preparation."   While all three components of subsection (C) apply here, based on the subsection's use of the disjunctive "or," the Court need only find that the defendant's relevant conduct was extensive in scope, planning, *or* preparation.   *See United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016).

Here, the PSR correctly determines that the co-conspirators' relevant conduct was extensive in scope, planning, *and* preparation.   In the related case of *United States v. Rhodes, et al.*, Case No. 22-cr-15-APM, this Court recently applied this specific offense characteristic to the co-conspirators' crimes related to the attack on the Capitol.   *See, e.g.*, 5/25/23AM Tr. at 76 ("Clearly there was extensive scope and planning for the events of January 6th. Even if we take the time period simply from December 19th forward, there's extensive scope and planning in terms of gathering people, making arrangements for transportation, hotel, bringing of weapons, and creating of groups to operate on that day.   And then, of course, planning and preparation in terms

of going into the building was exhibited by the way in which people entered in groups—that is planning and preparation, and shows organization.").

Indeed, this conspiracy was extensive in both its objective and size.   A total of 23 individuals have been convicted for their roles in this conspiracy: these five defendants, their co-defendants Greene and Crowl, the nine defendants in *Rhodes*, and the seven cooperating defendants.[3]   The conspiracy and its attendant conduct was protracted, lasting from December 2020 through January 2021.   The members of the conspiracy communicated with each other using sophisticated, encrypted messaging applications, email servers, and meeting platforms.   They also coordinated with one another to travel across the country from Arizona, Texas, Alabama, Georgia, Florida, Ohio, Indiana, North Carolina, Virginia, and elsewhere into the D.C. area.   The presence of the armed Quick Reaction Force staged miles from the Capitol building at a hotel in Virginia, armed with firearms and other weapons collected from numerous persons, also shows the extensive scope of the offense.   Finally, the scope of the conspiracy's objective was itself enormous: to forcibly prevent an entire branch of the federal government from performing its constitutional and statutory duties.

### 3.   Other Specific Offense Characteristics

The PSRs appropriately apply the specific offense characteristics for Counts Four through Eight of the Indictment.   Because of the grouping analysis set forth below in Section II.d,

---

[3] All but two of these defendants were convicted of at least one conspiracy charge.   The exceptions are Caldwell and Greene, who, as explained in greater detail in the sentencing materials for those defendants, which are incorporated herein by reference, were proven to be members of the conspiracy by preponderance of the evidence.   There are also three additional members of the conspiracy still pending trial (Kellye SoRelle, Jonathan Walden, and Jeremy Brown), not to mention the unindicted co-conspirators, including those who managed the arsenals of weapons at the QRF hotel.

however, the analysis for Counts One through Three will control the ultimate recommended Sentencing Guidelines range, so the government will not address the specific offense characteristics of those other counts in this memorandum.

### c. Chapter Three: Adjustments

The PSR applies the appropriate adjustments, given the defendants' relevant conduct.

#### i. Section 3B1.2 (Minor Role Adjustment)

The Guidelines provide for a two-level downward adjustment if "the defendant was a minor participant in any criminal activity."   The corresponding application note states that this adjustment is appropriate for "any participant who is less culpable than most other participants, but whose role could not be described as minimal."   U.S.S.G. § 3B1.2, cmt. 3.   "The determination of whether a defendant is eligible for a downward adjustment under Section 3B1.2 depends in large part on a determination of the amount of relevant conduct for which the defendant is being held responsible; this relevant conduct is the denominator for purposes of the Section 3B1.2 analysis."   *United States v. Graham*, 317 F.3d 262, 272 (D.C. Cir. 2003).

The Indictment charged these defendants with participating in a conspiracy that spanned from the beginning of December 2020 through January 2021.   As laid out above in the Background section, the evidence at trial established that the leaders of this conspiracy, including Rhodes, Kelly Meggs, and Watkins, took steps in furtherance of the conspiracy throughout that time period, including the recruitment of others to the conspiracy, the creation and use of encrypted messaging services and meeting platforms to assist with planning and coordination, and preparations to have an armed QRF to support co-conspirators on the ground inside of D.C.   These defendants did not personally participate in all of this relevant conduct.   In other words, the

numerator of their personal contributions to the conspiracy is smaller than the denominator of the relevant conduct, and the defendants should be considered minor participants in the conspiracy.

Thus, for the *conspiracy* charges, the government submits that a two-level reduction for minor role is appropriate.   The same reasoning does not apply to the substantive counts, however. For their conduct on January 6—in obstructing the official proceeding, interfering with law enforcement officers, entering and remaining in a restricted building and grounds, and contributing to the destruction of property—the defendants were active and full participants.[4]

Finally, a *minimal* role adjustment (-4 levels) is *not* appropriate for any of these five defendants, on any of the charges.   This adjustment is only appropriate "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity."   U.S.S.G. § 3B1.2, cmt. 3.   All five of these defendants joined and fully participated in the conspiracy no later than the afternoon of January 6.   Each defendant also took actions that showed they played more than a minimal role:   Bennie and Sandra Parker coordinated with Jessica Watkins as early as November 2020 and made plans with her in advance of January 6 to bring weapons to contribute to the QRF; Connie Meggs participated in the Florida team's contribution of weapons to the QRF and evidenced a clear understanding of the purpose of the co-conspirators' actions on January 6 in her statements that evening; Sandra Parker and Laura Steele joined in the effort to push down the hallway toward the Senate Chamber; and William Isaacs moved to the front of "Line One" to be the first Oath Keeper to breach the Capitol on January 6, and then, once inside, waved others down the hallway toward the Senate Chamber

---

[4] For the same reason, a minor role adjustment will not be appropriate for similar conduct committed by stand-alone January 6 defendants who did not participate in a conspiracy.

yelling, "The fight's not over!"   In sum, while these defendants were not the leaders of this conspiracy, they also were not "substantially less culpable than the average participant in the criminal activity," and a minimal role adjustment does not apply.

### ii.   Section 3C1.1 (Obstruction of Justice)

The PSR correctly determines that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice to each defendant.   This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."   U.S.S.G. § 3C1.1.   The commentary to the Guidelines includes a non-exhaustive list of some of the ways that a defendant can obstruct justice.   *See, e.g.*, U.S.S.G. § 3C1.1, cmt. n.4(B) (committing perjury); cmt. n. 4(D) (deleting evidence or instructing others to do so, or attempting to do so); *see also United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury merits the obstruction enhancement under Section 3C1.1); *United States v. Mellen*, 89 F. App'x 268, 270 (D.C. Cir. 2004) (affirming application of the enhancement for "advis[ing]" someone else to destroy property to avoid detection, and then destroying the evidence himself).   "Where conduct is directly and inherently obstructive—that is, where the defendant engages in behavior that a rational person would expect to obstruct justice—the court may infer an intent to obstruct justice and need not make a separate finding of specific intent."   *United States v. Reeves*, 586 F.3d 20, 23 (D.C. Cir. 2009) (citation and internal quotation marks omitted); *see also United States v. Khan*, 461 F.3d 477, 500-01 (4th Cir. 2006) (noting the trial court's imposition of the adjustment under Section 3C1.1 in a seditious conspiracy case where the defendant "gave false statements to investigators and destroyed

evidence before trial, in addition to providing 'incredible' testimony at trial" and that "the Guidelines treat those who accept responsibility and those who obstruct justice differently").

As described above, all five defendants obstructed justice by deleting or destroying evidence and by lying while testifying.

*First*, four of the defendants are culpable of "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so." Bennie and Sandra Parker deleted all their communications with Watkins from their cell phones. 02/27/2023PM Tr. 4602-03. Connie Meggs deleted of her most incriminating messages, in which she confessed to going to stop the vote, was not found on her phone. 02/27/2023PM Tr. at 4583-84. The FBI only obtained that message through T-Mobile. *Id.* at 4584.

As for Steele, she was convicted of tampering with evidence for using a burn pit in her backyard to burn and destroy evidence of her involvement in the attack on the Capitol, including the clothing she wore while at the Capitol on January 6, 2021.[5] *See* Eighth Superseding Indictment, ECF No. 684 at ¶ 126. At trial, the government presented the testimony of an agent who searched Steele's home and property in February 2021, who stated that he was unable to find the identifiable hat and Oath Keepers shirt Steele wore while inside the Capitol. 02/27/2023AM Tr. at 4322, 4334, and 4344. The agent also testified that law enforcement discovered charred remains of certain items burned in a burn pit behind Steele's house. *Id.* at 4336-37. Additionally, Steele's brother Graydon Young testified at the *Rhodes* trial that on January 7, he and Steele burned

---

[5] This conviction creates an additional reason to apply this upward adjustment. *See* U.S.S.G. § 3C1.1, cmt. n.4 ("This adjustment also applies to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense where there is a separate count of conviction for such conduct.").

all the gear they wore inside the Capitol in a burn pit in Steele's backyard.   10/31/22PM Tr. at 5788-89.   The Court can rely on that testimony to apply this adjustment.   *See Bapack*, 129 F.3d at 1324 (observing that a sentencing court may rely on any evidence established by the government "by a fair preponderance" to apply enhancements under the Guidelines).

*Second*, three of the defendants (Connie Meggs, Bennie Parker, and William Isaacs) provided false testimony at trial that "reflect[ed] a willful attempt to obstruct justice," U.S.S.G. § 3C1.1, cmts. n.2, 4(B).   Connie Meggs lied about numerous matters.   Most significantly, Meggs gave a variety of conflicting reasons for going toward and inside the Capitol, including that she went toward the Capitol and riot as part of a security detail (*id*. at 5173-74); that she went up the east stairs of the Capitol to retrieve two other Oath Keepers (*id*. at 5177-78); that she got sucked into the Capitol (*id*.); and that she went into the Capitol to help people that may be in trouble (*id*. at 5181, 5193).   But, according to her own message on the night of January 6, she and others "went to the Capitol to stop the vote." *Id*. at 5275.   Additionally, Meggs' testimony that she never saw any of Rhodes' open letters regarding the presidential election and January 6, 2021 (3/1/23AM Tr. at 5149-50) was belied by her sending a link to one of those open letters to a friend on January 4 (Gov. Exh. 10030).   Defendant Meggs' claim that she made it a practice to periodically delete data off her phone to save storage (3/1/23AM Tr. at 5120-21) was inconsistent with the evidence on her phone, which showed that in the data from before December 30, 2020, there were over 4,000 text messages that Defendant Meggs had retained; for the period of December 31 through January 13, there were only four messages; and from January 13 through February 17, there were over 1,500 messages.   *See* 3/8/23AM Tr. at 6517-18 (rebuttal testimony of Special Agent Michael Palian.   Finally, Defendant Meggs' assertion that her other family members may have sent

incriminating text messages from her phone to her best friend (3/1/23AM Tr. at 5150-51) simply strains credulity.[6]

Defendant Bennie Parker provided false testimony about his reasons for bringing an AR-15 firearm to the D.C. area for January 6.   Specifically, he claimed the weapon was only for target practice, but could not point to any evidence of plans or even a possible location for such activities. *See* 3/1/23PM Tr. at 5326; 3/3/23AM Tr. at 5447.

Finally, Defendant William Isaacs falsely minimized his conduct by claiming to not understand the meaning of the word "Rubicon" in his message of December 23, in which he stated, "Either trump crosses the Rubicon or the citizens cross the delaware."   3/6/23PM Tr. at 5872-75. Isaacs also first claimed he didn't know why he yelled, "The fight's not over!" as he waved other rioters down the Senate hallway on January 6.   3/6/23AM Tr. at 5774.   And he then asserted he was speaking of "a verbal First Amendment fight."   3/6/23PM Tr. at 5911.   The video evidence of what was going on around Isaacs at this time, as well as the evidence of how he next joined the mob trying to push past officers to gain access to the Senate Chambers, shows this testimony to be untrue.   Gov. Exs. 1504, 1505.

---

[6] Connie Meggs also testified that "only her husband owned an Oath Keepers shirt" (3/1/23AM Tr. at 5128-29); that she did not participate in firearms training due to her "severe arthritis" (*id.* at 5135); that she never ordered Oath Keepers flags (*id.* at 5168-69); and that she felt bad for the homeless people in Washington, DC, (*id.* at 5256-57).   These under oath statements were contradicted by Government's Exhibits 4804.1 (photograph of Connie Meggs wearing a Florida Oath Keepers shirt), 4801.8 (photograph of Meggs sitting on ground firing a gun while at a training with Kelly Meggs, Kenneth Harrelson, and Joseph Hackett in September 2020), 11.P.1-2 (photographs of Oath Keepers flag recovered from the Meggs' residence and the shipping label for the flag, which showed it was sent to "OK FL Patriots CONNIE MEGGS"), and 10027 (message from Connie Meggs to a friend on January 5: "Apple turned off map to get into city it's done gross here homeless people dirty and antifa all around here democrats are satans people on earth"), respectively.

The Court should therefore find by a preponderance of the evidence that these three defendants committed perjury.[7]   *See United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004). A defendant committed perjury if he or she gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94.   A "material" statement is one that concerns "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. n.6; *see also United States v. Hines*, 694 F.3d 112, 122 (D.C. Cir. 2012) (affirming the imposition of the two-point adjustment for obstruction of justice based on the defendant's "deliberate[] misrepresent[ion]" during a pretrial suppression hearing regarding a one-day discrepancy in the date he was first interviewed by government agents).

### iii.   Section 3E1.1 (Acceptance of Responsibility)

The PSRs correctly reject any claims to an entitlement to a reduction in offense level based on acceptance of responsibility.   Such an adjustment, the Guidelines commentary makes clear, "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."   U.S.S.G. § 3E1.1, cmt. n.2.   It will be "rare" for a defendant who proceeds to trial to receive this adjustment.   *Id.*   That "rare" situation is when a defendant proceeds to trial to "preserve issues that do not relate to factual guilt."   *Id.*   Here, the defendants all contested (either through their testimony or defense cases/arguments) that the government proved the necessary *mens rea* for them to have committed the conspiracy and obstruction of justice offenses

---

[7] Note 4(F) adds that "providing materially false information to a judge" is another type of conduct that merits the two-level enhancement.

with which they were charged.   The defendants, therefore, denied an essential factual element of guilt: their own intent.

Indeed, in a different Capitol riot case, Judge Walton held that a defendant who went to trial and testified about his conduct but denied possessing the necessary *mens rea* to corruptly obstruct the official proceeding would "absolutely" not be entitled to a reduction for acceptance of responsibility.  *United States v. Thompson*, 21-cr-161 (Nov. 18, 2022), Sent. Tr. at 64.   Judge Walton's conclusion echoes that of circuit courts, which routinely find that district judges do not abuse their discretion or clearly err in denying the acceptance-of-responsibility adjustment for defendants who proceed to trial in obstruction cases contesting whether they possessed the requisite corrupt intent.  *See, e.g., United States v. Marinello*, 839 F.3d 209, 226-27 (2d Cir. 2016), *reversed and remanded on other grounds*, 138 S. Ct. 1101 (2018); *United States v. Petruk*, 836 F.3d 974, 977-78 (8th Cir. 2016).   A defendant who admits his physical actions but denies his intent necessarily denies his "factual guilt" under Section 3E1.1.   *See United States v. Jaynes*, 75 F.3d 1493 (10th Cir. 1996) (affirming inapplicability of this adjustment for defendant who admitted conduct constituting forgeries but denied any intent to defraud government); *United States v. Burns*, 781 F.3d 688 (4th Cir. 2015) (affirming inapplicability of this adjustment for defendant who admitted to shooting into car but denied possessing intent to kill).

### d.  Grouping

For each defendant, all of the offenses of conviction group, and the Guidelines analysis for Counts One through Three controls.   Under U.S.S.G. § 3D1.2, "closely related counts" group. All the counts of conviction for each defendant should be placed into one group, as described more fully below.

- *Counts One through Three and Five*.   Under U.S.S.G. § 3D1.2(b), the counts that "involve the same victim" and "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" group.   Counts One (conspiracy to obstruct an official proceeding), Two (obstruction of an official proceeding), and Three (conspiracy to prevent members of Congress from discharging duties) involve the same victim (Congress).   Counts One, Two, Three, and Five and are part of the same common criminal objective: to oppose by force the lawful transfer of power following the 2020 U.S. Presidential election by interfering with the certification proceeding on January 6, 2021 (including by unlawfully entering and remaining in the Capitol building and grounds) and by preventing members of Congress from discharging their duties that day.   Counts One, Two, Three, and Five therefore group under U.S.S.G. § 3D1.2(b).

- *The Remaining Counts*.   Under U.S.S.G. § 3D1.2(c), a count that "embodies conduct that is treated as a specific offense characteristic in" another guideline groups with the guideline for that count.   For the reasons outlined in the bullet points that follow, Counts Three (conspiracy to prevent officers of the United States from discharging their duties); Count Four (destruction of government property); Six and Seven (interference with law enforcement officers during a civil disorder); and Eight (tampering with documents or other objects) each embody conduct that is treated as a specific offense characteristic in the Guidelines analysis for Counts One, Two, Three, and Five, therefore, all additional charges group, as well.

○ <u>Count Three:</u>  Count Three (conspiracy to prevent officers of the United States from discharging their duties) also embodies conduct that is treated as a specific offense characteristic in U.S.S.G. § 2J1.2(b)(1)(B).   In Count Three, the jury found the defendants guilty of conspiring to use "force, intimidation, or threat" to prevent Members of Congress from discharging duties.   Those same elements–force, intimidation, or threat–support application of the specific offense characteristic in U.S.S.G. § 2J1.2(b)(1)(B) of "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

○ <u>Count Four:</u>  Count Four (destruction of government property) embodies conduct that is treated as a specific offense characteristic in U.S.S.G. § 2J1.2(b)(1)(B).   In Count Four, the jury found Defendants Sandra Parker, Steele, Meggs, and Isaacs guilty of contributing to the damage sustained by the East Rotunda doors through which they breached the Capitol.   Those same elements–causing or threatening to cause property damage–support application of the specific offense characteristic in U.S.S.G. § 2J1.2(b)(1)(B) of "causing or threatening to cause . . . property damage, in order to obstruct the administration of justice."

○ <u>Counts Six and Seven:</u>   In Count Six, the jury found Defendant Isaacs guilty of interference with law enforcement officers during a civil disorder, and in Count Seven, the jury found Defendants Sandra Parker, Steele, and Isaacs guilty of interference with law enforcement officers during a civil disorder.   That conduct similarly supports application of the specific

offense characteristic in U.S.S.G. § 2J1.2(b)(1)(B) of "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

o <u>Count Eight:</u>   Count Eight (tampering with documents or other objects) is an obstruction count that groups with its underlying crimes under the principle embodied in U.S.S.G. § 3C1.1, cmt. n.8, which provides that if a defendant is convicted of both an obstruction offense and an underlying offense, the "the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of U.S.S.G. § 3D1.2 (Groups of Closely Related Counts)."

For these reasons, all the counts of conviction for each defendant group.[8]   Because the Guidelines analysis for Count Two, obstruction of an official proceeding, results in the highest offense level, that analysis controls for defendants Sandra Parker, Steele, Connie Meggs, and Isaacs.   U.S.S.G. § 3D1.3(a) ("In the case of counts grouped together pursuant to § 3D1.2(a)-(c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group.").   For Defendant Bennie Parker, the analysis for Count One, conspiracy to obstruct an official proceeding, results in the highest offense level and controls.

---

[8] If the Court determines that any of the specific offense characteristics or the adjustment for obstruction of justice do *not* apply to a particular defendant, then not all counts of conviction will group, and the Court will have to adjust the offense level according to the analysis in Part D of Chapter 3.

**e.  Departures**

The Court should depart upward from the Guidelines range for each of the defendants'
relevant conduct in this case for the bases explained below and in the sentencing allocution section
for each defendant.

*i.  Section 3A1.4, Note 4 (Terrorism)*

As in the *Rhodes* and *Minuta* sentencings, the Court should depart upward because these
defendants committed offenses that were calculated to influence or affect the conduct of the
government by intimidation or coercion, or to retaliate against government conduct.   All five
defendants were active participants in the Oath Keepers' conspiracy to prevent, hinder, or delay
the certification proceeding, and to use force, intimidation, or threats to prevent members of
Congress from discharging their duties during that proceeding.

Note 4 to Section 3A1.4 provides that an upward departure is "warranted" if the
defendant's "offense was calculated to influence or affect the conduct of government by
intimidation or coercion, or to retaliate against government conduct."   U.S.S.G. § 3A1.4, cmt.
n.4(A).   When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged,
structured upward departure*," the purpose of which is to provide courts with "a viable tool to
account for the harm involved during the commission of these offenses on a case-by-case basis"
and to "make[] it possible to impose punishment equal in severity to that which would have been
imposed if the § 3A1.4 adjustment actually applied."   Sentencing Guidelines, App. C, amend. 637
(2002) (emphasis added).

The conduct of these five defendants was clearly "calculated to influence or affect the
conduct of government by intimidation or coercion, or to retaliate against government conduct."
U.S.S.G. § 3A1.4., cmt. n.4.   A defendant's offense is so "calculated" if that offense was

specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force.   *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012).   As this Court recently observed in sentencing the defendants in the related *Rhodes* matter, "[I]t is challenging to find that in a case where individuals were convicted of participating in a [] conspiracy to stop the lawful transfer of power after a United States Presidential election, that they plotted to use force in so doing—it is very hard to not see that as terrorism within the definition certainly at least Note 4.   That is certainly conduct that is calculated or intended to result in the coercion and intimidation of the government in order to achieve some purpose." 5/25/23AM Tr. at 36.   The Court was, at the time, sentencing Defendant Rhodes, who was convicted of seditious conspiracy, but the Court found the Note 4 departure applied equally to defendants Watkins and Harrelson, who were convicted of only conspiracy to obstruct Congress and/or conspiracy to interfere with members of Congress.   In sentencing Watkins, the Court focused on the fact that "her offense was clearly calculated to influence or affect the conduct of the government by intimidation or coercion," because "her words and her captured actions inside the building and leading up to the building leave no doubt what was the true object of her force." 5/26/23AM Tr. at 11.

So, too, with these five defendants.   On January 6, each donned paramilitary gear and linked literal and metaphorical arms with their co-conspirators to breach the restricted areas of the Capitol building or grounds.   Each of them made statements or took actions that showed the object of this force was to influence or affect the conduct of the government by intimidation or coercion, and to retaliate against government conduct.   Connie Meggs admitted that she "went to the capital to stop the vote" when she learned that Vice President Michael R. Pence had failed to do so.   Gov. Ex. 9651 (Msg. Gov. Ex. 9651).   She then not only joined the mob that forced its way inside the

Capitol but pushed deeper into the building, towards the House of Representatives, in search of Speaker Pelosi.   02/23/2023PM Tr. at 3995-96; Gov. Ex. 1674.

Defendants Steele, Isaacs, and Sandra Parker each made statements in the wake of the election showing their willingness to forcibly oppose the result.   *See* Section I *supra*.   They then not only joined the mob that forced its way inside the Capitol but encroached deeper into the building, pushing against riot police officers to try to gain access to the Senate Chamber.   Gov. Exs. 1504, 1505.   As Isaacs urged other rioters to join this offensive, he shouted, "the fight's not over."   Gov. Ex. 1504.

Finally, as Bennie Parker stood with the throngs at the base of the Capitol steps, he plainly stated that "what's happening right now"—the attack on the Capitol—was occurring because "we just had a presidential election and it was stolen from us."   *Id.*   He showed his intentional participation in the effort to use force to coerce Congress into changing that result by acknowledging that there was "not a whole lot [the Capitol Police] can do with this many people" and threatening that Americans like him were prepared to take up arms and start a civil war if the government failed to take the actions they demanded.   *Id.*

Thus, like their co-conspirators in the *Rhodes* matter, these five defendants' conduct was calculated to influence or affect the actions of government through intimidation and coercion, and to retaliate against government conduct and thus, the Court should apply an upward departure under Note 4.   Accordingly, applying the same framework the Court used for determining the

appropriate sentencing ranges for the other co-conspirators, the governments seeks an upward

departure of one level for these defendants.[9]

### ii.   Alternative Bases for Upward Departure

Aside from Note 4, other provisions in the Sentencing Guidelines provide independent and

further bases for the Court to depart upwards from each defendant's Guidelines range: Section

5K2.7 (Disruption of Governmental Function), Section 5K2.0(a)(3) (Circumstances Present to a

Degree Not Adequately Taken Into Consideration); and Section 5K2.6 (Weapons).

"If the defendant's conduct resulted in a significant disruption of a governmental function,

the court may increase the sentence above the authorized guideline range to reflect the nature and

extent of the disruption and the importance of the governmental function affected."   U.S.S.G.

§ 5K2.7.   This departure "ordinarily would not be justified when the offense of conviction is . . .

obstruction of justice . . . unless the circumstances are unusual."   *Id.; see also* § 3A1.2, cmt. n.5;

---

[9]      Defendants Sandra Parker, Steele, Meggs, and Isaacs were each convicted of felony
destruction of government property, in violation of 18 U.S.C. § 1361, which is an enumerated
"federal crime of terrorism" under 18 U.S.C. § 2332b(g)(5)(B).   And each of these defendants'
relevant conduct was "calculated to influence or affect the conduct of government by intimidation
or     coercion,     or     to     retaliate     against     government     conduct,"     18     U.S.C.     §
2332b(g)(5)(A).   Accordingly, these defendants were found guilty of an offense that "involved",
or was intended to promote, a federal crime of terrorism.   Section 3A1.4 suggests that the Court
should therefore increase each of these four defendants' base offense level to 32, and increase their
criminal history scores from I to VI.   This would result in a significantly higher Guidelines
calculation for these defendants than those correctly calculated by the Court for the *Rhodes* and
*Minuta* defendants, all of whom were acquitted of felony destruction of government property.   As
set forth in Section II.c.1, these five defendants are less culpable than their *Rhodes* and *Minuta* co-
conspirators, and it would, consequently, be inequitable for these defendants to receive sentences
greater than those provided by the calculated Guidelines ranges for the other co-
conspirators.   Accordingly, when determining the appropriate Guidelines ranges for these
defendants, the Court should use the same methodology used with the other co-conspirators: find
that the appropriate Guidelines range is the one determined by the Note 4 departure, not the 3A1.4
adjustment.   The net result of these adjustments, departures, and variances would be increasing
each defendant's calculated Guidelines range by one offense level.

§ 2A2.4, cmt. n.3 (regarding additional relevant bases for applying Section 5K2.7).   Here, the circumstances of the offense are unusual: the defendants sought to disrupt a government function that is integral to our democracy and is mandated by the Constitution itself—the Certification of the votes of the Electoral College.   *See* U.S. Const. amend. XII.

Similarly, an upward departure under Section 5K2.6 may be warranted "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense."   Here, the co-conspirators' staging of an arsenal of semi-automatic rifles and other firearms just across the Potomac River means they "used or possessed" weapons to obstruct Congress (and to commit sedition), yet the use and possession of those weapons is not reflected by any increase in the total offense level.   Defendants Sandra Parker, Bennie Parker, and Connie Meggs all left their home states with weapons they planned to contribute to the QRF.   Defendant Steele also traveled to the D.C. area with a weapon, although there is not evidence that she ever planned to contribute this weapon to the QRF.

Courts of appeals have affirmed upward departures for firearms possession under Section 5K2.6 in fraud cases, premised on the idea that the fraud Guideline does not take into account the use of a weapon, and therefore does not adequately capture a defendant's dangerousness or the seriousness of the offense.   *United States v. Paslay*, 971 F.2d 667, 672 (11th Cir. 1992); *United States v. Gaddy*, 909 F.2d 196, 199-200 (7th Cir. 1990).[10]   The same premise holds true here: the co-conspirators' transportation and possession of firearms in furtherance of their obstruction of the

---

[10]  The courts in *Paslay* and *Gaddy* departed upward by four and two levels, respectively (though the *Paslay* court departed upward on multiple grounds).   Many Guidelines provide a two-level increase if a firearm was possessed.   *See, e.g.*, U.S.S.G. § 2B2.1(b)(4) (burglary); § 2B2.3(b)(2) (trespass); § 2B5.1(b)(4) (counterfeit bearer obligations); § 2B5.3(b)(6)(B) (criminal infringement of copyright).   Others provide a three-level increase for the same characteristic.   *See, e.g.*, U.S.S.G. § 2B3.1(b)(2)(E) (robbery); § 2B3.2(b)(3) (extortion by force).

congressional proceeding means that the Court should depart upward from the obstruction Guideline to account for the added dangerousness and seriousness of their criminal conduct, especially because under the grouping analysis there results an "inadequate scope for ensuring appropriate additional punishment for the additional [firearms] crimes."   U.S.S.G. § 3D1.4, bkgd. cmt.

Finally, an upward departure is equally appropriate under Section 5K2.0, which would account for the defendants' "intent to frighten, intimidate, and coerce" federal lawmakers in manner that is not otherwise accounted for in the Guidelines.   *United States v. Tankersley*, 537 F.3d 1100, 1116 (9th Cir. 2008); *see id.* at 1112-14 (upholding 12-level upward departure under Section 5K2.0 after the district court concluded that Section 3A1.4 did not apply).

### f.  Applicable Sentencing Guidelines Ranges

Based on the analysis above, the following guidelines, specific offense characteristics, adjustments, and departures should apply to Defendants Sandra Parker, Steele, Connie Meggs, and Isaacs:

| Base Offense Level: | 14 | §2J1.2(a) (obstruction of justice) |
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury or property damage) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference due administration of justice) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Upward Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Upward Departure | +1 | §3A1.4, Note 4 (terrorism) |
| Total | 30 | |

Because he was only convicted of conspiracy to obstruct an official proceeding, Bennie Parker's sentencing guidelines analysis differs slightly:

| Base Offense Level: | 14 | §2J1.2(a) (obstruction of justice) |

| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury or property damage) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference due administration of justice) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Downward Adjustment | -2 | §3B1.2(b) (minor role) |
| Upward Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Upward Departure | +1 | §3A1.4, Note 4 (terrorism) |
| Total | 28 | |

None of the defendants have any applicable criminal history, so they are all a Criminal History Category I. Applying all of these factors, the recommended sentencing guidelines range for Sandra Parker, Steele, Connie Meggs, and Isaacs is 97-121 months of incarceration. The recommended sentencing guidelines range for Bennie Parker is 78-97 months of incarceration.

## III.   SECTION 3553(a) FACTORS

The Court's sentence must be guided by the factors in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate general and specific deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). Here, these factors all weigh in favor of a significant sentence of incarceration for each defendant.

### a.   Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

All five defendants were convicted of participating in an unprecedented conspiracy to stop members of Congress from performing their constitutionally required duty to review and certify the results of the 2020 presidential election. As the Court noted after the verdict in the related

47

*Rhodes* matter, the seriousness of this offense cannot be overstated.   1/23/23 Tr. at 4769.   "[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy."   *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   The attack was calculated to interfere with, and did interfere with, one of the most important democratic processes we have: the peaceful transfer of power.   As noted by Judge Moss during a different sentencing hearing,

> [D]emocracy requires the cooperation of the governed.   When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.   The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.   It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, No. 21-cr-188, Sent. Tr. at 69-70.   Indeed, as this Court sadly observed in sentencing co-conspirator Rhodes, one of the "enduring legacies of January 6" is that "we all now hold our collective breaths every time an election is approaching."

On January 6, each of these defendants knowingly joined and took steps towards furthering this devastating attack on our democracy.   The Court must impose a significant sentence of incarceration to reflect their roles in this grave offense.

In addition to attacking our democracy itself, the conduct of the defendants and their co-conspirators harmed institutions and individuals alike: the government, Congress, legislators, the staffers working inside the Capitol building, and the hundreds of law enforcement officers from across the region valiantly trying to protect the building, the people, and the constitutional process. The chilling victim impact statements presented to the Court in the related *Rhodes* matter convey the monumental impact of the defendant's offense.   *See* 22-cr-15, 5/24/23 Tr. at 1-32.

Opposing the transfer of presidential power and invading the U.S. Capitol building and grounds also constituted an attack on the rule of law.   "The violence and destruction of property

at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11]   As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration.

**b.  The History and Characteristics of Each Defendant and Their Roles in The Offense**

      *i.  Sandra Parker*

Sandra Parker deserves a significant sentence in this matter.   Soon after the 2020 Presidential Election, she demonstrated that she saw her involvement in the militia movement as tied to her opposition to the election and its outcome.   On November 10, 2020, Bennie Parker messaged Jessica Watkins, "My wife wants to get her ham license and also make a database connecting other Militias for a more unified connection."   Gov. Exh. 9801 (Msg. 192.T.460-461). Five days prior, on November 5, Sandra Parker messaged other individuals, "They are stealing the election.   We the people must be prepared to fight to bring those guilty to justice!   I am not willing to watch this great nation fall to socialism!!"   Gov. Ex. 9803 (Msg. 2251.T.1.1).   Her efforts to connect with the Oath Keepers and organize among militarized groups was fueled by her opposition to the election's outcome.

She would later reveal the sincerity of her words on November 5.   In advance of January 6, Sandra Parker and Bennie Parker brought with them three weapons: one AR-15 and two handguns, one for Bennie and one for Sandra.   On January 6, she donned military gear, to include a helmet borrowed from Jessica Watkins.   Moreover, she continued toward the Capitol after her husband peeled off the group.   If her intention had been to watch the scene unfolding at the

---

[11] FBI Director Christopher Wray, Statement before House Oversight and Reform Committee (June 15, 2021), *available a*t oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray %20Testimony. pdf

Capitol, there was no reason for her to continue onward, she could have stayed with Bennie Parker. But her intention was instead to participate, demonstrating that she was indeed prepared to fight. Once inside, she did not stop in the Rotunda but continued down the Senate hallway after huddling with the rest of Stack One.   In the hallway, her demeanor is not apprehensive, but she is captured on video smiling, in formation with Watkins and Crowl pushing towards the outnumbered officers. Gov. Exh. 1500.3.

Sandra Parker's conduct on January 6 was not a lark, it was the culmination of her efforts and determination to use her connection with other militias to engage in a unified effort to oppose the peaceful transfer of power.   A significant sentence is merited.

### ii.   Bennie Parker

Bennie Parker's own words are the best evidence for why a significant sentence is merited. On the Capitol grounds, witnessing the chaos unfolding around him, Bennie Parker pledged an escalation of violence in future, ominously vowing that "it will come to a civil war" and that they were "willing to take up arms."   Gov. Exh. 9335.   Indeed, Bennie Parker's own positioning on the grounds is significant.   As described in his PSR, Bennie Parker suffers from significant mobility restrictions.   The distance from the White House Ellipse to the United States Capitol is approximately a mile and a half.   That Bennie Parker marched this distance with the rest of his co-conspirators despite these significant limitations is a reflection of his dedication to the illegal conspiracy that was underway.

Moreover, on the stand Bennie Parker minimized, if not lied, about his and his co-conspirators' intent and conduct on January 6.   When asked about his purpose in bringing three weapons, Bennie Parker contended that he brought his AR-15 for target shooting.   3/3/2023AM Tr. at 5326.   This despite his acknowledgement that Crowl's cousin, with whom the Parkers and

Watkins stayed with on January 5, lived in a subdivision, *id*, and there were no messages or references at any point to target practice.   In fact, the guns were intended for the QRF.

Bennie Parker further alleged inexplicably that his wife and Jessica Watkins had solely gone into the Capitol to provide medical aid.   3/3/2023AM Tr. at 5396.   This is contradicted by Jessica Watkins' own trial testimony in which she, while minimizing her conduct, claimed she was swept in by the mob.   Moreover, Bennie Parker maintained that Sandra Parker had continued to the Capitol after he stayed back to assist an unnamed "VIP" hear her son speak.   *Id.* at 5399.   There is no evidence this unknown individual was with the group while they were on Capitol grounds and the balance of evidence across the three trial contradicts this claim.   And most egregiously, Bennie Parker denied having any awareness that there was a vote taking place or even a basic understanding of the certification process.   *Id.* at 5404.   This is belied by the evidence, which includes speeches made during January 6 referencing the certification vote and Jessica Watkins' own reporting on Zello that Pence's inaction "had spread like wildfire."   Bennie Parker was in fact a knowing, willing participant in an effort he perceived as stopping a "stolen" election.

For Bennie Parker's conduct and refusal to take any responsibility for his actions, a significant sentence is merited.

### iii.   Laura Steele

Laura Steele is arguably the most culpable of all five defendants being sentenced.   As someone who spent a career in law enforcement, she was in a better position than most to appreciate the grave dangers posed by her conduct and the conduct of her co-conspirators on January 6.   10/31/22 PM Tr. at 5771 (Graydon Young testimony about his sister, Steele's, former job as a police officer and then-current job as a security guard).   Despite a career that provided her opportunities to develop good judgment, she ignored that judgment—to the detriment of this

community and to the country.   From November 2020 through January 2021, she had a criminal

objective and she acted on it.

Immediately after the election, Steele made clear on Facebook that the results could not,

and would not, stand.   "It's a Coup Trump won A storm is coming," she wrote on November 6,

2020, later adding, "Biden will never be POTUS."   Gov. Exs. 2008.T.206.A & 2008.T.143.H.

And she had a detailed understanding of the electoral process and its timeline, accentuating the

purpose and criminality of her actions on January 6.   "[T]he media can proclaim the winner all

they want but, he has not been certified in any state.   The battle for the legitimate President starts

Monday," she wrote on November 8.   Gov. Ex. 2008.T.190.C.   She likewise understood the

importance of January, noting on December 5, "Peaceful transition in January Trump to Trump,"

and on December 7, "the only date that matters constitutionally is January 20 Trump won."   Gov.

Exs. 2008.T.278.C & 2008.T.129.B.

And Steele didn't act alone.   According to her brother, Graydon Young, it was Steele who

pushed the Oath Keepers onto him after the election.   10/31/20 AM Tr. at 5703-04; 10/31/22 PM

Tr. at 5800.   Young then joined the organization to do something more "effective and more

forceful" than just a protest—he "felt like something needed to change or be done."   *Id*.   After

she also joined the organization, Steele then gained access to the "OKFL Hangout" Signal group—

the main communication channel for the Florida Oath Keepers and many of her co-conspirators.

02/14/23AM Tr. at 1838.   Just two days before January 6, Young shared with Steele a "Call to

Action" email from Rhodes to all Oath Keepers, focused on their "well armed and equipped QRF

teams on standby, outside DC," and ordering them to D.C. on January 6 "prepare[d] to do whatever

must be done to honor our oaths to defend the Constitution against all enemies, foreign and

domestic."   Gov. Ex. 4656.

Steele followed that order.   On January 6, she and Young drove from Steele's North Carolina residence to the D.C. area with two handguns.   10/31/22 PM Tr. at 5771.   She eventually equipped herself with an Oath Keepers shirt, tactical vest, and other gear, and she joined the stack of Oath Keepers that breached the Capitol.   When she marched down the Senate hallway with her brother, she confronted and pushed against police officers like those she once served with. Anyone of reasonable mind would know the wrongfulness of joining a mob of criminals, let alone someone who had once sworn an oath to defend against them.

Steele's actions after January 6 reflect just how conscious she was of her guilt.   She and Young returned to her residence and promptly burned all of their gear they wore inside the Capitol, including Young's helmet, both of their tactical vests, and their Oath Keepers shirts.   10/31/22 PM Tr. at 5788-89.   As Young testified at the *Rhodes* trial, Steele burned these materials "to destroy the trail of evidence of what we had participated in."   *Id*. at 5789.   On Facebook, Steele warned others about the need to be careful, writing to a colleague on January 13, "Be chill.   They are watching for this. . . . you know what they have said about cell phones.   Be careful what you say and text.   It can be used against you."   Gov. Ex. 2008.T.250.I.

Steele deserves a significant sentence.

iv.   *Connie Meggs*

In her own words on January 6, Connie Meggs put it bluntly: she and others "heard about mike pence being a f****** and everyone went to the capital to stop the vote."   Gov. Ex. 9651. Under oath at trial, she tried to deny the cold truth in that message.   Connie Meggs has no remorse for her actions, and a guidelines sentence is warranted.

Connie Meggs lied about small things leading up to January 6 to distance herself from the Oath Keepers—claiming that only her husband owned an Oath Keepers shirt (3/1/23AM Tr. at

53

5128-29), despite photographs of her in a small Oath Keepers shirt with Roger Stone (Gov. Ex. 4804.1); that she could not participate in firearms training due to "severe arthritis" (3/1/23AM Tr. at 5135), despite photographs and videos of her performing tactical maneuvers while shooting at targets with an AR-15 (Gov. Exs. 4801.5, 4801.8, 4802.1.1); and that she never ordered Oath Keepers flags (3/1/23AM Tr. at 5168-69), despite the shipping label with her name (Gov. Ex. 11.P.3).

And she lied about the big things.   On January 5, she sent a link to Rhodes's "Call to Action" email in a text message to another individual, but she claimed repeatedly on the stand that she never read any of Rhodes's writing about the election (3/1/23AM Tr. at 5149-50).   In those days leading up to the sixth, she traveled in a vehicle with over ten firearms cases from Florida, to North Carolina, and finally to the QRF hotel outside of D.C.   2/16/23 PM Tr. at 2809-10.   Yet, at trial, she testified she was not aware of any firearms and was focused on her dog in Florida delivering puppies.   And, on January 6, Connie Meggs donned military-style gear including a ballistic helmet, an Oath Keepers hat, and a tactical vest and joined the stack of Oath Keepers to breach the Capitol.   On the stand, she gave a variety of conflicting reasons for going toward and inside the Capitol, including that she went to the Capitol as part of a security detail (3/1/23AM Tr. at 5173-74); that she went up the east stairs to retrieve two other Oath Keepers (*id*. at 5177-78); that she got sucked into the Capitol (*id*.); and that she went into the Capitol to help people that may be in trouble (*id*. at 5181, 5193).   None of that was true.

Finally, because her own words around the time of January 6 betrayed her testimony on the stand, lied about those too.   According to Connie Meggs, her family members may have sent the incriminating text messages about *her* actions from *her* phone to *her* best friend (3/1/23AM Tr. at 5150-51).   That is not how a family plan works.   She also deleted those messages, and she

claimed at trial she made it a practice to periodically delete data off her phone to save storage (*id.* at 5120-21).   But her own messages and the rebuttal testimony of Special Agent Michael Palian made clear that Connie Meggs wrote those messages and that she did not, in fact, have any pattern of periodic deletion other than the large gap around the time of her crimes.

Far from a hapless tag-along, Connie Meggs fully joined and participated in these conspiracies and obstruction, and her lack of remorse is troubling.   Her actions and lies warrant a significant sentence.

> *v.*   *William Isaacs*

Defendant Isaacs came to D.C. for January 6 ready to engage in political violence.   When the opportunity arose, he leapt at it, actively pushing to get into the Capitol and get down the Senate hallway.   He also actively encouraged others to join in the "fight."   For these reasons, Isaacs is one of the more culpable defendants in this trial grouping.

Isaacs actively followed Trump's opposition to the election results, and he grasped the significance of January 6.   In late November 2020, Isaacs told his aunt, "Imo[,] Trump is dragging out legal battles So legislators dont certify and it goes to house," and suggested that if such a vote went to the House of Representatives, the members of Congress would likely vote along party lines (resulting in a Trump victory).   Gov. Ex. 85.1.T.70.   Isaacs then made plans with his aunt to travel to D.C. to ensure this result.

Isaacs' messages with his aunt from late December 2020 make clear that he was preparing to participate in a citizen uprising if politicians failed to stop the certification of the election.   On December 23, Isaacs told his aunt he was excited for January 6 and immediately followed that statement with, "Either [T]rump crosses the Rubicon or the citizens cross the delaware."   Gov. Ex. 9735.   Ten minutes later, Isaacs' aunt sent him this image:



Gov. Ex. 9734.   Isaacs brought a heavy anti-ballistics vest with plate carriers to D.C. for January

6.   3/6/23AM Tr. at 5748-49.   He was prepared for battle.   And Isaacs was willing to resort to

violence against politicians who tried to stand in his way.   On January 3, when Isaacs' aunt sent

him a meme reporting that Mayor Bowser had ordered hotels, restaurants, and stores to close on

January 4-6 to discourage Trump supporters from gathering in D.C., Isaacs responded, "Fucking

[N-word]," and "We should lynch her upon arrival."   Gov. Ex. 9734.

On January 6, Isaacs not only joined the Oath Keepers in marching to and breaching the

Capitol, but he led the charge at several critical moments.   When Line One ascended the East

Rotunda steps to the landing outside the doors, Isaacs pushed his way 5-10 feet ahead of the rest

of the group.   Gov. Ex. 1503.1 at 11:05-11:35, 12:33-12:53.   Isaacs was then the first Oath

Keeper—and, indeed, one of the first rioters—to enter through the East Rotunda Doors of the

Capitol.   Gov. Ex. 1500.4 at 12:25-12:55.   The video shows Isaacs' face, front and center, outside

the doors when they were forced open by rioters on the inside.   *Id.*   Isaacs then pushed his way past officers and other rioters to gain entry.   *Id.*; Gov. Ex. 1503.1 at 15:48-17:12, 1759-1853.

Once inside, Isaacs urged other rioters to go down the hallway towards the Senate Chamber, yelling, "The fight's not over."   Gov. Ex. 1505 at 00:18-00:50. He then went down that hallway himself and was at the front of the mob as it ran into a line of MPD officers trying to stop their advance.   *Id.* at 0:58-1:25, 4:15-4:22, 4:46-4:59.   Isaacs pulled up his mask as a scrum ensued, showing his intent to force his way forward.   *Id.*   He was close enough to the front of the mob that he took a direct hit to his eyes when the officers deployed chemical spray to disperse them.   *Id.* at 5:55-6:20.

After January 6, Isaacs was undeterred.   He called the riot "God damn glorious," Gov. Ex. 9827.   He expressed an interest in buying more Oath Keeper t-shirts.   *Id.*

These were not the words and actions of someone who just get caught up in the moment, or "swept in," as Isaacs claimed in his trial testimony, 3/6/23PM Tr. at 5883.   Rather, this evidence shows that Isaacs traveled to D.C. ready to use force to interfere with the certification of the election, and he pushed to be a part of the riot that arose to stop it.   Isaacs' sentence should reflect that he sought out and egged on such political violence.

The government disagrees with the PSR writers that the defendant's personal history warrants a more than 75% downward variance from the bottom of the applicable Sentencing Guidelines range.   Defendant Isaacs has certainly faced challenges in life, including his Autism Spectrum Disorder ("ASD") and the trauma and grief surrounding the death of his father.   But these challenges did not prevent Isaacs from understanding what he was saying and doing before, during, and after January 6.   The Court received extensive evidence and testimony, both before and during trial, regarding Isaacs' ASD and how it impacts him.   Most significantly, both the

government and defense experts agreed that Isaacs has average or above average cognitive ability and the ability to tell right from wrong.   3/3/23AM Tr. at 5546-5547 (testimony of Dr. Laurie Sperry); 3/6/23AM Tr. at 5664-5665 (continued testimony of Dr. Sperry); 3/8/23PM Tr. at 6659, 6661, 6671 (testimony of Dr. Galit Askenazi).   Therefore, while Isaacs' personal history and characteristics provide some context and mitigation for his crimes, they cannot justify a 75% downward variance, particularly in light of his role in these offenses.

### c.  Need for the Sentence to Afford Adequate General Deterrence

In this case, significant sentences are needed "to afford adequate deterrence to criminal conduct" by these defendants and others.   18 U.S.C. § 3553(a)(2)(B).   Here, the need to deter others is especially strong because these defendants and their co-conspirators engaged in acts that were intended to influence the government through intimidation or coercion.   Accordingly, their sentences will be noted by those who would join conspiracies to commit such political violence in the future.

### d.  Need to Avoid Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—a significant sentence of incarceration is demanded because of these defendants' participation in this conspiracy and the sentences recently imposed by the Court on some of the defendants' co-conspirators.

The defendants and their co-conspirators stand out among January 6 defendants because they not only joined in this horrific attack on our democracy as it unfolded, but they all took steps, *in advance* of January 6, to call for and prepare for such an attack.   From participating in chats and meetings in which they advocated for the use of force to stop the certification of the election,

to transporting weapons across the country to stage around our nation's capital in support of this objective, these defendants intentionally helped to set the stage for January 6.

Thus, other January 6 cases are simply not comparable to the scope and magnitude of the conspiracy that constitutes the relevant conduct for this case.   Rather, this Court should be mindful of the sentences it recently imposed sentence on the eight co-conspirators in the related *Rhodes* matter, which ranged from three years up to 18 years of incarceration.   To avoid unwarranted disparities with their co-conspirators, under Section 3553(a)(6), these defendants should also be sentenced to incarceration.

## IV.   OTHER SENTENCING CONDITIONS

### a.  Restitution

The government respectfully requests that the Court order the defendant to pay $500 in restitution to the Architect of the Capitol.

The defendant's conduct on January 6 affected several entities responsible for the Capitol building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.   In the related *Rhodes* matter, the government recently filed a brief outlining its factual and legal justification for the apportionment of restitution it has sought in January 6-related cases.   *See* Case No. 22-cr-15, ECF No. 654.   The government hereby incorporates by reference the facts and arguments in that pleading and submits on that record to justify its restitution request for Defendant Greene.   Should the Court directed the defendant to pay $500 as an approximate estimate of the losses for which he is responsible, his restitution payment should be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

**b.  Fine**

The PSRs find that some defendants are capable of paying a fine and others are not.   The government is not recommending that the Court impose a fine on any of these defendants.

**c.  Supervised Release**

Each defendant was convicted of at least one Class C felony.   *See* 18 U.S.C. § 3559(a)(3) (defining offenses like Count One, conspiracy to obstruct an official proceeding, for which the maximum penalty is less than twenty-five years but ten or more years of imprisonment, as Class C felonies).   The Court should sentence each defendant to a term of supervised release of three years.   18 U.S.C. § 3583(b)(2); U.S.S.G. §5D1.2(a)(2).   Multiple terms of supervised release should run concurrently to one another.   18 U.S.C. § 3624(e).

**d.  Special Conditions**

The Probation Office recommends that the Court consider imposing several special conditions on the defendants during their terms of supervised release, including "Contact Restriction," "Social Media Restriction," "Propaganda Restriction," and "Computer Monitoring/Search."

The Court may impose, as part of supervised release, "any . . . condition it considers to be appropriate."   18 U.S.C. § 3583(d).   Such a special condition may include "a discretionary condition" typically associated with probation under Section 3563(b).   *Id.*   It may also include "any other condition," so long as the condition satisfies the following three factors:    (1) it "is reasonably related to" the Section 3553(a) sentencing factors, (2) it "involves no greater deprivation of liberty than is reasonably necessary" for achieving the Section 3553(a) sentencing factors, and (3) it "is consistent with any pertinent policy statements issued by the Sentencing Commission."   *Id.*

The Court has "wide discretion when imposing terms and conditions of supervised release." *United States v. Hunt*, 843 F.3d 1022, 1030 (D.C. Cir. 2016) (quoting *United States v. Sullivan*, 451 F.3d 884, 895 (D.C. Cir. 2006)).   And "[s]eparating a convicted felon from negative influences in his prior life is reasonably related to the permissible goals of deterrence and rehabilitation and is a common purpose of supervised release." *Id.* at 1031 (quoting *United States v. Watson*, 582 F.3d 974, 983 (9th Cir. 2009)).

Courts have imposed similar restrictions on defendants convicted of terrorism crimes, including restrictions on association and extremist content.   *See, e.g., United States v. Rakhmatov*, No. 21-151, 2022 WL 16984536, at *3 (2d Cir. Nov. 17, 2022) (per curiam) (affirming conditions limiting association with terrorist enterprises and accessing content from "radical extremist group[s]"); *United States v. Doe*, 323 F. Supp. 3d 368, 390, 392 (E.D.N.Y. 2018) (after noting the "lack of data on terrorist recidivism rates," imposing special conditions that defendant (a) not "associate with any individuals involved in any radical extremist groups," or (b) "access any website affiliated with any radical extremist group").   Indeed, in sentencing another defendant who was part of a militia group for his role in the attack on the Capitol, Judge Friedrich imposed the following condition:   "You must not associate, communicate, or otherwise interact, directly or indirectly, with any extremist militia group or member of such a group, including but not limited to the Texas Three Percenters, the Oath Keepers, and the Texas Freedom Force." *Reffitt*, No. 21-cr-32, Sent. Tr. at 143.

Here, restricting the defendants' association and communication with other extremists and content published by other extremists furthers the goals of deterring and rehabilitating the defendant as he transitions back into the general population following his period of incarceration.

## V.      CONCLUSION

For the reasons set forth above, the government recommends that the Court impose

significant sentences of imprisonment for each defendant.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      _____/s/_____
Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Troy A. Edwards, Jr.
Alexandra S. Hughes
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530