UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Case No. 1:21-cr-00028-APM** |
| **v.** ) | |
| ) | |
| **CONNIE MEGGS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

<u>**REPLY IN SUPPORT OF MEMORANDUM IN AID OF SENTENCING**</u>

Though the government seeks to portray otherwise, Connie Meggs is nothing more than an otherwise everyday woman who got swept up in an outrage spread and amplified amongst many nationwide and – regrettably – who followed her husband and others into the Capitol Building.  While inside the Capitol Grounds, Mrs. Meggs, Mr. Meggs, and almost all of her Oath Keepers-associated co-defendants engaged in absolutely no conduct that could remotely be defined as violent or destructive.  *See* Memo. in Aid of Sentencing, at 3 (Aug. 11, 2023) (ECF No. 1019).  Further still, Mrs. Meggs's actions are uniquely moderate in comparison to just about every other individual who has been convicted for their actions taken on January 6, 2021, and the government even notes same.  *See* Gov. Sentencing Memorandum, at 30-31 (Aug. 12, 2023) (ECF No. 1021-1) (suggesting a two-level reduction for minor role involvement).

The government, however, seeks to portray Mrs. Meggs as a cold, calculated, and violent militant.  They do this in extremely contentious ways: by referencing the actions of her husband ad nauseum, and by referencing one text message out of context, in which Mrs. Meggs describes the circumstances that led a large group of people, most of whom she did not know and each of whom had their own unique intentions underlying the presence, to the Capitol Grounds on

January 6, 2021.[1]  *See generally* Gov. Sentencing Memorandum, at 12 ("Others bragged in messages.  Connie Meggs, for example, *echoing her husband's directive* to 'stop the vote'. . . recounted to a friend via text that she had 'heard about mike pence being a f[*****] and *everyone* went to the capital to stop the vote.'" (emphasis added)).

## I.   Mrs. Meggs Should Not Face Punishment for the Government's False Assertion That She is Remorseless

Despite lacking any support for this claim, the government claims that Mrs. Meggs is clearly and entirely remorseless for her part in January 6, 2021, and that her sentence should be enhanced for this.  The government mainly seems to argue this point by reference, implying that by taking this matter to trial, Mrs. Meggs has entirely waived a capability to express any remorse for what she has been convicted of.  See Gov. Sentencing Memorandum, at 53 ("Connie Meggs has no remorse for her actions, and a guideline sentence is warranted."). This argument is unsupported by the law.  *See generally United States v. Hopkins*, 464 F.2d 816, 822 (D.C. Cir. 197) ("[I]t came out that the appellant had told the probation officer, 'I didn't think I would be found guilty because I didn't do anything.' [] [In another case], it was seen that [Defendant] was paying a price for demanding a trial.  So, here, this appellant was not bound to yield a constitutional right only to be punished for not doing so." (citing *Scott v. United States*, 419 F.2d 264, 269 (D.C. Cir. 1969)).  Mrs. Meggs had a constitutional right to be tried before a jury of her peers, and that she pursued such rights should be of no bearing on whether or not she has expressed remorse or will express remorse for what she has been convicted of.

---

[1]    The Government has at length tried to portray Mrs. Meggs's use of an offensive term in reference to Mike Pence as a demonstration of an underlying malice to her actions, and/or a lack of remorse.  *See* Gov. Sentencing Memorandum, at 53.  While Mrs. Meggs's use of the term is offensive and she wholeheartedly regrets her use of such language, the government has failed to elucidate how such language reflects any lack of remorse or demonstration of malice.

**II.      No Terrorism Upward Departure Should Be Applied**

The government suggests an upward departure for the Section 3A1.4, Note 4 (Terrorism) enhancement, alleging that Mrs. Meggs's actions were "calculated" (as the government defines the term) and taken "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Gov. Sentencing Memorandum, at 41-42. The government once again primarily relies upon Mrs. Meggs out of context text message to support this claim, as well as her association with her co-defendants.  *See* Gov. Sentencing Memorandum, at 42 ("[E]ach [codefendant] donned paramilitary gear and linked literal and metaphorical arms with their co-conspirators. . . Connie Meggs admitted that she 'went to the capital to stop the vote' when she learned that Vice President Michael R. Pence had failed to do so.").

However, the government concedes here that even though Mrs. Meggs's felony destruction of government property technically falls into the normal "federal crime of terrorism" definition (see 18 U.S.C. 18 U.S.C. § 2332b(g)(5)(A)), that due to Mrs. Meggs being "less culpable than [her] *Rhodes* and *Minuta* co-conspirators. . . it would, consequently, be inequitable for [Mrs. Meggs] to receive sentences greater than those provided by the calculated Guidelines ranges for the other co-conspirators."  Gov. Sentencing Memorandum, at 44 n.9.  As noted in Mrs. Meggs's sentencing memorandum, the largest potential for sentencing disparities between Mrs. Meggs and others convicted for their roles in January 6, 2021 arise out of the government's needless recommendation for many unjustifiably applied criminal enhancements.  *See* Memo. in Aid of Sentencing, at 7.

Moreover, the government's use of the term "calculated" is inconsistent with its application in the cases to which the government cites.  The government relies upon *United*

*States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012), which does not provide a definition for the term calculated. Rather, the government provides its own definition for calculated, which very closely resembles – conveniently – the language of the crime with which Mrs. Meggs has now been convicted. A use of the common legal definition of "calculated" clearly undermines the evidence evinced throughout the *Rhodes*, *Minuta*, and *Crowl* trials, namely that so-called "calculated" events are planned in advance or to achieve common goal.[2] Also conveniently, the government completely ignores the evidence adduced at trial establishing that Mrs. Meggs, and many others, expected to provide private security at various events on January 6, 2021. Without evidence to establish the existence of any plan, the government cannot now claim that any conduct by Mrs. Meggs was "calculated" as required by the enhancement. This fact, taken in conjunction with the government's own admission that Mrs. Meggs is less culpable than many of her co-defendants, including those who received no upward departure for the terrorism enhancement, should entirely discredit any claim that any departure on the basis of the terrorism enhancement is not "warranted" as it relates to Mrs. Meggs.

### III.    The Jury Did Not Conclude That Mrs. Meggs Lied About Anything, and Such Allegations are Irrelevant to Mrs. Meggs's Sentencing

The government also places significant emphasis upon alleged lies that they claim Mrs. Meggs stated to support their assertion for a stricter sentence. Gov. Sentencing Memorandum, at 53-55. It must be noted, however, that a jury never made the determinations that Mrs. Meggs lied: the government tries to avoid admitting this point by citing to the existence of allegedly contradictory evidence and testimony which may comparatively dispute statements that Mrs.

---

[2]    CALCULATED, Black's Law Dictionary (11th ed. 2019) ("Undertaken after close consideration of the probable outcome <calculated risks>" or, "Planned so as to achieve a specific purpose; deliberate <a calculated move to replenish the fund."). *Compare with* Tr. 10296:5-8, *United States v. Rhodes III, et al.*, 1:21-cr-00015 (Nov. 21, 2022) ("Let me be clear on behalf of the United States of America, we do not allege a specific plan to storm the United States Capitol. We never have and we are not now. We do not have to prove a plan.").

Meggs made, but the simple fact remains: credibility determinations are to be made by the jury. *See e.g., United States v. Shan Shi*, 991 F.3d 198, 205 (D.C. Cir. 2020) (noting "full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." (internal quotation marks omitted) (quoting *United States v. Glover*, 681 F.3d 411, 423 (D.C. Cir. 2012)). *See also United States v. Ortiz*, 362 F.3d 1274, 1279 (9th Cir. 2004) ("Whether the witnesses have testified truthfully, of course, is entirely for the jury to determine."). *See also Bravo v. Shamailov*, 221 F. Supp. 3d 413, 422 (S.D.N.Y. 2016) ("It is the jury's role to determine whether a witness is credible and to decide what weight to give that witness's testimony."). As the record does not reflect that the jury made the determination that Mrs. Meggs lied or was otherwise uniquely uncredible, references to alleged lies are wholly irrelevant and should be ignored for sentencing purpose.

## IV.  No Alternative Upward Departures Apply to Connie Meggs

The government's similarly sought-after possession of firearms upward departure under 5K2.6 also strains credulity. Such a departure requires the showing that, "a weapon or dangerous instrumentality was used or possessed in the commission of the offense." *See* Gov. Sentencing Memo., at 45. The evidence from all three Oath Keepers trials establishes little more than that Meggs's had weapon cases, which were never even brought into Washington, D.C. The evidence similarly shows any efforts the Oath Keepers made to establish a so-called Quick-Reaction Force ("QRF"), were for defensive measures and only a last resort if they were attacked. Regardless, the cases which the government cite turn on the actual use or possession of the weapon during the commission of the conspiracy, a contention which is entirely unsupported by the record in any of the Oath Keepers trials. *United States v. Palsay*, 971 F.2d 667, 672 (11th Cir. 1992) ("The general guideline and offense characteristics for fraud do not take into account the use of a

weapon or dangerous instrumentality, and the record shows that Paslay *used a weapon or dangerous instrumentality incident to his crime*.") (emphasis added); *United States v. Gaddy*, 909 F.2d 196, 200 (7th Cir. 1990) ("While this evidence might not prove beyond a reasonable doubt that he had the gun, it constitutes enough reliable evidence for us to conclude that the district court was not clearly erroneous in finding, for sentencing purposes, *that Gaddy possessed a gun during the commission of the offense*." (emphasis added)).  The evidence broadly does not support Mrs. Meggs ever possessed any firearms, but more specifically the evidence does not support a claim that any of the actions for which Mrs. Meggs were taken while in possession of a weapon incident to the acts leading to conviction.

Similarly, Sections 5K2.7 (Disruption of Government Function) and 5K2.0(a)(3) (Circumstances Present to a Degree Not Adequately Taken Into Consideration) should not apply. The government, as it has sought to do in the past, explicitly notes that an upwards departure based on Section 5K2.7, "ordinarily would not be justified when the offense of conviction is . . . obstruction of justice . . . unless the circumstances are unusual."  Gov. Sentencing Memo., at 44-45.  However, the government claims such an unusual departure is warranted, without providing any basis for such a claim; the government merely alludes to the specific function that the government alleges was disrupted, and with no justification asserts that the specific function falls into the unusual circumstances.  *Id.*  Similarly, "intent to frighten, intimidate, and coerce" as used in the case cited by the government specifically was applied because the defendant in that case took actions to frighten, intimidate, and coerce members of a private corporation, rather than the government.  *See United States v. Tankersley*, 537 F.3d 1100, 1107-08 (9th Cir. 2008) ("[T]he government failed to show. . . that the U.S. Forest Industries arson was calculated to retaliate against government conduct. . . [but the Court] concluded that the Sentencing Guidelines did not

properly account for conduct directed at private individuals and/or entities. . . Therefore, I find

that 3A1.4 does not adequately take into account the defendant's intent to frighten, intimidate,

and coerce *private individuals* at the U.S. Forest Industries through her actions. I therefore

exercise my discretion under 5K2.0 to depart upward by 12 levels. . . .") (emphasis added).  As

such, 5K2.0 does not apply to Mrs. Meggs.

## CONCLUSION

For the foregoing reasons, Mrs. Meggs respectfully requests this Court impose a sentence

for each of the offense with which she has been convicted of not more than forty-five (45) days'

incarceration (with credit for time served), eighteen (18) months of home confinement, and three

(3) years of supervised release, to run concurrently.

Dated: August 25, 2023    Respectfully submitted,

            */s/ Stanley E. Woodward, Jr.*
          Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
          BRAND WOODWARD LAW, LP
          400 Fifth Street Northwest, Suite 350
          Washington, DC  20001
          202-996-7447 (telephone)
          202-996-0113 (facsimile)
          Stanley@BrandWoodwardLaw.com

          *Counsel for Defendant Connie Meggs*

## **CERTIFICATE OF SERVICE**

On August 25, 2023, the undersigned certifies that a true and correct copy of the foregoing was electronically filed and served via the CM/ECF system, and subsequently electronically mailed to government counsel.

*/s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)