IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, )
)
Plaintiff, ) CR NO.: 21-28
vs. ) Washington, D.C.
) Tuesday, March 7th, 2023
SANDRA R. PARKER, et al., ) 1:30 p.m.
)
Defendants. ) Day 21
______________________________) Afternoon Session

Transcript of Jury Trial Proceedings
Before the Honorable Amit P. Mehta
United States District Judge

APPEARANCES:

For the Government: Kathryn Leigh Rakoczy
Jeffrey S. Nestler
Alexandra Hughes
Troy Edwards
U.S. Attorney's Office
601 D. Street, NW
Washington, D.C. 20579
(202) 252-7277
Email:
Jeffrey.Nestler@usdoj.gov

For Defendant
Sandra Parker: John L. Machado
Law office of John Machado
503 D. Street, NW
Suite 310
Washington, D.C. 20001
(703) 989-0840
Email: johnlmachado@gmail.com

For Defendant
Bennie Parker: Stephen F. Brennwald
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, SE
Washington, D.C. 20003
(301) 928-7727
Email: sfbrennwald@cs.com

APPEARANCES CONTINUED:

For Defendant Laura Steele:

Peter A. Cooper
Law Office of Peter A. Cooper
400 5th Street, NW
Suite 350
Washington, D.C. 20001
(202) 400-1434
Email:
pcooper@petercooperlaw.com

For the Defendant Connie Meggs:

Stanley Edmund Woodward, Jr.
Brand Woodward Law
1808 Park Road, NW
Washington, DC 20010
(202) 996-7447
Email:
Stanley@brandwoodwardlaw.com

Julia Zsuzsa Haller
Law Offices of Julia Haller
601 Pennsylvania Avenue, NW
Suite 900
S. Building
Washington, D.C. 20036
(202) 352-2615
Email: hallerjulia@outlook.com

For Defendant William Isaacs:

Euene J. Rossi
Carlton Fields, P.A.
1025 Thomas Jefferson Street, NW
Suite 400 West
Washington, D.C. 20007
(202) 965-8100
Email: grossi@carltonfields.com

Charles Greene
Law Office of Charles M. Greene, P.A.
55 East Pine Street
Orlando, Florida 32801
(407) 648-1700
Email: gmg@cmgpa.com

APPEARANCES CONTINUED:

For Defendant Michael L. Greene:

Britt Redden
Redden Law, PLLC
3300 Oak Lawn Avenue
Suite 700
Dallas, Texas 75219
(214) 699-8429
Email: bredden@reddenlawtexas.com

William Lee Shipley, Jr.
Law Offices of William L. Shipley
P.O. Box 745
Kailua, HI 96734
(808) 228-1341
Email: 808Shipleylaw@gmail.com

Court Reporter:

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
333 Constitution Avenue, NW
Washington, D.C., 20001
christine_asif@dcd.uscourts.gov

INDEX

Witness Name Page

Michael L. Greene

Cross-examination By Ms. Rakoczy........................ 15

Redirect Examination By Mr. Shipley..................... 114

SA Michael N. Palian

Direct Examination By Mr. Woodward...................... 128

Cross-examination By Mr. Nestler........................ 132

Redirect Examination By Mr. Woodward.................... 137

P R O C E E D I N G S

MR. MACHADO: Your Honor, I'm ready to respond to the clip that we want to play. We don't have to do it right now but I just want to let the court know.

THE COURT: Okay. Mr. Rossi is here, so why don't you go ahead.

MR. MACHADO: Your Honor, speaking on behalf of Mr. Brennwald and myself, we have no objection to the clip played mostly. There is, however, one portion that I am objecting to, which basically he was asked whether presumably this is the Parkers that he's talking about, the older couple from Ohio that he had a -- that they had patches on Oath Keeper patches on, which I mean, factually is not true and I think there's a *Bruton* issue there. And so we would have no objection except for that portion. Just -- and if they played the rest of it we're not planning to have any issue with regard to cross-examination or calling a witness. We have no problem with the rest of it.

MR. NESTLER: Those were the words Mr. Isaacs used. That's how he described the older couple from Ohio with Oath Keeper patches on. And we think that's legitimate to do. If they think they need to cross-examine Mr. Isaacs about that, we have no problem with that.

THE COURT: If I admitted the portion that part of his description was that they had Oath Keepers patches on,

what would you -- what would your request then be?

MR. MACHADO: If the Court allows it, then I guess a --

MR. BRENNWALD: We're just going to show pictures in closing that they didn't have them on, that's all. I mean, he's factually incorrect. So that's why I'm not as worried about it as Mr. Machado is, but I mean they didn't have Oath Keeper patches on at any time, it just makes it seem like Mr. Isaacs is confused. So I don't really care if it's played or not, Mr. Machado is more concerned --

THE COURT: Well, again, this isn't being played, these are statements that are going to come in through the agent, so --

MR. MACHADO: And perhaps some limiting instruction explaining that the reason it's being introduced is for impeachment purpose and not anything that he said for the truth of the matter.

MR. ROSSI: And, Your Honor, they're going to read his statement, not summarize it?

THE COURT: I don't know that we've quite resolved how that's going to happen.

MR. NESTLER: We have not. We have another question for the Court to make sure we're operating under the Court's parameters that are being imposed here, which is that we did expect Agent Palian to describe many other facets of the

debriefing session; how long it took, Mr. Isaacs' demeanor during the session, how he answered questions, whether he gave analogies, whether he gave long narrative answers. So things that are not statements, but things that Agent Palian observed from watching it live on the Webex when he was there and also watching the video of it, we think are all completely fair game. And so I wanted to make sure that was okay with the Court. Of course, we would again prefer to use the video, but if we're being precluded from doing so, we would have Agent Palian describe his observations from having been present.

MR. ROSSI: So, Your Honor, the punch line is this: They want to have Agent Palian summarize his demeanor, ability to answer questions and then they want their cake and eat it too, with utmost respect to the government, they want to play the video with their expert. So they want to have it both ways.

MR. NESTLER: What we want Your Honor is not have a fraud on the jury, which is that Mr. Isaacs operated very differently on March 18th, 2021 for three hours while being interviewed about the same topic that he did here on the stand. And the jury does not understand that. And our point is to make sure the jury understands the difference. And the best way we can accomplish that is by showing the video. If we can't do the video, we'll go to the next best option.

MR. ROSSI: Your Honor, I think it's fair to say

that Mr. Isaac yesterday did not commit a fraud upon the Court or the jury. No. 2, in a controlled environment, which Dr. Sperry and their doctor will say, things are a lot different. That was an extremely controlled environment in which someone with Mr. Isaacs ASD can handle. What happened on January 6 is whole 180 degrees different, so --

THE COURT: Well, the issue is not --

MR. ROSSI: I don't like the word "fraud."

THE COURT: The issue is not -- the issue is not his demeanor and his ability to handle what happened on January 6, it's a comparison of how his demeanor was during the debrief, during the proffer session, which -- and I've seen the clips he wasn't wearing a set of headphones, now it was a small room, it was a friendlier examination.

MR. ROSSI: I proffer this, Your Honor, no pun intended, we may have to call Mr. Green as a witness, because he will say Mr. Charles Greene will say that during the interview he had to call for a break because he could see signs of his ASD kicking in, including flapping. So they're going to open a Pandora's box to having my co-counsel as a witness.

MR. NESTLER: That all came out on the video. We're happy to play all three hours. The point for the Government, Your Honor, is that he -- it was a very similar environment, he was being asked questions by FBI agents and myself and by

Mr. Greene. I think the way Mr. Greene asked him questions yesterday was far more combative than the way the FBI agents and myself asked him questions on March 18th of 2021. And the jury ought to be able to see how he was able to answer questions, including coming up with his own analogies, coming up with his own perceptions about what people were doing, why they were doing certain things. And so we think it's important for the jury to hear that he was able to do all that.

MR. ROSSI: Does the government really believe that the Court's going to allow the playing of a three-hour videotape interview? That's absurd.

THE COURT: No, I don't think they think that. I think the question is -- we'll take this up later.

MR. ROSSI: Okay. Thank you, Judge.

(Jury entered the courtroom.)

THE COURT: Okay. Welcome back, everyone. Have a seat. As much as I hate to do this, I need to get on the phone first before we continue the testimony.

(Bench conference on the record.)

MR. SHIPLEY: Can you hear me?

THE COURT: I can.

MR. SHIPLEY: We went through the report on Mr. Greene's phone. These are not sequential messages. There are other users in there. There are multiple messages in

between what the government wants to put up as context and Mr. Greene's message. There are website links. There's a YouTube video. So I think it's not at all clear that Mr. Greene is responding. I mean, the messages talk about, you know, anarchists and, you know, other kinds of, you know, antigovernmental efforts.

So I don't think it's at all fair to say that the two messages in advance of Mr. Greene's messages are messages he's responding to. So I mean Mr. Greene's words are Mr. Greene's words, I don't know that they're relevant because they come so far after but, you know, that's a different question for you. But I don't think the two messages that come before it are fairly introduced as being contextual.

MS. RAKOCZY: So Your Honor, I'm not sure if Mr. Shipley had a chance to review what we sent over the lunch break, but we created an exhibit that is going to be called Exhibit 9218.1, which we took screenshots from Axiom, which is the program, that's A-x-i-o-m, which is the program that was used to extract -- one of the programs used to extract data from Mr. Greene's phone by the FBI. When you look at the messages in Axiom, they are almost sequential in 9218, the one we showed during lunch, pages 1 and 2 of that exhibit are then followed by a message by a third party, and then the fourth message is what we had on page 3.

There is, I think, that the reason why when there

was an Excel report created of this chat, from which we created the original 9218, I think the reason why the numbers are so off is that the Axiom program segregates SMS messages versus MMS, or I'm not sure if that's the exact wording when you talk about Signal messages, but essentially Axiom segregates out the messages with multimedia attached into a different portion of the chat when the report is extracted. And that's why when we originally created this, the numbering system we used suggested it was so far off. But when you look at it in Axiom in the way we have portrayed in the screenshots from 9218.1, you can see that it's essentially -- there's one message between the first two and Mr. Greene's message, which is the fourth in the excerpt we with want to show.

MR. SHIPLEY: But that doesn't establish that Mr. Greene is responding to those messages. He could be responding to the message 6 from above.

MR. WOODWARD: Your Honor, the problem -- this is Mr. Woodward. The problem I have with the Government's Exhibit is it doesn't match the data that was produced in discovery. The scoped version of the phone that the government produced to us does not contain all of the messages that the government is referencing. I created my own report over the break, and as Mr. Shipley notes there are links to websites, as well as a YouTube video that is no longer active, that were sent also preceding Mr. Greene's message. So it's

entirely unclear what message Mr. Greene is responding to.

THE COURT: Hang on. Can I ask the government just to put the exhibit back up, because you'll forgive me, I don't remember the sequencing and what the contents are. So could we just put it up, please.

MS. RAKOCZY: So I'm showing now what's government exhibit 9218 --

THE COURT: No, I mean the other one. The one we were looking at before the break.

MS. RAKOCZY: Yes, Your Honor. That's the first message.

THE COURT: All right.

MS. RAKOCZY: Now we're showing the second message.

THE COURT: Okay. Next one please. So what you sent me Ms. Rakoczy, does it contain -- does it reflect when Mr. Greene's message was the -- that fourth one, oh, I see it here. Okay.

MR. SHIPLEY: The problem, though, is there's like eight or ten messages in a row there and they're all the same subject matter. So to say that Mr. Greene responding to the two the government picked is pure speculation. There are other messages the jury won't see, Mr. Greene won't see.

THE COURT: Can I just think this through for a second, please.

MR. SHIPLEY: Apology.

THE COURT: So Ms. Rakoczy, why are we not seeing that fourth message in the column view, it's supposed to be -- in the bubbles over at the side it says it's at 4:41 and follows the, put up your black flags and fight or fill the water bottles for those in the game. And then at least the review that has the column view doesn't reflect Mr. Greene's message.

MS. RAKOCZY: Yes, Your Honor, my understanding from having looked at Mr. Greene's Axiom phone report with Kate Cane, the CART examiner who has assisted the government in this case, when I looked at this report with her roughly a week ago in preparing for Mr. Greene's cross-examination, she explained to myself and our WFO agents that Axiom's -- it appears parses in one Signal group messages with multimedia attached versus messages without multimedia attached. So you essentially see two chronological versions of the same chat when you do the export report. And one part is the messages without multimedia. And then you see the chat start over again, essentially chronologically, and then you see the messages with the multimedia attached, that's my best way of trying to parrot what somebody who is more of an expert in this field than I am told me.

THE COURT: But do any of these contain multimedia such that, for example, Mr. Greene's message would not be

included in the column view?

MS. RAKOCZY: That is my understanding of why they're parsed. I don't know which do and which don't, whether it's the first two messages that do, or the first three messages, if you look at 9218.1 or whether it's Mr. Greene's message, but that is my understanding. And if you look at the chronology, in terms of the time stamps of the messages, there is no message that appears chronologically between the third message and the fourth message. The fourth message being Mr. Greene's. There's just none other with a time stamp in that time period that I could see.

THE COURT: Okay. Here's what I'll allow. Just because of some of the confusion of this, I'll allow the government to show the first and fourth slide, which are Mr. Greene's actual statements and his words. And then we'll exclude the two -- the two statements that are in between from others that the government wish to provide context for just because of some of the uncertainty of how this is coming out and what he may or may not be responding to. So --

MS. RAKOCZY: Just to be clear, Your Honor, I think the first message is not from Mr. Greene.

THE COURT: Oh, I'm sorry, I thought the first and the fourth were from him.

MS. RAKOCZY: I think just the fourth. Well, the fourth in actual chronology, page 3 of the Exhibit 9218.

THE COURT: I see. Okay.

MS. RAKOCZY: Understood, Your Honor.

THE COURT: All right. Let's just do it that way. The last statement can come in.

MS. RAKOCZY: Thank you, Your Honor.

(The following proceedings were had in open court.)

CROSS-EXAMINATION

BY MS. RAKOCZY:

**Q.** Good afternoon, Mr. Greene.

**A.** Good afternoon.

**Q.** So before the break you were telling us that -- we were talking a little bit about the operation in Louisville; do you remember that?

**A.** Yes.

**Q.** Okay. I believe I asked you whether the people in that parking lot in Louisville told you and the other Oath Keepers were inflaming the situation and you said no; do you remember that?

**A.** Yes.

MS. RAKOCZY: Okay. I would like to bring up now just for the witness what's been marked as Exhibit 9110, and we will come up to time stamp 9 minutes and 40 seconds.

Your Honor, the government is going -- can ask some foundational questions, but we will be seeking to admit and play for the jury what we'll mark as Government's Exhibit

9110.1, which will be from the time stamps 9 minutes and 40 seconds through the time stamp 10 minutes and 4 seconds of the larger video, Exhibit 9110.

THE COURT: Okay. Any objection?

MR. WOODWARD: 9110 is already admitted?

MS. RAKOCZY: No.

MR. SHIPLEY: I want to reserve on that, Your Honor, until I have a chance the see what the government --

MR. WOODWARD: Objection. Foundation.

THE COURT: The objections are overruled and I'll permit the government having --

MS. RAKOCZY: Thank you. So we're going to bring up on the screen now what will be admitted as Exhibit 9110.1, which is just for the record, between 9 minutes and 40 seconds through 10 minutes and 4 seconds of Exhibit 9110. And if we could publish for the jury.

**Q.** (BY MS. RAKOCZY) Mr. Greene, do you recognize the parking lot that we see depicted here?

**A.** Yes.

**Q.** This is the same parking lot that you and other Oath Keepers began or staged at in your Louisville operation in September of 2020; correct?

**A.** Yes.

**Q.** Okay. You see the Oath Keepers patch on the vest of the person in camera view?

**A.** Yes.

**Q.** Okay. Let's just play this clip through once, please, through 10 minutes and 4 seconds.

(Video played.)

**Q.** (BY MS. RAKOCZY) Mr. Greene, and we can take that down, thank you. Mr. Greene did you hear what the woman said in that clip?

**A.** I heard what they said, yeah.

**Q.** So -- thank you. Before the break we were also talking about the November 14th Oath Keeper operation in Washington D.C., do you remember talking about that?

**A.** Yes.

**Q.** Okay. You told us before the break that you had nothing to do with Mr. Rhodes's operation in D.C. on November 14th; is that right?

**A.** Correct.

**Q.** Okay. I'd like to bring up now just for the witness Government's Exhibit 10063, please.

Do you see on the screen Mr. Greene, a message from Stewart Rhodes to a chat called DC OP Leader Chat?

**A.** Yes.

**Q.** And is this message from November 14th of 2020?

**A.** Yes.

MS. RAKOCZY: Your Honor, pursuant to the prior stipulation regarding data extraction from Stewart Rhodes's

phone we would seek to admit Exhibit 10063.

MR. WOODWARD: No objection.

THE COURT: Exhibit 10063 is admitted.

**Q.** (BY MS. RAKOCZY) We seek to publish. So, Mr. Greene, this message is from November 14th, 2020; correct?

**A.** Yes.

**Q.** And that was the date of the Million MAGA March in D.C.; right?

**A.** Yes.

**Q.** This message is from Mr. Rhodes; correct?

**A.** Yes.

**Q.** And this is to the DC OP Leaders Chat; right?

**A.** Yes.

**Q.** And on November 14th in the morning, Mr. Rhodes wrote to this chat, This is a chat for leadership on the DC OP today; correct?

**A.** Yes.

**Q.** You were one of the people Mr. Rhodes put in this chat; correct?

**A.** Probably, more than likely.

**Q.** And this chat was downloaded from your phone; right?

**A.** I don't know where you downloaded it from, but I was part of several chats with Stewart.

**Q.** This chat was on your phone; right?

**A.** I can't say for sure. Did you download it from my phone?

**Q.** Okay. Mr. Greene, you have said multiple times on cross-examination prior to the break that you haven't seen your phone in three years, do you recall saying that?
**A.** Yeah, I haven't seen it since they took it. That's really like two years.
**Q.** About 18 months?
**A.** About two years.
**Q.** Okay. You can take that down.
You told us on direct examination, though, that you have been sitting in your attorney's basement reviewing discovery for the last while; correct?
**A.** That's kind of an analogy. What I said was, I've been in my attorney's basement playing Xbox games looking at court stuff.
**Q.** And to be clear the extraction of the data from your cell phone was provided to you in discovery materials; correct?
**A.** I think so, yeah.
**Q.** So it's not really fair to say you haven't seen the data on your phone since it was seized; correct?
**A.** I haven't seen every single piece, no, but I have seen some things.
**Q.** Okay. Now, before the break I asked you whether you were a member of a chat called the Flower Shirt Group; do you recall that question?
**A.** Yes.

**Q.** Let's bring up on the screen now government's -- just for the witness for the moment, Government's Exhibit 9218, please, page 3.

MS. RAKOCZY: And we will seek to admit what we will call 9218.1, which is just page 3 of this exhibit.

THE COURT: That will be admitted subject to the discussions at the bench.

MS. RAKOCZY: Thank you. And if we may publish now.

**Q.** (BY MS. RAKOCZY) Mr. Greene, this is a chat called the Flower Shirt Group chat; do you see that?

**A.** Yes.

**Q.** And this is a chat that was on your phone; right?

**A.** If you say so.

**Q.** And this is your phone number in the "from" field in the top left; correct?

**A.** Yes.

**Q.** So on January 18th, you wrote to the Flower Shirt Group chat, With all the crooked politicians currently in office, we could probably use a reset; correct?

**A.** Looks like it, yes.

**Q.** Okay. And you sent this message on January 18th; right?

**A.** Yes.

**Q.** Two days before the inauguration of Joseph Biden; correct?

**A.** Yes.
**Q.** The Flower Shirt Group chat was a group chat for a group called the Boogaloo boys; right?
**A.** No.
**Q.** You're familiar with the Boogaloo boys; right?
**A.** I am.
**Q.** They are a group that leans towards the right end of the political spectrum; correct?
**A.** They are also very racist.
**Q.** And they are a group that was advocating for a second civil war in this country; correct?
MR. SHIPLEY: Objection. Lack of foundation.
**A.** I don't know the premise of the Flower Shirt Group, but just because --
THE COURT: Go ahead, Mr. Greene. The objection is overruled. Cross-examination. He can answer if he knows the answer to the question. Go ahead.
**Q.** (BY MS. RAKOCZY) Go ahead, Mr. Greene. You were answering.
**A.** I can say for sure I'm not a part of any Boogaloo boys group, because of the fact that they're a predominantly racist group.
MS. RAKOCZY: Okay. Thank you. Ms. Rouhi, you can take that down.
THE COURT: Ladies and gentlemen, if I could just

give you a limiting instruction, please, 9218.1 that you've just seen, that exhibit is admitted only against Mr. Greene.

**Q.** (BY MS. RAKOCZY) Mr. Greene, you thought that there was fraud in the 2020 presidential election; correct?

**A.** I think that there's fraud in every election. That's why I don't vote.

**Q.** So you thought there was fraud in the 2020 election; right?

**A.** Yeah, more than likely.

**Q.** And you thought that that fraud might cause anger among Americans; right?

**A.** Every fraud would cause anger amongst Americans. Here's the thing about elections, most black communities think elections been rigged since about the 80s or 90s. So me saying that elections are rigged is me just saying elections are rigged. It's what I believe. I don't vote. I don't get into politics because of shit like that.

**Q.** And you told us that the security you were providing was bipartisan; right?

**A.** Yes.

**Q.** But in November of 2020 through January of 2021, you were only providing security for groups that were advocating against the steal of the election; correct?

**A.** That's who was hiring me. I mean, but I'm sure you went through my phone, did you see the pictures of me and Elizabeth

Warren? Did you see the pictures of me and Arthur Rowley, two democrats.

**Q.** Were those from November of 2020 through January 2021?

**A.** No, it wasn't from November through January, but I work for anybody if they're willing to pay my fees. I don't care if they're Republican, Democratic, Libertarian, Independent. At the time this is who was paying me, so this is who I was working for.

**Q.** And Stewart Rhodes was paying you in the period of November of 2020 through January of 2021; right?

**A.** Correct.

**Q.** And Stewart Rhodes in that time period was advocating for the opposition, by any means necessary, up to and including force of the election results; correct?

**A.** Stewart Rhodes was advocating for a lot of stuff. Now, I can't speak to Stewart's personal beliefs or personal thoughts, but as far as I'm concerned, I'm going to do the security job that he pays me to do. He's not paying me to fight any wars against politicians. He's not paying me to storm any capitols. He's not paying me to remove any politicians, because that's not the kind of stuff that I would do. Especially not for Stewart Rhodes. Especially not for an Oath Keepers group who honestly couldn't sustain battle, they had too many old members.

**Q.** Going back --

**A.** Stewart pays me for security, I do security. Stewart has thoughts and beliefs, Stewart has thoughts and beliefs. The words of Stewart Rhodes are the words of Stewart Rhodes. The thoughts of Stewart Rhodes are the thoughts of Stewart Rhodes. Not Mike Greene. What Stewart think doesn't make me shit.

**Q.** Let's bring up what's already admitted as Government's Exhibit 4604. And if we could please go to page 11 towards the bottom. Could you go up one page, sorry, to page 10. Could we zoom in on the part that has a highlight next to it.

Mr. Greene, this is from Mr. Rhodes's second open letter to President Trump; right?

**A.** I suppose, yeah. I never read his letters to Trump, I knew about them.

**Q.** Okay. And in this open letter Mr. Rhodes said, If you fail to do your duty, you being President Trump, you will leave we the people no choice but to walk in the founder's footsteps; do you see that?

**A.** Yes.

**Q.** Mr. Rhodes went on to say that he and we would be forced to declare the regime illegitimate, incapable of representing us, destructive of the just ends of this government, and to secure our liberty to be a mere puppet of a deadly foreign enemy; do you see that?

**A.** Yes.

**Q.** Mr. Rhodes went on to warn President Trump that like the

founding generation, we will take up arms -- take to arms in defense of our God given liberty, we will declare our independence from that puppet regime and we will fight for our liberty; do you see that there?

**A.** Yes.

**Q.** And this is the man from whom you collected a paycheck to be the operations leader; right?

**A.** Operations leader for security operations on the day of January 6 and January 5th, yes.

**Q.** The same day that two different groups of people under your and Mr. Rhodes's leadership stormed the Capitol; right?

**A.** Anybody who stormed the Capitol did so under their own recognizance. I gave no orders to go to the Capitol. I gave no orders to storm the Capitol. I gave no orders to enter into the capitol. So again, the thoughts of Stewart Rhodes and the words of Stewart Rhodes is the thoughts and words of Stewart Rhodes. And any member of Stewart Rhodes' Oath Keeper organization went in the Capitol, it's on their own.

**Q.** And how about those who called people to the Capitol, they did so on their own; right?

**A.** I'm sorry?

**Q.** How about those who called people to the Capitol, that would have been their decision and not Mr. Rhodes's; right?

**A.** I don't know anybody who called anybody to the Capitol, that's -- you know, it has nothing to do with what I did.

**Q.** All right. Let's get back to that in a second. This open letter you said you were aware of; correct?

**A.** I was aware of it, yes.

**Q.** And you heard Mike Adams testify on the stand that he left the Oath Keepers because of messages like this; right?

**A.** Yes.

**Q.** Because he didn't want to be part of the we; right?

**A.** I'm sorry?

**Q.** He did not want to be part of that we that would essentially foment a revolution if the president didn't stop the election; right?

**A.** I mean, if Mike Adams is not man enough to stand up for his own, then he can fall into the words of the we, as terms of somebody else telling him what to do, then I suppose not.

**Q.** All right. But you're man enough to stick with Stewart Rhodes when he's saying things like this?

**A.** I didn't stick with Stewart Rhodes. He paid me for a job, I did the job. If that's how Stewart felt, that's how Stewart felt. When I was done with the job I went home. Stewart went elsewhere. Stewart did other things. Stewart sent more messages. I didn't do any of that. That's not what I was on.

**Q.** Let's take down this exhibit and let's talk about what you were on. In the time period of November of 2020 through January of 2021, you participated in more than 200 phone calls

with Mr. Rhodes; right?
**A.** Say that again?
**Q.** In the time period of November of 2020 through January of 2021, you participated in more than 200 phone calls with Stewart Rhodes; right?
**A.** Probably.
**Q.** And in that same time period you participated in at least 100 direct text messages with Mr. Rhodes; right?
**A.** Probably.
**Q.** And that's to say nothing of all of the Signal group chats that you participated in for his November, December, and January D.C. operations; right?
**A.** Oh, yeah. I'm sorry, yes.
**Q.** So in the weeks after the November 2020 election, you chose to come to Washington D.C. for November 14th of 2020; correct?
**A.** Yes.
**Q.** If we could bring up Government's Exhibit 1002 please, and go to page 2 of the exhibit. And just zoom in on the top half of the page, please.
This is Mr. Rhodes's call to action for D.C. on November 14th; right?
**A.** I suppose, yes.
**Q.** And on November 10th of 2020, Mr. Rhodes issued this call to action, to march on D.C., stop the steal, defend the

president and defeat the deep state; correct?

**A.** If that's what you're putting up there.

**Q.** And you came to D.C. to be part of that operation; right?

**A.** Negative. I came to D.C. for the protection of Kellye SoRelle.

**Q.** And you were put on the Ops Leaders Chat for that chat -- for that operation?

**A.** If he put me on the chat it was to know what the security operation was. I mean, he wanted me to hear the security plan. But again, I was only there for the protection of Kellye SoRelle.

**Q.** Okay. Thank you, Ms. Rouhi, we can take that down.

And after November 14th, you went to Atlanta with Mr. Rhodes and the Oath Keepers; correct?

**A.** Went to Atlanta with Kellye SoRelle. Stewart was there as well, but I was, again, paid to protect Kellye SoRelle while she spoke at a stop the steal rally at the Georgia capitol.

**Q.** Let me stop before we get to Atlanta, actually. Let's talk about November of 2020 in D.C. You told us on direct examination that for the November 14th operation you went to someone named Thomas Caldwell's farm. Do you remember talking about that?

**A.** Yeah, we met at Thomas Caldwell's farm.

**Q.** Okay. And Mr. Rhodes was there as well; right?

**A.** Yes.

**Q.** And maybe a dozen, two dozen other Oath Keepers; right?

**A.** Yes.

**Q.** And at that farm meeting, Mr. Rhodes addressed the Oath Keepers who were gathered; correct?

**A.** Yes, he addressed them.

**Q.** And at that meeting, either at the meeting or elsewhere, you told us Mr. Rhodes discussed that the Oath Keepers needed to be prepared to go to the White House to fight against the National Guard, do you remember telling us that?

**A.** He didn't say anything about fight the National Guard. He was talking about people who were going to try to attempt to remove Trump from the White House, that's why he wanted to arm QRM for.

**Q.** Okay. And was he saying this to the whole group at Caldwell's farm or a smaller circle?

**A.** I can't remember exactly how many of the people at Caldwell's farm, it was a group of them he was talking to.

**Q.** And in addressing these people at Caldwell's farm, he said that the Oath Keepers needed to bring their guns to the White House; correct?

**A.** No. What he said was if the White House will be overran or, you know, however he put it, and Trump was to declare the Insurrection Act, that the Oath Keepers needed to be ready as the militia to come into D.C. and defend the White House.

And, again, once he told me about his QRF plan and, you know, I told you what I thought about it.

**Q.** And Mr. Rhodes -- isn't it true that Mr. Rhodes said that the force that might be coming in to remove President Trump from power was national guardsmen sent by Nancy Pelosi?

**A.** No, I don't remember him saying that, but --

**Q.** And this meeting in which Mr. Rhodes is saying these words, that was in a building that no one was allowed to bring their cell phones in; right?

**A.** I don't remember a building with nobody allowed to bring their cell phones. I mean, I had my cell phone.

**Q.** Don't you remember Mr. Rhodes telling people to leave their cell phones in their cars?

**A.** I don't by verbiage, no, but like I said I had my phone.

**Q.** And Mr. Rhodes asked that the windows be either blacked out or covered with curtains; right?

**A.** You talking at Caldwell's farm.

**Q.** Yup.

**A.** The garage he was standing in didn't have any windows it was like -- I don't remember any windows being there. It was like a fucking door, you walk in and they were, you know, they were having conversation.

**Q.** And the doors were locked before this meeting began; right?

**A.** I don't know about the doors being locked before the

meeting began. Like I walked in when he was talking, the door wasn't locked when I walked in. And so, you know, when I left, I don't remember anybody coming in or out. But, you know, so I don't know about any locked doors, I don't know about him telling anybody to leave their phones. Like I say when I walked in I had my phone. They were having a conversation and he was talking about the need for an armed QRF. And when I walked out they were still having a conversation. So I don't know if the doors were locked. I don't know if he told anybody to leave their phone, but that's what was going on.

**Q.** And Mr. Rhodes told you and other Oath Keepers that the Oath Keepers needed to be prepared to have an armed quick reaction force to go to the White House to fight to keep President Trump in power; right?

**A.** It's not what he said. What he said was he wanted a QRF in case people from the so-called left would try to remove Trump by force from the White House.

**Q.** The so-called left including politicians on the left; right?

**A.** And like I was saying, and Trump invokes Insurrection Act, he thought that they would get called as the militia. So he wanted to be quote, unquote, ready for combat if Trump called after somebody tried to forcefully remove him. Now, once I told him what I thought about it, we laughed about it, but he

still wanted to keep the QRF plan.

**Q.** Mr. Rhodes is calling for the Oath Keepers to be ready for combat to go to the White House; right?

**A.** No. You keep saying the same thing, I'm going to keep giving you the same answer.

**Q.** And you laughed about this idea; right?

**A.** Yes. It's a crazy fucking idea to think that anybody's going to be able to storm the White House, regardless of who they are. The White House has an arsenal. You're not going to be able to do it. And, you know, Stewart laughed with me. But he still wanted to have a armed QRF, just in case somebody could physically armed take over the White House and forcefully remove Trump, and Trump was to call in the Insurrection Act to call the Oath Keepers up as a militia. I mean, it's a crazy idea. But again, that's Stewart Rhodes.

**Q.** And you kept associating with Mr. Rhodes; right?

**A.** I mean, I took the job, it wasn't no -- like I said that's -- those are his thoughts, like I said his words don't move me. His words are not going to make me want to do harm, or his words are not going to make me want to be a revolutionary against my government that I spilled blood and cried for overseas. It's -- I mean, it's a crazy idea that anybody could storm the White House and overthrow the president.

**Q.** This man who's calling for revolution against the country

that you served, you kept taking a paycheck from him; right?

**A.** I took a paycheck from him.

**Q.** And you kept --

**A.** Listen, he's not the only fucking person I've ever heard talking about, oh, it's going to be a civil war. Like I said before, you go to barbershops you hear that kind of talk. It's like to me it's Stewart being Stewart. Now whether or not he absolutely believe it is one thing. But he absolutely thought there was going to be armed people trying to forcefully remove Trump. So he wanted to have a armed QRF in November for the Million MAGA March.

**Q.** Then he organized an armed QRF for the January operation?

**A.** Armed QRF wasn't a part of my security plan. So if Stewart organized an armed QRF, that's what Stewart did. But as far as my security plan went, there was no QRF.

**Q.** Because you had no idea there was a QRF; right?

**A.** I didn't know there was a QRF until after I started learning about stuff going on in the investigation. But again, my security plan didn't call for a QRF because you couldn't get a vehicle in there. There was going to be people there, you wouldn't be able to get a vehicle into them.

**Q.** That's why there were boats; right?

**A.** I'm sorry?

**Q.** That's why there were boats; right?

**A.** Have you thought about the logic of carting weapons from wherever the water's going to be, wherever the boats are going to come, to the Capitol. And then look at who you -- man, does a QRF, like how, how would they get there?

**Q.** I think the messages suggest they were going to get there by boat; right?

**A.** And then what?

**Q.** I believe Kelly Meggs said there were landing sites near the Lincoln Memorial; right?

**A.** How would you get to the Capitol with those weapons from a boat.

**Q.** Because those were the rally points; right?

**A.** What rally points can you take a boat to by the Capitol?

**Q.** You discussed on direct, Mr. Greene, that there were rally points that people discussed where they would be prepared to meet up; correct?

**A.** We had a rally point for security guys, maybe 50 minute walking from anywhere where the water was. The only place I see water around D.C. is right around the Jefferson Memorial. So if you were to take a boat to the Jefferson Memorial, how would you get weapons from there to the Capitol. If you have a old fucker like Caldwell pushing around the cart.

**Q.** Let me ask you this, Mr. Greene, the leaders of the January 6 operation were on the DC OP Jan 6 chat; right?

**A.** It's probably 200 people on the DC OP Jan 6 chat.

**Q.** And the 200 people involved in that chat all knew where the rally points were because Kelly Meggs told them; right?
**A.** No, Kelly Meggs didn't even know where our rally point was the morning of the 6th, because Kelly Meggs was already on operation. The people who were supposed to meet us were supposed to meet us at said rally point, not rally points, rally point. It's purely a meet up spot, take them from the rally point to stage 7. Nobody showed up.
**Q.** So just to go with this point for a second, you're telling us that Kelly Meggs, one of the leaders of this operation, was not told the rally point for -- that you had set?
**A.** No, so when we decided on the rally point the morning of the 6th, where I left Landon at, I don't remember talking to Kelly Meggs again. I wasn't in contact with Kelly Meggs, Stewart was. Now whether or not Stewart told Kelly I don't know. But our rally point was at the pond behind the Capitol.
**Q.** And you're saying that as the operations leader you chose not to tell the leader of the Florida contingent where the rally point was?
**A.** It's not that I wasn't telling him what the rally point was. It didn't concern him at the time, because his guys were on the operation with the eight politicians. So what use is it to Kelly to know where we're going to meet new guys coming in.

**Q.** Which eight politicians were the Floridians guarding, I'm curious?
**A.** I couldn't tell you.
**Q.** But you're the operations leader?
**A.** Exactly.
**Q.** And you're the operations leader for security; right?
**A.** Exactly.
**Q.** And you have no idea who Kelly Meggs is guarding, eight politicians, you have no idea their names?
**A.** Stewart called and said they had eight politicians, organized Roger Stone with different protection detail, that's how Josh James got them.
**Q.** And you have no idea?
**A.** I don't know who it was supposed to be.
**Q.** Okay. I was talking about rally points earlier because I was talking about the QRF rally points that Kelly Meggs broadcast to the DC OP Jan 6 security chat?
**A.** See again, my security operation didn't call for a QRF. So if Kelly Meggs put together QRF rally points, Kelly Meggs put together QRF rally points.
**Q.** Let's come back to that in a moment, because I want to first talk about December of 2020, you came back to D.C. with Mr. Rhodes, the man advocating for revolution, in December of 2020; right?
**A.** I came back to work one AP and then again for Kelly.

**Q.** And that had nothing to do with the Oath Keepers in December of 2020?

**A.** No, so again, Kelly after one AP, Kelly and Stone was supposed to speak at a stage. He paid me to be his guy to go and help one AP and then come back for Kelly.

**Q.** And at that stage Stewart Rhodes continued to advocate for a civil war; correct?

**A.** I didn't hear Stewart's speech at the stage, because I was doing advance work for the Flinn detail.

**Q.** Okay. And then in late December Mr. Rhodes asked you to be a leader of the operation in D.C. for January 6; correct?

**A.** No. He asked me to help Siekerman, who was the leader.

**Q.** So he asked you to be a deputy leader; fair to say?

**A.** No. He asked me to help organize executive protection details for VIPs and speakers.

**Q.** Can we bring up, please, Government's Exhibit 9725, which is already in evidence, and go to page 1.

This is a message Mr. Rhodes sent to the DC OP Jan 6 21 chat; do you see that?

**A.** I see it.

**Q.** And he sent this message on December 30th, of 2020; right?

**A.** I'm familiar with it.

**Q.** And Mr. Rhodes said in that message that he was putting Don Siekerman in overall command of the op; correct?

**A.** Yes.

**Q.** And then he listed you, you're Whip; right?

**A.** Yes.

**Q.** And he listed Josh and Kelly as Mr. Siekerman's seconds; correct?

**A.** Yes.

**Q.** So you were second in overall command; fair to say?

**A.** So you do realize Stewart put this message out before he even asked me to help Siekerman.

**Q.** Okay. And Mr. Rhodes is saying that you Josh and Kelly are his seconds; right?

**A.** I mean, that's what he said.

**Q.** Okay. So you're denying that you were helping Don Siekerman?

**A.** No, I'm not denying it. What I'm telling you is this message is before Stewart even asked me to help Siekerman.

**Q.** Okay. Are you denying you were helping in a leadership capacity, Mr. Siekerman?

**A.** I'm not denying anything. I'm just simply telling you, he put this message out before he even asked me to help Siekerman.

**Q.** Okay.

**A.** So when I did help Siekerman, it was purely to set up the EP details and the VIPs.

**Q.** Okay. But you were a second leader to Mr. Siekerman;

right?

**A.** If that's what he said.

**Q.** Well, that's -- no, I'm asking you.

**A.** No, I'm telling you what he told me my capacity with Siekerman was. Now you're reading something and you're telling me what this man told me.

**Q.** Okay. Let's take that down, please. Thank you.

Mr. Greene, were you an assistant leader to Don Siekerman for the DC Operation prior to January 6th?

**A.** I helped Siekerman with the set up of the executive protection details and the VIPs. Now, when Stewart asked me to take over, that's when Siekerman decided he wasn't coming.

**Q.** And Mr. Siekerman got sick shortly before January 6th; right?

**A.** Yes.

**Q.** And as of the morning of January 6, Mr. Rhodes put you in command as the operations leader for January 6?

**A.** It was actually before the morning of January 6. But again, he didn't put it out until the morning of January 6. He asked me maybe -- oh, maybe the 2nd or the 3rd, I remember we had a conversation and I left on the 4th.

**Q.** Okay. Great. So he asked you the 2nd or the 3rd to be the operations leader for January 6th; right?

**A.** Yes.

**Q.** Okay. And in coming to D.C. for January 6 you brought a firearm; correct?
**A.** I brought a handgun. An M&P shield, it shoots six rounds.
**Q.** And you brought part of a firearm for your friend Landon Bentley?
**A.** I brought a upper receiver.
**Q.** And a upper receiver is a part of a firearm; right?
**A.** Yes.
**Q.** And you were added to Mr. Rhodes to this DC OP January 6 chat; right?
**A.** Yes.
**Q.** And you were added on the evening of December 30th at about 8:36 p.m.; correct?
**A.** I guess so, yeah.
**Q.** Can we bring up on the screen Government's Exhibit 10050. And just for the witness, do you see Mr. Greene that this is a forensic examination report from a cellular telephone?
**A.** Yes.
**Q.** Okay. Could we go to the next page of the exhibit, please and the next page, please. And the next page, sorry. Could we zoom in on what's record 1 here.

Mr. Greene, have you seen the data extracted from your cell phone?
**A.** Some of it.

**Q.** Okay. And if we look at record 1 here, do we see that on December 30th, 2020, at 8:36 p.m. this chat begins on your phone?

**A.** Yes.

**Q.** Okay. Thank you, you can take that down.

Mr. Greene, once you were named -- once you were asked by Mr. Rhodes to become involved with helping Mr. Siekerman, you began to actively follow the planning for January 6; right?

**A.** Not so much. What I was doing, I was talking to Siekerman. And he was telling me some of the stuff that he wanted to do. He was telling me how he was talking to the police officers and the information he was putting out on the Signal chats. And then I was telling him how he could set up the VIPs and stuff like that. You know, Siekerman thought that he had a bunch of guys coming. And so it sounded like it would be a pretty easy operation. But, you know --

**Q.** And so are you saying that you did not actively follow planning chats like DC OP January 6 21 once you began helping Mr. Siekerman?

**A.** Not entirely. Like I would get on there and check it from time to time, you know what I'm saying. If Stewart wanted know see some stuff on there, he would hit me up and tell me to get on there and look at what was going on. Mostly like me and Siekerman communicated on phone. And he was telling me stuff he was putting out.

**Q.** Mr. Greene you testified at a prior hearing related to this case; right?

**A.** Yes.

**Q.** Can we bring up on the screen please Government's Exhibit 10052 just for the witness. And can we go to page 11. And I will direct counsel to lines 21 through 23.

Mr. Greene at that prior hearing you were asked the following question and gave the following answer.

Question: So you were actively on for the stuff around January 5th and 6?

Answer: During the planning phase.

Yes?

**A.** I'm looking at it say during the planning phase and then I'm looking at it say not the day of, so yeah, I see it.

**Q.** So you were actively involved in the Signal chats during the planning phase; correct?

**A.** I was actively involved in the planning. But like I said, I wasn't monitoring the Signal chats every day, minute after minute, no. So like I said when he would want me to get on there I would get on there and look what was going on on Signal.

**Q.** So I guess I should have read beginning from line 16. In that prior hearing you were asked -- I'm sorry, you said:

Let's say planning for January and 5th and 6th stuff, you know, then I would be actively on Signal looking at some of

the stuff that was going on during the planning phase and stuff like that, you gave that answer as well during the prior hearing?

**A.** Right. I'm saying the same thing you're saying. If he's telling me get on there, I'm going to actively go on there and look at it. So you know, like I said, my notifications are turned off. Me and Siekerman's talking. He's telling me what's going on. Stewart's saying, hey, man, get on there and look at this. So I'm going to actively get on there and look at it. So I'm actively looking at it when I'm looking at it. But I'm not monitoring it day-to-day. I didn't even have the notifications turned on. So sometimes I would have to get on there and look at it after being told what was going on.

**Q.** Thank you. We can take that down, Ms. Rouhi.

And there were at least five different chats, Signal group chats that addressed the topic of January 5/6, 2021; right?

**A.** Yeah. At least, yeah.

**Q.** So based on these chats you were aware that there was planning for a quick reaction force for January 6th?

**A.** Again, I wasn't monitoring the chats like you're trying to make it out to be. But when I took over, we scraped the need for a QRF. Now there was a QRF plan prior to me taking over, I'm sure, because he wanted QRF for just about every security operation.

**Q.** He being Stewart Rhodes; right?

**A.** Correct.

**Q.** Let's bring up what's already in evidence as Exhibit 9750, please. And let's go to page 35. We're showing now for the jury as well Mr. Greene, Government's Exhibit 9750, page 35. I'm sure you recall this message, Mr. Kelly Meggs OK Gator 1 wrote to the DC OP January 6 21 chat, good call last night. Lots covered. I'll get with NC team today and find out QRF location; right?

**A.** Yes.

**Q.** And that is a message that was -- that you were on this chat at that time; right?

**A.** Yeah, I was assigned to the chat, yes.

**Q.** And you were aware that OK Gator 1 was Kelly Meggs; right?

**A.** Yes.

**Q.** And you saw this message where he was saying he was going to get with the NC team to discuss the QRF location; right?

**A.** I seen it, but not when he sent it out.

**Q.** Okay.

**A.** But I have seen the message before.

**Q.** You saw it during -- before January 6; right?

**A.** Um, doubtful. I can't say for sure. I don't really remember. But I do know that they were planning to have a QRF before I took over.

**Q.** Okay. And if we could go to pages 38 through 40 now. We'll start with page 38 of this same exhibit. Kelly Meggs went on to send to that chat the QRF rally points water if the bridges get closed; right?
**A.** Uh-huh, I see it.
**Q.** Okay. If we go to pages 39 and 40 he sent to that chat the maps that were the rally points by land and page 39, if we go to the next page, by sea; right?
**A.** Uh-huh.
**Q.** Okay. And you saw these messages as well; right?
**A.** I saw them. But, again, not when they were sent, but I have seen these messages before.
**Q.** You saw these messages before January 6; right?
**A.** No.
**Q.** Okay. You're the operations leader; right?
**A.** Not on the 2nd.
**Q.** You are a leader, assistant to Don Siekerman; right?
**A.** I was assistant Siekerman with the EP details, yes.
**Q.** And these are planning for January 6; right?
**A.** It's planning.
**Q.** And it's for January 6; right?
**A.** It's for January 6.
**Q.** And it's by Kelly Meggs; right?
**A.** It's by Kelly Meggs.
**Q.** And you're not paying attention to these messages?

**A.** Uh -- no.

**Q.** All right. Let's go to page -- let's go to Exhibit 10050, please. And if we could go to page 136 of the exhibit, please. And could we look at, could we zoom in here on record 279 at the bottom, please.

Okay. Mr. Greene, this is the export report from your phone, do you understand that?

**A.** Yes.

**Q.** And it's for a chat called DC OP January 6 21; do you see that?

**A.** Yes.

MS. RAKOCZY: Your Honor, at this point in time we're going to move in just this record, 279, from page 136 of Exhibit 10050.

MR. SHIPLEY: No objection.

THE COURT: Okay. Be admitted.

**Q.** (BY MS. RAKOCZY) Mr. Greene, this is -- and can we publish to the jury, please.

Mr. Greene this was the message we were just looking at from Kelly Meggs where he said, good call last night. Lots covered. I'll get with NC team today and find out QRF location; do you see that?

**A.** I see it.

**Q.** Okay. And there's a field within this program that records a read receipt; do you see that?

**A.** I see that too.

**Q.** And this read receipt says yes; do you see that?

**A.** I see that too.

**Q.** Thank you. If we could take that zoom in down and can we go to page 162. Just exhibits -- just records 338 to 339, so page 162, these two records, 238 and 239. Let's do 238 first please. 338 sorry. Thank you very much, Ms. Rouhi. So we've just zoomed in now in Exhibit 10050 on page 162, to records 338 and 339.

You see this is also for the DC OP January 6 chat?

**A.** Yes.

**Q.** And this appear to be the messages from Kelly Meggs, water of the bridges get closed, and then a response from Paul Stamey, working on procuring boat transport as we speak; do you see that message?

**A.** Yes.

**Q.** And do you see that the read receipt for both of these messages is yes?

**A.** Yes.

**Q.** Okay. Thank you. We can bring that down. And can we go please to page -- Exhibit 10050 again. Could we go to page 202, please, of that exhibit. Record 430.

This is a different message to that same DC OP January 6 chat, also from Kelly Meggs' phone number; right?

**A.** Yes.

**Q.** And Mr. Meggs said here on January 3rd, Ammo situation, are we bringing or are we set at QRF? I mean, I'm always going to have a couple hundred, but if SHTF we've got ample availability; do you see that message?

**A.** Yes.

**Q.** Do you see that the read receipt for this one is yes?

**A.** Yes.

**Q.** Thank you. We can take that down. And if we can go to page 313 of the exhibit, please.

THE COURT: Can you hang on, can you put that back up, I don't know if the jury saw that. I think all of these are being admitted, correct, without objection?

MR. SHIPLEY: I'm sorry?

THE COURT: I'm saying all these exhibits that are being shown are being admitted without objection, correct.

MR. SHIPLEY: Well, Your Honor, I mean, Mr. Woodward and I were just talking about that.

THE COURT: I'm sorry?

MR. SHIPLEY: Mr. Woodward and I were just talking about that. My understanding was only the first one was asked to be admitted. And now we've run through several other, we're not stopping --

THE COURT: Okay. Well, do you have an objection to any others being -- well, let me put it this way, if you have an objection to it let me know before it gets published.

MS. RAKOCZY: So at this point in time, Your Honor, we would formally move to admit page 162, records 338 and 339 and page 202, record 430.

THE COURT: All right. They'll be admitted.

MR. SHIPLEY: Your Honor, no objection.

THE COURT: Okay. Admitted without objection.

**Q.** (BY MS. RAKOCZY) And if we could just show the jury, please, this is January 3rd of 2021, a message from Mr. Meggs to the DC OP January 6 chat; correct, Mr. Greene?

**A.** Yes.

**Q.** And Mr. Meggs said, ammo situation, are we bringing or are we set at QRF? I mean, I'm always going to have a couple hundred, but if SHTF we got ample availability; do you see that message?

**A.** Yes.

**Q.** And does the read receipt for this message also say yes?

**A.** Yes.

**Q.** Could you take that down please. And just for the witness, could we please go to page 313 of the exhibit and zoom in on record 628. At this point in time we would seek to move in from Exhibit 10050, page 313, record 628.

MR. SHIPLEY: No objection.

THE COURT: Admitted.

**Q.** (BY MS. RAKOCZY) Do you see that this is from -- and if we could publish, please.

Mr. Greene do you see this is a message from Stewart Rhodes's phone number?

**A.** Yes.

**Q.** And to that same DC OP January 6 chat?

**A.** Yes.

**Q.** And Mr. Rhodes says on January 6th at 6:27 a.m., we will have several well equipped QRFs outside D.C. and there are many, many others from other groups who will be watching and waiting on the outside in case of worst case scenarios; do you see that message?

**A.** Yes.

**Q.** And that message has a read receipt of yes as well?

**A.** Yes.

**Q.** And this message was sent by Mr. Rhodes on the morning of January 6; correct?

**A.** Yes.

**Q.** That's after you became the QRF leader -- I'm sorry, the operations leader for Mr. Rhodes's group; right?

**A.** Yes.

**Q.** After you allegedly canceled the QRF; right?

**A.** I did cancel the QRF. Stewart knew we didn't have a QRF. Yet he put that out any way. Now, it's important to note that if I was to send a message from this group chat and I just open up the Signal and go to the bottom and send a message, it's going to mark them all as read even if I didn't look at

them. So you can show as many read receipts as you want, it's all going to say read if I respond and go to the bottom without looking at the messages.

**Q.** I'm sorry, Mr. Greene, you're a cell phone expert as well?

**A.** I'm not a cell phone expert --

MR. SHIPLEY: Your Honor objection.

THE WITNESS: I'm not a cell phone expert but I can tell you how --

THE COURT: Whoa, whoa, whoa. Objection is overruled. Your client made a statement about how these should be read.

MR. SHIPLEY: I'm going to object that the question is argumentative.

THE COURT: Okay. All right. Well, it's overruled. Go ahead.

**Q.** (BY MS. RAKOCZY) Mr. Greene, are you a cell phone expert?

**A.** I'm not a cell phone expert, but I can tell you how this app works.

**Q.** Do you know how the Axiom program that processes data from cellular telephones works?

**A.** I don't know how the Axiom program works, but I know in Signal if I pop open a Signal chat, if it has 200 messages on it and I scroll to the bottom, they're all going to be marked

as read if I respond or if I scroll to the bottom. So I don't know about this program, but they're all going to be marked as read, because essentially they're going to be marked as read when you just scroll to the bottom.

**Q.** That's how your phone operates; right?

**A.** That's how Signal operates.

**Q.** You understand that data, metadata gets stored in phones perhaps in different ways?

MR. SHIPLEY: Your Honor, I'm going to object. There's no foundation for any of this questioning. This is expert testimony.

THE COURT: It's overruled. Based upon your client's answers to the question. Go ahead.

**Q.** (BY MS. RAKOCZY) Mr. Greene, I know you're telling us how cell phones work, but do you understand --

**A.** No, no, no, I said how Signal works.

**Q.** I understand you're telling us how Signal works when a human is using it on their phones. But do you understand that metadata gets stored in cell phones in different ways?

**A.** I suppose, yes.

**Q.** And so do you know what the metadata here when it says read reflects?

**A.** That the message is read. Now when you -- like I said, when you open up Signal, if you've got unread messages, if you scroll to the bottom, every message that's highlighted is

unread is it's going to mark like you read it.

**Q.** Okay, Mr. Greene. Let's take this down, please.

Mr. Greene, you saw there in that last message Mr. Rhodes on the morning of January 6 was talking about the fact that there was a QRF; right?

**A.** Correct, I seen it.

**Q.** And I think you just said that Mr. Rhodes said that even though he knew the QRF had been canceled by you; is that what you just said?

**A.** Correct. So when Mr. Rhodes sent that message, I didn't even know he sent the message till later. And once I learned, you know, the FBI asked me about it. And I told them the same thing I'm telling you, like Stewart knew there was no QRF plan for the security operation. Yet he put that message out. He also said that he had armed individuals.

**Q.** Mr. Greene you were staying at the same hotel as Mr. Rhodes on the night of January 5th into the morning of January 6th; right?

**A.** Yes.

**Q.** And you left the hotel with Mr. Rhodes that morning, right?

**A.** Yes.

**Q.** And you were the operations leader for Mr. Rhodes' group on January 6th; correct?

**A.** Yes.

**Q.** And that message was sent at about 6:00 a.m. The 6:00 a.m. hour on January 6th; right?

**A.** Yes.

**Q.** That's shortly before or during the time that you're traveling into D.C. with Mr. Rhodes; right?

MR. SHIPLEY: Objection. Lacks foundation. Assumes facts not in evidence.

THE COURT: It's cross-examination. It's overruled.

**Q.** (BY MS. RAKOCZY) Mr. Greene, let me repeat the question. The 6:00 a.m. hour on the morning of January 6 is around the time that is either shortly before or during the time that you're traveling into D.C. with Mr. Rhodes; right?

**A.** I don't remember what time we left. I think we got there about 8:00. Shit, it takes only 15 or 20 minutes from where we were staying, so 6:30 would be early.

**Q.** So shortly before you met up with Mr. Rhodes; fair to say?

**A.** Yeah, probably, probably before I met Mr. Rhodes.

**Q.** And you're telling this jury that before leaving that morning with Mr. Rhodes you didn't take a look at the DC OP Jan 6 chat for the operation you were leading?

**A.** No. What I'm saying is I'm not paying attention to the DC OP chat until I need to use it. So if Stewart sent a message, he sent a message. Now, when I got unread messages, all I do

is open it up. If I need to send a message, I open it up, punch to the bottom, send the message I need to send.

**Q.** This is the morning of January 6th --

**A.** The morning of January 6th.

**Q.** And you're the operations leader; right?

**A.** Yes.

**Q.** And this message was sent by your boss, the leader of everything; right?

**A.** Yes.

**Q.** And you're not looking to see if he's sending any messages that morning to the operational Signal chat?

**A.** So if Stewart needed me to do something, like he wanted to reach me directly, he would know to call or text me. He's not going to put a Signal message out for me to read. So if it's something that he needed me to know he would tell me, especially since we're riding together. So what Stewart didn't tell me was he was putting out a message saying we still had a armed QRF on standby, because he knows we didn't plan for a QRF. So if he put it out, he put it out. But he knows my security plan didn't plan for a QRF.

**Q.** So when you got in the car with Mr. Rhodes he told you he put out a false message; is that right?

**A.** He didn't tell me about the message at all.

**Q.** So I don't understand how you know that Mr. Rhodes is putting out a message that is not true?

**A.** Because I seen it, we didn't have a QRF.
**Q.** Okay. Could we bring up exhibit --
**A.** The day Stewart put the message out was the morning of the 6. He didn't tell me, hey, I'm going the send this message out.
**Q.** I see, but you know Mr. Rhodes knew there wasn't going to be a QRF --
**A.** Yes. Now --
**Q.** From talking to him?
**A.** No, no, no, I'm telling you our security plan didn't include a QRF. Stewart might have had another plan. But what I'm saying is as far as my security plan, as far as our security plan goes, we didn't plan for a QRF, we didn't have enough people for QRF. Hell, we only had two people at stage 7 after the EP guys. So we didn't have the manpower for a QRF. So if Stewart put out that we had a QRF on standby, hey that's what he put out.
**Q.** Well, you didn't need the manpower at the stage for a QRF, because the QRF was at the hotel across the river; right?
**A.** I didn't know about a QRF, because we didn't plan for a QRF. So everything I'm learning about QRF is after the fact. I didn't know Kelly Meggs had a QRF commander until after the fact. I didn't know Stewart sent a QRF message until maybe the day after when I'm looking at messages.
**Q.** I see. You didn't know that Mr. Meggs was dropping his

guns at the QRF; is that right?

**A.** No. So they had planned for a QRF. When I took over the operation, I scraped the QRF. I also told them not to wear any cammo. Everybody Kelly was with showed up in cammo. So apparently they wasn't listening to me. Now, as far as my security operation goes, you can look at the pictures of the guys who were with people. Josh James they didn't on any cammo, Jeff Morelock and his guy, he didn't have on cammo, Kelly Meggs, his guys, some of them had on cammo, some didn't. So if they still had a QRF, they had a QRF. As far as my security plan, we didn't plan for a QRF.

**Q.** I guess I'm confused Mr. Greene, because didn't Mr. Meggs tell you when he was dropping his weapon at the QRF hotel?

**A.** He didn't tell me he was dropping weapons at a QRF hotel. He put it on a DC Op chat.

**Q.** Can we bring up Exhibit 10061 just for the witness.

This is another forensic examination report from your phone, Mr. Greene. Do you see that here on the cover page of Exhibit 10061?

**A.** Yes.

**Q.** Could we go to page 3 of the exhibit. I'm sorry, could we go to page 4. Can we zoom in on record 1 here.

MS. RAKOCZY: Your Honor, at this point in time we would seek to admit Exhibit 10061 into evidence and seek to publish.

THE COURT: Mr. Shipley.

MR. SHIPLEY: And I'm not sure, do we have -- no objection.

THE COURT: Okay. It will be admitted.

**Q.** (BY MS. RAKOCZY) Thank you. If we could publish to the jury. We see here, Mr. Greene, this is a message from Kelly Meggs' phone number ending in 0600 to your phone number ending in 9968; do you see that?

**A.** Yes.

**Q.** A message from January 5th at -- here it says 11:46 p.m.; do you see that?

**A.** Yes.

**Q.** And this message from Mr. Meggs to you says, We are heading in, just unloaded at QRF; right?

**A.** I see it.

**Q.** And the read receipt for this message also says yes; right?

**A.** Yes.

**Q.** Thank you. We can take that down. Could we bring up Exhibit 9725 please, page 4. Also on the morning of January 5th -- Mr. Greene, on January 5th of 2021 Mr. Meggs sent the message we see here to the DC OP January 6 21 chat?

**A.** Yes.

**Q.** And at 9:19 a.m. that morning he said, We are ready. Should be in D.C. by noon; right?

**A.** Yes.

**Q.** And when he sent that message "we are ready," he sent that link to that video we've now watched a couple times showing you and other Oath Keepers in Louisville; right?

**A.** Yes.

**Q.** Can we bring up Government's Exhibit 1.S.159.818.V. And go to 15 seconds in. This is the video that Mr. Meggs sent with the message, We are ready; right?

**A.** Yeah, I seen the video.

**Q.** And at 15 seconds in we see images of people burning things; right?

**A.** Yes.

**Q.** And at 32 seconds in we see images of people breaking things; right?

**A.** Yes.

**Q.** And at 46 seconds in -- can we play through 55 seconds?

(Video played.)

**Q.** (BY MS. RAKOCZY) At 46 seconds through about 55, 56 seconds we see images of the Florida Oath Keepers firing guns at a gun range; right?

**A.** Right.

**Q.** And in the latter part of the video we then see some of the images we've already looked at today of you and other Oath Keepers in Louisville; correct?

**A.** Yes.

**Q.** So that's what Mr. Meggs is saying he and his group are ready for on his way to D.C.; right?
**A.** If that's how you take it. Again, you know, this is Kelly Meggs. This is Kelly Meggs' video.
**Q.** And he and Josh James were your deputy leaders for January 6; right?
**A.** No. Josh James had a team, Kelly Meggs had a team. There's no deputies. They have teams. They do this job. They have teams. They do this job.
**Q.** And you were in charge of them?
**A.** I was in charge of operation.
**Q.** And Mr. Rhodes was in charge of you; right?
**A.** Mr. Rhodes was in charge of the Oath Keepers, yeah.
**Q.** All right. Thank you. We can take that down Ms. Rouhi.
And Mr. Rhodes was also ready for January 6th as he moved towards the D.C. area on January 4th and 5th; correct?
**A.** How do you mean?
**Q.** Let's bring up Government's Exhibit 6924 already in evidence, please.
MS. RAKOCZY: Court's indulgence.
We can come back to that one. And this may not be in evidence, so if we just show the witness. Bringing up on the screen Government's Exhibit 6924. And at this point in time the government would seek to move Exhibit 69 24 into evidence.

MR. SHIPLEY: Objection.

THE COURT: Phone please.

(Bench conference on the record.)

THE COURT: So Ms. Rakoczy how -- this is a message from Mr. Rhodes to I presume Kellye SoRelle, December 29th of 2020, 10:32 p.m.

MS. RAKOCZY: Yes, Your Honor. And I plan on asking Mr. Greene whether he was aware that this was Mr. Rhodes's plan for the 6th, or these were his sentiments going into the 6th.

MR. WOODWARD: I don't think that makes the exhibit admissible independently.

MS. RAKOCZY: I would note this is not Mr. Woodward's witness.

MR. WOODWARD: I'm happy to be severed from the case, Judge.

MR. SHIPLEY: I didn't hear the initial exchange, so I couldn't say anything.

MS. RAKOCZY: Your Honor, the government is seeking to admit this to show Mr. Greene to ask him whether he was aware that these were Mr. Rhodes's sentiments leading into January 6. He's testified a lot about what his understanding was of the focus for January 6. We think this impeaches that.

THE COURT: I guess the issue is -- look, if he is

not -- first of all, he's not on this message. Second of all, putting it in front of him and showing it to the jury and he says, I knew nothing about this puts out Mr. Rhodes' message to the jury, can't sort of be -- the bell can't be unrung.

MS. RAKOCZY: Candidly, Your Honor, this is a co-conspirator statement. It's from the period leading up to January 6. It is from the leader of the conspiracy. He's an alleged co-conspirator. It is during the time period of the conspiracy. It is to another alleged co-conspirator, Kellye SoRelle. It is in furtherance of the conspiracy. It's relevant to Ms. SoRelle's intent as well. And she is the person who Mr. Greene has claimed he has been protecting on several of these operations.

MR. SHIPLEY: Well, then the government could have put it in its case in chief. This is cross-examination. If she wants to put it in front of him without the jury seeing and he says I don't know anything about it, then how does he answer more questions about it. This is not the government's case. They could have put it in, they didn't.

MS. RAKOCZY: I think it's relevant now that somebody has taken the stand -- the defendant has taken the stand and is claiming that they had no other purpose other than security details to be in D.C. that day. If the Court's going to preclude us, then I will ask him -- I will essentially paraphrase it and ask him if he was aware that

that was Mr. Rhodes' sentiment. If he denies it, we will seek to admit it in our rebuttal case. It seams fair to confront him with it.

MR. SHIPLEY: Confront him with somebody else's statement.

MS. RAKOCZY: His boss's and co-conspirator's.

MR. WOODWARD: I hope I'm not responsible for all my boss's statements.

MR. COOPER: Well, I'm glad I'm self-employed. But just looking at this, I think it's inappropriate to confront him with a statement from somebody else to another person, to a third person. There's no indication he's involved in this.

MR. SHIPLEY: And, in fact, he says he wasn't even contacted about January 6th until after the day of the statement.

MR. COOPER: I think the problem, Your Honor, this is just between two specific people and doesn't go out to any of the chats, so it's sort of difficult to imply that this is something that would be known by anybody else but these two individuals.

MR. SHIPLEY: The sole purpose here is to inflame the jury. That's it, the reference to rifles in hand.

MS. RAKOCZY: Respectfully, Your Honor, this is the leader of the alleged conspiracy talking to Mr. Greene, who is

alleged to be a co-conspirator we could have admitted this in our case in chief, we were trying to be judicious in how many of Mr. Rhodes's statements we introduced. We think this is completely relevant fair game for cross when this man on the stand, Mr. Greene, has said that everything was about security, there was no QRF, a whole number of statements that this rebuts.

MR. COOPER: But this isn't to Mr. Greene, this is to Kellye.

THE COURT: So look, I do think -- I think the government's right in the sense that this is independently admissible, at least in theory would have been independently admissible in its case in chief. This is cross-examination. The question for the jury is whether Mr. Greene would have had reason to know this was Mr. A Rhodes's intent leading up to the 6th. So the message between Mr. Rhodes and Ms. SoRelle, there's been no testimony so far that Mr. Greene would have been part of any conversation between the two of them concerning the events of January 6th. And I think it is unfair to confront him with a statement that he wasn't a part of. Just simply ask whether he was aware that Mr. Rhodes had this other motive or other intention. And so I do think while there's some probative value to it, arguably, I do think it's unfairly and prejudicial to bring it in at this point.

MS. RAKOCZY: Can I ask the Court, if I confront him

with this and denies it, I will ask follow-up questions about his role, his relationship, and sort of lay the foundation for the fact that it is incredible that he is not aware of the leader's sentiments. And then we will seek to move this in in our rebuttal case.

MR. WOODWARD: That's not at all what his testimony has been so far. His testimony has been that Stewart Rhodes was doing Stewart Rhodes.

THE COURT: Let's move forward. You can ask him -- look, the bottom line is, I think this is consistent with how I've been operating throughout, if he was on a chat and something was expressed by the chat by another co-conspirator, I have not objected -- I have not prevented him, frankly, there has been no objection to you confronting him with that statement. He has denied having read some of them and the jury will ultimately have to make a determination of whether his explanation is credible or not. This is a text message between Mr. Rhodes and Ms. SoRelle. If I remember correctly, this is part of -- well, this is a text message between the two of them. And so given that he has -- he's not on it, I think it's not proper to confront him with it. Okay.

MS. RAKOCZY: Yes, Your Honor.

(The following proceedings were had in open court.)

THE COURT: Objection. Sustained.

MS. RAKOCZY: Will you take that down, please.

**Q.** (BY MS. RAKOCZY) Mr. Greene as Mr. Rhodes prepared the Oath Keepers for January 6, you were aware that he did not believe this was just another rally; right?

**A.** I was not.

**Q.** You were aware that he believed that Congress and others would not take note until people came with rifles in hand; right?

**A.** That was a theory he had.

**Q.** A theory you knew about?

**A.** I mean he mentioned it in conversation, but again, that's Stewart. That's, you know, Stewart's typical rhetoric.

**Q.** And you agreed to be his operations leader for January 6; right?

**A.** Yeah, he paid me for security.

**Q.** You knew that Mr. Rhodes was saying in the lead up to January 6th, in the time period of November 20th -- of November 2020 through January 6th of 2021, you knew he was saying that he was calling for civil war; right?

**A.** No, he wasn't calling for civil war. He thought that it would be a civil war. And he thought that it would happen in our lifetime.

**Q.** Closer than in our lifetime; right?

**A.** I'm sorry?

**Q.** Mr. Rhodes was saying that that civil war was going to happen if President Trump didn't stop the election from

becoming finalized; right?

**A.** He thought that by Donald Trump not stopping the certification of the election or not doing the Insurrection Act thing, that people on the right would get outraged and, you know, turn to violence in the street against the people in the left.

**Q.** And you agreed that that was likely; right?

**A.** Nah, I can see how it would happen. I'm not agreeing to it. But I can see how it would happen.

**Q.** Can we bring up Exhibit 9732, page 3. You remember earlier in this case seeing messages between yourself and Landon Bentley who we heard from yesterday?

**A.** Yes.

**Q.** And in this message you and Mr. Greene talk about now we're in late November talking about upcoming operations in D.C.; right?

**A.** Yes.

**Q.** We go to the next page. You said here Stewart Rhodes -- Stewart, that's Stewart Rhodes; right?

**A.** Uh-huh.

**Q.** I'm sorry, you have to say yes or no for the court reporter.

**A.** Yes.

**Q.** Stewart Rhodes believes we're on the brink of a civil war; right?

**A.** Yes.
**Q.** That's what you said to Mr. Bentley on November 25th; right?
**A.** Yes.
**Q.** Not a war in our lifetime, but we're on the brink of a civil war?
**A.** We're on the brink of a war.
**Q.** If we go to the next page, please. Mr. Bentley says, Thanks, brother, just let me know where you're going to do the operations and I'll be there. What do you think about it. And if we go to the Next page, Mr. Bentley clarified, he wanted to know what you thought about the civil war; right?
**A.** Yes.
**Q.** If we go to the next page, you said you could see how it could happen; right?
**A.** Yes.
**Q.** And if we could go to the next page. You went on to say, A lot of people are upset about this election. Now that there is proof, people will be pissed by the results; right?
**A.** Yes.
**Q.** Thank you, you can take that down. And that's essentially what happened on January 6th; right?
**A.** No.
**Q.** On January 6th, that morning you woke up and you rode into D.C. with Stewart Rhodes and Kellye SoRelle; right?

**A.** Yes.

**Q.** And at some point that morning you heard from Josh James and the team that was guarding Roger Stone; right?

**A.** Probably -- yeah, I heard from them in the morning. He was telling me about them going to the ellipse or something.

**Q.** Right. The original plan that morning had been for Mr. James and his team to escort Roger Stone to the events at the Ellipse; right?

**A.** Yes.

**Q.** And you understand that Roger Stone is a political operative type; fair to say?

**A.** Yeah. I mean, one of Trump's lackeys.

**Q.** And you learn at some point that morning that Roger Stone told Mr. James and his team he did not want to go to the Ellipse; right?

**A.** I'm thinking that was probably closer to the afternoon hour.

**Q.** Okay. And closer to the afternoon hour, Mr. Stone said he was just going to stay in his hotel; right?

**A.** No, so what happened was they went to the Elipse and Roger Stone wasn't happy about the treatment he received. So then he wanted to go back to his hotel.

**Q.** And Mr. James and his team took him back to his hotel?

**A.** I suppose he did, yes.

**Q.** That's what Mr. James told you; right?

**A.** That's what he told me, yes.
**Q.** And Mr. James then reported to you that Mr. Stone was going to stay at his hotel; right?
**A.** Yes.
**Q.** Okay. And at around 1:30 p.m. is that when you went to the Capitol on January 6th?
**A.** I believe so.
**Q.** And you were not with Kellye SoRelle; right?
**A.** Not at that time, no.
**Q.** Okay. Really not until after everyone came out of the building and gathered on that east plaza were you with Ms. SoRelle; right?
**A.** Yes. So the whole day I was -- the day of the 6th, me, Landon and Bentley were together -- I mean me, Landon, and Joe were together the whole day. So I didn't see Stewart or Kelly again until everybody was standing on those stairs.
**Q.** Okay. And that's towards the end of everyone's time on the Capitol grounds that day, right, just to orient us?
**A.** Yes.
**Q.** You were also with William Todd Wilson for a portion of the afternoon of the 6th; right?
**A.** So with Todd, he came over, you know, he walked with us to the yard and then he just was gone. And we didn't see him again until we were all standing on the stairs.
**Q.** So when you got to the Capitol grounds, you saw what you

described as essentially a riot unfolding; right?

**A.** Yes.

**Q.** I think on direct you called it full scale; is that right?

**A.** Yes, riot.

**Q.** What did you mean by that?

**A.** I mean full scale is a bunch of people there. You had people -- so you had a group of people and then you had a group of people in front of them. And there were a line of police officers around the building. And they were -- the people in front of the group were scuffling with the police officers around the building.

**Q.** And people had gotten past the first few sets of barricades at this point; right?

**A.** So when we got there, there were -- you know, the only barricades was up around the Capitol. It was a line of police officers and then they had bike racks behind them.

**Q.** Uh-huh. But there had been bike racks in front of those officers; right?

**A.** I can't say one way or another, they were gone when we got there.

**Q.** Mr. Greene, you were in charge of security operations for the 6th; right?

**A.** The 6th, yes.

**Q.** And there were two stages on the Capitol grounds, stages

meant to be set up on the Capitol grounds where you were allegedly going to have security details doing protection; right?

**A.** Yes.

**Q.** And so as somebody in that capacity, you are aware that the area of the Capitol grounds, where you ultimately went to were restricted, right, not permitted for the public?

**A.** So what I was told was we had a permit to operate on the Capitol grounds. And, you know, going into it I didn't even know where the stage was going to be set up. So I knew at some point in time I had to go to the Capitol to see where they were going to set the stage up. But nobody was supposed to go to the Capitol until after the Ellipse was over.

MS. RAKOCZY: Court's indulgence. Could we bring up what's already in evidence as I believe 1675, one six seven five.

**Q.** (BY MS. RAKOCZY) Mr. Greene, the areas where your group was supposed to be doing security work were areas 7, and areas 8 that I've just marked on the right side of Exhibit 1675; right?

**A.** So, again, I didn't know where the stages were going to be at when they told us they had a permit to be at the Capitol. So I was, at some point had to go to the Capitol to see where the stages were going to be.

**Q.** And I'm sure you did that on the 5th or the morning of the

6th; right?

**A.** No, I didn't, actually.

**Q.** You were in charge of security for these two stages and you're telling me you had no idea where they were?

**A.** No, we didn't. Nobody knew where they were going to put the stages up at. Because the Alexander guy hadn't told Stewart exactly where the stages were going to be. So Stewart didn't tell me. So all he said is, hey, man, there's going to be a stage at the Capitol after the Ellipse. So I knew at some point I had to go check and see where the stage was going to be. Because the day before you had a stage where 8 is and then at the -- in front of the Supreme Court. We didn't know where the stage was going to be the next day for the Capitol.

**Q.** Forgive me, but we heard from Steven Brown, that's Ali Alexander's guy; right?

**A.** I know what you heard, but I'm telling you what we heard. I know what Steve said, I heard all that. But I'm telling you what Ali Alexander communicated with Stewart -- or at least what Stewart communicated with me as to the location of the stage, you know I didn't have a clear picture.

**Q.** Mr. Greene, you were on a Signal group chat with Steven Brown; right?

**A.** I don't remember if I was on a Signal group chat with Steve Brown. So many Signal chats I was on. Again, I wasn't

monitoring every single chat. Stewart's best chance of communicating with me was texting or calling. That's why he would text or call me to get on Signal when there was something that he wanted me to see.

MS. RAKOCZY: Court's indulgence.

**Q.** (BY MS. RAKOCZY) Okay. Mr. Greene, isn't it true that there was a Signal group chat called something to the effect of January 5/6 Security VIP chat?

**A.** Yes, I know about it now.

**Q.** That was a chat you were on; right?

**A.** I -- sure. Like I said, so many Signal chats. Like I can't say because I don't -- I mean, it's been a while. But I don't remember being on a chat with them. I'm not disputing that I am, but I'm saying I don't remember.

**Q.** It would seem that that would be an important chat, though, for somebody who was in charge of security details for January 6; right?

**A.** I mean, not when he's telling me everything I need to know.

**Q.** Well, that was the chat that Steven Brown was on; right?

**A.** If you say so.

**Q.** And that was the chat that Ali Alexander was on; right?

**A.** If you say so.

**Q.** And that was the chat that Roger Stone was on; right?

**A.** If, again, you can tell me everybody who was in the chat

and I couldn't tell you everybody was in the chat.

**Q.** Well, there weren't that many people in there, right, there was just the protectees; right?

**A.** You're asking me questions I can't answer.

**Q.** And Mr. Rhodes created that chat to enable communication between his leaders in the Oath Keepers and the supposed protectees; right?

**A.** Listen, I don't remember the chat. I don't remember who was in the chat. Again, like the people from the 5th, Stewart linked up with me and gave me their number. So I was able to talk to them directly. Now, my first time ever seeing Steven Brown was when he was here the last time I had to testify. So I can't say one way or the other who was on the conversation and what conversation took place. You know, one, I don't remember. And two, I can't dispute if I was or wasn't.

**Q.** Okay. And so for the sake of argument, let's assume that you and Kelly Meggs and Josh James and Stewart Rhodes are on a chat with all of the people you were supposed to be protecting on January 6, okay, let's say that hypothetically.

**A.** Okay.

**Q.** You wouldn't reach out to that group chat to ask, Hey, where's the stage for tomorrow?

**A.** If I was on the chat, I would have. But again, you know, if I'm added to a chat and I'm not monitoring Signal to know I'm added to a chat, how would I know I was on the chat.

**Q.** I see. So you would not monitor the chat called January 5/6 Security VIP chat even though you were the operations leader allegedly in charge of protecting the VIPs?

**A.** So if he put me in a chat and didn't tell me, I wouldn't know I was on a chat. So if I opened up my Signal and there's a chat there, it's in the fucking Signal chat, you know what I mean. And that's how -- unfortunately, that's how Stewart did me.

**Q.** I really don't know what you mean, Mr. Greene, could you explain a little bit further how you could not know that you were on a chat called Jan 5/6 Security VIP chats, when you were supposed to be in charge of that operation?

**A.** Well, the same way Stewart added me to the DC OPs chat and didn't tell me for days.

**Q.** You were on that chat?

**A.** That's what I'm saying. He didn't tell me, hey, I'm going to add you to this chat. He asked me to work with Siekerman. When I open up Signal I was on this chat.

**Q.** And you don't pay attention?

**A.** Well, I'm just saying I wasn't monitoring Signal. Look, when Stewart puts you in Signal chat and you're already in Signal chats, and then you're in this Signal chat, and that Signal chat, and this Signal chat, and that Signal chat, everybody's constantly talking, your phone's going to keep beeping and binging and binging and binging until I cut the

notifications off. So that's why Stewart had to physically call me and tell me, hey, look at this chat. So if he put me on this chat, I can't tell you one way or another because I don't remember being on a chat.

Now, I mean, if I had the phone I could look at it and tell you I remember being on this chat, but I can't. So if he put me on a chat and didn't tell me, I wouldn't have known. Just the same way he had a chat with the lady from the Virginia Women's Fraternal. He didn't tell me about it, what he did was he called me, gave me her information. I called her and then she called her guy. And that's how I linked up with those people. Because going into the 5th, I didn't even know what time she wanted to meet.

**Q.** This was another person you were supposed to be protecting?

**A.** This was on the 5th, this was the stage.

THE COURT: Ms. Rakoczy, let me interrupt. Let's take our afternoon break. It's a little after 3:00, we'll resume a little after 3:15. See you shortly.

(Jury left the courtroom.)

THE COURT: Mr. Greene, you may step down.

Ms. Rakoczy, do you have a sense how much longer you will be. I'd like to see if we can finish Mr. Greene today, including redirect. So I'll urge you to be more expeditious. Thank you.

MS. RAKOCZY: Yes, sir.

(A recess was taken.)

(Jury entered the courtroom.)

THE COURT: Have a seat, everyone. Welcome back.

Ms. Rakoczy.

MS. RAKOCZY: Thank you, Your Honor.

**Q.** (BY MS. RAKOCZY) 1500.4, please. And could we go to six minutes and 48 seconds. Six minutes and 48 seconds, and if we could publish to the jury.

Mr. Greene -- actually, could we go back to -- sorry, Ms. Rouhi, could we go back to 3 minutes and 22 seconds.

Mr. Greene, we're showing on the screen now a picture you took from your phone in the middle there, do you see that picture?

**A.** Yes.

**Q.** So this is what you were seeing at about 1:50 p.m. on the 6th; right?

**A.** Yes.

**Q.** That's a rioter here scaling a wall or climbing a railing of stairs on the Capitol building; right?

**A.** Yes. He's on the stairs.

**Q.** And the cops are pleading with him and other rioters to go away; right?

**A.** Looks like to me that it's a back and forth. I don't know, I guess you can say they're trying to figure -- I don't

know what they're doing. I know they ended up scuffling with each other.

**Q.** And you don't remember hearing them beg him and other rioters to leave?

**A.** Are you asking did I hear these cops --

**Q.** Yeah.

**A.** On these stairs?

**Q.** Do you remember hearing cops in this area begging with rioters to leave?

**A.** No.

**Q.** Do you remember seeing the cops pepper stray this man?

**A.** Yes.

**Q.** Because he's trying to go somewhere he's not allowed; right?

**A.** He was trying to get through the cops.

**Q.** And you're about ten, ten rows back from this scene, 20 rows back from this scene?

**A.** No. I'm further than that. The picture's don't --

**Q.** But We can see sort of the person that's in front of you; right?

**A.** Yeah.

**Q.** And so you're not that far away; right?

**A.** I'm not terribly far away, right. But it's its a zoomed in picture, like it's like zoomed in.

**Q.** And you are in restricted areas of the Capitol grounds at

this time; right?

**A.** If you say.

**Q.** And that's something you would know as one of the security leaders for events near the Capitol -- on and near the Capitol grounds that day; right?

**A.** I'm sorry?

**Q.** That's something you would know as somebody in charge of security on and near the Capitol grounds on January 6th; right?

**A.** I didn't know what areas was restricted, you know, we were at the Capitol the day before, so.

**Q.** Okay. And as you see this scene unfold, let's go to six minutes and 48 seconds, please. You say at 2:15 p.m. this is -- first of all, this picture in the middle of the screen is a picture you took; right?

**A.** Yes.

**Q.** And you're seeing rioters scale the walls of the Capitol; right?

**A.** Yes.

**Q.** And this photo was taken at about 2:16 p.m.; right?

**A.** Yes.

**Q.** And a minute earlier you told the DC OP Jan 6 chat, they have taken ground at the Capitol; right?

**A.** Yes.

**Q.** Because that's what you're seeing here; correct?

**A.** Yes.

**Q.** And you said, We need to regroup any members that are not on mission; correct?

**A.** Yes.

**Q.** You called people to the Capitol?

**A.** I didn't call anybody to the Capitol.

**Q.** And if we could go to Government's Exhibit -- still in this 1500.4 at 4:06 -- 4 minutes and 6 seconds, please. At around the 1:54, 2:00 p.m. hour, in a separate chat, the one we were just talking about, January 5/6 DC OP Intel team or a related chat, DC OP Intel team, people on that chat are asking -- they're sending pictures and videos of folks at the Capitol and people are asking are they actually patriots; do you remember these messages?

**A.** Yes.

**Q.** And you said, They're patriots; right?

**A.** Yes.

**Q.** That's how you described the people you saw scaling the walls of the Capitol?

**A.** That's how you described everybody who wasn't law enforcement or part of another group. So the Oath Keepers call everybody patriots who are not law enforcement or Proud Boys and stuff like that so essentially everybody in this courtroom would be considered patriots to the way they used to conversate.

**Q.** I see, BLM are patriots?

**A.** No, BLM would be BLM. Antifa would be Antifa, but everybody -- it's like how police officers use the term civilian. Everybody's a civilian unless you're a gang member or an EMS or something like that. So the way that they conversate with each other, everybody's patriots unless they're associated with some other type of group, military, law enforcement, Antifa, BLM.

**Q.** So everybody but Antifa, BLM, and law enforcement are patriots in the Oath Keepers language?

**A.** No. What I'm telling you is everybody is a patriot. Everybody. Everybody in this courtroom is a patriot. Now A law enforcement officer would be a police officer, I meant he's still a patriot, but he's a police officer, or an FBI agent be FBI agent. It's the same way police officers call everybody civilians unless they're associated with something else. So like, yeah, if a police officer sees another police officer he's going to identify him as a fellow LEO.

**Q.** And so you called the people scaling the walls of the Capitol patriots; right?

**A.** Called the rioters patriots.

**Q.** Okay. And Mr. Rhodes called the rioters actual patriots, pissed off patriots, like the sons of liberty were pissed off patriots; right?

**A.** Again, everybody who's not associated with anybody is a

patriots, so essentially everybody out there is a patriot. The whole crowd. Rioters, people who wasn't rioting, bystanders, they're all patriots.

**Q.** Okay. And Josh James said, We're coming to the Capitol ETA 30 minutes; right?

**A.** Yes. I see that.

**Q.** So at 2:04 p.m. Mr. James said we're coming to the Capitol, 30 minutes; right?

**A.** Yes.

**Q.** So you know he was inbound, going to be at the Capitol at 2:30 p.m.; right?

**A.** I knew he was inbound to the Capitol because he told me he was coming to the Capitol, not because --

**Q.** He said that to you on the phone too; right?

**A.** Yeah, he told me he was going to come to the Capitol.

**Q.** In fact, you told him to come to the Capitol; right?

**A.** No.

**Q.** And you were calling him to the Capitol where a riot was unfolding; correct?

**A.** I didn't call him to the Capitol at all. He called to tell me --

**Q.** Well, you said -- go ahead, sir.

**A.** He called to tell me he was going to take Roger Stone to his room. And then when he called me again he said he was coming to the Capitol.

**Q.** And Mr. James's protectee was Roger Stone; right?
**A.** Correct.
**Q.** Mr. Stone is in his hotel room; right?
**A.** Correct.
**Q.** Down the street from the Capitol; right?
**A.** Yeah.
**Q.** And a riot is unfolding and instead of telling Mr. James, no, no, go to your protectee, you had him come to the Capitol; right?
**A.** Well, Mr. James protectee was at his room, I can't tell him not to. Like I said, he can do what he want to do.
**Q.** Mr. Greene, Mr. James ran every single movement that day of Mr. Stone past you; right?
**A.** Yes.
**Q.** Mr. James is former military; correct?
**A.** Yes.
**Q.** A soldier like yourself; right?
**A.** Yes.
**Q.** Also someone who saw combat; correct?
**A.** Yes.
**Q.** You and he both understand the chain of command; right?
**A.** Yes.
**Q.** You were on top, higher than him in the chain of command on January 6; right?
**A.** Yes.

**Q.** You're telling me he couldn't -- you couldn't tell him go to your protectee, don't come to the Capitol where a riot is unfolding?

**A.** I'm not going to tell him what to do. He knows what his job is, so if he says I'm dropping Stone off and I'm coming to the Capitol, I'm not going to say, no man, no, I need you to do this, that, no. You know your job is to protect Roger Stone. Now if Roger Stone is not in play. If Roger Stone's not on the move, if you feel like he's safe and secure, then you know, you can do what you need to do, so long as you can get back to your principal if he needs to move. Now at that point when Josh James told he was coming to the Capitol, okay.

**Q.** In fact, Roger Stone wanted to get to the airport, right?

**A.** I don't know what Roger Stone wanted to do. Last I heard from James, Roger Stone wanted to go back to his hotel. And I don't think his flight was until later in the evening. So he said he was going to take Stone back to his hotel.

**Q.** Mr. Stone wanted to get out of town because a riot was unfolding; right?

**A.** I don't know what Mr. Stone wanted to do. Last I heard from James he was dropping Mr. Stone off at his hotel because Mr. Stone was not happy about the way he was treated.

**Q.** Well, you and Mr. James really wouldn't know because you guys were on your way to the Capitol where the riot was

unfolding; right?

**A.** I was at the Capitol. I don't know what James was thinking. But he was with Stone and he told me he was dropping tone off and the next time I heard from him he said he was on his way to the Capitol.

**Q.** And you told the Oath Keepers that we need to regroup everybody who's not on mission because they're taking ground at the Capitol; right?

**A.** Yes, the security team.

**Q.** And that's because you wanted folks to come to the Capitol; correct?

**A.** No, I never said come to the Capitol. I never said regroup where? Nobody responded to me. So I just moved on with my day.

**Q.** Well, it's not that no one responded to you, you talked to Stewart Rhodes, Josh James and Kelly Meggs that afternoon; right?

**A.** I talked to Stewart Rhodes and I talked to Josh James, nobody responded in the chat.

**Q.** Let's be clear --

**A.** -- Josh James --

**Q.** -- when Josh James --

**A.** -- and I talked to Stewart Rhodes via phone, not on Signal.

**Q.** All right. Well, let's look at the phone records in a

second. But to be clear, when Josh James said, We're coming to the Capitol ETA 30 minutes in this chat and when you talked to him on the phone, in neither of those instances did you tell him, don't come?

**A.** He's a grown man. I mean, what he want to do is what he want to do. I can't control him. This ain't the military.

**Q.** Let's go now to the same exhibit. Let me get rid of these -- thank you, Mr. Douyon. If we could go now to about 7 minutes and 14 seconds, please.

Speaking of your communications with Mr. Rhodes that day, you testified on direct that you were having some trouble with sending and receiving messages on the afternoon of the 6th; do you remember saying that?

**A.** Yes.

**Q.** You were able to have some communications, though, with people through text and Signal?

**A.** Some.

**Q.** So, for example, we're looking here at 7 minutes and 14 seconds in Exhibit 1500.4. We see that Mr. Rhodes asks you to call him at 2:15 p.m. and you were able to tell him that it went to voicemail; correct?

**A.** Yes.

**Q.** And we see that Mr. Rhodes is telling you where he is and asking where you are; do you see that?

**A.** I see that.

**Q.** Okay. And if we could go to 7 minutes and 44 seconds. That was at around 2:15 p.m. Now ten minutes later, around 2:24 p.m. Mr. Rhodes is telling Mr. Meggs to go to the south side of the Capitol, because that's where I'm going to link up with Whip. So you see that Mr. Rhodes believes that he has found out from you where you are and he's going to meet you; do you see that?

**A.** I see it.

**Q.** Okay. Could we go please to 8 minutes and 49 seconds. Do you see here, around that same time, you tell Mr. Rhodes that you're by the trailers and Mr. Rhodes says, On my way?

**A.** Correct.

**Q.** Okay. So you were able to have some exchanges over text and Signal with some people on the afternoon of the 6th; correct?

**A.** Some people. Mostly Stewart and Josh.

**Q.** Okay. So let's please go in this same exhibit, 1500.4, to 11 minutes and 18 seconds. All right. So at about 2:32 p.m. -- well, 2:31 p.m. you call Mr. Rhodes; correct?

**A.** Yes.

**Q.** And Mr. Rhodes picks up; right?

**A.** Yes.

**Q.** And you talked to him; correct?

**A.** Yes.

**Q.** So you were able to communicate with him on this phone

call; right?

**A.** We were on the phone, yeah. I don't remember if the call was great, but we were on the phone.

**Q.** And this call lasts over three minutes; right?

**A.** Yes.

**Q.** In fact, I think it lasts nearly five minutes; correct?

**A.** I'm not exactly sure about the time, but it was a call.

**Q.** And it's fair to say you would not have stayed on screaming I can't hear you for three to five minutes, right, you must have been able to exchange some words with Mr. Rhodes?

**A.** Some words, but if it's patchy you're still having a conversation, it's just a patchy conversation.

**Q.** Sure but even a hard to hear conversation is a conversation; right?

**A.** It varies. I mean, it depends how hard it is to hear and stuff like that. I mean dead space is still phone space.

**Q.** Okay. And you now see from this exhibit and you know from the phone records that you've seen that at 2:32 p.m. and 18 second, or about 45 seconds into your call, Mr. Rhodes merges in Kelly Meggs's phone; right?

**A.** I see it.

**Q.** Okay. Now, your testimony here today is that you don't know whether Mr. Meggs was silently joined into the call or not?

**A.** What I'm saying is if Stewart merged Kelly, I didn't know he was on the phone, because he never said he merged Kelly. He never told me Kelly was on the phone. So if he just merged Kelly in our call, he never said anything and he never told me Kelly was on the phone. So, you know, I'm going to say it didn't happen. But if it was on the phone, then maybe, you know what I'm saying.
**Q.** Do you remember --
**A.** I'm sorry what?
**Q.** I'm sorry I didn't mean to interrupt you. Please continue.
**A.** What I'm saying, when me and Stewart was on the phone, he never once said, hey, I'm going to click Kelly in, or hey's Kelly's on the phone, or hold on Whip, let me put Kelly on the line. He never said any of those things.
**Q.** That would be typical for someone to say when they get an intervening three-way call; right?
**A.** Well, that would be typical for Stewart to say and he didn't do that.
**Q.** Okay. And yet the phone records seem to show that Mr. Meggs's phone is joined in; right?
**A.** If that's what you're saying, I can't argue that.
**Q.** And the call stayed connected, Mr. Meggs' call stayed merged in with your call for about 90 seconds; right?
**A.** If that's what it says.

**Q.** Uh-huh. And you're saying that for a full 90 seconds Mr. Meggs is part of this phone and you have no idea?

**A.** Correct.

**Q.** And what are you and Mr. Rhodes talking about at this time?

**A.** I don't remember.

**Q.** You don't remember what you're talking about with Mr. Rhodes at 2:32 p.m. in a five-minute phone call?

**A.** Most the calls from me and Stewart and me and Josh were trying to figure out where each other were.

**Q.** Uh-huh.

**A.** So, you know, maybe we're still trying to figure out where each other were. I even sent him a text message of what I was standing next to.

**Q.** You testified previously at a hearing related to this case about this phone call, right?

**A.** Yes.

**Q.** And at that hearing you did not say you have no idea whether Mr. Meggs was merged in or not, do you?

**A.** I told you how a call can look like a three-way call then I told you the same thing, if he was on the phone I didn't hear him. If he was on the phone Stewart didn't say it, and Stewart never told me he connected him to the phone. So yeah, I said about the same thing. My explanation of how it could look like a three-way call.

**Q.** Could we please bring up Government's Exhibit 10053, page 15. And if we could begin at line 8 here, you were asked the following questions and gave the following answer. You said, So you -- and now Meggs calls Rhodes. So you have been speaking to Stewart Rhodes for about 40 seconds or so, do you see that? And you said, See, I can't say whether or not that's one of the phone calls that connected. Do you remember asking that question and giving that answer?

**A.** I remember that.

**Q.** And you were asked, sure. And you said, I mean, maybe it's 20 or 30 attempts to call Stewart, some went through, some didn't. Were you asked that question and gave that answer.

**A.** Yes.

**Q.** And you were asked this question and gave this answer. You were asked, I didn't ask you yet whether it connected. And you said, well, I'm just saying I can't say for sure if that is one, like if it rings and goes to voice mail it would be about 40 seconds. You were asked that question and gave that answer; correct?

**A.** Yes.

**Q.** Going down to page -- the bottom there, line 25, you were asked, At two minutes and 32 and 18 seconds, so seven seconds after -- and if we could go to the next page -- Kelly Meggs calls Stewart Rhodes, Stewart Rhodes merges is call with you

and you are now on a three-way call, do you see that? And you said, I see that. Is that the question you were asked and the answer you gave?

**A.** Yes.

**Q.** You were then asked, Right. So you were talking to Rhodes and then Meggs called Rhodes, and then Meggs merged the calls. And you said, It could have been, I am talking to Rhodes, Meggs calls Rhodes and clicks over and there is still all three there. I don't know about a merged call, because I was -- I don't remember being on the phone with Kelly and Stewart at the same time like ever during the 6th, or it could have been Stewart called, went to voice mail, and then he clicked over and called Kelly and it would have looked like all the calls. And that was the question you were asked and the answer you gave; right?

**A.** Right.

**Q.** Okay. Thank you. You can take that down.

So you have given a number of different answers about what you think happened during that phone call; right?

**A.** No it's the same answer. That's an explanation of how a call can look like a three-way call.

**Q.** Okay. So for 90 seconds you were connected with Mr. Rhodes and Mr. Meggs; correct?

**A.** You're asking me the same question. You want me to give you the same answer?

**Q.** Sure.

**A.** Okay. I can't say whether or not me and Stewart and Kelly was on the phone, because I'm going to tell you it didn't happen, because I never heard Kelly say anything, Stewart never told me Kelly was on the phone.

**Q.** For 90 seconds?

**A.** So I can't say whether or not Kelly was on the phone. I mean, if you're telling me he connected the call I can't dispute that. But what I can say is Stewart never told me Kelly was on the phone. I never heard Kelly say anything. And Stewart always tells me when somebody's on the phone with me. So in my mind, we're not on a three-way call.

**Q.** And Stewart always tells you when he connects a third party; right?

**A.** If Stewart calls me with somebody on the phone, yes, he tells me, hey, I got so-and-so on the phone or hey, I've got such-and-such on the phone, or if he wants to click over and call somebody, he say well, hey, let me get this person on the phone.

**Q.** And if we could go to 1500.4 please at 11 minutes and 16 seconds. At about 233 and 48 seconds Mr. Meggs left the call; correct?

**A.** Yes.

**Q.** And if we could play now through 47 seconds, 11 minutes and 47 seconds. You stayed on for another four minutes, three

and a half minutes; right?

**A.** Yeah.

**Q.** And after Mr. Meggs left that phone call, we see here in Exhibit 1500.4, that Kelly Meggs led a group we've referred to as line one up the steps of the Capitol; right?

**A.** If that's what you're saying. I see the picture.

MS. HALLER: Your Honor, it's subject to the rule of completeness the first time this was played (INAUDIBLE) so that it was complete.

THE COURT: Okay. Go ahead, Ms. Rakoczy.

**Q.** (BY MS. RAKOCZY) So if we could bring up now Government's Exhibit -- so that's at 2:30 p.m., 2:35 p.m. If we could bring up now Government's Exhibit 6740A and go to page 2. And if we could focus on the bottom of the page between about 3:00 p.m. and 3:16 p.m. We see here between 3:00 p.m. and 3:16 p.m. on the 6th, you have a one minute and 12 second phone call with Josh James. And then a one minute and 41 second call with Stewart Rhodes; right?

**A.** Uh-huh.

**Q.** And then you have at 3:04 p.m. a three and a half minute phone call with Josh James; right?

**A.** Yes.

**Q.** And then a few other phone calls of 45 to 55 seconds or thereabouts in the 3:09 to 3:16 p.m. phone period -- time period; correct?

**A.** Yes.

**Q.** Okay. And at 3:06 p.m., which would be when you're on this 3:04 p.m. phone call. If we could go to Exhibit 9902. Slide 46. At 3:06 p.m. while you're on that call with Mr. James you send a message to someone in your phone that says, "We're storming the Capitol"; right?

**A.** You couldn't possibly send a message and talk on the phone at the same time. I didn't have on a ear piece. So I'm pretty sure that's one of the messages that didn't go out when it was sent out.

**Q.** That's what you're telling us?

**A.** That's what I'm telling you, yeah. If I'm on the phone at 3:06 with no ear piece, I can't text and send a message at the same time.

**Q.** You've never been on a call and taken it down, the person's still talking to you, and you go on your phone and you send a message, have you ever done that?

**A.** Personally, no. That's why I got a headset.

**Q.** And you could have also had a headset while you were sending this message and talking to Mr. James; right?

**A.** Seen pictures of me with a headset?

**Q.** Could you have had a headset?

**A.** I didn't have a headset.

**Q.** Okay. And so you could have taken the phone down and sent this message as I just demonstrated; right?

**A.** That's not what happened. I'm telling you -- if I'm on the phone at 3:06 I couldn't send a message at 3:06.

**Q.** Well, T-mobile says you sent this message that says, "We're storming the Capitol," at 3:06; right?

**A.** That's what you're saying, but I'm telling you I couldn't possibly be on the phone and send a message if I don't have a head piece. So I can absolutely say for sure I didn't send that message while I was talking on the phone.

**Q.** And at 3:06 p.m., while you're talking to Mr. James and saying, "We're storming the Capitol" -- if we could bring up, go back to 1500.4 please, and go around 19:31, 19 minutes and 31 seconds. Mr. James's group is on the steps of the Capitol; right?

**A.** Yes.

**Q.** And you just happened to be saying at that moment, "We're storming the Capitol"; right?

**A.** At 3:10 or 3:06.

**Q.** At 3:06 p.m. you send a message "We're storming the Capitol"; right?

**A.** Right.

**Q.** And four minutes later Mr. James and his group are on the steps of the Capitol; right?

**A.** Right.

**Q.** And "We're storming the Capitol" happens to not have been on your phone at the time the FBI searched it; right?

**A.** Can't say for sure. I know for certain when I gave Palian the phone it was in my Google voice.

**Q.** You know for certain that that one message was on your phone at the time you gave it to Special Agent Palian.

**A.** It was a whole text thread in Google Voice.

**Q.** You can't remember being on the January 5/6 Security VIP chat when that was your mission on January 6, but you remember that one message was on your phone when you gave it to Special Agent Palian?

**A.** I remember the text because I didn't delete anything I thought could be evidence from the phone, because I knew there was going to be an investigation. So when he got the phone, I gave him the phone as it was. So it was a whole text thread. Now, the thing that's taken out of context is the fact that that person, it was absolutely out of context and it wasn't even meant for that person. It was supposed to be one of the pictures saying "Storming the Capitol."

**Q.** But you accidentally wrote "We're"?

**A.** No, it was a prior thread going on that already had "we're" in it that I just punched the "Storming the Capitol" and sent the picture. And instead of it going to the individual I was texting, it went to this lady. Now, you can pull up the complete text thread and you can see the messages before you can see that message, and then you can see the messages after, it's completely out of context.

**Q.** I can't pull up the thread because it's not in your phone; right, Mr. Greene?

**A.** I mean, didn't you have three FBI agents testify to the fact that they didn't know anything about Voice and they couldn't tell you if it was in the phone?

**Q.** Mr. Greene, you understand we got this message from T-Mobile, the cell phone company?

**A.** I understand where you got it from. But do you understand how Google Voice works?

**Q.** I think I understand. Let me, since you seem to know this, isn't it correct that T-Mobile does not get messages sent through internet messaging apps like Google Voice, they don't go through the phone messages they go through the internet?

**A.** Well, only if your signal doesn't work, which sent to a text mail number from your phone, the number that the message went to is not even the number that it went to, that's the text mail that it went to, because you couldn't find a network, so they send it to a regular number, didn't send it to the phone.

**Q.** Okay. Let me go back and try to understand what you're telling us about this message. The "We're storming the Capitol," the "we're" was meant for a different thread and somehow you accidentally put it into the message "We're storming the Capitol," that you sent this woman on your

phone?

**A.** So, if you look at the message, you would see the context of it. So when I'm typing her "we're" I'm typing her on a different day. Now, when she sent me a message, as I was typing another message, it comes up. So when I switch on it text app, when I'm texting and the message comes up I'm still typing "Storming the Capitol" to my individual I was typing "storming the Capitol" to and the message sent out to her minus the picture. Now, again, if you look at the complete context of the conversation me and this woman had you would understand.

**Q.** Well, we can't do that because it's not on your phone; right?

**A.** (No verbal response.)

**Q.** Okay.

THE COURT: Let's move forward.

MS. RAKOCZY: Yes, Your Honor.

**Q.** (BY MS. RAKOCZY) And speaking of things that are not on your phone, if we could go back to on 1500.4, 406. This whole exchange where people ask if the rioters are patriots and you say they're patriots and Josh James says he's coming to the Capitol, that's not on your phone either; is it?

**A.** It should be. Should be in a DC OP Intel chat. I didn't delete any Signal chats.

**Q.** Well, it seems that two very important sets of messages

are missing from your phone, Mr. Greene?

**A.** I'm telling you I didn't delete any Signal chats.

**Q.** Okay. You can take that down please. I'm sorry, Ms. Rouhi, can you bring back up 1500.4 again. And go to 20 minutes and 4 seconds, please. Ten minutes after you sent that message "We're storming the Capitol," Josh James led line 2 into the Capitol; right?

**A.** If that's what you're saying.

**Q.** Well, you see here at 3:14 p.m. on camera 7029?

**A.** Okay. I see it, yes.

**Q.** You see this guy here, that's Rob Minuta; right?

**A.** Yes.

**Q.** And Josh James is -- he's in front of him right there; right?

**A.** Yes.

**Q.** And they're entering the Capitol at 3:14 p.m.; right?

**A.** Yes.

**Q.** And if we could go now, advance in this exhibit to 20 minutes and 39 seconds, we see another photograph that you took on your phone at about 3:15 p.m.; right?

**A.** Yes.

**Q.** And you had been on the northwest side, I'm marking it here on the left side of the exhibit, for a good hour, hour 15 minutes prior to 3:15 p.m.; right?

**A.** Yes.

**Q.** And at 3:15 p.m., as Mr. James is leading line 2 into the Capitol, you happen to now be looking at those same doors; right?

**A.** Yes. Now, I didn't know Josh James was up the steps past all those people and going into those doors, how could I possibly see that? The last I talked to Josh James, he wanted to meet at these stairs. So we came to those stairs. He wasn't there.

**Q.** Let's look at Exhibit 9217, please. These are the imagines where you direct Mr. James where he should join you; right?

**A.** Yes, that's where we were standing with Stewart.

**Q.** At this point in time we would seek to admit Exhibit 9217 into evidence?

MR. SHIPLEY: No objection.

THE COURT: 9271 is admitted.

MS. RAKOCZY: Can we publish please.

THE COURT: I'm sorry 9217, I misspoke.

MS. RAKOCZY: Thank you, Your Honor.

**Q.** (BY MS. RAKOCZY) These are messages between you and Joshua James; right?

**A.** Yes.

**Q.** And these are not at 3:15 p.m., they were at 3:34 p.m.; right?

**A.** Yes, when we were standing on the northeast corner.

**Q.** And you say come to the corner to the left towards the street; right?
**A.** Yes.
**Q.** And if we could page through the next few exhibits. He says, are you to the middle or the left, on the end. Go to the next one, please. East of the middle. Walk to the street. Middle. Northeast corner. Go to the next one, please. Is that it? Thank you.
These are the messages where you're giving Mr. James directions to find you; right?
**A.** Yes.
**Q.** And this is between 3:30 and 3:45 p.m.; right?
**A.** Yes.
**Q.** After Mr. James has left the Capitol; right?
**A.** I didn't know Mr. James was in the Capitol.
**Q.** Well, he had just been in the Capitol; right? We just saw that on the video?
**A.** Yeah.
**Q.** And you happened to be looking at the steps he was entering through at the precise moment he was entering?
**A.** I didn't know Josh James was entering into the Capitol. Again, we were supposed to meet at those stairs. When me and Landon and Joe got there Josh wasn't there.
**Q.** Okay. That's because he was in the Capitol; right?
**A.** Suppose so, yeah. I mean.

**Q.** Okay. And you also asked Landon Bentley if he wanted to go in the Capitol; right?

**A.** I did, yeah. We were joking around all day. So when I looked at him, when all the shit was going on, it was like, hey, Landon, you want to go in?

**Q.** That's how you joke with people when you seeing a riot, hey, would you like to go inside the Capitol?

**A.** Yes.

**Q.** And you're telling us that's what you said to Landon Bentley, but you never said those similar -- same exact words to Joshua James and Kelly Meggs before they went into the Capitol?

**A.** Absolutely. I'm standing with Landon. Me and Landon are joking around all day. I can't joke with those guys because I'm not standing around them. And with that shit going on, I don't want to even say anything remotely close to that, because I don't know where their head space is. Landon, I'm with him, I know where his head space is. I mean, if you could hear some of the other conversations me and Landon said -- had around the Capitol, I mean, we just hung out all day and watched these riots.

**Q.** And Mr. Meggs and Mr. James were both beneath you in the organizational structure for January 6; right?

**A.** They had a team. James had one protectant detail and Kelly Meggs had another protection detail.

**Q.** And you were the operations leader over both those teams; right?

**A.** I was operations leader over the security operation, they had a team, they had a principal.

**Q.** And Mr. James was a soldier like yourself; right?

**A.** Mr. James was a soldier, yes.

**Q.** And Mr. Meggs certainly liked to play soldier, didn't he?

**A.** I suppose he did.

**Q.** And both of them, you're saying, went rogue that day and didn't run it all to the chain of command before going in the Capitol?

**A.** That's exactly what I'm telling you.

**Q.** Can we look at Government's Exhibit 9207, please. This is a photograph of you and Stewart Rhodes on the east plaza of the Capitol on January 6; right?

**A.** Yes.

MS. RAKOCZY: We'd move to admit this into evidence.

MR. SHIPLEY: No objection.

THE COURT: Sorry, you said it was 9207.

MS. RAKOCZY: Yes, please.

**Q.** (BY MS. RAKOCZY) And, Mr. Greene, you indicated to us that the person on the right that I've just drawn a line on, that's you; right?

**A.** Yes.

**Q.** And the person here on the left that I've just drawn another line, that's Mr. Rhodes; right?
**A.** Yes.
**Q.** And that's on the grounds of the Capitol; correct?
**A.** Yes.
**Q.** That's a restricted area that you weren't supposed to be in; right?
**A.** In you say so. Like I said, we didn't know what areas were restricted.
**Q.** Even though you were responsible for protecting stages on those grounds that day?
**A.** We didn't know what area was restricted at the Capitol.
**Q.** Can we bring up 5312 just for the witness, please. Can we zoom in, Ms. Rouhi, on this area.

Do you recognize this to be another photograph of yourself talking to Mr. Rhodes on the Capitol grounds on January 6th?
**A.** Yes.

MS. RAKOCZY: Can we please move 5312 into evidence?

MR. SHIPLEY: No objection.

THE COURT: Admitted.
**Q.** (BY MS. RAKOCZY) Can we publish to the jury, please.

Again, Mr. Greene, circled you talking to Mr. Rhodes on the grounds of the 6th -- on the grounds of the Capitol on

January 6th; right?

**A.** Yes.

**Q.** Thank you. You can take that down.

After you and other members of the Oath Keepers -- well, let me ask you this, while you're out there on that plaza Kelly Meggs and his group come find you; right?

**A.** Kelly came with a couple people, yes.

**Q.** And Josh James came with his group and found you and Mr. Rhodes; right?

**A.** Yes.

**Q.** And you all stayed there for a period of time on THE Capitol grounds after you all gathered together; right?

**A.** Yeah, we stood out there. They were just bullshitting around. People were talking about what was going on.

**Q.** So all these people you had regrouped, you weren't telling them to get off the Capitol grounds where a riot was unfolding; right?

**A.** Well, actually, yeah. We were waiting for people to leave and Stewart still wanted to wait in case other people came up there. So we were standing there waiting.

**Q.** And when you left the Capitol grounds that day neither you or Mr. James or anyone on your team went to find Roger Stone, did you?

**A.** I don't know what happened to Roger Stone. At that point operation is over. You know, there's no concert. There's --

I mean, there's no stage on the 7th anymore -- I mean, at the Capitol I'm saying. There's no stage at the Capitol. Stage 7 is closed down. You know, I don't know if you know Roger Stone stayed at his hotel, you know.

**Q.** You have no idea; right?

**A.** Nah, you know, as far as I was concerned everything was over with. And so after Stewart said, hey, you know, we're just going to leave then, hey, okay.

**Q.** Kelly never went to find his Congress people or Ali Alexander; right?

**A.** I don't know where Kelly went when we left. Ali Alexander, Jeff -- I think Jeff said that Ali Alexander left from the Ellipse.

**Q.** And you went to the Olive Garden; right?

**A.** Yes we went to Olive Garden.

**Q.** With Mr. Rhodes; correct?

**A.** Yes, Stewart was there.

**Q.** And Josh James; right?

**A.** Josh was there.

**Q.** And a guy named Ed Vallejo; right?

**A.** Come to find out later he was -- that was one of the guys who were there.

**Q.** Uh-huh. And the mood was celebratory; right?

**A.** No, everybody had their own conversations going on.

**Q.** Like with themselves?

**A.** I was talking to Landon. Stewart was talking to quite a few people and making phone calls. And Kelly was talking to somebody on the phone. You had a couple One AP guys, they were there.

**Q.** People were talking about the need to save the republic; right?

**A.** I can't say for sure. Everybody had different conversations. Couple people was talking about something that happened in another state. Something similar to what was going on at the Capitol. One guy was talking about the Ashli Babbit chick who got shot.

**Q.** People were talking about more violence coming; right?

**A.** Somebody said they could see more violence coming. But like I said everybody was having their own conversations. So I kind of was just -- me and Landon were talking.

**Q.** People were talking about going back the next day; right?

**A.** I don't hear -- I didn't hear anybody say they were going to go back the next day at the Olive Garden.

**Q.** At some point in that dinner word got around that the FBI was starting to arrest people who had been at the Capitol; correct?

**A.** No. They said police were arresting people who were not from D.C. They were going to their hotels and taking them to jail.

**Q.** People were arresting people just because they were not from D.C.

**A.** That's what was said.

**Q.** Okay. And you and everyone else at that dinner left quickly; correct?

**A.** We didn't leave quick. Me and Landon and Joe was -- stood in the parking lot doubting the information.

**Q.** And you went back to the hotel where you and Joe and Landon and Mr. James and Mr. Rhodes were all staying; correct?

**A.** Josh James didn't stay at the hotel with us.

**Q.** You all packed up your stuff; right?

**A.** I didn't have to pack my stuff up, it was already in the trunk.

**Q.** Okay. Mr. Rhodes packed up his stuff; right?

**A.** I'm supposing he did. Like they parked in the parking garage, I parked on the street. So --

**Q.** And at some point you all got together at a gas station; fair to say?

**A.** Yeah, I pulled up to the gas station and they were there.

**Q.** And you all, Mr. Rhodes split up some of his guns among himself, Kellye SoRelle, and Mr. James; right?

**A.** No. So I only seen Stewart put a gun -- a rifle in the car with him and Landon.

**Q.** Okay. So he took a gun that he had traveled there with Ms. SoRelle and he put it in the car with him and Mr. Bentley; Right?

**A.** Yes. He took a weapon and he took a weapon with him from out of Kelly's vehicle.

**Q.** And he gave his phone to Kellye SoRelle; right?

**A.** Yeah, I came to learn later that he gave his phone to Kellye SoRelle.

**Q.** And you all left; right?

**A.** Yes, everybody left.

**Q.** And it was sometime in the middle of the night; right?

**A.** No.

**Q.** After midnight?

**A.** No, it was not midnight at all. It was probably 9:00 or 10:00.

**Q.** Okay. So it's about 10:00 p.m. and you all leave the D.C. area; right?

**A.** Yes.

**Q.** And you all drive -- well, you drive home; right?

**A.** I went home.

**Q.** Straight?

**A.** I didn't go straight home. But I stopped a couple places, then I went home. I had been up all day.

**Q.** So you drove from about 10:00 p.m. till, what, 1:00 a.m., 2:00 a.m. before you pulled off to get a hotel room?

**A.** About 2:00.

**Q.** Okay. After January 6th, you were aware that Oath Keepers had gone inside the Capitol building; right?

**A.** Yes, I was made aware. I think I got a couple calls and a couple texts.

**Q.** And you continued serving as somebody who helped out Stewart Rhodes; right?

**A.** Nah, Mmm, not so much as far as like helping, you know, I'd still do security, but in terms of like group stuff, I kind of, you know, -- I didn't want any parts of overall Oath Keeper operation again after that. But still willing to do EP stuff.

**Q.** And you went to Texas to help Mr. Rhodes in late January of 2021; right?

**A.** I went to Texas in late -- yeah, late January, early February.

**Q.** To help Mr. Rhodes?

**A.** No Kellye.

**Q.** To do security for Mr. Rhodes's girlfriend; fair to say?

**A.** Yeah, Kellye.

**Q.** Okay. And in January, after the 6th, you received an $8,000 payment from Stewart Rhodes; right?

**A.** Yes.

**Q.** Now you testified at a prior hearing related to this case; correct?

**A.** Yes.

**Q.** And at that prior hearing you said you gave that money back; correct?

**A.** I didn't give all the money back. I took what was owed. And then instead of giving it back he wanted me to pay his lawyer's retainer fee in case other people got indicted and arrested.

**Q.** Could we please bring up Government's Exhibit 10052, page 120.

Mr. Greene, in this prior hearing you testified under oath; right?

**A.** Yes.

**Q.** And you were asked here on page 120 line 25, Did he pay you 8 grand after January 6th? And if we could go to the next page, please. You answered, He paid me for January 6th and to come to Texas at the same time. Now, I gave him back the money because the need for me to stay in Texas wasn't there. I only stayed for two weeks and Stewart got -- so Stewart got his money back. That's the question you were asked and the answer you gave at the prior hearing where you testified under oath; right?

**A.** Yes.

**Q.** And that wasn't true, was it?

**A.** It -- I mean, yeah and no. So it was Stewart's money and it went to Stewart's attorney, instead of me giving it

directly back to him. I just gave it to his attorney.

**Q.** You pocketed 3 grand from that money; right?

**A.** Yes, I kept.

**Q.** Okay so it's not true that you gave the money back, is it?

**A.** No, no, what I said was I gave back what he was owed, because I didn't stay the whole time.

**Q.** Okay. Let's take that down, please.

MS. RAKOCZY: Thank you. I have no further questions.

THE COURT: Thank you, Ms. Rakoczy.

All right. Mr. Shipley. Redirect.

REDIRECT EXAMINATION

BY MR. SHIPLEY:

**Q.** Mr. Greene, do you remember being asked several questions about whether you were Stewart Rhodes's right-hand man?

**A.** Yes.

**Q.** Okay. And we talked on direct about your friend named Greg?

**A.** Yes.

**Q.** Okay. At some point while you were doing work for the Oath Keepers, did you learn what Greg's role in the Oath Keepers organization was?

**A.** Yes, I did. He was the vice president of national operations.

**Q.** National vice president?
**A.** Yes.
**Q.** Okay. And Stewart Rhodes was the president?
**A.** Yes.
**Q.** Okay. And based on your conversations with Mr. Greg, was it obvious that he was in regular contact with Stewart?
**A.** Yes.
**Q.** Okay.

MR. SHIPLEY: Your Honor, I want to use the chart real quick, if I may.

**Q.** (BY MR. SHIPLEY) Now, you described Greg as a 6'6", 300 pound African American gentleman; right?
**A.** Yes.
**Q.** And he's the national vice president of the Oath Keepers?
**A.** Yes.
**Q.** Is he on the leadership board anywhere?
**A.** No.
**Q.** Okay. Who was Stewart Rhodes's right-hand man in the Oath Keepers?
**A.** Greg.
**Q.** You were shown some video about your time in Louisville; right?
**A.** Yes.
**Q.** And a lady said to you, you know, that your presence

wasn't welcome there, you were making problems worse; right?

**A.** Wasn't to me --

**Q.** Didn't say it to you.

**A.** Right.

**Q.** You heard it on the video?

**A.** Yes.

**Q.** Now, were there troublemakers that your group, the Oath Keepers, encountered in Louisville?

**A.** Yes.

**Q.** Was there more than one group of troublemakers?

**A.** Yes.

**Q.** Describe one and then we'll talk about the other.

**A.** Well, we had some BLM guys, you had a couple -- a few Antifa guys, but it was mostly BLM in Louisville. You know they show up to where these guys are getting ready to push out and go to the pawnshops and stuff like that.

**Q.** Now, the video you were shown, the individual wearing the Oath Keepers gear was possessing a -- what is generally called an assault rifle; right?

**A.** A rifle, it's you know --

**Q.** Well, you would know.

**A.** Yeah, we don't -- civilians don't get access to assault rifles.

**Q.** It was a long gun?

**A.** It was a long gun.

**Q.** And is it lawful to possess long guns in the state of Kentucky?

**A.** Yes.

**Q.** Is it lawful to carry long guns out in public in the state of Kentucky?

**A.** Yes, they have open carry.

**Q.** Okay. And some of the BLM folks who came out, were they in possession of long guns?

**A.** Most of them. They had -- so it's a weapon called a Draco, it's a cut down AK-47. No butt stock, 30-round magazine, couple of them had drums. Couple guys had spears with knifes. They all had play carriers. One guy had a Galil, which is a high end version of a AK. And then, you know, a couple ARs and stuff like that.

**Q.** Okay. So -- and that's one group of troublemakers, my description, lack of a better description, not the Oath Keepers. Is there a second group of people that caused you difficulty?

**A.** Yeah, so Stewart had these guys come out, they were Kentucky mountain rangers. They were -- I thought they were white supremecists, but the bigger issue was they were getting drunk and they were getting high. One of the guys was snorting and the other guy was snorting heroin.

**Q.** Did they have long guns?

**A.** Yes. Yes.

**Q.** So the Oath Keepers weren't the only ones there with firearms; right?
**A.** Correct.
**Q.** And if the Oath Keepers had not come with firearms, they would have been the only ones there unarmed?
**A.** Correct.
**Q.** Can I have Government's 10056, please. That's just the list of the Signal chats. Can we just blow up roughly half of it. Now you testified on direct, I believe, that you used Signal before getting involved with the Oath Keepers; right?
**A.** Yes.
**Q.** And then Ms. Rakoczy asked you several questions about this list of 45 Signal chats?
**A.** I mean, yeah. I don't remember 45 Signal chats, you know like I said, I can't dispute it. I used Signal. But you know, I didn't -- maybe I didn't realize I had 45 on there. But I used Signal.
**Q.** Do you recognize some on this list having nothing to do with the Oath Keepers?
**A.** I recognize a couple of them.
**Q.** So Konas Gas and oil, did have anything to do with the Oath Keepers?
**A.** No, that was a job.
**Q.** And dead group on Ohio LEO shooting, did that have anything to do with the Oath Keepers?

**A.** I can't remember. I can't remember.
**Q.** FUBAR group, did that have anything to do with the Oath Keepers?
**A.** No.
**Q.** So would it be fair to say this list of 45 surprised you?
**A.** It surprised me, because like I said, I didn't realize it was that many Signal conversations in my phone.
**Q.** Did you ever try to keep track of how many Signal conversations Stewart Rhodes put you in on the phone?
**A.** It's impossible.
**Q.** Did you keep track of every individual Signal conversation Stewart Rhodes put you in the phone?
**A.** No.
**Q.** Now Ms. Rakoczy showed you a list of sort of technical printouts and of messages sent by Kelly Meggs and others, and there was a little reference there that said "read," do you remember that?
**A.** Yes.
**Q.** And then there was a little tense back and forth exchange between you and Ms. Rakoczy on what that meant; right?
**A.** Yes.
**Q.** Was there a date on that?
**A.** No.
**Q.** So it said read, but it doesn't say when you read it;

correct?

**A.** Correct.

**Q.** While you were taking pictures, starting about sometime after 1:30, gentleman up on the railing, you remember that picture; right?

**A.** Yes.

**Q.** You took more pictures than just that one; right?

**A.** Yes.

**Q.** And you were distributing those to friends who were inquiring what was going on I think you said?

**A.** Yes.

**Q.** What's the closest you ever actually got to the Capitol building where the police and the rioters were actually engaged with each other?

**A.** The stairs when I was standing with Stewart, that's about the closest I got to the actual building.

**Q.** Okay. And -- well, when you were standing with Stewart, that was on the other side of the building; right?

**A.** Correct.

**Q.** I'm talking about while you're still kind of taking pictures and watching this unfold, what's the closest you got at that point?

**A.** I don't know. I'd say, 80, 90 yards, maybe. I didn't want to get real close to the police line, because you know they were fighting with them. So I didn't want to get as

close as, you know, being able to touch a cop or something like that. But I can't say for sure. But, you know, it wasn't very, very close, because again, they were fighting with police officers. And I didn't want to get scuffle.

**Q.** Okay. Now, when you went to the opposite side of the building, when you met up with Stewart Rhodes, you said you met him -- the closest you got to the building was the bottom of the stairs; right?

**A.** Yeah.

**Q.** Was there any fighting with police in that location?

**A.** No. No, not in that location, but down where they were still going into the Capitol. You know, they were still -- whatever they were doing to get in the door. And then on the other side they were fighting with police. But right in that area, nobody was doing anything. They were just standing there.

**Q.** During the time that you were on the east side, where we've seen videos of the Oath Keepers going up the steps, at any time when you were on that side, did you see violence between any protesters, rioters, whatever you want to call them, on the east side and the police on the east side?

**A.** No.

**Q.** Could you see people going in and out the building through the door?

**A.** I couldn't see just --

**Q.** I'm not asking did you see individual people, but did you see people going in and out?
**A.** Yeah, I saw people going in.
**Q.** Would you describe that as storming the Capitol, walking in and out a open door?
MS. RAKOCZY: Objection.
THE COURT: Hang on, hang on. I'll sustain the objection. Can you rephrase the question.
**Q.** (BY MR. SHIPLEY) Okay. You've described that -- you use the words "Storming the Capitol"?
**A.** Correct.
**Q.** As you watch people go in and out the doors from the east side, would you have described that to somebody else as storming the Capitol?
**A.** Just watching them walk in and out, no, that's not storming the Capitol. When they were actively fighting with the police, trying to get into the Capitol, and they were piling people upon people on to the cops, that's storming the Capitol.
**Q.** All right.
MR. SHIPLEY: If I can have just a moment here. If I can have government -- it might take a minute, hopefully not minute. Can I have, I think it's 1504, the montage video. I want to get right to the point where Josh James begins to engage with officer Mendoza. Can we back up there right about

there. That's good. Okay. Go ahead and pause it, please. Okay. So this person right there. Do you recognize them.

THE COURT: Yes.

**Q.** (BY MR. SHIPLEY) Who's that?

**A.** That's Josh James.

**Q.** What time does that say?

**A.** 3:17.

**Q.** Can you take that down, please. Can we go to the summary of calls. Ms. Rakoczy I have it, but I don't have my computer here. The telephone calls. The next page down.

See what I've circled down there, did you have a telephone call with Josh Greene?

**A.** Yes.

**Q.** Did that call go through?

**A.** No.

**Q.** Because at that moment Josh Greene was -- or Josh James was about to become involved in an altercation with a police officer; right?

**A.** Yes.

**Q.** You weren't talking to him?

**A.** No.

**Q.** And the time it says you were on the phone with Joshua James, at least the records, was 42 seconds?

**A.** Yes.

**Q.** But from the video it's obvious he wasn't on the phone

with you; right?

**A.** Yes.

**Q.** Did you delete a message off of your phone?

**A.** Did I delete a message off my phone? No. I deleted a thread months later out of Google voice.

**Q.** An entire thread of messages?

**A.** An entire thread.

**Q.** And was that thread of messages with regard to particular individual?

**A.** Yes.

**Q.** And was there a reason why you wanted to delete that thread of messages from a particular individual?

**A.** Yes, it was.

**Q.** What was the reason?

**A.** So that the -- so another female wouldn't see it.

**Q.** So if somebody got a hold of your phone they wouldn't find that by accident?

**A.** Yeah, I mean, you know angry black woman, you know they have better investigative skills than the FBI.

MR. SHIPLEY: No further questions, Your Honor.

THE COURT: Mr. Greene. Thank you, sir. You may step down. All right. Could I ask everyone to get on the phone.

(Bench conference on the record.)

THE COURT: All right. Mr. Shipley, any other

witnesses or evidence?

MR. SHIPLEY: Can I think about it over night? No, Your Honor. We're done.

THE COURT: All right. Other than Agent Palian and the Berry prior consistent/inconsistent statement issue, is there anything left?

MR. BRENNWALD: Your Honor, Steve Brennwald here. I just want to make sure that the Berry pages are read. I want to make sure that the government's committing to that. So as long as that's done, I don't have anything else.

MR. ROSSI: Your Honor, I apologize to the Court. I was going to redact some of those exhibits, including the military records. And I'll have my final answer tomorrow morning to introduce them in our case in chief.

THE COURT: I'm going to ask you to rest if you've got nothing anymore. I mean, I'm asking all defense counsel if they've got no more evidence to rest. If there's some loose ends about redactions and the like we can take care of that in due course.

MR. ROSSI: Then, Your Honor, I move into evidence W1 through W4.

THE COURT: Okay. Well, I had rule that 2, 3 and 4, if I remember correctly, the only thing I said could potentially come in was the CV, which I thought was the CV for Dr. Sperry.

MR. ROSSI: Your Honor, the military records, Your Honor's ruling they're not business records?

THE COURT: No. What I said was is the government presented some military records, you had made a rule of completeness objection. And I said I'm open to hearing what you think is required to complete it. But that's where we left it.

MR. ROSSI: There's a couple pages that I'd like to introduce.

THE COURT: Okay. Well, I think we can handle that after the fact.

MR. ROSSI: Okay. Thank you so much.

THE COURT: Okay. So I'm going to ask everybody to rest and then Mr. Woodward you're going to put Agent Palian on; is that right?

MR. WOODWARD: I stand at the ready.

MS. RAKOCZY: Your Honor, just for the Court's information, I may leave at 4:45 for a child care issue. I don't mean any disrespect.

THE COURT: That's okay. None taken.

MR. NESTLER: And to answer what Mr. Brennwald was asking, my answer is I don't know what he's talking about.

THE COURT: Well, I think the question is, have you and Mr. Woodward resolved how this is all going to happen?

MR. NESTLER: The government intends to on cross

read the two pages or so that Your Honor read into the record yesterday. I will read the Qs and Agent Palian will read the As.

THE COURT: Okay. All right. Fine. So that's how we'll proceed. So Mr. Brennwald and Mr. Machado, and --

MR. SHIPLEY: Me.

THE COURT: Mr. Shipley. We'll just ask everybody to rest in order. And then we'll put Agent Palian on. Okay.

MR. BRENNWALD: So Mrs. Parker is theoretically first in the case. So I don't know if you want Mr. Machado to start first. I'm just trying to keep it consistent.

THE COURT: That's fine. I'll go down the list, just doing it in the order in which I see everybody. Okay.

(The following proceedings were had in open court.)

THE COURT: Let me go back now to some of the other counsel now that Mr. Greene has completed his testimony, starting with Mr. Machado. Do you have additional witnesses or evidence?

MR. MACHADO: No, Your Honor, with the eight items that have already been moved into evidence, which I confirmed with the clerk, at this point Sandra Parker rests. Thank you, Your Honor.

THE COURT: Mr. Brennwald on behalf of Mr. Parker.

MR. BRENNWALD: Mr. Parker rests, Your Honor.

THE COURT: On behalf of Ms. Steele, Mr. Cooper has

already rested. On behalf of Mr. Isaacs?

MR. ROSSI: Your Honor we rest with the proviso about the military records.

THE COURT: And then Mr. Shipley on behalf of Mr. Greene?

MR. SHIPLEY: On behalf of Mr. Greene we'll rest, subject to cleaning up our exhibits with your deputy.

THE COURT: Mr. Woodward, do you have any additional witnesses?

MR. WOODWARD: Yes, Your Honor. On behalf of Mrs. Meggs we call Special Agent Palian to the stand, please.

THE WITNESS: Am I still under oath?

THE COURT: You're still under oath.

SPECIAL AGENT MICHAEL N. PALIAN,

called as a witness, being previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WOODWARD:

**Q.** Special Agent, please remind the ladies and gentlemen and spell your first and last name for the court reporter.

**A.** Sure. My name is Special Agent Michael N. Palian, P-a-l-i-a-n.

**Q.** And Agent Palian, you're familiar with what a 302 is?

**A.** Yes, I am.

**Q.** And that is a record that you and your colleagues at the

FBI create after interviewing a witness; correct?

**A.** That's correct.

**Q.** And you generate a 302 pretty typically after each time you meet with a witness in an investigation; correct?

**A.** Correct.

**Q.** Now, you may meet with a witness multiple times in an investigation; correct?

**A.** We may.

**Q.** But nevertheless you would generate multiple 302s in that circumstance; correct?

**A.** Yes. I would add to that, though, that the way we do that is if we meet with a person multiple times and they've given us the same information again, usually I'll put a header up top that says "only new information is being provided in this report."

**Q.** Very good. Only new information is added in a subsequent 302 that's generated?

**A.** Correct.

**Q.** I can't remember if it's you or a colleague, but it's correct that after you generate that 302 it's serialized; correct?

**A.** Yes. It's serialized to the case file.

**Q.** And any exhibits or documents or other evidence that you show a witness is serialized with that 302; correct?

**A.** Yes.

**Q.** All right. Now, did you, in the course of your investigation, have an opportunity to meet with Caleb Berry?
**A.** Yes, I did. Several times.
**Q.** And is it correct that you met with Mr. Berry on August 5th, 2021?
**A.** Yes.
**Q.** And after that meeting did you memorialize the new information that you had learned from Mr. Berry?
**A.** Yes, I did.
**Q.** In a 302?
**A.** It was in a 302.
**Q.** All right. Do you recall showing Mr. Berry several videos in that interview that you had with him?
**A.** Yes.
**Q.** And when you memorialized your interview with Mr. Berry you noted that you had shown him those videos, did you not?
**A.** Correct, I did.
**Q.** And -- Court's indulgence. You did that by indicating that you had shown him a video and then you indicated what the beginning of the file name was for the video; correct?
**A.** Yes. To distinguish between the several videos I had shown him.
**Q.** And also because the videos in this case often have lengthy file names?
**A.** Correct.

**Q.** Okay. And if I can show what has previously been admitted into evidence, this is CM-47. We can publish to the jury as well. Do you recall showing Mr. Berry this video, Agent Palian?

**A.** Pardon me. Yes, I do.

**Q.** And you see that the group of Oath Keepers that is over here on the right of this video?

**A.** Yes, I see them.

**Q.** All right. Move this along. And you see the group has moved now, just a few feet to the left here?

**A.** Yes, I see them.

**Q.** Now, if I can ask you after showing Mr. Berry this video, isn't it correct that he told you that this is the gathering where Kelly Meggs told him that the group was going to go into the Capitol to stop the vote count?

**A.** That's my recollection.

**Q.** Thank you, sir.

MR. WOODWARD: Nothing further, Your Honor.

THE COURT: Okay. Any cross-examination?

MR. NESTLER: We ask for a limiting instruction, Your Honor.

THE COURT: I'll provide the instructions at the end in terms of how the statement can be used.

MR. NESTLER: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. NESTLER:

**Q.** Good afternoon, Agent Palian.

**A.** Mr. Nestler, good afternoon.

**Q.** So this meeting took place on August 5th of 2021 at the U.S. Attorney's Office; is that correct?

**A.** That is correct.

**Q.** And this was the first time that Mr. Berry was shown surveillance video from outside of the Capitol; is that right?

**A.** I believe it was.

**Q.** And so you showed him that video that Mr. Woodward just showed you of the Oath Keepers in sort of the huddle formation on the north side of the Capitol, towards the west; is that right?

**A.** Yes, that's approximately where it was.

**Q.** And that was at approximately 2:24 p.m.

**A.** Yes, that's the approximate time.

**Q.** And then you also showed him a surveillance video from the east side of the Capitol; correct?

**A.** Yes, I did.

**Q.** Also Oath Keepers in sort of a huddle formation; is that right?

**A.** Yes, I believe that happened at approximately 2:32 p.m.

**Q.** Okay. And so when you played for him that first video from the north side, closer to the west, at around 2:24 p.m.,

he said it was around that time that Kelly Meggs said something about going to stop the vote count in the Capitol; is that right?

**A.** That's my recollection.

**Q.** Okay. Now, you indicated that you typically only memorialize in your 302s when there's new information; right?

**A.** That's correct.

**Q.** And so you were present at a prior meeting about a month earlier with Mr. Berry; is that right?

**A.** Yes.

**Q.** Did that take place around July 1st of 2021?

**A.** Yes, it did.

**Q.** And he at this time was in Tampa; right?

**A.** Yes, I believe we were in remote -- reviewed the meeting remotely.

**Q.** How does that work for everybody who may need a little refresher on how that works?

**A.** It's like a Zoom meeting, except we can share documents at times.

**Q.** Okay. And so in that meeting you also heard what Mr. Berry was telling you; is that correct?

**A.** Yes, that's right.

**Q.** Okay. And just to be clear, you didn't show him in that that meeting any of the surveillance video from the north side

or the east side?
**A.** No, I did not.
**Q.** But in that meeting he did make a comment about Kelly Meggs's comment in the huddle; is that correct?
**A.** Yes, he did.
**Q.** Now, I'm going to approach with -- one second, Your Honor. All right. We're going to call this Exhibit 10200. And Agent Palian, are you aware of Caleb Berry testifying at a different proceeding related to this case?
**A.** Yes, I am.
**Q.** And I just handed you a transcript dated January 3rd of 2023?
**A.** Yes.
**Q.** Okay. If we can go to page 2618, please. And this is a portion of Caleb Berry's testimony in that other proceeding; do you see that?
**A.** I see it.
**Q.** I'm going to read the Qs like the questioner, you read the As like you were the witness, Mr. Berry, okay?
**A.** Yes, sir.
**Q.** So the question starting on the top of page 2618 line 1: When you got close to the Capitol building, did there come a time when you were in a huddle with other members of your Oath Keepers group?
**A.** Yes, sir.

**Q.** Who was with you in that huddle?
**A.** Most of the younger Florida Oath Keepers members. Some of the people of more recent military, Kelly, leadership, Joe.
**Q.** Okay. When you were in this huddle -- well, who formed the huddle?
**A.** Kelly.
**Q.** And while you were huddled, approximately how long were you huddled for?
**A.** Five, ten minutes.
**Q.** Was there any talking?
**A.** There was.
**Q.** Who was doing most of the talking?
**A.** Kelly.
**Q.** What was Kelly saying?
**A.** Kelly was saying that two of our guys had got separated. Two of the Oath Keepers got separated from the group and had walked up the stairs. And he also said that we were going the try to stop the vote count.
**Q.** When Kelly said that, we are going to try to stop the vote count, did you know who, quote, we, unquote, meant?
**A.** The Oath Keepers.
**Q.** What about you?
**A.** Myself included.
**Q.** And let's take a pause for a second. Did you know what was happening inside of the Capitol building on January 6th in

the afternoon?

**A.** I did.

**Q.** How did you know?

**A.** Because it was all over the news.

**Q.** And had it been part of the conversations with you and other members of the Oath Keepers about what was happening that day?

**A.** Yes, sir.

**Q.** And what was your understanding about what Congress was doing on the afternoon of January 6th?

**A.** Certifying the election for Joe Biden.

**Q.** What would that mean for President Trump?

**A.** He had lost.

**Q.** And so when Kelly said something about trying to stop the vote count, what did you think?

**A.** I was scared. But we could do it as a group.

**Q.** After Kelly said this, did the huddle sort of break up?

**A.** We did.

**Q.** And when Kelly made this comment about trying to stop the vote count, did anyone voice any disagreement?

**A.** No.

**Q.** Did anyone say, I'm not doing that?

**A.** No.

**Q.** And after the huddle broke up, did you all walk in a certain direction?

**A.** We did.
**Q.** Towards what?
**A.** The entrance up to the stair -- I'm sorry, the stairs up to the entrance.
**Q.** Did you turn and walk the other direction?
**A.** No.
**Q.** Who was leading your group?
**A.** Kelly.
**Q.** And when he started walking towards the stairs, what did you do?
**A.** I followed.
**Q.** And for the record that ends on page 2620 at line 13.

MR. NESTLER: Thank you Agent, Palian. I have no further questions, Your Honor.

THE COURT: Thank you, Mr. Nestler.

MR. WOODWARD: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. WOODWARD:

**Q.** Agent Palian, Mr. Nestler asked you about whether you showed Mr. Berry other video in that August I believe it was 5th interview; correct?
**A.** I believe Mr. Nestler asked me if we showed other video in the July 1st meeting. I don't know if he asked that question about August 5th.
**Q.** I think he asked you if on August 5th in addition to the

video of the northwest side of the Capitol did you show Mr. Berry video of the east side of the Capitol?

**A.** Pardon me, yes, he did ask me that question.

**Q.** And you did show Mr. Berry video of the east side of the Capitol, didn't you?

**A.** We did.

**Q.** And one such video file that you showed him began with the phrase "East front plaza"; correct?

**A.** I believe so.

**Q.** Okay. And although this has been admitted into evidence, there's no way that I will remember the Government's Exhibit number, so I'll just seek to move this in as CM 83. Thank you Mr. Douyon, CM 84.

MR. NESTLER: Objection to the admission.

THE COURT: Take a look at it first, please.

MR. WOODWARD: If the government would prefer, we can play their exhibit. I just don't know the number.

MR. NESTLER: Our point is it's not proper in redirect for this witness.

THE COURT: I knew that was the point. On the phone for a moment.

(Bench conference on the record.)

THE COURT: Mr. Woodward, what are you seeking to elicit?

MR. WOODWARD: Well, Mr. Nestler asked him if they

showed him other video at the same time. They showed him this video. This is the other huddle. And Mr. Palian did not record in the 302 that it is in this huddle where the statement was made.

THE COURT: I'm sorry. He did not record in the 302 that this is where the statement is made?

MR. WOODWARD: Right. That he obviously recorded that the statement was made at the other huddle. They show him this huddle, they ask him about it, and they record comments which I won't get into, but I'll just ask him, he didn't tell you this was the huddle where Mr. Berry's statement was made.

THE COURT: So the 302 reflects Mr. Berry's answers to questions about this video, this is the Sandra Parker video on the east side; correct?

MR. WOODWARD: Yes, sir.

THE COURT: Okay. And the 302 reflects his answers to questions he was asked, was he asked -- well, and then your point is that the 302 just doesn't say anything about him having identified this as the huddle.

MR. WOODWARD: Exactly right. He's asked to identify various people and to confirm certain things that are said. I don't need to play it, really I've already shown more than I need to.

THE COURT: Okay. Given that the government opened

the door to it, I think it's appropriate to ask what if anything Mr. Berry said about this. I mean, the suggestion was -- one of the potential suggestions of the question was that Mr. Berry answered the question in response to viewing another video. I think it's appropriate to complete the -- or to convey to the jury that he did not.

MR. NESTLER: I'm not sure this is the video that was -- second video that was shown. I believe it was surveillance video that was shown, not Sandra Parker's video.

THE COURT: Well, that was the question I had, I should have asked that first. Because the way you described the video, it's at least as a title it would not seem to line up with Ms. Parker's video.

MR. WOODWARD: I'm showing the Court and government counsel their spreadsheet of records that were shown. You can see the serial has numbers here. This is the file names as they provided to us. This is the file name of the original file. And then I'm switching back to the 302 in which Berry was shown the enclosed video with the file name starting with "East front plaza," and here's what was recorded in the 302.

THE COURT: Okay. And that's -- go ahead.

MR. NESTLER: Yes, I'm sorry. To clarify, I'm not saying he wasn't shown this video. If you look at the top of the page you can see that the very first substance Berry

stated this was another place where they stopped to huddle. So my point was that Agent Palian showed a surveillance video of the huddle on the east side and then showed Sandra Parker's video.

THE COURT: Okay. So I just, look the 302 reflects two different videos. Mr. Nestler just read -- can you put the 302 back up -- is a different video. In other words, what Mr. Nestler said Berry advised this was another place where they stopped to huddle. And maybe there are two videos of that same advantage point?

MR. WOODWARD: I'll pull up the second video. This is the video that references a second huddle. I believe it's the overhead view of, somewhere in there --

THE COURT: But he was shown both is your point?

MR. WOODWARD: Correct.

MR. NESTLER: That's just my point. He was shown both. But I believe on cross I asked Agent Palian he was shown surveillance video from the west side and then surveillance video from the east side, that was my point, Your Honor.

MR. WOODWARD: I would have left it at he was shown the one video and sat down, but they opened the door.

THE COURT: I don't disagree. So just ask him, I mean, I guess you could show him the first video and say was this video shown to Mr. Berry and what if anything did he say

about the statement in connection with the video and leave it at that. Okay.

MR. WOODWARD: Show him not this video but the other one.

THE COURT: The other one, I think he was shown both.

MR. WOODWARD: I can, but I don't have a desire to.

THE COURT: What's that?

MR. WOODWARD: I can if the Court wants me to, but I don't have a desire to show him --

THE COURT: I'm not asking you to. All I'm saying is he was shown both, you might as well just show him the one that's more relevant.

(The following proceedings were had in open court.)

**Q.** (BY MR. WOODWARD) Okay. Mr Palian, so you showed Mr. Berry multiple videos in that interview that we discussed before; correct?

**A.** Yes, sir.

**Q.** And Mr. Nestler asked you about CCTV footage from the east side of the Capitol, this is 82 -- 84. If we could admit and publish to the jury.

Do you recall showing this video to Mr. Berry, Agent Palian?

**A.** I do.

**Q.** And what if anything did Mr. Berry say about -- what if anything did Mr. Berry tell you Mr. Meggs said as depicted in this video?

**A.** You know, I don't really recall. I'd like to see my report.

**Q.** I'd be happy to show, just for the witness please. And for the record, I was showing Agent Palian the video that is referenced in his report as 0902.

**A.** I remember this now.

**Q.** Okay. So back to the jury please. Did Mr. Berry tell you about anything about this video?

**A.** He did. He said that this was another place that they stopped to huddle. He said that they were going to go up the stairs and get the two Oath Keepers that were on the stairs. And he also said that Kelly was on the phone at the time.

**Q.** All right. Now, he didn't tell you that it was at this huddle that Kelly Meggs said we're going to stop the vote count?

**A.** I don't believe he did.

**Q.** All right. And the other video -- this is 83, I believe Mr. Douyon, that's why you switched me to 84 -- that you showed Mr. Berry was this one. Do you recall -- is this published to the jury? Do you recall showing Mr. Berry this video?

**A.** I do.

MR. SHIPLEY: What exhibit is that?

MR. WOODWARD: CM 83. 85 -- CM85. Sorry, Your Honor, and madame court reporter.

MR. SHIPLEY: It's also SP-94.

**Q.** (BY MR. WOODWARD) And after showing Mr. Berry this video, again, he did not say that this was the huddle where Kelly Meggs said this is where we're going to stop the vote count?

**A.** He did not, sir.

MR. WOODWARD: Thank you, sir.

THE COURT: All right. Agent Palian, thank you very much.

Mr. Woodward, on behalf of Ms. Meggs?

MR. WOODWARD: Your Honor, subject to the few evidentiary issues we'll work out, on behalf of Ms. Meggs, we rest.

THE COURT: Okay. Ladies and gentlemen, what you have just heard over the last few minutes is that the defense has now rested their cases. The defense has rested their cases. Another important milestone in the case. What it now means, if you'll recall, is the government has the opportunity --

MR. NESTLER: Sorry, limiting instruction, Your Honor.

THE COURT: With respect to the -- I'll do this and I'll repeat it at the end. What you just saw the back and

forth with respect to Mr. Berry's statements, and you'll get more detailed instructions about this at the end. You can use and consider a prior inconsistent statements made by Mr. Berry to evaluate his credibility. Likewise, any prior consistent statements that Mr. Berry has made can also be used for his credibility, but however, cannot be used for establishing the truth of what he said in the prior statement. And we'll provide you with some further instructions about that at the end. But that's the basic way these prior statements can be used by a jury. Again, prior statements can be used, both inconsistent and consistent, for evaluating his credibility here in court. But the statement cannot be used for establishing the truth of what was said in the prior statement.

Okay. All right. So the defense -- various defendants have rested their case. The government will have an opportunity to present a rebuttal case. So what we will do now is adjourn for the day and start again tomorrow morning at 8:30, if the government chooses to present a rebuttal case and we will go from there. Yes, sir?

JUROR: Did you say 8:30?

THE COURT: Did I say 8:30? 9:30. Thank you very much. See you in the morning. Thank you, everyone.

(Jury left the courtroom.)

THE COURT: Have a seat everybody, please. All

right. Can I ask defense counsel to just put your Rule 29s on the record, please.

MR. MACHADO: On behalf of Sandra Parker we renew our motions for the same reasons stated previously.

MR. BRENNWALD: Same for me.

MR. COOPER: Same for me, Your Honor.

MR. ROSSI: Your Honor, I make a Rule 29, reserve the right to file a written motion.

MR. SHIPLEY: We renew the motion previously made at the close of the government's case.

MR. WOODWARD: Just on the record, Judge, you don't want to hear from us? We renew our Rule 29 motion, Your Honor. Thank you, sir.

THE COURT: Make sure you've preserved your arguments.

Okay. One reminder as we approach the close of the case. Just a reminder to make sure you all have exhibit lists prepared for the jury that you exchange in advance to make sure that they are sort of neutral enough in their description of the exhibits that have been admitted, one. Two, there were some exhibits that I admitted conditionally in the defense case that the government used in cross-examination. And I just want to remind the government to the extent that any foundation needs to be laid for those exhibits, the expectation is you're going to do that in your rebuttal

case.

MR. EDWARDS: Yes, sir.

THE COURT: We've been trying to keep track, and hopefully you have too, but we can send you a list of the exhibits we have as conditionally admitted subject to laying a further foundation.

So what is -- what does it look like for tomorrow in the government's rebuttal in terms of timing?

MR. NESTLER: We have likely three witnesses, Your Honor. We will not fill the whole day.

THE COURT: Can you give me a sense of how much time you think you will fill?

MR. NESTLER: Probably half day. Depends how long Dr. Josh Ashkenaze (phonetic) goes. Dr. Ashkenaze, a law enforcement witness and an FBI agent for clean up, including foundational issues, so should be -- it should be about a half day.

THE COURT: So dare I ask the whole Mr. Cummings issue is --

MR. NESTLER: We proposed a compromise to the defense, they want him here live. We're not willing to push him and his lawyer to force him to get on a plane from Oregon to be here live.

THE COURT: Okay. So I've got a plea at 5:00 o'clock. So instead of trying to jam into the next 15 minutes

our discussion about jury instructions, given what looks like to be the schedule, we should plan to discuss jury instructions tomorrow after the close of the government's case. We circulated instructions last night, they did not incorporate the government's additional request instructions. Obviously, we'll have to talk about those as well. And so we'll do that tomorrow.

What that then means is the government will open -- excuse me, close -- what that means is that I will instruct Thursday morning, closing. And then, Mr. Woodward, you will get out of here a little bit later than perhaps we anticipated, but since it will take me about an hour 15 or so, at least -- probably take about an hour to read instructions, if the last few trials are any indication. And so, you can estimate your departure based upon that.

MR. WOODWARD: I'm not going to be able to go, Your Honor. And so is there any appetite for the Court to consider doing that on Monday?

THE COURT: You're telling me you can't go if you have to leave midday Thursday?

MR. WOODWARD: Correct.

MR. EDWARDS: No disrespect to Mr. Woodward's family plans, if we start accounting for family vacations, which I truly appreciate Mr. Woodward's facing, how hard he's working. My family has a vacation next week. So if we start

considering vacation plans as to when the jury sits, I just -- I'm not sure that's an appropriate consideration for in terms of making the jury not be here. And they will be available for Thursday and Friday. I don't mean to say that I would want to delay next week either, I just mean if we start considering those kinds of plans --

THE COURT: Well, let me ask you this, where is the defense and the government in terms of the instructions themselves? How much do you all think we're going to need to have to discuss the instructions? At least from a substantive point they are largely verbatim from the last trial. We've taken some out, added one or two that I thought were appropriate for this case. And I still need defense theory of the case instruction.

MR. NESTLER: Aside from the two supplements we filed, Your Honor, and we haven't seen any of the defense theory of the cases, it shouldn't be particularly complicated. We are willing to move expeditiously tomorrow and hopefully, if Your Honor wants to have the jury wait for a couple hours in the afternoon to hopefully be able to instruct them tomorrow afternoon, we're all on board for that to start closings on Thursday morning rather than instructions on Thursday morning, rather than instructions Thursday morning. I don't know if that helps Mr. Woodward at all.

THE COURT: Would that help?

MR. WOODWARD: I'll take what I can get, Judge.

THE COURT: Okay. Let's --

MR. NESTLER: We're willing to do a charging conference over lunch if Your Honor doesn't mind sort of moving through it. We're willing to work on that, that's probably as far as we can go.

THE COURT: Okay. I mean, I think it's probably the best we can do, if that helps you, let's do that. Let's plan to do that. Let's try and, you know, if there are going to be extended discussions about jury instructions, please let us know this evening and submit whatever you think you need to submit in terms of substantive instructions. So at least I have an opportunity to take a look at whatever the issues may be before we convene tomorrow.

Mr. Cooper.

MR. COOPER: Yeah, Your Honor, before we break just very, very quick, with respect to the jury instructions but also with what's about to happen tomorrow, I'm looking at the jury instruction, I'll be quick about this, about evidence admitted against one defendant only and it says at the bottom, "Unless I've previously instructed you otherwise, all other evidence has been admitted against all defendants." I don't think that's appropriate with a rebuttal case coming. I think the jury needs to be informed that from this point forward any other evidence that's being admitted is not admitted against

Ms. Steele. It's rebuttal.

THE COURT: Fair enough. I think I'll have to wait. I suppose one of the things that we should make clear on that list which may not be in there is that the expert testimony is only as to Mr. Isaacs, I don't think that -- I think that may be absent from the list. So that at least resolves one of your issues. I don't know what the government's witnesses are going to bring forward.

MR. COOPER: I don't have any doubt that the government's going to -- going to violate that, but I think the jury should know it, because the instruction says, "Unless you've been previously instructed otherwise."

THE COURT: Well, let me just see how it plays out and then we can figure out what the instruction should say or not say.

MR. COOPER: Okay.

MR. MACHADO: Your Honor, the Court -- has it been decided that Mr. Woodward -- or the Connie Meggs case will be closing first? I mean, I don't mind. I just want to know if that's --

THE COURT: Well, after the government.

MR. MACHADO: I'm sorry?

THE COURT: After the government.

MR. MACHADO: After the government.

MR. NESTLER: The only other issue we would like to

address today before we have to leave for Your Honor's plea is Mr. Isaacs' proffer, so we can prepare tonight what we're going to do tomorrow.

THE COURT: Mr. Isaac's proffer?

MR. NESTLER: The proffer -- the issue I flagged before the jury came in right during one of the breaks.

THE COURT: You don't mean the proffer, you mean the use of the video.

MR. NESTLER: The use of the video, so we know how to prepare for what we're introducing tomorrow.

MR. ROSSI: Your Honor, if Your Honor's going to make -- allow us to leave?

THE COURT: If anybody feels like -- are there any other issues that are at that -- that are applicable to all defendants?

MR. BRENNWALD: No issues on the jury instructions, but I'll send it out tonight if you want me to talk about them.

THE COURT: All right. Fine. So anybody who wishes to leave other than Mr. Rossi can leave.

Mr. Rossi.

MR. ROSSI: Oh, Your Honor, very briefly. If Your Honor's going to allow the video, could we just block out Mr. Greene? If Your Honor's going to allow that, please. We object, of course --

MR. NESTLER: And we have no problem blocking out Mr. Greene. We'll work on it technologically.

THE COURT: Okay. So the government has proposed two ways in which the video could be admitted. The first is through the expert who did look at the video in connection with her report. And that she may in theory opine on -- well, it's not clear to me how she would opine or what she would opine on with respect to the FBI video. I'm not going to allow it. I looked back to her, I looked back to her report. Her report, although it referenced and summarized the FBI video, the proffer session that Mr. Isaacs had, it really did not in her ultimate opinion section have very much to seemingly to do with her opinion. So I'm not going to permit her to provide an opinion about Mr. Isaacs' demeanor during the FBI proffer session that's on video.

In terms of whether Agent Palian can describe Mr. Isaacs's demeanor during the session, I think I am going to revert to where I was, and that is -- or -- let me back up, I thought the government offered as an alternative that Agent Palian -- the video would come through Agent Palian in rebuttal. And that as a fall-back he would be permitted to describe Mr. Isaacs' demeanor during the proffer.

You can have a seat Mr. Rossi, unless you want to be heard on something.

MR. ROSSI: Oh, I'm sorry.

THE COURT: I said, you can have a seat unless you want to be heard on something.

MR. ROSSI: I need to stretch my legs any way.

THE COURT: Bear with me a minute.

Mr. Rossi, let me ask you a question, have you formulated a view at this point about what you are going to say about Mr. Isaacs' demeanor in your closing?

MR. ROSSI: I'm going to say to the jury, there's going to be a jury instruction on credibility. And I will try my best to file the exact language of the credibility. I'm not going to emphasize, you saw a individual that had autism, you saw his responses. To be very blunt, Your Honor, I don't think I need to do that. If I just mention that they judge credibility, that's enough for me.

THE COURT: Okay.

MR. ROSSI: I'm going to mention autism, but I'm not going to harp on, you know, his head was down and he wanted to stop. I don't think I need to. I think it's already etched in their brain.

THE COURT: Here's what the proffer agreement says: Third, in the event your client is ever a witness, or presents evidence or arguments through other witnesses, at trial or at any other proceeding, and your client's statements or that evidence contradicts statements made in your client's debriefing, attorney or agent for the Government may

cross-examine your client and other witnesses concerning any statements made or other information provided by your client during the debriefings and may use any statements or evidence in any pleadings it files. Evidence regarding such statements may also be introduced in rebuttal.

Look, I think what I'm grappling with, and the reason I asked you the question Mr. Rossi, is that if you are intending to argue to the jury that based upon Mr. Isaacs' demeanor here in court, you can infer, or you can come to the conclusion that he would not have been able to form the requisite intent on January 6. For example, if you were intending to get up and argue, you saw what he was like today, or you saw what he was like while he was on the stand, ladies and gentlemen, can you imagine what it was lake for him on January 6th? If you intend to make that kind of argument --

MR. ROSSI: I think I can't help but make impliedly if not expressly that argument. And if I do, Your Honor, is Your Honor saying that Mr. Palian -- or Agent Palian, I'm sorry, that Agent Palian can just describe his demeanor.

THE COURT: That's what I'm trying to figure out, because I'm sorry to interrupt Mr. Rossi, because again, this says in the event your client is a witness or presents evidence or arguments through other witnesses, that's why I'm asking.

MR. ROSSI: Your Honor, can I make life easy for the

Court. If it gives me a little more flexibility in my closing, I think we could agree that Mr. -- Agent Palian can describe his demeanor. As long as we don't have the videos, I'm okay. As long as we don't have the audio recording. But if he wants to describe the demeanor, as long as it's not, you know, 30 minutes of description, I will allow -- I will agree to that as long as I have a little flexibility in my closing. And I'm not going to be over the top.

THE COURT: Let me just spin out for you what my thinking is in two steps.

MR. ROSSI: Sure.

THE COURT: One is, again, the proffer agreement allows use of the debriefing, not only with respect to presentation of evidence, but also presentation of argument.

MR. ROSSI: Of what, Your Honor?

THE COURT: Of argument, arguments. And if you intend to say to the jury, as I've suggested that, you know, you saw what he was like here in court, imagine what it was like for him on January the 6th, that seems to me to be an argument that is arguably -- sorry for the two arguments -- is an argument that would contradict statements made by your client during the debriefing.

MR. ROSSI: I --

THE COURT: And I say that because, to be perfectly candid, your client's demeanor, at least in the six clips I've

seen, is worlds apart from what it was here in court. And you know, he's calm, he's collected. He doesn't seem under distress. He's not wearing his headphones. Now, again it's a small room with a small number of people. And he's not being quite pressed in the way that he was on cross-examination and, frankly, even by Mr. Greene. And so maybe there's some differences and the reason his conduct was different here in court.

But again, if you're intending to argue that his demeanor here shows -- you can be convinced, ladies and gentlemen, that on January 6th you can imagine what it was like for him. I think I'm in the position where I've got to be able to -- well, that the proffer agreement permits the government to bring in what his demeanor was like during the proffer session, one. Two, if we're in agreement that the government can bring it in, it seems to me the best evidence of it is the video and not Agent Palian's description of his demeanor.

MR. ROSSI: I was going to say Hobson's choice, but Hobson's choice there is no choice.

THE COURT: You want to think about it.

MR. ROSSI: Let me -- if I agree not to make that argument, Your Honor, in my closing would it be Mr. -- Agent Palian just describing and no video?

THE COURT: No. I mean, I'm not sure then I would

permit it at all. Look, the door only gets opened if you're going to make arguments that contradicts statements of your client during the debriefing. And I think given the argument that I've just spun out that you might make, I think under a reading of this proffer agreement that evidence relating to his demeanor that is inconsistent with the argument is fair game.

MR. ROSSI: Okay. Your Honor, just so I'm clear because I think I can give an answer, if the Court allows me to make those arguments in my closing, in the manner that Your Honor just said, I think I'm willing to take the risk of having the video.

THE COURT: Okay.

MR. ROSSI: As long as Mr. Greene's blocked out.

THE COURT: Okay.

MR. ROSSI: I will have opportunity to cross Agent Palian on the circumstances?

THE COURT: Of course.

MR. ROSSI: Okay. As long as Mr. Greene's blocked out, I think it's -- I think I'm willing to make that bargain. But bear in mind, I don't want to waive my right that we want to keep it all out.

THE COURT: No, I understand. I'm trying to -- well, you understand where I'm coming from.

MR. ROSSI: Yes, absolutely, Judge. And I want to

be clear, because I'm a little tired now, is Your Honor keeping the video out during the expert?

THE COURT: Yes.

MR. ROSSI: Okay. Thank you. Right now I'm just limiting it to the six that the government has presented to me and presumably Mr. Rossi has seen those six?

MR. ROSSI: Yes, I looked at them with the assistance of Mr. Woodward.

THE COURT: Okay. And we'll get those from a different angle that does not include Mr. --

MR. NESTLER: We'll work on blurring or excising.

MR. ROSSI: Mr. Nestler can show me tomorrow. I trust him. Your Honor, we'll accept that.

MR. NESTLER: Your Honor, so that's fine. We'll proceed with those six. There may be other portions of the interview that we're going to want to use for impeachment. I'll make sure I flag those for Mr. Rossi. I'm sitting down with Agent Palian as soon as this is done and going over the full interview. And in light of the transcript from Mr. Isaacs's testimony yesterday there may be a couple of other instances that are important for us to highlight, as we highlight this in light of what Mr. Rossi wants to argue in closing. So I think that's fine, I just want to flag that for the Court. We'll let the defense know.

MR. ROSSI: Just so I'm clear, does that mean more

videos?

MR. NESTLER: Yeah, but limited to certain small facts. I'll be up front with the Court right now. There were a couple different times where Mr. Isaacs was the one who proffered an analogy. And we think that's important, because that does rebut an argument or evidence presented by the defense case that's through Dr. Sperry, which is that he's a literal thinker and cannot use analogies and metaphors. And so we believe that door is already open. So an example of Mr. Isaac saying, let me describe it to you this way, it's like the movie 300. And giving a description like that we think does go to impeachment.

THE COURT: Well, I want to sort of go back to where we were at the very beginning of this and what I've ruled. You know, again, the sort of ground on which arguments can be made, it seems to me, about how autism effects his -- whether he had the requisite state of mind or had the capacity to form the requisite state of mind, really came down to four points; it was the issue of mind blindness, it was the issue of his intellect, it was the issue of his ability to appreciate right from wrong, and his ability to executive functioning, executive processing. Those were the four traits that I thought were relevant to the issue of his intent.

I don't think, or at least I thought I had said that the issue of whether he's a literal thinker or not, I know it

was referenced in the testimony, in both passing and perhaps directly, is something that really does go to his intent. He said what he said. And I'm not -- I don't know that I'm permitting either side to argue that something -- that because of his autism you can't literally or not literally take what he has said, either in his messages or here in court.

MR. NESTLER: We understand Your Honor's point. Mr. Isaacs testified that when he used words he didn't mean them. So he testified when he used things about Trump crossing the Delaware or Trump crossing the Rubicon, where citizens have to cross the Delaware, and when he made comments about Mayor Bowser he didn't mean them.

THE COURT: I'd have to look and see what he said, but I thought --

MR. ROSSI: And I disagree on with Mr. Nestler on that, Your Honor.

THE COURT: I'll just look at the transcript. I thought -- my recollection of what he said about crossing the Delaware is that he didn't, frankly, say very much, I think he just kind of demurred.

MR. ROSSI: But he admitted --

THE COURT: He made the statement.

MR. ROSSI: Well, about the mayor, he admitted that he just said it was in a fit of anger.

THE COURT: I think that's right.

MR. NESTLER: That's fine, Your Honor. We'll stick with our six clips, but Agent Palian will describe sort of the proffer and the procedure more generally, how it was set up and how he viewed it and his observations during the meeting.

THE COURT: Well -- no, I mean you can play the video clips, but his observations are off the table. Because the video is the best evidence. You can argue based on the video not going to permit Agent Palian to provide his own opinion about it.

MR. NESTLER: Sorry, when I say his observations or his opinions, I'm just going to say generally, it lasted for three hours, there were questions of Mr. Isaacs, he didn't ask for any breaks, and Mr. Isaacs volunteered several analogies. That is the gist of what I'm getting at.

MR. ROSSI: I think there was one break.

MR. NESTLER: There was a break and Mr. Isaacs didn't request it.

MR. ROSSI: Uh --

MR. NESTLER: But regardless that's a factual thing, that's fine. My point is that we're getting into how a proffer was conducted, we would like Agent Palian to be able to give the context of how the proffer was --

MR. ROSSI: Judge, I want -- I don't want to go there, because then I have to call Mr. Greene to say that

there was, you know, a wink and a nod, let's take a break. I don't want to go there. They don't need that.

THE COURT: So I would -- and we can scope this out tomorrow. But I would very much like to be very limited in what's coming through Agent Palian. What's a proffer. How long was it. I asked questions. You know, we told him he needed to be truthful. And then play the video clips and be done. Okay.

MR. ROSSI: That's fine, Your Honor. That's fine.

THE COURT: Right. I mean, that's what you would do otherwise if you were cross-examining somebody with prior statements.

MR. ROSSI: That's fine.

THE COURT: This is where you were, this is what you were told about being truthful, and these are the statements you made. Okay.

MR. NESTLER: Yes, Your Honor.

MR. ROSSI: Thank you, Judge.

THE COURT: Keep it very tight.

MR. ROSSI: Fair enough.

MR. MACHADO: Your Honor, as to the one clip that we have a concern about, I don't know if the government is -- it appears they have six clips. We just want to remove the part of a question and answer that had no question to analogy or anything like that, but just simply that he identifies that

these two old people from Ohio, which are --

THE COURT: All right, I'll -- in order to remove the confrontation issue and, frankly, to, you know, -- it's not accurate that either of them had patches on, correct? I don't think there's evidence that either of them had patches on. Now, he may have been referring to Ms. Watkins, but to sort of take out the issue of confrontation to put Mr. Isaacs back on the stand for limited cross-examination about whether he observed patches or not, and since that portion doesn't -- I mean, to some extent it meets the impeachment.

MR. NESTLER: We can redact the four words that says they had patches, but we can leave the older couple from Ohio.

MR. MACHADO: There was a question and an answer I want removed. I'll go through it again, it's -- I don't think it's necessary.

THE COURT: All right. Well, talk to Mr. Nestler as to what you want out. But what I'm hearing you say Mr. Machado, on behalf of Mr. Brennwald, is that you are not exercising confrontation rights unless the video contains reference to patches.

MR. MACHADO: The question and answer that had to do with patches. There's discussion of them and we have no problem with them, old people from Ohio, or something to that effect. No problem.

THE COURT: Okay. Fine. I think we're all on the same page. Thank you everyone. See you tomorrow.

(The proceedings were concluded at 5:13 p.m.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

__________/s/_______________
Christine T. Asif
Official Court Reporter

< Dates >.
August 5th 6373:4, 6378:24, 6378:25.
August 5th, 2021 6371:4.
December 29th 6302:5.
Jan 5/6 6317:11.
Jan 6 6275:24, 6275:25, 6277:17, 6295:22, 6321:22.
Jan 6 21 6278:18.
January 18th 6261:18, 6261:22.
January 2021 6264:3.
January 3rd 6289:1, 6290:8, 6375:11.
January 4th 6301:16.
January 5/6 6315:8, 6317:1, 6322:10, 6339:6.
January 5/6, 2021 6284:16.
January 5th 6266:9, 6283:10, 6294:17, 6299:10, 6299:20, 6299:21.
January 6 6249:5, 6249:10, 6266:9, 6275:24, 6278:11, 6280:17, 6280:18, 6280:19, 6280:20, 6281:1, 6281:10, 6282:8, 6285:22, 6286:13, 6286:19, 6286:21, 6286:22, 6288:10, 6288:23, 6290:9, 6291:4, 6291:15, 6294:4, 6295:11, 6301:5, 6302:22, 6302:23, 6303:7, 6307:2, 6307:12, 6315:17, 6316:19, 6325:24, 6339:7, 6345:23, 6346:16, 6396:11.
January 6 21 6282:18, 6285:7, 6287:9, 6299:22.
January 6th 6280:9, 6280:14, 6280:24, 6284:20, 6291:6, 6294:18, 6294:24, 6295:2, 6296:3, 6296:4, 6301:15, 6304:15, 6305:19, 6307:16, 6307:17, 6309:22, 6309:24, 6311:6, 6321:8, 6347:17, 6348:1, 6353:2, 6354:14, 6354:15, 6376:25, 6377:10, 6396:15, 6398:11.
July 1st 6374:12, 6378:23.
March 18th 6250:3.
March 18th, 2021 6248:19.
March 7th 6242:9.
November 14th 6258:10, 6258:14, 6258:22, 6259:14, 6268:15, 6268:21, 6269:14, 6269:21.
November 14th, 2020 6259:5.
November 2020 6268:14, 6307:17.
November 25th 6309:2.
November, December 6268:11.
$8,000 6353:22.
.
.
< 0 >.
0600 6299:7.
0902 6384:8.
.
.
< 1 >.
1 6251:22, 6278:17, 6281:22, 6282:1, 6285:6, 6285:14, 6298:22, 6300:6, 6375:21.
10 6257:2, 6257:15, 6258:3, 6265:8.
100 6268:8.
1002 6268:18.
10050 6281:16, 6287:2, 6287:14, 6288:8, 6288:21, 6290:21.
10052 6283:5, 6354:8.
10053 6333:1.
10056 6359:7.
10061 6298:16, 6298:19, 6298:24.
10063 6258:18, 6259:1, 6259:3.
10200 6375:7.
1025 6243:37.
10:00 6352:15, 6352:16, 6352:24.
10:32 6302:6.
10th 6268:24.
11 6265:7, 6283:5, 6329:18, 6335:20, 6335:24.
11:46 6299:10.
12 6336:16.
120 6354:9, 6354:13.
13 6378:12.
136 6287:3, 6287:13.
14 6328:9, 6328:18.
15 6295:15, 6300:7, 6300:10, 6333:2, 6342:23, 6388:25, 6389:12.
1500.4 6319:7, 6322:8, 6328:19, 6329:17, 6335:20, 6336:4, 6338:11, 6341:19, 6342:4.
1504 6363:23.
159.818 6300:6.
16 6283:22, 6335:20.
162 6288:5, 6288:6, 6288:8, 6290:2.
1675 6313:15, 6313:19.
18 6260:6, 6329:18,

6330:19, 6333:23.
180 6249:6.
1808 6243:19.
19 6338:11.
19:31 6338:11.
1:00 6352:24.
1:30 6242:10, 6311:5, 6361:4.
1:50 6319:16.
1:54 6322:9.
.
.
< 2 >.
2 6249:2, 6251:22, 6268:19, 6336:13, 6342:7, 6343:1, 6366:22.
20 6295:15, 6320:16, 6333:11, 6342:4, 6342:18.
200 6267:25, 6268:4, 6275:25, 6276:1, 6292:24.
20001 6242:39, 6243:10, 6244:27.
20003 6242:47.
20007 6243:39.
20010 6243:20.
20036 6243:30.
202 6242:29, 6243:11, 6243:21, 6243:31, 6243:40, 6288:22, 6290:3.
2020 6257:22, 6258:22, 6263:4, 6263:7, 6263:21, 6264:3, 6264:10, 6267:24, 6268:3, 6268:15, 6268:24, 6269:20, 6277:22, 6277:24, 6278:2, 6278:21, 6282:2, 6302:6.
2021 6250:3, 6263:21, 6264:10, 6267:25, 6268:4, 6290:8, 6299:21, 6307:17, 6353:14, 6373:4, 6374:12.
2023 6242:9, 6375:12.
20579 6242:28.
20th 6307:16.
21 6242:12, 6283:6.
21-28 6242:7.
214 6244:11.
22 6319:11.
228-1341 6244:20.
23 6283:6.
233 6335:21.
238 6288:6.
239 6288:6.
24 6301:24.
25 6333:22, 6354:13.
252-7277 6242:29.
2618 6375:14, 6375:21.
2620 6378:12.
279 6287:5, 6287:13.
29 6387:7, 6387:12.
29s 6387:1.
2:00 6322:9, 6352:25, 6353:1.
2:04 6324:7.
2:15 6321:13, 6328:20, 6329:2.
2:16 6321:20.
2:24 6329:3, 6373:16, 6373:25.
2:30 6324:11, 6336:12.
2:31 6329:19.
2:32 6329:18, 6330:19, 6332:8, 6373:23.
2:35 6336:12.
2nd 6280:21, 6280:23, 6286:16.
.
.
< 3 >.
3 6251:24, 6255:25, 6261:3, 6261:5, 6298:21, 6308:10, 6319:11, 6355:2, 6366:22.
30 6324:5, 6324:8, 6328:2, 6333:11, 6397:6.
30-round 6358:10.
300 6356:11, 6401:11.
301 6242:48.
302 6369:23, 6370:3, 6370:17, 6370:20, 6370:24, 6371:10, 6371:11, 6380:3, 6380:5, 6380:13, 6380:17, 6380:19, 6381:19, 6381:21, 6382:5, 6382:7.
302s 6370:9, 6374:6.
30th 6278:21, 6281:13, 6282:2.
31 6338:12.
310 6242:38.
313 6289:9, 6290:19, 6290:21.
32 6300:13, 6333:23.
32801 6243:47.
3300 6244:8.
333 6244:26.
338 6288:5, 6288:7, 6288:9, 6290:2.
339 6288:5, 6288:9, 6290:2.
35 6285:4, 6285:5.
350 6243:9.
352-2615 6243:31.
38 6286:1, 6286:2.
39 6286:6, 6286:7, 6342:19.
3:00 6318:18, 6336:14, 6336:15.
3:04 6336:20, 6337:3.
3:06 6337:2, 6337:4, 6337:13, 6338:2, 6338:4, 6338:9, 6338:17, 6338:18.
3:09 6336:24.
3:10 6338:17.
3:14 6342:9, 6342:16.
3:15 6318:19, 6342:20, 6342:24,

6343:1, 6343:23.
3:16 6336:15, 6336:24.
3:17 6364:7.
3:30 6344:12.
3:34 6343:23.
3:45 6344:12.
3rd 6280:21, 6280:23.
.
.
< 4 >.
4 6257:2, 6257:15, 6258:3, 6298:22, 6299:20, 6322:8, 6342:5, 6366:22.
40 6256:22, 6257:1, 6257:14, 6286:1, 6286:6, 6333:5, 6333:19.
400 6243:8, 6243:38.
400-1434 6243:11.
406 6341:19.
407 6243:48.
41 6336:17.
42 6364:23.
430 6288:22, 6290:3.
44 6329:1.
45 6330:20, 6336:23, 6359:13, 6359:14, 6359:16, 6360:5.
46 6300:16, 6300:18, 6337:4.
4604 6265:7.
47 6335:24, 6335:25.
48 6319:8, 6321:13, 6335:21.
49 6329:9.
4:06 6322:8.
4:41 6254:4.
4:45 6367:18.
4th 6280:22.
.
.
< 5 >.
50 6275:17.
503 6242:37.
5312 6347:13, 6347:19.
55 6243:46, 6300:16, 6300:18, 6336:23.
56 6300:18.
5:00 6388:24.
5:13 6406:3.
5th 6243:8, 6283:24, 6301:16, 6313:25, 6316:9, 6318:12, 6318:16, 6378:21.
.
.
< 6 >.
6 6252:16, 6283:10, 6297:4, 6322:8.
6'6" 6356:11.
601 6242:27, 6243:27.
628 6290:20, 6290:21.
648-1700 6243:48.
6740A 6336:13.
69 6301:24.
6924 6301:18, 6301:23.
699-8429 6244:11.
6:00 6295:1, 6295:11.
6:27 6291:6.
6:30 6295:16.
6th 6276:4, 6276:13, 6283:24, 6302:9, 6302:10, 6305:16, 6311:13, 6311:21, 6312:23, 6312:24, 6314:1, 6319:17, 6328:12, 6329:14, 6334:11, 6336:16, 6347:25, 6353:21, 6397:19.
.
.
< 7 >.
7 6276:8, 6297:15, 6313:18, 6328:8, 6328:18, 6329:1, 6349:2.
700 6244:9.
7029 6342:9.
703 6242:40.
745 6244:18.
75219 6244:10.
7th 6349:1.
.
.
< 8 >.
8 6313:19, 6314:11, 6329:9, 6333:2, 6354:14.
80 6361:23.
808 6244:20.
808shipleylaw@gmail.com 6244:21.
80s 6263:14.
82 6383:21.
83 6379:12, 6384:20, 6385:2.
84 6379:13, 6383:21, 6384:21.
85 6385:2.
8:00 6295:15.
8:30 6386:19, 6386:21, 6386:22.
8:36 6281:14, 6282:2.
.
.
< 9 >.
9 6256:22, 6257:1, 6257:14.
90 6331:24, 6332:1, 6334:22, 6335:6, 6361:23.
900 6243:28.
90s 6263:14.
9110 6256:21, 6257:3, 6257:5, 6257:15.
9110.1 6257:1, 6257:13.
9207 6346:14, 6346:20.
9217 6343:9, 6343:13, 6343:18.
9218 6251:21, 6252:2, 6253:7, 6255:25, 6261:2.
9218.1 6251:17, 6252:11, 6255:5, 6261:5, 6263:1.

922 6242:46.
9271 6343:16.
928-7727 6242:48.
965-8100 6243:40.
96734 6244:19.
9725 6278:16, 6299:20.
9732 6308:10.
9750 6285:3, 6285:5.
989-0840 6242:40.
9902 6337:3.
996-7447 6243:21.
9968 6299:8.
9:00 6352:14.
9:19 6299:24.
9:30 6386:22.
__________/s/__________ _____ 6406:9.
.
.
< A >.
A-x-i-o-m 6251:18.
A. 6243:6, 6243:7.
a.m. 6291:6, 6295:1, 6295:2, 6295:11, 6299:24, 6352:24, 6352:25.
ability 6248:12, 6249:10, 6401:20, 6401:21.
able 6250:4, 6250:8, 6273:8, 6273:10, 6274:22, 6316:10, 6328:15, 6328:20, 6329:13, 6329:25, 6330:10, 6362:1, 6389:16, 6390:20, 6396:10, 6398:13, 6403:22.
above 6252:16.
above-entitled 6406:7.
absent 6392:6.
Absolutely 6274:8, 6338:7, 6339:15, 6345:13, 6399:25.
absurd 6250:12.
accept 6400:13.
access 6357:22.
accident 6365:17.
accidentally 6339:18, 6340:24.
accomplish 6248:23.
accounting 6389:23.
accurate 6405:4.
across 6297:19.
Act 6270:24, 6272:21, 6273:14, 6308:4.
action 6268:21, 6268:25.
active 6252:24.
actively 6282:8, 6282:17, 6283:9, 6283:15, 6283:17, 6283:25, 6284:5, 6284:9, 6284:10, 6363:16.
actual 6255:15, 6255:25, 6323:22, 6361:16.
actually 6269:19, 6280:19, 6314:2, 6319:10, 6322:13, 6348:18, 6361:12, 6361:13.
Adams 6267:4, 6267:12.
add 6317:17, 6370:11.
added 6281:10, 6281:13, 6316:24, 6316:25, 6317:13, 6370:16, 6390:12.
addition 6378:25.
additional 6368:17, 6369:8, 6389:5.
address 6393:1.
addressed 6270:4, 6270:6, 6284:16.
addressing 6270:19.
adjourn 6386:18.
admissible 6302:12, 6305:12, 6305:13.
admission 6379:14.
admit 6256:24, 6259:1, 6261:4, 6290:2, 6298:24, 6302:20, 6304:2, 6343:13, 6346:18, 6383:21.
Admitted 6246:24, 6257:5, 6257:13, 6259:3, 6261:6, 6263:2, 6265:6, 6287:16, 6289:12, 6289:15, 6289:21, 6290:4, 6290:6, 6290:23, 6299:4, 6305:1, 6343:16, 6347:22, 6372:1, 6379:10, 6387:20, 6387:21, 6388:5, 6391:20, 6391:22, 6391:25, 6394:4, 6402:21, 6402:23.
advance 6251:8, 6278:9, 6342:18, 6387:18.
advantage 6382:10.
advised 6382:8.
advocate 6278:6.
advocating 6262:10, 6263:22, 6264:12, 6264:15, 6277:23.
African 6356:12.
Afternoon 6242:13, 6256:9, 6256:10, 6310:16, 6310:18, 6311:21, 6318:18, 6327:16, 6328:12, 6329:14, 6373:2, 6373:3, 6377:1, 6377:10, 6390:20, 6390:21.
agents 6249:25, 6250:2, 6254:14, 6340:3.
ago 6254:13.
agree 6397:2, 6397:6, 6398:22.
agreed 6307:12, 6308:7.
agreeing 6308:8.
agreement 6395:20, 6397:12, 6398:13, 6398:15, 6399:5.
ahead 6246:6, 6262:15, 6262:17, 6262:18, 6292:16,

6293:13, 6324:22, 6336:10, 6364:1, 6381:22.
ain't 6328:6.
airport 6326:13.
AK 6358:13.
AK-47 6358:10.
al 6242:10.
Alexander 6314:6, 6314:16, 6314:19, 6315:22, 6349:10, 6349:12.
Alexandra 6242:24.
Ali 6314:15, 6314:19, 6315:22, 6349:9, 6349:11, 6349:12.
alleged 6303:8, 6303:9, 6304:25, 6305:1.
allegedly 6291:20, 6313:2, 6317:3.
allow 6250:11, 6255:12, 6255:13, 6393:12, 6393:23, 6393:24, 6394:9, 6397:6.
allowed 6271:8, 6271:10, 6320:13.
allows 6247:2, 6397:13, 6399:9.
almost 6251:21.
already 6257:5, 6265:6, 6276:4, 6278:17, 6285:3, 6300:23, 6301:18, 6313:15, 6317:21, 6339:19, 6351:13, 6368:20, 6369:1, 6380:23, 6395:18, 6401:9.
altercation 6364:17.
alternative 6394:19.
although 6379:10, 6394:10.
AMERICA 6242:5.
American 6356:12.
Americans 6263:11, 6263:12.
Amit 6242:16.
Ammo 6289:1, 6290:11.
among 6263:10, 6351:22.
amongst 6263:12.
ample 6289:3, 6290:13.
analogies 6248:3, 6250:5, 6401:8, 6403:14.
analogy 6260:12, 6401:5, 6404:24.
anarchists 6251:5.
anger 6263:10, 6263:12, 6402:24.
angle 6400:10.
angry 6365:18.
Answer 6248:13, 6250:4, 6262:16, 6262:17, 6273:5, 6283:8, 6283:11, 6284:2, 6303:18, 6316:4, 6333:3, 6333:8, 6333:13, 6333:15, 6333:20, 6334:3, 6334:15, 6334:20, 6334:25, 6354:20, 6366:13, 6367:21, 6367:22, 6399:9, 6404:24, 6405:14, 6405:22.
answered 6248:2, 6354:15, 6381:4.
answering 6262:19.
answers 6248:3, 6293:13, 6334:18, 6380:13, 6380:17.
anticipated 6389:12.
Antifa 6323:2, 6323:8, 6323:9, 6357:14.
antigovernmental 6251:6.
Anybody 6264:5, 6266:12, 6266:24, 6272:3, 6272:5, 6272:10, 6273:7, 6273:23, 6304:20, 6322:6, 6323:25, 6350:18, 6393:13, 6393:19.
AP 6277:25, 6278:3, 6278:5, 6350:3.
apart 6398:1.
apologize 6366:11.
Apology 6254:1.
app 6292:20, 6341:6.
apparently 6298:5.
appear 6288:12.
APPEARANCES 6242:20, 6243:1, 6244:1.
appears 6254:15, 6255:8, 6404:23.
appetite 6389:17.
applicable 6393:14.
appreciate 6389:24, 6401:20.
approach 6375:6, 6387:16.
appropriate 6381:1, 6381:5, 6390:2, 6390:13, 6391:23.
approximate 6373:17.
approximately 6373:15, 6373:16, 6373:23, 6376:7.
apps 6340:12.
area 6301:16, 6313:6, 6320:8, 6347:6, 6347:12, 6347:14, 6352:17, 6362:15.
areas 6313:17, 6313:18, 6320:25, 6321:10, 6347:8.
arguably 6305:23, 6397:20.
argue 6331:22, 6396:8, 6396:12, 6398:9, 6400:22, 6402:4, 6403:8.
argument 6316:16, 6396:15, 6396:17, 6397:14, 6397:16, 6397:20, 6397:21, 6398:23, 6399:3, 6399:6, 6401:6.

argumentative 6292:14.
arguments 6387:15, 6395:22, 6396:23, 6397:16, 6397:20, 6399:2, 6399:10, 6401:15.
arm 6270:13.
Armed 6272:7, 6272:13, 6273:11, 6273:12, 6274:9, 6274:10, 6274:12, 6274:14, 6274:15, 6294:15, 6296:18.
arms 6266:1.
around 6275:19, 6275:22, 6283:9, 6295:11, 6311:5, 6312:10, 6312:12, 6312:16, 6322:9, 6329:2, 6329:10, 6338:11, 6345:3, 6345:14, 6345:15, 6345:20, 6348:14, 6350:20, 6373:25, 6374:1, 6374:12.
arrest 6350:21.
arrested 6354:7.
arresting 6350:23, 6351:1.
Ars 6358:14.
arsenal 6273:9.
Arthur 6264:1.
ASD 6249:5, 6249:19.
Ashkenaze 6388:14.
Ashli 6350:10.
Aside 6390:15.
Asif 6244:24, 6406:5, 6406:10.
asks 6328:19.
assault 6357:19, 6357:22.
assigned 6285:13.
assistance 6400:8.
assistant 6280:8, 6286:17, 6286:18.
assisted 6254:11.
associated 6323:7, 6323:16, 6323:25.
associating 6273:16.
assume 6316:16.
Assumes 6295:6.
Atlanta 6269:14, 6269:16, 6269:19.
attached 6252:6, 6254:16, 6254:21.
attempt 6270:12.
attempts 6333:11.
attention 6286:25, 6295:23, 6317:19.
Attorney 6242:26, 6260:10, 6260:13, 6354:25, 6355:1, 6373:5, 6395:25.
audio 6397:4.
August 6378:20.
autism 6395:11, 6395:16, 6401:16, 6402:5.
availability 6289:4, 6290:13.
available 6390:3.
Avenue 6242:46, 6243:27, 6244:8, 6244:26.
aware 6267:2, 6267:3, 6284:19, 6285:14, 6302:8, 6302:21, 6303:25, 6305:21, 6306:3, 6307:2, 6307:5, 6313:5, 6353:2, 6353:4, 6375:8.
away 6319:23, 6320:22, 6320:23.
Axiom 6251:17, 6251:21, 6252:3, 6252:5, 6252:10, 6254:10, 6254:14, 6292:21, 6292:23.
.
.
< B >.
Babbit 6350:11.
barbershops 6274:6.
bargain 6399:20.
barricades 6312:14, 6312:16.
Based 6284:19, 6293:12, 6356:5, 6389:15, 6396:8, 6403:8.
basement 6260:10, 6260:13.
basic 6386:9.
basically 6246:10.
battle 6264:23.
Bear 6395:4, 6399:21.
became 6291:17.
become 6282:7, 6364:17.
becoming 6308:1.
beeping 6317:25.
beg 6320:3.
began 6257:21, 6271:23, 6272:1, 6282:8, 6282:18, 6379:7.
begging 6320:8.
begin 6333:2.
beginning 6283:22, 6371:20, 6401:14.
begins 6282:2, 6363:24.
behalf 6246:7, 6368:23, 6368:25, 6369:1, 6369:4, 6369:6, 6369:10, 6385:12, 6385:14, 6387:3, 6405:19.
behind 6276:16, 6312:17.
beliefs 6264:16, 6265:2.
believe 6250:10, 6256:15, 6263:16, 6274:8, 6275:8, 6307:3, 6311:7, 6313:15, 6359:9, 6373:10, 6373:23, 6374:15, 6378:20, 6378:22, 6379:9, 6381:8, 6382:12, 6382:17, 6384:19, 6384:20, 6401:9.
believed 6307:5.
believes 6308:24,

6329:5.
bell 6303:4.
Bench 6250:20, 6261:7, 6302:3, 6365:24, 6379:22.
beneath 6345:22.
Bennie 6242:44.
Bentley 6281:6, 6308:12, 6309:2, 6309:8, 6309:11, 6311:14, 6345:1, 6345:10, 6352:2.
best 6248:23, 6248:24, 6254:21, 6315:1, 6391:8, 6395:10, 6398:16, 6403:8.
better 6358:16, 6365:19.
Biden 6261:24, 6377:11.
bigger 6358:21.
bike 6312:17, 6312:18.
binging 6317:25.
bipartisan 6263:19.
bit 6256:12, 6317:10, 6389:11.
black 6254:5, 6263:13, 6365:18.
blacked 6271:15.
blindness 6401:19.
BLM 6323:1, 6323:2, 6323:8, 6323:9, 6357:13, 6357:14, 6358:7.
block 6393:23.
blocked 6399:14, 6399:19.
blocking 6394:1.
blood 6273:21.
blow 6359:8.
blunt 6395:12.
blurring 6400:11.
board 6356:17, 6390:21.
boat 6275:6, 6275:11, 6275:13, 6275:20, 6288:14.
boats 6274:23, 6274:25, 6275:2.
Boogaloo 6262:3, 6262:5, 6262:20.
boss 6296:7, 6304:6, 6304:8.
bottles 6254:6.
bottom 6265:8, 6287:5, 6291:24, 6292:2, 6292:25, 6293:1, 6293:4, 6293:25, 6296:2, 6306:10, 6333:22, 6336:14, 6362:7, 6391:20.
Bowser 6402:12.
Box 6244:18, 6249:20.
Boys 6262:3, 6262:5, 6262:20, 6322:23.
brain 6395:19.
Brand 6243:18.
break 6249:18, 6251:16, 6252:23, 6253:9, 6256:11, 6258:9, 6258:13, 6260:2, 6260:22, 6318:18, 6377:17, 6391:16, 6403:16, 6403:17, 6404:1.
breaking 6300:13.
breaks 6393:6, 6403:14.
bredden@reddenlawtexas.com 6244:13.
Brennwald 6242:44, 6242:45, 6246:8, 6366:7, 6367:21, 6368:5, 6368:23, 6405:19.
bridges 6286:4, 6288:13.
briefly 6378:16, 6393:22.
Bringing 6289:2, 6290:11, 6301:22.
brink 6308:24, 6309:5, 6309:7.
Britt 6244:6.
broadcast 6277:17.
broke 6377:24.
brother 6309:9.
brought 6281:1, 6281:3, 6281:5, 6281:7.
Brown 6314:15, 6314:23, 6314:25, 6315:20, 6316:12.
Bruton 6246:14.
bubbles 6254:4.
Building 6243:29, 6271:8, 6271:10, 6311:11, 6312:10, 6312:12, 6319:20, 6353:3, 6361:13, 6361:16, 6361:18, 6362:6, 6362:7, 6362:23, 6375:22, 6376:25.
bullshitting 6348:13.
bunch 6282:15, 6312:7.
burning 6300:10.
business 6367:2.
butt 6358:10.
bystanders 6324:3.
.
.
< C >.
cake 6248:13.
Caldwell 6269:22, 6269:24, 6270:16, 6270:18, 6270:19, 6271:17, 6275:22.
Caleb 6371:2, 6375:8, 6375:15.
Called 6251:16, 6258:20, 6260:23, 6261:10, 6262:3, 6266:19, 6266:22, 6266:24, 6272:22, 6272:23, 6277:10, 6287:9, 6312:3, 6315:7, 6317:1, 6317:11, 6318:10, 6318:11, 6322:5, 6323:19, 6323:21, 6323:22, 6324:20, 6324:23, 6324:24, 6334:6, 6334:12,

6334:13, 6357:18, 6358:9, 6369:15.
calling 6246:17, 6273:2, 6273:25, 6307:18, 6307:19, 6315:2, 6324:18.
calls 6267:25, 6268:4, 6332:9, 6333:4, 6333:7, 6333:25, 6334:6, 6334:8, 6334:14, 6335:15, 6336:23, 6350:2, 6353:4, 6364:9, 6364:10.
calm 6398:2.
camera 6257:25, 6342:9.
cammo 6298:4, 6298:8, 6298:9.
cancel 6291:21.
canceled 6291:20, 6294:8.
candid 6397:25.
Candidly 6303:5.
Cane 6254:11.
capacity 6279:18, 6280:4, 6313:5, 6401:17.
Capitol. 6339:17.
capitols 6264:20.
car 6296:21, 6351:25, 6352:2.
care 6247:9, 6264:5, 6366:18, 6367:18.
Carlton 6243:36.
carriers 6358:12.
carry 6358:4, 6358:6.
cars 6271:13.
CART 6254:11, 6275:22.
carting 6275:1.
cases 6385:18, 6385:19, 6390:17.
cause 6263:10, 6263:12.
caused 6358:17.
CCTV 6383:20.
celebratory 6349:23.
cell 6260:15, 6271:9, 6271:11, 6271:13, 6281:24, 6292:4, 6292:6, 6292:8, 6292:17, 6292:19, 6293:15, 6293:19, 6340:7.
cellular 6281:18, 6292:22.
certain 6250:7, 6339:1, 6339:3, 6377:25, 6380:22, 6401:2.
certainly 6346:7.
certification 6308:3.
certify 6406:5.
Certifying 6377:11.
chain 6325:21, 6325:23, 6346:11.
chance 6251:15, 6257:8, 6315:1.
charge 6301:10, 6301:11, 6301:12, 6301:13, 6312:22, 6314:3, 6315:16, 6317:3, 6317:12, 6321:7.
charging 6391:3.
Charles 6243:43, 6243:44, 6249:17.
chart 6356:9.
chats 6259:23, 6268:10, 6282:13, 6282:18, 6283:15, 6283:18, 6284:15, 6284:16, 6284:19, 6284:21, 6304:19, 6314:25, 6315:11, 6317:11, 6317:22, 6341:24, 6342:2, 6359:8, 6359:13, 6359:14.
check 6282:20, 6314:10.
chick 6350:11.
chief 6303:15, 6305:2, 6305:13, 6366:14.
child 6367:18.
choice 6265:16, 6398:19, 6398:20.
chooses 6386:19.
chose 6268:15, 6276:18.
Christine 6244:24, 6406:5, 6406:10.
christine_asif@dcd.uscourts.gov 6244:28.
chronological 6254:17.
chronologically 6254:20, 6255:8.
chronology 6255:7, 6255:25.
circle 6270:16.
circled 6347:24, 6364:11.
circulated 6389:4.
circumstance 6370:10.
circumstances 6399:17.
citizens 6402:11.
civil 6262:11, 6274:5, 6278:7, 6307:18, 6307:19, 6307:20, 6307:24, 6308:24, 6309:6, 6309:12.
civilian 6323:4.
civilians 6323:16, 6357:22.
claimed 6303:12.
claiming 6303:22.
clarified 6309:11.
clarify 6381:23.
clean 6388:15.
cleaning 6369:7.
clear 6251:3, 6255:20, 6260:15, 6314:21, 6327:20, 6328:1, 6374:24, 6392:3, 6394:7, 6399:8, 6400:1, 6400:25.
clerk 6368:21.
click 6331:13, 6335:17.

clicked 6334:13.
clicks 6334:8.
client 6292:11, 6293:13, 6395:21, 6395:23, 6395:24, 6396:1, 6396:2, 6396:22, 6397:22, 6397:25, 6399:3.
climbing 6319:19.
clip 6246:3, 6246:8, 6258:2, 6258:7, 6404:21.
clips 6249:12, 6397:25, 6403:2, 6403:7, 6404:7, 6404:23.
close 6345:16, 6361:24, 6362:1, 6362:3, 6375:22, 6387:10, 6387:16, 6389:3, 6389:9.
closed 6286:4, 6288:13, 6349:3.
Closer 6307:22, 6310:16, 6310:18, 6373:25.
closest 6361:12, 6361:16, 6361:21, 6362:7.
closing 6247:5, 6389:10, 6392:19, 6395:7, 6397:2, 6397:7, 6398:23, 6399:10, 6400:23.
closings 6390:22.
CM 6379:12, 6379:13, 6385:2.
CM-47 6372:2.
CM85 6385:2.
co-conspirator 6303:6, 6303:8, 6303:9, 6304:6, 6305:1, 6306:12.
co-counsel 6249:20.
colleague 6370:19.
colleagues 6369:25.
collected 6266:6, 6398:2.
COLUMBIA 6242:2.
column 6254:3, 6254:7, 6255:1.
combat 6272:23, 6273:3, 6325:19.
combative 6250:2.
comes 6341:5, 6341:6.
coming 6250:5, 6255:18, 6271:4, 6272:3, 6276:24, 6280:13, 6281:1, 6282:15, 6324:4, 6324:7, 6324:13, 6324:25, 6326:5, 6326:12, 6328:1, 6341:21, 6350:12, 6350:13, 6391:23, 6399:24, 6404:5.
command 6278:25, 6279:7, 6280:18, 6325:21, 6325:23, 6346:11.
commander 6297:22.
comment 6375:3, 6375:4, 6377:19.
comments 6380:10, 6402:11.
commit 6249:1.
committing 6366:9.
communicate 6329:25.
communicated 6282:24, 6314:19, 6314:20.
communicating 6315:2.
communication 6316:5.
communications 6328:10, 6328:15.
communities 6263:13.
company 6340:7.
comparison 6249:11.
complete 6336:9, 6339:23, 6341:9, 6367:6, 6381:5.
completed 6368:16.
completely 6248:6, 6305:4, 6339:25.
completeness 6336:8, 6367:5.
complicated 6390:17.
compromise 6388:20.
computer 6364:9.
concern 6276:22, 6404:22.
concerned 6247:10, 6264:17, 6349:6.
concerning 6305:19, 6396:1.
concert 6348:25.
concluded 6406:3.
conclusion 6396:10.
conditionally 6387:21, 6388:5.
conduct 6398:7.
conducted 6403:22.
conference 6250:20, 6302:3, 6365:24, 6379:22, 6391:4.
confirm 6380:22.
confirmed 6368:20.
Confront 6304:2, 6304:4, 6304:10, 6305:20, 6305:25, 6306:21.
confrontation 6405:3, 6405:7, 6405:20.
confronting 6306:14.
confused 6247:9, 6298:12.
confusion 6255:13.
Congress 6307:5, 6349:9, 6377:9.
connected 6331:23, 6332:23, 6333:7, 6333:16, 6334:22, 6335:8.
connection 6383:1, 6394:5.
connects 6335:13.
Connie 6243:17, 6392:18.
consider 6386:3, 6389:17.
consideration 6390:2.
considered 6322:24.
considering 6390:1,

6390:6.
consistent 6306:10, 6368:11, 6386:4, 6386:11.
consistent/inconsistent 6366:5.
conspiracy 6303:7, 6303:9, 6303:10, 6304:25.
constantly 6317:24.
Constitution 6244:26.
contact 6276:14, 6356:6.
contacted 6304:15.
contain 6252:21, 6253:16, 6254:24.
contains 6405:20.
contents 6253:4.
context 6251:1, 6255:17, 6339:14, 6339:15, 6339:25, 6341:2, 6341:10, 6403:23.
contextual 6251:13.
contingent 6276:19.
continue 6250:19, 6331:11.
CONTINUED 6243:1, 6244:1, 6278:6, 6353:6.
contradict 6397:21.
contradicts 6395:24, 6399:2.
control 6328:6.
controlled 6249:2, 6249:4.
convene 6391:14.
conversate 6322:25, 6323:6.
conversation 6271:22, 6272:7, 6272:9, 6280:22, 6305:18, 6307:10, 6316:13, 6316:14, 6330:13, 6330:14, 6330:15, 6341:10, 6360:12.
conversations 6345:19, 6349:24, 6350:8, 6350:14, 6356:5, 6360:8, 6360:10, 6377:5.
convey 6381:6.
convinced 6398:10.
Cooper 6243:6, 6243:7, 6304:9, 6368:25, 6391:15.
cop 6362:1.
cops 6319:22, 6320:5, 6320:8, 6320:11, 6320:15, 6363:18.
corner 6343:25, 6344:1, 6344:7.
correctly 6306:18, 6366:23.
counsel 6283:6, 6366:16, 6368:16, 6381:16, 6387:1.
count 6372:15, 6374:2, 6376:18, 6376:20, 6377:15, 6377:20, 6384:18, 6385:7.
country 6262:11, 6273:25.
Couple 6246:11, 6246:20, 6289:3, 6290:12, 6300:3, 6348:7, 6350:3, 6350:8, 6352:22, 6353:4, 6353:5, 6357:13, 6358:11, 6358:14, 6359:20, 6367:8, 6390:19, 6400:20, 6401:4, 6405:12.
course 6248:8, 6366:19, 6371:1, 6393:25, 6399:18.
court. 6256:6, 6306:23, 6368:14, 6383:15.
courtroom 6322:24, 6323:12.
courtroom. 6250:16, 6318:20, 6319:3, 6386:24.
cover 6298:18.
covered 6271:16, 6285:8, 6287:21.
CR 6242:7.
crazy 6273:7, 6273:15, 6273:22.
create 6370:1.
created 6251:16, 6252:1, 6252:2, 6252:8, 6252:22, 6316:5.
credibility 6386:4, 6386:6, 6386:11, 6395:9, 6395:10, 6395:14.
credible 6306:17.
cried 6273:22.
crooked 6261:19.
cross 6305:4, 6367:25, 6382:17, 6399:16, 6402:11.
CROSS-EXAMINATION 6246:17, 6254:13, 6256:7, 6260:2, 6262:16, 6295:8, 6303:15, 6305:13, 6372:19, 6372:25, 6387:22, 6398:5, 6405:8.
cross-examine 6246:22, 6396:1.
cross-examining 6404:11.
crossing 6402:10, 6402:18.
crowd 6324:2.
Cummings 6388:18.
curious 6277:2.
currently 6261:19.
curtains 6271:16.
cut 6317:25, 6358:10.
CV 6366:24.
.
.
< D >.
D. 6242:27, 6242:37.
Dallas 6244:10.
dare 6388:18.
data 6251:19, 6252:19, 6258:25, 6260:15, 6260:18,

6281:23, 6292:21, 6293:7.
date 6259:7, 6360:23.
dated 6375:11.
day-to-day 6284:11.
days 6261:24, 6317:14.
DC 6243:20, 6258:20, 6259:12, 6259:15, 6275:24, 6275:25, 6277:17, 6278:18, 6280:9, 6281:10, 6282:18, 6285:7, 6287:9, 6288:10, 6288:23, 6290:9, 6291:4, 6295:21, 6295:23, 6298:15, 6299:22, 6317:13, 6321:22, 6322:10, 6322:11, 6341:23.
dead 6330:17, 6359:24.
deadly 6265:22.
debrief 6249:11.
debriefing 6248:1, 6395:25, 6397:13, 6397:22, 6399:3.
debriefings 6396:3.
December 6277:22, 6277:23, 6278:2, 6278:10, 6278:21, 6281:13, 6282:2.
decided 6276:12, 6280:12, 6392:18.
decision 6266:23.
declare 6265:20, 6266:2, 6270:23.
deep 6269:1.
defeat 6269:1.
defend 6268:25, 6270:25.
Defendant 6242:34, 6242:43, 6243:5, 6243:16, 6243:34, 6244:5, 6303:21, 6391:20.
Defendants 6242:12, 6386:16, 6393:15.
defendants. 6391:22.
defense 6266:2, 6366:16, 6385:17, 6385:18, 6386:15, 6387:1, 6387:21, 6388:21, 6390:8, 6390:13, 6390:16, 6400:24, 6401:7.
degrees 6249:6.
Delaware 6402:10, 6402:11, 6402:19.
delay 6390:5.
delete 6339:10, 6341:24, 6342:2, 6365:3, 6365:4, 6365:11.
deleted 6365:4.
demeanor 6248:1, 6248:12, 6249:10, 6249:11, 6394:14, 6394:17, 6394:22, 6395:7, 6396:9, 6396:19, 6397:3, 6397:5, 6397:25, 6398:10, 6398:14, 6398:18, 6399:6.
Democratic 6264:6.
democrats 6264:2.
demonstrated 6337:25.
demurred 6402:20.
denied 6306:15.
denies 6304:1, 6306:1.
denying 6279:13, 6279:15, 6279:17, 6279:19.
departure 6389:15.
Depends 6330:16, 6388:13.
depicted 6257:18, 6384:2.
deputies 6301:8.
deputy 6278:13, 6301:5, 6369:7.
Describe 6247:25, 6248:10, 6357:12, 6363:4, 6394:16, 6394:22, 6396:19, 6397:3, 6397:5, 6401:10, 6403:2.
described 6246:20, 6312:1, 6322:18, 6322:20, 6356:11, 6363:9, 6363:13, 6381:12.
describing 6398:24.
description 6246:25, 6358:16, 6387:19, 6397:6, 6398:17, 6401:11.
desire 6383:7, 6383:11.
destructive 6265:21.
detail 6277:11, 6278:9, 6345:24, 6345:25.
detailed 6386:2.
details 6278:15, 6279:24, 6280:11, 6286:18, 6303:23, 6313:2, 6315:16.
determination 6306:16.
difference 6248:22.
differences 6398:7.
different 6249:3, 6249:6, 6251:11, 6252:7, 6266:10, 6277:11, 6284:15, 6288:23, 6293:8, 6293:19, 6334:18, 6340:23, 6341:4, 6350:7, 6375:8, 6382:6, 6382:7, 6398:7, 6400:10, 6401:4.
differently 6248:19.
difficult 6304:19.
difficulty 6358:18.
dinner 6350:20, 6351:4.
DIRECT 6260:9, 6268:8, 6269:20, 6275:14, 6283:6, 6312:3, 6328:11, 6343:10, 6355:18, 6359:9, 6369:17.

direction 6377:25, 6378:5.
directions 6344:10.
directly 6296:13, 6316:11, 6355:1, 6402:2.
disagree 6382:23, 6402:15.
disagreement 6377:20.
discovery 6252:20, 6260:10, 6260:16.
discuss 6285:18, 6389:2, 6390:10.
discussed 6270:8, 6275:14, 6275:15, 6383:17.
discussion 6389:1, 6405:23.
discussions 6261:7, 6391:10.
dispute 6316:15, 6335:9, 6359:15.
disputing 6315:13.
disrespect 6367:19, 6389:22.
distinguish 6371:21.
distress 6398:3.
distributing 6361:9.
District 6242:1, 6242:2, 6242:17.
doctor 6249:3.
documents 6370:23, 6374:19.
doing 6248:9, 6250:6, 6250:7, 6278:9, 6282:9, 6306:8, 6308:3, 6313:2, 6313:18, 6320:1, 6355:21, 6362:13, 6362:15, 6368:13, 6376:12, 6377:10, 6377:22, 6389:18.
Don 6278:25, 6279:13, 6280:8, 6286:17.
Donald 6308:2.
done 6267:19, 6337:17, 6366:3, 6366:10, 6400:18, 6404:8.
door 6271:21, 6272:1, 6362:13, 6362:24, 6363:5, 6381:1, 6382:22, 6399:1, 6401:9.
doors 6271:23, 6271:25, 6272:4, 6272:9, 6343:2, 6343:5, 6363:12.
doubt 6392:9.
doubtful 6285:23.
doubting 6351:7.
Douyon 6328:8, 6379:13, 6384:21.
download 6259:25.
downloaded 6259:21, 6259:22.
dozen 6270:2.
Draco 6358:10.
drawn 6346:23, 6347:1.
drive 6352:19.
dropping 6297:25, 6298:13, 6298:14, 6326:5, 6326:22, 6327:4.
drove 6352:24.
drums 6358:11.
drunk 6358:22.
due 6366:19.
duly 6369:15.
During 6248:2, 6249:11, 6249:12, 6249:17, 6251:22, 6283:11, 6283:13, 6283:15, 6284:1, 6284:2, 6285:22, 6295:4, 6295:12, 6303:8, 6334:11, 6334:19, 6362:17, 6393:6, 6394:14, 6394:17, 6394:22, 6396:3, 6397:22, 6398:14, 6399:3, 6400:2, 6403:4.
duty 6265:15.
.
.
< E >.
ear 6337:8, 6337:13.
earlier 6277:15, 6308:11, 6321:22, 6374:10.
early 6295:16, 6353:15.
East 6243:46, 6311:11, 6344:6, 6346:15, 6362:17, 6362:21, 6363:12, 6373:19, 6375:1, 6379:2, 6379:4, 6379:8, 6380:15, 6381:21, 6382:3, 6382:19, 6383:20.
easy 6282:16, 6396:25.
eat 6248:13.
Ed 6349:20.
Edmund 6243:17.
Edwards 6242:25.
effect 6315:7, 6405:25.
effects 6401:16.
efforts 6251:6.
eight 6253:20, 6276:23, 6277:1, 6277:8, 6277:10, 6368:19.
either 6270:7, 6271:15, 6295:12, 6341:22, 6390:5, 6402:4, 6402:6, 6405:4, 6405:5.
election 6263:4, 6263:5, 6263:7, 6263:23, 6264:14, 6267:11, 6268:14, 6307:25, 6308:3, 6309:18, 6377:11.
elections 6263:13, 6263:14, 6263:15.
elicit 6379:24.
Elipse 6310:20.
Elizabeth 6263:25.
Ellipse 6310:5, 6310:8, 6310:15, 6313:13, 6314:9,

6349:13.
elsewhere 6267:20, 6270:7.
Email 6242:30, 6242:41, 6242:49, 6243:12, 6243:22, 6243:32, 6243:41, 6243:49, 6244:12, 6244:21.
emphasize 6395:11.
EMS 6323:5.
enable 6316:5.
enclosed 6381:20.
encountered 6357:8.
end 6262:7, 6311:17, 6344:5, 6358:13, 6372:22, 6385:25, 6386:2, 6386:9.
ended 6320:1.
ending 6299:7.
ends 6265:21, 6366:18, 6378:12.
enemy 6265:23.
enforcement 6322:21, 6322:22, 6323:8, 6323:9, 6323:13, 6388:15.
engage 6363:25.
engaged 6361:14.
enough 6267:12, 6267:15, 6297:14, 6387:19, 6392:2, 6395:14, 6404:20.
enter 6266:14.
entered 6250:16, 6319:3.
entering 6342:16, 6344:20, 6344:21.
entire 6365:6, 6365:7.
entirely 6253:1, 6282:20.
entrance 6378:3, 6378:4.
environment 6249:2, 6249:4, 6249:24.
EP 6279:24, 6286:18, 6297:15, 6353:11.
equipped 6291:7.
escort 6310:7.
Especially 6264:22, 6296:16.
essentially 6252:5, 6252:11, 6254:17, 6254:20, 6267:10, 6293:3, 6303:25, 6309:21, 6312:1, 6322:23, 6324:1.
establish 6252:14.
establishing 6386:6, 6386:13.
estimate 6389:15.
et 6242:10.
ETA 6324:5, 6328:2.
etched 6395:18.
Euene 6243:35.
evaluate 6386:4.
evaluating 6386:11.
evening 6281:13, 6326:17, 6391:11.
event 6395:21, 6396:22.
events 6305:19, 6310:7, 6321:4.
Everybody 6298:4, 6311:16, 6315:25, 6316:1, 6317:24, 6322:20, 6322:22, 6322:23, 6323:3, 6323:4, 6323:6, 6323:9, 6323:11, 6323:12, 6323:16, 6323:25, 6324:1, 6327:7, 6349:24, 6350:7, 6350:14, 6352:10, 6367:13, 6368:7, 6368:13, 6374:17, 6386:25.
everyone 6250:17, 6311:10, 6311:17, 6319:4, 6351:4, 6365:22, 6386:23, 6406:2.
everything 6296:8, 6297:21, 6305:5, 6315:18, 6349:6.
evidentiary 6385:14.
exact 6252:4, 6345:10, 6395:10.
Exactly 6270:17, 6277:5, 6277:7, 6314:7, 6330:7, 6346:13, 6380:21.
EXAMINATION 6249:14, 6260:9, 6269:21, 6281:18, 6298:17, 6355:13, 6369:17, 6378:17.
examined 6369:15.
examiner 6254:11.
example 6254:25, 6328:18, 6396:11, 6401:9.
Excel 6252:1.
except 6246:15, 6374:19.
excerpt 6252:13.
exchange 6302:17, 6330:10, 6341:20, 6360:20, 6387:18.
exchanges 6329:13.
excising 6400:11.
exclude 6255:16.
excuse 6389:9.
executive 6278:14, 6280:10, 6401:21, 6401:22.
exercising 6405:20.
exhibits 6288:5, 6289:14, 6344:4, 6366:12, 6369:7, 6370:23, 6387:20, 6387:21, 6387:24, 6388:5.
expect 6247:25.
expectation 6387:25.
expeditious 6318:24.
expeditiously 6390:18.
expert 6248:15, 6254:22, 6292:4, 6292:6, 6292:8, 6292:18, 6292:19, 6293:11, 6392:4, 6394:5, 6400:2.
explain 6317:10.
explained 6254:14.

explaining 6247:15.
explanation 6306:17, 6332:24, 6334:20.
export 6254:18, 6287:6.
expressed 6306:12.
expressly 6396:17.
extended 6391:10.
extent 6387:23, 6405:10.
extract 6251:19.
extracted 6252:7, 6281:23.
extraction 6258:25, 6260:15.
extremely 6249:4.
.
.
< F >.
F. 6242:44.
facets 6247:25.
facing 6389:24.
fact 6262:21, 6294:4, 6297:21, 6297:23, 6304:14, 6306:3, 6324:16, 6326:13, 6330:6, 6339:14, 6340:4, 6367:11.
facts 6295:7, 6401:3.
factual 6403:20.
factually 6246:13, 6247:6.
fail 6265:15.
Fair 6248:6, 6248:25, 6251:7, 6260:18, 6278:13, 6279:7, 6295:17, 6304:2, 6305:4, 6310:11, 6330:8, 6351:19, 6353:19, 6360:5, 6392:2, 6399:6, 6404:20.
fairly 6251:13.
fall 6267:13.
fall-back 6394:21.
false 6296:22.
familiar 6262:5, 6278:23, 6369:23.
family 6389:22, 6389:23, 6389:25.
far 6250:2, 6251:11, 6252:9, 6264:17, 6274:16, 6297:12, 6298:5, 6298:10, 6305:17, 6306:7, 6320:22, 6320:23, 6349:6, 6353:8, 6391:6.
farm 6269:22, 6269:24, 6270:4, 6270:16, 6270:18, 6270:19, 6271:17.
FBI 6249:25, 6250:2, 6251:20, 6294:12, 6323:14, 6323:15, 6338:25, 6340:3, 6350:20, 6365:19, 6370:1, 6388:15, 6394:8, 6394:10, 6394:15.
FCRR 6244:24, 6406:5.
February 6353:16.
Federal 6244:25.
fee 6354:6.
feel 6326:9.
feels 6393:13.
fees 6264:5.
feet 6372:10.
fellow 6323:18.
felt 6267:18, 6267:19.
female 6365:15.
few 6312:13, 6336:23, 6344:4, 6350:2, 6357:13, 6372:10, 6385:13, 6385:17, 6389:14.
field 6254:23, 6261:15, 6287:24.
Fields 6243:36.
fight 6254:5, 6264:19, 6266:3, 6270:9, 6270:11, 6272:14.
fighting 6361:25, 6362:3, 6362:10, 6362:14, 6363:16.
figure 6319:25, 6332:10, 6332:12, 6392:14, 6396:20.
file 6370:22, 6371:20, 6371:24, 6379:7, 6381:17, 6381:18, 6381:19, 6381:20, 6387:8, 6395:10.
filed 6390:16.
files 6396:4.
fill 6254:5, 6388:10, 6388:12.
final 6366:13.
finalized 6308:1.
find 6285:8, 6287:21, 6340:18, 6344:10, 6348:6, 6348:22, 6349:9, 6349:21, 6365:16.
Fine 6368:4, 6368:12, 6393:19, 6400:14, 6400:23, 6403:1, 6403:21, 6404:9, 6404:13, 6406:1.
finish 6318:23.
firearm 6281:2, 6281:5, 6281:8.
firearms 6359:2, 6359:4.
firing 6300:19.
first 6250:19, 6252:12, 6253:10, 6255:4, 6255:14, 6255:21, 6255:22, 6277:22, 6288:6, 6289:20, 6303:1, 6312:13, 6316:11, 6321:14, 6336:8, 6368:10, 6368:11, 6369:20, 6373:7, 6373:24, 6379:15, 6381:12, 6381:25, 6382:24, 6392:19, 6394:4.
fit 6402:24.
Five 6284:15, 6313:16, 6330:6, 6330:9, 6376:9.
five-minute 6332:8.
flag 6400:17,

6400:23.
flagged 6393:5.
flags 6254:5.
flapping 6249:19.
flexibility 6397:1, 6397:7.
flight 6326:17.
Flinn 6278:9.
Florida 6243:47, 6276:19, 6300:19, 6376:2.
Floridians 6277:1.
Flower 6260:23, 6261:11, 6261:18, 6262:2, 6262:13.
focus 6302:23, 6336:14.
folks 6322:12, 6327:10, 6358:7.
follow 6282:8, 6282:17.
follow-up 6306:1.
followed 6251:23, 6378:11.
following 6256:6, 6283:8, 6306:23, 6333:3, 6368:14, 6383:15.
follows 6254:5, 6369:16.
foment 6267:10.
footage 6383:20.
footsteps 6265:17.
force 6264:14, 6271:4, 6272:14, 6272:18, 6284:20, 6388:22.
forced 6265:19.
forcefully 6272:24, 6273:13, 6274:10.
foregoing 6406:6.
foreign 6265:22.
forensic 6281:18, 6298:17.
Forgive 6253:3, 6314:15.
form 6396:10, 6401:17.
formally 6290:2.
formation 6373:12, 6373:21.
formed 6376:4.
former 6325:15.
formulated 6395:6.
forth 6319:24, 6360:20, 6386:1.
forward 6306:9, 6341:16, 6391:24, 6392:8.
found 6329:6, 6348:8.
Foundation 6257:9, 6262:12, 6293:10, 6295:6, 6306:2, 6387:24, 6388:6.
foundational 6256:24, 6388:16.
founder 6265:16.
founding 6266:1.
four 6335:25, 6338:21, 6401:18, 6401:22, 6405:11.
fourth 6251:23, 6252:13, 6253:17, 6254:3, 6255:9, 6255:14, 6255:23, 6255:24, 6255:25.
frankly 6306:13, 6398:6, 6402:19, 6405:3.
Fraternal 6318:9.
fraud 6248:18, 6249:1, 6263:4, 6263:5, 6263:7, 6263:10, 6263:12.
fraud. 6249:8.
Friday 6390:4.
friend 6281:5, 6355:18.
friendlier 6249:14.
friends 6361:9.
front 6303:2, 6303:16, 6312:9, 6312:11, 6312:18, 6314:12, 6320:19, 6342:13, 6379:8, 6381:21, 6401:3.
FUBAR 6360:2.
fucker 6275:22.
fucking 6271:21, 6273:7, 6274:4, 6317:6.
full 6312:3, 6312:7, 6332:1, 6400:19.
functioning 6401:21.
furtherance 6303:10.
.
.
< G >.
Galil 6358:13.
game 6248:7, 6254:6, 6305:4, 6399:7.
games 6260:13.
gang 6323:4.
garage 6271:19, 6351:17.
Garden 6349:14, 6349:15, 6350:19.
Gas 6351:18, 6351:20, 6359:21.
gathered 6270:5, 6311:11, 6348:12.
gathering 6372:13.
Gator 6285:6, 6285:14.
gave 6248:2, 6248:3, 6266:13, 6266:14, 6283:8, 6284:2, 6316:10, 6318:10, 6333:3, 6333:12, 6333:15, 6333:19, 6334:3, 6334:15, 6339:1, 6339:4, 6339:8, 6339:13, 6352:6, 6352:7, 6354:2, 6354:16, 6354:20, 6355:1, 6355:4, 6355:6.
gear 6357:18.
generally 6357:18, 6403:3, 6403:12.
generate 6370:3, 6370:9, 6370:20.
generated 6370:17.
generation 6266:1.
gentleman 6356:12, 6361:4.
gentlemen 6262:25,

6369:19, 6385:16, 6396:14, 6398:11.
Georgia 6269:18.
gets 6289:25, 6293:7, 6293:19, 6399:1.
getting 6357:15, 6358:21, 6358:22, 6359:10, 6403:15, 6403:21.
girlfriend 6353:19.
gist 6403:15.
give 6263:1, 6334:24, 6354:4, 6388:11, 6399:9, 6403:23.
Given 6266:2, 6306:20, 6334:18, 6370:12, 6380:25, 6389:1, 6399:3.
gives 6397:1.
giving 6273:5, 6333:8, 6344:9, 6354:5, 6354:25, 6401:11.
glad 6304:9.
gmg@cmgpa.com 6243:49.
God 6266:2.
Google 6339:2, 6339:5, 6340:9, 6340:12, 6365:5.
gotten 6312:13.
grand 6354:14, 6355:2.
grappling 6396:6.
Great 6280:23, 6330:3.
Green 6249:16.
Greg 6355:19, 6355:22, 6356:5, 6356:11, 6356:21.
grossi@carltonfields.com 6243:41.
ground 6321:23, 6327:7, 6401:15.
grounds 6311:18, 6311:25, 6312:25, 6313:1, 6313:6, 6313:9, 6320:25, 6321:5, 6321:8, 6347:4, 6347:11, 6347:16, 6347:25, 6348:12, 6348:16, 6348:21.
groups 6263:22, 6266:10, 6291:8.
grown 6328:5.
Guard 6270:10, 6270:11.
guarding 6277:1, 6277:8, 6310:3.
guardsmen 6271:5.
guess 6247:2, 6281:15, 6283:22, 6298:12, 6302:25, 6319:25, 6382:24.
gun 6300:20, 6351:24, 6352:1, 6357:24, 6357:25.
guns 6270:20, 6298:1, 6300:19, 6351:22, 6358:1, 6358:4, 6358:8, 6358:24.
guy 6278:4, 6298:8, 6314:6, 6314:16, 6318:11, 6342:11, 6349:20, 6350:10, 6358:12, 6358:23.
guys 6275:17, 6276:22, 6276:24, 6282:15, 6297:15, 6298:7, 6298:9, 6326:25, 6345:14, 6349:21, 6350:3, 6357:13, 6357:14, 6357:15, 6358:11, 6358:19, 6358:22, 6376:15.
.
.
< H >.
half 6268:19, 6336:1, 6336:20, 6359:8, 6388:13, 6388:16.
Haller 6243:25, 6243:26.
hallerjulia@outlook.com 6243:32.
hand 6304:23, 6307:6.
handed 6375:11.
handgun 6281:3.
handle 6249:5, 6249:10, 6367:10.
Hang 6253:2, 6289:10, 6363:7.
happen 6247:21, 6307:20, 6307:25, 6308:8, 6308:9, 6309:15, 6331:6, 6335:4, 6343:2, 6367:24, 6391:18.
happened 6249:5, 6249:10, 6309:22, 6310:20, 6334:19, 6338:1, 6338:15, 6344:19, 6348:24, 6350:9, 6373:23.
happening 6376:25, 6377:6.
happens 6338:24.
happy 6249:23, 6302:15, 6310:21, 6326:23, 6384:6.
hard 6330:14, 6330:16, 6389:24.
harm 6273:19.
harp 6395:17.
hate 6250:18.
head 6338:7, 6345:17, 6345:18, 6395:17.
header 6370:13.
heading 6299:14.
headphones 6249:13, 6398:3.
headset 6337:18, 6337:19, 6337:21, 6337:22, 6337:23.
hear 6250:8, 6250:21, 6258:6, 6269:10, 6274:6, 6278:8, 6302:17, 6320:5, 6330:9, 6330:14, 6330:16, 6332:22, 6345:19, 6350:18, 6387:12.
heard 6258:8, 6267:4, 6274:4, 6308:12, 6310:2, 6310:4, 6314:15, 6314:17, 6314:18, 6326:15,

6326:21, 6327:4, 6335:4, 6335:10, 6357:5, 6374:21, 6385:17, 6394:24, 6395:2.
hearing 6283:1, 6283:7, 6283:23, 6284:3, 6320:3, 6320:8, 6332:15, 6332:18, 6353:24, 6354:2, 6354:10, 6354:20, 6367:5, 6405:18.
Hell 6297:14.
help 6278:5, 6278:12, 6278:14, 6279:9, 6279:16, 6279:20, 6279:23, 6353:13, 6353:17, 6390:25, 6396:16.
helped 6280:10, 6353:6.
helping 6279:13, 6279:17, 6282:7, 6282:18, 6353:8.
helps 6390:24, 6391:8.
hereby 6406:5.
heroin 6358:23.
high 6358:13, 6358:22.
higher 6325:23.
highlight 6265:9, 6400:21, 6400:22.
highlighted 6293:25.
hiring 6263:24.
hit 6282:22.
Hobson 6398:19, 6398:20.
hold 6331:14, 6365:16.
home 6267:19, 6352:19, 6352:20, 6352:22, 6352:23.
honestly 6264:23.
Honorable 6242:16.
hope 6304:7.
hopefully 6363:22, 6388:4, 6390:18, 6390:20.
hotel 6294:16, 6294:20, 6297:19, 6298:13, 6298:14, 6310:19, 6310:22, 6310:23, 6311:3, 6325:3, 6326:16, 6326:18, 6326:22, 6349:4, 6351:8, 6351:11, 6352:25.
hotels 6350:24.
hour 6295:2, 6295:11, 6310:17, 6310:18, 6322:9, 6342:23, 6389:12, 6389:13.
hours 6248:19, 6249:23, 6390:19, 6403:13.
House 6270:9, 6270:13, 6270:21, 6270:22, 6270:25, 6272:14, 6272:18, 6273:3, 6273:8, 6273:9, 6273:12, 6273:23.
huddle 6373:12, 6373:21, 6375:4, 6375:23, 6376:1, 6376:4, 6376:5, 6377:17, 6377:24, 6380:2, 6380:3, 6380:8, 6380:9, 6380:11, 6380:20, 6382:1, 6382:3, 6382:9, 6382:12, 6384:13, 6384:17, 6385:6.
huddled 6376:7, 6376:8.
Hughes 6242:24.
human 6293:18.
hundred 6289:3, 6290:13.
hung 6345:20.
hypothetically 6316:19.
.
.
< I >.
idea 6273:6, 6273:7, 6273:15, 6273:22, 6274:17, 6277:8, 6277:9, 6277:13, 6314:4, 6332:2, 6332:18, 6349:5.
identified 6380:20.
identifies 6404:25.
identify 6323:18, 6380:22.
illegitimate 6265:20.
images 6300:10, 6300:13, 6300:19, 6300:23.
imagine 6396:14, 6397:18, 6398:11.
imagines 6343:10.
impeaches 6302:23.
impeachment 6247:16, 6400:16, 6401:12, 6405:10.
impliedly 6396:16.
imply 6304:19.
important 6250:8, 6291:22, 6315:15, 6341:25, 6385:19, 6400:21, 6401:5.
imposed 6247:24.
impossible 6360:11.
in. 6272:2, 6300:7.
inappropriate 6304:10.
INAUDIBLE 6336:8.
inauguration 6261:24.
inbound 6324:10, 6324:12.
incapable 6265:20.
include 6297:11, 6400:10.
included 6255:1, 6376:23.
including 6249:19, 6250:5, 6264:13, 6272:19, 6318:24, 6366:12, 6388:15.
inconsistent 6386:3, 6386:11, 6399:6.
incorporate 6389:5.
incorrect 6247:6.

incredible 6306:3.
independence 6266:3.
Independent 6264:6.
independently 6302:12, 6305:11, 6305:12.
indicated 6346:22, 6371:19, 6374:5.
indicating 6371:18.
indication 6304:12, 6389:14.
indicted 6354:6.
individual 6339:22, 6341:7, 6357:17, 6360:12, 6363:1, 6365:9, 6365:12, 6395:11.
individuals 6294:15, 6304:21.
indulgence 6301:20, 6313:14, 6315:5, 6371:18.
infer 6396:9.
inflame 6304:22.
inflaming 6256:17.
information 6282:12, 6318:10, 6351:7, 6367:18, 6370:13, 6370:14, 6370:16, 6371:8, 6374:6, 6396:2.
informed 6391:24.
initial 6302:17.
inquiring 6361:10.
inside 6345:7, 6353:3, 6376:25.
instances 6328:3, 6400:21.
instead 6325:7, 6339:21, 6354:5, 6354:25, 6388:25.
instruct 6389:9, 6390:20.
instructed 6391:21, 6392:12.
instruction 6247:14, 6263:1, 6372:20, 6385:22, 6390:14, 6391:19, 6392:11, 6392:14, 6395:9.
instructions 6372:22, 6386:2, 6386:8, 6389:1, 6389:3, 6389:4, 6389:5, 6389:13, 6390:8, 6390:10, 6390:22, 6390:23, 6391:10, 6391:12, 6391:17, 6393:16.
Insurrection 6270:24, 6272:21, 6273:14, 6308:3.
Intel 6322:10, 6322:11, 6341:23.
intellect 6401:20.
intend 6396:15, 6397:17.
intended 6249:16.
intending 6396:8, 6396:12, 6398:9.
intends 6367:25.
intent 6303:11, 6305:15, 6396:11, 6401:23, 6402:2.
intention 6305:22.
internet 6340:12, 6340:14.
interrupt 6318:17, 6331:10, 6396:21.
intervening 6331:17.
interview 6249:18, 6250:12, 6371:13, 6371:15, 6378:21, 6383:17, 6400:16, 6400:19.
interviewed 6248:20.
interviewing 6370:1.
introduce 6366:14, 6367:9.
introduced 6247:15, 6251:13, 6305:3, 6396:5.
introducing 6393:10.
investigation 6274:19, 6339:12, 6370:4, 6370:7, 6371:2.
investigative 6365:19.
invokes 6272:21.
involved 6276:1, 6282:7, 6283:15, 6283:17, 6304:12, 6359:10, 6364:17.
Isaac 6249:1, 6393:4, 6401:10.
Isaacs 6243:35, 6246:19, 6246:22, 6247:9, 6248:1, 6248:18, 6249:5, 6369:1, 6392:5, 6393:2, 6394:11, 6394:14, 6394:17, 6394:22, 6395:7, 6396:8, 6400:20, 6401:4, 6402:8, 6403:13, 6403:14, 6403:17, 6405:7.
issue 6246:14, 6246:16, 6249:7, 6249:9, 6302:25, 6358:21, 6366:5, 6367:18, 6388:19, 6392:25, 6393:5, 6401:19, 6401:20, 6401:23, 6401:25, 6405:3, 6405:7.
issued 6268:24.
issues 6385:14, 6388:16, 6391:13, 6392:7, 6393:14, 6393:16.
items 6368:19.
.
.
< J >.
J. 6243:35.
jail 6350:25.
jam 6388:25.
January 6263:21, 6264:4, 6264:10, 6267:25, 6268:3, 6268:12, 6274:12, 6283:24, 6353:13, 6353:15, 6353:21,

6397:19.
Jeff 6298:8, 6349:12.
Jefferson 6243:37, 6275:19, 6275:20.
Jeffrey 6242:23.
Jeffrey.nestler@usdoj.gov 6242:31.
job 6264:18, 6267:17, 6267:18, 6267:19, 6273:17, 6301:8, 6301:9, 6326:5, 6326:7, 6359:23.
Joe 6311:14, 6344:23, 6351:6, 6351:8, 6376:3, 6377:11.
John 6242:35, 6242:36.
johnlmachado@gmail.com 6242:41.
join 6343:10.
joined 6330:24, 6331:21.
joke 6345:6, 6345:14.
joking 6345:3, 6345:14.
Joseph 6261:24.
Joshua 6343:21, 6345:11, 6364:22.
Jr 6243:17, 6244:15.
Judge 6242:17, 6250:15, 6302:16, 6387:11, 6391:1, 6395:13, 6399:25, 6403:24, 6404:18.
judicious 6305:2.
Julia 6243:25, 6243:26.
JUROR 6386:21.
.
.
< K >.
Kailua 6244:19.
Kate 6254:10.
Kathryn 6242:22.
Keep 6272:14, 6273:1, 6273:4, 6317:24, 6360:9, 6360:12, 6368:11, 6388:3, 6399:22, 6404:19.
Keeper 6246:12, 6246:21, 6247:8, 6258:10, 6266:17, 6353:11.
keeping 6400:2.
Kellye 6269:5, 6269:12, 6269:16, 6269:17, 6302:5, 6303:9, 6305:9, 6309:25, 6311:8, 6351:23, 6352:6, 6352:8, 6353:18, 6353:20.
Kentucky 6358:2, 6358:5, 6358:20.
kept 6273:16, 6274:1, 6274:3, 6355:3.
kicking 6249:19.
kind 6260:12, 6264:21, 6274:6, 6350:15, 6353:10, 6361:20, 6396:15, 6402:20.
kinds 6251:5, 6390:6.
knifes 6358:12.
known 6304:20, 6318:8.
knows 6262:16, 6296:18, 6296:20, 6326:4.
Konas 6359:21.
.
.
< L >.
L. 6242:35, 6244:6, 6244:16.
Lack 6262:12, 6358:16.
lackeys 6310:12.
Lacks 6295:6.
Ladies 6262:25, 6369:19, 6385:16, 6396:13, 6398:10.
lady 6318:8, 6339:22, 6356:25.
laid 6387:24.
lake 6396:14.
land 6286:7.
landing 6275:8.
Landon 6276:13, 6281:5, 6308:12, 6311:14, 6344:23, 6345:1, 6345:5, 6345:9, 6345:13, 6345:17, 6345:19, 6350:1, 6350:15, 6351:6, 6351:9, 6351:25.
language 6323:10, 6395:10.
largely 6390:11.
larger 6257:3.
Last 6256:4, 6260:11, 6285:7, 6287:20, 6294:3, 6316:12, 6326:15, 6326:21, 6343:6, 6369:20, 6385:17, 6389:4, 6389:14, 6390:11.
lasted 6403:12.
lasts 6330:4, 6330:6.
late 6278:10, 6308:15, 6353:13, 6353:15.
later 6250:14, 6294:11, 6326:17, 6329:2, 6338:21, 6349:21, 6352:7, 6365:5, 6389:11.
latter 6300:22.
laughed 6272:25, 6273:6, 6273:10.
Laura 6243:6.
Law 6242:36, 6243:7, 6243:18, 6243:26, 6243:44, 6244:7, 6244:16, 6322:20, 6322:22, 6323:8, 6323:9, 6323:13, 6388:14.
lawful 6358:1, 6358:4.
Lawn 6244:8.
lawyer 6354:6, 6388:22.
lay 6306:2.

laying 6388:5.
lead 6307:15.
Leader 6258:20, 6266:7, 6266:8, 6276:18, 6276:19, 6277:4, 6277:6, 6278:11, 6278:12, 6278:13, 6279:25, 6280:8, 6280:18, 6280:24, 6286:15, 6286:17, 6291:17, 6291:18, 6294:23, 6296:5, 6296:7, 6303:7, 6304:25, 6306:4, 6307:12, 6317:3, 6346:1, 6346:3.
Leaders 6259:12, 6269:7, 6275:23, 6276:10, 6301:5, 6316:6, 6321:4.
leadership 6259:15, 6266:11, 6279:17, 6356:17, 6376:3.
leading 6295:22, 6302:21, 6303:6, 6305:15, 6343:1, 6378:7.
leans 6262:7.
learn 6310:13, 6352:7, 6355:22.
learned 6294:11, 6371:8.
learning 6274:19, 6297:21.
least 6254:6, 6268:7, 6284:15, 6284:18, 6305:12, 6314:19, 6364:23, 6381:13, 6389:13, 6390:10, 6391:12, 6392:6, 6397:25, 6401:24.
leave 6265:16, 6271:12, 6272:5, 6272:10, 6320:4, 6320:9, 6348:18, 6349:8, 6351:6, 6352:16, 6367:18, 6383:1, 6389:20, 6393:1, 6393:12, 6393:20, 6405:12.
leaving 6295:20.
led 6336:4, 6342:6.
Lee 6244:15.
left 6261:16, 6267:4, 6272:3, 6272:17, 6272:19, 6276:13, 6280:22, 6294:20, 6295:14, 6308:6, 6318:20, 6335:21, 6336:3, 6342:23, 6344:1, 6344:5, 6344:14, 6347:1, 6348:21, 6349:11, 6349:12, 6351:4, 6352:9, 6352:10, 6366:6, 6367:7, 6372:10, 6382:21, 6386:24.
legitimate 6246:21.
legs 6395:3.
Leigh 6242:22.
lengthy 6371:24.
LEO 6323:18, 6359:24.
letter 6265:10, 6265:14, 6267:2.
letters 6265:12.
Libertarian 6264:6.
liberty 6265:22, 6266:2, 6266:4, 6323:23.
life 6396:25.
lifetime 6307:21, 6307:22, 6309:5.
light 6400:19, 6400:22.
likely 6259:20, 6263:9, 6308:7, 6388:9.
Likewise 6386:4.
limited 6401:2, 6404:4, 6405:8.
limiting 6247:14, 6263:1, 6372:20, 6385:22, 6400:5.
Lincoln 6275:9.
line 6248:11, 6283:22, 6306:10, 6312:9, 6312:16, 6331:15, 6333:2, 6333:22, 6336:5, 6342:6, 6343:1, 6346:23, 6347:2, 6354:13, 6361:24, 6375:21, 6378:12, 6381:13.
lines 6283:6.
link 6300:3, 6329:4.
linked 6316:10, 6318:11.
links 6251:2, 6252:23.
list 6359:8, 6359:13, 6359:18, 6360:5, 6360:15, 6368:12, 6388:4, 6392:4, 6392:6.
listed 6279:2, 6279:4.
Listen 6274:4, 6316:8.
listening 6298:5.
lists 6387:17.
literal 6401:8, 6401:25.
literally 6402:5.
little 6256:12, 6317:10, 6318:18, 6318:19, 6360:17, 6360:20, 6374:17, 6389:11, 6397:1, 6397:7, 6400:1.
live 6248:5, 6388:21, 6388:23.
LLP 6242:45.
location 6285:9, 6285:18, 6287:22, 6314:20, 6362:10, 6362:11.
locked 6271:23, 6271:25, 6272:2, 6272:4, 6272:9.
logic 6275:1.
long 6248:1, 6248:3, 6326:10, 6357:24, 6357:25, 6358:1, 6358:4, 6358:8, 6358:24, 6366:10,

6376:7, 6388:13, 6397:3, 6397:4, 6397:5, 6397:7, 6399:14, 6399:19, 6404:6.
longer 6252:24, 6318:22.
looked 6254:10, 6254:12, 6300:23, 6334:13, 6345:4, 6394:9, 6400:7.
looking 6253:9, 6260:13, 6283:13, 6283:14, 6283:25, 6284:10, 6287:19, 6292:3, 6296:10, 6297:24, 6304:10, 6328:18, 6343:2, 6344:19, 6391:18.
Looks 6261:21, 6319:24, 6389:1.
loose 6366:18.
lost 6377:13.
lot 6249:3, 6256:16, 6257:18, 6257:20, 6264:15, 6302:22, 6309:18, 6351:7.
Lots 6285:8, 6287:20.
Louisville 6256:12, 6256:16, 6257:21, 6300:4, 6300:24, 6356:22, 6357:8, 6357:14.
lunch 6251:15, 6251:22, 6391:4.
.
.
< M >.
M&P 6281:3.
M. 6243:44.
Machado 6242:35, 6242:36, 6246:7, 6247:7, 6247:10, 6368:5, 6368:10, 6368:17, 6405:19.
madame 6385:3.
MAGA 6259:7, 6274:11.
magazine 6358:11.
mail 6333:18, 6334:12, 6340:16, 6340:18.
man 6266:6, 6267:12, 6267:15, 6273:25, 6275:3, 6277:23, 6280:6, 6284:8, 6305:4, 6314:8, 6320:11, 6326:6, 6328:5, 6355:16, 6356:19.
manner 6399:10.
manpower 6297:15, 6297:18.
maps 6286:7.
March 6259:7, 6268:25, 6274:11.
mark 6256:25, 6291:25, 6294:1.
marked 6256:21, 6292:25, 6293:2, 6293:3, 6313:19.
marking 6342:22.
match 6252:19.
materials 6260:16.
matter 6247:17, 6253:21, 6406:7.
Mayor 6402:12, 6402:23.
means 6264:13, 6385:20, 6389:8, 6389:9.
meant 6313:1, 6323:13, 6339:16, 6340:23, 6360:21, 6376:20.
meet 6275:16, 6276:5, 6276:6, 6276:7, 6276:24, 6318:13, 6329:6, 6343:7, 6344:22, 6370:4, 6370:6, 6370:12, 6371:2.
meeting 6270:4, 6270:7, 6271:7, 6271:23, 6272:1, 6371:7, 6373:4, 6374:9, 6374:15, 6374:19, 6374:21, 6374:25, 6375:3, 6378:23, 6403:5.
meets 6405:10.
Mehta 6242:16.
member 6260:23, 6266:17, 6323:4.
members 6264:24, 6322:2, 6348:4, 6375:23, 6376:2, 6377:6.
Memorial 6275:9, 6275:19, 6275:20.
memorialize 6371:7, 6374:6.
memorialized 6371:15.
Mendoza 6363:25.
mention 6395:13, 6395:16.
mentioned 6307:10.
mere 6265:22.
merged 6331:1, 6331:2, 6331:3, 6331:24, 6332:19, 6334:6, 6334:9.
merges 6330:20, 6333:25.
messaging 6340:12.
met 6269:24, 6295:17, 6295:19, 6362:6, 6362:7, 6371:4.
metadata 6293:7, 6293:19, 6293:21.
metaphors 6401:8.
Michael 6244:6, 6369:14, 6369:21.
midday 6389:20.
Middle 6319:13, 6321:14, 6344:5, 6344:6, 6344:7, 6352:11.
midnight 6352:13, 6352:14.
Mike 6265:5, 6267:4, 6267:12.
milestone 6385:19.
military 6323:7, 6325:15, 6328:6, 6366:13, 6367:1, 6367:4, 6369:3, 6376:3.

militia 6270:25, 6272:22, 6273:14.
Million 6259:7, 6274:11.
mind 6335:12, 6391:4, 6392:19, 6399:21, 6401:17, 6401:18, 6401:19.
minus 6341:9.
Minuta 6342:11.
minute 6275:17, 6283:18, 6283:19, 6321:22, 6336:16, 6336:17, 6336:20, 6363:22, 6363:23, 6395:4.
missing 6342:1.
mission 6322:3, 6327:7, 6339:7.
misspoke 6343:18.
Mmm 6353:8.
MMS 6252:4.
moment 6261:2, 6277:21, 6338:15, 6344:20, 6363:21, 6364:16, 6379:21.
Monday 6389:18.
money 6354:2, 6354:4, 6354:17, 6354:19, 6354:24, 6355:2, 6355:4.
monitor 6317:1.
monitoring 6283:18, 6284:11, 6284:21, 6315:1, 6316:24, 6317:20.
montage 6363:23.
month 6374:9.
months 6260:6, 6365:5.
mood 6349:23.
Morelock 6298:8.
morning 6259:14, 6276:4, 6276:12, 6280:17, 6280:19, 6280:20, 6291:14, 6294:4, 6294:17, 6294:20, 6295:11, 6295:21, 6296:3, 6296:4, 6296:11, 6297:3, 6299:20, 6299:24, 6309:24, 6310:2, 6310:4, 6310:6, 6310:13, 6313:25, 6366:14, 6386:18, 6386:23, 6389:10, 6390:22, 6390:23.
Mostly 6246:9, 6282:23, 6329:16, 6357:14.
motion 6387:8, 6387:9, 6387:12.
motions 6387:4.
motive 6305:22.
mountain 6358:20.
Move 6273:19, 6287:13, 6290:2, 6290:21, 6301:24, 6306:4, 6306:9, 6326:9, 6326:11, 6341:16, 6346:18, 6347:19, 6366:20, 6372:9, 6379:12, 6390:18.
moved 6301:15, 6327:13, 6368:20, 6372:10.
movement 6325:12.
movie 6401:11.
moving 6391:5.
MR. BRENNWALD 6247:4, 6366:7, 6368:9, 6368:24, 6387:5, 6393:16.
MR. COOPER 6304:17, 6305:8, 6387:6, 6391:16, 6392:9, 6392:16.
MR. EDWARDS 6388:2, 6389:22.
MR. MACHADO 6246:2, 6247:2, 6247:14, 6368:19, 6387:3, 6392:17, 6392:22, 6392:24, 6404:21, 6405:14, 6405:22.
MR. SHIPLEY 6250:21, 6252:14, 6254:1, 6262:12, 6287:15, 6289:13, 6289:16, 6290:5, 6290:22, 6292:7, 6292:13, 6293:9, 6295:6, 6299:2, 6302:1, 6304:4, 6304:14, 6304:22, 6343:15, 6346:19, 6347:21, 6355:14, 6363:9, 6363:21, 6364:4, 6365:20, 6366:2, 6368:6, 6369:6, 6385:4, 6387:9.
MR. WOODWARD 6252:17, 6257:9, 6259:2, 6302:15, 6304:7, 6306:6, 6367:16, 6369:10, 6369:18, 6372:18, 6378:16, 6378:18, 6379:16, 6379:25, 6380:7, 6380:16, 6380:21, 6381:15, 6382:11, 6382:15, 6382:21, 6383:3, 6383:7, 6383:10, 6383:16, 6385:5, 6385:13, 6387:11, 6389:16, 6389:21, 6391:1.
MS. HALLER 6336:7.
multimedia 6252:6, 6254:15, 6254:16, 6254:19, 6254:21, 6254:24.
multiple 6250:25, 6260:1, 6370:6, 6370:9, 6370:12, 6383:17.
Myself 6246:8, 6249:25, 6250:3, 6254:14, 6376:23.
.
.
< N >.
N. 6369:14, 6369:21.
Nah 6308:8, 6349:6, 6353:8.
name 6369:20, 6369:21, 6371:20,

6381:18, 6381:20.
named 6269:22, 6282:6, 6349:20, 6355:18.
names 6277:9, 6371:24, 6381:17.
Nancy 6271:5.
narrative 6248:3.
National 6270:10, 6270:11, 6271:5, 6355:24, 6356:1, 6356:14.
NC 6285:8, 6285:18, 6287:21.
near 6275:8, 6321:4, 6321:8.
nearly 6330:6.
necessary 6264:13, 6405:16.
need 6246:22, 6250:18, 6272:7, 6284:22, 6295:24, 6296:1, 6296:2, 6297:18, 6315:18, 6322:2, 6326:6, 6326:10, 6327:6, 6350:5, 6354:17, 6374:17, 6380:23, 6380:24, 6390:9, 6390:13, 6391:11, 6395:3, 6395:13, 6395:18, 6404:2.
needed 6270:8, 6270:20, 6270:24, 6272:13, 6296:12, 6296:15, 6404:7.
needs 6326:11, 6387:24, 6391:24.
Negative 6269:5.
neither 6328:3, 6348:21.
Nestler 6242:23, 6373:3, 6378:15, 6378:19, 6378:22, 6379:25, 6381:7, 6382:6, 6382:8, 6383:20, 6400:12, 6402:15, 6404:17, 6405:17.
network 6340:19.
neutral 6387:19.
nevertheless 6370:9.
new 6276:24, 6370:14, 6370:16, 6371:7, 6374:6.
news 6377:4.
Next 6248:24, 6253:15, 6265:9, 6281:20, 6281:21, 6286:8, 6308:18, 6309:8, 6309:11, 6309:14, 6309:17, 6314:13, 6327:4, 6332:14, 6333:24, 6344:4, 6344:6, 6344:7, 6350:16, 6350:19, 6354:14, 6364:10, 6388:25, 6389:25, 6390:5.
night 6285:7, 6287:20, 6294:17, 6352:11, 6366:2, 6389:4.
No. 6242:7, 6249:2, 6257:6, 6270:22, 6273:4, 6278:12, 6278:14, 6283:19, 6295:23, 6298:2, 6301:7, 6320:18, 6323:11, 6326:7, 6337:18, 6350:23, 6351:24, 6354:24, 6362:11, 6365:4, 6367:3, 6398:25.
Nobody 6271:10, 6276:8, 6313:12, 6314:5, 6327:13, 6327:19, 6362:15.
nod 6404:1.
None 6255:10, 6367:20.
noon 6299:25.
north 6373:13, 6373:25, 6374:25.
Northeast 6343:25, 6344:7.
northwest 6342:22, 6379:1.
note 6291:22, 6302:13, 6307:6.
noted 6371:16.
notes 6252:23.
Nothing 6258:13, 6266:25, 6268:10, 6278:1, 6303:3, 6359:18, 6366:16, 6372:18.
notifications 6284:6, 6284:12, 6318:1.
November 6263:21, 6264:3, 6264:4, 6264:10, 6267:24, 6268:3, 6268:24, 6269:20, 6274:11, 6307:16, 6308:15.
number 6261:15, 6288:24, 6291:2, 6299:7, 6305:6, 6316:10, 6334:18, 6340:16, 6340:17, 6340:19, 6379:12, 6379:17, 6398:4.
numbering 6252:8.
numbers 6252:2, 6381:17.
NW 6242:27, 6242:37, 6243:8, 6243:19, 6243:27, 6243:37, 6244:26.
.
.
< O >.
o'clock 6388:25.
Oak 6244:8.
object 6292:13, 6293:9, 6393:25.
objected 6306:13.
objecting 6246:9.
Objection 6246:8, 6246:15, 6257:4, 6257:9, 6259:2, 6262:12, 6262:15, 6287:15, 6289:12, 6289:15, 6289:23, 6289:25, 6290:5, 6290:6, 6290:22, 6292:7, 6292:10, 6295:6, 6299:3, 6302:1, 6306:14,

6306:24, 6343:15, 6346:19, 6347:21, 6363:6, 6363:8, 6367:5, 6379:14.
objections 6257:10.
observations 6248:10, 6403:4, 6403:7, 6403:11.
observed 6248:4, 6405:9.
obvious 6356:6, 6364:25.
Obviously 6380:7, 6389:6.
offered 6394:19.
Office 6242:26, 6242:36, 6243:7, 6243:44, 6261:19, 6373:5.
officer 6323:13, 6323:14, 6323:17, 6323:18, 6363:25, 6364:18.
officers 6282:12, 6312:10, 6312:12, 6312:17, 6312:19, 6323:3, 6323:15, 6362:4.
Offices 6243:26, 6244:16.
Official 6244:25, 6406:11.
often 6371:23.
Ohio 6246:12, 6246:20, 6359:24, 6405:1, 6405:13, 6405:24.
oil 6359:21.
OK 6285:6, 6285:14.
old 6264:24, 6275:22, 6405:1, 6405:24.
older 6246:11, 6246:20, 6405:12.
Olive 6349:14, 6349:15, 6350:19.
once 6258:2, 6271:1, 6272:24, 6282:6, 6282:18, 6294:11, 6331:13.
ones 6359:1, 6359:5.
OP 6258:20, 6259:12, 6259:15, 6275:24, 6275:25, 6277:17, 6278:18, 6278:25, 6281:10, 6282:18, 6285:7, 6287:9, 6288:10, 6288:23, 6290:9, 6291:4, 6295:21, 6295:24, 6298:15, 6299:22, 6321:22, 6322:10, 6322:11, 6341:23.
open 6249:20, 6256:6, 6265:10, 6265:14, 6267:1, 6291:24, 6292:24, 6293:24, 6296:1, 6306:23, 6317:18, 6358:6, 6363:5, 6367:5, 6368:14, 6383:15, 6389:8, 6401:9.
opened 6317:5, 6380:25, 6382:22, 6399:1.
operate 6313:8.
operated 6248:18.
operates 6293:5, 6293:6.
operating 6247:23, 6306:11.
Operation 6256:12, 6257:21, 6258:10, 6258:14, 6269:3, 6269:8, 6269:10, 6269:21, 6274:13, 6275:24, 6276:5, 6276:10, 6276:23, 6277:18, 6278:11, 6280:9, 6282:16, 6284:25, 6294:14, 6295:22, 6298:3, 6298:6, 6301:11, 6317:12, 6346:3, 6348:25, 6353:11.
operational 6296:11.
Operations 6266:7, 6266:8, 6268:12, 6276:18, 6277:4, 6277:6, 6280:18, 6280:24, 6286:15, 6291:18, 6294:23, 6296:5, 6303:13, 6307:12, 6308:15, 6309:10, 6312:22, 6317:2, 6346:1, 6346:3, 6355:25.
operative 6310:11.
opine 6394:6, 6394:7, 6394:8.
opinion 6394:12, 6394:13, 6394:14, 6403:10.
opinions 6403:12.
opportunity 6371:2, 6385:21, 6386:17, 6391:13, 6399:16.
opposite 6362:5.
opposition 6264:13.
Ops 6269:7, 6317:13.
option 6248:24.
order 6368:8, 6368:13, 6405:2.
orders 6266:13, 6266:14.
Oregon 6388:22.
organization 6266:18, 6355:23.
organizational 6345:23.
organize 6278:14.
organized 6274:12, 6274:15, 6277:11.
orient 6311:18.
original 6252:2, 6310:6, 6381:18.
originally 6252:8.
Orlando 6243:47.
others 6255:17, 6289:24, 6291:8, 6307:5, 6360:16.
otherwise 6391:21, 6404:11.
otherwise. 6392:12.
ought 6250:4.
outraged 6308:4.
outside 6291:7, 6291:9, 6373:8.

overall 6278:25, 6279:7, 6353:10.
overhead 6382:13.
overran 6270:22.
overruled 6257:10, 6262:16, 6292:11, 6292:15, 6293:12, 6295:9.
overseas 6273:22.
overthrow 6273:23.
owed 6354:4, 6355:6.
own 6250:5, 6250:6, 6252:22, 6266:12, 6266:18, 6266:20, 6267:13, 6349:24, 6350:14, 6403:9.
.
.
< P >.
P-a-l-i-a-n 6369:22.
P. 6242:16.
pack 6351:13.
packed 6351:12, 6351:15.
pages 6251:22, 6286:1, 6286:6, 6366:8, 6367:8, 6368:1.
paid 6267:17, 6269:17, 6278:4, 6307:14, 6354:15.
Pandora 6249:20.
parameters 6247:24.
paraphrase 6303:25.
Pardon 6372:5, 6379:3.
Park 6243:19.
parked 6351:16, 6351:17.
Parker 6242:10, 6242:35, 6242:44, 6368:9, 6368:21, 6368:23, 6368:24, 6380:14, 6381:9, 6381:14, 6382:3, 6387:3.
Parkers 6246:11.
parking 6256:16, 6257:17, 6257:20, 6351:7, 6351:16.
parrot 6254:22.
parsed 6255:3.
parses 6254:15.
part 6246:24, 6254:18, 6259:22, 6262:20, 6265:9, 6267:7, 6267:9, 6269:3, 6274:14, 6281:5, 6281:8, 6300:22, 6305:18, 6305:20, 6306:19, 6322:21, 6332:2, 6377:5, 6404:23.
participated 6267:25, 6268:4, 6268:7, 6268:11.
particular 6365:8, 6365:12.
particularly 6390:17.
parts 6353:10.
party 6251:23, 6335:14.
passing 6402:1.
past 6312:13, 6325:13, 6343:4.
patch 6257:24.
patches 6246:12, 6246:13, 6246:21, 6246:25, 6247:8, 6405:4, 6405:5, 6405:9, 6405:12, 6405:21, 6405:23.
patchy 6330:12, 6330:13.
patriot 6323:11, 6323:12, 6323:14, 6324:1.
patriots 6322:13, 6322:16, 6322:22, 6322:24, 6323:1, 6323:6, 6323:10, 6323:20, 6323:21, 6323:22, 6323:23, 6323:24, 6324:1, 6324:3, 6341:20, 6341:21.
Paul 6288:13.
pause 6364:1, 6376:24.
pawnshops 6357:16.
pay 6264:5, 6317:19, 6354:5, 6354:13.
paycheck 6266:6, 6274:1, 6274:2.
paying 6264:7, 6264:9, 6264:18, 6264:19, 6264:20, 6286:25, 6295:23.
payment 6353:22.
pays 6264:18, 6265:1.
pcooper@petercooperlaw.com 6243:13.
Pelosi 6271:5.
Pennsylvania 6242:46, 6243:27.
pepper 6320:11.
perceptions 6250:6.
perfectly 6397:24.
perhaps 6247:14, 6293:8, 6389:11, 6402:1.
period 6255:11, 6264:9, 6264:12, 6267:24, 6268:3, 6268:7, 6303:6, 6303:8, 6307:16, 6336:24, 6336:25, 6348:11.
permit 6257:11, 6313:8, 6313:22, 6394:13, 6399:1, 6403:9.
permits 6398:13.
permitted 6313:7, 6394:21.
permitting 6402:4.
person 6257:25, 6274:4, 6303:12, 6304:11, 6304:12, 6318:14, 6320:19, 6335:18, 6337:16, 6339:15, 6339:16, 6346:23, 6347:1, 6364:2, 6370:12.
personal 6264:16.
Personally 6337:18.

Peter 6243:6, 6243:7.
phase 6283:11, 6283:13, 6283:16, 6284:1.
phones 6271:9, 6271:11, 6271:13, 6272:5, 6293:7, 6293:15, 6293:18, 6293:19.
phonetic 6388:14.
photo 6321:20.
photograph 6342:19, 6346:15, 6347:15.
phrase 6379:8.
physically 6273:12, 6318:1.
picked 6253:22.
picks 6329:21.
picture 6314:21, 6319:12, 6319:14, 6320:18, 6320:24, 6321:14, 6321:15, 6336:6, 6339:21, 6341:9, 6361:5.
pictures 6247:4, 6263:25, 6264:1, 6298:6, 6322:12, 6337:21, 6339:17, 6361:3, 6361:7, 6361:21.
piece 6260:20, 6337:8, 6337:13, 6338:7.
piling 6363:18.
Pine 6243:46.
pissed 6309:19, 6323:23.
place 6275:18, 6316:14, 6373:4, 6374:12, 6382:1, 6382:8, 6384:12.
places 6352:22.
Plaintiff 6242:7.
plan 6269:11, 6271:1, 6273:1, 6274:14, 6274:16, 6274:20, 6284:23, 6294:13, 6296:19, 6296:20, 6297:10, 6297:11, 6297:12, 6297:13, 6297:20, 6298:11, 6302:7, 6302:9, 6310:6, 6389:2, 6391:8.
plane 6388:22.
planned 6298:2.
planning 6246:16, 6282:8, 6282:18, 6283:11, 6283:13, 6283:16, 6283:17, 6283:24, 6284:1, 6284:20, 6285:24, 6286:19, 6286:20.
plans 6389:23, 6390:1, 6390:6.
play 6246:3, 6248:14, 6249:23, 6256:25, 6258:2, 6300:16, 6326:8, 6335:24, 6346:7, 6358:12, 6379:17, 6380:23, 6403:6, 6404:7.
played 6246:8, 6246:15, 6247:9, 6247:11, 6336:8, 6373:24.
played. 6258:4, 6300:17.
playing 6250:11, 6260:13.
plays 6392:13.
plaza 6311:11, 6346:15, 6348:5, 6379:8, 6381:21.
plea 6388:24, 6393:1.
pleading 6319:22.
pleadings 6396:4.
PLLC 6244:7.
pocketed 6355:2.
points 6275:12, 6275:13, 6275:15, 6276:2, 6276:6, 6277:15, 6277:16, 6277:19, 6277:20, 6286:3, 6286:7, 6401:18.
police 6282:12, 6312:10, 6312:11, 6312:16, 6323:3, 6323:13, 6323:14, 6323:15, 6323:17, 6350:23, 6361:13, 6361:24, 6362:4, 6362:10, 6362:14, 6362:21, 6363:17, 6364:17.
political 6262:8, 6310:10.
politicians 6261:19, 6264:19, 6264:21, 6272:19, 6276:23, 6277:1, 6277:9, 6277:10.
politics 6263:17.
pond 6276:16.
pop 6292:24.
portion 6246:9, 6246:15, 6246:24, 6252:7, 6311:20, 6375:15, 6405:9.
portions 6400:15.
portrayed 6252:10.
position 6398:12.
possess 6358:1.
possessing 6357:18.
possession 6358:8.
possibly 6337:7, 6338:6, 6343:6.
potential 6381:3.
potentially 6366:24.
pound 6356:12.
power 6271:5, 6272:15.
preceding 6252:25.
precise 6344:20.
preclude 6303:24.
precluded 6248:9.
predominantly 6262:21.
prefer 6248:8, 6379:16.
prejudicial 6305:24.
premise 6262:13.
prepare 6393:2, 6393:10.
prepared 6270:9,

6272:13, 6275:15, 6307:1, 6387:18.
preparing 6254:13.
presence 6356:25.
present 6248:10, 6374:9, 6386:17, 6386:19.
presentation 6397:14.
presented 6367:4, 6400:5, 6401:6.
presents 6395:21, 6396:22.
preserved 6387:14.
President 6265:11, 6265:15, 6265:25, 6267:10, 6269:1, 6271:4, 6272:15, 6273:24, 6307:25, 6355:24, 6356:1, 6356:3, 6356:14, 6377:12.
presidential 6263:4.
pressed 6398:5.
presumably 6246:10, 6400:6.
presume 6302:5.
pretty 6282:16, 6337:9, 6370:3.
prevented 6306:13.
previously 6332:15, 6369:15, 6372:1, 6387:4, 6387:9, 6391:21, 6392:12.
principal 6326:11, 6346:4.
printouts 6360:16.
prior 6258:24, 6260:2, 6280:9, 6283:1, 6283:7, 6283:23, 6284:2, 6284:23, 6339:19, 6342:24, 6353:24, 6354:2, 6354:10, 6354:20, 6366:5, 6374:9, 6386:3, 6386:4, 6386:7, 6386:9, 6386:10, 6386:13, 6404:11.
Probably 6259:20, 6261:20, 6268:6, 6268:9, 6275:25, 6295:19, 6310:4, 6310:16, 6352:14, 6388:13, 6389:13, 6391:6, 6391:7.
probative 6305:23.
problem 6246:18, 6246:23, 6252:17, 6252:18, 6253:19, 6304:17, 6394:1, 6405:24, 6405:25.
problems 6357:1.
procedure 6403:3.
proceed 6368:5, 6400:15.
proceeding 6375:9, 6375:15, 6395:23.
Proceedings 6242:15, 6256:6, 6306:23, 6368:14, 6383:15, 6406:3, 6406:7.
processes 6292:21.
processing 6401:22.
procuring 6288:14.
produced 6252:19, 6252:21.
proffer 6249:12, 6249:15, 6393:2, 6393:4, 6393:5, 6393:7, 6394:11, 6394:15, 6394:22, 6395:20, 6397:12, 6398:13, 6398:15, 6399:5, 6403:3, 6403:22, 6403:23, 6404:5.
proffered 6401:5.
program 6251:18, 6252:3, 6287:24, 6292:21, 6292:23, 6293:2.
programs 6251:19.
proof 6309:19.
proper 6306:21, 6379:18.
proposed 6388:20, 6394:3.
protect 6269:17, 6326:7.
protectant 6345:24.
protectee 6325:1, 6325:8, 6325:10, 6326:2.
protectees 6316:3, 6316:7.
protecting 6303:12, 6316:18, 6317:3, 6318:15, 6347:10.
protection 6269:5, 6269:11, 6277:11, 6278:14, 6280:11, 6313:2, 6345:25.
protesters 6362:20.
Proud 6322:22.
provide 6255:17, 6372:22, 6386:8, 6394:14, 6403:9.
provided 6260:16, 6370:14, 6381:18, 6396:2.
providing 6263:18, 6263:22.
proviso 6369:2.
public 6313:7, 6358:4.
publish 6257:16, 6259:4, 6261:8, 6287:18, 6290:25, 6298:25, 6299:5, 6319:9, 6343:17, 6347:23, 6372:2, 6383:22.
published 6289:25, 6384:23.
pull 6339:23, 6340:1, 6382:11.
pulled 6351:20, 6352:25.
pun 6249:15.
punch 6248:11, 6296:2.
punched 6339:20.
puppet 6265:22, 6266:3.
pure 6253:22.
purely 6276:7, 6279:23.
purpose 6247:16,

6303:22, 6304:22.
pursuant 6258:24.
push 6357:15, 6388:21.
pushing 6275:22.
puts 6303:3, 6317:21.
putting 6269:2, 6278:24, 6282:12, 6282:25, 6296:17, 6296:25, 6303:2.
.
.
< Q >.
Qrfs 6291:7.
QRM 6270:14.
Qs 6368:2, 6375:18.
questioner 6375:18.
questioning 6293:10.
questions 6248:2, 6248:13, 6249:25, 6250:1, 6250:3, 6250:5, 6256:24, 6303:18, 6306:1, 6316:4, 6333:3, 6355:10, 6355:15, 6359:12, 6365:20, 6378:14, 6380:14, 6380:18, 6403:13, 6404:6.
quick 6272:13, 6284:20, 6351:6, 6356:10, 6391:17, 6391:19.
quickly 6351:5.
quite 6247:20, 6350:1, 6398:5.
quote 6272:23, 6376:20.
.
.
< R >.
R. 6242:10.
racist 6262:9, 6262:21.
racks 6312:17, 6312:18.
railing 6319:19, 6361:4.
Rakoczy 6242:22, 6253:16, 6254:2, 6257:6, 6257:17, 6261:4, 6262:23, 6298:23, 6302:4, 6313:17, 6318:17, 6318:22, 6319:1, 6319:5, 6336:10, 6343:17, 6346:18, 6347:19, 6355:11, 6359:12, 6360:15, 6360:21, 6364:9.
rally 6269:18, 6275:12, 6275:13, 6275:14, 6275:17, 6276:2, 6276:3, 6276:6, 6276:7, 6276:8, 6276:11, 6276:12, 6276:16, 6276:20, 6276:21, 6277:15, 6277:16, 6277:19, 6277:20, 6286:3, 6286:7, 6307:3.
ran 6325:12.
range 6300:20.
rangers 6358:20.
rather 6390:22, 6390:23.
reach 6296:13, 6316:21.
reaction 6272:14, 6284:20.
read 6247:18, 6265:12, 6283:22, 6287:25, 6288:2, 6288:17, 6289:6, 6290:16, 6291:12, 6291:25, 6292:1, 6292:2, 6292:12, 6293:1, 6293:3, 6293:22, 6293:23, 6294:1, 6296:14, 6299:16, 6306:15, 6360:17, 6360:25, 6366:8, 6368:1, 6368:2, 6375:18, 6382:6, 6389:13.
reading 6280:5, 6399:5.
ready 6246:2, 6270:24, 6272:23, 6273:2, 6299:24, 6300:2, 6300:8, 6301:2, 6301:15, 6357:15, 6367:16.
real 6356:10, 6361:24.
realize 6279:8, 6359:16, 6360:7.
Really 6247:9, 6250:10, 6260:4, 6260:18, 6285:23, 6311:10, 6317:9, 6326:24, 6380:23, 6384:4, 6394:11, 6401:18, 6402:2.
reason 6247:15, 6251:25, 6252:2, 6305:15, 6365:11, 6365:14, 6396:7, 6398:7.
reasons 6387:4.
rebut 6401:6.
rebuts 6305:7.
rebuttal 6304:2, 6306:5, 6386:17, 6386:19, 6387:25, 6388:8, 6391:23, 6392:1, 6394:21, 6396:5.
recall 6260:3, 6260:24, 6285:6, 6371:12, 6372:3, 6383:23, 6384:4, 6384:22, 6384:23, 6385:20.
receipt 6287:25, 6288:2, 6288:17, 6289:6, 6290:16, 6291:12, 6299:16.
receipts 6292:1.
received 6310:21, 6353:21.
receiver 6281:7, 6281:8.
receiving 6328:12.
recent 6376:3.
recess 6319:2.
recognizance

6266:13.
recognize 6257:17, 6347:15, 6359:18, 6359:20, 6364:2.
recollection 6372:16, 6374:4, 6402:18.
Record 6257:14, 6281:22, 6282:1, 6287:4, 6287:13, 6288:22, 6290:3, 6290:20, 6290:21, 6298:22, 6368:1, 6369:25, 6378:12, 6380:3, 6380:5, 6380:9, 6384:7, 6387:2, 6387:11, 6406:7.
record. 6250:20, 6302:3, 6365:24, 6379:22.
recorded 6380:7, 6381:21.
recording 6397:4.
records 6287:25, 6288:5, 6288:6, 6288:8, 6290:2, 6327:25, 6330:19, 6331:20, 6364:23, 6366:13, 6367:1, 6367:2, 6367:4, 6369:3, 6381:16.
redact 6366:12, 6405:11.
redactions 6366:18.
Redden 6244:6, 6244:7.
REDIRECT 6318:24, 6355:12, 6355:13, 6378:17, 6379:19.
reference 6304:23, 6360:17, 6405:21.
referenced 6384:8, 6394:10, 6402:1.
references 6382:12.
referencing 6252:22.
referred 6336:4.
referring 6405:6.
reflect 6253:16, 6254:7.
reflects 6293:22, 6380:13, 6380:17, 6382:5.
refresher 6374:18.
regard 6246:17, 6365:8.
regarding 6258:25, 6396:4.
regardless 6273:8, 6403:20.
regime 6265:20, 6266:3.
regroup 6322:2, 6327:6, 6327:13.
regrouped 6348:15.
regular 6340:19, 6356:6.
related 6283:1, 6322:11, 6332:15, 6353:24, 6375:9.
relating 6399:5.
relationship 6306:2.
relevant 6251:10, 6303:11, 6303:20, 6305:4, 6383:14, 6401:23.
remind 6369:19, 6387:23.
reminder 6387:16, 6387:17.
remote 6374:15.
remotely 6345:16, 6374:16.
remove 6264:20, 6270:13, 6271:4, 6272:17, 6272:24, 6273:13, 6274:10, 6404:23, 6405:2.
removed 6405:15.
renew 6387:3, 6387:9, 6387:12.
repeat 6295:10, 6385:25.
rephrase 6363:8.
report 6250:23, 6252:1, 6252:7, 6252:22, 6254:10, 6254:12, 6254:18, 6281:18, 6287:6, 6298:17, 6384:5, 6384:8, 6394:6, 6394:9, 6394:10.
report. 6370:15.
reported 6311:2.
Reporter 6244:24, 6244:25, 6308:22, 6369:20, 6385:3, 6406:11.
representing 6265:20.
republic 6350:5.
Republican 6264:6.
request 6247:1, 6389:5, 6403:18.
required 6367:6.
requisite 6396:11, 6401:17, 6401:18.
reserve 6257:7, 6387:7.
reset 6261:20.
resolved 6247:20, 6367:24.
resolves 6392:6.
respect 6248:14, 6385:24, 6386:1, 6391:17, 6394:8, 6397:13.
Respectfully 6304:24.
respond 6246:2, 6292:2, 6293:1.
responded 6327:13, 6327:15, 6327:19.
responding 6251:4, 6251:9, 6252:15, 6252:16, 6253:1, 6253:21, 6255:19.
response 6288:13, 6381:4.
response. 6341:14.
responses 6395:12.
responsible 6304:7, 6347:10.
rest 6246:16, 6246:18, 6366:15, 6366:17, 6367:14, 6368:8, 6369:2, 6369:6, 6385:15.
rested 6369:1,

6385:18, 6386:16.
restricted 6313:7, 6320:25, 6321:10, 6347:6, 6347:9, 6347:12.
rests 6368:21, 6368:24.
results 6264:14, 6309:19.
resume 6318:19.
retainer 6354:6.
revert 6394:18.
review 6251:15, 6254:7.
reviewed 6374:15.
reviewing 6260:10.
revolution 6267:10, 6273:25, 6277:23.
revolutionary 6273:21.
rhetoric 6307:11.
rid 6328:7.
riding 6296:16.
rifle 6351:24, 6357:19, 6357:20.
rifles 6304:23, 6307:6, 6357:23.
rigged 6263:14, 6263:15, 6263:16.
right-hand 6355:16, 6356:19.
rights 6405:20.
rings 6333:18.
riot 6312:1, 6312:5, 6324:18, 6325:7, 6326:2, 6326:19, 6326:25, 6345:6, 6348:16.
rioter 6319:19.
Rioters 6319:22, 6320:4, 6320:9, 6321:17, 6323:21, 6323:22, 6324:2, 6341:20, 6361:13, 6362:20.
rioting 6324:2.
riots 6345:21.
risk 6399:11.
river 6297:19.
Road 6243:19.
Rob 6342:11.
Robertson 6242:45.
rode 6309:24.
Roger 6277:11, 6310:3, 6310:7, 6310:10, 6310:13, 6310:20, 6315:24, 6324:23, 6325:1, 6326:7, 6326:8, 6326:13, 6326:15, 6326:16, 6348:22, 6348:24, 6349:3.
rogue 6346:10.
role 6306:2, 6355:22.
room 6249:14, 6324:24, 6325:3, 6325:10, 6352:25, 6398:4.
ROSSI 6243:35, 6246:5, 6393:20, 6393:21, 6393:22, 6394:23, 6395:5, 6396:7, 6396:21, 6400:6, 6400:12, 6400:17, 6400:22, 6400:25.
roughly 6254:12, 6359:8.
Rouhi 6262:23, 6269:13, 6284:14, 6288:7, 6301:14, 6319:11, 6342:4, 6347:14.
rounds 6281:4.
row 6253:20.
Rowley 6264:1.
rows 6320:16, 6320:17.
RPR 6244:24, 6406:5.
Rubicon 6402:10.
Rule 6336:7, 6366:22, 6367:4, 6387:1, 6387:7, 6387:12.
ruled 6401:14.
ruling 6367:2.
run 6289:21, 6346:11.
.
.
< S >.
S. 6242:23, 6243:29.
safe 6326:9.
sake 6316:16.
Sandra 6242:10, 6242:35, 6368:21, 6380:14, 6381:9, 6382:3, 6387:3.
sat 6382:22.
save 6350:5.
saw 6285:17, 6285:22, 6286:10, 6286:11, 6286:13, 6289:11, 6294:3, 6311:25, 6322:18, 6325:19, 6344:16, 6363:3, 6385:25, 6395:11, 6395:12, 6396:12, 6396:13, 6397:18.
says 6254:4, 6288:2, 6291:6, 6293:21, 6299:10, 6299:13, 6299:16, 6303:3, 6303:17, 6304:14, 6309:8, 6326:5, 6329:11, 6331:25, 6337:6, 6338:3, 6341:21, 6344:5, 6364:22, 6370:14, 6391:20, 6392:11, 6395:20, 6396:22, 6405:11.
scale 6312:3, 6312:7, 6321:17.
scaling 6319:19, 6322:18, 6323:19.
scared 6377:16.
scenarios 6291:9.
scene 6320:16, 6320:17, 6321:12.
schedule 6389:2.
scope 6404:3.
scoped 6252:20.
scraped 6284:22, 6298:3.
screaming 6330:9.
screen 6257:13, 6258:19, 6261:1,

6281:16, 6283:4, 6301:23, 6319:12, 6321:14.
screenshots 6251:17, 6252:10.
scroll 6292:25, 6293:1, 6293:4, 6293:25.
scuffle 6362:4.
scuffling 6312:11, 6320:1.
SE 6242:46.
sea 6286:8.
seams 6304:2.
searched 6338:25.
seat 6250:18, 6319:4, 6386:25, 6394:23, 6395:1.
Second 6253:13, 6253:25, 6262:10, 6265:10, 6267:1, 6276:9, 6279:7, 6279:25, 6303:1, 6328:1, 6330:20, 6336:16, 6336:17, 6358:17, 6375:6, 6376:24, 6381:8, 6382:11, 6382:12.
section 6394:12.
secure 6265:22, 6326:9.
seeing 6254:2, 6303:16, 6308:11, 6316:11, 6319:16, 6320:11, 6321:17, 6321:25, 6345:6.
seek 6259:1, 6259:4, 6261:4, 6290:20, 6298:24, 6301:24, 6304:1, 6306:4, 6343:13, 6379:12.
seeking 6256:24, 6302:19, 6379:23.
seem 6247:8, 6315:15, 6331:20, 6340:10, 6381:13, 6398:2.
seemingly 6394:13.
seems 6341:25, 6397:19, 6398:16, 6401:16.
Seen 6249:12, 6260:2, 6260:4, 6260:18, 6260:20, 6263:2, 6281:23, 6285:19, 6285:21, 6286:12, 6294:6, 6297:1, 6300:9, 6330:19, 6337:21, 6351:24, 6362:18, 6390:16, 6398:1, 6400:6.
sees 6323:17.
segregates 6252:3, 6252:6.
seized 6260:19.
self-employed 6304:9.
send 6286:3, 6291:23, 6291:24, 6296:1, 6296:2, 6297:4, 6337:5, 6337:7, 6337:13, 6337:17, 6338:2, 6338:6, 6338:7, 6338:18, 6340:19, 6388:4, 6393:17.
sending 6296:10, 6322:12, 6328:12, 6337:20.
sense 6305:11, 6318:22, 6388:11.
sentiment 6304:1.
sentiments 6302:9, 6302:21, 6306:4.
separate 6322:9.
separated 6376:15, 6376:16.
September 6257:22.
sequencing 6253:4.
sequential 6250:24, 6251:21.
serial 6381:17.
serialized 6370:20, 6370:22, 6370:24.
served 6274:1.
serving 6353:6.
Session 6242:13, 6248:1, 6248:2, 6249:12, 6394:11, 6394:15, 6394:17, 6398:15.
set 6249:13, 6276:11, 6279:23, 6280:10, 6282:13, 6289:2, 6290:12, 6313:1, 6313:10, 6313:12, 6403:3.
sets 6312:13, 6341:25.
seven 6313:15, 6333:23.
Several 6259:23, 6289:21, 6291:7, 6303:13, 6355:15, 6359:12, 6371:3, 6371:12, 6371:21, 6403:14.
severed 6302:15.
sfbrennwald@cs.com 6242:49.
share 6374:19.
shield 6281:3.
SHIPLEY 6244:15, 6244:17, 6250:23, 6251:15, 6252:23, 6253:19, 6257:7, 6289:19, 6299:1, 6302:17, 6303:14, 6355:12, 6356:9, 6356:11, 6365:25, 6368:7, 6369:4, 6385:1.
Shirt 6260:23, 6261:11, 6261:18, 6262:2, 6262:13.
Shit 6263:17, 6265:5, 6295:15, 6345:4, 6345:15.
shooting 6359:24.
shoots 6281:3.
shortly 6280:14, 6295:4, 6295:12, 6295:17, 6318:19.
shot 6350:11.
shouldn't 6390:17.
Show 6247:4, 6252:13, 6255:14, 6290:7, 6292:1, 6301:22, 6302:20, 6331:20, 6357:15, 6370:24, 6372:1, 6374:24,

6379:1, 6379:4, 6380:8, 6382:24, 6383:3, 6383:11, 6383:13, 6384:6, 6400:12.
showed 6251:22, 6276:8, 6298:4, 6360:15, 6373:11, 6373:12, 6373:18, 6378:20, 6378:22, 6379:7, 6380:1, 6382:2, 6382:3, 6383:16, 6384:22.
showing 6248:23, 6253:6, 6253:13, 6285:4, 6300:3, 6303:2, 6319:12, 6371:12, 6372:3, 6372:12, 6381:15, 6383:23, 6384:7, 6384:23, 6385:5.
shown 6289:15, 6356:22, 6357:17, 6371:16, 6371:19, 6371:22, 6373:7, 6380:23, 6381:8, 6381:9, 6381:16, 6381:20, 6381:24, 6382:14, 6382:16, 6382:18, 6382:21, 6382:25, 6383:5, 6383:13.
shows 6398:10.
SHTF 6289:3, 6290:13.
sick 6280:14.
side 6254:4, 6313:19, 6329:4, 6342:22, 6342:23, 6361:18, 6362:5, 6362:14, 6362:17, 6362:19, 6362:21, 6363:13, 6373:13, 6373:19, 6373:25, 6374:25, 6375:1, 6379:1, 6379:2, 6379:4, 6380:15, 6382:3, 6382:18, 6382:19, 6383:21, 6402:4.
Siekerman 6278:12, 6278:25, 6279:4, 6279:9, 6279:14, 6279:16, 6279:18, 6279:21, 6279:23, 6279:25, 6280:5, 6280:8, 6280:10, 6280:12, 6280:14, 6282:7, 6282:10, 6282:14, 6282:19, 6282:24, 6284:7, 6286:17, 6286:18, 6317:17.
signs 6249:19.
silently 6330:24.
similar 6249:24, 6345:10, 6350:9.
simply 6279:19, 6305:21, 6404:25.
single 6260:20, 6315:1, 6325:12.
sir 6319:1, 6324:22, 6365:21, 6372:17, 6375:20, 6375:25, 6377:8, 6380:16, 6383:19, 6385:8, 6385:9, 6386:20, 6387:13, 6388:2.
sites 6275:8.
sits 6390:1.
sitting 6260:10, 6400:17.
situation 6256:17, 6289:1, 6290:11.
Six 6281:3, 6313:15, 6319:7, 6319:8, 6321:12, 6397:25, 6400:5, 6400:6, 6400:15, 6403:2, 6404:23.
skills 6365:19.
Slide 6255:14, 6337:4.
small 6249:13, 6398:4, 6401:2.
smaller 6270:16.
SMS 6252:3.
snorting 6358:23.
so-and-so 6335:16.
so-called 6272:17, 6272:19.
soldier 6325:17, 6346:5, 6346:6, 6346:7.
sole 6304:22.
Somebody 6254:22, 6267:14, 6272:24, 6273:11, 6303:21, 6304:4, 6304:11, 6313:5, 6315:16, 6321:7, 6335:11, 6335:15, 6335:18, 6350:3, 6350:13, 6353:6, 6363:13, 6365:16, 6404:11.
somehow 6340:24.
someone 6249:4, 6269:22, 6325:19, 6331:16, 6337:5.
sometime 6352:11, 6361:3.
sometimes 6284:12.
somewhere 6320:13, 6382:13.
sons 6323:23.
soon 6400:18.
Sorelle 6269:6, 6269:12, 6269:16, 6269:17, 6302:5, 6303:10, 6303:11, 6305:16, 6306:18, 6309:25, 6311:8, 6311:12, 6351:23, 6352:2, 6352:6, 6352:8.
sort 6303:4, 6304:19, 6306:2, 6320:19, 6360:15, 6373:12, 6373:21, 6377:17, 6387:19, 6391:4, 6401:13, 6401:15, 6403:2, 6405:7.
sounded 6282:15.
south 6329:3.
SP-94 6385:4.
space 6330:17, 6345:17, 6345:18.
speakers 6278:15.
Speaking 6246:7, 6328:10, 6333:5, 6341:18.

spears 6358:11.
Special 6339:4, 6339:8, 6369:11, 6369:14, 6369:19, 6369:21.
specific 6304:18.
spectrum 6262:8.
speculation 6253:22.
speech 6278:8.
spell 6369:20.
Sperry 6249:3, 6366:25, 6401:7.
spilled 6273:21.
spin 6397:9.
split 6351:22.
spoke 6269:18.
spot 6276:7.
spreadsheet 6381:16.
spun 6399:4.
Stage 6276:8, 6278:4, 6278:6, 6278:8, 6297:14, 6297:18, 6313:10, 6313:12, 6314:9, 6314:10, 6314:11, 6314:13, 6314:21, 6316:22, 6318:16, 6349:1, 6349:2.
staged 6257:21.
stages 6312:25, 6313:21, 6313:24, 6314:3, 6314:6, 6314:7, 6347:10.
stair 6378:3.
stairs 6311:16, 6311:24, 6319:20, 6319:21, 6320:7, 6343:7, 6344:22, 6361:15, 6362:8, 6376:17, 6378:3, 6378:9, 6384:14.
Stamey 6288:14.
stamp 6255:11, 6256:22, 6257:2.
stamps 6255:7, 6257:1.
stand 6248:21, 6267:4, 6267:12, 6303:21, 6303:22, 6305:5, 6367:16, 6369:11, 6396:13, 6405:8.
standby 6296:18, 6297:16.
standing 6271:19, 6311:16, 6311:24, 6332:14, 6343:12, 6343:25, 6345:13, 6345:15, 6348:20, 6361:15, 6361:17, 6362:15.
Stanley 6243:17.
Stanley@brandwoodwardlaw.com 6243:23.
start 6254:19, 6286:2, 6368:11, 6386:18, 6389:23, 6389:25, 6390:5, 6390:21.
started 6274:18, 6378:9.
starting 6350:21, 6361:3, 6368:17, 6375:21, 6381:20.
state 6269:1, 6350:9, 6358:1, 6358:4, 6401:17, 6401:18.
stated 6382:1, 6387:4.
statement 6247:19, 6256:4, 6292:11, 6303:6, 6304:5, 6304:11, 6304:16, 6305:20, 6306:15, 6366:5, 6372:23, 6380:4, 6380:6, 6380:8, 6380:12, 6383:1, 6386:7, 6386:12, 6386:14, 6402:22.
statements 6247:12, 6248:4, 6255:15, 6255:16, 6304:8, 6305:3, 6305:6, 6386:1, 6386:3, 6386:5, 6386:9, 6386:10, 6395:23, 6395:24, 6396:2, 6396:3, 6396:4, 6397:21, 6399:2, 6404:12, 6404:15.
States 6242:1, 6242:5, 6242:17.
station 6351:18, 6351:20.
stay 6310:19, 6311:3, 6351:11, 6354:17, 6355:7.
stayed 6330:8, 6331:23, 6335:25, 6348:11, 6349:4, 6354:18.
staying 6294:16, 6295:16, 6351:9.
steal 6263:23, 6268:25, 6269:18.
Steele 6243:6, 6368:25, 6392:1.
stenographic 6406:6.
step 6318:21, 6365:22.
Stephen 6242:44.
steps 6336:5, 6338:12, 6338:22, 6343:4, 6344:19, 6362:18, 6397:10.
Steve 6314:18, 6314:25, 6366:7.
Steven 6314:15, 6314:22, 6315:20, 6316:11.
stick 6267:15, 6267:17, 6403:1.
stipulation 6258:25.
stock 6358:10.
Stone 6277:11, 6278:3, 6310:3, 6310:7, 6310:10, 6310:13, 6310:18, 6310:21, 6311:2, 6315:24, 6324:23, 6325:1, 6325:3, 6325:13, 6326:5, 6326:8, 6326:13, 6326:15, 6326:16, 6326:18, 6326:19,

6326:21, 6326:22, 6326:23, 6327:3, 6348:22, 6348:24, 6349:4.
stood 6348:13, 6351:6.
stop 6267:10, 6268:25, 6269:18, 6269:19, 6307:25, 6372:15, 6374:2, 6376:18, 6376:19, 6377:14, 6377:19, 6384:17, 6385:7, 6395:18.
stopped 6352:22, 6382:1, 6382:9, 6384:13.
stopping 6289:22, 6308:2.
stored 6293:7, 6293:19.
storm 6264:20, 6266:14, 6273:8, 6273:23.
stormed 6266:11, 6266:12.
Storming 6337:6, 6338:4, 6338:10, 6338:16, 6338:18, 6338:24, 6339:17, 6339:20, 6340:22, 6340:25, 6341:7, 6341:8, 6342:6, 6363:4, 6363:10, 6363:14, 6363:16, 6363:18.
Straight 6352:21, 6352:22.
stray 6320:11.
Street 6242:27, 6242:37, 6243:8, 6243:37, 6243:46, 6308:5, 6325:5, 6344:2, 6344:7, 6351:17.
stretch 6395:3.
structure 6345:23.
stuff 6260:14, 6264:15, 6264:21, 6274:19, 6282:10, 6282:14, 6282:22, 6282:25, 6283:9, 6283:24, 6284:1, 6284:2, 6322:23, 6330:17, 6351:12, 6351:13, 6351:15, 6353:9, 6353:12, 6357:16, 6358:14.
subject 6253:21, 6261:6, 6336:7, 6369:7, 6385:13, 6388:5.
submit 6391:11, 6391:12.
subsequent 6370:16.
substance 6381:25.
substantive 6390:10, 6391:12.
such-and-such 6335:17.
suggest 6275:5.
suggested 6252:9, 6397:17.
suggestion 6381:2.
suggestions 6381:3.
Suite 6242:38, 6243:9, 6243:28, 6243:38, 6244:9.
summarize 6247:19, 6248:12.
summarized 6394:10.
summary 6364:8.
supplements 6390:15.
Suppose 6265:12, 6267:14, 6268:23, 6293:20, 6310:24, 6344:25, 6346:9, 6392:3.
supposed 6254:3, 6276:5, 6276:6, 6277:14, 6278:4, 6313:12, 6313:18, 6316:6, 6316:18, 6317:12, 6318:14, 6339:16, 6344:22, 6347:6.
supposing 6351:16.
Supreme 6314:12.
supremecists 6358:21.
surprised 6360:5, 6360:7.
surveillance 6373:8, 6373:18, 6374:25, 6381:9, 6382:2, 6382:18, 6382:19.
sustain 6264:23, 6363:7.
Sustained 6306:24.
switch 6341:5.
switched 6384:21.
switching 6381:19.
sworn 6369:15.
system 6252:9.
.
.
< T >.
T-mobile 6338:3, 6340:7, 6340:11.
T. 6244:24, 6406:10.
table 6403:7.
taken. 6319:2.
talked 6327:15, 6327:18, 6327:23, 6328:2, 6329:23, 6343:6, 6355:18.
Tampa 6374:14.
team 6285:8, 6285:18, 6287:21, 6301:7, 6310:3, 6310:7, 6310:14, 6310:23, 6322:10, 6322:11, 6327:9, 6345:24, 6346:4, 6348:22.
teams 6301:8, 6301:9, 6346:1.
technical 6360:15.
technologically 6394:2.
telephone 6281:18, 6364:10, 6364:12.
telephones 6292:22.
tells 6335:11, 6335:13, 6335:16.
Ten 6253:20, 6320:16, 6329:2, 6342:5, 6376:9.
tense 6360:20.

term 6323:3.
terms 6255:7, 6267:13, 6353:9, 6372:23, 6388:8, 6390:2, 6390:8, 6391:12, 6394:16.
terribly 6320:23.
testified 6283:1, 6302:22, 6328:11, 6332:15, 6353:24, 6354:10, 6354:20, 6359:9, 6369:16, 6402:8, 6402:9.
testify 6267:4, 6316:12, 6340:3.
testifying 6375:8.
testimony 6250:19, 6293:11, 6305:17, 6306:6, 6306:7, 6330:23, 6368:16, 6375:15, 6392:4, 6400:20, 6402:1.
Texas 6244:10, 6353:13, 6353:15, 6354:16, 6354:17.
text 6268:8, 6296:13, 6306:17, 6306:19, 6315:3, 6328:16, 6329:13, 6332:13, 6337:13, 6339:5, 6339:10, 6339:13, 6339:23, 6340:16, 6340:18, 6341:6.
texting 6315:2, 6339:22, 6341:6.
texts 6353:5.
Thanks 6309:9.
themselves 6349:25, 6390:9.
theoretically 6368:9.
theory 6305:12, 6307:8, 6307:9, 6390:13, 6390:17, 6394:6.
thereabouts 6336:24.
They'll 6290:4.
they've 6366:17, 6370:12.
thinker 6401:8, 6401:25.
thinking 6310:16, 6327:3, 6397:10.
Third 6251:23, 6255:9, 6304:12, 6335:13, 6395:21.
Thomas 6243:37, 6269:22, 6269:24.
though 6253:19, 6260:9, 6294:8, 6315:16, 6317:2, 6328:15, 6347:10, 6370:11.
thoughts 6264:17, 6265:2, 6265:4, 6266:15, 6266:16, 6273:18.
thread 6339:5, 6339:13, 6339:19, 6339:23, 6340:1, 6340:23, 6365:5, 6365:6, 6365:7, 6365:8, 6365:12.
three 6248:19, 6249:23, 6255:5, 6260:3, 6330:4, 6330:9, 6334:9, 6335:25, 6336:20, 6340:3, 6388:9, 6403:13.
three-hour 6250:11.
three-way 6331:17, 6332:20, 6332:25, 6334:1, 6334:21, 6335:12.
throughout 6306:11.
Thursday 6389:10, 6389:20, 6390:4, 6390:22, 6390:23.
tight 6404:19.
till 6294:11, 6352:24.
timing 6388:8.
tired 6400:1.
title 6381:13.
today 6259:15, 6285:8, 6287:21, 6300:23, 6318:23, 6330:23, 6393:1, 6396:12.
Todd 6311:20, 6311:22.
together 6277:19, 6277:20, 6296:16, 6311:14, 6311:15, 6348:12, 6351:18.
tomorrow 6316:22, 6366:13, 6386:18, 6388:7, 6389:3, 6389:7, 6390:18, 6390:21, 6391:14, 6391:18, 6393:3, 6393:10, 6400:12, 6404:4, 6406:2.
tone 6327:4.
tonight 6393:2, 6393:17.
took 6248:1, 6251:17, 6260:4, 6273:17, 6274:2, 6284:22, 6285:25, 6298:2, 6310:23, 6316:14, 6319:13, 6321:15, 6342:20, 6352:1, 6352:4, 6354:4, 6361:7, 6373:4.
top 6261:16, 6268:19, 6325:23, 6370:14, 6375:21, 6381:24, 6397:8.
topic 6248:20, 6284:16.
touch 6362:1.
Towards 6262:7, 6265:7, 6301:16, 6311:17, 6344:1, 6373:13, 6378:2, 6378:9.
town 6326:19.
track 6360:9, 6360:12, 6388:3.
trailers 6329:11.
traits 6401:22.
Transcript 6242:15, 6375:11, 6400:19, 6402:17, 6406:6.
transport 6288:14.
traveled 6352:1.
traveling 6295:5,

6295:13.
treated 6326:23.
treatment 6310:21.
Trial 6242:15, 6390:11, 6395:22.
trials 6389:14.
tried 6272:24.
trouble 6328:11.
troublemakers 6357:7, 6357:10, 6358:15.
Troy 6242:25.
true 6246:13, 6271:3, 6296:25, 6315:6, 6354:23, 6355:4.
truly 6389:24.
Trump 6265:11, 6265:12, 6265:15, 6265:25, 6270:13, 6270:23, 6271:4, 6272:15, 6272:18, 6272:21, 6272:23, 6273:13, 6274:10, 6307:25, 6308:2, 6310:12, 6377:12, 6402:9, 6402:10.
trunk 6351:14.
trust 6400:13.
truth 6247:17, 6386:7, 6386:13.
truthful 6404:7, 6404:15.
try 6270:12, 6272:17, 6340:21, 6360:9, 6376:18, 6376:19, 6391:9, 6395:9.
trying 6254:22, 6274:9, 6284:21, 6305:2, 6319:25, 6320:13, 6320:15, 6332:10, 6332:12, 6363:17, 6368:11, 6377:14, 6377:19, 6388:3, 6388:25, 6396:20, 6399:23.
Tuesday 6242:9.
turn 6308:5, 6378:5.
turned 6284:7, 6284:12.
type 6310:11, 6323:7.
typical 6307:11, 6331:16, 6331:18.
typically 6370:3, 6374:5.
typing 6341:3, 6341:5, 6341:7.
.
.
< U >.
ultimate 6394:12.
ultimately 6306:16, 6313:6.
unarmed 6359:5.
uncertainty 6255:18.
unclear 6253:1.
understand 6248:21, 6287:7, 6293:7, 6293:15, 6293:17, 6293:18, 6296:24, 6310:10, 6325:21, 6340:6, 6340:8, 6340:10, 6340:21, 6341:11, 6399:23, 6399:24, 6402:7.
understanding 6254:9, 6255:2, 6255:6, 6289:20, 6302:22, 6377:9.
understands 6248:22.
Understood 6256:2.
unfair 6305:20.
unfairly 6305:24.
unfold 6321:12, 6361:21.
unfolding 6312:1, 6324:19, 6325:7, 6326:3, 6326:20, 6327:1, 6348:17.
unfortunately 6317:7.
United 6242:1, 6242:5, 6242:17.
Unless 6323:4, 6323:6, 6323:16, 6391:21, 6392:11, 6394:23, 6395:1, 6405:20.
unloaded 6299:14.
unquote 6272:23, 6376:20.
unread 6293:24, 6294:1, 6295:25.
unrung 6303:4.
until 6257:8, 6274:18, 6280:20, 6295:24, 6297:22, 6297:23, 6304:15, 6307:6, 6311:10, 6311:16, 6311:24, 6313:13, 6317:25, 6326:17.
upcoming 6308:15.
upper 6281:7, 6281:8.
upset 6309:18.
urge 6318:24.
users 6250:25.
using 6293:18.
utmost 6248:14.
.
.
< V >.
vacation 6389:25, 6390:1.
vacations 6389:23.
Vallejo 6349:20.
value 6305:23.
varies 6330:16.
various 6380:22, 6386:15.
vehicle 6274:21, 6274:22, 6352:5.
verbal 6341:14.
verbatim 6390:11.
verbiage 6271:14.
version 6252:20, 6358:13.
versions 6254:17.
versus 6252:4, 6254:16.
vest 6257:24.
via 6327:23.
vice 6355:24, 6356:1, 6356:14.
videos 6322:12, 6362:18, 6371:12, 6371:16, 6371:21,

6371:23, 6382:6, 6382:9, 6383:17, 6397:3, 6401:1.
videotape 6250:12.
view 6254:3, 6254:7, 6255:1, 6257:25, 6382:13, 6395:6.
viewed 6403:4.
viewing 6381:4.
violate 6392:10.
violence 6308:5, 6350:12, 6350:13, 6362:19.
VIP 6315:8, 6317:2, 6317:11, 6339:6.
Vips 6278:15, 6279:24, 6280:11, 6282:14, 6317:3.
Virginia 6318:9.
Voice 6333:18, 6334:12, 6339:2, 6339:5, 6340:4, 6340:9, 6340:12, 6365:5, 6377:20.
voicemail 6328:21.
volunteered 6403:14.
vote 6263:6, 6263:16, 6372:15, 6374:2, 6376:18, 6376:19, 6377:15, 6377:20, 6384:17, 6385:7.
vs 6242:8.
.
.
< W >.
W1 6366:21.
W4 6366:21.
wait 6348:19, 6390:19, 6392:2.
waiting 6291:9, 6348:18, 6348:20.
waive 6399:21.
Walk 6265:16, 6271:21, 6344:6, 6363:15, 6377:24, 6378:5.
walked 6272:1, 6272:2, 6272:6, 6272:8, 6311:22, 6376:17.
walking 6275:18, 6363:4, 6378:9.
wall 6319:19.
walls 6321:17, 6322:19, 6323:19.
wanted 6248:7, 6269:10, 6270:13, 6272:16, 6272:23, 6273:1, 6273:11, 6274:10, 6282:11, 6282:21, 6284:24, 6296:12, 6309:12, 6310:22, 6315:4, 6318:13, 6326:13, 6326:15, 6326:16, 6326:19, 6326:21, 6327:10, 6343:6, 6345:1, 6348:19, 6354:5, 6365:11, 6395:17.
wants 6251:1, 6303:16, 6335:17, 6383:10, 6390:19, 6397:5, 6400:22.
war 6262:11, 6274:5, 6278:7, 6307:18, 6307:19, 6307:20, 6307:24, 6308:24, 6309:5, 6309:6, 6309:7, 6309:12.
warn 6265:25.
Warren 6264:1.
wars 6264:19.
Washington 6242:8, 6242:28, 6242:39, 6242:47, 6243:10, 6243:20, 6243:30, 6243:39, 6244:27, 6258:10, 6268:15.
watch 6363:12.
watched 6300:3, 6345:21.
watching 6248:5, 6248:6, 6291:8, 6361:21, 6363:15.
water 6254:6, 6275:2, 6275:18, 6275:19, 6286:3, 6288:12.
Watkins 6405:6.
ways 6248:16, 6293:8, 6293:19, 6394:4.
weapon 6298:13, 6352:4, 6358:9.
weapons 6275:1, 6275:10, 6275:21, 6298:14.
wear 6298:3.
wearing 6249:13, 6357:17, 6398:3.
Webex 6248:5.
website 6251:2.
websites 6252:24.
week 6254:13, 6389:25, 6390:5.
weeks 6268:14, 6354:18.
Welcome 6250:17, 6319:4, 6357:1.
West 6243:38, 6373:13, 6373:25, 6382:18.
WFO 6254:14.
whatever 6362:13, 6362:20, 6391:11, 6391:13.
wherever 6275:2.
whether 6246:10, 6248:2, 6248:3, 6255:4, 6255:5, 6256:15, 6260:22, 6274:7, 6276:15, 6302:8, 6302:20, 6305:14, 6305:21, 6306:16, 6330:24, 6332:19, 6333:6, 6333:16, 6335:2, 6335:7, 6355:16, 6378:19, 6394:16, 6401:16, 6401:25, 6405:8.
Whip 6279:2, 6329:5, 6331:14.
White 6270:9, 6270:13, 6270:20, 6270:22, 6270:25, 6272:14, 6272:18, 6273:3, 6273:8, 6273:9, 6273:12, 6273:23, 6358:21.

Whoa 6292:10.
whole 6249:6, 6270:15, 6305:6, 6311:13, 6311:15, 6324:2, 6339:5, 6339:13, 6341:19, 6355:7, 6388:10, 6388:18.
whom 6266:6.
William 6243:35, 6244:15, 6244:16, 6311:20.
willing 6264:5, 6353:11, 6388:21, 6390:18, 6391:3, 6391:5, 6399:11, 6399:20.
Wilson 6311:20.
windows 6271:15, 6271:19, 6271:20.
wink 6404:1.
wish 6255:17.
wishes 6393:19.
within 6287:24.
without 6254:16, 6254:19, 6289:12, 6289:15, 6290:6, 6292:3, 6303:16.
WITNESS 6246:17, 6249:16, 6249:21, 6256:21, 6258:17, 6261:2, 6281:17, 6283:5, 6290:19, 6292:8, 6298:16, 6301:22, 6302:14, 6347:13, 6369:12, 6369:15, 6370:1, 6370:4, 6370:6, 6370:24, 6375:19, 6379:19, 6384:6, 6388:15, 6395:21, 6396:22.
witnesses 6366:1, 6368:17, 6369:9, 6388:9, 6392:7, 6395:22, 6396:1, 6396:23.
woke 6309:24.
woman 6258:6, 6340:25, 6341:10, 6365:18.
Women 6318:9.
Woodward 6243:17, 6243:18, 6252:18, 6257:5, 6289:16, 6289:19, 6302:11, 6302:14, 6367:14, 6367:24, 6369:8, 6373:11, 6379:23, 6385:2, 6385:9, 6385:12, 6389:10, 6389:22, 6389:24, 6390:24, 6392:18, 6400:8.
word 6249:8, 6350:20.
wording 6252:4.
words 6246:19, 6251:9, 6251:10, 6255:15, 6265:3, 6266:16, 6267:13, 6271:8, 6273:18, 6273:19, 6273:20, 6330:10, 6330:12, 6345:10, 6363:10, 6382:7, 6402:8, 6405:11.
work 6264:4, 6277:25, 6278:9, 6293:15, 6313:18, 6317:17, 6340:15, 6355:21, 6374:17, 6385:14, 6391:5, 6394:2, 6400:11.
working 6264:8, 6288:14, 6389:24.
works 6292:20, 6292:22, 6292:23, 6293:16, 6293:17, 6340:9, 6374:18.
worlds 6398:1.
worried 6247:6.
worse 6357:1.
worst 6291:9.
written 6387:8.
wrote 6259:14, 6261:18, 6285:7, 6339:18.
.
.
< X >.
Xbox 6260:13.
.
.
< Y >.
yard 6311:23.
yards 6361:23.
years 6260:3, 6260:5, 6260:7.
yesterday 6249:1, 6250:2, 6308:12, 6368:2, 6400:20.
younger 6376:2.
yourself 6308:11, 6325:17, 6346:5, 6347:16.
Youtube 6251:3, 6252:24.
Yup 6271:18.
.
.
< Z >.
Zoom 6265:9, 6268:19, 6281:22, 6287:4, 6288:4, 6290:20, 6298:22, 6347:14, 6374:19.
zoomed 6288:8, 6320:23, 6320:24.
Zsuzsa 6243:25.