```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 21-cr-28
 4                                    .
             Plaintiff,               .
 5                                    .
         vs.                          .
 6                                    .
     SANDRA RUTH PARKER, BENNIE ALVIN .
 7   PARKER, LAURA STEELE, CONNIE     .
     MEGGS, WILLIAM ISAACS, and       .  Washington, D.C.
 8   MICHAEL L. GREENE,               .  March 8, 2023
                                      .  1:15 p.m.
 9           Defendants.              .
     - - - - - - - - - - - - - - - - -

10

11             TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
                   BEFORE THE HONORABLE AMIT P. MEHTA
12                   UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the United States:      KATHRYN RAKOCZY, AUSA
                                 JEFFREY NESTLER, AUSA
16                               TROY EDWARDS, AUSA
                                 ALEXANDRA HUGHES, AUSA
17                               United States Attorney's Office
                                 601 D Street Northwest
18                               Washington, D.C. 20579

19   For Defendant S. Parker:    JOHN MACHADO, ESQ.
                                 Law Office of John Machado
20                               503 D Street Northwest
                                 Suite 310
21                               Washington, D.C. 20001

22   For Defendant B. Parker:    STEPHEN BRENNWALD, ESQ.
                                 Brennwald & Robertson, LLP
23                               922 Pennsylvania Avenue Southeast
                                 Washington, D.C. 20003

24

25                         -- continued --
```

```
 1    APPEARANCES (CONTINUED):

 2    For Defendant Steele:        PETER COOPER, ESQ.
                                   400 Fifth Street Northwest
 3                                 Suite 350
                                   Washington, D.C. 20001
 4
      For Defendant Meggs:         STANLEY WOODWARD, JR., ESQ.
 5                                 Brand Woodward Law
                                   1808 Park Road Northwest
 6                                 Washington, D.C. 20010

 7                                 JULI HALLER, ESQ.
                                   Law Offices of Julia Haller
 8                                 601 Pennsylvania Avenue Northwest
                                   Suite 900, South Building
 9                                 Washington, D.C. 20036

10    For Defendant Isaacs:        EUGENE ROSSI, ESQ.
                                   Carlton Fields P.A.
11                                 1025 Thomas Jefferson Street Northwest
                                   Suite 400 West
12                                 Washington, D.C. 20007

13                                 CHARLES GREENE, ESQ.
                                   Law Office of Charles M. Greene, P.A.
14                                 55 East Pine Street
                                   Orlando, Florida 32801
15
      For Defendant Greene:        BRITT REDDEN, ESQ.
16                                 Redden Law, PLLC
                                   3300 Oak Lawn Avenue
17                                 Suite 700
                                   Dallas, Texas 75219
18

19

20

21    Official Court Reporter:     SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

# C O N T E N T S

## TESTIMONY

GALIT ASKENAZI          Direct Examination.............. 6644
                        Cross-Examination............... 6672
                        Redirect Examination............ 6704

HARRY DUNN              Direct Examination.............. 6706
                        Cross-Examination............... 6715
                        Cross-Examination............... 6719
                        Redirect Examination............ 6721

## EXHIBITS RECEIVED

Defendant CI-1 and CI-4................................ 6769

Government 10166....................................... 6647

```
 1                      P R O C E E D I N G S
 2          (Jury not present.)
 3          THE COURT:  Okay.  Do we have -- we don't have
 4   Mr. Isaacs present.
 5              MR. ROSSI:  I waive his appearance, Your Honor.
 6          THE COURT:  Okay.  I think we've got everyone
 7   otherwise accounted for.
 8          Let's take the time to go through the instructions that
 9   were circulated.  We circulated a revised version at lunch that
10   includes the exhibits that were admitted in rebuttal so far as
11   to only certain defendants.
12          So just going through page by page, if there is an issue,
13   somebody please tell me.  Page 1, page 2, 3, 4, 5.
14          We've deleted what was provided in the last trial at the
15   bottom of page 6.  By the way, I'm using the redline that was
16   sent around so everybody can follow along.  We had had -- it was
17   Mr. Greene that testified, or maybe it was somebody else.  In
18   any event, there was an instruction about participant's
19   testimony.  I don't think anybody fits that category in this
20   trial, and so I've removed it.
21          Anybody have any issues with that?
22              MS. RAKOCZY:  Not from the government.
23          THE COURT:  Okay.  We've identified Mr. Berry as the
24   only witness with a plea agreement there on page 7.
25          Page 8, I've included -- I don't know.  Maybe it just
```

1   wasn't my question, but it occurred to me that the standard

2   identification instruction has not been included previously.  I

3   don't know if it's an issue since nobody asked for it, and

4   there's really been no dispute about it.  But I thought we

5   should include it.

6       Any objections to that or thoughts?

7           MR. BRENNWALD:  It should be, given the fact that

8   people could or could not identify various people based upon the

9   clothing that was covering their face.

10          THE COURT:  All right.  So page 9, defendants not

11  testifying, Ms. Parker and Ms. Steele --

12          MR. COOPER:  I apologize, Your Honor.  My copy here

13  has different page numbers.  I definitely do not have the same

14  copy you're looking at.

15          MR. BRENNWALD:  Our page numbers are one page off.

16          MR. COOPER:  It doesn't have the things I added to it.

17          THE COURT:  It doesn't have what?

18          MR. COOPER:  I added a couple things also, Your Honor,

19  like defendants' theory of the case, and that's not on here

20  either.

21          THE COURT:  Because they haven't been finalized.

22      I will keep going here.  Page 9, we've identified the two

23  defendants who have testified and who have not testified.

24      There's no character evidence present.  So that instruction

25  has been removed.

1        The two experts considering autism spectrum disorder, I

2    identified --

3            MR. NESTLER:  Your Honor, just so it's clear, we are

4    planning to offer Dr. Askenazi in something broader than just

5    ASD.  She's a neuropsychologist.

6        I'm not sure it matters here.  Just so Your Honor is aware.

7            THE COURT:  Do you want that --

8            MR. NESTLER:  It's fine.

9            THE COURT:  Evaluation of prior inconsistent

10   statements, we've included the instruction both about prior

11   inconsistent statements and then on the next page consistent

12   statements with respect to Mr. Berry.

13       Any comments or thoughts on those?

14           MR. NESTLER:  Yes, Your Honor.  We do not believe that

15   Caleb Berry was impeached with his grand jury transcript, and

16   therefore, we do not believe that redline paragraph ought to be

17   included.

18       We went back and reviewed the transcript.  Mr. Brennwald

19   asked him questions about what he had said in the grand jury

20   previously but did not confront him with it.  And Mr. Shipley

21   asked him several questions about what he said in the grand

22   jury, the number of times he had talked about stopping the steal

23   and other things like that, but did not confront him with any

24   portion of his transcript.  So we do not believe he was

25   impeached with his grand jury transcript.

```
 1            THE COURT:  Am I misrecollecting that his grand jury

 2     transcript was put up at one point?

 3            MR. NESTLER:  It was.  I was going to do it in

 4     redirect, but after the Court's 106 ruling on what else would

 5     come in, I elected to not do it.  So we did not do it either.

 6            THE COURT:  Okay.  So is everybody comfortable with

 7     removing that paragraph on page 11 that is prior statements made

 8     under oath?

 9            MR. NESTLER:  Is it okay if Dr. Askenazi sits in the

10     courtroom?

11            MS. HALLER:  Could it be edited to take out the

12     reference to "subject to the penalty of perjury of the grand

13     jury" because the inconsistent statement was made in court?

14            MS. RAKOCZY:  Just to be clear for Ms. Haller, we're

15     not proposing taking out the first paragraph about inconsistent

16     statements outside of court.  We're proposing taking out the

17     inconsistent statements under oath and grand jury.

18            THE COURT:  All right.  So we will take that paragraph

19     out.  I guess I was misrecollecting the use of the grand jury

20     testimony.  So we will take that out.

21        All right.  The -- everybody okay with the prior consistent

22     statement instruction?

23            MS. RAKOCZY:  Your Honor, I would just note that it

24     says that the prior consistent statement was made during a prior

25     proceeding.  It should probably say something like during a
```

1    prior interview with law enforcement.  Oh, sorry.  Never mind.

2    Sorry.

3              THE COURT:  No problem.

4        We don't have to deal with impeachment by proof of

5    conviction.  So that's being taken out.

6        I added into this instruction an instruction I've used in

7    the past, and it's consistent with what I've done orally

8    concerning search warrants and arrest warrants and not to draw

9    any inference from them.

10       Okay.  The next one is evidence admitted against only one

11   defendant, and we've been trying our best to keep track of the

12   evidence that has only been admitted against one defendant.

13       Am I missing anything?

14             MS. RAKOCZY:  From earlier today.

15             THE COURT:  Those should be included.

16             MS. RAKOCZY:  Oh, sorry.

17             THE COURT:  Those are now, I think, at lines 9 and

18   10 -- I'm sorry.  Lines -- right, 8, 9, and 10.

19             MR. MACHADO:  With regard to number 6, the statement

20   regarding Bennie and Sandra Parker's gun ownership, is that a

21   statement, or was it a stipulation on our end?

22             THE COURT:  It was not a stipulation.  That's why I

23   called it a statement.

24             MR. MACHADO:  Thank you.

25             THE COURT:  All right.  So hearing none, that's what

that will say.

Just another reminder, if the defense -- Mr. Shipley had alluded to a potential competing transcript, but I have not seen one. So the transcripts will go back as evidence to -- not as evidence, excuse me, to support the jury's understanding of audio and video.

We've included on page 13, carryover to 14 the exhibits that were admitted as to which the authenticity would be determined by the jury. And so we've listed those there.

And then 14 to 15 are the summary exhibits that we have associated with the particular witnesses that testified about them.

Again, am I missing any of them, or have we included something that should not be there?

MS. RAKOCZY: We have not noted anything yet, but we will take one final check tonight.

THE COURT: Okay. Well, I was hoping to read these this afternoon. That can always be modified if I'm wrong. It's not the end of the day.

MS. RAKOCZY: It appeared right to us. We just hadn't gone fully through.

THE COURT: Government Exhibit 1529, that concerns the board, and I've already ruled that a single sheet replicating the board will be admitted with these limiting instructions.

Okay. Speech and firearms, Mister -- I know the government

1   opposed the firearms instruction last time around.  I'm going to

2   include it again this time around.

3       Mr. Brennwald has indicated that he disagrees with the

4   following statement:  You may, however, consider this evidence

5   as circumstantial proof that a defendant planned to do something

6   unlawful.

7       I'm not sure why you think that's an incorrect statement of

8   the law, Mr. Brennwald, since it says "may."

9           MR. BRENNWALD:  I don't understand how the fact that

10  he legally had a gun, left it in Virginia, didn't take it here,

11  didn't take it to the QRF, didn't take it to the hotel, somehow

12  provides the jury with some circumstances -- some circumstantial

13  proof that he was going to do anything illegal in D.C.

14          THE COURT:  Well, that's your client.  There are

15  co-conspirators who brought guns closer to Washington and left

16  them there.

17          MR. MACHADO:  Would the Court consider where it

18  says "possess firearms in certain circumstances," add something

19  to the effect of "at certain locations"?

20          THE COURT:  No.  This is a legal instruction.  It's

21  not an instruction about the evidence.  If you want to make

22  arguments about where the guns were brought, not brought, who

23  had them, who didn't, nothing in here is foreclosing you from

24  doing that.

25          MR. BRENNWALD:  I can see the Court's reasoning if

 1    it's talking about other individuals, people who were in the

 2    hotel --

 3             THE COURT:  Let me back up here.  If you don't want

 4    it, I will take it out.

 5             MR. BRENNWALD:  No, I want it.  I just want to --

 6             THE COURT:  I put this in there because of the concern

 7    raised by defense counsel at past trials that mere possession

 8    might be viewed as unlawful.

 9             MR. GREENE:  Thank you, Judge.

10             THE COURT:  And the government has asked me to balance

11    that with what the law says, which is that if you do possess

12    guns in certain circumstances, it can be considered proof of a

13    crime.

14             MR. GREENE:  That's fair, Judge.

15             THE COURT:  Okay.  So I will leave it as is.

16        All right.  Unfortunately, Mr. Brennwald, your comments,

17    while I appreciate you having said them, unfortunately now are a

18    little off in terms of the page numbering.  I may have some

19    difficulty identifying what your comments relate to.  So if you

20    would please flag it for me.

21             MR. BRENNWALD:  Basically, the version I got last

22    night and the version I actually got at 1:11 today also has the

23    same pagination, which is one off from what the Court apparently

24    has.  So whatever my numbers are, it should be the next page in

25    this version.

1          MS. RAKOCZY:  I think it's at the end of "organization

2     and persons not present."

3          THE COURT:  I'm happy to -- I don't think

4     Mr. Brennwald's -- I'm happy to change the wording if there's no

5     objection to it.

6          MS. RAKOCZY:  No objection.

7          THE COURT:  Okay.  All right.  So that last full

8     sentence in the "organization and persons not present" will now

9     read, "The only issue for you to decide is whether the

10    government has proved a particular defendant guilty of a crime

11    or crimes beyond a reasonable doubt."

12        In terms of the summary of the indictment --

13         MR. MACHADO:  Your Honor, just a consistency thing,

14    there's a heading about proof "in and around," but the second

15    part talks about "on or about."  It's the same concept.  I don't

16    know if the Court wants to deal with that.  Under "other

17    counts," it says "on or about."

18         THE COURT:  I think the reason for that -- I mean, I

19    can change the title to include "on or about," because I think

20    the indictment defines the conspiracy in terms of "in and

21    around," but then with respect to obstruction counts on specific

22    dates, it's "on or about."  So we can just change the header to

23    include both.

24         MR. MACHADO:  It goes more towards that.  Thank you.

25         THE COURT:  Okay.  Page 16, going on to page 17, no

1   comments there.

2       Summary of the indictment, page 18, Mr. Brennwald, you just

3   want to include the word "into" between "entered" and "and" in

4   the second paragraph under "summary of indictment"?

5           MR. BRENNWALD:  It seemed more grammatically correct,

6   but maybe I'm not right about that.

7           THE COURT:  I'm not sure it makes a difference one way

8   or the other.

9           MS. RAKOCZY:  No objection from the government.

10          THE COURT:  We will include "into."

11      All right.  Page 17, we will include the word "in" In the

12  summary with respect to Count 5.

13      And, Mr. Brennwald, you asked to include "allegedly."  I

14  don't know that it doesn't any real work here.  We're just

15  summarizing what the indictment says.

16          MR. BRENNWALD:  What line are we on?

17          THE COURT:  You've asked -- this is of the current

18  version page 18 under "summary of indictment," third full

19  paragraph, second sentence.

20      "Count 5 charges all six defendants with entering or

21  remaining in a restricted building or grounds," and you would

22  ask me to add "for allegedly knowingly entering restricted areas

23  of the Capitol."

24          MR. BRENNWALD:  Court's indulgence.

25          THE COURT:  In any event, I'm not going to

```
1    include "allegedly" in there.  As I said, it's not doing any
2    work here in the overall context of where you're asking me to
3    put it.  And it's just a summary of the indictment.  These are
4    just allegations.
5         Okay.  So with respect to the conspiracy instruction --
6              MS. RAKOCZY:  The government has just one small
7    change, Your Honor.  In the first paragraph on page 19
8    under "conspiracy," the last clause reads, "But first, I will
9    instruct you as to certain principles about conspiracies that
10   apply to all three of these offenses."  I think that should be
11   just "to both of these offenses."  I think that's a holdover
12   from there being three conspiracy charges.
13             THE COURT:  Thank you.
14        All right.  Mr. Brennwald, help me with what your
15   suggestion 5 is and where it should be.
16             MR. BRENNWALD:  Suggestion number 5?
17             THE COURT:  Yes, which was originally page 20, line 2.
18             MR. BRENNWALD:  I'm trying to find that here.  Is that
19   above the part where it says "successful development"?  I'm just
20   trying to make sure I'm on the right page.
21             THE COURT:  That's why I'm asking you to help me
22   locate where I'm supposed to be.
23             MR. BRENNWALD:  I'm sorry?
24             THE COURT:  I said, I'm asking for your help to locate
25   where I'm supposed to be.
```

1          MR. WOODWARD:  I think it's now page 21, paragraph

2     that begins, "You've heard evidence of certain acts and

3     conversations that are alleged to have taken place."

4          THE COURT:  So what's your -- what's the request here,

5     Mr. Brennwald?

6          MR. BRENNWALD:  Again, I'm not finding the page, but

7     is that the one where I cite to Judge Cooper's inclusion of a

8     sentence, or is that a different one?

9          THE COURT:  No, that's later on.  What is now page 21,

10    the paragraph that begins, "You have heard evidence of certain

11    acts."

12         MS. RAKOCZY:  I think in the second sentence, Your

13    Honor, I think Mr. Brennwald was asking to repeat the

14    word "allege."  "You may but are not required to consider this

15    evidence in determining whether these alleged acts and

16    conversations show beyond a reasonable doubt."

17         MR. BRENNWALD:  The thing is, the way it's written, to

18    me, and I've talked about this with other defense counsel, is

19    some of the instructions seem to be written in a manner that

20    assumes that people did say certain things or do certain things.

21        And I just want the jury -- to make sure that the Court is

22    not stating here that people did say things or do things.

23    That's why -- I don't want to overuse "allegedly," but this is a

24    conclusory type of sentence, "you've heard evidence."

25         THE COURT:  I'm happy to include it, but the first

1  sentence uses the word "alleged."  But I will insert it there if

2  you think it makes a difference.

3      All right.  Next page, 22, "duration and extent"

4  subheading.

5          MR. WOODWARD:  He's again requesting addition of the

6  word "alleged."  "The duration and extent of the defendants'

7  alleged joining of the agreement," the first sentence under the

8  subheading.

9          THE COURT:  Okay.  We can include that in there.

10     Let's see.  "Termination of conspiracy," page 23,

11  Mr. Brennwald, you've asked for a sentence concerning

12  withdrawing from a conspiracy.

13     Let me ask you, what evidence is there that anybody

14  actually withdrew from the conspiracy?

15         MR. BRENNWALD:  Mr. Parker testified that when -- I

16  think it was when he got home, but anyway, he deleted Jessica

17  Watkins's number from his phone, as well as Donovan Crowl's

18  phone number, because he wanted to have nothing to do with them

19  anymore.  I'm not sure if there can be any more emphatic proof

20  that he was wanting to end whatever relationship he had, and

21  they were the only two people he ever dealt with in this alleged

22  conspiracy.

23     So that's my basis for requesting that.  Otherwise, it

24  seems is if everything that everybody said thereafter he's still

25  supposed to be a part of, even if he clearly indicated by his

1    actions and in court by his words that he didn't want to have

2    anything to do with them anymore.

3            THE COURT:  Is there any evidence?  I don't know what

4    date he said he got home and what the date is that he took --

5    what is the date he took those actions?

6            MS. RAKOCZY:  It's certainly after the message is

7    exchanged on the 14th of January.

8            THE COURT:  Is there any other evidence post-dating

9    the 14th of January that's been admitted?

10           MR. BRENNWALD:  If not, then it's irrelevant, or if

11   not, it's not necessary.

12           THE COURT:  Okay.  I'm just thinking through.  I don't

13   recall there being -- well, there was one message from

14   Mr. Greene on the 18th, if I remember correctly, in the Flower

15   Chat, but that's only been admitted as to him.

16       Okay.  Page 23 over to 24, 25.

17           MS. RAKOCZY:  Your Honor, I noticed in the "conspiracy

18   principles" instruction, there's a few references to the male

19   pronoun, he and his.  It's fine if that's what the Court wants

20   to do, but just flagging since we do have female defendants in

21   this case, if the Court wants to do a pronoun check.

22           THE COURT:  We can take a look at that and address

23   that.

24       Mr. Brennwald has asked, I assume you would like that to

25   be -- I don't know where you're asking to insert it, "the fact

1   that defendants' mere presence in the Capitol may have had the

2   unintended effect of obstructing or impeding a proceeding does

3   not establish that defendant acted with the intent to obstruct

4   or impede that proceeding."

5        Where are you suggesting that goes in, and what's the

6   government's position?

7        MS. RAKOCZY:  The government opposes that for two

8   reasons.  One, on the current version, page 22, in articulating

9   "principles of conspiracy," the Court states the statement and

10  the principle "mere presence at the scene of a crime, even

11  coupled with knowledge of that crime is taking place, is not

12  sufficient to support a conviction for conspiracy."

13       So I think in some respect, that principle of law is

14  articulated.  But more to the point of the crime of obstruction

15  of an official proceeding, which is where Mr. Brennwald is, I

16  think, asking for that principle to be articulated, we would

17  note that there are three elements that the Court is instructing

18  the jury on that all essentially deal with a required state of

19  mind that must be taken and must accompany, for example,

20  presence.

21       And so we disagree that stating that there is necessary

22  when the Court has already instructed on the elements.

23       MR. BRENNWALD:  So I'm asking to go right before the

24  italicized word "attempt."  Again, just because I want to make

25  sure that the jury doesn't conclude that the fact that they were

1  in the Capitol and that their very presence, you know, they

2  couldn't continue the vote count until everybody was taken out

3  of the Capitol proves that they somehow obstructed.  Yeah, that

4  would be an incidental occurrence, but if that wasn't their

5  intent, then the jury should be clear on that.

6      And I don't think we can ever -- well, I shouldn't say

7  that.  I think it's sometimes helpful to overexplain to a jury

8  just in case they have any questions.

9      But I think that's the appropriate place to put it.  So

10  right after it says the defendants' unlawful intent is not

11  negated by the simultaneous presence of another purpose for the

12  defendant's conduct, but again, just because they're in there

13  and because their presence may have had the unintended

14  consequence of continuing the delay does not make that person

15  guilt of obstructing justice if they didn't have the intent to

16  obstruct.

17      So it's kind of convoluted, but I think it's important to

18  explain that sentence and that whole concept.

19          MS. RAKOCZY:  And the government does agree that mere

20  presence without also proving the other elements of the offense

21  would not be sufficient.  So as a matter of law, we think that

22  that sentiment is correct.  We think the language about how a

23  defendant's presence could have unintended consequences is

24  argument and is not a statement of the law.

25      So I think if the Court's inclined to give it, we would

prefer something that tracks closer to what's in the

"conspiracy" section that would say essentially mere presence is

not enough, as I've just instructed you, you must find all the

elements of this offense or something along those lines.  We

think that's a correct statement of the law.

    But the language about how someone's presence may have

unintended consequences, we would submit, is argument.

        THE COURT:  I guess what I'm struggling with here is

what to say and how to contrast it with what -- in other words,

just being repetitive.  I mean, if the whole gist here is that a

defendant's mere presence in the Capitol is not enough to find

the defendant guilty, the counterweight to that is you've got to

find them guilty beyond a reasonable doubt with respect to the

three elements.  And I don't know that I'm telling them anything

more than they're already being told.

        MR. BRENNWALD:  The way the Court put it, I

understand.  But again, what you're telling the jury is that --

it's just one of those incidental things.  Saying that mere

presence is not enough is true.  But this last sentence above

the word "intent" says that their intent to obstruct isn't

negated by the fact that they had some other purpose as well,

like in Sandra's part of the case helping somebody.

    But again, a juror could think well, okay, maybe she was

there to help somebody, but she was in there, and her

presence -- she was in the Capitol; whether she was trying to

help somebody or not, her presence caused the proceedings to be
delayed.  Nancy Pelosi could not call the House back to order
until everybody left.

And I just want to make sure the jury understands that.
Sure, her mere presence isn't enough to convict her, but the
fact that her presence also happened to delay the proceedings
doesn't make her guilty if that was not her intent.

So we can discuss how to explain that, but I don't think
it's argumentative.  I think that's a clear explanation of the
law.  I think that having it in the "conspiracy" section is
good.  I think it should be placed in this one, too.  The jury
could easily think well, that's the law with conspiracy, but
it's not the law with the actual obstruction.

So again, the sentence I proposed adding was one that was
given by Judge Cooper exactly as I presented it in my e-mail to
the Court, and I think it's probably the clearest way to say it.

MS. RAKOCZY:  Again, we think the elements are clear
and the Court is clearly instructing already.

But I think you could also pull out the "mere presence"
line from the conspiracy instruction and have an instruction
that says, "Each of the offenses charged herein have an element
of a required mental state.  Mere presence at the scene of a
crime" and sort of quote that language from the "conspiracy"
section and say, "As I will instruct you when I get to each
offense in giving you the elements, you must also find for each

offense that the defendant possessed or had the required level
of intent or the required mental state."

I think it could be an overarching instruction given
towards the beginning.

MR. WOODWARD:  So an overarching instruction that
would specify being in the building does not itself constitute
any of the crimes that are charged.

MS. RAKOCZY:  We prefer being more general.  I think
talking specifically about being present in a building or on the
grounds is not really appropriate.  That gets to argument.  We
would not necessarily oppose an instruction that -- I'm quoting
here from what's in the "conspiracy principles" section,
something to the effect of "mere presence at the scene of a
crime, even as coupled with knowledge that said crime is taking
place, is not sufficient to support a conviction for that
crime," instead of saying "for conspiracy."  "For each of the
offenses charged herein, there is a required mental state.  As I
get to each offense, I will instruct you on the required mental
state, and you must find for each offense that the defendant, in
addition to taking the actions required, also had the required
mental state."

MR. BRENNWALD:  By the way, that instruction did not
work in a trial that I had it in because the client had also
texted, "We stormed the Capitol, and that caused Pence to delay
the proceedings."  So that didn't help.  But I think it is the

```
 1    appropriate instruction.
 2              MR. WOODWARD:  Steve, was that case a 1512 and a
 3    entering and remaining?
 4              MR. BRENNWALD:  Yes.
 5              MR. WOODWARD:  It was also entering and remaining?
 6              MR. BRENNWALD:  Yes.
 7              THE COURT:  Let's just put a pause on the
 8    conversation.
 9        I will say I'm not moved.  It may be an accurate statement
10    of the law, but the entire thing is an accurate statement of the
11    law.
12              MR. BRENNWALD:  So if I accept the government's fall-
13    back about mere presence, adding that there so the jury doesn't
14    think it just applies to the conspiracy but it also applies
15    here, would the Court go with that?
16              THE COURT:  If you can work something out with the
17    government, I will include it.
18        (Jury entered courtroom.)
19              THE COURT:  Welcome back, everybody.  I hope everybody
20    had a nice lunch hour.  We are ready to continue.
21        Mr. Nestler, does the government have their next witness?
22              MR. NESTLER:  Thank you, Your Honor.  The United
23    States calls Dr. Galit Askenazi.
24           GALIT ASKENAZI, WITNESS FOR THE GOVERNMENT, SWORN
25              THE COURT:  Dr. Askenazi, welcome.
```

```
 1              THE WITNESS:  Thank you.
 2                      DIRECT EXAMINATION
 3              BY MR. NESTLER:
 4    Q.    Good afternoon.
 5    A.    Good afternoon.
 6    Q.    Could you state and spell your name for us.
 7    A.    Galit, G-a-l-i-t, Askenazi, A-s-k-e-n-a-z-i.
 8    Q.    And what do you do for a living, Dr. Askenazi?
 9    A.    I'm a forensic neuropsychologist.
10    Q.    What does a forensic neuropsychologist do?
11    A.    So forensic means that I do work associated with the law,
12    and a neuropsychologist is a psychologist who specializes in
13    assessing the connection between brain and behavior and
14    emotions, so thinking, cognitive abilities, emotional
15    functioning, and behaviors.
16    Q.    Are you a college graduate?
17    A.    Yes, I am.
18    Q.    Where did you go to undergrad?
19    A.    I went to Princeton University.  I graduated magna cum
20    laude there.
21    Q.    And did you do any educational work afterwards?
22    A.    I then went to Case Western Reserve University, which is in
23    Cleveland, Ohio, where I completed my master's and my Ph.D. in
24    clinical psychology.
25    Q.    And after you got your Ph.D. in clinical psychology from
```

1    Case Western, did you have any further affiliations with

2    educational institutions, or what kind of profession did you

3    enter after that?

4    A.   So after you finish your Ph.D., I had to do a one-year

5    supervised training fellowship before I could sit for state

6    licensure as a psychologist.

7         I then completed a two-year fellowship specifically in

8    neuropsychology and got board certified in that, which is about

9    a two-year process.

10        And then I was supervised in forensic psychology

11   specifically for several years before I got board certified in

12   forensic psychology.

13   Q.   And so you used the phrase "board certified."  What does

14   that mean?

15   A.   So it's by the American Board of Professional Psychology.

16   It's the boarding organization in the United States and in

17   Canada.  And it means that it's -- your qualifications are

18   standardized and peer reviewed.

19        So I first needed to do an application to make sure I

20   completed everything, like the two-year supervision.  I have to

21   do a written examination, give a work sample for it to be

22   approved, and then complete an oral examination on my work

23   samples and hypothetical samples.

24   Q.   Are you still board certified now?

25   A.   Yes.

1   Q.   And so you're actually board certified in two different

2   fields; is that right?

3   A.   Yes.  There's about eight of us in the country.

4   Q.   Who are sort of dual board certified in forensic psychology

5   and neuropsychology?

6   A.   Yes.

7   Q.   Okay.  Now, what is your current profession in terms of

8   what do you do on a day-to-day?

9   A.   So I do all work in forensics.  All my work are legal

10  referrals.  A majority of my work now is actually in records

11  review and write-ups, because I do a lot of background work.

12  Before I ever see a person, I will review any and all records

13  that are available for that matter.

14  Q.   Who typically hires you?

15  A.   I get hired by attorneys in criminal cases.  I do a lot of

16  civil cases, traumatic brain injury, medical malpractice,

17  post-traumatic stress disorder.  So that comes oftentimes from

18  insurance companies if it's accident related.

19  Q.   In criminal cases, which side hires you or which sides hire

20  you?

21  A.   I work for both sides.  I actually do more work for defense

22  than I do for prosecution.  And I've had cases where I've been

23  jointly hired by both sides as the only expert, because I'm

24  known locally as being rather unbiased, and I've work for both

25  sides.

1    Q.   Where are you based?

2    A.   Cleveland, Ohio.

3    Q.   And do you have any experience with diagnosing and working

4    with people with autism?

5    A.   Yes, with adults.  I don't work with children, but I have

6    worked with adults with autism spectrum disorder.

7    Q.   And do you have any experience working in the forensic

8    psychology field with people with autism related to criminal

9    cases?

10   A.   Yes.

11   Q.   And if we could pull up on the screen just for

12   Dr. Askenazi, please, Government Exhibit 10166.

13        And Dr. Askenazi, when it comes up on the screen, I will

14   ask you, is this your current CV?

15   A.   Yes, it appears to be.

16        MR. NESTLER:  The government would move in Exhibit

17   1066 consistent with the conversation we had previously, Your

18   Honor, subject to redactions.

19        MR. GREENE:  We can't see it, Your Honor, to see what

20   it is.  We just want to make sure it's the same thing, because

21   she's produced a couple different ones.

22        No objection, Your Honor, subject to our --

23        THE COURT:  10166 will be admitted subject to further

24   review.

25        (Government Exhibit 10166 received into evidence.)

1          BY MR. NESTLER:

2   Q.   Have you testified in court before?

3   A.   Yes, I have.

4   Q.   Have you been qualified as an expert when testifying in

5   court before?

6   A.   Yes, I have.

7   Q.   Approximately how many times?

8   A.   I've testified overall in about 65 cases.  Some of them are

9   in court; some of them have been prerecorded trial depositions.

10          MR. NESTLER:  At this point, the United States moves

11   to qualify Dr. Askenazi as an expert in neuropsychology and

12   autism.

13          MR. GREENE:  We will waive voir dire at this point,

14   Your Honor, admit she meets the minimum qualifications, but

15   reserve the right to cross-examine her to as to her

16   qualifications.

17          THE COURT:  Thank you.  Dr. Askenazi will be admitted

18   as an expert in neuropsychology and autism.

19          Ladies and gentlemen, I will remind you again, a witness

20   ordinarily cannot testify as to her opinions or conclusions.

21   There's an exception for expert witnesses who are allowed to

22   give opinions and the reasons for them, because they've become

23   expert in some art, science, or professional calling.

24          In this case, Dr. Askenazi has been qualified as an expert

25   on the subjects we've just discussed.  You are not bound by her

opinion.  If you find that the opinion is not based on

sufficient education or experience or the reasons supporting the

opinion are not sound and that the opinion is outweighed by

other evidence, you may completely or partially disregard the

opinion.

     You should consider this evidence with all the other

evidence in the case and give it as much weight as you think it

fairly deserves.

     And I think this was unintentional, but I ask you to ignore

the portion of Dr. Askenazi's testimony in which she referred to

her reputation.  Ultimately, it's going to be your

determination.  Okay?

     Thank you very much.

          BY MR. NESTLER:

Q.   Were you hired by the government to conduct an evaluation

of a person named William Isaacs?

A.   Yes, I was.

Q.   Okay.  So when you are hired, what kind of information do

you review in order to start your process?

A.   Well, I ask for all medical, mental health, school records,

legal filings, and in certain cases where there's a question of,

let's say, mental status at the time or possible intent, I want

to get as many records as possible from around the time of the

events.

Q.   And so did you review an interview that the FBI conducted

1    of Mr. Isaacs from March of 2021?

2    A.   Yes, I did.

3    Q.   And you said you reviewed school records; is that right?

4    A.   Yes.

5    Q.   And have you also reviewed records from other doctors?

6         MR. GREENE:  Objection; leading.

7         THE COURT:  Just be mindful, and rephrase the

8    question, please.

9         MR. NESTLER:  Sure.

10        BY MR. NESTLER:

11   Q.   Have you reviewed records from other doctors?

12   A.   Yes, I have.

13   Q.   Is one of those doctors Dr. Gorman?

14   A.   Yes.

15        MR. GREENE:  Objection; leading.

16        THE COURT:  Can we just get through this quickly?

17        MR. GREENE:  (Nodded head.)

18        THE COURT:  Thank you.

19        MR. GREENE:  Thank you, Judge.

20        BY MR. NESTLER:

21   Q.   Is another one of those doctors Dr. Sperry?

22   A.   Yes.

23   Q.   And while you're testifying today, would it be helpful to

24   have the reports from Dr. Gorman and Dr. Sperry with you at the

25   witness stand?

```
 1    A.   Yes, please.

 2              MR. NESTLER:  I'm marking Dr. Gorman's report as

 3    Exhibit 10167 and Dr. Sperry's report at Exhibit 1016 -- sorry,

 4    as 10158 and her supplement as 10159.

 5              BY MR. NESTLER:

 6    Q.   Thank you, Dr. Askenazi.

 7         Now, after you were done with your evaluation, did you

 8    complete a report yourself?

 9    A.   Yes, I did.

10    Q.   Would it be helpful for you to have a copy of your report

11    while you're testifying today?

12    A.   Yes, it would.

13              MR. NESTLER:  The government is marking Dr. Askenazi's

14    report as Government Exhibit 10165.

15              BY MR. NESTLER:

16    Q.   Now, Doctor, in addition to reviewing the FBI interview of

17    Mr. Isaacs and also the school records and also Dr. Sperry's

18    report and Dr. Gorman's report, did you also meet with

19    Mr. Isaacs?

20    A.   Yes, I did.

21    Q.   Can you please describe that meeting?  Let's start with,

22    how long did you meet with him for?

23    A.   Okay.  So I flew down to Orlando, Florida, to meet with him

24    since he was in Florida.  I met with him at Mr. Greene, his

25    attorney's office.  We spent the better part of a day together,
```

1    over six hours together.  And that included the time both for

2    formal interview and formal testing, as well as we ate lunch

3    together, took breaks together.  So it was a full day together.

4    Q.   And so when you said "formal testing and interview," what

5    does that mean?  What did you do?

6    A.   So I always start my time with the person doing the

7    interview, basic information, education history, medical

8    history, mental health history, employment history, their

9    family.

10        And then in the legal case, I sort of shift then into the

11   questions regarding legal knowledge, if that's pertinent to

12   them, events of the day, their thoughts at that time.

13        And that comprises the entire interview section.

14        I then switch into testing.  So what's important in

15   neuropsychological testing is to do objective testing of

16   abilities.  So what are their thinking abilities like?  What's

17   their attention like?  What's their memory like?  What are their

18   reasoning and problem-solving skills?

19        And I also may do questionnaires, looking at symptoms,

20   mental health symptoms, any subsequent symptoms specific to

21   their condition.

22        So that's the distinction between interview and testing.

23   Q.   And while you were having these six or so hours with

24   Mr. Isaacs, you said you also had breaks and lunch together?

25   A.   Yes, that's correct.

```
 1   Q.   Is that intentional?

 2   A.   You know, sometimes I stay with people, sometimes not.  But

 3   I wasn't going to leave the site, and we just ended up having

 4   lunch together.

 5   Q.   And when you were interacting with Mr. Isaacs during lunch

 6   and during breaks, could you talk about your ability to have a

 7   conversation with him?

 8   A.   Yes.  So when he came in, he was very nervous, said he was

 9   not happy about being there, he did not like to talk about his

10   legal events, and actually appeared quite anxious, you know,

11   tapping his feet a bit, fidgeting with his hands.

12        But then once we finished the interview and we took our

13   lunch break, he was much more engaged.  We spoke about the video

14   games he likes.  He actually put his headphones on at that point

15   because he wanted to play a video game during our break.  We

16   spoke about the music that he likes to listen to.

17        So it was informal.  It wasn't related to the evaluation at

18   that point.

19   Q.   Were you able to have any reciprocal interactions with him?

20   A.   Well, that was throughout the day.  Actually, as soon as I

21   walked in and we were introduced, he thanked me for coming all

22   the way from Cleveland to see him.

23   Q.   Were you able to chitchat with him?

24   A.   Yes.  I mean, we don't talk about a lot.  It was more of me

25   asking about his interests.
```

1   Q.   Was he able to sustain a conversation with you?

2   A.   Yes.

3   Q.   When you were doing your exam and have your breaks and

4   lunch with him, was he able to provide -- or what kind of

5   answers did he provide in terms of were they narrative or more

6   one word?

7   A.   So his answers were appropriate.  He wasn't distractible.

8   He didn't answer incorrectly.  They were not one-word answers.

9   He did give descriptive answers.  Some of his comments were

10  spontaneous at times.

11      But at the same rate, during testing -- there are certain

12  times during testing they give you an answer, and it's not

13  enough for me to like score it afterwards, so I say tell me

14  more.  Sometimes he could tell me more, and sometimes he would

15  be like no, that's it.

16  Q.   Okay.  How was his eye contact?

17  A.   His eye contact with me was good.

18  Q.   Did he spend time during the six hours sort of mumbling to

19  himself at all?

20  A.   No.

21  Q.   Or looking down and not being able to look at you in the

22  face?

23  A.   No.  He was engaged the entire time.

24  Q.   So let's talk about autism.  What is it?

25  A.   So autism spectrum disorders are considered developmental

1   disorders, meaning you're born with them and, in most cases,

2   show symptoms of it between the ages of 1 and 2.  Most children

3   are diagnosed by the age of 3 with it.  It involves problems in

4   social communications and interactions, as well as restrictive

5   and repetitive behaviors, interests, or activities.

6        So it's considered a social developmental mental disorder

7   than, let's say, a thinking disorder or an intellectual

8   disorder.  You don't have to have any cognitive compromise

9   associated with this condition.

10  Q.   And are there certain levels, according to experts in the

11  field, about where someone falls on the ASD spectrum?

12  A.   Yes.  So they're divided into three levels.  Level 1 is the

13  lowest.  Level 3 is the highest.  And it primarily reflects the

14  extent of symptoms and the requirement of support.

15  Q.   So what does that mean, symptoms and requirement of

16  support?

17  A.   So how many symptoms you have, how extensive they are, how

18  life interfering they may be, as well as are you someone who can

19  live near full independence, do you require some housing

20  community, do you require 24-hour-a-day care.  So there's

21  different levels of it.  And what's important to know is a lot

22  of times in more severe conditions, there's other conditions

23  going on too, like an intellectual disability.

24  Q.   And so you referred to like an intellectual disability or a

25  cognitive disability.  How do those interact with someone's

1    autism, if at all?

2    A.   Well, they're distinct diagnoses.   The more diagnoses you

3    have, the more symptoms you have, the more difficult it may be

4    to function.

5    Q.   As a part of your -- well, as a part of your training, do

6    you also do assessments about people's cognitive ability?

7    A.   Yes.   That's primarily the focus of neuropsychology.

8    Q.   And what about people's intelligence?

9    A.   Yes.

10   Q.   Okay.   And so let's talk about cognitive ability.   Are

11   there -- how many main areas of cognitive ability are there?

12   A.   So we describe there's five main thinking areas, and that's

13   primarily attention, memory.   And memory is both visual and

14   verbal.   We talk about visual skills, how well you perceive

15   something visually, your language abilities, and what we also

16   call executive functions, which at the higher order skills sort

17   of integrates some of the lower ones.   So how well can you

18   attend to something, remember something from the past, and

19   figure out a solution to a new problem.

20   Q.   And so can you describe for us some of the different kinds

21   of tests and assessments used in your field related to cognitive

22   ability?

23   A.   There are hundreds of tests that exist, and some of them

24   are stand-alone tests, and some of them are comprehensive

25   batteries.   I oftentimes use comprehensive batteries that

1    includes all of it in a test.  When I say "a test," this might

2    have like 20 to 23 sections in it and take an hour and a half to

3    two hours to complete.

4    Q.   Now, what does it mean for an assessment to be

5    self-reported?

6    A.   So a self-report is basically you just stating your

7    symptoms and your perception of your symptoms, your perception

8    of your difficulties.  So a questionnaire or an assessment would

9    be different from what we objectively call a test in which we

10   have norms, we know what to expect for people of certain ages,

11   perhaps of certain intellectual abilities, certain education.

12   So the test, we hope, is more objective because there is that

13   normative data.

14   Q.   Have you reviewed Dr. Sperry's report?

15   A.   Yes, I have.

16   Q.   From your review of her report, did she appear to have

17   administered any objective tests to Mr. Isaacs?

18   A.   No, she didn't.

19   Q.   Did you administer objective tests to Mr. Isaacs?

20   A.   Yes, I did.

21   Q.   Okay.  Now, let's talk about the results of some of those

22   tests.  We're not going to get into every test that you

23   performed, Doctor, but let's talk about those five components or

24   five areas of cognitive ability.

25        So for attention, did you perform any tests with Mr. Isaacs

1    regarding his attention?

2    A.    Yes.  So I used a comprehensive battery, and it has several

3    tests on it that look at attention, both verbal attention and

4    visual attention, and it was fully intact.

5    Q.    And so fully intact, is that a medical term or a --

6    A.    Intact, so statistically speaking, we say anyone who is

7    below the 16th percentile may have some impairments and

8    different degrees of impairments, you know, the worse they do on

9    the actual test.  If we say intact, we're saying at least above

10   the 16th percentile on a normative curve.

11   Q.    So that's average?

12   A.    Yeah, that would be at least average.

13   Q.    And so that means not a deficit?

14   A.    Not a deficit.

15   Q.    Okay.  So for attention, Mr. Isaacs has no deficits as far

16   as your testing revealed?

17   A.    Yes, that's correct.

18   Q.    What about for his memory?

19   A.    His memory was intact both for new verbal materials and

20   visual materials presented to him.

21   Q.    And how about for language?

22   A.    His language abilities, which means both understanding and

23   producing language, being able to name things, that was all

24   intact.

25   Q.    How about his visuospatial abilities?

1    A.    Those were intact as well.

2    Q.    And how about his executive functions?

3    A.    His executive functioning was intact, and actually, on the

4    comprehensive measure I gave, he got perfect scores on the tests

5    that assess executive functioning.

6    Q.    Separate and apart from assessing his cognitive ability,

7    did you also administer a test about his intelligence level?

8    A.    I did a full IQ test with him.

9    Q.    And where did he generally fall on the range in terms of

10   normal or average or below average or above average?

11   A.    So his full-scale IQ was 106.  100 is average.  Anywhere

12   basically from 90 to 110 is considered broadly average, and then

13   you have low average and high average, so right in the average

14   range.

15        He had some variation depending on what was being assessed.

16   He had better verbal skills actually than visual skills on the

17   intelligence testing.  His working memory, how he can hold

18   things in his head, was intact.  And it is slightly on the lower

19   side for redundant type of tasks.

20   Q.    Okay.  So in terms of cognitive ability and intelligence,

21   no deficits, at least average?

22   A.    Yes.

23   Q.    All right.  Let's talk about mind-blindness.  Have you

24   heard the phrase "mind-blindness" before?

25   A.    Yes, I have.

1    Q.    What is it in your field?

2    A.    Mind-blindness is this idea that a person can't appreciate

3    that someone else's mind is separate and distinct from their

4    own.  It means that they may not be able to appreciate that

5    other people have a different perspective, have different

6    thoughts or different emotions that they have.

7    Q.    Does mind-blindness have effects -- sorry.

8        Does mind-blindness have anything to do with facial

9    expressions?

10    A.    Not specifically.  So let's say if someone has difficulty

11    knowing if someone's sad unless they tell them they're sad,

12    well, once they know they're sad, whether or not they can read

13    their facial or nonverbal expressions, if they know they're sad

14    and they know why they're sad, can they imagine what that person

15    actually feels like from their own perspective versus how they

16    would feel like.

17    Q.    So Dr. Sperry defined "mind-blindness" as more of social

18    perception.

19        Are you aware of that?

20    A.    Yes, I am.

21    Q.    Is that correct?

22    A.    No, it's not.

23    Q.    Why not?

24    A.    Because it's not considered the social perception.  It's

25    how you then envision yourself in someone else's shoes.  And

1    that's why it's highly associated with the idea of empathy, can

2    you put yourself in their shoes.

3    Q.   So did you administer any tests to Mr. Isaacs related to

4    his empathy levels?

5    A.   Yes, I did.

6    Q.   Which kinds of tests were those?

7    A.   So this was a self-report questionnaire.  It was the

8    Toronto Empathy Questionnaire.  And it asks how often he may or

9    may not feel things regarding how he cares about other people or

10   can place himself in their position.

11   Q.   And what was your conclusion regarding that test in terms

12   of his level of empathy?

13   A.   He scored in a normal range, meaning that he had a normal

14   degree of empathy.  And this actually was in historical records

15   where he was described as having average social perception and

16   average empathy, in both his school records and by Dr. Gorman.

17           MR. GREENE:  Objection, move to strike; nonresponsive,

18   hearsay.

19           THE COURT:  Overruled.  She's an expert.  She can rely

20   on other records.

21           BY MR. NESTLER:

22   Q.   And let's put a finer point on this, Dr. Askenazi.  So did

23   you reach a conclusion regarding Mr. Isaacs's level of empathy?

24   A.   Yes, that it was intact.  It's average.

25   Q.   And what did you base your conclusion on?

1    A.    It's both that test, as well as questions that I asked him

2    during interview and his responses to those.

3    Q.    And was it also based on your review of the records you

4    were just mentioning?

5    A.    Yes, it was.

6    Q.    So what kinds of things did you see in the records you

7    reviewed that led you to your conclusion that he had an average

8    degree of empathy?

9    A.    Can I cite it specifically?

10   Q.    You sure can.

11   A.    Okay.  So we know that he saw Dr. Gorman in 2010 when he

12   was 10 years old, and he did some testing.  And there's a

13   section in his report called "social perception."  And it

14   specifically says, "William's ability to assess affect, happy,

15   sadness, anger, was normal for his age.  In addition, his

16   ability to take others' perspectives and understand and

17   interpret social nuances was average for his age."

18   Q.    And that was the report from Dr. Gorman when he was ten

19   years old?

20   A.    Yes, that's correct.

21   Q.    Okay.  And you also were referencing one of his middle

22   school records; is that right?

23   A.    Yes.

24   Q.    And can you summarize it, or you can look it, which is,

25   what did you see in his middle school records that led you to

1    believe he had average empathy levels?

2    A.    Okay.  So one of his middle school records -- and again,

3    I'm quoting from the record.  This isn't my words.  "He is a

4    bright student and loves science class.  He is very creative and

5    is good with skills involving designing and putting things

6    together.  He is able to verbally express his challenges.  He

7    does well with concrete concepts and directions.  William is

8    empathetic."

9    Q.    You also indicated that you had talked with him when you

10   were meeting with him for your assessment.

11         Did you ask questions that were designed to elicit whether

12   he was empathetic?

13   A.    Yes.  These are involving his specific feelings and

14   thoughts regarding the January 6 events.

15   Q.    Did you ask him about his feelings about police officers on

16   January 6?

17   A.    I asked him very specifically, "How do you think the police

18   officers felt on that day at the Capitol?"

19   Q.    What did he say?

20   A.    He said that he imagined that they felt intimidated and

21   that this would affect their psychological adjustment.

22   Q.    And what did that mean for you in terms of his level of

23   empathy?

24   A.    That he certainly could put himself in their shoes and see

25   things from their perspective.

1   Q.   So if he does not exhibit mind-blindness, in your opinion,

2   did you determine whether he had any deficits associated with

3   autism or ASD?

4   A.   Are you saying specifically in terms of mind-blindness --

5   Q.   You said not mind-blindness.  Was there any area in which

6   you did assess he had any particular deficit?

7   A.   So he did report in terms in association with autism

8   spectrum disorder that he does have some difficulty reading

9   people's emotions, and he doesn't feel comfortable expressing

10  his own emotions.

11  Q.   So do you have any opinion regarding his ability to

12  interpret facial expressions?

13  A.   Yeah, so I did this thing where I made facial expressions

14  and asked him to tell me what he thought they meant.  And then I

15  asked him to mimic.  So he could mimic all of them without

16  difficulty, even though he said he doesn't like to smile, and he

17  could recognize happiness, he could recognize sadness.  But

18  anger, he thought it was more just pensive or thoughtful.

19  Q.   And so what did that mean for you in terms of that he had

20  some trouble with recognizing your facial expressions?

21  A.   That's consistent with ASD.

22  Q.   And so does that have anything to do with nonverbal

23  communication?

24  A.   So that is a part of what we say nonverbal communication.

25  So that would be facial expressions and sometimes like hand

1   expressions or things like that.

2   Q.   Okay.  Does it have anything to do with spoken words?

3   A.   No.

4   Q.   Or written words?

5   A.   No.

6   Q.   Or situations?

7   A.   No.

8   Q.   And how would you describe someone in his situation who

9   might have trouble with interpreting facial expressions in terms

10  of whether someone was wearing a mask?

11  A.   It would be the same as you and I trying to interpret

12  someone else's facial expression if they were wearing a mask.

13  We might have to ask them if we can't see if they're smiling

14  underneath or, you know, grimacing underneath.

15  Q.   So during COVID times and people were wearing masks, did

16  people exhibit similar characteristics?

17  A.   I believe so.  Like you weren't always sure, are you

18  telling a joke, I can't tell if you're smiling or not.  So you

19  have to ask just to clarify.

20  Q.   Now, Dr. Sperry testified that Mr. Isaacs was cognitively

21  rigid.

22       Have you heard of that phrase before?

23  A.   Yes.

24  Q.   What does it mean?

25  A.   So to be rigid means that you're stuck in your same

1    patterns of thinking, that it's difficult to adjust your

2    thinking and maybe integrate new information.

3    Q.   Did you perform any tests or assessment on Mr. Isaacs to

4    assess whether he was cognitively rigid?

5    A.   So there's a test called the Wisconsin Card Sorting Test

6    that looks at unusual problem solving.  And you give them

7    nonspecific feedback and see how they integrate it to figure out

8    sorting strategies.  And then you switch it up on them, and you

9    see if they can figure out -- if they can shift their

10   strategies.  And that would be contrary to being cognitively

11   rigid; you wouldn't be able to switch.  He did quite well on the

12   test.

13   Q.   Dr. Sperry also testified that people with autism could

14   display deficits with social queues or situations.

15        Is that accurate, that people with autism could display

16   such deficits?

17   A.   Yes.

18   Q.   In your opinion, does Mr. Isaacs display such deficits?

19   A.   He didn't report them.  He said he sort of was fine in

20   social settings, even though he was uncomfortable when people

21   were overly emotional or he couldn't read their faces.  But

22   other types of queues, you know, the situation or what they were

23   saying, he was good with those.

24   Q.   And did Dr. Gorman, back in 2010 when he was first

25   diagnosed with autism, have anything to say about Mr. Isaacs's

1  affect?

2  A.   His affect at that point was relatively flat, but sort of

3  like normal emotional functioning.

4  Q.   While you were meeting with Mr. Isaacs, did you talk to him

5  about his time in the Navy?

6  A.   I did speak with him about that.

7  Q.   Did you ask him why he did not make it through boot camp?

8  A.   I did.

9  Q.   What was his answer?

10  A.   He said he could not pass the physical aspect of it, that

11  even though he was good at doing things like sit-ups and

12  pull-ups and push-ups, that he hated to run, and his aerobic

13  capacity was never good, and so he could not pass the physical

14  aspect of boot camp.

15  Q.   Did he tell you anything with regard to his Navy service

16  and his separation from the Navy had anything to do with autism?

17  A.   No, he did not.

18  Q.   Did you ask him or did you assess his ability to tell right

19  from wrong?

20  A.   Yes, we spoke about that.

21  Q.   Why did you do that?

22  A.   Because you want to know whether or not a person

23  appreciates both the idea of there are legal as well as moral

24  issues and can you make the distinction as to making that

25  independent decision whether you think something is right or

1    wrong, legal or illegal.

2    Q.   And did you ask him about what happened on January 6 and

3    whether he thought what he was doing was right or wrong?

4    A.   Yes, I did.

5    Q.   Why did you do that?

6    A.   Because given the specific question that I was asked to

7    answer regarding his intent, that is something you need to know,

8    what were his thoughts, what were his intentions, how did he

9    perceive the situation.

10   Q.   What were his answers to you regarding his actions on

11   January 6 and whether they were right or wrong?

12   A.   So the way he described it, and we're talking about the

13   time near the Capitol, is he did not initially perceive that

14   anything was wrong.  He didn't -- he informed me he didn't see

15   police there.  He thought people were just there to hear

16   additional speakers, that it was going to be a peaceful protest,

17   and then by the time he got into the Rotunda inside of the

18   Capitol, he realized it was dangerous and he shouldn't be there,

19   and at that point, he didn't know what to do to get out.

20        And he actually expressed that he was glad to have been

21   maced, because then he had a reason to then leave the Capitol.

22   Q.   Did he indicate anything about his memory or what he was

23   trying to do with his memory with respect to what happened on

24   January 6?

25   A.   He was very explicit in saying that he had tried to forget,

1    that he -- that he was 99 percent involuntarily, involuntarily

2    trying to forget those events.  He didn't like to talk about it.

3    He wanted it to go away.  He didn't want to deal with the

4    situation.  And that's why his memory was much better when he

5    spoke to the FBI than when he had spoken with me, because he did

6    not want to remember these events.

7    Q.   Did he tell you anything about remembering being crushed?

8    A.   Yes, he did.

9    Q.   What did he say about it?

10   A.   He said that he felt like he couldn't move, that he had

11   gotten pushed in.  And there were some other comments that he

12   made that he had actually gotten mad the second time he had

13   gotten crushed because it was happening again and he couldn't

14   get out of that situation.

15   Q.   What did it mean for you that he was telling you that he

16   had gotten mad?

17            MR. GREENE:  Objection; irrelevant what it meant to

18   her.

19            THE COURT:  It's overruled.  Go ahead.

20            THE WITNESS:  The main thing is that it actually told

21   me he remembered more than what he was actually saying in the

22   moment.

23            MR. GREENE:  Objection.  She's commenting on the

24   credibility of a witness.

25            THE COURT:  Phone, please.

1        (Bench conference.)

2            THE COURT:  She's not directly testifying about his

3    credibility on the day he was with her.  So I'm not sure she's

4    testifying about his credibility here in court.

5            MR. GREENE:  It's certainly the entire intended

6    implication of the question, Your Honor.  She asked him did he

7    have a better memory now than then, and that's what she's

8    saying.  And she concludes in her report, we all know she

9    concludes he was lying, that he remembers more.  She actually

10   says that in the final paragraph, I believe, of her report.

11       So this question is designed to at least give the

12   implication, if not the express statement, that he's lying.  So

13   she's commenting on his credibility.

14           THE COURT:  Okay.  Why don't we move on.

15           MR. NESTLER:  I'm sorry, Your Honor.  We're not asking

16   her to comment on his testimony or asking her to comment on what

17   he told her during the assessment, which I think is perfectly

18   fair game.

19           THE COURT:  Right.  And I think that question was

20   asked and answered, and then the follow-up question is what did

21   that mean for you, and that's what drew the objection.

22           MR. NESTLER:  I can reframe it as to what it meant for

23   her in terms of assessing him during her evaluation.

24           MR. GREENE:  It's the same problem, Your Honor.

25       And also, while we're here, a question slipped by me where

1    I want to make sure he's not going to get into the specific

2    intent on January 6th, which you told us all to stay away.  I

3    believe Mr. Nestler slipped in a question while I was reading

4    something else.

5         So I hope we're not going there, and I would ask that

6    Mr. Nestler not to go there.  She's not supposed to opine about

7    the issue that goes to the jury, did he have intent on

8    January 6th.

9              MR. NESTLER:  I know the guardrails.

10             THE COURT:  Let's move forward.  I will sustain the

11   objection, and ask you to move forward, please.

12        (End of bench conference.)

13             THE COURT:  The objection is sustained.

14             BY MR NESTLER.

15   Q.   So did you come to a conclusion about Mr. Isaacs's ability

16   to recognize right from wrong?

17   A.   Yes.  And it wasn't just from my interview.  Dr. Sperry

18   actually asked him about it at length, and he gave excellent

19   examples with her.

20   Q.   Like what?

21   A.   So she asked him the difference between legal and illegal

22   and right from wrong.  And he had made the statement that's in

23   her report about stealing a can of soup would be illegal, but

24   giving it to a homeless person wouldn't be wrong.

25             MR. NESTLER:  No further questions, Your Honor.

```
 1              THE COURT:  All right.  Let's take a short break.
 2    Although we haven't been going quite as long, our court reporter
 3    has been going for almost an hour and a half.  So we will take a
 4    slightly shorter break this afternoon.  We will resume at 2:35.
 5    See everybody shortly.
 6         Thank you.
 7         (Jury exited courtroom.)
 8              THE COURT:  Dr. Askenazi, I ask you not to discuss
 9    your testimony during the break.  Thank you.
10         (Recess taken from 2:28 p.m. to 2:38 p.m.)
11         (Jury entered courtroom.)
12              THE COURT:  All right.  Please be seated, everyone.
13    Let's continue forward.
14         Mr. Greene.
15              MR. GREENE:  Thank you, Your Honor.
16                       CROSS-EXAMINATION
17              BY MR. GREENE:
18    Q.   Good afternoon again.
19    A.   Good afternoon.
20    Q.   Third time.  I want to ask you a few questions just to
21    clarify some things.
22         You're not a medical doctor, are you?
23    A.   No, I'm not.
24    Q.   You're a scientist?
25    A.   I'm a psychologist.
```

1    Q.   Is that a -- is psychology a science?

2    A.   I'm not sure what you're saying.  I consider a medical

3    doctor a scientist as well.  I'm not sure what you're asking.

4    Q.   In your field, is autism a recognized developmental

5    disability?

6    A.   Yes -- I wouldn't say disability.  Disability is a legal

7    term.  It's a developmental disorder.

8    Q.   But it's characterized in the legal arena as a disability,

9    isn't it?

10   A.   It can potentially --

11            MR. NESTLER:  Objection.

12            THE COURT:  That's sustained.

13            BY MR. GREENE:

14   Q.   Is -- do you have patients?

15   A.   No, I do not see patients for treatment purposes at this

16   time.

17   Q.   You don't do clinical plans for people?

18   A.   No, I do not.

19   Q.   You don't help people get better?

20   A.   I hope that I can help people get better, but I don't do

21   treatment planning, and I actually never saw treatments on a

22   regular basis as a neuropsychologist, just as a general

23   psychologist.

24   Q.   You told the jury earlier and it says on your website that

25   you only take legal referrals; correct?

```
 1    A.   At this point, yes, that's correct.

 2    Q.   That means you only get involved if there's a lawsuit?

 3    A.   It's not just a lawsuit.  I also do things like immigration

 4    cases, exceptions for citizenship, things like that.

 5    Q.   So you only get involved if there's a case of some sort;

 6    correct?

 7    A.   Yes.  I'm a full-time forensic psychologist.

 8    Q.   And you only -- and when you get involved, you get involved

 9    on one side or the other usually?

10    A.   Yes.

11    Q.   You're hired by one of the parties?

12    A.   Yes, I'm hired by one of the parties, that's correct.

13    Q.   In this case, you're hired by the Department of Justice

14    through Mr. Nestler; correct?

15    A.   Yes, that's correct.

16    Q.   Now, William Isaacs has autism, doesn't he?

17    A.   Yes, he does.

18    Q.   You diagnosed William Isaacs with autism yourself?

19    A.   Yes.

20    Q.   And you know he's been diagnosed by others as well;

21    correct?

22    A.   Yes.

23    Q.   You know he was first diagnosed at age 10; correct?

24    A.   Yes.

25    Q.   And he also has ASD -- or ADHD; correct?
```

1    A.    Yes.  That was diagnosed prior to then and for which he was

2    receiving treatment as a child.

3    Q.    But he has ADHD not instead of but in addition to autism;

4    correct?

5              MR. NESTLER:  Objection.

6              THE COURT:  I'll allow that one question.  Go ahead.

7              THE WITNESS:  Can you repeat that?

8              BY MR. GREENE:

9    Q.    He has ADHD not instead of but in addition to autism;

10   correct?

11   A.    Yes.

12   Q.    You've diagnosed him that way yourself?

13             THE COURT:  That's sustained.

14             BY MR. GREENE:

15   Q.    You agree that in your report you did a test and you

16   concluded that William Isaacs indicates significant autistic

17   traits?  Do you agree with that?

18   A.    Traits that are significant for autism, yes.

19   Q.    And on the tests that you administered to him, he scored in

20   a range that indicated he had significant autistic traits?

21   A.    Significant in the term that it fell into the range of

22   autism.  Significant just means that it statistically fell.  It

23   doesn't actually give its severity, like mild, modest, severe.

24   It's just a general questionnaire.  It doesn't give the level.

25   Q.    But at the top of page 23 of your report you have in front

1    of you, your words were, you gave him a test and the result

2    indicates significant autistic traits?  Were those your words?

3    A.   Yes, that's correct.  It's significant for autism.

4    Q.   And you agree that autism now is called ASD?

5    A.   Yes.

6    Q.   Because of the variations in which people were treating

7    things with Asperger's and different names, they created a

8    spectrum on which now everybody with an autistic order falls.

9         Do you agree with that?

10   A.   Yes.  It was always a spectrum kind of disorder, but they

11   were always updating the names and changing the way that they

12   quantify disorders.

13   Q.   Our information about autism continues to evolve, doesn't

14   it?

15   A.   Yes.

16   Q.   And right now, there are three levels of ASD?

17   A.   Yes.

18   Q.   Only three levels?

19   A.   Yes.

20   Q.   There's not a minus level 1?

21   A.   That's correct.

22   Q.   There's not a subpar level 1?

23   A.   No, there isn't, but I refer sometimes to subpar where it's

24   questionable whether they actually meet full criteria even

25   though clearly he may have met full criteria in the past.

1   Q.   There are three levels and only three levels, one, two, and

2   three; correct?

3   A.   Yes.

4   Q.   And William Isaacs is a level 1?

5   A.   Yes.

6   Q.   And people at level 1 need support?

7   A.   Well, and that's, of course, my issue why I report him as

8   being subpar.

9   Q.   I didn't ask you the reason.  Do people at level 1 -- I

10   don't mean to be disrespectful.

11        Do people at level 1 need support?

12   A.   The definition of it, yes.

13   Q.   Do you know what sort of support William receives?

14   A.   My understanding is he does not receive day-in/day-out

15   support.

16   Q.   Do you know how long William Isaacs has lived alone?  His

17   entire life, how long has he lived alone?

18   A.   When I had seen him, he had been living alone for several

19   months.  Plus, he had been living with his grandmother and

20   caretaking for her.

21   Q.   And did they have another caretaker living with them during

22   that time?

23   A.   For part of that time until William asked him to leave.

24   Q.   And after that person left, did anybody else help care-take

25   for both of them?

1    A.   On a daily basis, not that I'm aware of.

2    Q.   You never met with any of his family members, did you?

3    A.   No.

4    Q.   Because, you indicated in earlier testimony, you didn't

5    need to because it was so clear he had ASD; correct?

6    A.   Well, you're asking two different questions there.  I did

7    not speak with his family members, and I had already diagnosed

8    him with ASD.

9    Q.   You didn't see a need to meet with the family members;

10   correct?

11   A.   That's correct.

12   Q.   Does William Isaacs pay for his electricity where he lives?

13            MR. NESTLER:  Objection.

14            THE WITNESS:  He had told me that his grandmother had

15   a pension and that she paid for everything related to the house.

16            BY MR. GREENE:

17   Q.   So he doesn't pay for rent or gas or water or cable or any

18   of those things, does he?

19   A.   My understanding, he told me that his grandmother owned the

20   property in full and otherwise from her pension paid for all of

21   the utilities.

22   Q.   What support does William Isaacs pay for himself?

23            THE COURT:  Can we move on?  Thank you.

24            MR. GREENE:  Thank you, Judge.

25            BY MR. GREENE:

1    Q.   You are a professional witness, aren't you?

2    A.   I am an expert witness.  I do all forensic witness.  So any

3    of my cases could potentially lead to me testifying in a case.

4    Q.   You get paid to testify?

5    A.   I get paid to work and to testify and to review records.

6    All my work gets paid.

7    Q.   And you're getting paid today?

8    A.   Yes, absolutely.

9    Q.   And in fact, before today, you billed the government

10   already, Mr. Nestler, over $41,000; correct?

11   A.   I don't know the total, but that sounds like it's probably

12   accurate.

13   Q.   Well, let me show you what we will mark as WI-6.

14        May I approach the witness, Your Honor?

15        Can you identify that for us.

16   A.   This is my most recent contract with the government in this

17   matter.

18   Q.   With Mr. Nestler's office?

19   A.   That's correct.

20   Q.   And how much are you being paid an hour for your work on

21   this case?

22   A.   So it's $420 an hour for work hours and $210 an hour for

23   travel time.

24   Q.   And how much have you billed so far in this case?

25   A.   That's what I'm saying.  I'm not sure what that total is,

1  but this is the amount that's been earmarked for me to bill up

2  to.

3  Q.   Okay.  So it says -- on the last page where it

4  says "current: $40,3428.44" --

5  A.   That's the earmarked amount.  And that includes the flights

6  and the hotels and all that, here twice, Florida, yes.

7  Q.   So you haven't accumulated so far exactly how much you're

8  going to bill the government at $420 an hour?

9  A.   No.  I won't know until I complete my work in the matter.

10  Q.   Well, how many hours have you spent on this matter?

11  A.   I don't know that exactly.

12  Q.   Well, you told us all the records you reviewed.  Did that

13  take you one hour to review them?  Ten hours to review them?

14  A.   Oh, no.  This is a really lengthy case.  It takes me a long

15  time to review it, to look at the videos, to do the report, to

16  do the in-person interview, to do the scoring.

17  Q.   You've got at least 100 hours in this, don't you?

18  A.   No, because if you look here, you would see that wouldn't

19  cover up to 100 hours.  But I would certainly say at least 50 or

20  60 hours.

21  Q.   This is not the first time you've testified for the

22  Department of Justice, is it?

23  A.   No, it is not.

24  Q.   This is not the first time you've testified for

25  Mr. Nestler's office, is it?

1  A.   I'm not sure when you say his office.  I have never worked

2  with him before, but I've worked with the D.C. Courts before.

3  Q.   You've worked with the United States Attorney's Office for

4  the D.C. Circuit before?

5  A.   Yes, I have.

6  Q.   And you've worked for the Department of Justice in other

7  states across the country before?

8  A.   Yes, because I'm a specialist in death penalty work, and

9  there's not many of us throughout the country.

10  Q.   We will get to your death penalty work in a minute.  But

11  you've worked for the Department of Justice across the country

12  in various cases testifying for it?

13  A.   Yes, I have.

14  Q.   And you've never ever ever ever taken a position adverse to

15  the Department of Justice in a criminal case, have you?

16  A.   That's not correct.  Just because you don't see it and you

17  don't know the cases I'm working on doesn't mean that's the

18  case.

19  Q.   Okay.  So you will agree that you have a list of noteworthy

20  cases in various places, on your website and elsewhere; right?

21  A.   Yes.

22  Q.   Do any of those list a case where you've ever testified

23  against the Department of Justice?

24  A.   I'm not sure if it does or not, but a lot of times, I get

25  hired and it's for preliminary evaluations that don't go to

1    trial, that go to someone taking a plea deal.

2    Q.   So you have a company in Ohio?

3    A.   Yes.

4    Q.   And the name of your company is Neuropsychology and

5    Forensic Psychology, Ltd?

6    A.   Neuropsychology and Forensic Psychology Specialty Services,

7    yes.

8    Q.   How many people work for you?

9    A.   It's just me.  I do all the work.

10   Q.   And you've got a website that you advertise to people, you

11   tell people what you want them to know about yourself?

12   A.   Yes.

13   Q.   And do you agree that your website says -- did you write

14   the stuff on your website yourself?

15   A.   Yes.

16   Q.   And would it be accurate that your website says that your

17   current focus is on evaluating adults with concerns of emotional

18   functioning and cognition, i.e. thinking, in order to clarify

19   diagnoses, determine cognitive functions, and make legal

20   opinions and recommendations"?

21   A.   That sounds right.  I don't have it in front of me, but

22   yes.

23   Q.   Does that sound about right, except for me butchering a

24   couple of words there?

25   A.   Yes.

1   Q.   It doesn't say anything about that your focus is on autism

2   anywhere, does it?

3   A.   I would need to go to the page that identifies different

4   type of conditions that I do work with, but it would fall under

5   like a developmental disability.

6          MR. GREENE:  May I approach the witness, Your Honor?

7          THE COURT:  Yes.

8          BY MR. GREENE:

9   Q.   I've handed what we will mark as WI-7.  Is that a page from

10  your website?

11  A.   Yes, it is, although it looks different than what my page

12  looks like, but yes.

13  Q.   But you have there in the first paragraph the focus thing I

14  just read; correct?  Your focus -- current focus is on

15  evaluating adults, et cetera?

16  A.   Yes.

17  Q.   And then you define "neuropsychology," which is what you

18  do; correct?

19  A.   Yes, but I'm a general psychologist as well.  That's the

20  whole point.  I do things like --

21  Q.   This is on your website.

22  A.   Yes.

23  Q.   This is where you tell people what you do and what you want

24  people who may hire you to know; correct?

25  A.   Yes.

1   Q.   So tell us, what do you tell them "neuropsychology" is?

2   A.   This is a definition of "neuropsychology."

3   "Neuropsychology is the science of the relationship between

4   brain functioning and behaviors in thinking processes.  A

5   clinical neuropsychologist is someone who specializes in the

6   assessment of individuals with complaints in behavior and

7   thinking to determine what can be attributed to abnormal or

8   normal brain functioning, emotional issues, and/or situational

9   factors.

10  Q.   Does the word "autism" or the acronym "ASD" appear anywhere

11  in that definition?

12  A.   No, because that doesn't define neuropsychology.  That's a

13  single psychological disorder.

14  Q.   I understand.  I don't know -- I'm not a scientist.

15       I don't see the word "autism" or "ASD" in there, do you?

16  A.   No.  I do not name any condition in there.

17  Q.   Thank you.  And then you go on to define "forensic

18  psychology"; correct?

19  A.   Yes.

20  Q.   How do you define "forensic psychology"?

21  A.   So I have written here, "Forensic psychology is the

22  practice of evaluating the psychological status of an individual

23  in association with specific legal questions.  Forensic

24  neuropsychology integrates the assessment of brain functioning

25  in answering such legal questions."

1    Q.   And just to punctuate the obvious, "ASD" and "autism," that

2    doesn't appear in that definition either, does it?

3    A.   No, it does not.

4    Q.   How much time have you spent with the prosecutors in

5    getting ready for this case?

6    A.   A few hours.

7    Q.   A few hours today?

8    A.   No, not today.  Yesterday.

9    Q.   How many hours did you spend yesterday?

10   A.   About an hour and a half yesterday.

11   Q.   And have you been in touch with the prosecutors throughout

12   this trial?

13   A.   Yes, I have.

14   Q.   We got a whole bunch of e-mail last night.  You've

15   exchanged a lot of e-mail with the prosecutors during the course

16   of this trial?

17   A.   Yes.

18   Q.   Have they been keeping you advised of what's been going on

19   in the courtroom?

20   A.   Yes, for the most part.

21   Q.   They've told you things like William Isaacs is wearing

22   headphones during the trial?

23   A.   Yes.

24   Q.   You discussed the mom's testimony?

25   A.   Yes.

1    Q.   You discussed William's testimony?

2    A.   Yes.

3    Q.   You discussed the things that they said and how they

4    appeared in the courtroom?

5    A.   Yes.

6    Q.   You discussed Dr. Sperry's testimony?

7    A.   Yes.

8    Q.   How she appeared, how she came across?

9    A.   I don't know about that.  I think we focused more on the

10   text, and I read the transcript.

11        MR. GREENE:  May we go to the phone for a moment.

12        (Bench conference.)

13        MR. GREENE:  I am obligated to make a motion to strike

14   her testimony for violation of the rule of sequestration when

15   she discussed the testimony of mom and William Isaacs's

16   testimony and things going on, the headphones.  There is no

17   exception made for her being an expert that she could hear

18   Dr. Laura Sperry's testimony.

19        I believe the case law will support me on this one, that

20   when an expert violates the rule of sequestration, the proper

21   remedy is to strike them.

22        MR. NESTLER:  We disagree, first of all.  There's no

23   usual remedy under the rule of sequestration or violation

24   therefor.  Usually, if there was a violation, the remedy would

25   be the defense could cross-examine the witness about it.

1      Regardless, there was no violation under the rules of

2    sequestration because we already specifically flagged for the

3    Court that Dr. Askenazi was going to be reviewing the trial

4    transcript of Mr. Isaacs's testimony, as well as Dr. Sperry's

5    testimony.  And Your Honor actually, I believe, offered to make

6    a remote connection available for her to watch it live.  She was

7    not able to do so.  So we provided her with a transcript.

8          MR. GREENE:  I believe the only exception was for

9    Dr. Sperry.  It was not for Mr. Isaacs, and I'm relying upon

10   Mr. Rossi somewhat for this, but there was no exception for the

11   mom, none whatsoever.

12         THE COURT:  That may be, but even if there was no

13   exception, and I'm not suggesting there was or there wasn't, she

14   hasn't said a word about the mother.  There's nothing she has

15   said thus far that is based upon the mother's testimony.  So I

16   don't see how it in any way prejudices Mr. Isaacs that she has

17   seen or learned about the mother's testimony.

18     So the motion is denied.  We have talked about her having

19   access.  She is an expert.  She can rely on trial testimony.

20   Frankly, she could have been here if she had requested it.  So

21   at least she was able to do so with Dr. Sperry's testimony, and

22   I don't think I placed a limit on her with respect to

23   Mr. Isaacs's testimony.  To the extent it wasn't mentioned, it

24   was likely because the decision to put Mr. Isaacs on was made

25   quite -- when you all made it, and our discussion about what she

1    could have access to preceded that.

2         MR. GREENE:  Under the case law, Judge, and I will be

3    glad to follow up, I will note there's no automatic exemption

4    for an expert and that they need to seek specific relief, and it

5    wasn't sought.

6         But I will move on.  I understand.

7         (End of bench conference.)

8         BY MR. GREENE:

9    Q.   You indicated that a lot of your testimony was in capital

10   cases.

11   A.   Yes.  I've done a lot of testifying in sentencing and

12   hearings for Capitol cases.

13   Q.   You've now testified more than 65 times; is that correct?

14   A.   Overall, yes.

15   Q.   And more than 40 of those have been in capital cases?

16   A.   I have worked in approximately 40 capital cases.  I have

17   not testified in all of those.

18   Q.   And capital cases are where --

19   A.   The death penalty is a potential sentence.

20   Q.   So you've worked to more than 40 death penalty cases?

21   A.   Yes, I have.

22   Q.   And you work for the government?

23   A.   For the government, for defense, prosecution, whoever hires

24   me.

25   Q.   How many of your death penalty cases have involved people

1   with autism?

2   A.   One.

3   Q.   How many of the cases in which you've testified have

4   involved people with autism?

5   A.   If you're talking about criminal cases, I have had two.

6   Q.   And how many criminal cases have you worked on?

7   A.   Oh, criminal cases overall?  Well, I used to be a

8   consultant for two court systems.  So you're talking about near

9   a thousand, if not more, criminal cases.

10   Q.   And two of those involved people with autism?

11   A.   Yes, because I only work with adults, keep in mind.  I'm

12   not a treating doctor.  I don't work with children.

13   Q.   Can you give me the name of a case where you've testified

14   on the issue of autism.

15   A.   No, I can't.  You asked me that before.  I cannot recall

16   the other one, and the other one I can't disclose at this time.

17   But one was for defense, and one was for prosecution, and it was

18   mitigating in both factors.

19            MR. GREENE:  May I approach, Your Honor?

20            THE COURT:  You may.

21            MR. GREENE:  Is next noted WI-8?  Thank you.

22            BY MR. GREENE:

23   Q.   I guess I could have used the government's, but this is

24   your CV?

25   A.   Yes.

1    Q.   This is the same thing you identified earlier with your

2    questioning from Mr. Nestler?

3    A.   Yes.

4    Q.   And a CV is where you tell the world about yourself;

5    correct?

6    A.   Yes.

7    Q.   And "CV" stands for curriculum vitae; correct?

8    A.   Yes.

9    Q.   But it's a resume?

10   A.   Yes.

11   Q.   It's where you sell yourself to the people who might want

12   to buy your services?

13   A.   Yes.

14   Q.   You tell them everything you have to sell so that they

15   might buy it; correct?

16   A.   Well, not everything.  That would be highly extensive, if I

17   listed every single diagnosis I've ever worked with.

18   Q.   You give them the key things?

19   A.   Yes.

20   Q.   The things that stick out about you?

21   A.   Yes, for the most part.

22   Q.   The things that -- when you're doing a CV or a resume,

23   that's not the time to be humble, is it?

24   A.   No.

25   Q.   That's when you want to tell everybody the things you do

1    and what you do well; right?

2    A.   Well, it's not supposed to be what I do well.  It's really

3    a listing of what I do and what I have done.

4    Q.   So the first category you have is "licensure and

5    certification"; correct?

6    A.   Yes.

7    Q.   There's four licenses mentioned; right?

8    A.   Yes, different type of licenses and board certifications.

9    Q.   Does the word "autism" or "ASD" appear in any of those

10   licensures or certification?

11   A.   No.

12   Q.   The next category of stuff you have is "training."  I'm not

13   going to go through everything, but I'm going to hit the

14   categories.

15   A.   Yes.

16   Q.   Does the word "autism" or "ASD" appear under any of your

17   training?

18   A.   No.

19   Q.   The next category you have is "education"; correct?

20   A.   Yes.

21   Q.   Does the word "autism" or "ASD" appear under any of your

22   education?

23   A.   No.  Absolutely no diagnoses are in any of those

24   categories.

25   Q.   The next category is you have "clinical and research work

1   experience"; correct?

2   A.   Yes.

3   Q.   Does the word "autism" or "ASD" appear anywhere under that

4   category?

5   A.   No.

6   Q.   Then you have "select cases"; correct?

7   A.   Yes.

8   Q.   And these are cases you selected that you want the world to

9   know about?

10   A.   And that I can disclose because it's in the public record,

11   yes.

12   Q.   But the person that selected these cases is you, number 1;

13   correct?

14   A.   Yes.

15   Q.   And number 2, you selected these because you thought they

16   told the world significant things about yourself?

17   A.   Yes.

18   Q.   Did any of those cases involve ASD?

19   A.   All of them.

20   Q.   A lot of capital murder cases where you testified for the

21   prosecution; right?

22   A.   Prosecution and defense, yes.

23   Q.   But there's at least seven where you testified for the

24   prosecution; right?

25   A.   Yes, which is a smaller number than the number I've done

1    for defense.

2    Q.   And the next category you have is "presentations."  And

3    these are things that you've presented to other people; right?

4    A.   Yes.

5    Q.   How many of your presentations have involved -- does the

6    word "ASD" or "autism" appear under your presentations?

7    A.   No diagnoses appear there.

8    Q.   And in the next category, you have "select publications";

9    is that right?

10   A.   Yes.

11   Q.   And how many of your select publications mention the word

12   "autism" or "ASD"?

13   A.   It's not mentioned there.

14   Q.   And the next category is "professional organizations";

15   correct?

16   A.   Yes.

17   Q.   Under that category, does it mention the word "ASD"

18   or "autism"?

19   A.   No.  My knowledge is much broader than that.

20        MR. GREENE:  May I approach the witness, Your Honor?

21        THE COURT:  You may.

22        MR. GREENE:  Thank you, Judge.

23        BY MR. GREENE:

24   Q.   Can you identify what I've marked as WI-9?

25   A.   Yes.  It's a prior testimony list.  So what we do as

psychologists, especially forensic psychologists, you write a
summary of prior cases you've been on, who you were hired by,
and what type of work you may have done, if you've testified or
given a deposition.

Q.   So this is something you use as a part of your legal
services to tell people where you've testified?

A.   It's specifically requested in the federal court system to
be provided.

Q.   And this is all of your testimony since 2008; correct?

A.   For the most part.  It doesn't include this year's, but
yes.

Q.   And none of those cases involved autism or ASD, did they?

A.   No, because, again, these are all testimony ones.

Q.   And if you go to page 2, you were hired by the Department
of Justice in 2021?

A.   I'm sorry.  Which case are you looking at?

Q.   *United States v. Kirby Cleveland*.

A.   Yes.

Q.   And if you go to the one right below that, you were hired
by the Department of Justice in 2019?

A.   That was the same case.  I testified multiple times on it,
yes.

Q.   So -- but in two different years?

A.   Yes, because, as you know, these cases tend to take many
years to complete.

```
 1    Q.   If you go to the next-to-the-last page, you testified for
 2    the Department of Justice in 2012?
 3    A.   Yes.
 4    Q.   And then you testified for it again in a different case in
 5    2012?
 6    A.   Yes, that's correct.
 7    Q.   And then you testified for the Department of Justice in
 8    2011?
 9    A.   Yes, that's correct.
10    Q.   And if you go to the next page, you testified for the
11    Department of Justice in 2010?
12    A.   Yes.  And if you look at the summary, it says I did 25
13    cases for defense and 13 for prosecution, so about twice as many
14    for the defense than for the prosecution.
15    Q.   Do you agree that the Handbook of Forensic Neuropsychology
16    is a learned treatise recognized in your profession?
17    A.   I'm not sure how you define "learned treatise," but it's
18    considered authoritative in our field.
19    Q.   So it's authoritative, and you rely upon it?
20    A.   Yes, I do.
21    Q.   And did you give a copy of it to Mr. Nestler?
22    A.   I didn't give him a copy of the book.  I just sent him a
23    copy of a page defining "mind-blindness."
24    Q.   So you sent him a copy of a page from this book, Handbook
25    of Forensic Neuropsychology?
```

```
 1   A.    Yes.  It's a pretty big book, yes.

 2   Q.    You sent him page 495?

 3   A.    Whatever page number it is.  I don't know.

 4              MR. GREENE:  May I approach the witness, Your Honor?

 5              THE COURT:  You may.

 6              BY MR. GREENE:

 7   Q.    I'm going to add a few more pages to it.

 8              MR. NESTLER:  Can you please show me a copy first,

 9   Mr. Greene?

10        Mr. Greene, I have not seen it.  Can you please show me a

11   copy first?

12              MR. GREENE:  Your office gave it to me.  Kate has it.

13   Pages 494 through 497.

14              MR. NESTLER:  Thank you for identifying them for the

15   record, Mr. Greene.

16              THE WITNESS:  I haven't read through these pages.  I

17   would need time to do that.

18              BY MR. GREENE:

19   Q.    I will give you time to read through anything you need to

20   read through.

21        But can you identify this as being pages within the

22   treatise that you said is authoritative?

23   A.    I'm not comfortable with the term "treatise."  That's not

24   how we refer to the handbook.  The book, in this book.  This is

25   just one of multiple books.
```

```
 1    Q.   This is an authoritative handbook --

 2    A.   It's an authoritative handbook, yes.

 3    Q.   And you and other people in your profession rely upon it?

 4    A.   Yes, that's correct.

 5    Q.   And among other things, it talks about mind-blindness?

 6    A.   Yes.

 7    Q.   And when you sent Mr. Nestler the one page you sent him

 8    yesterday, you didn't send him everything it said about

 9    mind-blindness?

10    A.   Oh, no, I didn't send him the entire chapter or the whole

11    book.

12    Q.   So you sent one page out of an entire chapter about

13    mind-blindness?

14    A.   Yes, because I was advised that that had come up, and I

15    wanted him to see what a textbook would say on this.

16    Q.   But you agree that the entire book, the entire handbook, is

17    authoritative to you and other experts in your field?

18    A.   That's correct.  It's not diagnostic like the *Diagnostic*

19    *and Statistical Manual*, and mind-blindness is a theory.

20    Q.   And do you agree with the statement that an individual with

21    ASD in the forensic arena poses many rather unusual and peculiar

22    problems?

23    A.   Yes, but I don't think any more so than any mental health

24    diagnosis that I've worked with.

25    Q.   Do you agree with the statement that "first, this person
```

1   does not operate in the world in the same manner as the rest of

2   us do"?

3   A.   That's a very broad statement, and as we've discussed

4   before, every single person with every single diagnosis is

5   different.  No two people operate in the world the same as other

6   people do.

7   Q.   Well, at page 494 of the *Handbook of Forensic*

8   *Neuropsychology*, which you said was authoritative, in talking

9   about people with ASD, it says, "First, this person does not

10  operate in the world in the same manner as the rest of us do,"

11  doesn't it?

12  A.   That is what the sentence says, yes.

13  Q.   It goes on to say, doesn't it, "Such individuals do not

14  think like the rest of the population"?  Did I read that

15  correctly?

16  A.   Yes, but that is not correct, because we know that

17  cognitive abilities are not necessarily impacted in this

18  population.

19  Q.   But you -- in the handbook that you said is authoritative,

20  that's what the authorities wrote, isn't it?

21  A.   I wouldn't say that myself, no.  Not everything in this

22  book is correct.  I would go to the *Diagnostic and Statistical*

23  *Manual* in order for diagnoses, looking at the research for the

24  actual statistics.

25  Q.   So in this handbook that you said was authoritative, you

```
 1    pick and choose the things that you like and discard the things

 2    you don't like?

 3    A.   I critically evaluate what's in here, and the reason why I

 4    sent the page that I did is because it had the definition of

 5    mind-blindness by the person who created the concept.

 6    Q.   This whole chapter is on mind-blindness, isn't it?

 7    A.   No, not at all.  The whole chapter is not on mind-

 8    blindness, not at all.

 9    Q.   What's the name of the chapter?

10    A.   "Autism spectrum disorders."

11    Q.   Does it say in this handbook that forensic

12    neuropsychologists, which is what you are, have difficulty

13    conceiving and understanding the perspective of those with ASD?

14    A.   I don't know if it says that.

15    Q.   Well, look at the second paragraph, the first full

16    paragraph on page 494.

17    A.   Okay.

18    Q.   Go to the middle of that paragraph, and tell me if it says

19    that.  I'll read it again so you can find it.

20    A.   Where is it?

21    Q.   "Forensic neuropsychologists have difficulty conceiving and

22    understanding the perspective of those with ASD."

23         Did I read that correctly?

24    A.   Yes, you read it correctly, which is really funny, because

25    the next sentence then acts as if forensic neuropsychologists
```

1    have mind-blindness because then it writes, "This leaves them

2    with trying to understand behaviors from their own perspective,

3    what they would have been thinking if they performed these

4    acts."

5        I haven't read this whole chapter in a long time, but it

6    almost like it's leading up to say a-ha, this is what

7    mind-blindness is.

8    Q.   You read all of page 495, the page you sent Mr. Nestler?

9    A.   Yes, because that was the specific term that came up, and

10   it did not appear that it was presented correctly.

11   Q.   And you agree with page 495?

12   A.   In general, the definition, not the interpretation, just

13   how it was originally defined by the person who coined the term.

14   Q.   Did you agree with everything on page 495 before you sent

15   it to Mr. Nestler?

16   A.   I'm not sure if I agree with everything on that page.  Some

17   of it refers to research.  But I do know that empathy is a big

18   hallmark of the mind-blindness theory.

19   Q.   On page 495, it says, "People with ASD really cannot put

20   their feet in the shoes of others or view the world from the

21   perspective of another."

22   A.   Yes.  So that's basically the definition of it.

23   Q.   Let's get through this.  I will try to get through this

24   real quick, and you can agree or disagree that this is what it

25   says.

1    A.    Okay.

2    Q.    It says, "When asked to tell the story of Snow White and

3    the Seven Dwarfs from Grumpy's perspective, they find that

4    impossible."

5          Is that what it says?

6    A.    That's what it says.

7    Q.    "You get the story as they perceive it, even to the point

8    of talking about the seven little minors"; correct?

9    A.    Yes, that's what's written.

10   Q.    And the last sentence goes, "In the case of some with an

11   ASD, they simply cannot read the emotion of another," next to

12   the last sentence.

13         Is that what it reads?

14   A.    Yes.

15   Q.    And it goes on to read -- and this is all talking about

16   mind-blindness; right?

17   A.    Well, no.  It appears that it's expanding into other areas

18   at this point.

19   Q.    Right above it uses the term -- is defining

20   "mind-blindness," and then it gives examples; right?

21   A.    It does, but then it's continuing and transitioning to the

22   next idea of theory of mind.

23   Q.    Well, under "mind-blindness," under the second paragraph

24   after the word "mind-blindness," it says at the bottom of page

25   495, "Given gross queues such as laughing and crying, they can

conclude that the person may be happy or sad," going over to the

next page, "but the subtle expressions of facial and body

language are not read.  Prosody seems to be poorly perceived at

best, and the person does not have the foggiest idea what the

other person is feeling or that it could be different from what

he or she is feeling."

A.   So that entire paragraph is focused on empathy, both

specific to mind-blindness and more generally, and that's why

they also mention psychopathy in that paragraph.

Q.   Let's go on so we are clear that these guys are talking

about mind-blindness.  Go down to the middle of the page on 496,

the page after the one you sent to Mr. Nestler.

     It says, "Such mind-blindness is discussed by Baron-Cohen

1999"; right?

A.   And so it's mentioned on the page prior.

Q.   And Baron-Cohen is the people mentioned on the page prior

as the experts defining "mind-blindness"; correct?

A.   And it specifically says what I said earlier, that ASD "not

only are unable to have an appreciation for what's going on in

the mind of others, but they cannot imagine a mind different

from their own," which is how I described he had coined the term

originally.

Q.   That is all a part of mind-blindness; correct?

A.   Yes, that sentence right there is mind-blindness, yes.

Q.   Go on to what they say further regarding mind-blindness

1     beginning "there is a presumption."

2     A.    But you have to keep in mind, earlier in that same

3     paragraph, they're talking about theory of mind.

4           THE COURT:  Dr. Askenazi, you will have an opportunity

5     with Mr. Nestler.

6           THE WITNESS:  Sure.

7           THE COURT:  This will go a lot smoother.

8           BY MR. GREENE:

9     Q.    Mr. Nestler will have the opportunity to stand up and ask

10    you for an explanation, but I just want to point out how these

11    experts you rely upon define "mind-blindness."

12          Read the sentence beginning "there is a presumption" and

13    the sentence that follows.

14    A.    Okay.  "There is a presumption that others know what they

15    know somewhat like a collected fund of knowledge.  For example,

16    if they found out that a box labeled cookies actually contained

17    candies, they expect that others will also now know there are

18    candies in there."

19    Q.    And the next sentence.

20    A.    "When pressed later, they can appreciate that the other

21    person would have no way of knowing that, but this appreciation

22    is more through a mechanical determination than insight."

23    Q.    And the next sentence?

24    A.    "Given this quite different orientation to the world, one

25    can see the difficulties of people with ASD when they get into

1    legal difficulties."

2    Q.   And the next sentence.

3    A.   "On the surface, they can resemble people without ASD" --

4         MR. NESTLER:  Objection, Your Honor.  I believe we're

5    getting into portions here that Your Honor has precluded, if

6    Your Honor wants to read the next sentence.

7         THE COURT:  I have to see what it says.

8         MR. GREENE:  May I?

9         THE COURT:  I will sustain the objection as to that

10   line.

11        MR. GREENE:  I think I've made my point.  No further

12   questions.

13        THE COURT:  All right.  Thank you, Mr. Greene.

14   Mr. Nestler, any redirect?

15                    REDIRECT EXAMINATION

16        BY MR. NESTLER:

17   Q.   Okay, Dr. Askenazi.  Let's be clear.  ASD, where does that

18   fall in the realm with psychology?

19   A.   You're talking about like what portion of psychology?

20   Q.   Right.  So which is the greater, and which is the smaller?

21   A.   Okay.  So psychology is the field at large, psychology and

22   psychiatry, and there are hundreds and hundreds of diagnoses

23   within the field.

24   Q.   So ASD is just one of the hundreds and hundreds of

25   diagnoses that a psychologist has to deal with?

1    A.   Yes, that's correct.

2    Q.   And as a psychologist, you do have expertise with ASD; is

3    that right?

4    A.   Yes.

5    Q.   Earlier, Mr. Greene was asking you about other cases in

6    which you have performed work.

7         Do you remember those questions?

8    A.   Yes.

9    Q.   Have you performed work on other cases involving ASD?

10   A.   Yes.

11   Q.   Have you performed work for both the prosecution and the

12   defense?

13   A.   Yes.

14   Q.   Okay.  Now, I just want to get back to why you're here

15   today.  In your opinion, does William Isaacs exhibit

16   characteristics of mind-blindness?

17   A.   No.

18             MR. NESTLER:  Thank you.  No further questions.

19             THE COURT:  All right.  Dr. Askenazi, that you for

20   your time and your testimony.

21             THE WITNESS:  Thank you.

22             THE COURT:  Mr. Nestler, next witness?

23             MR. NESTLER:  Yes, Your Honor.  The United States

24   calls United States Capitol Police Officer Harry Dunn.  We're

25   collecting him from the hallway, Your Honor.

1          MR. EDWARDS:  Your Honor, I can check if it was just

2     an inopportune restroom break.

3          THE COURT:  If you would, Mr. Edwards.

4          MR. NESTLER:  He's on his way down the hallway, Your

5     Honor.

6          HARRY DUNN, WITNESS FOR THE GOVERNMENT, SWORN

7                    DIRECT EXAMINATION

8          BY MS. HUGHES:

9     Q.   Good afternoon.

10    A.   Good afternoon.

11    Q.   In a loud and clear voice, could you please introduce

12    yourself to the ladies and gentlemen of the jury by stating and

13    spelling your name.

14    A.   My name is officer Harry Dunn, H-a-r-r-y D-u-n-n.

15    Q.   Where are you employed?

16    A.   United States Capitol Police.

17    Q.   What is your title?

18    A.   Private first class.

19    Q.   How long have you worked at the United States Capitol

20    Police?

21    A.   I'm currently serving in my 15th year.

22    Q.   What are some of the positions you have held while employed

23    at the United States Capitol Police?

24    A.   I'm a police training officer, which means after the

25    officers graduate the academy, they do field training in the

field, and I'm one of the officers who trains them at their

post-academy training.

I'm also a crisis intervention officer and a crisis

negotiator for our department.

Q.   Were you on duty on January 6th, 2021?

A.   I was.

Q.   What time did you report for duty that day?

A.   Approximately 6:45 or so.  I usually get to work about 15

minutes prior --

Q.   6:45 a.m.?

A.   Yes.  Our roll call is at 7:00.  I usually get there about

10, 15 minutes prior to.

Q.   And what time did you leave the Capitol that day?

A.   Maybe midnight the next day, a little after maybe.

Q.   So in a very long day, I want to focus your attention on a

particular period of time.

A.   Okay.

Q.   First of all, were you armed that day?

A.   Yes.  We have our duty carry weapons, which is a pistol,

.40-caliber Glock.  Additionally, I was armed with an M4 rifle

also additionally that day.

Q.   If we could please bring up what's already been admitted

into evidence, Government's Exhibit 7.P.1.

Officer Dunn, do you recognize yourself in this photograph?

A.   Yes.  I'm the big guy in the back.

1    Q.    And you can circle yourself on the screen.

2          So the officer in the center?

3    A.    Yeah, that's me.

4    Q.    Where are you when this photograph was taken?

5    A.    So directly in front of me is the entrance into the Speaker

6    of the House's wing of the Capitol.  Behind me is a staircase

7    that leads to the crypt, the first floor of the U.S. Capitol.

8    Q.    Why is your back to this stairwell in this photograph?  Do

9    you recall why you were standing there?

10   A.    I just ran to the top of the stairs.  I was actually down

11   in the crypt.  I was responding, trying to get to another area

12   on the second floor of the Capitol, and I came across some

13   individuals.  In my mind, it made sense for me to keep them from

14   going to the area that I just left from.

15   Q.    And if we could please bring up what was admitted as a

16   component part to a larger summary, or perhaps -- pardon me.  I

17   wanted to confirmed.  These have been admitted as component

18   parts of a broader summary.  So we would seek to publish

19   Government's 1078.2.

20          MS. HALLER:  No objection, subject to the rule of

21   completeness.

22          THE COURT:  Okay.  78.2 is admitted, or it's already

23   admitted.

24          MS. HUGHES:  Apologies.  This was introduced through

25   cross-examination of another witness, just for the record.

1          BY MS. HUGHES:

2     Q.   Officer Dunn, I'm going to play this video all the way

3     through, and I would like you to just listen to what individuals

4     are saying, and then we will go back and revisit the video.

5          Okay?

6     A.   Okay.

7     Q.   Ms. Badalament, if we could please play with sound, please.

8          (Video played.)

9          BY MS. HUGHES:

10    Q.   If we could go back to ten seconds, Ms. Badalament.

11         (Video played.)

12         BY MS. HUGHES:

13    Q.   We can pause there.

14         Do you generally remember this moment?

15    A.   Yeah, generally, yes, I do.

16    Q.   And do you remember seeing individuals dressed in military

17    fatigues in that area of the Capitol?

18    A.   Yes.

19    Q.   Did any of those individuals offer to assist you?

20    A.   No.

21    Q.   Could you hear yourself in that video?

22    A.   Yes, I did.

23    Q.   What could you hear yourself saying?

24    A.   "You" -- something "You can't come this way.  I'm not

25    letting you come this way."

1    Q.   If we could please play the video one more time.  Thank

2    you.

3         (Video played.)

4              BY MS. HUGHES:

5    Q.   Officer Dunn, can you see what your hand was doing in this

6    video?

7    A.   People were attempting to come through the gathering of

8    individuals that was there, and I put my hand out while saying

9    "I'm not letting you come this way."

10   Q.   Why didn't you want individuals going down that stairwell?

11   A.    In hindsight, it actually really made no sense why I was

12   guarding that stairwell.  The area I just left from was overrun

13   with rioters that day.

14        In my mind, I was just trying to keep an area contained.

15   In a disorderly day, you were just trying to keep a area clear.

16   I just thought that I didn't want anybody getting down to a

17   lower level where I was at that place.

18   Q.   If we could please now bring up Government's Exhibit

19   1092.1, and I believe this has also already been admitted as a

20   component part of a summary exhibit.  So if we could publish,

21   please.

22              MS. HALLER:  Can you give me the number again?

23              MS. HUGHES:  Certainly.  It's 1092.1.

24        (Video played.)

25              BY MS. HUGHES:

1    Q.    If we can pause for a moment.

2          We're going to go through the same exercise, Officer Dunn.

3    I'll play through the video, and then I would ask if you can

4    hear yourself.

5          MS. HALLER:  Objection on a point.  Can we get on the

6    phone for a moment?

7          (Bench conference.)

8          MS. HALLER:  Your Honor, we tried to introduce this

9    exhibit.  It was only marked.  It hasn't been admitted, because

10   the government objected because of the time at the top.  So if

11   Your Honor recalls, we had the time on our video.  This time is

12   different.  It says 00:55.  Whereas, ours showed 2:57.

13         MS. HUGHES:  We have this exhibit as already admitted,

14   Your Honor.

15         THE COURT:  It is admitted, but I thought we were

16   going to redact the time stamp because we couldn't confirm its

17   accuracy.

18         MS. HUGHES:  That's right, and we can confirm that is

19   redacted before it goes back to the jury.

20         THE COURT:  Okay.

21         (End of bench conference.)

22         BY MS. HUGHES:

23   Q.    Same exercise.  We will play the video, and then I will ask

24   you if you can hear yourself say anything or if you hear any of

25   the rioters say anything to you.

1    A.    Okay.

2          (Video played.)

3             BY MS. HUGHES:

4    Q.    Starting with yourself, can you hear yourself say anything

5    in this video?

6    A.    It appears I'm dropping the f-bomb a lot.  "You want an

7    all-out war and kill everybody" is what I can take away clearly

8    of what I'm saying.

9    Q.    What was the beginning of that?

10   A.    "You just want an all-out war and kill everybody."

11   Q.    And is it fair to say, then, that you were upset in this

12   moment?

13   A.    At the least, yes.

14   Q.    And could you hear any of the rioters say anything to you?

15   A.    "No, no" -- their response after my statement was, "No, no,

16   we don't want to hurt anybody.  We just want answers."

17   Q.    And Officer Dunn, at this point in time -- is this, first

18   of all, the same location that we looked at that was captured in

19   that first video?

20   A.    That's correct.

21   Q.    And at any point, did any of these individuals offer to

22   assist you?

23   A.    No.

24   Q.    Fair to say this was an antagonistic encounter?

25   A.    Not by everybody there.  There were people -- it was a

1    heated conversation -- well, I don't even know if it's a

2    conversation.  It was a heated exchange.  But yes, it was

3    antagonistic, but not everybody, by a few people there, yes.

4    Q.   Did you encounter any other United States Capitol Police in

5    this area?

6    A.   Yeah, actually, one of the reasons why I stood there is one

7    of the special agents that was assigned to the speaker's detail

8    initially was being accosted by a couple of the rioters, and I

9    just knew that he had something important to do more than crowd

10   control, I guess.  So I stepped in and intervened.

11   Q.   And so I want to pause there.  First of all, what was the

12   name of this other -- this individual who was on the speaker's

13   detail?

14   A.   His name was David Lazarus.

15   Q.   And why did you think in your mind that Special Agent

16   Lazarus was up to something that was important?

17   A.   Well, a couple things.  The officers that are assigned to

18   the protection details, they don't wear uniforms.  They have on

19   suits and special pins on their lapels.  So it's possible to

20   think that the rioters may have thought that he was a member of

21   Congress or somebody important.

22        And also, like I said, he's not there for crowd control.

23   He's there because he had something to do.  I know he's assigned

24   to the speaker's detail.  So it could be something -- if I'm

25   assuming that he's there, then I'm assuming the speaker is

1    nearby also.

2    Q.   And was that a motivation for you to be engaging and be

3    drawing attention to yourself?

4    A.   That's correct.

5    Q.   And Officer Dunn, while Special Agent Lazarus was -- when

6    you saw him, did you only see him once?

7    A.   No.   I saw him a couple different times, two or three.   I

8    can't be certain.   But it was definitely more than once.   Time

9    was a blur that day.   So I would say maybe three minutes or so

10   between encounters.   And I would lose sight of him, and then I

11   would see him again come back, and then I would lose sight of

12   him again.   So he was doing something.   He wasn't on crowd

13   control, but he was doing something.

14   Q.   Could you describe Special Agent Lazarus?

15   A.   5' 9" or so.   So I don't know his ethnicity.   He's a man of

16   color.   I wouldn't say an African American.   Probably 45, 50

17   years old maybe.

18   Q.   Is it fair to say he's smaller than you?

19   A.   Yeah, that's easy.

20   Q.   Not that that's a fair barometer, but fair to say he's a

21   smaller man than you?

22   A.   Yes.

23   Q.   And I know you said time is a blur.   But how long were you

24   in this location?   A minute?   Five minutes?   Ten minutes?   Any

25   way of gauging?

```
 1   A.   Longer than five, less than 30 maybe.  I don't know.

 2   Q.   And throughout that entire time, the five to 30 minutes you

 3   were there, did anyone offer to help you?

 4   A.   No.

 5            MS. HUGHES:  No further questions.

 6            THE COURT:  Mr. Rossi?

 7            MS. HALLER:  Yes, Your Honor.

 8            MR. ROSSI:  Ms. Haller, do you want to go first?

 9            MS. HALLER:  Sure.  With the Court's indulgence, I

10   just need to get my computer over there.

11                          CROSS-EXAMINATION

12            BY MS. HALLER:

13   Q.   How are you, Officer?

14   A.   Well.  Thank you.

15   Q.   I'm Juli Haller, and I represent a woman named Connie

16   Meggs.

17        Can you stand up for him?

18   A.   Hello.

19   Q.   Officer Dunn, do you have any specific recollection of

20   Ms. Connie Meggs?

21   A.   No, ma'am.

22   Q.   Okay.  And that day was a long day if you started at 6:45;

23   right?

24   A.   Yes, ma'am.

25   Q.   Thank you for your service.
```

1      I'm just going to show you CCTV, which is 0171, camera

2  0171, and if I can show it just for the witness.

3           MS. HUGHES:  We're going to object, Your Honor.

4           MS. HALLER:  Well, let me lay a foundation first, Your

5  Honor.

6           BY MS. HALLER:

7  Q.   On direct, you were asked about a gentleman named David

8  Lazarus; right?

9  A.   Yes, David Lazarus.

10  Q.   Thank you.  And you can identify him if I were to show you

11  what he looked like?  Because you described him as a person of

12  color but not African American; right?

13  A.   Yes.

14  Q.   Okay.  So I would just like for the witness, to show him a

15  shot of David Lazarus.

16           MS. HUGHES:  Your Honor, we're going to object to

17  this.  It may be easier to get on the phone before we go too

18  far.

19       (Bench conference.)

20           MS. HUGHES:  He was not there.  He doesn't have

21  firsthand knowledge of Officer Lazarus running through a hallway

22  alone.

23           MS. HALLER:  I'm not asking anything more than the

24  identification of the individual.

25           THE COURT:  Look, I think this falls in the bucket of

1    this is authenticated video.  If he can say that that's Special

2    Agent Lazarus in a particular scene, that's been good enough for

3    admissibility in other contexts.

4         MS. HUGHES:  The government's objection is not to

5    admissibility.  It's to, one, scope and, two, foundation to do

6    this with this witness.  He can't opine on what Special Agent

7    Lazarus is doing when he's alone in a hallway.

8         MS. HALLER:  Would the government let me ask the

9    question first before they object?  Because all I want to ask is

10   identification.  I'm not asking what he's doing.

11        THE COURT:  All right.  Let's see how this plays out.

12   As I said, I think the video, as long as he can identify Agent

13   Lazarus, it's admissible, and we will see where it goes from

14   there.

15        (End of bench conference.)

16        BY MS. HALLER:

17   Q.   Okay, sir.  This shouldn't take long.  I just want to show

18   you an image, as soon as I can pull it up.

19        Your Honor, may we publish it to the jury as we do this?

20   And this is CCTV --

21        THE COURT:  Do you have an exhibit number, Ms. Haller?

22        MS. HALLER:  Yes.  I think we're up to CM-82.

23        COURTROOM DEPUTY:  87.

24        MS. HALLER:  87.  Thank you, JC.  87.

25        BY MS. HALLER:

1    Q.   Okay.  You had spoken about the crypt; correct?

2    A.   Yes.

3    Q.   And can you see the image in front of you?  Is it on the --

4    A.   Yes, there's an image in front of me.

5    Q.   And can you identify the place?  Would this be the crypt?

6    A.   No, that's not the crypt.  The location right there is at

7    the bottom of the stairwell, slightly -- there's an individual

8    in the picture, and to his right -- excuse me, to my right,

9    would be his left, is the mouth of the stairwell.

10   Q.   And you're standing above the stairwell?

11   A.   Correct.  There's a circular stairwell or semicircular

12   stairwell, and I'm at the top of that stairwell.

13   Q.   Thank you, sir.  I'm going to play it for a second and just

14   let the individual come forward.

15        (Video played.)

16             BY MS. HALLER:

17   Q.   Is it playing?  Okay.

18        Can you recognize the individual?

19   A.   Can you stop the image?

20   Q.   Yeah, let me go back.  There's a bit of a delay between my

21   computer and the screen.

22        (Video played.)

23             BY MS. HALLER:

24   Q.   All right.  Whoops.

25   A.   I was able to see it.

1    Q.    Did you recognize him?

2    A.    I feel comfortable saying that was Special Agent Lazarus.

3    Q.    Thank you.  I would just ask you, as far as the image that

4    the government showed you, when they showed you that clip -- if

5    the government can pull it up, I believe it was 1070.2.  Well,

6    just for background, but we don't need to pull it up.

7          You were asked on direct about a clip, and you stated that

8    you generally remembered the moment; correct?

9    A.    Generally, yes.

10   Q.    That means you don't have a specific recollection of that

11   moment?

12   A.    I can't tell you every single detail that happened, but

13   overall, I can summarize what happened.

14   Q.    Okay.  And you stated that it was an antagonistic situation

15   but not by everybody there; would that be fair to say?

16   A.    Yes, that's correct.

17   Q.    Okay.  And did you -- and Agent Lazarus does not appear in

18   the clip that you were shown; correct?

19   A.    I did not see him in the clip.

20         MS. HALLER:  Okay.  That's all I have.  Thank you.

21   Thank you, sir.

22         THE WITNESS:  You're welcome.

23                          CROSS-EXAMINATION

24         BY MR. ROSSI:

25   Q.    Officer John, good afternoon.

1    A.    Officer Dunn.

2    Q.    Do you know my client, William Isaacs?

3    A.    It's Officer Dunn, not John.

4    Q.    I'm sorry.  Officer Dunn, do you know William Isaacs?

5    A.    I do not know --

6    Q.    The one who is standing up?

7    A.    Hello.  I don't know him.

8    Q.    Just a few questions.

9    A.    Okay.

10   Q.    In the videos and all the experience on January 6, where

11   you were, at was very loud; correct?

12   A.    Yes.

13   Q.    Very chaotic?

14   A.    Very.

15   Q.    People were yelling?

16   A.    Yes.

17   Q.    Chanting?

18   A.    Yes.

19   Q.    Repeating each other?

20   A.    Yes.

21             MR. ROSSI:  Thank you.

22             THE COURT:  Anything else?  Okay.

23        Ms. Hughes, redirect?

24             MS. HUGHES:  Very briefly.  Thank you, Your Honor.

25        Can we please bring up what's already been admitted as

```
 1    Government Exhibit 1056.0263.0215FF, and if we could go forward
 2    about a minute, Ms. Badalament.  And you can go forward another
 3    minute.  Apologies.  And we can play from here.  Thank you.
 4         (Video playing.)
 5                        REDIRECT EXAMINATION
 6              BY MS. HUGHES:
 7    Q.   Officer Dunn, do you recognize this hallway as being within
 8    the speaker's suite?
 9                   DEFENSE COUNSEL:  Objection.
10                   THE COURT:  Rephrase the question, please.
11              BY MS. HUGHES:
12    Q.   Officer Dunn, do you recognize this hallway?
13    A.   Yes.
14    Q.   Where is this hallway?
15    A.   It's a part of the speaker's wing of the Capitol.
16    Q.   And do you recognize the individual on the screen now?
17    A.   Yeah.  That's -- I feel comfortable saying that's Special
18    Agent Lazarus.
19    Q.   This is the same special agent that you saw going back and
20    forth in that small Rotunda?
21    A.   That's correct.
22    Q.   Officer Dunn, what would have been helpful to you for the
23    rioters in the building to have done that day?
24    A.   To leave.
25    Q.   We can pause there.
```

 1    A.    To leave the building.

 2              MS. HUGHES:   No further questions.

 3              THE COURT:   Officer Dunn, thank you very much.   Thank

 4    you for your testimony.

 5              THE WITNESS:   Thank you.

 6         (Bench conference.)

 7              THE COURT:   Is the government prepared to rest?

 8              MS. RAKOCZY:   Yes, the government is prepared to rest.

 9              THE COURT:   Okay.

10         (End of bench conference.)

11              THE COURT:   Any further witnesses or evidence from the

12    government?

13              MS. HUGHES:   No, Your Honor.   At this time, the

14    government rests.

15              THE COURT:   All right.   Ladies and gentlemen, that

16    means the close of the evidence in the case has been announced.

17    The portion of the case where you are seeing and hearing from

18    witnesses and seeing evidence is over.

19         What is left before the case is in your hands is for me to

20    provide you with legal instructions and for you to hear closing

21    arguments from the parties.

22         That is not something we are going to get done today.   We

23    will have you all adjourn today.   We asked you earlier today

24    what time you can be here tomorrow.   And so we're going to start

25    at 8:30 tomorrow.   We will begin with my instructions, and then

1    we will go straight to the government's closing arguments, and

2    we will move forward from there.

3        Thank you all very much.  We look forward to seeing you

4    tomorrow.  Thank you.

5        (Jury exited courtroom.)

6            THE COURT:  All right.  Please have a seat, everyone.

7            MS. RAKOCZY:  I apologize, Your Honor.  Did you just

8    tell the jury 8:30 for tomorrow morning, just to clarify?

9            THE COURT:  I did.

10           MR. BRENNWALD:  Your Honor, before we go to jury

11   instructions, I think I should renew my motion, unless I'm

12   wrong, Rule 29.

13           THE COURT:  Sure.

14           MR. WOODWARD:  Just yours?

15           MR. BRENNWALD:  I can only do mine.

16           THE COURT:  I take it all defendants are renewing

17   their Rule 29 motions?

18           DEFENSE COUNSEL:  Yes, Your Honor.

19           THE COURT:  Those are all noted for the record, and

20   the Court will defer ruling on the motions.

21       Okay.  Let's pick up where we left off.

22           MR. EDWARDS:  Your Honor, only for the record, we want

23   to state on the record that we oppose those motions, and the

24   government submits that the evidence we presented has met every

25   element of every charge against every defendant.

1          THE COURT:  So noted.

2      All right.  I think where we left off, we were talking

3  about Mr. Brennwald's request for a sort of "mere presence" type

4  instruction.

5      Ms. Rakoczy and Mr. Brennwald, have you all had an

6  opportunity to confer further?

7          MR. BRENNWALD:  We did, Your Honor, and I will let

8  Ms. Rakoczy talk, but we did not reach an agreement, because

9  Ms. Rakoczy has -- well, I will let her talk.

10          MS. RAKOCZY:  Yes, Your Honor.

11      I went back to the Red Book to see if I could find sort of

12  a stand-alone "mere presence" instruction, and I could not.  I

13  did find an instruction or some case law in the "aiding and

14  abetting" section that talked about how mere presence is not

15  enough, but if that presence was combined with evidence evincing

16  a desire or intent to aid and abet, et cetera, et cetera.

17      And the problem with trying to fashion a stand-alone

18  instruction on mere presence here is that we have two conspiracy

19  offenses.  We have several substantive offenses under which the

20  defendants may be found guilty under either a principle theory

21  of liability, an aiding and abetting theory of liability, or a

22  conspiracy theory of liability.  And so fashioning that "but"

23  part was just not something that I was able to come up with.

24      And so in light of that, we think it is more prudent simply

25  to instruct the jury on the elements of each offense.

1          THE COURT:  Okay.  In light of that, I will agree.  I

2     think the instructions are accurate.  There's nothing in the

3     instructions that foreclose any defendant from making the

4     argument Mr. Brennwald wishes to make, both in terms of the

5     legal principle and the facts that would support it.

6          So the fact that it's not in the instructions is not in

7     any way, shape, or form preventing any defendant from making the

8     argument that just because they were there doesn't mean that

9     that's enough to convict any defendant.  You've got to still

10    conclude beyond a reasonable doubt that the defendant had the

11    requisite state of mind and whatever additional elements are

12    required for any particular offense.

13         Okay?

14         MR. BRENNWALD:  So at the risk of insulting

15    Mr. Greene, I don't want to pull a Mr. Greene and keep fighting

16    with the Court.

17         But I just want to put on the record that we can make the

18    argument, but I can see the jury going back and saying, well,

19    that's not what the instruction says, so we know that what the

20    lawyers say isn't evidence.

21         Although I understand the Court's statement that the

22    instructions as written cover all the bases, I'm just not sure

23    the jury will be clear about that.  But I understand what the

24    Court's ruling is.

25         THE COURT:  All right.  And let's see.  The final note

1    you had sent us, Mr. Brennwald, was on page 29.  You wrote, "I'm

2    not sure how the first paragraph applies to these defendants, as

3    the government alleges there was a separate or third conspiracy

4    of some sort."

5         So where are we looking, Mr. Brennwald?  Maybe this is just

6    an artifact issue.

7              MR. BRENNWALD:  I think I spoke about it with the

8    government, and unless I'm confused, I thought the government

9    agreed that there were only two conspiracies and that this was

10   something that other defendants wanted in other cases, saying

11   that there was a sub-conspiracy that they wouldn't be a part of.

12             MR. COOPER:  Your Honor, what section are we actually

13   on?

14             THE COURT:  That's what I'm trying to figure out.

15   This is, unfortunately -- the reference in Mr. Brennwald's

16   e-mail is just to page 29.

17             MS. RAKOCZY:  The instruction is entitled "more than

18   one conspiracy."

19             THE COURT:  Oh, I see.  This is the "multiple

20   conspiracy" instruction.

21             MR. COOPER:  Thank you.

22             THE COURT:  Look, it's in there because that was

23   requested in the prior trials.  If you don't want it, I will

24   take it out.

25             MS. HALLER:  I'm sorry, Your Honor.  Where are we?

1          THE COURT:  Bottom of page 30.

2          MR. BRENNWALD:  Maybe there's a good reason for it.  I

3    just wasn't aware of it.

4          MR. WOODWARD:  I will talk with Mr. Brennwald after.

5    We would like to keep the instruction.

6          MS. RAKOCZY:  I guess we would just ask for a

7    clarification on what the evidence has been presented in this

8    cases of a separate uncharged conspiracy.  I'm not sure --

9    again, in the past, we've acquiesced to this instruction because

10   we have felt there was arguably evidence of that.

11       And so I guess we're just trying to seek clarification

12   here, because I think the evidence has come in fairly

13   differently in this case with respect to that issue.

14         MR. WOODWARD:  I think that the -- do you want to hear

15   from me?

16         THE COURT:  I always want to hear from you, sure.

17         MR. WOODWARD:  I think it should be no surprise to the

18   government that we may argue that what Mr. Rhodes was doing with

19   Ms. SoRelle and others to potentially even include others in the

20   leadership is not what Mrs. Meggs was doing.  So there's

21   definitely evidence of another conspiracy uncharged in this

22   case.  In my view, it's even clearer that there's multiple

23   conspiracies in this case insofar as the seditious conspiracy

24   isn't charged.

25       So the jury ought to know that if they conclude that Rhodes

```
1    is engaged in seditious conspiracy or -- I would never say, I
2    would never plant that seed in their mind that sedition is
3    something that's happening.  But the jury ought to know that if
4    Mr. Rhodes is off doing his thing and that's a conspiracy, that
5    that doesn't mean that they have to conclude, in fact it means
6    they can't conclude that Mrs. Meggs had joined that conspiracy
7    absent --
8              THE COURT:  So all of that is right, undoubtedly true.
9    But the multiple conspiracy instruction is that a defendant is a
10   part of a different uncharged conspiracy.  And we've given that
11   instruction before on the theory that there could have been
12   other combinations of people who, in fact, were acting with
13   other unlawful purposes that included one or more of the
14   defendants, in particular Mr. Rhodes.
15        And so I guess the question is, does any defendant believe
16   there is evidence to support their participation in a different
17   conspiracy.
18        I suppose the -- I suppose if the Parkers wanted it, they
19   could say we were in a conspiracy with just Ms. Watkins but
20   that's not what's charged.  I mean, that's, I guess, one
21   possibility, but I don't know if that's what you all want as an
22   instruction.  I suspect it's not what you're going to argue, but
23   if there's a request for it and a basis for the evidence -- I
24   mean, if there's a request and a basis for the instruction and
25   the evidence, I will give it.
```

1    MS. HALLER:  Your Honor, should it say two conspiracy

2    counts at the end?  The last sentence, it says three conspiracy

3    counts.

4    THE COURT:  Yes, it should two.  Thank you.

5    MS. HALLER:  I would only suggest, Your Honor, that

6    Zello came into this case, and we had representation from the

7    government previously that that's a separate conspiracy.

8    THE COURT:  Even if I accept that passing statement

9    that was made, it doesn't involve anybody in this case arguably

10   except for maybe the Parkers.

11   MS. HALLER:  Forgive me if I'm mistaken, but I thought

12   the Zello transcript came in as against all of the defendants.

13   THE COURT:  It did, but I'm making a different point,

14   which is that the existence of a separate conspiracy based on

15   the Zello chat, for example, was something that was put out

16   there as a potential conspiracy among those on the Zello chat

17   and perhaps maybe the Parkers because they were in close

18   proximity to this and, therefore, would constitute a different

19   conspiracy.

20   MR. WOODWARD:  And I think I was being inarticulate

21   inadvertently, because what I was endeavoring to say is that

22   there's been evidence admitted in trial as against Mr. Rhodes,

23   Ms. SoRelle, Mr. Vallejo, and that that evidence arguably goes

24   towards a conspiracy other than seeking to interfere with the

25   certification of the Electoral College vote.

1      That evidence discussed things like the potential for a

2   Civil War.  That evidence discussed things like bringing rifles

3   to the Capitol to scare those who were in the Capitol building,

4   not necessarily tied directly to the conspiracy charged in this

5   case.

6           THE COURT:  Right.

7           MR. WOODWARD:  And I don't know what the government is

8   intending to say in argument, and some of this will need to be

9   done on the fly.  But if the government's argument, just to use

10  a dramatic example, is Mr. Meggs is guilty of everything her

11  husband had done, then I could see a world in which we're saying

12  no, Mr. Meggs and Mr. Rhodes and whatever they were doing is not

13  the conspiracy charged in this case, and even if you find that

14  Mrs. Meggs is guilty, again to be dramatic, because of the

15  actions of her husband of that conspiracy, you may not find that

16  she is guilty of this other conspiracy that the government is

17  alleging in this case.

18      And that is the purpose of the "multiple conspiracies"

19  instruction.

20          MS. RAKOCZY:  I don't think Mr. Woodward is seriously

21  saying that he's going to stand up and say Mrs. Meggs was a part

22  of a seditious conspiracy with her husband and Mr. Rhodes and

23  that's not charged here.

24      And that's what the instruction is for, is that sure, this

25  defendant is guilty of a conspiracy but it's not the one charged

```
 1    here.  That's the defense, that the government improperly
 2    charged, that there was an alternate conspiracy that these
 3    defendants participated in and it's not charged, so too bad, so
 4    sad, government.  I think that's sort of the purpose of the
 5    instruction.
 6            THE COURT:  That's the gist of the instruction, which
 7    is that you've heard evidence of a defendant's participation in
 8    a different conspiracy than the one that is charged, and if the
 9    government has failed to prove the one that is charged, even
10    though you are convinced of evidence of the different
11    conspiracy, you must acquit.  That is the purpose of a "multiple
12    conspiracy" instruction.
13            MR. WOODWARD:  And we have heard evidence of a
14    conspiracy to stop Joe Biden from taking -- from taking office
15    by force.  I think that was something we've been arguing since
16    openings, why is the force coming in.
17            THE COURT:  Look, I think if what you are theorizing
18    is that the jury could say Ms. Meggs or any other defendant was
19    involved in a seditious conspiracy but one isn't charged, that
20    seems unlikely.
21            MR. WOODWARD:  It does.
22            THE COURT:  But if that's the basis for it, I suppose
23    I can give the instruction.  But it seems -- I can't suspect
24    anybody's going to get up and argue it.  In a sense, it's pretty
25    farfetched.
```

1          MR. WOODWARD:  I don't know what the government is

2    going to argue.  I'm not asking what the government is going to

3    argue.  If we were doing the instructions after argument, I

4    think you're right, that this never comes up and we never hear

5    about it, it's not referenced in closings.

6          But out of an abundance of caution, there was a fair amount

7    of evidence about what Mr. Rhodes was doing.  I think we should

8    be permitted, if appropriate, to argue that Mr. Rhodes was up to

9    something else, and even if you find that these defendants were

10   part and parcel of what Mr. Rhodes was doing, it doesn't mean

11   that they were conspiring to stop the certification.

12         MR. COOPER:  I think it also deals with the potential

13   fall suggesting that irrespective of a conspiracy that's going

14   on with Rhodes or with Kelly Meggs, that both of those

15   individuals involved themselves in separate conspiracy that's

16   not being charged here.

17         THE COURT:  Can you say that last part and speak into

18   the mic, because I just had trouble hearing you.

19         MR. COOPER:  I think it's -- it also addresses the

20   possibility that there were multiple conspiracies going on here,

21   and to the extent that these -- there's a conspiracy going on

22   between Rhodes and Kelly Meggs, it's two different conspiracies

23   going on to Rhodes and Kelly Meggs in and of themselves and then

24   Rhodes and Kelly Meggs with respect to the people that are

25   charged here.

1          So I think what this does is just address that part of the

2     Venn diagram just to say it comes up, you cannot infer that one

3     of the defendants here was shown to be a part of something else

4     going on that's different than what's here, that then implies

5     they're guilty here.  I think it kind of walls that off.  I'm

6     not saying it's a likely potential of it happening, but it

7     covers it just in case.

8               THE COURT:  Okay.

9               MR. COOPER:  If that makes sense.  Not much?

10              THE COURT:  Not much, but that's okay.  That's not the

11    standard for giving an instruction.  It doesn't have to make

12    sense.  It just needs to be supported by a modicum of evidence.

13         And if that's what you all think the evidence could support

14    with a reasonable inference, then I will leave it in there and

15    make the one change.

16         All right.  Anything else in the instructions before we get

17    to the request for the defense instruction and the government's

18    supplemental instructions?

19         Well, I guess we should address, just to go backwards,

20    Mr. Edwards had sent an e-mail over the lunch hour seeking to

21    make some changes to both the authentication of video evidence

22    portion and the summary exhibit evidence.

23         Does anybody think differently than what Mr. Edwards has

24    put in his e-mail?

25              MR. WOODWARD:  I trust Mr. Edwards.

1          THE COURT:  Okay.  So we will make changes to those

2    exhibits in those two instructions consistent with what

3    Mr. Edwards's e-mail reflects.

4      Okay.  Moving forward, then, is there anything else about

5    these instructions that anybody wishes to raise at this point

6    other than the defense instruction and the government's request

7    for supplemental instructions?

8          MR. ROSSI:  No, Your Honor.

9          DEFENSE COUNSEL:  No, Your Honor.

10          MS. RAKOCZY:  Not for the government.

11          DEFENSE COUNSEL:  Not at this time.

12          DEFENSE COUNSEL:  No, Your Honor.

13          THE COURT:  Mr. Woodward?  Ms. Haller?

14          MS. HALLER:  Not related to instructions, just those

15    two exhibits.

16          THE COURT:  Okay.  We can deal with that in a moment.

17      Let's then turn to government's proposed jury instructions.

18    There are a handful that the government is requesting be added.

19    The first is a Pinkerton instruction on the destruction of

20    government property charge.

21      Let me hear from the defense on your views and why I

22    shouldn't give it.

23          MR. WOODWARD:  Anybody?

24          MR. GREENE:  You, you are the body.

25          MR. WOODWARD:  I don't know that there's a lot we can

argue about why you shouldn't give it.  The case law is clear
that the government is allowed to ask for it, and they don't
have to specify it in the indictment.

My argument would be more Rule 29.  There has been
absolutely no evidence to suggest that there was any agreement
by any of the defendants in this case that there was a plan to
destroy government property.  I think the evidence shows quite
the opposite.  We heard Officer Carrion testify that destruction
of property wasn't a concern of his, that he was going to
destroy the building himself if that's what it took to keep
people from going into the building.

And I appreciate why the government is wanting to do this.
We've had, what, nine defendants tried under this same set of
facts, all of whom were acquitted on the destruction of evidence
charge.

I will be blunt.  My concern is that I -- I don't want
Ms. Meggs to push the destruction of evidence so that she can be
convicted of some other charge.  I want the jury to be
considering only those counts that are really truly meritorious
here.  And destruction of property isn't one.  These folks
didn't destroy property, and they shouldn't be charged with it
in this case.

THE COURT:  Okay.

MS. RAKOCZY:  As we've stated in our filing, Your
Honor, we believe that there is sufficient evidence for the

jury, a reasonable jury to find that the defendants entered into a conspiracy to obstruct the official proceeding and a conspiracy to prevent members of Congress from discharging their duties that day and that the destruction of property was a reasonably foreseeable consequence of that.

And so the destruction of property at the doors has been established.  The property was, in fact, damaged.  And that was a reasonably foreseeable consequence of the conspiracy that these defendants entered into.

THE COURT:  Is that the standard?

MR. WOODWARD:  No.

THE COURT:  In other words, the fact that the object -- well, put it differently.

The conspiracy charge requires that there be an object of the conspiracy to which there was an agreement.  If there is a separate unlawful consequence of the conspiracy, I don't know if that gets shoehorned into a different conspiracy.

In other words, I've conspired to rob a bank.  If one of the people shoots the security guard, it doesn't mean there's a conspiracy to shoot the security guard.

MS. RAKOCZY:  Your Honor, I think under a Pinkerton theory of liability, if you enter into a conspiracy to commit an armed robbery and it is reasonably foreseeable that there will be security guards at the bank and that they might draw their weapons and that a shooting could happen --

 1          THE COURT:  That's certainly true.  The person could

 2     be liable under a Pinkerton theory, I suppose, but I don't know

 3     that it then becomes a separate conspiracy to shoot the security

 4     guard.

 5          MS. RAKOCZY:  That's not what we're alleging.  We're

 6     asking that under the destruction of property charge, that these

 7     defendants be charged -- that the jury be charged that these

 8     defendants could be held liable under that Pinkerton theory of

 9     liability.

10        So if the jury finds that these defendants entered into the

11     conspiracies that are charged, they will be instructed to ask

12     themselves whether the destruction of property was a reasonably

13     foreseeable consequence of the conspiracies that they entered

14     into.

15          MS. HALLER:  Except, Your Honor, we brought forward

16     evidence that the property damage occurred before these

17     defendants got anywhere near the Capitol.

18        So the problem with the aiding and abetting agreement would

19     be that it would have had to have been in place prior to they

20     being at the Capitol.

21        And none of the Oath Keepers were at the Capitol when the

22     doors were damaged.  So the challenge becomes that the

23     government's theory is based on all 500 or 5,000 or 5 million

24     people that were there that day are in conspiracy?  There's a

25     flaw in the --

1          MR. WOODWARD:  I think to put that differently, what I

2     understand the standard to be is not that -- sorry, Your Honor.

3          THE COURT:  No, go ahead.

4          MR. WOODWARD:  Is not that because the defendants may

5     be found guilty of a 1512 conspiracy or an interference with an

6     official duties conspiracy, that the reasonable foreseeable

7     actions of that conspiracy can be swept in, which is how I

8     understood the government to argue it.

9          What I think the instruction says is that there are

10     different theories of liability on a specific -- yeah, you're

11     tracking with me.  So you can't --

12          THE COURT:  You can't shoehorn one conspiracy into the

13     other.  I agree with that.

14          Look, I hear you, but frankly, this may not be a reason --

15     first, I'm not sold on the idea that reasonable foreseeability

16     warrants a separate instruction of conspiracy with respect to a

17     separate count as a basis for liability.  That's one.

18          Two, look, yes, this is a different case, but it's the same

19     exact evidence.  The government didn't ask for it before, and

20     I'm not going to put these defendants up on a different

21     conspiracy and expand the potential liability that they face.

22     It wasn't requested for in the prior trials and for which there

23     have been nine acquittals.

24          So I'm not going to give the instruction.

25          "Public authority" curative instruction, is there any

```
 1    objection to giving the requested instruction?

 2              MR. WOODWARD:  Rather than give the instruction, I

 3    just wonder whether everybody wouldn't agree that public

 4    authority is not going to be something that's argued in

 5    summation.  I don't know that we need to confuse the jury about

 6    what the significance is --

 7              THE COURT:  I would ask your colleagues if they are

 8    going to raise the issue.  I mean, at least in Mr. Rossi's

 9    opening, it was at least highlighted, and there was something to

10    the effect of he's a young man, the president told him to go to

11    the Capitol.  I'm putting words in your mouth.

12              MR. ROSSI:  With all due respect --

13              THE COURT:  Correct me if I'm wrong, Mr. Rossi.

14    That's just my recollection.

15              MR. ROSSI:  I'm sorry, Your Honor?

16              THE COURT:  That's just my recollection.

17              MR. ROSSI:  No, no, I'm not going to argue public

18    authority.  I am going to argue that he was at that rally, and

19    the president said, I'm going there with you, and it wasn't any

20    order that he do that, but that enticed him to walk down the

21    road to the Capitol.

22         It wasn't public authority.  I will not argue it.  I will

23    even say there was no order that he was going to the Capitol or

24    pursuant to an order.  I'm not going to argue it.  And I don't

25    think I argued it in my opening.
```

1          MS. RAKOCZY:  Respectfully, Your Honor, that is a

2     public authority defense.  Mr. Isaacs, through counsel, is

3     seeking to cloak himself in the president's words to explain or

4     excuse his conduct.

5          And I would note that both Mr. Rossi and Mr. Woodward asked

6     questions of witnesses that put this idea in the jury's head.

7     Questions from them both were words along of lines of, quoting

8     Mr. Woodward here, asking Mr. Berry:  "Do you recall some of the

9     things President Trump said in his speech that day?"  "Do you

10    recall him saying that you have to fight like hell?"  "Do you

11    recall him saying that he would be there right with you, that he

12    would be walking to the Capitol with you?"

13         So the fact that those ideas have been put out there,

14    frankly, they're in the jury's mind right now, and we think we

15    need to provide the jury some assistance as to whether that

16    provides a defense to the defendants in this case.

17         MR. WOODWARD:  I want to be very careful, because I do

18    think it is -- that's evidence in the case, and I think it's

19    evidence appropriately in the case.

20         But public authority defense is something very different,

21    which is that the defendant was authorized to engage in the

22    conduct, even if it is criminal, by a competent authority, and

23    that is not something that any defendant should be arguing in

24    this case.

25         As the Court knows, there's a process for invoking a public

authority defense.  So providing an instruction that there was
no public authority without --

THE COURT:  Here's my concern about giving it, but I
want to figure this out.  Giving an instruction as to -- I don't
want -- what I'm concerned about is sort of the imprimatur of
the Court being placed on the speech and the response to it.  In
other words, that somehow it was inappropriate for them to march
upon being requested to march.

MS. RAKOCZY:  I think, Your Honor, the way we tried to
craft the instruction was not to suggest that the Court was
saying one way or the other what the president was saying or
doing, but saying even if you were to find the president
directed people to the Capitol and to enter the Capitol grounds
or the building on the 6th, that those statements alone would
not constitute a defense.  That's the way we worded the
instruction.

And I think that's important when the idea has been pout
out there and it appears at least Mr. Rossi or the Isaacs team
is going to argue that those words influenced at least
Mr. Isaacs's decision to go into the Capitol.  That puts out
there the idea that that is a defense, and that alone is not.

MR. ROSSI:  Your Honor, I will not argue that the
president's words persuaded Mr. Isaacs to go into the Capitol.
I think in my opening, I said the president's words persuaded
him to walk to the Capitol, not to enter it.  I didn't argue

1       that.  Opening sometimes is argument.  I didn't say that.  I

2       think I specifically said he didn't follow the orders of the

3       president, but the president's comments persuaded him to go to

4       the Capitol.

5              That's not public authority.

6              THE COURT:  What if we just said, "You heard

7       statements about" -- "You heard testimony about certain

8       statements made about President Trump on January 6, 2021.  Those

9       statements alone cannot negate the intent requirement with

10      respect to any offense," or something like that?

11             It's a little awkward, but I can tweak it.

12             MR. ROSSI:  That's fine.

13             MS. RAKOCZY:  I'm thinking out loud here, Your Honor,

14      but I think it's more appropriate to say --

15             THE COURT:  So am I.

16             MS. RAKOCZY:  -- that those statements do not --

17      either reliance on those statements does not negate culpability

18      for the offenses charged or those statements did not give the

19      defendants the authority to commit the offenses charged.  That's

20      the public authority angle.

21             Frankly, my reaction to the Court's proposal was actually

22      more of a concern for the defense, because I think there's a

23      world in which intent -- the defendants get to broadly argue

24      what intent they did and didn't have, and I'm concerned about

25      telling the jury they can't consider certain things for intent.

1    I think the public authority defense that has not been

2    raised properly or proven here is that the president could not

3    have given them the authority to commit any of these offenses.

4    So that's the thrust of what we are trying to instruct the jury.

5        So the president's statements do not constitute or did not

6    constitute a defense, or the president's statements do not

7    negate the defendant's culpability, or the president's

8    statements do not constitute a defense to the offenses charged,

9    something along those lines, I think, more accurately tracks

10   with the public authority law.

11       MR. BRENNWALD:  I think if we're going to do that --

12   which I agree with Ms. Rakoczy.  I'm just worried about the

13   words "commit the offenses."  It has to be, "If you find that

14   the defendants committed the offenses, the fact that the

15   president may have instructed people to go to the Capitol does

16   not constitute a legal defense to any crimes you have concluded

17   they have committed."

18       MR. ROSSI:  Your Honor, to me, it's like a murder

19   case.  It's first degree or second degree or voluntary

20   manslaughter, and Your Honor gives an instruction, I hereby

21   instruct you there was no self-defense.  If the defendant is not

22   arguing self-defense, you don't need an instruction that there's

23   no self-defense.

24       Mr. Isaacs, in his testimony, in no way implied or stated

25   that he went into the Capitol or walked towards the Capitol

because of what President Trump said or ordered.  He didn't even say that in his testimony.

So what Your Honor is doing is throwing in an instruction that is going to distract from the issues --

THE COURT:  Then help me.  What was the point of the examination that's cited in the government's papers, which is:

"Question:  Do you recall some of the things President Trump said in his speech that day?"

This is with Mr. Berry.

"Answer:  Not a lot.

"Question:  Do you recall him saying you have to fight like hell?

"Answer:  I do.

"Question:  Do you recall him saying he would be right there with you?

"Answer:  I don't.

"Question:  That he would be walking to the Capitol with you?

"Answer:  I do not."

Then in the cross-examination of Special Agent Abrams:

"Question:  Okay.  Let's talk about the walk to the Capitol.  Were you able to listen or watch the president's speech at The Ellipse on that day?

"Answer:  No, I was not.

"Question:  Are you aware that there was some fiery

```
 1    rhetoric, like fight like hell?
 2         "Answer:  I believe so, yes.
 3         "Question:  Is it fair to say that after his comments and
 4    others who spoke, individuals at the Ellipse walked to the
 5    Capitol?  Correct?
 6         "Answer:  Yes, after he finished speaking, they did proceed
 7    toward the Capitol."
 8              MR. GREENE:  The purpose was, Judge -- I think those
 9    were all my questions -- was to put the let's fight like hell
10    video in context, not to argue any public authority.  It was the
11    words that the president used, keep fighting, fight like hell,
12    same thing William Isaacs was saying.
13         Mr. Rossi is doing the closing.  He's in no way arguing
14    public authority.
15              MR. ROSSI:  Pardon me, Judge.  The proposal you made
16    about three minutes ago, we're fine.  The Isaacs team is fine
17    with that.
18              MR. GREENE:  That's appropriate because the word
19    "alone" makes it stand out, Judge.  You don't want to posit that
20    somehow what the president said has no meaning.
21         The public authority instruction as proposed by the
22    government --
23              THE COURT:  As you know, I've held it does have some
24    meaning.
25              MR. GREENE:  Pardon me?
```

```
 1              MR. ROSSI:  Yes, absolutely.

 2              THE COURT:  Let's do this:  Let me think about it.  I

 3    will send something out tonight.  And we can resolve it.

 4              MR. ROSSI:  Your Honor, I have good news.

 5              THE COURT:  I like good news.

 6              MR. ROSSI:  On the government's second supplemental,

 7    if Your Honor is going to that.

 8              THE COURT:  There's one more before I get there, and

 9    that is the curative instruction regarding agent witnesses'

10    interpretation of messages.

11         Any objection to that?

12              MR. WOODWARD:  Court's indulgence.

13              MR. GREENE:  We defer to Mr. Woodward.

14              MR. WOODWARD:  I have it up.  The government is asking

15    for a curative instruction on agents not being permitted to

16    interpret text messages.

17         "At one point, the Court precluded the government's

18    witness, FBI agent from describing what an upper was.  Yet,

19    during cross-examination, defense counsel have often asked

20    agents to interpret messages and then have suggested error or

21    wrongdoing where the agents have declined or been unable to

22    interpret the messages."

23              MR. ROSSI:  Your Honor, that's bolstering.  That's

24    putting a Band-Aid on a little wound there.  I oppose it on

25    behalf of Mr. Isaacs.
```

1          MR. WOODWARD:  I think the government accomplished

2     what they wanted to in their cross -- or in their direct,

3     rather, in rebuttal of Palian today.

4          MS. RAKOCZY:  We were precluded from doing that, Your

5     Honor.  We tried to, and the Court said that the Court would

6     defer and consider this instruction.

7          An example today was where Mr. Shipley was asking the agent

8     essentially like, so did Mr. Greene delete the messages.  And

9     the agent, because he has been told not to state his opinion,

10    said, all I can say is I don't see the messages in his phone.

11         So the defense is free, then, to stand up and say even the

12    special agent said he couldn't say whether the messages were

13    deleted.  And so we feel like because of what was a rightful

14    directive from the Court, since these agents have testified

15    consistently with that, and now we feel that it is necessary to

16    clarify for the jury why.

17         MR. WOODWARD:  Does this come from a Red Book

18    instruction?

19         MS. RAKOCZY:  No, because it doesn't always come up in

20    cases.

21         MR. ROSSI:  It's The Blue Book.

22         MS. HALLER:  Your Honor, it's different what happened

23    with Agent Palian today.  He couldn't say when it was sent, and

24    he explained that he could only say that it was read.

25         But to bolster his testimony, like counsel pointed out,

1    with an instruction that, you know -- where they don't have more

2    evidence, because it was a lack of evidence.  That's why he

3    couldn't say when or why he could only give limited responses in

4    his messages.  The evidence was limited.

5         MR. COOPER:  It seems to me to be a little more

6    clear-cut dried than that.  The witness was just asked to

7    testify to a factual matter, do you have any knowledge if that

8    was deleted, and --

9         THE COURT:  This has nothing -- I'm not thinking about

10   this in the context of the Agent Palian issue.  I think that's

11   not what is driving the issue here.

12        Here's what I will do:  I will give the first two sentences

13   but not the third.  Okay?  To resolve any concerns about

14   bolstering, I will just simply say, "You've heard testimony from

15   several FBI agents who read into evidence certain messages

16   recovered from the electronic evidence in this case.  The agents

17   were not permitted to interpret the messages they read into

18   evidence.  That was my order consistent with the Rules of

19   Evidence."

20        And then I'm not going to tell them whether to hold it

21   against the witness or not.

22        Okay?

23        MS. RAKOCZY:  Yes, Your Honor.

24        THE COURT:  All right.  Government's second

25   supplemental proposed instruction concerning Mr. Isaacs and the

1    ASD.

2              MR. ROSSI:  Good news.  I hope it's good news.  We

3    agree with 99.5 percent of it.  The entire paragraph is

4    copacetic, Your Honor.  We would like to add the following

5    phrase, and we could put it after the word "responsibility."

6    And we would like the following phrase:  "But it is one of the

7    factors you may consider," period, closed quote.  That's it.

8              THE COURT:  It's not accurate.

9              MR. ROSSI:  Okay.

10             THE COURT:  In other words, it's not the diagnosis of

11   ASD that they are permitted to consider.  It is the particular

12   manifestation or trait of someone who has ASD that they can

13   consider.

14             MR. ROSSI:  Your Honor, I have to say, if we give this

15   instruction as is, it still implies that it could be a factor.

16   As it is, that last sentence still implies ASD does not on its

17   own negate his criminal responsibility.

18             THE COURT:  You're asking them to then say it's

19   something they can consider.

20             MR. ROSSI:  I think that last sentence means that they

21   can consider ASD in determining --

22             THE COURT:  But they can't consider the mere diagnosis

23   of ASD as one of the factors.  It has to be the trait, the

24   particular trait of ASD that they can consider.

25             MR. ROSSI:  Hold on, Your Honor.

1          MR. GREENE:  Judge, I think you could insert the

2     words "but the characteristics manifested by that diagnosis is

3     one of the factors" or something like that, thinking out loud.

4     I get the distinction you're talking about, and I think it's

5     appropriate.

6          THE COURT:  What if it said "but the traits of someone

7     diagnosed with ASD are factors you may consider"?

8          MR. ROSSI:  Perfect, perfect.  Thank you, Judge.

9          MR. NESTLER:  We object to that, Your Honor, because

10    the traits of someone diagnosed with ASD are far broader than

11    what Your Honor let in, and Dr. Askenazi testified there are

12    several other traits of people with ASD.

13         THE COURT:  How about if I just drop the last line all

14    together?

15         MR. ROSSI:  We object to that, Your Honor.

16         THE COURT:  The last line.

17         MR. ROSSI:  "The fact that"?

18         THE COURT:  Right.

19         MR. ROSSI:  No, I like that.

20         MR. NESTLER:  We are fine getting rid of the last

21    line, Your Honor.

22         MR. ROSSI:  Judge, this is their proposal.  I'm now

23    agreeing to it.  And because I've analyzed it a little more

24    carefully, they're now backing off from the last sentence?

25         THE COURT:  I'm suggesting that --

1          MR. ROSSI:  Your Honor, we like it as is; we like it

2     as is, Your Honor.

3          THE COURT:  Okay.

4          MR. ROSSI:  We like it as is.

5       Your Honor, two minor exhibit issues.

6          THE COURT:  Not yet.

7          MR. ROSSI:  Okay.

8          THE COURT:  The defense instruction, where are we with

9     that?

10         MR. WOODWARD:  I have everyone's edits.  I can read

11    the material language, which is only to the destruction of

12    evidence counts, if that's helpful, or if we want to talk about

13    what's there now and agree on that, and I can send around a

14    redline with the destruction of evidence piece of it.

15         THE COURT:  Let's just go through what was sent at

16    9:21 this morning by Mr. Woodward.

17      I'm not going to read the first two sentences.  "The

18    defenses are not required to present a defense to prove any

19    fact.  Rather, the government must prove each and every element

20    of the charged offenses beyond a reasonable doubt.  Put

21    differently, the defendants are not required to prove their

22    innocence."

23      I've already said that before.  I'm not going to repeat it

24    again.

25         MR. WOODWARD:  That is, Your Honor, taken from

1   Rhodes 2.

2           THE COURT:  Oh, well, okay.  Fine, I'll say it.  Okay.

3           MR. WOODWARD:  Now, in transparency, it's later in

4   the -- it's not the first two sentences.  I moved it up to the

5   front, for obvious reasons.  But it's in the defense theory of

6   the case in Rhodes 2.

7           THE COURT:  Anybody have any objection to including

8   those first three sentences at the start of the instruction?

9           MS. RAKOCZY:  No, Your Honor.

10          THE COURT:  All right.  So there's -- we've caught all

11  the typos?  So rather than "the government must prove each and

12  every ever elements," "each and every element of the offenses

13  charged beyond a reasonable doubt."

14      It looks like Mr. Woodward wrote this on Signal.

15          MR. ROSSI:  Ouch.

16          THE COURT:  All right.  "Defendants Sandra Parker,

17  Bennie Parker, Laura Steele, Connie Meggs, William Isaacs, and

18  Michael Greene contend that the government has failed to prove

19  beyond a reasonable doubt that the defendants are guilty of the

20  offenses with which they have been charged."

21      I take it no objection to that sentence?

22          MS. RAKOCZY:  No.

23          THE COURT:  All right.  Here's where some wording,

24  rewording needs to be done.  Specifically, "The defendants

25  refute that the government has failed to prove beyond a

1    reasonable doubt."

2         I don't think that's what you mean.

3              MS. HALLER:  "Submit."

4              MR. BRENNWALD:  "The defendants assert that."

5              THE COURT:  It would be a very odd defense instruction

6    otherwise.  "Specifically, the defendants assert that the

7    government has failed to prove beyond a reasonable doubt the

8    existence of any conspiracy to obstruct an official proceeding

9    and/or to prevent members of Congress from discharging their

10   duties.  Even if there was such a conspiracy, defendants contend

11   that the government has failed to prove that any of these

12   defendants reached an agreement to join such a conspiracy.  The

13   government has failed to prove such an agreement because there

14   was such no agreement.  Rather, the defendants contend that they

15   were present in Washington, D.C., on January 26, 2021, to

16   participate in the Oath Keepers security operation that day, to

17   provide personal security details for various organizers and

18   speakers, as well as members of their family, participating in

19   the events that had been organized that day."

20        Any objection?

21             MS. HALLER:  "Had been organized" or "in anticipation

22   of the events."

23        There is another typo, Your Honor.  "Even if there were

24   such a conspiracy."  I don't think it's "was."

25             THE COURT:  Right.  Any objection to that?

1          MS. RAKOCZY:  No, Your Honor.

2          THE COURT:  Okay.  Next paragraph, I think same issue.

3     "Separate and apart from the conspiracies with which the

4     defendants have been charged, defendants also contend that the

5     government has failed to prove beyond a reasonable doubt that

6     any defendant individually intended to obstruct or impede an

7     official proceeding.  Even if the government did prove such

8     intent beyond a reasonable doubt, the defendants contend that

9     the government has failed to prove beyond a reasonable doubt

10    that any defendant individually knew their actions would result

11    in the obstruction or impediment of an official proceeding or

12    that they acted knowingly.  And even if the government did prove

13    any defendant acted knowingly, defendants contend that the

14    government failed to prove beyond a reasonable doubt that any

15    defendant acted corruptly."

16         Any objection to that?

17         MS. RAKOCZY:  We object to the -- that the government

18    failed to prove that the defendant knew their actions would

19    result in the obstruction or impediment.  We think that is not a

20    precise statement of the knowing element here.

21         MR. WOODWARD:  And I'm open to -- that's all I'm

22    trying to do is use the definition of "knowingly," which is why

23    I have that "or they acted knowingly" at the end, to point them

24    back to the Court's instructions on "knowingly."

25         MS. RAKOCZY:  So for -- sorry.

 1           THE COURT:  So I think a couple things.  One is, I

 2     have to look back at what the "knowingly" instruction says, but

 3     it is not accurate to say that the government needs to prove

 4     that they knew their actions would result.  The crime is

 5     committed once they have the specific intent and take an act if

 6     it's supported by the specific intent.  It doesn't actually need

 7     to result in an actual obstruction or impediment of an official

 8     proceeding.

 9           MS. RAKOCZY:  Within the instructions, the third

10     element is that the defendants -- for this crime, for

11     obstruction of an official proceeding, the third element is that

12     "the defendant acted knowingly, with awareness that the natural

13     and probable effect of the defendant's conduct would be to

14     obstruct or impede the official proceeding."

15           MR. WOODWARD:  I'm fine with that.

16           THE COURT:  Okay.

17           MR. WOODWARD:  Could you read that again, Ms. Rakoczy?

18           MS. RAKOCZY:  So the definition of knowing in the

19     third element of the offense is "acted knowingly, with an

20     awareness that the natural and probable effect of the

21     defendant's conduct would be to obstruct or impede the official

22     proceeding."

23           MR. WOODWARD:  And we will end the sentence there.

24           THE COURT:  Okay.  All right.  Next

25     paragraph, "Defendants have also been accused of willfully

1    injuring, damaging, or destroying property of the United States

2    which they respectfully assert that the government has not

3    proved beyond a reasonable doubt.  Specifically, the defendants

4    refute that the government presented any evidence that the

5    defendants injured, damaged, or destroyed any property or that

6    the government has proven beyond a reasonable doubt that the

7    defendants attempted, aided, or abetted the destruction of any

8    property."

9           The next sentence comes out.

10           MR. WOODWARD:  Yes.

11           THE COURT:  "Put differently, while defendants do not

12    contest damage was done to the Capitol on January 6, defendants

13    contend that the evidence shows that the damage was a result of

14    those other than these defendants."

15           MS. RAKOCZY:  I don't think that last part means what

16    they wanted it to mean.

17           THE COURT:  No, I think that's right.  Let's just say,

18    "They contend that they are not responsible for that damage."

19           MR. WOODWARD:  "The defendants contend that they are

20    not responsible for that damage."

21           THE COURT:  "Criminally responsible for that damage."

22       Does that work?

23           MR. WOODWARD:  Sure.

24           MS. RAKOCZY:  No objection.

25           THE COURT:  Okay.  Next paragraph.  "The defendants

1    have also been accused of knowingly entering and remaining in a

2    restricted building or its grounds.  The defendants maintain

3    that the government has not proven beyond a reasonable doubt

4    that any of the defendants did act knowingly insofar as their

5    actions were the result of ignorance, mistake, or accident."

6         Okay with that?

7              MS. RAKOCZY:  Court's indulgence.

8         No objection, Your Honor.

9              THE COURT:  Next paragraph.  "Defendants Bennie

10   Parker, Laura Steele, and William Isaacs have also been charged

11   with civil disorder which they assert that the government has

12   not or failed to prove beyond a reasonable doubt.  Specifically,

13   defendants contend that the government failed to prove beyond a

14   reasonable doubt that they intended their actions on January 6,

15   2021, to obstruct, impede, or interfere with any law

16   enforcement."

17        It seems incomplete.

18             MS. HALLER:  Yes, and with typos, Your Honor.  I think

19   you need a "with."

20             THE COURT:  Right.  But I think it's different than

21   that.  I mean, it's broader than that.

22             MR. COOPER:  I can actually read to you the version

23   that we wrote, but it's not the version you're looking at right

24   now, tampering.

25             MR. WOODWARD:  We're not there yet.

1          MS. HALLER:  Civil disorder for Parker, Steele, and

2     Isaacs.

3          MS. HUGHES:  It's that the actions of the defendants

4     would have to obstruct or adversely affect commerce is the civil

5     disorder.  So that last sentence, I don't know how that can be

6     remedied.  It's a misstatement of law.

7          MR. WOODWARD:  Well, my intention was to copy this

8     from the jury instructions.  So "intended to obstruct, impede,

9     or interfere with one or more law enforcement officers."  So

10    "the government failed to prove beyond a reasonable doubt that

11    they intended through their actions on January 6 to obstruct,

12    impede, or interfere with any law enforcement."

13         MS. HUGHES:  It's the second sentence -- third

14    sentence.

15         MR. WOODWARD:  "Even if the government has proven

16    beyond a reasonable doubt that defendants intended their actions

17    to interfere with law enforcement, they contend that such

18    interference did not obstruct, delay, or adversely affect any

19    commerce," which again is quoting from the fourth element.

20         MS. HUGHES:  So it's the civil disorder.

21         THE COURT:  It's the civil disorder that has to --

22         MS. HALLER:  Your Honor, Ben Parker is not one of the

23    ones charged with civil disorder.  So there's typos in that.

24         THE COURT:  Okay.  So it's just -- it's Sandra Parker.

25    It should read as follows:  "Defendants Sandra Parker, Laura

1   Steele, and Williams Isaacs have also been charged with civil

2   disorder, which they assert the government has failed to prove

3   beyond a reasonable doubt.  Specifically, defendants contend

4   that the government failed to prove beyond a reasonable doubt

5   that they intended their actions on January 6, 2021, to

6   obstruct, impede, or interfere with any law enforcement officers

7   in the conduct of their official duties.  Even if the government

8   has proven beyond a reasonable doubt that defendants, Sandra

9   Parker, Steele, and/or Isaacs intended their actions to

10  interfere with law enforcement officers in the performance of

11  their official duties, they contend that the civil disorder did

12  not obstruct, delay, or adversely affect any commerce."

13          MS. HUGHES:  "Or a federally protected function."

14          THE COURT:  Okay.

15          MS. HALLER:  I'm sorry.  Can you say that again.

16          MS. HUGHES:  A civil disorder has to impede a -- has

17  to impede interstate commerce or a federally protected function.

18  That's the instruction.  So it's not just commerce.

19          THE COURT:  Next paragraph, Mr. Cooper.

20          MR. COOPER:  Very simply, "Defendants Laura Steele and

21  Michael Greene have also been charged with tampering with

22  documents of proceedings.  With respect to Ms. Steele,

23  Ms. Steele contends the government has not proven beyond a

24  reasonable doubt that Ms. Steele engaged in any acts or actions

25  regarding the tampering of evidence."

 1                  THE COURT:  Okay.

 2                  MS. REDDEN:  And I have one, Your Honor.  "With

 3       respect to Count 9, Mr. Greene submits that he did not act

 4       corruptly when he removed certain text message threads from his

 5       phone.  The government has failed to prove beyond a reasonable

 6       doubt that Mr. Greene intended to destroy evidence so it could

 7       not be used in an official proceeding."

 8                  THE COURT:  Are you conceding he deleted messages from

 9       his phone?

10                  MS. REDDEN:  He admitted it on the stand.

11                  THE COURT:  He did?  He deleted the chat.

12                  MS. REDDEN:  Or should I say chat?  I can say chat.

13                  THE COURT:  Hang on.  What's the allegation in the

14       indictment?  What's the deleted object in the indictment?

15                  MS. REDDEN:  It said he deleted certain files, media,

16       or communications.

17                  THE COURT:  Okay.

18                  MS. REDDEN:  So certain files, media, or

19       communications.

20                  THE COURT:  So why don't we use that.  Can you read

21       that again, Ms. Redden?

22                  MS. REDDEN:  Do what?

23                  THE COURT:  Can you read it again?

24                  MS. REDDEN:  Yes.  "With respect to count 9,

25       Mr. Greene submits that he did not act corruptly when he removed

1    certain text message threads from his phone.  The government has

2    failed to prove beyond a reasonable doubt that Mr. Greene

3    intended to destroy evidence so it could not be used in an

4    official proceeding."

5            THE COURT:  Okay.  We'll substitute what the words are

6    in the indictment for "text message threads."  Okay?

7            MS. RAKOCZY:  And I think with respect to the last

8    clause with respect to what his intent was, I think we would ask

9    that the language parallel the fourth element of the offense as

10   charged in the instructions, which would be "acting with the

11   intent to impair the object's integrity or availability for use

12   in an official proceeding."

13           THE COURT:  Okay.  Any objection to that, Ms. Redden?

14           MS. REDDEN:  Yes, Your Honor.  I think that it -- I

15   mean, I think the sentence is self-explanatory as is.

16           THE COURT:  Okay.  It may be, but the rest of this

17   very much tracks the instructions.  So let's stay consistent

18   with tracking the language of the elements.

19           MS. REDDEN:  Yes, Your Honor.

20           THE COURT:  So that takes care of those two.

21        Now, finally, there's a final paragraph.  "Mr. Isaacs

22   adopts the theory of other defendants but further contends that

23   he traveled to Washington, D.C., on January 5th to get

24   experience that would assist him in his quest for a career as an

25   EMT.  He was not a part of any plan to obstruct Congress and did

1    not know of anyone else's plans to do so.  Mr. Isaacs contends

2    he never conspired with anyone and did not intend to commit any

3    of the crimes alleged.  Because of the circumstances, Mr. Isaacs

4    contends that his autism is a factor that must be concerned

5    considered in determining whether he developed the requisite

6    intent.  With respect to the charges related to restricted

7    areas, Mr. Isaacs's conduct was the result of acts of mistake

8    and ignorance."

9          MR. NESTLER:  We object to the penultimate paragraph

10   about the autism.

11         THE COURT:  You mean the penultimate sentence?

12         MR. NESTLER:  Sorry, sentence.

13         MR. ROSSI:  We would agree that the Court should

14   change that to the traits of autism as opposed to the way it's

15   phrased currently to be consistent with your prior ruling.

16         MR. NESTLER:  And we don't mind if it's changed to

17   what Your Honor's ruling is, which I think is appropriate, which

18   is his difficulty with reading facial expressions.

19         THE COURT:  So I can do -- I'm sorry?

20         MR. GREENE:  I don't think your ruling was limited

21   to testimony, evidence from Dr. Sperry just reading facial

22   expressions.  It's mind-blindness, which is much more.

23         THE COURT:  Right.  But it was even more than

24   mind-blindness.  It was his ability to know right from wrong.

25   It was his intellectual capacity and his executive functioning.

1        I would prefer not to list on all those things and just

2     rely on your good faith on limiting your arguments to those

3     traits so it does not require me to be more detailed than this.

4        Okay?  So I will take that sentence out.

5            MR. BRENNWALD:  Your Honor, going back to paragraph 2,

6     if I may.

7            THE COURT:  Paragraph 2 of what?

8            MR. BRENNWALD:  The e-mail that Mr. Woodward sent out

9     that talks about "the defendants contend they were present in

10    Washington, D.C., on January 6 to participate in the Oath

11    Keepers security operation."

12       If we can somehow distinguish, it might require another

13    sentence, but the Parkers contend they were present in

14    Washington, D.C., on January 6 to attend the rally.

15           MS. HALLER:  Yes.

16           MR. BRENNWALD:  And later agreed to assist the

17    security operations for that day.  But they did not go -- I

18    think some people did go there as a part of security.  But they

19    specifically went there to attend the rally.

20       And then as they learned on their way down that they

21    were -- that they might participate --

22           THE COURT:  How about it just says the following:

23    "The defendants contend they were present in Washington, D.C.,

24    on January 6 to participate in the Oath Keepers security

25    operation that day, to provide security details for various

```
 1    organizers and speakers, as well as their family members, or to
 2    participate in the events that had been organized for that day"?
 3    I could say "and/or."
 4             MS. HALLER:  Can we say "to attend the president's
 5    rally"?
 6             THE COURT:  No.
 7             MS. HALLER:  They all have VIP passes --
 8             THE COURT:  I've heard evidence that they were doing
 9    more than just attending the president's rally.
10             MS. HALLER:  Right.  But that --
11             THE COURT:  Can I just finish this with Mr. Brennwald?
12        So I would end -- it would be "to participate in the Oath
13    Keepers security operation that day; to provide personal
14    security details to various organizers and speakers, as well as
15    the members and their families; and/or to participate in the
16    events that had been organized for that day."
17             MR. BRENNWALD:  That's fine.
18             THE COURT:  Okay.  All right.  Okay.  Those are our
19    instructions.
20        Anything else, speak now or forever hold your peace.
21             MR. MACHADO:  Your Honor, I'm massaging --
22    Mr. Brennwald and I had agreed as far as a theory of the case.
23    Can we provide that to the Court, defendant's theory of the
24    case?
25             THE COURT:  I just spent 15 minutes reading it.  What
```

1    do you want to massage?

2            MR. MACHADO:  Well, put specifically to Sandra and

3    Bennie Parker, Your Honor, my request is going to be that we put

4    in, and I will send it to the Court, "it is defendant Sandra

5    Parker's and Bennie Parker's theory of the case that they

6    traveled to Washington, D.C., for the sole purpose of attending

7    the rally, but that Jessica Watkins and Donovan Crowl asked them

8    to volunteer in helping the Oath Keepers" --

9            THE COURT:  No, no, I'm not giving that detailed an

10   instruction.  You can make that argument.  It's not going to be

11   in the instructions.

12           MR. BRENNWALD:  So we start at 8:30, and the Court

13   goes until about 9:45.  I guess we will take a break until

14   10:00, and the government will go until 11:15, 11:30, take

15   another break, and Mr. Woodward will go.  And I assume the rest

16   of us will go in the afternoon?

17           THE COURT:  Correct.  I'm trying to get Mr. Woodward

18   out of here in order to preserve his marriage.

19           MS. HALLER:  So Mr. Woodward is going first?

20           THE COURT:  After the government.

21        Mr. Isaacs, anything else you want to add?

22           MR. ROSSI:  Your Honor, just so we're clear, we would

23   have Mrs. Meggs's closing, and it then would be --

24           THE COURT:  After Ms. Meggs's closing, we will go

25   right down the indictment.  Sorry?

```
 1              MR. BRENNWALD:  He will go before me is what you're
 2      saying?
 3              THE COURT:  Correct.
 4              MR. ROSSI:  We will take a lunch break before the
 5      others?
 6              THE COURT:  Probably.
 7              MR. ROSSI:  Thank you, Judge.
 8              THE COURT:  So can I get rough estimates of length of
 9      time?  I won't hold it to you strictly, but I will pull you off
10      stage if you're going over excessively.
11          Mr. Machado?
12              MR. MACHADO:  No more than 40 minutes, Your Honor.
13              THE COURT:  Mr. Brennwald?
14              MR. BRENNWALD:  I will say an hour, but I hope to do
15      it in 45.
16              THE COURT:  Mr. Cooper, are you going to do a closing?
17              MR. COOPER:  I've never said before in my life "may it
18      please the Court," but I just might, Your Honor.  About half an
19      hour.
20              THE COURT:  Mr. Woodward?
21              MR. WOODWARD:  I'm going to go for an hour, but I
22      would ask for leave to go for 90 minutes.  I think I will be an
23      hour or less.
24              THE COURT:  I'll put you at 90 minutes with a hard
25      stop.
```

1          MR. WOODWARD:  Understood.

2          THE COURT:  Mr. Rossi?

3          MR. ROSSI:  70 minutes.

4      Judge, that was my baseball -- 7 was my baseball number.

5          THE COURT:  You could have just gone with seven

6   minutes.

7          MR. ROSSI:  Don't tempt me.

8          THE COURT:  All right.  Last but not least,

9   Ms. Redden?

10         MS. REDDEN:  Let's say an hour, hopefully less.

11         MR. COOPER:  How hard is the Court going to hold our

12  feet to the fire with the 30 minutes?

13         THE COURT:  Like I said, I won't pull you off stage if

14  it hits the 30-minute mark, but if it gets long beyond it, I

15  will.  I will give you a warning at the estimated time mark or

16  shortly before.

17         MR. NESTLER:  Does Your Honor have a hard stop

18  tomorrow?

19         THE COURT:  I do not have a hard stop personally.  Do

20  I?  No.  But --

21         MS. HALLER:  Your Honor, when do we deal with

22  exhibits?  We have a few that need to be admitted that were

23  marked but were not ruled upon.  And I think the government had

24  e-mailed some of their exhibits.

25         THE COURT:  So by my estimate, it seems unlikely that

1    we would finish all closings tomorrow, unless some of the

2    defense closings are a little bit shorter than expected.

3         Well, actually, hang on for a second.  I think I'm

4    double-counting Ms. Meggs's closing.  So hold on.

5              MR. WOODWARD:  I really don't think that I'm going to

6    run 90 minutes, but I don't want --

7              THE COURT:  I think we can actually get there by 5:00,

8    give or take, depending upon how things play out.

9         Bottom line is, ideally, we can finish closings tomorrow,

10   government's rebuttal Friday morning, final instructions, and

11   then we're done.  Okay?

12             MR. MACHADO:  Your Honor, I'm trying to do a balancing

13   of something over at Superior Court.  Are we going to stop for

14   lunch at 12:30?

15             THE COURT:  We will stop when there's an appropriate

16   time to stop.

17             MR. BRENNWALD:  Your Honor, I have a 9:00 case before

18   Judge Kotelly.  I thought it would be okay because we usually

19   start at 9:15 or 9:30.

20        But could I ask for the Court's assistance perhaps in

21   reaching out to her and saying that the Court decided to start

22   at 8:30 tomorrow morning?

23             THE COURT:  It's up to you.  I mean, I'm just reading

24   instructions.  I will still be reading instructions at 9:00.

25             MR. BRENNWALD:  So I don't need to be here?

```
 1            THE COURT:  That's up to you and your client.
 2            MS. RAKOCZY:  Did the Court say we were starting to
 3    read instructions at 9:00 or 8:30?
 4            THE COURT:  8:30.
 5        Oh, yeah, right, this is an important issue.  I actually
 6    wrote it down and circled it.
 7        Mr. Rossi?
 8            MR. ROSSI:  Minor issue.  Exhibits, there were two
 9    exhibits --
10            THE COURT:  Can we put a pause on that for a second.
11    I want to deal with exhibits all at once.
12        We received an e-mail weeks ago from the juror in seat 12
13    who has told us that he, I believe, yeah, he is scheduled to be
14    in London from March 17th through March the 26th.  His flight
15    leaves the evening of March the 16th.
16        I have concerns about length of deliberations, based upon
17    past trials, that we could run into that -- the 16th is the
18    Thursday evening of next week if my calendar is right, and I
19    don't want to -- well, let me put it this way:  Unless the
20    defense is prepared to do two things, one, roll the dice and,
21    two, not object if he has to leave and we're down to 11.
22            MR. ROSSI:  Your Honor, may I suggest something?  Can
23    we keep the two alternates on a leash, respectful leash?  Okay.
24            THE COURT:  No, because they would have to start
25    deliberations all over again, Mr. Rossi.
```

```
 1              MR. COOPER:  Let him go now and don't roll the dice.

 2              MS. HALLER:  No.

 3              MR. COOPER:  That's my position.

 4              THE COURT:  I'm not going to seat him as a juror.  I

 5    do not think I can in good faith seat him as a juror unless all

 6    defendants agree they will not raise an argument if we are

 7    reduced to 11 jurors.

 8              MS. HALLER:  Your Honor, we don't even have a live

 9    issue, because even in the Rhodes case, which was the longest

10    verdict in all of the D.C. jury trials on January 6 cases --

11              THE COURT:  Ms. Haller, what happens if at 5:00 on

12    Thursday the jury has not returned a verdict and he needs to get

13    on a plane to go to London?

14              MS. HALLER:  There isn't even a 1 percent chance of

15    that happening.

16              THE COURT:  You are wrong.  There is more than a 1

17    percent, and I am not going to risk it.  The last two juries

18    have taken three days.  There's one additional defendant in this

19    case.  I am absolutely not going to take that risk unless you

20    all over here on this side of the room are willing to sign off

21    on that risk.  And I don't hear anybody doing it.

22              MS. HALLER:  Can we have the Court's indulgence and

23    just have a discussion among us for five minutes, two minutes?

24              THE COURT:  Sure.  Talk about it and let me know in

25    the morning.
```

1          I guess the other possibility we could have is to talk to

2     the juror tomorrow and just find out or JC can talk to him

3     privately and find out how much flexibility he has in his travel

4     plans.

5               MR. WOODWARD:  Can we confirm that he still has travel

6     plans?

7               THE COURT:  Fair enough.

8               MR. ROSSI:  Judge, it's back row, third one?

9               THE COURT:  So I will ask JC to reach out to find out

10    his current plans and what, if any, flexibility he has on the

11    front end, even though, I will say this, even if he says I've

12    got some flexibility, that's not going to remove the concern at

13    least I might have as a defense lawyer that his desire to go to

14    London might be --

15              MR. COOPER:  I will say right now, I'm not going to

16    agree to 11 jurors.  I'm not.

17              MS. HALLER:  We're not asking you to, but we're going

18    to -- can we discuss this and come back to the Court in the

19    morning, as the judge said, suggested?

20              MR. COOPER:  Certainly.

21              THE COURT:  Okay.  Before we adjourn, what are the

22    exhibit issues, Mr. Rossi?  You had a couple.

23              MR. ROSSI:  The resume, 1 and 4, the resume, I gave a

24    redacted version to Mr. Nestler, and I think I have six pages

25    from military records, which is --

```
1                THE COURT:  Are we okay with --

2                MR. NESTLER:  Yes.

3                MR. ROSSI:  Yay.

4                THE COURT:  I was going to say Rossi 1 and 4.  CI-1

5      and 4 are admitted.

6           (Defendant Exhibits CI-1 and CI-4 received into evidence.)

7                MR. MACHADO:  In advance of tomorrow, how do we

8      prepare the exhibits to get them to the Court?

9                THE COURT:  Thumb drive.

10               MR. MACHADO:  I'm sorry?

11               THE COURT:  Thumb drive.

12               MR. MACHADO:  Okay.  Thank you.  The exhibit list

13     printed out?

14               THE COURT:  Both, so it's both searchable and they've

15     got a hard copy.

16               MR. MACHADO:  Thank you.

17               MS. HALLER:  Your Honor, could we seek to move in the

18     Ford Fischer video, CM-55.  I think it was an oversight that it

19     wasn't admitted, the Ford Fischer video.  It was played both on

20     direct with Connie Meggs and earlier with Joanna Abrams.

21               MS. RAKOCZY:  Can we talk tonight about the exhibit,

22     just to make sure we understand?

23               MS. HALLER:  Okay.

24               THE COURT:  Okay.

25               MR. EDWARDS:  Your Honor, as we've done in past
```

1    trials, we will have a written filing that we rested, and we

2    will get that on file.

3              THE COURT:  Okay.  Anything else?

4        Okay.  Thank you, all, very much.  We will see you in the

5    morning, 8:30.  Please, please, please be here on time.

6        And we will circulate final instructions tonight.  We will

7    circulate final instructions, both a redline and a final.

8        Oh, I should have asked, but I guess it can wait until

9    tomorrow.  I don't know whether the defendants have any

10   objections to the verdict form.

11             MR. BRENNWALD:  The one that says not guilty first and

12   then guilty is fine.

13             THE COURT:  Lucky for you, they're sitting right next

14   to each other.

15       Anyway, we don't need to resolve that tonight.  We only

16   need to resolve it by Friday.

17       (Proceedings adjourned at 5:02 p.m.)

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick_____          March 9, 2023_____

9    SIGNATURE OF COURT REPORTER              DATE

## $

**$210** [1] - 6679:22
**$40,3428.44** [1] - 6680:4
**$41,000** [1] - 6679:10
**$420** [2] - 6679:22, 6680:8

## /

**/s** [1] - 6774:8

## 0

**00:55** [1] - 6711:12
**0171** [2] - 6716:1, 6716:2

## 1

**1** [14] - 6624:13, 6655:2, 6655:12, 6676:20, 6676:22, 6677:4, 6677:6, 6677:9, 6677:11, 6692:12, 6770:14, 6770:16, 6771:23, 6772:4
**10** [5] - 6628:18, 6662:12, 6674:23, 6707:12
**100** [3] - 6659:11, 6680:17, 6680:19
**10158** [1] - 6651:4
**10159** [1] - 6651:4
**1016** [1] - 6651:3
**10165** [1] - 6651:14
**10166** [3] - 6647:12, 6647:23, 6647:25
**10166........................
............** [1] - 6623:12
**10167** [1] - 6651:3
**1025** [1] - 6622:11
**1056.0263.0215FF** [1] - 6721:1
**106** [2] - 6627:4, 6659:11
**1066** [1] - 6647:17
**1070.2** [1] - 6719:5
**1078.2** [1] - 6708:19
**1092.1** [2] - 6710:19, 6710:23
**10:00** [1] - 6765:14
**11** [4] - 6627:7, 6769:21, 6770:7, 6771:16
**110** [1] - 6659:12
**11:15** [1] - 6765:14
**11:30** [1] - 6765:14

**12** [1] - 6769:12
**12:30** [1] - 6768:14
**13** [1] - 6629:7, 6695:13
**14** [2] - 6629:7, 6629:10
**14th** [2] - 6637:7, 6637:9
**15** [4] - 6629:10, 6707:8, 6707:12, 6764:25
**1512** [1] - 6643:2, 6738:5
**1529** [1] - 6629:22
**15th** [1] - 6706:21
**16** [1] - 6632:25
**16th** [4] - 6658:7, 6658:10, 6769:15, 6769:17
**17** [2] - 6632:25, 6633:11
**17th** [1] - 6769:14
**18** [2] - 6633:2, 6633:18
**1808** [1] - 6622:5
**18th** [1] - 6637:14
**19** [1] - 6634:7
**1999** [1] - 6702:14
**1:11** [1] - 6631:22
**1:15** [1] - 6621:8

## 2

**2** [9] - 6624:13, 6634:17, 6655:2, 6692:15, 6694:14, 6752:1, 6752:6, 6763:5, 6763:7
**20** [2] - 6634:17, 6657:2
**20001** [3] - 6621:21, 6622:3, 6622:22
**20003** [1] - 6621:23
**20007** [1] - 6622:12
**20010** [1] - 6622:6
**20036** [1] - 6622:9
**2008** [1] - 6694:9
**2010** [3] - 6662:11, 6666:24, 6695:11
**2011** [1] - 6695:8
**2012** [2] - 6695:2, 6695:5
**2019** [1] - 6694:20
**202-354-3284** [1] - 6622:23
**2021** [7] - 6650:1, 6694:15, 6707:5, 6742:8, 6753:15, 6757:15, 6759:5
**2023** [2] - 6621:8,

**6774:8**
**20579** [1] - 6621:18
**21** [2] - 6635:1, 6635:9
**21-cr-28** [1] - 6621:3
**22** [2] - 6636:3, 6638:8
**23** [4] - 6636:10, 6637:16, 6657:2, 6675:25
**24** [1] - 6637:16
**24-hour-a-day** [1] - 6655:20
**25** [2] - 6637:16, 6695:12
**26** [1] - 6753:15
**26th** [1] - 6769:14
**29** [5] - 6723:12, 6723:17, 6726:1, 6726:16, 6735:4
**2:28** [1] - 6672:10
**2:35** [1] - 6672:4
**2:38** [1] - 6672:10
**2:57** [1] - 6711:12

## 3

**3** [3] - 6624:13, 6655:3, 6655:13
**30** [4] - 6715:1, 6715:2, 6727:1, 6767:12
**30-minute** [1] - 6767:14
**310** [1] - 6621:20
**32801** [1] - 6622:14
**3300** [1] - 6622:16
**333** [1] - 6622:21
**350** [1] - 6622:3

## 4

**4** [4] - 6624:13, 6771:23, 6772:4, 6772:5
**40** [4] - 6688:15, 6688:16, 6688:20, 6766:12
**40-caliber** [1] - 6707:20
**400** [2] - 6622:2, 6622:11
**45** [2] - 6714:16, 6766:15
**4704-B** [1] - 6622:22
**494** [3] - 6696:13, 6698:7, 6699:16
**495** [6] - 6696:2, 6700:8, 6700:11, 6700:14, 6700:19, 6701:25
**496** [1] - 6702:11

**497** [1] - 6696:13

## 5

**5** [7] - 6624:13, 6633:12, 6633:20, 6634:15, 6634:16, 6714:15, 6737:23
**5,000** [1] - 6737:23
**50** [2] - 6680:19, 6714:16
**500** [1] - 6737:23
**503** [1] - 6621:20
**55** [1] - 6622:14
**5:00** [1] - 6768:7, 6770:11
**5:02** [1] - 6773:17
**5th** [1] - 6761:23

## 6

**6** [17] - 6624:15, 6628:19, 6663:14, 6663:16, 6668:2, 6668:11, 6668:24, 6720:10, 6742:8, 6756:12, 6757:14, 6758:11, 6759:5, 6763:10, 6763:14, 6763:24, 6770:10
**60** [1] - 6680:20
**601** [2] - 6621:17, 6622:8
**65** [2] - 6648:8, 6688:13
**6644** [1] - 6623:4
**6647** [1] - 6623:12
**6672** [1] - 6623:4
**6704** [1] - 6623:5
**6706** [1] - 6623:6
**6715** [1] - 6623:6
**6719** [1] - 6623:7
**6721** [1] - 6623:7
**6769** [1] - 6623:11
**6:45** [3] - 6707:8, 6707:10, 6715:22
**6th** [4] - 6671:2, 6671:8, 6707:5, 6741:14

## 7

**7** [2] - 6624:24, 6767:4
**7.P.1** [1] - 6707:23
**70** [1] - 6767:3
**700** [1] - 6622:17
**75219** [1] - 6622:17
**78.2** [1] - 6708:22
**7:00** [1] - 6707:11

## 8

**8** [3] - 6621:8, 6624:25, 6628:18
**87** [3] - 6717:23, 6717:24
**8:30** [7] - 6722:25, 6723:8, 6765:12, 6768:22, 6769:3, 6769:4, 6773:5

## 9

**9** [8] - 6625:10, 6625:22, 6628:17, 6628:18, 6714:15, 6760:3, 6760:24, 6774:8
**90** [4] - 6659:12, 6766:22, 6766:24, 6768:6
**900** [1] - 6622:8
**922** [1] - 6621:23
**99** [1] - 6669:1
**99.5** [1] - 6749:3
**9:00** [3] - 6768:17, 6768:24, 6769:3
**9:15** [1] - 6768:19
**9:21** [1] - 6751:16
**9:30** [1] - 6768:19
**9:45** [1] - 6765:13

## A

**a-ha** [1] - 6700:6
**A-s-k-e-n-a-z-i** [1] - 6644:7
**a.m** [1] - 6707:10
**abet** [1] - 6724:16
**abetted** [1] - 6756:7
**abetting** [1] - 6724:14, 6724:21, 6737:18
**abilities** [8] - 6644:14, 6652:16, 6656:15, 6657:11, 6658:22, 6658:25, 6698:17
**ability** [14] - 6653:6, 6656:6, 6656:10, 6656:11, 6656:22, 6657:24, 6659:6, 6659:20, 6662:14, 6662:16, 6664:11, 6667:18, 6671:15, 6762:24
**able** [14] - 6653:19, 6653:23, 6654:1, 6654:4, 6654:21, 6658:23, 6660:4, 6663:6, 6666:11, 6687:7, 6687:21,

6718:25, 6724:23,
6744:22
**abnormal** [1] - 6684:7
**above-entitled** [1] -
6774:5
**Abrams** [2] - 6744:20,
6772:20
**absent** [1] - 6728:7
**absolutely** [5] -
6679:8, 6691:23,
6735:5, 6746:1,
6770:19
**abundance** [1] -
6732:6
**academy** [2] -
6706:25, 6707:2
**accept** [2] - 6643:12,
6729:8
**access** [2] - 6687:19,
6688:1
**accident** [2] -
6646:18, 6757:5
**accompany** [1] -
6638:19
**accomplished** [1] -
6747:1
**according** [1] -
6655:10
**accosted** [1] - 6713:8
**accounted** [1] -
6624:7
**accumulated** [1] -
6680:7
**accuracy** [1] - 6711:17
**accurate** [8] - 6643:9,
6643:10, 6666:15,
6679:12, 6682:16,
6725:2, 6749:8,
6755:3
**accurately** [1] -
6743:9
**accused** [2] - 6755:25,
6757:1
**acquiesced** [1] -
6727:9
**acquit** [1] - 6731:11
**acquittals** [1] -
6738:23
**acquitted** [1] -
6735:14
**acronym** [1] - 6684:10
**act** [4] - 6755:5,
6757:4, 6760:3,
6760:25
**acted** [7] - 6638:3,
6754:12, 6754:13,
6754:15, 6754:23,
6755:12, 6755:19
**acting** [2] - 6728:12,
6761:10

**actions** [17] - 6637:1,
6637:5, 6642:20,
6668:10, 6730:15,
6738:7, 6754:10,
6754:18, 6755:4,
6757:5, 6757:14,
6758:3, 6758:11,
6758:16, 6759:5,
6759:9, 6759:24
**activities** [1] - 6655:5
**acts** [7] - 6635:2,
6635:11, 6635:15,
6699:25, 6700:4,
6759:24, 6762:7
**actual** [4] - 6641:13,
6658:9, 6698:24,
6755:7
**add** [5] - 6630:18,
6633:22, 6696:7,
6749:4, 6765:21
**added** [4] - 6625:16,
6625:18, 6628:6,
6734:18
**adding** [2] - 6641:14,
6643:13
**addition** [6] - 6636:5,
6642:20, 6651:16,
6662:15, 6675:3,
6675:9
**additional** [3] -
6668:16, 6725:11,
6770:18
**additionally** [2] -
6707:20, 6707:21
**address** [3] - 6637:22,
6733:1, 6733:19
**addresses** [1] -
6732:19
**ADHD** [3] - 6674:25,
6675:3, 6675:9
**adjourn** [2] - 6722:23,
6771:21
**adjourned** [1] -
6773:17
**adjust** [1] - 6666:1
**adjustment** [1] -
6663:21
**administer** [3] -
6657:19, 6659:7,
6661:3
**administered** [2] -
6657:17, 6675:19
**admissibility** [2] -
6717:3, 6717:5
**admissible** [1] -
6717:13
**admit** [1] - 6648:14
**admitted** [24] -
6624:10, 6628:10,
6628:12, 6629:8,

6629:24, 6637:9,
6637:15, 6647:23,
6648:17, 6707:22,
6708:15, 6708:17,
6708:22, 6708:23,
6710:19, 6711:9,
6711:13, 6711:15,
6720:25, 6729:22,
6760:10, 6767:22,
6772:5, 6772:19
**adopts** [1] - 6761:22
**adults** [5] - 6647:5,
6647:6, 6682:17,
6683:15, 6689:11
**advance** [1] - 6772:7
**adverse** [1] - 6681:14
**adversely** [3] - 6758:4,
6758:18, 6759:12
**advertise** [1] -
6682:10
**advised** [2] - 6685:18,
6697:14
**aerobic** [1] - 6667:12
**affect** [7] - 6662:14,
6663:21, 6667:1,
6667:2, 6758:4,
6758:18, 6759:12
**affiliations** [1] -
6645:1
**African** [2] - 6714:16,
6716:12
**afternoon** [10] -
6629:18, 6644:4,
6644:5, 6672:4,
6672:18, 6672:19,
6706:9, 6706:10,
6719:25, 6765:16
**AFTERNOON** [1] -
6621:11
**afterwards** [2] -
6644:21, 6654:13
**age** [4] - 6655:3,
6662:15, 6662:17,
6674:23
**agent** [6] - 6721:19,
6746:9, 6746:18,
6747:7, 6747:9,
6747:12
**Agent** [12] - 6713:15,
6714:5, 6714:14,
6717:2, 6717:6,
6717:12, 6719:2,
6719:17, 6721:18,
6744:20, 6747:23,
6748:10
**agents** [7] - 6713:7,
6746:15, 6746:20,
6746:21, 6747:14,
6748:15, 6748:16
**ages** [2] - 6655:2,

6657:10
**ago** [2] - 6745:16,
6769:12
**agree** [24] - 6639:19,
6675:15, 6675:17,
6676:4, 6676:9,
6681:19, 6682:13,
6695:15, 6697:16,
6697:20, 6697:25,
6700:11, 6700:14,
6700:16, 6700:24,
6725:1, 6738:13,
6739:3, 6743:12,
6749:3, 6751:13,
6762:13, 6770:6,
6771:16
**agreed** [3] - 6726:9,
6763:16, 6764:22
**agreeing** [1] - 6750:23
**agreement** [9] -
6624:24, 6636:7,
6724:8, 6735:5,
6736:15, 6737:18,
6753:12, 6753:13,
6753:14
**ahead** [3] - 6669:19,
6675:6, 6738:3
**Aid** [1] - 6746:24
**aid** [1] - 6724:16
**aided** [2] - 6622:25,
6756:7
**aiding** [3] - 6724:13,
6724:21, 6737:18
**ALEXANDRA** [1] -
6621:16
**all-out** [2] - 6712:7,
6712:10
**allegation** [1] -
6760:13
**allegations** [1] -
6634:4
**allege** [1] - 6635:14
**alleged** [7] - 6635:3,
6635:15, 6636:1,
6636:6, 6636:7,
6636:21, 6762:3
**allegedly** [4] -
6633:13, 6633:22,
6634:1, 6635:23
**alleges** [1] - 6726:3
**alleging** [2] - 6730:17,
6737:5
**allow** [1] - 6675:6
**allowed** [2] - 6648:21,
6735:2
**alluded** [1] - 6629:3
**almost** [2] - 6672:3,
6700:6
**alone** [12] - 6656:24,
6677:16, 6677:17,

6677:18, 6716:22,
6717:7, 6724:12,
6724:17, 6741:14,
6741:21, 6742:9,
6745:19
**alternate** [1] - 6731:2
**alternates** [1] -
6769:23
**ALVIN** [1] - 6621:6
**AMERICA** [1] - 6621:3
**American** [3] -
6645:15, 6714:16,
6716:12
**AMIT** [1] - 6621:11
**amount** [3] - 6680:1,
6680:5, 6732:6
**analyzed** [1] - 6750:23
**anger** [2] - 6662:15,
6664:18
**angle** [1] - 6742:20
**announced** [1] -
6722:16
**answer** [4] - 6654:8,
6654:12, 6667:9,
6668:7
**Answer** [7] - 6744:10,
6744:13, 6744:16,
6744:19, 6744:24,
6745:2, 6745:6
**answered** [1] -
6670:20
**answering** [1] -
6684:25
**answers** [6] - 6654:5,
6654:7, 6654:8,
6654:9, 6668:10,
6712:16
**antagonistic** [3] -
6712:24, 6713:3,
6719:14
**anticipation** [1] -
6753:21
**anxious** [1] - 6653:10
**anyway** [2] - 6636:16,
6773:15
**apart** [2] - 6659:6,
6754:3
**apologies** [2] -
6708:24, 6721:3
**apologize** [2] -
6625:12, 6723:7
**appear** [11] - 6657:16,
6684:10, 6685:2,
6691:9, 6691:16,
6691:21, 6692:3,
6693:6, 6693:7,
6700:10, 6719:17
**appearance** [1] -
6624:5
**APPEARANCES** [2] -

6621:14, 6622:1
**appeared** [4] -
6629:20, 6653:10,
6686:4, 6686:8
**application** [1] -
6645:19
**applies** [3] - 6643:14,
6726:2
**apply** [1] - 6634:10
**appreciate** [5] -
6631:17, 6660:2,
6660:4, 6703:20,
6735:12
**appreciates** [1] -
6667:23
**appreciation** [2] -
6702:19, 6703:21
**approach** [5] -
6679:14, 6683:6,
6689:19, 6693:20,
6696:4
**appropriate** [10] -
6639:9, 6642:10,
6643:1, 6654:7,
6732:8, 6742:14,
6745:18, 6750:5,
6762:17, 6768:15
**appropriately** [1] -
6740:19
**approved** [1] -
6645:22
**area** [8] - 6664:5,
6708:11, 6708:14,
6709:17, 6710:12,
6710:14, 6710:15,
6713:5
**areas** [6] - 6633:22,
6656:11, 6656:12,
6657:24, 6701:17,
6762:7
**arena** [2] - 6673:8,
6697:21
**arguably** [3] -
6727:10, 6729:9,
6729:23
**argue** [17] - 6727:18,
6728:22, 6731:24,
6732:2, 6732:3,
6732:8, 6735:1,
6738:8, 6739:17,
6739:18, 6739:22,
6739:24, 6741:19,
6741:22, 6741:25,
6742:23, 6745:10
**argued** [2] - 6739:4,
6739:25
**arguing** [4] - 6731:15,
6740:23, 6743:22,
6745:13
**argument** [13] -

6639:24, 6640:7,
6642:10, 6725:4,
6725:8, 6725:18,
6730:8, 6730:9,
6732:3, 6735:4,
6742:1, 6765:10,
6770:6
**argumentative** [1] -
6641:9
**arguments** [4] -
6630:22, 6722:21,
6723:1, 6763:2
**armed** [3] - 6707:18,
6707:20, 6736:23
**arrest** [1] - 6628:8
**art** [1] - 6648:23
**articulated** [2] -
6638:14, 6638:16
**articulating** [1] -
6638:8
**artifact** [1] - 6726:6
**ASD** [44] - 6626:5,
6655:11, 6664:3,
6664:21, 6674:25,
6676:4, 6676:16,
6678:5, 6678:8,
6684:10, 6684:15,
6685:1, 6691:9,
6691:16, 6691:21,
6692:3, 6692:18,
6693:6, 6693:12,
6693:17, 6694:12,
6697:21, 6698:9,
6699:13, 6699:22,
6700:19, 6701:11,
6702:18, 6703:25,
6704:3, 6704:17,
6704:24, 6705:2,
6705:9, 6749:1,
6749:11, 6749:12,
6749:16, 6749:21,
6749:23, 6749:24,
6750:7, 6750:10,
6750:12
**ASKENAZI** [1] -
6623:4, 6643:24
**Askenazi** [19] -
6626:4, 6627:9,
6643:23, 6643:25,
6644:7, 6644:8,
6647:12, 6647:13,
6648:11, 6648:17,
6648:24, 6651:6,
6661:22, 6672:8,
6687:3, 6703:4,
6704:17, 6705:19,
6750:11
**Askenazi's** [2] -
6649:10, 6651:13
**aspect** [2] - 6667:10,

6667:14
**Asperger's** [1] -
6676:7
**assert** [5] - 6753:4,
6753:6, 6756:2,
6757:11, 6759:2
**assess** [5] - 6659:5,
6662:14, 6664:6,
6666:4, 6667:18
**assessed** [1] -
6659:15
**assessing** [3] -
6644:13, 6659:6,
6670:23
**assessment** [7] -
6657:4, 6657:8,
6663:10, 6666:3,
6670:17, 6684:6,
6684:24
**assessments** [2] -
6656:6, 6656:21
**assigned** [3] - 6713:7,
6713:17, 6713:23
**assist** [4] - 6709:19,
6712:22, 6761:24,
6763:16
**assistance** [2] -
6740:15, 6768:20
**associated** [5] -
6629:11, 6644:11,
6655:9, 6661:1,
6664:2
**association** [2] -
6664:7, 6684:23
**assume** [2] - 6637:24,
6765:15
**assumes** [1] - 6635:20
**assuming** [2] -
6713:25
**ate** [1] - 6652:2
**attempt** [1] - 6638:24
**attempted** [1] - 6756:7
**attempting** [1] -
6710:7
**attend** [4] - 6656:18,
6763:14, 6763:19,
6764:4
**attending** [2] - 6764:9,
6765:6
**attention** [10] -
6652:17, 6656:13,
6657:25, 6658:1,
6658:3, 6658:4,
6658:15, 6707:15,
6714:3
**Attorney's** [2] -
6621:17, 6681:3
**attorney's** [1] -
6651:25
**attorneys** [1] -

6646:15
**attributed** [1] - 6684:7
**audio** [1] - 6629:6
**AUSA** [4] - 6621:15,
6621:15, 6621:16,
6621:16
**authenticated** [1] -
6717:1
**authentication** [1] -
6733:21
**authenticity** [1] -
6629:8
**authoritative** [9] -
6695:18, 6695:19,
6696:22, 6697:1,
6697:2, 6697:17,
6698:8, 6698:19,
6698:25
**authorities** [1] -
6698:20
**authority** [18] -
6738:25, 6739:4,
6739:18, 6739:22,
6740:2, 6740:20,
6740:22, 6741:1,
6741:2, 6742:5,
6742:19, 6742:20,
6743:1, 6743:3,
6743:10, 6745:10,
6745:14, 6745:21
**authorized** [1] -
6740:21
**autism** [45] - 6626:1,
6647:4, 6647:6,
6647:8, 6648:12,
6648:18, 6654:24,
6654:25, 6656:1,
6664:3, 6664:7,
6666:13, 6666:15,
6666:25, 6667:16,
6673:4, 6674:16,
6674:18, 6675:3,
6675:9, 6675:18,
6675:22, 6676:3,
6676:4, 6676:13,
6683:1, 6684:10,
6684:15, 6685:1,
6689:1, 6689:4,
6689:10, 6689:14,
6691:9, 6691:16,
6691:21, 6692:3,
6693:6, 6693:12,
6693:18, 6694:12,
6699:10, 6762:4,
6762:10, 6762:14
**autistic** [4] - 6675:16,
6675:20, 6676:2,
6676:8
**automatic** [1] - 6688:3
**availability** [1] -

6761:11
**available** [2] -
6646:13, 6687:6
**Avenue** [4] - 6621:23,
6622:8, 6622:16,
6622:21
**average** [17] -
6658:11, 6658:12,
6659:10, 6659:11,
6659:12, 6659:13,
6659:21, 6661:15,
6661:16, 6661:24,
6662:7, 6662:17,
6663:1
**aware** [5] - 6626:6,
6660:19, 6678:1,
6727:3, 6744:25
**awareness** [2] -
6755:12, 6755:20
**awkward** [1] - 6742:11

**B**

**background** [2] -
6646:11, 6719:6
**backing** [1] - 6750:24
**backwards** [1] -
6733:19
**bad** [1] - 6731:3
**Badalament** [3] -
6709:7, 6709:10,
6721:2
**balance** [1] - 6631:10
**balancing** [1] -
6768:12
**Band** [1] - 6746:24
**Band-Aid** [1] -
6746:24
**bank** [2] - 6736:18,
6736:24
**barometer** [1] -
6714:20
**Baron** [2] - 6702:13,
6702:16
**Baron-Cohen** [2] -
6702:13, 6702:16
**base** [1] - 6661:25
**baseball** [2] - 6767:4
**based** [8] - 6625:8,
6647:1, 6649:1,
6662:3, 6687:15,
6729:14, 6737:23,
6769:16
**bases** [1] - 6725:22
**basic** [1] - 6652:7
**basis** [7] - 6636:23,
6673:22, 6678:1,
6682:23, 6728:24,
6731:22, 6738:17
**batteries** [2] - 6656:25

**battery** [1] - 6658:2
**become** [1] - 6648:22
**becomes** [2] - 6737:3, 6737:22
**BEFORE** [2] - 6621:1, 6621:11
**begin** [1] - 6722:25
**beginning** [4] - 6642:4, 6703:1, 6703:12, 6712:9
**begins** [2] - 6635:2, 6635:10
**behalf** [1] - 6746:25
**behavior** [2] - 6644:13, 6684:6
**behaviors** [4] - 6644:15, 6655:5, 6684:4, 6700:2
**behind** [1] - 6708:6
**below** [3] - 6658:7, 6659:10, 6694:19
**Ben** [1] - 6758:22
**Bench** [4] - 6670:1, 6686:12, 6711:7, 6722:6
**bench** [6] - 6671:12, 6688:7, 6711:21, 6716:19, 6717:15, 6722:10
**Bennie** [5] - 6628:20, 6752:17, 6757:9, 6765:3, 6765:5
**BENNIE** [1] - 6621:6
**berry** [2] - 6626:12, 6740:8
**Berry** [3] - 6624:23, 6626:15, 6744:9
**best** [2] - 6628:11, 6702:4
**better** [6] - 6651:25, 6659:16, 6669:4, 6670:7, 6673:19, 6673:20
**between** [9] - 6633:3, 6644:13, 6652:22, 6655:2, 6671:21, 6684:3, 6714:10, 6718:20, 6732:22
**beyond** [27] - 6632:11, 6635:16, 6640:13, 6725:10, 6751:20, 6752:13, 6752:19, 6752:25, 6753:7, 6754:5, 6754:8, 6754:9, 6754:14, 6756:3, 6756:6, 6757:3, 6757:12, 6757:13, 6758:10, 6758:16, 6759:3, 6759:4, 6759:8,

6759:23, 6760:5, 6761:2, 6767:14
**Biden** [1] - 6731:14
**big** [3] - 6696:1, 6700:17, 6707:25
**bill** [2] - 6680:1, 6680:8
**billed** [2] - 6679:9, 6679:24
**bit** [3] - 6653:11, 6718:20, 6768:2
**blindness** [35] - 6659:23, 6659:24, 6660:2, 6660:7, 6660:8, 6660:17, 6664:1, 6664:4, 6664:5, 6695:23, 6697:5, 6697:9, 6697:13, 6697:19, 6699:5, 6699:6, 6699:8, 6700:1, 6700:7, 6700:18, 6701:16, 6701:20, 6701:23, 6701:24, 6702:8, 6702:11, 6702:13, 6702:17, 6702:23, 6702:24, 6702:25, 6703:11, 6705:16, 6762:22, 6762:24
**Blue** [1] - 6747:21
**blunt** [1] - 6735:16
**blur** [2] - 6714:9, 6714:23
**Board** [1] - 6645:15
**board** [9] - 6629:23, 6629:24, 6645:8, 6645:11, 6645:13, 6645:24, 6646:1, 6646:4, 6691:8
**boarding** [1] - 6645:16
**body** [2] - 6702:2, 6734:24
**bolster** [1] - 6747:25
**bolstering** [2] - 6746:23, 6748:14
**bomb** [1] - 6712:6
**Book** [3] - 6724:11, 6747:17, 6747:21
**book** [8] - 6695:22, 6695:24, 6696:1, 6696:24, 6697:11, 6697:16, 6698:22
**books** [1] - 6696:25
**boot** [2] - 6667:7, 6667:14
**born** [1] - 6655:1
**bottom** [5] - 6624:15, 6701:24, 6718:7, 6727:1, 6768:9

**bound** [1] - 6648:25
**box** [1] - 6703:16
**brain** [5] - 6644:13, 6646:16, 6684:4, 6684:8, 6684:24
**Brand** [1] - 6622:5
**break** [9] - 6653:13, 6653:15, 6672:1, 6672:4, 6672:9, 6706:2, 6765:13, 6765:15, 6766:4
**breaks** [4] - 6652:3, 6652:24, 6653:6, 6654:3
**BRENNWALD** [41] - 6621:22, 6625:7, 6625:15, 6630:9, 6630:25, 6631:5, 6631:21, 6633:5, 6633:16, 6633:24, 6634:16, 6634:18, 6634:23, 6635:6, 6635:17, 6636:15, 6637:10, 6638:23, 6640:16, 6642:22, 6643:4, 6643:6, 6643:12, 6723:10, 6723:15, 6724:7, 6725:14, 6726:7, 6727:2, 6743:11, 6753:4, 6763:5, 6763:8, 6763:16, 6764:17, 6765:12, 6766:1, 6766:14, 6768:17, 6768:25, 6773:11
**Brennwald** [21] - 6621:22, 6626:18, 6630:3, 6630:8, 6631:16, 6633:2, 6633:13, 6634:14, 6635:5, 6635:13, 6636:11, 6637:24, 6638:15, 6724:5, 6725:4, 6725:1, 6726:5, 6727:4, 6764:11, 6764:22, 6766:13
**Brennwald's** [3] - 6632:4, 6724:3, 6726:15
**briefly** [1] - 6720:24
**bright** [1] - 6663:4
**bring** [4] - 6707:22, 6708:15, 6710:18, 6720:25
**bringing** [1] - 6730:2
**BRITT** [1] - 6622:15
**broad** [1] - 6698:3
**broader** [5] - 6626:4,

6693:19, 6708:18, 6750:10, 6757:21
**broadly** [2] - 6659:12, 6742:23
**brought** [4] - 6630:15, 6630:22, 6737:15
**bucket** [1] - 6716:25
**building** [10] - 6633:21, 6642:6, 6642:9, 6721:23, 6722:1, 6730:3, 6735:10, 6735:11, 6741:14, 6757:2
**Building** [1] - 6622:8
**bunch** [1] - 6685:14
**butchering** [1] - 6682:23
**buy** [2] - 6690:12, 6690:15
**BY** [40] - 6644:3, 6648:1, 6649:14, 6650:10, 6650:20, 6651:5, 6651:15, 6661:21, 6671:14, 6672:17, 6673:13, 6675:8, 6675:14, 6678:16, 6678:25, 6683:8, 6688:8, 6689:22, 6693:23, 6696:6, 6696:18, 6703:8, 6704:16, 6706:8, 6709:1, 6709:9, 6709:12, 6710:4, 6710:25, 6711:22, 6712:3, 6715:12, 6716:6, 6717:16, 6717:25, 6718:16, 6718:23, 6719:24, 6721:6, 6721:11

**C**

**cable** [1] - 6678:17
**Caleb** [1] - 6626:15
**calendar** [1] - 6769:18
**camera** [1] - 6716:1
**camp** [2] - 6667:7, 6667:14
**Canada** [1] - 6645:17
**candies** [2] - 6703:17, 6703:18
**cannot** [7] - 6648:20, 6689:15, 6700:19, 6701:11, 6702:20, 6733:2, 6742:9
**capacity** [2] - 6667:13, 6762:25
**capital** [5] - 6688:9, 6688:15, 6688:16,

6688:18, 6692:20
**Capitol** [46] - 6633:23, 6638:1, 6639:1, 6639:3, 6640:11, 6640:25, 6642:24, 6663:18, 6668:13, 6668:18, 6668:21, 6688:12, 6705:24, 6706:16, 6706:19, 6706:23, 6707:13, 6708:6, 6708:7, 6708:12, 6709:17, 6713:4, 6721:15, 6730:3, 6737:17, 6737:20, 6737:21, 6739:11, 6739:21, 6739:23, 6740:12, 6741:13, 6741:20, 6741:23, 6741:25, 6742:4, 6743:15, 6743:25, 6744:17, 6744:22, 6745:5, 6745:7, 6756:12
**captured** [1] - 6712:18
**Card** [1] - 6666:5
**care** [3] - 6655:20, 6677:24, 6761:20
**care-take** [1] - 6677:24
**career** [1] - 6761:24
**careful** [1] - 6740:17
**carefully** [1] - 6750:24
**cares** [1] - 6661:9
**caretaker** [1] - 6677:21
**caretaking** [1] - 6677:20
**Carlton** [1] - 6622:10
**Carrion** [1] - 6735:8
**carry** [1] - 6707:19
**carryover** [1] - 6629:7
**Case** [3] - 6621:3, 6644:22, 6645:1
**case** [55] - 6625:19, 6637:21, 6639:8, 6640:22, 6643:2, 6648:24, 6649:7, 6652:10, 6674:5, 6674:13, 6679:3, 6679:21, 6679:24, 6680:14, 6681:15, 6681:18, 6681:22, 6685:5, 6686:19, 6688:2, 6689:13, 6694:16, 6694:21, 6695:4, 6701:10, 6722:16, 6722:17, 6722:19, 6724:13, 6727:13, 6727:22, 6727:23, 6729:6,

6729:9, 6730:5,
6730:13, 6730:17,
6733:7, 6735:1,
6735:6, 6735:22,
6738:18, 6740:16,
6740:18, 6740:19,
6740:24, 6743:19,
6748:16, 6752:6,
6764:22, 6764:24,
6765:5, 6768:17,
6770:9, 6770:19

**cases** [40] - 6646:15,
6646:16, 6646:19,
6646:22, 6647:9,
6648:8, 6649:21,
6655:1, 6674:4,
6679:3, 6681:12,
6681:17, 6681:20,
6688:10, 6688:12,
6688:15, 6688:16,
6688:18, 6688:20,
6688:25, 6689:3,
6689:5, 6689:6,
6689:7, 6689:9,
6692:6, 6692:8,
6692:12, 6692:18,
6692:20, 6694:2,
6694:12, 6694:24,
6695:13, 6705:5,
6705:9, 6726:10,
6727:8, 6747:20,
6770:10

**categories** [2] -
6691:14, 6691:24

**category** [10] -
6624:19, 6691:4,
6691:12, 6691:19,
6691:25, 6692:4,
6693:2, 6693:8,
6693:14, 6693:17

**caught** [1] - 6752:10

**caused** [2] - 6641:1,
6642:24

**caution** [1] - 6732:6

**CCTV** [2] - 6716:1,
6717:20

**center** [1] - 6708:2

**certain** [23] - 6624:11,
6630:18, 6630:19,
6631:12, 6634:9,
6635:2, 6635:10,
6635:20, 6649:21,
6654:11, 6655:10,
6657:10, 6657:11,
6714:8, 6742:7,
6742:25, 6748:15,
6760:4, 6760:15,
6760:18, 6761:1

**certainly** [7] - 6637:6,
6663:24, 6670:5,

6680:19, 6710:23,
6737:1, 6771:20

**CERTIFICATE** [1] -
6774:1

**certification** [4] -
6691:5, 6691:10,
6729:25, 6732:11

**certifications** [1] -
6691:8

**certified** [6] - 6645:8,
6645:11, 6645:13,
6645:24, 6646:1,
6646:4

**certify** [1] - 6774:3

**cetera** [3] - 6683:15,
6724:16

**challenge** [1] -
6737:22

**challenges** [1] -
6663:6

**chance** [1] - 6770:14

**change** [6] - 6632:4,
6632:19, 6632:22,
6634:7, 6733:15,
6762:14

**changed** [1] - 6762:16

**changes** [2] -
6733:21, 6734:1

**changing** [1] -
6676:11

**chanting** [1] - 6720:17

**chaotic** [1] - 6720:13

**chapter** [5] - 6697:10,
6697:12, 6699:6,
6699:7, 6699:9,
6700:5

**character** [1] -
6625:24

**characteristics** [3] -
6665:16, 6705:16,
6750:2

**characterized** [1] -
6673:8

**charge** [6] - 6723:25,
6734:20, 6735:15,
6735:18, 6736:14,
6737:6

**charged** [32] -
6641:21, 6642:7,
6642:17, 6727:24,
6728:20, 6730:4,
6730:13, 6730:23,
6730:25, 6731:2,
6731:3, 6731:8,
6731:9, 6731:19,
6732:16, 6732:25,
6735:21, 6737:7,
6737:11, 6742:18,
6742:19, 6743:8,
6751:20, 6752:13,

6752:20, 6754:4,
6757:10, 6758:23,
6759:1, 6759:21,
6761:10

**charges** [3] - 6633:20,
6634:12, 6762:6

**CHARLES** [1] -
6622:13

**Charles** [1] - 6622:13

**chat** [5] - 6729:15,
6729:16, 6760:11,
6760:12

**Chat** [1] - 6637:15

**check** [3] - 6629:16,
6637:21, 6706:1

**child** [1] - 6675:2

**children** [3] - 6647:5,
6655:2, 6689:12

**chitchat** [1] - 6653:23

**choose** [1] - 6699:1

**CI-1** [3] - 6623:11,
6772:4, 6772:6

**CI-4** [1] - 6772:6

**CI-4...........................
...** [1] - 6623:11

**circle** [1] - 6708:1

**circled** [1] - 6769:6

**Circuit** [1] - 6681:4

**circular** [1] - 6718:11

**circulate** [2] - 6773:6,
6773:7

**circulated** [1] - 6624:9

**circumstances** [4] -
6630:12, 6630:18,
6631:12, 6762:3

**circumstantial** [2] -
6630:5, 6630:12

**cite** [2] - 6635:7,
6662:9

**cited** [1] - 6744:6

**citizenship** [1] -
6674:4

**civil** [10] - 6646:16,
6757:11, 6758:1,
6758:4, 6758:20,
6758:21, 6758:23,
6759:1, 6759:11,
6759:16

**Civil** [1] - 6730:2

**clarification** [2] -
6727:7, 6727:11

**clarify** [5] - 6665:19,
6672:21, 6682:18,
6723:8, 6747:16

**class** [1] - 6663:4,
6663:6

**clause** [2] - 6634:8,
6761:8

**clear** [14] - 6626:3,
6627:14, 6639:5,

6641:9, 6641:17,
6678:5, 6702:10,
6704:17, 6706:11,
6710:15, 6725:23,
6735:1, 6748:6,
6765:22

**clear-cut** [1] - 6748:6

**clearer** [1] - 6727:22

**clearest** [1] - 6641:16

**clearly** [4] - 6636:25,
6641:18, 6676:25,
6712:7

**Cleveland** [4] -
6644:23, 6647:2,
6653:22, 6694:17

**client** [4] - 6630:14,
6642:23, 6720:2,
6769:1

**clinical** [5] - 6644:24,
6644:25, 6673:17,
6684:5, 6691:25

**clip** [4] - 6719:4,
6719:7, 6719:18,
6719:19

**cloak** [1] - 6740:3

**close** [2] - 6722:16,
6729:17

**closed** [1] - 6749:7

**closer** [2] - 6630:15,
6640:1

**closing** [7] - 6722:20,
6723:1, 6745:13,
6765:23, 6765:24,
6766:16, 6768:4

**closings** [4] - 6732:5,
6768:1, 6768:2,
6768:9

**clothing** [1] - 6625:9

**CM-55** [1] - 6772:18

**CM-82** [1] - 6717:22

**co** [1] - 6630:15

**co-conspirators** [1] -
6630:15

**cognition** [1] -
6682:18

**cognitive** [12] -
6644:14, 6655:8,
6655:25, 6656:6,
6656:10, 6656:11,
6656:21, 6657:24,
6659:6, 6659:20,
6682:19, 6698:17

**cognitively** [3] -
6665:20, 6666:4,
6666:10

**Cohen** [2] - 6702:13,
6702:16

**coined** [2] - 6700:13,
6702:21

**colleagues** [1] -

6739:7

**collected** [1] -
6703:15

**collecting** [1] -
6705:25

**college** [1] - 6644:16

**College** [1] - 6729:25

**color** [2] - 6714:16,
6716:12

**COLUMBIA** [1] -
6621:1

**combinations** [1] -
6728:12

**combined** [1] -
6724:15

**comfortable** [5] -
6627:6, 6664:9,
6696:23, 6719:2,
6721:17

**coming** [2] - 6653:21,
6731:16

**comment** [2] -
6670:16

**commenting** [2] -
6669:23, 6670:13

**comments** [8] -
6626:13, 6631:16,
6631:19, 6633:1,
6654:9, 6669:11,
6742:3, 6745:3

**commerce** [5] -
6758:4, 6758:19,
6759:12, 6759:17,
6759:18

**commit** [5] - 6736:22,
6742:19, 6743:3,
6743:13, 6762:2

**committed** [3] -
6743:14, 6743:17,
6755:5

**communication** [2] -
6664:23, 6664:24

**communications** [3] -
6655:4, 6760:16,
6760:19

**community** [1] -
6655:20

**companies** [1] -
6646:18

**company** [2] - 6682:2,
6682:4

**competent** [1] -
6740:22

**competing** [1] -
6629:3

**complaints** [1] -
6684:6

**complete** [5] -
6645:22, 6651:8,
6657:3, 6680:9,

6694:25
**completed** [3] -
6644:23, 6645:7,
6645:20
**completely** [1] -
6649:4
**completeness** [1] -
6708:21
**component** [3] -
6708:16, 6708:17,
6710:20
**components** [1] -
6657:23
**comprehensive** [4] -
6656:24, 6656:25,
6658:2, 6659:4
**comprises** [1] -
6652:13
**compromise** [1] -
6655:8
**computer** [3] -
6622:25, 6715:10,
6718:21
**computer-aided** [1] -
6622:25
**conceding** [1] -
6760:8
**conceiving** [2] -
6699:13, 6699:21
**concept** [3] - 6632:15,
6639:18, 6699:5
**concepts** [1] - 6663:7
**concern** [6] - 6631:6,
6735:9, 6735:16,
6741:3, 6742:22,
6771:12
**concerned** [3] -
6741:5, 6742:24,
6762:4
**concerning** [3] -
6628:8, 6636:11,
6748:25
**concerns** [4] -
6629:22, 6682:17,
6748:13, 6769:16
**conclude** [6] -
6638:25, 6702:1,
6725:10, 6727:25,
6728:5, 6728:6
**concluded** [2] -
6675:16, 6743:16
**concludes** [2] -
6670:8, 6670:9
**conclusion** [5] -
6661:11, 6661:23,
6661:25, 6662:7,
6671:15
**conclusions** [1] -
6648:20
**conclusory** [1] -

6635:24
**concrete** [1] - 6663:7
**condition** [3] -
6652:21, 6655:9,
6684:16
**conditions** [3] -
6655:22, 6683:4
**conduct** [8] - 6639:12,
6649:15, 6740:4,
6740:22, 6755:13,
6755:21, 6759:7,
6762:7
**conducted** [1] -
6649:25
**confer** [1] - 6724:6
**conference** [10] -
6670:1, 6671:12,
6686:12, 6688:7,
6711:7, 6711:21,
6716:19, 6717:15,
6722:6, 6722:10
**confirm** [3] - 6711:16,
6711:18, 6771:5
**confirmed** [1] -
6708:17
**confront** [2] -
6626:20, 6626:23
**confuse** [1] - 6739:5
**confused** [1] - 6726:8
**Congress** [4] -
6713:21, 6736:3,
6753:9, 6761:25
**connection** [2] -
6644:13, 6687:6
**CONNIE** [1] - 6621:7
**Connie** [4] - 6715:15,
6715:20, 6752:17,
6772:20
**consequence** [5] -
6639:14, 6736:5,
6736:8, 6736:16,
6737:13
**consequences** [2] -
6639:23, 6640:7
**consider** [15] - 6630:4,
6630:17, 6635:14,
6649:6, 6673:2,
6742:25, 6747:6,
6749:7, 6749:11,
6749:13, 6749:19,
6749:21, 6749:22,
6749:24, 6750:7
**considered** [7] -
6631:12, 6654:25,
6655:6, 6659:12,
6660:24, 6695:18,
6762:5
**considering** [2] -
6626:1, 6735:19
**consistency** [1] -

6632:13
**consistent** [10] -
6626:11, 6627:21,
6627:24, 6628:7,
6647:17, 6664:21,
6734:2, 6748:18,
6761:17, 6762:15
**consistently** [1] -
6747:15
**conspiracies** [9] -
6634:9, 6726:9,
6727:23, 6730:18,
6732:20, 6732:22,
6737:11, 6737:13,
6754:3
**conspiracy** [78] -
6632:20, 6634:5,
6634:8, 6634:12,
6636:10, 6636:12,
6636:14, 6636:22,
6637:17, 6638:9,
6638:12, 6640:2,
6641:10, 6641:12,
6641:20, 6641:23,
6642:12, 6642:16,
6643:14, 6724:18,
6724:22, 6726:3,
6726:11, 6726:18,
6726:20, 6727:8,
6727:21, 6727:23,
6728:1, 6728:4,
6728:6, 6728:9,
6728:10, 6728:17,
6728:19, 6729:1,
6729:2, 6729:7,
6729:14, 6729:16,
6729:19, 6729:24,
6730:4, 6730:13,
6730:15, 6730:16,
6730:22, 6730:25,
6731:2, 6731:8,
6731:11, 6731:12,
6731:14, 6731:19,
6732:13, 6732:15,
6732:21, 6736:2,
6736:3, 6736:8,
6736:14, 6736:15,
6736:16, 6736:17,
6736:20, 6736:22,
6737:3, 6737:24,
6738:5, 6738:6,
6738:7, 6738:12,
6738:16, 6738:21,
6753:8, 6753:10,
6753:12, 6753:24
**conspirators** [1] -
6630:15
**conspired** [2] -
6736:18, 6762:2
**conspiring** [1] -

6732:11
**constitute** [7] -
6642:6, 6729:18,
6741:15, 6743:5,
6743:6, 6743:8,
6743:16
**Constitution** [1] -
6622:21
**consultant** [1] -
6689:8
**contact** [2] - 6654:16,
6654:17
**contained** [2] -
6703:16, 6710:14
**contend** [16] -
6752:18, 6753:10,
6753:14, 6754:4,
6754:8, 6754:13,
6756:13, 6756:18,
6756:19, 6757:13,
6758:17, 6759:3,
6759:11, 6763:9,
6763:13, 6763:23
**contends** [4] -
6759:23, 6761:22,
6762:1, 6762:4
**contest** [1] - 6756:12
**context** [3] - 6634:2,
6745:10, 6748:10
**contexts** [1] - 6717:3
**continue** [3] - 6639:2,
6643:20, 6672:13
**continued** [1] -
6621:25
**CONTINUED** [1] -
6622:1
**continues** [1] -
6676:13
**continuing** [2] -
6639:14, 6701:21
**contract** [1] - 6679:16
**contrary** [1] - 6666:10
**contrast** [1] - 6640:9
**control** [3] - 6713:10,
6713:22, 6714:13
**conversation** [6] -
6643:8, 6647:17,
6653:7, 6654:1,
6713:1, 6713:2
**conversations** [2] -
6635:3, 6635:16
**convict** [2] - 6641:5,
6725:9
**convicted** [1] -
6735:18
**conviction** [3] -
6628:5, 6638:12,
6642:15
**convinced** [1] -
6731:10

**convoluted** [1] -
6639:17
**cookies** [1] - 6703:16
**Cooper** [3] - 6641:15,
6759:19, 6766:16
**COOPER** [18] -
6622:2, 6625:12,
6625:16, 6625:18,
6726:12, 6726:21,
6732:12, 6732:19,
6733:9, 6748:5,
6757:22, 6759:20,
6766:17, 6767:11,
6770:1, 6770:3,
6771:15, 6771:20
**Cooper's** [1] - 6635:7
**copacetic** [1] - 6749:4
**copy** [11] - 6625:12,
6625:14, 6651:10,
6695:21, 6695:22,
6695:23, 6695:24,
6696:8, 6696:11,
6758:7, 6772:15
**correct** [66] - 6633:5,
6639:22, 6640:5,
6652:25, 6658:17,
6660:21, 6662:20,
6673:25, 6674:1,
6674:6, 6674:12,
6674:14, 6674:15,
6674:21, 6674:23,
6674:25, 6675:4,
6675:10, 6676:3,
6676:21, 6677:2,
6678:5, 6678:10,
6678:11, 6679:10,
6679:19, 6681:16,
6683:14, 6683:18,
6683:24, 6684:18,
6688:13, 6690:5,
6690:7, 6690:15,
6691:5, 6691:19,
6692:1, 6692:6,
6692:13, 6693:15,
6694:9, 6695:6,
6695:9, 6697:4,
6697:18, 6698:16,
6698:22, 6701:8,
6702:17, 6702:23,
6705:1, 6712:20,
6714:4, 6718:1,
6718:11, 6719:8,
6719:16, 6719:18,
6720:11, 6721:21,
6739:13, 6745:5,
6765:17, 6766:3,
6774:4
**correctly** [5] -
6637:14, 6698:15,
6699:23, 6699:24,

6700:10
**corruptly** [3] -
6754:15, 6760:4,
6760:25
**COUNSEL** [5] -
6721:9, 6723:18,
6734:9, 6734:11,
6734:12
**counsel** [5] - 6631:7,
6635:18, 6740:2,
6746:19, 6747:25
**count** [3] - 6639:2,
6738:17, 6760:24
**Count** [3] - 6633:12,
6633:20, 6760:3
**counterweight** [1] -
6640:12
**counting** [1] - 6768:4
**country** [4] - 6646:3,
6681:7, 6681:9,
6681:11
**counts** [6] - 6632:17,
6632:21, 6729:2,
6729:3, 6735:19,
6751:12
**couple** [8] - 6625:18,
6647:21, 6682:24,
6713:8, 6713:17,
6714:7, 6755:1,
6771:22
**coupled** [2] - 6638:11,
6642:14
**course** [2] - 6677:7,
6685:15
**Court** [35] - 6622:21,
6630:17, 6631:23,
6632:16, 6635:21,
6637:19, 6637:21,
6638:9, 6638:17,
6638:22, 6640:16,
6641:16, 6641:18,
6643:15, 6687:3,
6723:20, 6725:16,
6740:25, 6741:6,
6741:10, 6746:17,
6747:5, 6747:14,
6762:13, 6764:23,
6765:4, 6765:12,
6766:18, 6767:11,
6768:13, 6768:21,
6769:2, 6771:18,
6772:8
**COURT** [239] - 6621:1,
6624:3, 6624:6,
6624:23, 6625:10,
6625:17, 6625:21,
6626:7, 6626:9,
6627:1, 6627:6,
6627:18, 6628:3,
6628:15, 6628:17,

6628:22, 6628:25,
6629:17, 6629:22,
6630:14, 6630:20,
6631:3, 6631:6,
6631:10, 6631:15,
6632:3, 6632:7,
6632:18, 6632:25,
6633:7, 6633:10,
6633:17, 6633:25,
6634:13, 6634:17,
6634:21, 6634:24,
6635:4, 6635:9,
6635:25, 6636:9,
6637:3, 6637:8,
6637:12, 6637:22,
6640:8, 6643:7,
6643:16, 6643:19,
6643:25, 6647:23,
6648:17, 6650:7,
6650:16, 6650:18,
6661:19, 6669:19,
6669:25, 6670:2,
6670:14, 6670:19,
6671:10, 6671:13,
6672:1, 6672:8,
6672:12, 6673:12,
6675:6, 6675:13,
6678:23, 6683:7,
6687:12, 6689:20,
6693:21, 6696:5,
6703:4, 6703:7,
6704:7, 6704:9,
6704:13, 6705:19,
6705:22, 6706:3,
6708:22, 6711:15,
6711:20, 6715:6,
6716:25, 6717:11,
6717:21, 6720:22,
6721:10, 6722:3,
6722:7, 6722:9,
6722:11, 6722:15,
6723:6, 6723:9,
6723:13, 6723:16,
6723:19, 6724:1,
6725:1, 6725:25,
6726:14, 6726:19,
6726:22, 6727:1,
6727:16, 6728:8,
6729:4, 6729:8,
6729:13, 6730:6,
6731:6, 6731:17,
6731:22, 6732:17,
6733:8, 6733:10,
6734:1, 6734:13,
6734:16, 6735:23,
6736:10, 6736:12,
6737:1, 6738:3,
6738:12, 6739:7,
6739:13, 6739:16,
6741:3, 6742:6,
6742:15, 6744:5,

6745:23, 6746:2,
6746:5, 6746:8,
6748:9, 6748:24,
6749:8, 6749:10,
6749:18, 6749:22,
6750:6, 6750:13,
6750:16, 6750:18,
6750:25, 6751:3,
6751:6, 6751:8,
6751:15, 6752:2,
6752:7, 6752:10,
6752:16, 6752:23,
6753:5, 6753:25,
6754:2, 6755:1,
6755:16, 6755:24,
6756:11, 6756:17,
6756:21, 6756:25,
6757:9, 6757:20,
6758:21, 6758:24,
6759:14, 6759:19,
6760:1, 6760:8,
6760:11, 6760:13,
6760:17, 6760:20,
6760:23, 6761:5,
6761:13, 6761:16,
6761:20, 6762:11,
6762:19, 6762:23,
6763:7, 6763:22,
6764:6, 6764:8,
6764:11, 6764:18,
6764:25, 6765:9,
6765:17, 6765:20,
6765:24, 6766:3,
6766:6, 6766:8,
6766:13, 6766:16,
6766:20, 6766:24,
6767:2, 6767:5,
6767:8, 6767:13,
6767:19, 6767:25,
6768:7, 6768:15,
6768:23, 6769:1,
6769:4, 6769:10,
6769:24, 6770:4,
6770:11, 6770:16,
6770:24, 6771:7,
6771:9, 6771:21,
6772:1, 6772:4,
6772:9, 6772:11,
6772:14, 6772:24,
6773:3, 6773:13,
6774:1, 6774:9
**court** [10] - 6627:13,
6627:16, 6637:1,
6648:2, 6648:5,
6648:9, 6670:4,
6672:2, 6689:8,
6694:7
**Court's** [13] - 6627:4,
6630:25, 6633:24,
6639:25, 6715:9,
6725:21, 6725:24,

6742:21, 6746:12,
6754:24, 6757:7,
6768:20, 6770:22
**COURTROOM** [1] -
6717:23
**courtroom** [7] -
6627:10, 6643:18,
6672:7, 6672:11,
6685:19, 6686:4,
6723:5
**Courts** [1] - 6681:2
**cover** [2] - 6680:19,
6725:22
**covering** [1] - 6625:9
**covers** [1] - 6733:7
**COVID** [1] - 6665:15
**craft** [1] - 6741:10
**created** [2] - 6676:7,
6699:5
**creative** [1] - 6663:4
**credibility** [4] -
6669:24, 6670:3,
6670:4, 6670:13
**crime** [11] - 6631:13,
6632:10, 6638:10,
6638:11, 6638:14,
6641:23, 6642:14,
6642:16, 6755:4,
6755:10
**crimes** [4] - 6632:11,
6642:7, 6743:16,
6762:3
**criminal** [10] -
6646:15, 6646:19,
6647:8, 6681:15,
6689:5, 6689:6,
6689:7, 6689:9,
6740:22, 6749:17
**criminally** [1] -
6756:21
**crisis** [2] - 6707:3
**criteria** [2] - 6676:24,
6676:25
**critically** [1] - 6699:3
**Cross** [3] - 6623:4,
6623:6, 6623:7
**cross** [6] - 6648:15,
6686:25, 6708:25,
6744:20, 6746:19,
6747:2
**CROSS** [3] - 6672:16,
6715:11, 6719:23
**cross-examination** [3]
- 6708:25, 6744:20,
6746:19
**CROSS-**
**EXAMINATION** [3] -
6672:16, 6715:11,
6719:23
**Cross-Examination..**

............ [3] - 6623:4,
6623:6, 6623:7
**cross-examine** [2] -
6648:15, 6686:25
**crowd** [3] - 6713:9,
6713:22, 6714:12
**Crowl** [1] - 6765:7
**Crowl's** [1] - 6636:17
**CRR** [1] - 6622:21
**crushed** [2] - 6669:7,
6669:13
**crying** [1] - 6701:25
**crypt** [5] - 6708:7,
6708:11, 6718:1,
6718:5, 6718:6
**culpability** [2] -
6742:17, 6743:7
**cum** [1] - 6644:19
**curative** [3] - 6738:25,
6746:9, 6746:15
**current** [8] - 6633:17,
6638:8, 6646:7,
6647:14, 6680:4,
6682:17, 6683:14,
6771:10
**curriculum** [1] -
6690:7
**curve** [1] - 6658:10
**cut** [1] - 6748:6
**CV** [5] - 6647:14,
6689:24, 6690:4,
6690:7, 6690:22

**D**

**D-u-n-n** [1] - 6706:14
**D.C** [19] - 6621:7,
6621:18, 6621:21,
6621:23, 6622:3,
6622:6, 6622:9,
6622:12, 6622:22,
6630:13, 6681:2,
6681:4, 6753:15,
6761:23, 6763:10,
6763:14, 6763:23,
6765:6, 6770:10
**daily** [1] - 6678:1
**Dallas** [1] - 6622:17
**damage** [6] - 6737:16,
6756:12, 6756:13,
6756:18, 6756:20,
6756:21
**damaged** [3] - 6736:7,
6737:22, 6756:5
**damaging** [1] - 6756:1
**dangerous** [1] -
6668:18
**data** [1] - 6657:13
**DATE** [1] - 6774:9
**date** [3] - 6637:4,

6637:5
**dates** [1] - 6632:22
**dating** [1] - 6637:8
**David** [4] - 6713:14,
6716:7, 6716:9,
6716:15
**day-in/day-out** [1] -
6677:14
**day-to-day** [1] -
6646:8
**days** [1] - 6770:18
**deal** [9] - 6628:4,
6632:16, 6638:18,
6669:3, 6682:1,
6704:25, 6734:16,
6767:21, 6769:11
**deals** [1] - 6732:12
**dealt** [1] - 6636:21
**death** [5] - 6681:8,
6681:10, 6688:19,
6688:20, 6688:25
**decide** [1] - 6632:9
**decided** [1] - 6768:21
**decision** [3] -
6667:25, 6687:24,
6741:20
**declined** [1] - 6746:21
**Defendant** [8] -
6621:19, 6621:22,
6622:2, 6622:4,
6622:10, 6622:15,
6623:11, 6772:6
**defendant** [28] -
6628:11, 6628:12,
6630:5, 6632:10,
6638:3, 6640:12,
6642:1, 6642:19,
6723:25, 6725:3,
6725:7, 6725:9,
6725:10, 6728:9,
6728:15, 6730:25,
6731:18, 6740:21,
6740:23, 6743:21,
6754:6, 6754:10,
6754:13, 6754:15,
6754:18, 6755:12,
6765:4, 6770:18
**defendant's** [8] -
6639:12, 6639:23,
6640:11, 6731:7,
6743:7, 6755:13,
6755:21, 6764:23
**defendants** [64] -
6624:11, 6625:10,
6625:23, 6633:20,
6637:20, 6723:16,
6724:20, 6726:2,
6726:10, 6728:14,
6729:12, 6731:3,
6732:9, 6733:3,

6735:6, 6735:13,
6736:1, 6736:9,
6737:7, 6737:8,
6737:10, 6737:17,
6738:4, 6738:20,
6740:16, 6742:19,
6742:23, 6743:14,
6751:21, 6752:16,
6752:19, 6752:24,
6753:4, 6753:6,
6753:10, 6753:12,
6753:14, 6754:4,
6754:8, 6754:13,
6755:10, 6756:3,
6756:5, 6756:7,
6756:11, 6756:12,
6756:14, 6756:19,
6756:25, 6757:2,
6757:4, 6757:9,
6757:13, 6758:3,
6758:16, 6758:25,
6759:3, 6759:8,
6761:22, 6763:9,
6763:23, 6770:6,
6773:9
**Defendants** [3] -
6621:9, 6755:25,
6759:20
**defendants'** [4] -
6625:19, 6636:6,
6638:1, 6639:10
**defense** [39] - 6629:2,
6631:7, 6635:18,
6646:21, 6686:25,
6688:23, 6689:17,
6692:22, 6693:1,
6695:13, 6695:14,
6705:12, 6731:1,
6733:17, 6734:6,
6734:21, 6740:2,
6740:16, 6740:20,
6741:1, 6741:15,
6741:21, 6742:22,
6743:1, 6743:6,
6743:8, 6743:16,
6743:21, 6743:22,
6743:23, 6746:19,
6747:11, 6751:8,
6751:18, 6752:5,
6753:5, 6768:2,
6769:20, 6771:13
**DEFENSE** [5] -
6721:9, 6723:18,
6734:9, 6734:11,
6734:12
**defenses** [1] - 6751:18
**defer** [3] - 6723:20,
6746:13, 6747:6
**deficit** [3] - 6658:13,
6658:14, 6664:6

**deficits** [6] - 6658:15,
6659:21, 6664:2,
6666:14, 6666:16,
6666:18
**define** [6] - 6683:17,
6684:12, 6684:17,
6684:20, 6695:17,
6703:11
**defined** [2] - 6660:17,
6700:13
**defines** [1] - 6632:20
**defining** [3] - 6695:23,
6701:19, 6702:17
**definitely** [3] -
6625:13, 6714:8,
6727:21
**definition** [9] -
6677:12, 6684:2,
6684:11, 6685:2,
6699:4, 6700:12,
6700:22, 6754:22,
6755:18
**degree** [4] - 6661:14,
6662:8, 6743:19
**degrees** [1] - 6658:8
**delay** [6] - 6639:14,
6641:6, 6642:24,
6718:20, 6758:18,
6759:12
**delayed** [1] - 6641:2
**delete** [1] - 6747:8
**deleted** [8] - 6624:14,
6636:16, 6747:13,
6748:8, 6760:8,
6760:11, 6760:14,
6760:15
**deliberations** [2] -
6769:16, 6769:25
**denied** [1] - 6687:18
**department** [1] -
6707:4
**Department** [11] -
6674:13, 6680:22,
6681:6, 6681:11,
6681:15, 6681:23,
6694:14, 6694:20,
6695:2, 6695:7,
6695:11
**deposition** [1] -
6694:4
**depositions** [1] -
6648:9
**DEPUTY** [1] - 6717:23
**describe** [5] -
6651:21, 6656:12,
6656:20, 6665:8,
6714:14
**described** [4] -
6661:15, 6668:12,
6702:21, 6716:11

**describing** [1] -
6746:18
**descriptive** [1] -
6654:9
**deserves** [1] - 6649:8
**designed** [2] -
6663:11, 6670:11
**designing** [1] - 6663:5
**desire** [2] - 6724:16,
6771:13
**destroy** [5] - 6735:7,
6735:10, 6735:21,
6760:6, 6761:3
**destroyed** [1] - 6756:5
**destroying** [1] -
6756:1
**destruction** [12] -
6734:19, 6735:8,
6735:14, 6735:17,
6735:20, 6736:4,
6736:6, 6737:6,
6737:12, 6751:11,
6751:14, 6756:7
**detail** [4] - 6713:7,
6713:13, 6713:24,
6719:12
**detailed** [2] - 6763:3,
6765:9
**details** [4] - 6713:18,
6753:17, 6763:25,
6764:14
**determination** [2] -
6649:12, 6703:22
**determine** [3] -
6664:2, 6682:19,
6684:7
**determined** [1] -
6629:9
**determining** [3] -
6635:15, 6749:21,
6762:5
**developed** [1] -
6762:5
**development** [1] -
6634:19
**developmental** [5] -
6654:25, 6655:6,
6673:4, 6673:7,
6683:5
**diagnosed** [10] -
6655:3, 6666:25,
6674:18, 6674:20,
6674:23, 6675:1,
6675:12, 6678:7,
6750:7, 6750:10
**diagnoses** [5] -
6656:2, 6682:19,
6691:23, 6693:7,
6698:23, 6704:22,
6704:25

**diagnosing** [1] -
6647:3
**diagnosis** [6] -
6690:17, 6697:24,
6698:4, 6749:10,
6749:22, 6750:2
**diagnostic** [1] -
6697:18
**Diagnostic** [2] -
6697:18, 6698:22
**diagram** [1] - 6733:2
**dice** [2] - 6769:20,
6770:1
**difference** [3] -
6633:7, 6636:2,
6671:21
**different** [39] -
6625:13, 6635:8,
6646:1, 6647:21,
6655:21, 6656:20,
6657:9, 6658:8,
6660:5, 6660:6,
6676:7, 6678:6,
6683:3, 6683:11,
6691:8, 6694:23,
6695:4, 6698:5,
6702:5, 6702:20,
6703:24, 6711:12,
6714:7, 6728:10,
6728:16, 6729:13,
6729:18, 6731:8,
6731:10, 6732:22,
6733:4, 6736:17,
6738:10, 6738:18,
6738:20, 6740:20,
6747:22, 6757:20
**differently** [6] -
6727:13, 6733:23,
6736:13, 6738:1,
6751:21, 6756:11
**difficult** [2] - 6656:3,
6666:1
**difficulties** [3] -
6657:8, 6703:25,
6704:1
**difficulty** [7] -
6631:19, 6660:10,
6664:8, 6664:16,
6699:12, 6699:21,
6762:18
**dire** [1] - 6648:13
**Direct** [2] - 6623:4,
6623:6
**DIRECT** [2] - 6644:2,
6706:7
**direct** [4] - 6716:7,
6719:7, 6747:2,
6772:20
**directed** [1] - 6741:13
**directions** [1] - 6663:7

**directive** [1] - 6747:14
**directly** [3] - 6670:2,
6708:5, 6730:4
**disability** [8] -
6655:23, 6655:24,
6655:25, 6673:5,
6673:6, 6673:8,
6683:5
**disagree** [3] -
6638:21, 6686:22,
6700:24
**disagrees** [1] - 6630:3
**discard** [1] - 6699:1
**discharging** [2] -
6736:3, 6753:9
**disclose** [2] - 6689:16,
6692:10
**discuss** [3] - 6641:8,
6672:8, 6771:18
**discussed** [10] -
6648:25, 6685:24,
6686:1, 6686:3,
6686:6, 6686:15,
6698:3, 6702:13,
6730:1, 6730:2
**discussion** [2] -
6687:25, 6770:23
**disorder** [19] - 6626:1,
6646:17, 6647:6,
6655:6, 6655:7,
6655:8, 6664:8,
6673:7, 6676:10,
6684:13, 6757:11,
6758:1, 6758:5,
6758:20, 6758:21,
6758:23, 6759:2,
6759:11, 6759:16
**disorderly** [1] -
6710:15
**disorders** [4] -
6654:25, 6655:1,
6676:12, 6699:10
**display** [3] - 6666:14,
6666:15, 6666:18
**dispute** [1] - 6625:4
**disregard** [1] - 6649:4
**disrespectful** [1] -
6677:10
**distinct** [2] - 6656:2,
6660:3
**distinction** [3] -
6652:22, 6667:24,
6750:4
**distinguish** [1] -
6763:12
**distract** [1] - 6744:4
**distractible** [1] -
6654:7
**DISTRICT** [3] - 6621:1,
6621:1, 6621:12

**divided** [1] - 6655:12
**doctor** [3] - 6672:22,
6673:3, 6689:12
**Doctor** [2] - 6651:16,
6657:23
**doctors** [4] - 6650:5,
6650:11, 6650:13,
6650:21
**documents** [1] -
6759:22
**done** [14] - 6628:7,
6651:7, 6688:11,
6691:3, 6692:25,
6694:3, 6721:23,
6722:22, 6730:9,
6730:11, 6752:24,
6756:12, 6768:11,
6772:11
**Donovan** [2] -
6636:17, 6765:7
**doors** [2] - 6736:6,
6737:22
**double** [1] - 6768:4
**double-counting** [1] -
6768:4
**doubt** [26] - 6632:11,
6635:16, 6640:13,
6725:10, 6751:20,
6752:13, 6752:19,
6753:1, 6753:7,
6754:5, 6754:8,
6754:9, 6754:14,
6756:3, 6756:6,
6757:3, 6757:12,
6757:14, 6758:10,
6758:16, 6759:3,
6759:4, 6759:8,
6759:24, 6760:6,
6761:2
**down** [12] - 6651:23,
6654:21, 6702:11,
6706:4, 6708:10,
6710:10, 6710:16,
6739:20, 6763:20,
6765:25, 6769:6,
6769:21
**Dr** [43] - 6626:4,
6627:9, 6643:23,
6643:25, 6644:8,
6647:12, 6647:13,
6648:11, 6648:17,
6648:24, 6649:10,
6650:13, 6650:21,
6650:24, 6651:2,
6651:3, 6651:6,
6651:13, 6651:17,
6651:18, 6657:14,
6660:17, 6661:16,
6661:22, 6662:11,
6662:18, 6665:20,

6666:13, 6666:24,
6671:17, 6672:8,
6686:6, 6686:18,
6687:3, 6687:4,
6687:9, 6687:21,
6703:4, 6704:17,
6705:19, 6750:11,
6762:21
**dramatic** [2] -
6730:10, 6730:14
**draw** [2] - 6628:8,
6736:24
**drawing** [1] - 6714:3
**dressed** [1] - 6709:16
**drew** [1] - 6670:21
**dried** [1] - 6748:6
**drive** [2] - 6772:9,
6772:11
**driving** [1] - 6748:11
**drop** [1] - 6750:13
**dropping** [1] - 6712:6
**dual** [1] - 6646:4
**due** [1] - 6739:12
**Dunn** [16] - 6705:24,
6706:14, 6707:24,
6709:2, 6710:5,
6711:2, 6712:17,
6714:5, 6715:19,
6720:1, 6720:3,
6720:4, 6721:7,
6721:12, 6721:22,
6722:3
**DUNN** [2] - 6623:6,
6706:6
**duration** [2] - 6636:3,
6636:6
**during** [17] - 6627:24,
6627:25, 6653:5,
6653:6, 6653:15,
6654:11, 6654:12,
6654:18, 6662:2,
6665:15, 6670:17,
6670:23, 6672:9,
6677:21, 6685:15,
6685:22, 6746:19
**duties** [5] - 6736:4,
6738:6, 6753:10,
6759:7, 6759:11
**duty** [3] - 6707:5,
6707:7, 6707:19
**Dwarfs** [1] - 6701:3

# E

**e-mail** [9] - 6641:15,
6685:14, 6685:15,
6726:16, 6733:20,
6733:24, 6734:3,
6763:8, 6769:12
**e-mailed** [1] - 6767:24

**earmarked** [2] -
6680:1, 6680:5
**easier** [1] - 6716:17
**easily** [1] - 6641:12
**East** [1] - 6622:14
**easy** [1] - 6714:19
**edited** [1] - 6627:11
**edits** [1] - 6751:10
**education** [5] -
6649:2, 6652:7,
6657:11, 6691:19,
6691:22
**educational** [2] -
6644:21, 6645:2
**Edwards** [4] - 6706:3,
6733:20, 6733:23,
6733:25
**EDWARDS** [4] -
6621:16, 6706:1,
6723:22, 6772:25
**Edwards's** [1] -
6734:3
**effect** [6] - 6630:19,
6638:2, 6642:13,
6739:10, 6755:13,
6755:20
**effects** [1] - 6660:7
**eight** [1] - 6646:3
**either** [5] - 6625:20,
6627:5, 6685:2,
6724:20, 6742:17
**elected** [1] - 6627:5
**Electoral** [1] - 6729:25
**electricity** [1] -
6678:12
**electronic** [1] -
6748:16
**element** [10] -
6641:21, 6723:25,
6751:19, 6752:12,
6754:20, 6755:10,
6755:11, 6755:19,
6758:19, 6761:9
**elements** [11] -
6638:17, 6638:22,
6639:20, 6640:4,
6640:14, 6641:17,
6641:25, 6724:25,
6725:11, 6752:12,
6761:18
**elicit** [1] - 6663:11
**Ellipse** [2] - 6744:23,
6745:4
**elsewhere** [1] -
6681:20
**emotion** [1] - 6701:11
**emotional** [5] -
6644:14, 6666:21,
6667:3, 6682:17,
6684:8

**emotions** [4] -
6644:14, 6660:6,
6664:9, 6664:10
**empathetic** [2] -
6663:8, 6663:12
**empathy** [11] - 6661:1,
6661:4, 6661:12,
6661:14, 6661:16,
6661:23, 6662:8,
6663:1, 6663:23,
6700:17, 6702:7
**Empathy** [1] - 6661:8
**emphatic** [1] -
6636:19
**employed** [2] -
6706:15, 6706:22
**employment** [1] -
6652:8
**EMT** [1] - 6761:25
**encounter** [2] -
6712:24, 6713:4
**encounters** [1] -
6714:10
**end** [9] - 6628:21,
6629:19, 6632:1,
6636:20, 6729:2,
6754:23, 6755:23,
6764:12, 6771:11
**End** [5] - 6671:12,
6688:7, 6711:21,
6717:15, 6722:10
**endeavoring** [1] -
6729:21
**ended** [1] - 6653:3
**enforcement** [7] -
6628:1, 6757:16,
6758:9, 6758:12,
6758:17, 6759:6,
6759:10
**engage** [1] - 6740:21
**engaged** [4] -
6653:13, 6654:23,
6728:1, 6759:24
**engaging** [1] - 6714:2
**enter** [4] - 6645:3,
6736:22, 6741:13,
6741:25
**entered** [7] - 6633:3,
6643:18, 6672:11,
6736:1, 6736:9,
6737:10, 6737:13
**entering** [5] - 6633:20,
6633:22, 6643:3,
6643:5, 6757:1
**enticed** [1] - 6739:20
**entire** [12] - 6643:10,
6652:13, 6654:23,
6670:5, 6677:17,
6697:10, 6697:12,
6697:16, 6702:7,

6715:2, 6749:3
**entitled** [2] - 6726:17, 6774:5
**entrance** [1] - 6708:5
**envision** [1] - 6660:25
**error** [1] - 6746:20
**especially** [1] - 6694:1
**ESQ** [8] - 6621:19, 6621:22, 6622:2, 6622:4, 6622:7, 6622:10, 6622:13, 6622:15
**essentially** [3] - 6638:18, 6640:2, 6747:8
**establish** [1] - 6638:3
**established** [1] - 6736:7
**estimate** [1] - 6767:25
**estimated** [1] - 6767:15
**estimates** [1] - 6766:8
**et** [3] - 6683:15, 6724:16
**ethnicity** [1] - 6714:15
**EUGENE** [1] - 6622:10
**evaluate** [1] - 6699:3
**evaluating** [3] - 6682:17, 6683:15, 6684:22
**evaluation** [5] - 6626:9, 6649:15, 6651:7, 6653:17, 6670:23
**evaluations** [1] - 6681:25
**evening** [2] - 6769:15, 6769:18
**event** [2] - 6624:18, 6633:25
**events** [10] - 6649:24, 6652:12, 6653:10, 6663:14, 6669:2, 6669:6, 6753:19, 6753:22, 6764:2, 6764:16
**evidence** [69] - 6625:24, 6628:10, 6628:12, 6629:4, 6629:5, 6630:4, 6630:21, 6635:2, 6635:10, 6635:15, 6635:24, 6636:13, 6637:3, 6637:8, 6647:25, 6649:4, 6649:6, 6649:7, 6707:23, 6722:11, 6722:16, 6722:18, 6723:24, 6724:15, 6725:20, 6727:7,

6727:10, 6727:12, 6727:21, 6728:16, 6728:23, 6728:25, 6729:22, 6729:23, 6730:1, 6730:2, 6731:7, 6731:10, 6731:13, 6732:7, 6733:12, 6733:13, 6733:21, 6733:22, 6735:5, 6735:7, 6735:14, 6735:17, 6735:25, 6737:16, 6738:19, 6740:18, 6740:19, 6748:2, 6748:4, 6748:15, 6748:16, 6748:18, 6751:12, 6751:14, 6756:4, 6756:13, 6759:25, 6760:6, 6761:3, 6762:21, 6764:8, 6772:6
**Evidence** [1] - 6748:19
**evincing** [1] - 6724:15
**evolve** [1] - 6676:13
**exact** [1] - 6738:19
**exactly** [3] - 6641:15, 6680:7, 6680:11
**exam** [1] - 6654:3
**examination** [6] - 6645:21, 6645:22, 6708:25, 6744:6, 6744:20, 6746:19
**EXAMINATION** [7] - 6644:2, 6672:16, 6704:15, 6706:7, 6715:11, 6719:23, 6721:5
**Examination...........** [2] - 6623:5, 6623:7
**Examination...........** [2] - 6623:4, 6623:6
**Examination...........** . [3] - 6623:4, 6623:6, 6623:7
**examine** [2] - 6648:15, 6686:25
**example** [5] - 6638:19, 6703:15, 6729:15, 6730:10, 6747:7
**examples** [2] - 6671:19, 6701:20
**excellent** [1] - 6671:18
**except** [3] - 6682:23, 6729:10, 6737:15
**exception** [5] - 6648:21, 6686:17, 6687:8, 6687:10, 6687:13
**exceptions** [1] -

6674:4
**excessively** [1] - 6766:10
**exchange** [1] - 6713:2
**exchanged** [2] - 6637:7, 6685:15
**excuse** [3] - 6629:5, 6718:8, 6740:4
**executive** [5] - 6656:16, 6659:2, 6659:3, 6659:5, 6762:25
**exemption** [1] - 6688:3
**exercise** [2] - 6711:2, 6711:23
**exhibit** [12] - 6664:1, 6665:16, 6705:15, 6710:20, 6711:9, 6711:13, 6717:21, 6733:22, 6751:5, 6771:22, 6772:12, 6772:21
**Exhibit** [10] - 6629:22, 6647:12, 6647:16, 6647:25, 6651:3, 6651:14, 6707:23, 6710:18, 6721:1
**exhibits** [11] - 6624:10, 6629:7, 6629:10, 6734:2, 6734:15, 6767:22, 6767:24, 6769:8, 6769:9, 6769:11, 6772:8
**Exhibits** [1] - 6772:6
**EXHIBITS** [1] - 6623:10
**exist** [1] - 6656:23
**existence** [2] - 6729:14, 6753:8
**exited** [2] - 6672:7, 6723:5
**expand** [1] - 6738:21
**expanding** [1] - 6701:17
**expect** [2] - 6657:10, 6703:17
**expected** [1] - 6768:2
**experience** [6] - 6647:3, 6647:7, 6649:2, 6692:1, 6720:10, 6761:24
**expert** [13] - 6646:23, 6648:4, 6648:11, 6648:18, 6648:21, 6648:23, 6648:24, 6661:19, 6692:2, 6686:17, 6686:20, 6687:19, 6688:4

**expertise** [1] - 6705:2
**experts** [5] - 6626:1, 6655:10, 6697:17, 6702:17, 6703:11
**explain** [3] - 6639:18, 6641:8, 6740:3
**explained** [1] - 6747:24
**explanation** [2] - 6641:9, 6703:10
**explanatory** [1] - 6761:15
**explicit** [1] - 6668:25
**express** [2] - 6663:6, 6670:12
**expressed** [1] - 6668:20
**expressing** [1] - 6664:9
**expression** [1] - 6665:12
**expressions** [11] - 6660:9, 6660:13, 6664:12, 6664:13, 6664:20, 6664:25, 6665:1, 6665:9, 6702:2, 6762:18, 6762:22
**extensive** [2] - 6655:17, 6690:16
**extent** [5] - 6636:3, 6636:6, 6655:14, 6687:23, 6732:21
**eye** [2] - 6654:16, 6654:17

---

# F

**f-bomb** [1] - 6712:6
**face** [3] - 6625:9, 6654:22, 6738:21
**faces** [1] - 6666:21
**facial** [11] - 6660:8, 6660:13, 6664:12, 6664:13, 6664:20, 6664:25, 6665:9, 6665:12, 6702:2, 6762:18, 6762:21
**fact** [16] - 6625:7, 6630:9, 6637:25, 6638:25, 6640:21, 6641:6, 6679:9, 6725:6, 6728:5, 6728:12, 6736:7, 6736:12, 6740:13, 6743:14, 6750:17, 6751:19
**factor** [2] - 6749:15, 6762:4
**factors** [6] - 6684:9,

6689:18, 6749:7, 6749:23, 6750:3, 6750:7
**facts** [2] - 6725:5, 6735:14
**factual** [1] - 6748:7
**failed** [17] - 6731:9, 6752:18, 6752:25, 6753:7, 6753:11, 6753:13, 6754:5, 6754:9, 6754:14, 6754:18, 6757:12, 6757:13, 6758:10, 6759:2, 6759:4, 6760:5, 6761:2
**fair** [11] - 6631:14, 6670:18, 6712:11, 6712:24, 6714:18, 6714:20, 6719:15, 6732:6, 6745:3, 6771:7
**fairly** [2] - 6649:8, 6727:12
**faith** [2] - 6763:2, 6770:5
**fall** [3] - 6643:12, 6659:9, 6683:4, 6704:18, 6732:13
**falls** [3] - 6655:11, 6676:8, 6716:25
**families** [1] - 6764:15
**family** [6] - 6652:9, 6678:2, 6678:7, 6678:9, 6753:18, 6764:1
**far** [9] - 6624:10, 6658:15, 6679:24, 6680:7, 6687:15, 6716:18, 6719:3, 6750:10, 6764:22
**farfetched** [1] - 6731:25
**fashion** [1] - 6724:17
**fashioning** [1] - 6724:22
**fatigues** [1] - 6709:17
**FBI** [5] - 6649:25, 6651:16, 6669:5, 6746:18, 6748:15
**federal** [1] - 6694:7
**federally** [2] - 6759:13, 6759:17
**feedback** [1] - 6666:7
**feelings** [2] - 6663:13, 6663:15
**feet** [3] - 6653:11, 6700:20, 6767:12
**fell** [2] - 6675:21, 6675:22
**fellowship** [2] -

6645:5, 6645:7
**felt** [4] - 6663:18, 6663:20, 6669:10, 6727:10
**female** [1] - 6637:20
**few** [8] - 6637:18, 6672:20, 6685:6, 6685:7, 6696:7, 6713:3, 6720:8, 6767:22
**fidgeting** [1] - 6653:11
**field** [11] - 6647:8, 6655:11, 6656:21, 6660:1, 6673:4, 6695:18, 6697:17, 6704:21, 6704:23, 6706:25, 6707:1
**Fields** [1] - 6622:10
**fields** [1] - 6646:2
**fiery** [1] - 6744:25
**Fifth** [1] - 6622:2
**fight** [5] - 6740:10, 6744:11, 6745:1, 6745:9, 6745:11
**fighting** [2] - 6725:15, 6745:11
**figure** [5] - 6656:19, 6666:7, 6666:9, 6726:14, 6741:4
**file** [1] - 6773:2
**files** [2] - 6760:15, 6760:18
**filing** [2] - 6735:24, 6773:1
**filings** [1] - 6649:21
**final** [8] - 6629:16, 6670:10, 6725:25, 6761:21, 6768:10, 6773:6, 6773:7
**finalized** [1] - 6625:21
**finally** [1] - 6761:21
**fine** [11] - 6626:8, 6637:19, 6666:19, 6742:12, 6745:16, 6750:20, 6752:2, 6755:15, 6764:17, 6773:12
**finer** [1] - 6661:22
**finish** [4] - 6645:4, 6764:11, 6768:1, 6768:9
**finished** [2] - 6653:12, 6745:6
**fire** [1] - 6767:12
**firearms** [3] - 6629:25, 6630:1, 6630:18
**first** [37] - 6627:15, 6634:7, 6634:8, 6635:25, 6636:7, 6645:19, 6666:24,

6674:23, 6680:21, 6680:24, 6683:13, 6686:22, 6691:4, 6696:8, 6696:11, 6697:25, 6698:9, 6699:15, 6706:18, 6707:18, 6708:7, 6712:17, 6712:19, 6713:11, 6715:8, 6716:4, 6717:9, 6726:2, 6734:19, 6738:15, 6743:19, 6748:12, 6751:17, 6752:4, 6752:8, 6765:19, 6773:11
**firsthand** [1] - 6716:21
**Fischer** [2] - 6772:18, 6772:19
**fits** [1] - 6624:19
**five** [7] - 6656:12, 6657:23, 6657:24, 6714:24, 6715:1, 6715:2, 6770:23
**flag** [1] - 6631:20
**flagged** [1] - 6687:2
**flagging** [1] - 6637:20
**flat** [1] - 6667:2
**flaw** [1] - 6737:25
**flew** [1] - 6651:23
**flexibility** [3] - 6771:3, 6771:10, 6771:12
**flight** [1] - 6769:14
**flights** [1] - 6680:5
**floor** [2] - 6708:7, 6708:12
**Florida** [4] - 6622:14, 6651:23, 6651:24, 6680:6
**Flower** [1] - 6637:14
**fly** [1] - 6730:9
**focus** [7] - 6656:7, 6682:17, 6683:1, 6683:13, 6683:14, 6707:15
**focused** [2] - 6686:9, 6702:7
**foggiest** [1] - 6702:4
**folks** [1] - 6735:20
**follow** [4] - 6624:16, 6670:20, 6688:3, 6742:2
**follow-up** [1] - 6670:20
**following** [4] - 6630:4, 6749:4, 6749:6, 6763:22
**follows** [2] - 6703:13, 6758:25
**FOR** [3] - 6621:1, 6643:24, 6706:6

**force** [2] - 6731:15, 6731:16
**Ford** [2] - 6772:18, 6772:19
**foreclose** [1] - 6725:3
**foreclosing** [1] - 6630:23
**foregoing** [1] - 6774:3
**forensic** [17] - 6644:9, 6644:10, 6644:11, 6645:10, 6645:12, 6646:4, 6647:7, 6674:7, 6679:2, 6684:17, 6684:20, 6684:23, 6694:1, 6697:21, 6699:11, 6699:21, 6699:25
**Forensic** [6] - 6682:5, 6682:6, 6684:21, 6695:15, 6695:25, 6698:7
**forensics** [1] - 6646:9
**foreseeability** [1] - 6738:15
**foreseeable** [5] - 6736:5, 6736:8, 6736:23, 6737:13, 6738:6
**forever** [1] - 6764:20
**forget** [2] - 6668:25, 6669:2
**forgive** [1] - 6729:11
**form** [2] - 6725:7, 6773:10
**formal** [3] - 6652:2, 6652:4
**forth** [1] - 6721:20
**forward** [10] - 6671:10, 6671:11, 6672:13, 6718:14, 6721:1, 6722:2, 6723:2, 6723:3, 6734:4, 6737:15
**foundation** [2] - 6716:4, 6717:5
**four** [1] - 6691:7
**fourth** [2] - 6758:19, 6761:9
**frankly** [4] - 6687:20, 6738:14, 6740:14, 6742:21
**free** [1] - 6747:11
**Friday** [2] - 6768:10, 6773:16
**front** [7] - 6675:25, 6682:21, 6708:5, 6718:3, 6718:4, 6752:5, 6771:11
**full** [11] - 6632:7, 6633:18, 6652:3,

6655:19, 6659:8, 6659:11, 6674:7, 6676:24, 6676:25, 6678:20, 6699:15
**full-scale** [1] - 6659:11
**full-time** [1] - 6674:7
**fully** [3] - 6629:21, 6658:4, 6658:5
**function** [3] - 6656:4, 6759:13, 6759:17
**functioning** [9] - 6644:15, 6659:3, 6659:5, 6667:3, 6682:18, 6684:4, 6684:8, 6684:24, 6762:25
**functions** [3] - 6656:16, 6659:2, 6682:19
**fund** [1] - 6703:15
**funny** [1] - 6699:24

**G**

**Galit** [2] - 6643:23, 6644:7
**GALIT** [3] - 6623:4, 6643:24, 6644:7
**game** [2] - 6653:15, 6670:18
**games** [1] - 6653:14
**gas** [1] - 6678:17
**gathering** [1] - 6710:7
**gauging** [1] - 6714:25
**general** [5] - 6642:8, 6673:22, 6675:24, 6683:19, 6700:12
**generally** [6] - 6659:9, 6702:8, 6709:14, 6709:15, 6719:8, 6719:9
**gentleman** [1] - 6716:7
**gentlemen** [3] - 6648:19, 6706:12, 6722:15
**gist** [2] - 6640:10, 6731:6
**given** [9] - 6625:7, 6641:15, 6642:3, 6668:6, 6694:4, 6701:25, 6703:24, 6728:10, 6743:3
**glad** [2] - 6668:20, 6688:3
**Glock** [1] - 6707:20
**Gorman** [6] - 6650:13, 6650:24, 6661:16, 6662:11, 6662:18,

6666:24
**Gorman's** [2] - 6651:2, 6651:18
**Government** [5] - 6623:12, 6647:12, 6647:25, 6651:14, 6721:1
**GOVERNMENT** [2] - 6643:24, 6706:6
**government** [82] - 6624:22, 6629:22, 6629:25, 6631:10, 6632:10, 6633:9, 6634:6, 6638:7, 6639:19, 6643:17, 6643:21, 6647:16, 6649:15, 6651:13, 6679:9, 6679:16, 6680:8, 6688:22, 6688:23, 6711:10, 6717:8, 6719:4, 6719:5, 6722:7, 6722:8, 6722:12, 6722:14, 6723:24, 6726:3, 6726:8, 6727:18, 6729:7, 6730:7, 6730:16, 6731:1, 6731:4, 6731:9, 6732:1, 6732:2, 6734:10, 6734:18, 6734:20, 6735:2, 6735:7, 6735:12, 6738:8, 6738:19, 6745:22, 6746:14, 6747:1, 6751:19, 6752:11, 6752:18, 6752:25, 6753:7, 6753:11, 6753:13, 6754:5, 6754:7, 6754:9, 6754:12, 6754:14, 6754:17, 6755:3, 6756:2, 6756:4, 6756:6, 6757:3, 6757:11, 6757:13, 6758:10, 6758:15, 6759:2, 6759:4, 6759:7, 6759:23, 6760:5, 6761:1, 6765:14, 6765:20, 6767:23
**Government's** [3] - 6707:23, 6708:19, 6710:18
**government's** [15] - 6638:6, 6643:12, 6689:23, 6717:4, 6723:1, 6730:9, 6733:17, 6734:6, 6734:17, 6737:23,

6744:6, 6746:6, 6746:17, 6748:24, 6768:10
**graduate** [2] - 6644:16, 6706:25
**graduated** [1] - 6644:19
**grammatically** [1] - 6633:5
**grand** [8] - 6626:15, 6626:19, 6626:21, 6626:25, 6627:1, 6627:12, 6627:17, 6627:19
**grandmother** [3] - 6677:19, 6678:14, 6678:19
**greater** [1] - 6704:20
**Greene** [20] - 6622:13, 6622:15, 6624:17, 6637:14, 6651:24, 6672:14, 6696:9, 6696:10, 6696:15, 6704:13, 6705:5, 6725:15, 6747:8, 6752:18, 6759:21, 6760:3, 6760:6, 6760:25, 6761:2
**GREENE** [50] - 6621:8, 6622:13, 6631:9, 6631:14, 6647:19, 6648:13, 6650:6, 6650:15, 6650:17, 6650:19, 6661:17, 6669:17, 6669:23, 6670:5, 6670:24, 6672:15, 6672:17, 6673:13, 6675:8, 6675:14, 6678:16, 6678:24, 6678:25, 6683:6, 6683:8, 6686:11, 6686:13, 6687:8, 6688:2, 6688:8, 6689:19, 6689:21, 6689:22, 6693:20, 6693:22, 6693:23, 6696:4, 6696:6, 6696:12, 6696:18, 6703:8, 6704:8, 6704:11, 6734:24, 6745:8, 6745:18, 6745:25, 6746:13, 6750:1, 6762:20
**grimacing** [1] - 6665:14
**gross** [1] - 6701:25
**grounds** [4] - 6633:21, 6642:10, 6741:13, 6757:2

**Grumpy's** [1] - 6701:3
**guard** [3] - 6736:19, 6736:20, 6737:4
**guarding** [1] - 6710:12
**guardrails** [1] - 6671:9
**guards** [1] - 6736:24
**guess** [12] - 6627:19, 6640:8, 6689:23, 6713:10, 6727:6, 6727:11, 6728:15, 6728:20, 6733:19, 6765:13, 6771:1, 6773:8
**guilt** [1] - 6639:15
**guilty** [14] - 6632:10, 6640:12, 6640:13, 6641:7, 6724:20, 6730:10, 6730:14, 6730:16, 6730:25, 6733:5, 6738:5, 6752:19, 6773:11, 6773:12
**gun** [2] - 6628:20, 6630:10
**guns** [3] - 6630:15, 6630:22, 6631:12
**guy** [1] - 6707:25
**guys** [1] - 6702:10

## H

**half** [4] - 6657:2, 6672:3, 6685:10, 6766:18
**HALLER** [46] - 6622:7, 6627:11, 6708:20, 6710:22, 6711:5, 6711:8, 6715:7, 6715:9, 6715:12, 6716:4, 6716:6, 6716:23, 6717:8, 6717:16, 6717:22, 6717:24, 6717:25, 6718:16, 6718:23, 6719:20, 6726:25, 6729:1, 6729:5, 6729:11, 6734:14, 6737:15, 6747:22, 6753:3, 6753:21, 6757:18, 6758:1, 6758:22, 6759:15, 6763:15, 6764:4, 6764:7, 6764:10, 6765:19, 6767:21, 6770:2, 6770:8, 6770:14, 6770:22, 6771:17, 6772:17, 6772:23
**Haller** [7] - 6622:7, 6627:14, 6715:8,

6715:15, 6717:21, 6734:13, 6770:11
**hallmark** [1] - 6700:18
**hallway** [7] - 6705:25, 6706:4, 6716:21, 6717:7, 6721:7, 6721:12, 6721:14
**hand** [3] - 6664:25, 6710:5, 6710:8
**Handbook** [3] - 6695:15, 6695:24, 6698:7
**handbook** [7] - 6696:24, 6697:1, 6697:2, 6697:16, 6698:19, 6698:25, 6699:11
**handed** [1] - 6683:9
**handful** [1] - 6734:18
**hands** [2] - 6653:11, 6722:19
**hang** [2] - 6760:13, 6768:3
**happiness** [1] - 6664:17
**happy** [6] - 6632:3, 6632:4, 6635:25, 6653:9, 6662:14, 6702:1
**hard** [5] - 6766:24, 6767:11, 6767:17, 6767:19, 6772:15
**HARRY** [3] - 6623:6, 6706:6, 6706:14
**Harry** [2] - 6705:24, 6706:14
**hated** [1] - 6667:12
**head** [3] - 6650:17, 6659:18, 6740:6
**header** [1] - 6632:22
**heading** [1] - 6632:14
**headphones** [3] - 6653:14, 6685:22, 6686:16
**health** [4] - 6649:20, 6652:8, 6652:20, 6697:23
**hear** [16] - 6668:15, 6686:17, 6709:21, 6709:23, 6711:4, 6711:24, 6712:4, 6712:14, 6722:20, 6727:14, 6727:16, 6732:4, 6734:21, 6738:14, 6770:21
**heard** [12] - 6635:2, 6635:10, 6635:24, 6659:24, 6665:22, 6731:7, 6731:13, 6735:8, 6742:6,

6715:15, 6717:21, 6734:13, 6770:11
**hearing** [3] - 6628:25, 6722:17, 6732:18
**hearings** [1] - 6688:12
**hearsay** [1] - 6661:18
**heated** [2] - 6713:1, 6713:2
**held** [3] - 6706:22, 6737:8, 6745:23
**hell** [5] - 6740:10, 6744:12, 6745:1, 6745:9, 6745:11
**hello** [2] - 6715:18, 6720:7
**help** [11] - 6634:14, 6634:21, 6634:24, 6640:24, 6641:1, 6642:25, 6673:19, 6673:20, 6677:24, 6715:3, 6744:5
**helpful** [5] - 6639:7, 6650:23, 6651:10, 6721:22, 6751:12
**helping** [2] - 6640:22, 6765:8
**hereby** [1] - 6743:20
**herein** [2] - 6641:21, 6642:17
**high** [1] - 6659:13
**higher** [1] - 6656:16
**highest** [1] - 6655:13
**highlighted** [1] - 6739:9
**highly** [2] - 6661:1, 6690:16
**himself** [6] - 6654:19, 6661:10, 6663:24, 6678:22, 6735:10, 6740:3
**hindsight** [1] - 6710:11
**hire** [2] - 6646:19, 6683:24
**hired** [11] - 6646:15, 6646:23, 6649:15, 6649:18, 6674:11, 6674:12, 6674:13, 6681:25, 6694:2, 6694:14, 6694:19
**hires** [1] - 6646:14, 6646:19, 6688:23
**historical** [1] - 6661:14
**history** [4] - 6652:7, 6652:8
**hit** [1] - 6691:13
**hits** [1] - 6767:14
**hold** [7] - 6659:17, 6748:20, 6749:25,

6742:7, 6748:14, 6764:8
**hearing** [3] - 6628:25, 6722:17, 6732:18

6764:20, 6766:9, 6767:11, 6768:4
**holdover** [1] - 6634:11
**home** [2] - 6636:16, 6637:4
**homeless** [1] - 6671:24
**Honor** [109] - 6624:5, 6625:12, 6625:18, 6626:3, 6626:6, 6626:14, 6627:23, 6632:13, 6634:7, 6635:13, 6637:17, 6643:22, 6647:18, 6647:19, 6647:22, 6648:14, 6670:6, 6670:15, 6670:24, 6671:25, 6672:15, 6679:14, 6683:6, 6687:5, 6689:19, 6693:20, 6696:4, 6704:4, 6704:5, 6704:6, 6705:23, 6705:25, 6706:1, 6706:5, 6711:8, 6711:11, 6711:14, 6715:7, 6716:3, 6716:5, 6716:16, 6717:19, 6720:24, 6722:13, 6723:7, 6723:10, 6723:18, 6723:22, 6724:7, 6724:10, 6726:12, 6726:25, 6729:1, 6729:5, 6734:8, 6734:9, 6734:12, 6735:25, 6736:21, 6737:15, 6738:2, 6739:15, 6740:1, 6741:9, 6741:22, 6742:13, 6743:18, 6743:20, 6744:3, 6746:4, 6746:7, 6746:23, 6747:5, 6747:22, 6748:23, 6749:4, 6749:14, 6749:25, 6750:9, 6750:11, 6750:15, 6750:21, 6751:1, 6751:2, 6751:5, 6751:25, 6752:9, 6753:23, 6754:1, 6757:8, 6757:18, 6758:22, 6760:2, 6761:14, 6761:19, 6763:5, 6764:21, 6765:3, 6765:22, 6766:12, 6766:18, 6767:17, 6767:21, 6768:12, 6768:17, 6769:22, 6770:8,

6772:17, 6772:25
**Honor's** [1] - 6762:17
**HONORABLE** [1] - 6621:11
**hope** [6] - 6643:19, 6657:12, 6671:5, 6673:20, 6749:2, 6766:14
**hopefully** [1] - 6767:10
**hoping** [1] - 6629:17
**hotel** [2] - 6630:11, 6631:2
**hotels** [1] - 6680:6
**hour** [15] - 6643:20, 6657:2, 6672:3, 6679:20, 6679:22, 6680:8, 6680:13, 6685:10, 6733:20, 6766:14, 6766:19, 6766:21, 6766:23, 6767:10
**hours** [13] - 6652:1, 6652:23, 6654:18, 6657:3, 6679:22, 6680:10, 6680:13, 6680:17, 6680:19, 6680:20, 6685:6, 6685:7, 6685:9
**House** [1] - 6641:2
**house** [1] - 6678:15
**House's** [1] - 6708:6
**housing** [1] - 6655:19
**Hughes** [1] - 6720:23
**HUGHES** [28] - 6621:16, 6706:8, 6708:24, 6709:1, 6709:9, 6709:12, 6710:4, 6710:23, 6710:25, 6711:13, 6711:18, 6711:22, 6712:3, 6715:5, 6716:3, 6716:16, 6716:20, 6717:4, 6720:24, 6721:6, 6721:11, 6722:2, 6722:13, 6758:3, 6758:13, 6758:20, 6759:13, 6759:16
**humble** [1] - 6690:23
**hundreds** [5] - 6656:23, 6704:22, 6704:24
**hurt** [1] - 6712:16
**husband** [3] - 6730:11, 6730:15, 6730:22
**hypothetical** [1] - 6645:23

**I**

**i.e** [1] - 6682:18
**idea** [9] - 6660:2, 6661:1, 6667:23, 6701:22, 6702:4, 6738:15, 6740:6, 6741:17, 6741:21
**ideally** [1] - 6768:9
**ideas** [1] - 6740:13
**identification** [1] - 6625:2, 6716:24, 6717:10
**identified** [4] - 6624:23, 6625:22, 6626:2, 6690:1
**identifies** [1] - 6683:3
**identify** [7] - 6625:8, 6679:15, 6693:24, 6696:21, 6716:10, 6717:12, 6718:5
**identifying** [2] - 6631:19, 6696:14
**ignorance** [2] - 6757:5, 6762:8
**ignore** [1] - 6649:9
**illegal** [4] - 6630:13, 6668:1, 6671:21, 6671:23
**image** [5] - 6717:18, 6718:3, 6718:4, 6718:19, 6719:3
**imagine** [2] - 6660:14, 6702:20
**imagined** [1] - 6663:20
**immigration** [1] - 6674:3
**impacted** [1] - 6698:17
**impair** [1] - 6761:11
**impairments** [2] - 6658:7, 6658:8
**impeached** [2] - 6626:15, 6626:25
**impeachment** [1] - 6628:4
**impede** [10] - 6638:4, 6754:6, 6755:14, 6755:21, 6757:15, 6758:8, 6758:12, 6759:6, 6759:16, 6759:17
**impediment** [3] - 6754:11, 6754:19, 6755:7
**impeding** [1] - 6638:2
**implication** [2] - 6670:6, 6670:12
**implied** [1] - 6743:24

**implies** [3] - 6733:4, 6749:15, 6749:16
**important** [8] - 6639:17, 6652:14, 6655:21, 6713:9, 6713:16, 6713:21, 6741:17, 6769:5
**impossible** [1] - 6701:4
**imprimatur** [1] - 6741:5
**improperly** [1] - 6731:1
**in-person** [1] - 6680:16
**in/day** [1] - 6677:14
**inadvertently** [1] - 6729:21
**inappropriate** [1] - 6741:7
**inarticulate** [1] - 6729:20
**incidental** [2] - 6639:4, 6640:18
**inclined** [1] - 6639:25
**include** [14] - 6625:5, 6630:2, 6632:19, 6632:23, 6633:3, 6633:10, 6633:11, 6633:13, 6634:1, 6635:25, 6636:9, 6643:17, 6694:10, 6727:19
**included** [9] - 6624:25, 6625:2, 6626:10, 6626:17, 6628:15, 6629:7, 6629:13, 6652:1, 6728:13
**includes** [3] - 6624:10, 6657:1, 6680:5
**including** [1] - 6752:7
**inclusion** [1] - 6635:7
**incomplete** [1] - 6757:17
**inconsistent** [5] - 6626:9, 6626:11, 6627:13, 6627:15, 6627:17
**incorrect** [1] - 6630:7
**incorrectly** [1] - 6654:8
**independence** [1] - 6655:19
**independent** [1] - 6667:25
**indicate** [1] - 6668:22
**indicated** [6] - 6630:3, 6636:25, 6663:9,

6675:20, 6678:4, 6688:9
**indicates** [2] - 6675:16, 6676:2
**indictment** [12] - 6632:12, 6632:20, 6633:2, 6633:4, 6633:15, 6633:18, 6634:3, 6735:3, 6760:14, 6761:6, 6765:25
**individual** [8] - 6684:22, 6697:20, 6713:12, 6716:24, 6718:7, 6718:14, 6718:18, 6721:16
**individually** [2] - 6754:6, 6754:10
**individuals** [12] - 6631:1, 6684:6, 6698:13, 6708:13, 6709:3, 6709:16, 6709:19, 6710:8, 6710:10, 6712:21, 6732:15, 6745:4
**indulgence** [5] - 6633:24, 6715:9, 6746:12, 6757:7, 6770:22
**infer** [1] - 6733:2
**inference** [2] - 6628:9, 6733:14
**influenced** [1] - 6741:19
**informal** [1] - 6653:17
**information** [4] - 6649:18, 6652:7, 6666:2, 6676:13
**informed** [1] - 6668:14
**injured** [1] - 6756:5
**injuring** [1] - 6756:1
**injury** [1] - 6646:16
**innocence** [1] - 6751:22
**inopportune** [1] - 6706:2
**insert** [3] - 6636:1, 6637:25, 6750:1
**inside** [1] - 6668:17
**insight** [1] - 6703:22
**insofar** [2] - 6727:23, 6757:4
**instead** [3] - 6642:16, 6675:3, 6675:9
**institutions** [1] - 6645:2
**instruct** [6] - 6634:9, 6641:24, 6642:18, 6724:25, 6743:4, 6743:21

**instructed** [4] - 6638:22, 6640:3, 6737:11, 6743:15
**instructing** [2] - 6638:17, 6641:18
**instruction** [69] - 6624:18, 6625:2, 6625:24, 6626:10, 6627:22, 6628:6, 6630:1, 6630:20, 6630:21, 6634:5, 6637:18, 6641:20, 6642:3, 6642:5, 6642:11, 6642:22, 6643:1, 6724:4, 6724:12, 6724:13, 6724:18, 6725:19, 6726:17, 6726:20, 6727:5, 6727:9, 6728:9, 6728:11, 6728:22, 6728:24, 6730:19, 6730:24, 6731:5, 6731:6, 6731:12, 6731:23, 6733:11, 6733:17, 6734:6, 6734:19, 6738:9, 6738:16, 6738:24, 6738:25, 6739:1, 6739:2, 6741:1, 6741:4, 6741:10, 6741:16, 6743:20, 6743:22, 6744:3, 6745:21, 6746:9, 6746:15, 6747:6, 6747:18, 6748:1, 6748:25, 6749:15, 6751:8, 6752:8, 6753:5, 6755:2, 6759:18, 6765:10
**instructions** [31] - 6624:8, 6629:24, 6635:19, 6722:20, 6722:25, 6723:11, 6725:2, 6725:3, 6725:6, 6725:22, 6732:3, 6733:16, 6733:18, 6734:2, 6734:5, 6734:7, 6734:14, 6734:17, 6754:24, 6755:9, 6758:8, 6761:10, 6761:17, 6764:19, 6765:11, 6768:10, 6768:24, 6769:3, 6773:6, 6773:7
**insulting** [1] - 6725:14
**insurance** [1] - 6646:18
**intact** [10] - 6658:4,

6658:5, 6658:6, 6658:9, 6658:19, 6658:24, 6659:1, 6659:3, 6659:18, 6661:24
**integrate** [2] - 6666:2, 6666:7
**integrates** [2] - 6656:17, 6684:24
**integrity** [1] - 6761:11
**intellectual** [5] - 6655:7, 6655:23, 6655:24, 6657:11, 6762:25
**intelligence** [4] - 6656:8, 6659:7, 6659:17, 6659:20
**intend** [1] - 6762:2
**intended** [10] - 6670:5, 6754:6, 6757:14, 6758:8, 6758:11, 6758:16, 6759:5, 6759:9, 6760:6, 6761:3
**intending** [1] - 6730:8
**intent** [23] - 6638:3, 6639:5, 6639:10, 6639:15, 6640:20, 6641:7, 6642:2, 6649:22, 6668:7, 6671:2, 6671:7, 6724:16, 6742:9, 6742:23, 6742:24, 6742:25, 6754:8, 6755:5, 6755:6, 6761:8, 6761:11, 6762:6
**intention** [1] - 6758:7
**intentional** [1] - 6653:1
**intentions** [1] - 6668:8
**interact** [1] - 6655:25
**interacting** [1] - 6653:5
**interactions** [2] - 6653:19, 6655:4
**interests** [2] - 6653:25, 6655:5
**interfere** [7] - 6729:24, 6757:15, 6758:9, 6758:12, 6758:17, 6759:6, 6759:10
**interference** [2] - 6738:5, 6758:18
**interfering** [1] - 6655:18
**interpret** [7] - 6662:17, 6664:12, 6665:11, 6746:16, 6746:20, 6746:22, 6748:17

**interpretation** [2] - 6700:12, 6746:10
**interpreting** [1] - 6665:9
**interstate** [1] - 6759:17
**intervened** [1] - 6713:10
**intervention** [1] - 6707:3
**interview** [12] - 6628:1, 6649:25, 6651:16, 6652:2, 6652:4, 6652:7, 6652:13, 6652:22, 6653:12, 6662:2, 6671:17, 6680:16
**intimidated** [1] - 6663:20
**introduce** [2] - 6706:11, 6711:8
**introduced** [2] - 6653:21, 6708:24
**invoking** [1] - 6740:25
**involuntarily** [2] - 6669:1
**involve** [2] - 6692:18, 6729:9
**involved** [11] - 6674:2, 6674:5, 6674:8, 6688:25, 6689:4, 6689:10, 6693:5, 6694:12, 6731:19, 6732:15
**involves** [1] - 6655:3
**involving** [3] - 6663:5, 6663:13, 6705:9
**IQ** [2] - 6659:8, 6659:11
**irrelevant** [2] - 6637:10, 6669:17
**irrespective** [1] - 6732:13
**ISAACS** [1] - 6621:7
**Isaacs** [48] - 6622:10, 6624:4, 6649:16, 6650:1, 6651:17, 6651:19, 6652:24, 6653:5, 6657:17, 6657:19, 6657:25, 6658:15, 6661:3, 6665:20, 6666:3, 6666:18, 6667:4, 6674:16, 6674:18, 6675:16, 6677:4, 6677:16, 6678:12, 6678:22, 6685:21, 6687:9, 6687:16, 6687:24, 6705:15, 6720:2, 6720:4,

6740:2, 6741:18, 6741:23, 6743:24, 6745:12, 6745:16, 6746:25, 6748:25, 6752:17, 6757:10, 6758:2, 6759:1, 6759:9, 6761:21, 6762:1, 6762:3, 6765:21
**Isaacs's** [8] - 6661:23, 6666:25, 6671:15, 6686:15, 6687:4, 6687:23, 6741:20, 6762:7
**issue** [15] - 6624:12, 6625:3, 6632:9, 6671:7, 6677:7, 6689:14, 6726:6, 6727:13, 6739:8, 6748:10, 6748:11, 6754:2, 6769:5, 6769:8, 6770:9
**issues** [6] - 6624:21, 6667:24, 6684:8, 6744:4, 6751:5, 6771:22
**italicized** [1] - 6638:24
**itself** [1] - 6642:6

## J

**January** [22] - 6637:7, 6637:9, 6663:14, 6663:16, 6668:2, 6668:11, 6668:24, 6671:2, 6671:8, 6707:5, 6720:10, 6742:8, 6753:15, 6756:12, 6757:14, 6758:11, 6759:5, 6761:23, 6763:10, 6763:14, 6763:24, 6770:10
**JC** [3] - 6717:24, 6771:2, 6771:9
**Jefferson** [1] - 6622:11
**JEFFREY** [1] - 6621:15
**Jessica** [2] - 6636:16, 6765:7
**Joanna** [1] - 6772:20
**Joe** [1] - 6731:14
**JOHN** [1] - 6621:19
**John** [3] - 6621:19, 6719:25, 6720:3
**join** [1] - 6753:12
**joined** [1] - 6728:6
**joining** [1] - 6636:7
**jointly** [1] - 6646:23

**joke** [1] - 6665:18
**JR** [1] - 6622:4
**Judge** [14] - 6631:9, 6631:14, 6635:7, 6641:15, 6650:19, 6678:24, 6688:2, 6693:22, 6745:8, 6745:15, 6745:19, 6750:8, 6766:7, 6768:18
**judge** [5] - 6750:1, 6750:22, 6767:4, 6771:8, 6771:19
**JUDGE** [1] - 6621:12
**Juli** [1] - 6715:15
**JULI** [1] - 6622:7
**Julia** [1] - 6622:7
**juries** [1] - 6770:17
**juror** [5] - 6640:23, 6769:12, 6770:4, 6770:5, 6771:2
**jurors** [2] - 6770:7, 6771:16
**JURY** [1] - 6621:11
**jury** [47] - 6624:2, 6626:15, 6626:19, 6626:22, 6626:25, 6627:1, 6627:13, 6627:17, 6627:19, 6629:9, 6630:12, 6635:21, 6638:18, 6638:25, 6639:5, 6639:7, 6640:17, 6641:4, 6641:11, 6643:13, 6671:7, 6673:24, 6706:12, 6711:19, 6717:19, 6723:8, 6723:10, 6724:25, 6725:18, 6725:23, 6727:25, 6728:3, 6731:18, 6734:17, 6735:18, 6736:1, 6737:7, 6737:10, 6739:5, 6740:15, 6742:25, 6743:4, 6747:16, 6758:8, 6770:10, 6770:12
**Jury** [4] - 6643:18, 6672:7, 6672:11, 6723:5
**jury's** [3] - 6629:5, 6740:6, 6740:14
**justice** [1] - 6639:15
**Justice** [11] - 6674:13, 6680:22, 6681:6, 6681:11, 6681:15, 6681:23, 6694:15, 6694:20, 6695:2, 6695:7, 6695:11

## K

**Kate** [1] - 6696:12
**KATHRYN** [1] - 6621:15
**keep** [12] - 6625:22, 6628:11, 6689:11, 6703:2, 6708:13, 6710:14, 6710:15, 6725:15, 6727:5, 6735:10, 6745:11, 6769:23
**Keepers** [6] - 6737:21, 6753:16, 6763:11, 6763:24, 6764:13, 6765:8
**keeping** [1] - 6685:18
**Kelly** [4] - 6732:14, 6732:22, 6732:23, 6732:24
**key** [1] - 6690:18
**kill** [2] - 6712:7, 6712:10
**kind** [6] - 6639:17, 6645:2, 6649:18, 6654:4, 6676:10, 6733:5
**kinds** [3] - 6656:20, 6661:6, 6662:6
**Kirby** [1] - 6694:17
**knowing** [4] - 6660:11, 6703:21, 6754:20, 6755:18
**knowingly** [11] - 6633:22, 6754:12, 6754:13, 6754:22, 6754:23, 6754:24, 6755:2, 6755:12, 6755:19, 6757:1, 6757:4
**knowledge** [7] - 6638:11, 6642:14, 6652:11, 6693:19, 6703:15, 6716:21, 6748:7
**known** [1] - 6646:24
**knows** [1] - 6740:25
**Kotelly** [1] - 6768:18

## L

**labeled** [1] - 6703:16
**lack** [1] - 6748:2
**ladies** [1] - 6706:12
**Ladies** [2] - 6648:19, 6722:15
**language** [11] - 6639:22, 6640:6, 6641:23, 6656:15, 6658:21, 6658:22,

6658:23, 6702:3, 6751:11, 6761:9, 6761:18
**lapels** [1] - 6713:19
**large** [1] - 6704:21
**larger** [1] - 6708:16
**last** [24] - 6624:14, 6630:1, 6631:21, 6632:7, 6634:8, 6640:19, 6680:3, 6685:14, 6695:1, 6701:10, 6701:12, 6729:2, 6732:17, 6749:16, 6749:20, 6750:13, 6750:16, 6750:20, 6750:24, 6756:15, 6758:5, 6761:7, 6767:8, 6770:17
**laude** [1] - 6644:20
**laughing** [1] - 6701:25
**LAURA** [1] - 6621:7
**Laura** [5] - 6686:18, 6752:17, 6757:10, 6758:25, 6759:20
**Law** [5] - 6621:19, 6622:5, 6622:7, 6622:13, 6622:16
**law** [25] - 6628:1, 6630:8, 6631:11, 6638:13, 6639:21, 6639:24, 6640:5, 6641:10, 6641:12, 6641:13, 6643:10, 6643:11, 6644:11, 6686:19, 6688:2, 6724:13, 6735:1, 6743:10, 6757:15, 6758:6, 6758:9, 6758:12, 6758:17, 6759:6, 6759:10
**Lawn** [1] - 6622:16
**lawsuit** [2] - 6674:2, 6674:3
**lawyer** [1] - 6771:13
**lawyers** [1] - 6725:20
**lay** [1] - 6716:4
**Lazarus** [14] - 6713:14, 6713:16, 6714:5, 6714:14, 6716:8, 6716:9, 6716:15, 6716:21, 6717:2, 6717:7, 6717:13, 6719:2, 6719:17, 6721:18
**lead** [1] - 6679:3
**leadership** [1] - 6727:20
**leading** [3] - 6650:6, 6650:15, 6700:6

**leads** [1] - 6708:7
**learned** [4] - 6687:17, 6695:16, 6695:17, 6763:20
**leash** [2] - 6769:23
**least** [15] - 6658:9, 6658:12, 6659:21, 6670:11, 6680:17, 6680:19, 6687:21, 6692:23, 6712:13, 6739:8, 6739:9, 6741:18, 6741:19, 6767:8, 6771:13
**leave** [10] - 6631:15, 6653:3, 6668:21, 6677:23, 6707:13, 6721:24, 6722:1, 6733:14, 6766:22, 6769:21
**leaves** [2] - 6700:1, 6769:15
**led** [2] - 6662:7, 6662:25
**left** [10] - 6630:10, 6630:15, 6641:3, 6677:24, 6708:14, 6710:12, 6718:9, 6722:19, 6723:21, 6724:2
**legal** [20] - 6630:20, 6646:9, 6649:21, 6652:10, 6652:11, 6653:10, 6667:23, 6668:1, 6671:21, 6673:6, 6673:8, 6673:25, 6682:19, 6684:23, 6684:25, 6694:5, 6704:1, 6722:20, 6725:5, 6743:16
**legally** [1] - 6630:10
**length** [3] - 6671:18, 6766:8, 6769:16
**lengthy** [1] - 6680:14
**less** [3] - 6715:1, 6766:23, 6767:10
**letting** [2] - 6709:25, 6710:9
**level** [15] - 6642:1, 6655:12, 6655:13, 6659:7, 6661:12, 6661:23, 6663:22, 6675:24, 6676:20, 6676:22, 6677:4, 6677:6, 6677:9, 6677:11, 6710:17
**levels** [9] - 6655:10, 6655:12, 6655:21, 6661:4, 6663:1, 6676:16, 6676:18,

6677:1
**liability** [8] - 6724:21, 6724:22, 6736:22, 6737:9, 6738:10, 6738:17, 6738:21
**liable** [2] - 6737:2, 6737:8
**licenses** [2] - 6691:7, 6691:8
**licensure** [2] - 6645:6, 6691:4
**licensures** [1] - 6691:10
**life** [3] - 6655:18, 6677:17, 6766:17
**light** [2] - 6724:24, 6725:1
**likely** [2] - 6687:24, 6733:6
**limit** [1] - 6687:22
**limited** [3] - 6748:3, 6748:4, 6762:20
**limiting** [2] - 6629:24, 6763:2
**line** [8] - 6633:16, 6634:17, 6641:20, 6704:10, 6750:13, 6750:16, 6750:21, 6768:9
**lines** [4] - 6628:17, 6640:4, 6740:7, 6743:9
**Lines** [1] - 6628:18
**list** [5] - 6681:19, 6681:22, 6693:25, 6763:1, 6772:12
**listed** [2] - 6629:9, 6690:17
**listen** [3] - 6653:16, 6709:3, 6744:22
**listing** [1] - 6691:3
**live** [3] - 6655:19, 6687:6, 6770:8
**lived** [2] - 6677:16, 6677:17
**lives** [1] - 6678:12
**living** [4] - 6644:8, 6677:18, 6677:19, 6677:21
**LLP** [1] - 6621:22
**locally** [1] - 6646:24
**locate** [2] - 6634:22, 6634:24
**location** [3] - 6712:18, 6714:24, 6718:6
**locations** [1] - 6630:19
**London** [3] - 6769:14, 6770:13, 6771:14
**longest** [1] - 6770:9

**look** [15] - 6637:22, 6654:21, 6658:3, 6662:24, 6680:15, 6680:18, 6695:12, 6699:15, 6716:25, 6723:3, 6726:22, 6731:17, 6738:14, 6738:18, 6755:2
**looked** [2] - 6712:18, 6716:11
**looking** [7] - 6625:14, 6652:19, 6654:21, 6694:16, 6698:23, 6726:5, 6757:23
**looks** [4] - 6666:6, 6683:11, 6683:12, 6752:14
**lose** [2] - 6714:10, 6714:11
**loud** [4] - 6706:11, 6720:11, 6742:13, 6750:3
**loves** [1] - 6663:4
**low** [1] - 6659:13
**lower** [3] - 6656:17, 6659:18, 6710:17
**lowest** [1] - 6655:13
**Ltd** [1] - 6682:5
**lucky** [1] - 6773:13
**lunch** [11] - 6624:9, 6643:20, 6652:2, 6652:24, 6653:4, 6653:5, 6653:13, 6654:4, 6733:20, 6766:4, 6768:14
**lying** [2] - 6670:9, 6670:12

**M**

**M4** [1] - 6707:20
**ma'am** [2] - 6715:21, 6715:24
**maced** [1] - 6668:21
**MACHADO** [14] - 6621:19, 6628:19, 6628:24, 6630:17, 6632:13, 6632:24, 6764:21, 6765:2, 6766:12, 6768:12, 6772:7, 6772:10, 6772:12, 6772:16
**Machado** [2] - 6621:19, 6766:11
**mad** [2] - 6669:12, 6669:16
**magna** [1] - 6644:19
**mail** [9] - 6641:15, 6685:14, 6685:15, 6726:16, 6733:20,

6733:24, 6734:3, 6763:8, 6769:12
**mailed** [1] - 6767:24
**main** [3] - 6656:11, 6656:12, 6669:20
**maintain** [1] - 6757:2
**majority** [1] - 6646:10
**male** [1] - 6637:18
**malpractice** [1] - 6646:16
**man** [3] - 6714:15, 6714:21, 6739:10
**manifestation** [1] - 6749:12
**manifested** [1] - 6750:2
**manner** [3] - 6635:19, 6698:1, 6698:10
**manslaughter** [1] - 6743:20
**Manual** [2] - 6697:19, 6698:23
**March** [6] - 6621:8, 6650:1, 6769:14, 6769:15, 6774:8
**march** [2] - 6741:7, 6741:8
**mark** [4] - 6679:13, 6683:9, 6767:14, 6767:15
**marked** [3] - 6693:24, 6711:9, 6767:23
**marking** [2] - 6651:2, 6651:13
**marriage** [1] - 6765:18
**mask** [2] - 6665:10, 6665:12
**masks** [1] - 6665:15
**massage** [1] - 6765:1
**massaging** [1] - 6764:21
**master's** [1] - 6644:23
**material** [1] - 6751:11
**materials** [2] - 6658:19, 6658:20
**matter** [7] - 6639:21, 6646:13, 6679:17, 6680:9, 6680:10, 6748:7, 6774:5
**matters** [1] - 6626:6
**mean** [27] - 6632:18, 6640:10, 6645:14, 6652:5, 6653:24, 6655:15, 6657:4, 6663:22, 6664:19, 6665:24, 6669:15, 6670:21, 6677:10, 6681:17, 6725:8, 6728:5, 6728:20, 6728:24, 6732:10,

6736:19, 6739:8,
6753:2, 6756:16,
6757:21, 6761:15,
6762:11, 6768:23
**meaning** [4] - 6655:1,
6661:13, 6745:20,
6745:24
**means** [14] - 6644:11,
6645:17, 6658:13,
6658:22, 6660:4,
6665:25, 6674:2,
6675:22, 6706:24,
6719:10, 6722:16,
6728:5, 6749:20,
6756:15
**meant** [5] - 6664:14,
6669:17, 6670:22
**measure** [1] - 6659:4
**mechanical** [1] -
6703:22
**media** [2] - 6760:15,
6760:18
**medical** [6] - 6646:16,
6649:20, 6652:7,
6658:5, 6672:22,
6673:2
**meet** [5] - 6651:18,
6651:22, 6651:23,
6676:24, 6678:9
**meeting** [3] - 6651:21,
6663:10, 6667:4
**meets** [1] - 6648:14
**Meggs** [17] - 6622:4,
6715:16, 6715:20,
6727:20, 6728:6,
6730:10, 6730:12,
6730:14, 6730:21,
6731:18, 6732:14,
6732:22, 6732:23,
6732:24, 6735:17,
6752:17, 6772:20
**MEGGS** [1] - 6621:7
**Meggs's** [3] - 6765:23,
6765:24, 6768:4
**MEHTA** [1] - 6621:11
**member** [1] - 6713:20
**members** [8] - 6678:2,
6678:7, 6678:9,
6736:3, 6753:9,
6753:18, 6764:1,
6764:15
**memory** [10] -
6652:17, 6656:13,
6658:18, 6658:19,
6659:17, 6668:22,
6668:23, 6669:4,
6670:7
**mental** [11] - 6641:22,
6642:2, 6642:17,
6642:18, 6642:21,

6649:20, 6649:22,
6652:8, 6652:20,
6655:6, 6697:23
**mention** [3] - 6693:11,
6693:17, 6702:9
**mentioned** [5] -
6687:23, 6691:7,
6693:13, 6702:15,
6702:16
**mentioning** [1] -
6662:4
**mere** [17] - 6631:7,
6638:1, 6638:10,
6639:19, 6640:2,
6640:11, 6640:18,
6641:5, 6641:19,
6641:22, 6642:13,
6643:13, 6724:3,
6724:12, 6724:14,
6724:18, 6749:22
**meritorious** [1] -
6735:19
**message** [5] - 6637:6,
6637:13, 6760:4,
6761:1, 6761:6
**messages** [11] -
6746:10, 6746:16,
6746:20, 6746:22,
6747:8, 6747:10,
6747:12, 6748:4,
6748:15, 6748:17,
6760:8
**met** [4] - 6651:24,
6676:25, 6678:2,
6723:24
**mic** [1] - 6732:18
**Michael** [2] - 6752:18,
6759:21
**MICHAEL** [1] - 6621:8
**middle** [5] - 6662:21,
6662:25, 6663:2,
6699:18, 6702:11
**midnight** [1] - 6707:14
**might** [12] - 6631:8,
6657:1, 6665:9,
6665:13, 6690:11,
6690:15, 6736:24,
6763:12, 6763:21,
6766:18, 6771:13,
6771:14
**mild** [1] - 6675:23
**military** [2] - 6709:16,
6771:25
**million** [1] - 6737:23
**mimic** [2] - 6664:15
**mind** [51] - 6628:1,
6638:19, 6659:23,
6659:24, 6660:2,
6660:3, 6660:7,
6660:8, 6660:17,

6664:1, 6664:4,
6664:5, 6689:11,
6695:23, 6697:5,
6697:9, 6697:13,
6697:19, 6699:5,
6699:6, 6699:7,
6700:1, 6700:7,
6700:18, 6701:16,
6701:20, 6701:22,
6701:23, 6701:24,
6702:8, 6702:11,
6702:13, 6702:17,
6702:20, 6702:23,
6702:24, 6702:25,
6703:2, 6703:3,
6703:11, 6705:16,
6708:13, 6710:14,
6713:15, 6725:11,
6728:2, 6740:14,
6762:16, 6762:22,
6762:24
**mind-blindness** [34] -
6659:23, 6659:24,
6660:2, 6660:7,
6660:8, 6660:17,
6664:1, 6664:4,
6664:5, 6695:23,
6697:5, 6697:9,
6697:13, 6697:19,
6699:5, 6699:6,
6700:1, 6700:7,
6700:18, 6701:16,
6701:20, 6701:23,
6701:24, 6702:8,
6702:11, 6702:13,
6702:17, 6702:23,
6702:24, 6702:25,
6703:11, 6705:16,
6762:22, 6762:24
**mindful** [1] - 6650:7
**mine** [1] - 6723:15
**minimum** [1] -
6648:14
**minor** [2] - 6751:5,
6769:8
**minors** [1] - 6701:8
**minus** [1] - 6676:20
**minute** [4] - 6681:10,
6714:24, 6721:2,
6721:3
**minutes** [17] - 6707:9,
6707:12, 6714:9,
6714:24, 6715:2,
6745:16, 6764:25,
6766:12, 6766:22,
6766:24, 6767:3,
6767:6, 6767:12,
6768:6, 6770:23
**misrecollecting** [2] -
6627:1, 6627:19

**missing** [2] - 6628:13,
6629:13
**misstatement** [1] -
6758:6
**mistake** [2] - 6757:5,
6762:7
**mistaken** [1] - 6729:11
**Mister** [1] - 6629:25
**mitigating** [1] -
6689:18
**modest** [1] - 6675:23
**modicum** [1] -
6733:12
**modified** [1] - 6629:18
**mom** [2] - 6686:15,
6687:11
**mom's** [1] - 6685:24
**moment** [9] - 6669:22,
6686:11, 6709:14,
6711:1, 6711:6,
6712:12, 6719:8,
6719:11, 6734:16
**months** [1] - 6677:19
**moral** [1] - 6667:23
**morning** [7] - 6723:8,
6751:16, 6768:10,
6768:22, 6770:25,
6771:19, 6773:5
**most** [6] - 6655:1,
6655:2, 6679:16,
6685:20, 6690:21,
6694:10
**mother** [1] - 6687:14
**mother's** [2] -
6687:15, 6687:17
**motion** [3] - 6686:13,
6687:18, 6723:11
**motions** [3] - 6723:17,
6723:20, 6723:23
**motivation** [1] -
6714:2
**mouth** [2] - 6718:9,
6739:11
**move** [10] - 6647:16,
6661:17, 6669:10,
6670:14, 6671:10,
6671:11, 6678:23,
6688:6, 6723:2,
6772:17
**moved** [2] - 6643:9,
6752:4
**moves** [1] - 6648:10
**moving** [1] - 6734:4
**MR** [248] - 6624:5,
6625:7, 6625:12,
6625:15, 6625:16,
6625:18, 6626:3,
6626:8, 6626:14,
6627:3, 6627:9,
6628:19, 6628:24,

6630:9, 6630:17,
6630:25, 6631:5,
6631:9, 6631:14,
6631:21, 6632:13,
6632:24, 6633:5,
6633:16, 6633:24,
6634:16, 6634:18,
6634:23, 6635:1,
6635:6, 6635:17,
6636:5, 6636:15,
6637:10, 6638:23,
6640:16, 6642:5,
6642:22, 6643:2,
6643:4, 6643:5,
6643:6, 6643:12,
6643:22, 6644:3,
6647:16, 6647:19,
6648:1, 6648:10,
6648:13, 6649:14,
6650:6, 6650:9,
6650:10, 6650:15,
6650:17, 6650:19,
6650:20, 6651:2,
6651:5, 6651:13,
6651:15, 6661:17,
6661:21, 6669:17,
6669:23, 6670:5,
6670:15, 6670:22,
6670:24, 6671:9,
6671:14, 6671:25,
6672:15, 6672:17,
6673:11, 6673:13,
6675:5, 6675:8,
6675:14, 6678:13,
6678:16, 6678:24,
6678:25, 6683:6,
6683:8, 6686:11,
6686:13, 6686:22,
6687:8, 6688:2,
6688:8, 6689:19,
6689:21, 6689:22,
6693:20, 6693:22,
6693:23, 6696:4,
6696:6, 6696:8,
6696:12, 6696:14,
6696:18, 6703:8,
6704:4, 6704:8,
6704:11, 6704:16,
6705:18, 6705:23,
6706:1, 6706:4,
6715:8, 6719:24,
6720:21, 6723:10,
6723:14, 6723:15,
6723:22, 6724:7,
6725:14, 6726:7,
6726:12, 6726:21,
6727:2, 6727:4,
6727:14, 6727:17,
6729:20, 6730:7,
6731:13, 6731:21,
6732:1, 6732:12,

6732:19, 6733:9,
6733:25, 6734:8,
6734:23, 6734:24,
6734:25, 6736:11,
6738:1, 6738:4,
6739:2, 6739:12,
6739:15, 6739:17,
6740:17, 6741:22,
6742:12, 6743:11,
6743:18, 6745:8,
6745:15, 6745:18,
6745:25, 6746:1,
6746:4, 6746:6,
6746:12, 6746:13,
6746:14, 6746:23,
6747:1, 6747:17,
6747:21, 6748:5,
6749:2, 6749:9,
6749:14, 6749:20,
6749:25, 6750:1,
6750:8, 6750:9,
6750:15, 6750:17,
6750:19, 6750:20,
6750:22, 6751:1,
6751:4, 6751:7,
6751:10, 6751:25,
6752:3, 6752:15,
6753:4, 6754:21,
6755:15, 6755:17,
6755:23, 6756:10,
6756:19, 6756:23,
6757:22, 6757:25,
6758:7, 6758:15,
6759:20, 6762:9,
6762:12, 6762:13,
6762:16, 6762:20,
6763:5, 6763:8,
6763:16, 6764:17,
6764:21, 6765:2,
6765:12, 6765:22,
6766:1, 6766:4,
6766:7, 6766:12,
6766:14, 6766:17,
6766:21, 6767:1,
6767:3, 6767:7,
6767:11, 6767:17,
6768:5, 6768:12,
6768:17, 6768:25,
6769:8, 6769:22,
6770:1, 6770:3,
6771:5, 6771:8,
6771:15, 6771:20,
6771:23, 6772:2,
6772:3, 6772:7,
6772:10, 6772:12,
6772:16, 6772:25,
6773:11
**MS** [130] - 6624:22,
6627:11, 6627:14,
6627:23, 6628:14,
6628:16, 6629:15,

6629:20, 6632:1,
6632:6, 6633:9,
6634:6, 6635:12,
6637:6, 6637:17,
6638:7, 6639:19,
6641:17, 6642:8,
6706:8, 6708:20,
6708:24, 6709:1,
6709:9, 6709:12,
6710:4, 6710:22,
6710:23, 6710:25,
6711:5, 6711:8,
6711:13, 6711:18,
6711:22, 6712:3,
6715:5, 6715:7,
6715:9, 6715:12,
6716:3, 6716:4,
6716:6, 6716:16,
6716:20, 6716:23,
6717:4, 6717:8,
6717:16, 6717:22,
6717:24, 6717:25,
6718:16, 6718:23,
6719:20, 6720:24,
6721:6, 6721:11,
6722:2, 6722:8,
6722:13, 6723:7,
6724:10, 6726:17,
6726:25, 6727:6,
6729:1, 6729:5,
6729:11, 6730:20,
6734:10, 6734:14,
6735:24, 6736:21,
6737:5, 6737:15,
6740:1, 6741:9,
6742:13, 6742:16,
6747:4, 6747:19,
6747:22, 6748:23,
6752:9, 6752:22,
6753:3, 6753:21,
6754:1, 6754:17,
6754:25, 6755:9,
6755:18, 6756:15,
6756:24, 6757:7,
6757:18, 6758:1,
6758:3, 6758:13,
6758:20, 6758:22,
6759:13, 6759:15,
6759:16, 6760:2,
6760:10, 6760:12,
6760:15, 6760:18,
6760:22, 6760:24,
6761:7, 6761:14,
6761:19, 6763:15,
6764:4, 6764:7,
6764:10, 6765:19,
6767:10, 6767:21,
6769:2, 6770:2,
6770:8, 6770:14,
6770:22, 6771:17,
6772:17, 6772:21,

6772:23
**multiple** [8] - 6694:21,
6696:25, 6726:19,
6727:22, 6728:9,
6730:18, 6731:11,
6732:20
**mumbling** [1] -
6654:18
**murder** [2] - 6692:20,
6743:18
**music** [1] - 6653:16
**must** [9] - 6638:19,
6640:3, 6641:25,
6642:19, 6731:11,
6751:19, 6752:11,
6762:4

---

# N

**name** [10] - 6644:6,
6658:23, 6682:4,
6684:16, 6689:13,
6699:9, 6706:13,
6706:14, 6713:12,
6713:14
**named** [3] - 6649:16,
6715:15, 6716:7
**names** [2] - 6676:7,
6676:11
**Nancy** [1] - 6641:2
**narrative** [1] - 6654:5
**natural** [2] - 6755:12,
6755:20
**Navy** [3] - 6667:5,
6667:15, 6667:16
**near** [4] - 6655:19,
6668:13, 6689:8,
6737:17
**nearby** [1] - 6714:1
**necessarily** [3] -
6642:11, 6698:17,
6730:4
**necessary** [3] -
6637:11, 6638:21,
6747:15
**need** [21] - 6668:7,
6677:6, 6677:11,
6678:5, 6678:9,
6683:3, 6688:4,
6696:17, 6696:19,
6715:10, 6719:6,
6730:8, 6739:5,
6740:15, 6743:22,
6755:6, 6757:19,
6767:22, 6768:25,
6773:15, 6773:16
**needed** [1] - 6645:19
**needs** [4] - 6733:12,
6752:24, 6755:3,
6770:12

**negate** [4] - 6742:9,
6742:17, 6743:7,
6749:17
**negated** [2] - 6639:11,
6640:21
**negotiator** [1] -
6707:4
**nervous** [1] - 6653:8
**NESTLER** [43] -
6621:15, 6626:3,
6626:8, 6626:14,
6627:3, 6627:9,
6643:22, 6644:3,
6647:16, 6648:1,
6648:10, 6649:14,
6650:9, 6650:10,
6650:20, 6651:2,
6651:5, 6651:13,
6651:15, 6661:21,
6670:15, 6670:22,
6671:9, 6671:14,
6671:25, 6673:11,
6675:5, 6678:13,
6686:22, 6696:8,
6696:14, 6704:4,
6704:16, 6705:18,
6705:23, 6706:4,
6750:9, 6750:20,
6762:9, 6762:12,
6762:16, 6767:17,
6772:2
**Nestler** [16] - 6643:21,
6671:3, 6671:6,
6674:14, 6679:10,
6690:2, 6695:21,
6697:7, 6700:8,
6700:15, 6702:12,
6703:5, 6703:9,
6704:14, 6705:22,
6771:24
**Nestler's** [2] -
6679:18, 6680:25
**neuropsychological**
[1] - 6652:15
**neuropsychologist**
[6] - 6626:5, 6644:9,
6644:10, 6644:12,
6673:22, 6684:5
**neuropsychologists**
[3] - 6699:12,
6699:21, 6699:25
**neuropsychology** [12]
- 6645:8, 6646:5,
6648:11, 6648:18,
6656:7, 6682:6,
6683:17, 6684:1,
6684:2, 6684:3,
6684:12, 6684:24
**Neuropsychology** [4]
- 6682:4, 6695:15,

6695:25, 6698:8
**never** [12] - 6628:1,
6667:13, 6673:21,
6678:2, 6681:1,
6681:14, 6728:1,
6728:2, 6732:4,
6762:2, 6766:17
**new** [2] - 6656:19,
6658:19, 6666:2
**news** [4] - 6746:4,
6746:5, 6749:2
**next** [32] - 6626:11,
6628:10, 6631:24,
6636:3, 6643:21,
6689:21, 6691:12,
6691:19, 6691:25,
6693:2, 6693:8,
6693:14, 6695:1,
6695:10, 6699:25,
6701:11, 6701:22,
6702:2, 6703:19,
6703:23, 6704:2,
6704:6, 6705:22,
6707:14, 6754:2,
6755:24, 6756:9,
6756:25, 6757:9,
6759:19, 6769:18,
6773:13
**next-to-the-last** [1] -
6695:1
**nice** [1] - 6643:20
**night** [2] - 6631:22,
6685:14
**nine** [2] - 6735:13,
6738:23
**nobody** [1] - 6625:3
**none** [4] - 6628:25,
6687:11, 6694:12,
6737:21
**nonresponsive** [1] -
6661:17
**nonspecific** [1] -
6666:7
**nonverbal** [3] -
6660:13, 6664:22,
6664:24
**normal** [6] - 6659:10,
6661:13, 6662:15,
6667:3, 6684:8
**normative** [2] -
6657:13, 6658:10
**norms** [1] - 6657:10
**Northwest** [7] -
6621:17, 6621:20,
6622:2, 6622:5,
6622:8, 6622:11,
6622:21
**note** [5] - 6627:23,
6638:17, 6688:3,
6725:25, 6740:5

**noted** [4] - 6629:15, 6689:21, 6723:19, 6724:1
**noteworthy** [1] - 6681:19
**nothing** [5] - 6630:23, 6636:18, 6687:14, 6725:2, 6748:9
**noticed** [1] - 6637:17
**nuances** [1] - 6662:17
**Number** [1] - 6621:3
**number** [13] - 6626:22, 6628:19, 6634:16, 6636:17, 6636:18, 6692:12, 6692:15, 6692:25, 6696:3, 6710:22, 6717:21, 6767:4
**numbering** [1] - 6631:18
**numbers** [3] - 6625:13, 6625:15, 6631:24

**O**

**Oak** [1] - 6622:16
**Oath** [6] - 6737:21, 6753:16, 6763:10, 6763:24, 6764:12, 6765:8
**oath** [2] - 6627:8, 6627:17
**object** [11] - 6716:3, 6716:16, 6717:9, 6736:13, 6736:14, 6750:9, 6750:15, 6754:17, 6760:14, 6762:9, 6769:21
**object's** [1] - 6761:11
**objected** [1] - 6711:10
**objection** [31] - 6632:5, 6632:6, 6633:9, 6647:22, 6650:6, 6650:15, 6661:17, 6669:17, 6669:23, 6670:21, 6671:11, 6671:13, 6673:11, 6675:5, 6678:13, 6704:4, 6704:9, 6708:20, 6711:5, 6717:4, 6721:9, 6739:1, 6746:11, 6752:7, 6752:21, 6753:20, 6753:25, 6754:16, 6756:24, 6757:8, 6761:13
**objections** [2] - 6625:6, 6773:10

**objective** [4] - 6652:15, 6657:12, 6657:17, 6657:19
**objectively** [1] - 6657:9
**obligated** [1] - 6686:13
**obstruct** [16] - 6638:3, 6639:16, 6640:20, 6736:2, 6753:8, 6754:6, 6755:14, 6755:21, 6757:15, 6758:4, 6758:8, 6758:11, 6758:18, 6759:6, 6759:12, 6761:25
**obstructed** [1] - 6639:3
**obstructing** [2] - 6638:2, 6639:15
**obstruction** [7] - 6632:21, 6638:14, 6641:13, 6754:11, 6754:19, 6755:7, 6755:11
**obvious** [2] - 6685:1, 6752:5
**occurred** [2] - 6625:1, 6737:16
**occurrence** [1] - 6639:4
**odd** [1] - 6753:5
**OF** [5] - 6621:1, 6621:3, 6621:11, 6774:1, 6774:9
**offense** [11] - 6639:20, 6640:4, 6641:25, 6642:1, 6642:18, 6642:19, 6724:25, 6725:12, 6742:10, 6755:19, 6761:9
**offenses** [15] - 6634:10, 6634:11, 6641:21, 6642:17, 6724:19, 6742:18, 6742:19, 6743:3, 6743:8, 6743:13, 6743:14, 6751:20, 6752:12, 6752:20
**offer** [4] - 6626:4, 6709:19, 6712:21, 6715:3
**offered** [1] - 6687:5
**Office** [4] - 6621:17, 6621:19, 6622:13, 6681:3
**office** [6] - 6651:25, 6679:18, 6680:25, 6681:1, 6696:12, 6731:14

**Officer** [11] - 6705:24, 6711:2, 6712:17, 6714:5, 6715:13, 6716:21, 6719:25, 6720:1, 6720:3, 6720:4, 6735:8
**officer** [12] - 6706:14, 6706:24, 6707:3, 6707:24, 6708:2, 6709:2, 6710:5, 6715:19, 6721:7, 6721:12, 6721:22, 6722:3
**officers** [8] - 6663:15, 6663:18, 6706:25, 6707:1, 6713:17, 6758:9, 6759:6, 6759:10
**Offices** [1] - 6622:7
**OFFICIAL** [1] - 6774:1
**Official** [1] - 6622:21
**official** [15] - 6638:15, 6736:2, 6738:6, 6753:8, 6754:7, 6754:11, 6755:7, 6755:14, 6755:21, 6759:7, 6759:11, 6760:7, 6761:4, 6761:12
**often** [2] - 6661:8, 6746:19
**oftentimes** [2] - 6655:21, 6717, 6656:25
**Ohio** [3] - 6644:23, 6647:2, 6682:2
**old** [3] - 6662:12, 6662:19, 6714:17
**once** [6] - 6653:12, 6660:12, 6714:6, 6714:8, 6755:5, 6769:11
**one** [76] - 6625:15, 6627:2, 6628:10, 6628:12, 6629:4, 6629:16, 6631:23, 6633:7, 6634:6, 6635:7, 6635:8, 6637:13, 6638:8, 6640:18, 6641:11, 6641:14, 6645:4, 6650:13, 6650:21, 6654:6, 6654:8, 6662:21, 6663:2, 6674:9, 6674:11, 6674:12, 6675:6, 6677:1, 6680:13, 6686:19, 6689:2, 6689:16, 6689:17, 6694:19, 6696:25, 6697:7, 6697:12,

6702:12, 6703:24, 6704:24, 6707:1, 6710:1, 6713:6, 6717:5, 6720:6, 6726:18, 6728:13, 6728:20, 6730:25, 6731:8, 6731:9, 6731:19, 6733:2, 6733:15, 6735:20, 6736:18, 6738:12, 6738:17, 6741:11, 6746:8, 6746:17, 6749:6, 6749:23, 6750:3, 6755:1, 6758:9, 6758:22, 6760:2, 6769:20, 6770:18, 6771:8, 6773:11
**one-word** [1] - 6654:8
**one-year** [1] - 6645:4
**ones** [4] - 6647:21, 6656:17, 6694:13, 6758:23
**open** [1] - 6754:21
**opening** [4] - 6739:9, 6739:25, 6741:24, 6742:1
**openings** [1] - 6731:16
**operate** [3] - 6698:1, 6698:5, 6698:10
**operation** [4] - 6753:16, 6763:11, 6763:25, 6764:13
**operations** [1] - 6763:17
**opine** [2] - 6671:6, 6717:6
**opinion** [10] - 6649:1, 6649:3, 6649:5, 6664:1, 6664:11, 6666:18, 6705:15, 6747:9
**opinions** [3] - 6648:20, 6648:22, 6682:20
**opportunity** [3] - 6703:4, 6703:9, 6724:6
**oppose** [3] - 6642:11, 6723:23, 6746:24
**opposed** [2] - 6630:1, 6762:14
**opposes** [1] - 6638:7
**opposite** [1] - 6735:8
**oral** [1] - 6645:22
**orally** [1] - 6628:7
**order** [11] - 6641:22, 6649:19, 6656:16, 6676:8, 6682:18,

6698:23, 6739:20, 6739:23, 6739:24, 6748:18, 6765:18
**ordered** [1] - 6744:1
**orders** [1] - 6742:2
**ordinarily** [1] - 6648:20
**organization** [3] - 6632:1, 6632:8, 6645:16
**organizations** [1] - 6693:14
**organized** [4] - 6753:19, 6753:21, 6764:2, 6764:16
**organizers** [3] - 6753:17, 6764:1, 6764:14
**orientation** [1] - 6703:24
**originally** [3] - 6634:17, 6700:13, 6702:22
**Orlando** [2] - 6622:14, 6651:23
**others'** [1] - 6662:16
**otherwise** [4] - 6624:7, 6636:23, 6678:20, 6753:6
**ouch** [1] - 6752:15
**ought** [3] - 6626:16, 6727:25, 6728:3
**outside** [1] - 6627:16
**outweighed** [1] - 6649:3
**overall** [5] - 6634:2, 6648:8, 6688:14, 6689:7, 6719:13
**overarching** [2] - 6642:3, 6642:5
**overexplain** [1] - 6639:7
**overly** [1] - 6666:21
**overruled** [2] - 6661:19, 6669:19
**overrun** [1] - 6710:12
**oversight** [1] - 6772:18
**overuse** [1] - 6635:23
**own** [6] - 6660:4, 6660:15, 6664:10, 6700:2, 6702:21, 6749:17
**owned** [1] - 6678:19
**ownership** [1] - 6628:20

**P**

**P.A** [2] - 6622:10,

6622:13
**p.m** [4] - 6621:8, 6672:10, 6773:17
**page** [64] - 6624:12, 6624:13, 6624:15, 6624:24, 6624:25, 6625:10, 6625:13, 6625:15, 6625:22, 6626:11, 6627:7, 6629:7, 6631:18, 6631:24, 6632:25, 6633:2, 6633:11, 6633:18, 6634:7, 6634:17, 6634:20, 6635:1, 6635:6, 6635:9, 6636:3, 6636:10, 6637:16, 6638:8, 6675:25, 6680:3, 6683:3, 6683:9, 6683:11, 6694:14, 6695:1, 6695:10, 6695:23, 6695:24, 6696:2, 6696:3, 6697:7, 6697:12, 6698:7, 6699:4, 6699:16, 6700:8, 6700:11, 6700:14, 6700:16, 6700:19, 6701:24, 6702:2, 6702:11, 6702:12, 6702:15, 6702:16, 6726:1, 6726:16, 6727:1
**pages** [5] - 6696:7, 6696:13, 6696:16, 6696:21, 6771:24
**pagination** [1] - 6631:23
**paid** [7] - 6678:15, 6678:20, 6679:4, 6679:5, 6679:6, 6679:7, 6679:20
**Palian** [3] - 6747:3, 6747:23, 6748:10
**papers** [1] - 6744:6
**paragraph** [29] - 6626:16, 6627:7, 6627:15, 6627:18, 6633:4, 6633:19, 6634:7, 6635:1, 6635:10, 6670:10, 6683:13, 6699:15, 6699:16, 6699:18, 6701:23, 6702:7, 6702:9, 6703:3, 6726:2, 6749:3, 6754:2, 6755:25, 6756:25, 6757:9, 6759:19, 6761:21, 6762:9, 6763:5,

6763:7
**parallel** [1] - 6761:9
**parcel** [1] - 6732:10
**pardon** [3] - 6708:16, 6745:15, 6745:25
**Park** [1] - 6622:5
**parker** [1] - 6625:11
**Parker** [12] - 6621:19, 6621:22, 6636:15, 6752:16, 6752:17, 6757:10, 6758:1, 6758:22, 6758:24, 6758:25, 6759:9, 6765:3
**PARKER** [2] - 6621:6, 6621:7
**Parker's** [3] - 6628:20, 6765:5
**Parkers** [4] - 6728:18, 6729:10, 6729:17, 6763:13
**part** [28] - 6632:15, 6634:19, 6636:25, 6640:22, 6651:25, 6656:5, 6664:24, 6677:23, 6685:20, 6690:21, 6694:5, 6694:10, 6702:23, 6708:16, 6710:20, 6721:15, 6724:23, 6726:11, 6728:10, 6730:21, 6732:10, 6732:17, 6733:1, 6733:3, 6756:15, 6761:25, 6763:18
**partially** [1] - 6649:4
**participant's** [1] - 6624:18
**participate** [7] - 6753:16, 6763:10, 6763:21, 6763:24, 6764:2, 6764:12, 6764:15
**participated** [1] - 6731:3
**participating** [1] - 6753:18
**participation** [2] - 6728:16, 6731:7
**particular** [9] - 6629:11, 6632:10, 6664:6, 6707:16, 6717:2, 6725:12, 6728:14, 6749:11, 6749:24
**parties** [3] - 6674:11, 6674:12, 6722:21
**parts** [1] - 6708:18
**pass** [2] - 6667:10, 6667:13

**passes** [1] - 6764:7
**passing** [1] - 6729:8
**past** [7] - 6628:7, 6631:7, 6656:18, 6676:25, 6727:9, 6769:17, 6772:25
**patients** [2] - 6673:14, 6673:15
**patterns** [1] - 6666:1
**pause** [6] - 6643:7, 6709:13, 6711:1, 6713:11, 6721:25, 6769:10
**pay** [3] - 6678:12, 6678:17, 6678:22
**peace** [1] - 6764:20
**peaceful** [1] - 6668:16
**peculiar** [1] - 6697:21
**peer** [1] - 6645:18
**Pelosi** [1] - 6641:2
**penalty** [6] - 6627:12, 6681:8, 6681:10, 6688:19, 6688:20, 6688:25
**pence** [1] - 6642:24
**Pennsylvania** [2] - 6621:23, 6622:8
**pension** [2] - 6678:15, 6678:20
**pensive** [1] - 6664:18
**penultimate** [2] - 6762:9, 6762:11
**people** [57] - 6625:8, 6631:1, 6635:20, 6635:22, 6636:21, 6647:4, 6647:8, 6653:2, 6657:10, 6660:5, 6661:9, 6665:15, 6665:16, 6666:13, 6666:15, 6666:20, 6668:15, 6673:17, 6673:19, 6673:20, 6676:6, 6677:6, 6677:9, 6677:11, 6682:8, 6682:10, 6682:11, 6683:23, 6683:24, 6688:25, 6689:4, 6689:10, 6690:11, 6693:3, 6694:6, 6697:3, 6698:5, 6698:6, 6698:9, 6700:19, 6702:16, 6703:25, 6704:3, 6710:7, 6712:25, 6713:3, 6720:15, 6728:12, 6732:24, 6735:11, 6736:19, 6737:24, 6741:13, 6743:15, 6750:12,

6763:18
**people's** [3] - 6656:6, 6656:8, 6664:9
**perceive** [4] - 6656:14, 6668:9, 6668:13, 6701:7
**perceived** [1] - 6702:3
**percent** [4] - 6669:1, 6749:3, 6770:14, 6770:17
**percentile** [2] - 6658:7, 6658:10
**perception** [6] - 6657:7, 6660:18, 6660:24, 6661:15, 6662:13
**perfect** [3] - 6659:4, 6750:8
**perfectly** [1] - 6670:17
**perform** [2] - 6657:25, 6666:3
**performance** [1] - 6759:10
**performed** [5] - 6657:23, 6700:3, 6705:6, 6705:9, 6705:11
**perhaps** [4] - 6657:11, 6708:16, 6729:17, 6768:20
**period** [2] - 6707:16, 6749:7
**perjury** [1] - 6627:12
**permitted** [4] - 6732:8, 6746:15, 6748:17, 6749:11
**person** [22] - 6639:14, 6646:12, 6649:16, 6652:6, 6660:2, 6660:14, 6667:22, 6671:24, 6677:24, 6680:16, 6692:12, 6697:25, 6698:4, 6698:9, 6699:5, 6700:13, 6702:1, 6702:4, 6702:5, 6703:21, 6716:11, 6737:1
**personal** [2] - 6753:17, 6764:13
**personally** [1] - 6767:19
**persons** [2] - 6632:2, 6632:8
**perspective** [8] - 6660:5, 6660:15, 6663:25, 6699:13, 6699:22, 6700:2, 6700:21, 6701:3
**perspectives** [1] -

6662:16
**persuaded** [3] - 6741:23, 6741:24, 6742:3
**pertinent** [1] - 6652:11
**PETER** [1] - 6622:2
**Ph.D** [3] - 6644:23, 6644:25, 6645:4
**phone** [10] - 6636:17, 6636:18, 6669:25, 6686:11, 6711:6, 6716:17, 6747:10, 6760:5, 6760:9, 6761:1
**photograph** [3] - 6707:24, 6708:4, 6708:8
**phrase** [5] - 6645:13, 6659:24, 6665:22, 6749:5, 6749:6
**phrased** [1] - 6762:15
**physical** [2] - 6667:10, 6667:13
**pick** [2] - 6699:1, 6723:21
**picture** [1] - 6718:8
**piece** [1] - 6751:14
**Pine** [1] - 6622:14
**Pinkerton** [4] - 6734:19, 6736:21, 6737:2, 6737:8
**pins** [1] - 6713:19
**pistol** [1] - 6707:19
**place** [8] - 6635:3, 6638:11, 6639:9, 6642:15, 6661:10, 6710:17, 6718:5, 6737:19
**placed** [3] - 6641:11, 6687:22, 6741:6
**places** [1] - 6681:20
**Plaintiff** [1] - 6621:4
**plan** [2] - 6735:6, 6761:25
**plane** [1] - 6770:13
**planned** [1] - 6630:5
**planning** [2] - 6626:4, 6673:21
**plans** [5] - 6673:17, 6762:1, 6771:4, 6771:6, 6771:10
**plant** [1] - 6728:2
**play** [5] - 6653:15, 6709:2, 6709:7, 6710:1, 6711:3, 6711:23, 6718:13, 6721:3, 6768:8
**played** [8] - 6709:8, 6709:11, 6710:3, 6710:24, 6712:2,

6718:15, 6718:22, 6772:19

**playing** [2] - 6718:17, 6721:4

**plays** [1] - 6717:11

**plea** [2] - 6624:24, 6682:1

**PLLC** [1] - 6622:16

**plus** [1] - 6677:19

**point** [23] - 6627:2, 6638:14, 6648:10, 6648:13, 6653:14, 6653:18, 6661:22, 6667:2, 6668:19, 6674:1, 6683:20, 6701:7, 6701:18, 6703:10, 6704:11, 6711:5, 6712:17, 6712:21, 6729:13, 6734:5, 6744:5, 6746:17, 6754:23

**pointed** [1] - 6747:25

**Police** [5] - 6705:24, 6706:16, 6706:20, 6706:23, 6713:4

**police** [4] - 6663:15, 6663:17, 6668:15, 6706:24

**poorly** [1] - 6702:3

**population** [2] - 6698:14, 6698:18

**portion** [5] - 6626:24, 6649:10, 6704:19, 6722:17, 6733:22

**portions** [1] - 6704:5

**poses** [1] - 6697:21

**posit** [1] - 6745:19

**position** [4] - 6638:6, 6661:10, 6681:14, 6770:3

**positions** [1] - 6706:22

**possess** [2] - 6630:18, 6631:11

**possessed** [1] - 6642:1

**possession** [1] - 6631:7

**possibility** [3] - 6728:21, 6732:20, 6771:1

**possible** [3] - 6649:22, 6649:23, 6713:19

**post** [3] - 6637:8, 6646:17, 6707:2

**post-academy** [1] - 6707:2

**post-dating** [1] - 6637:8

**post-traumatic** [1] - 6646:17

**potential** [7] - 6629:3, 6688:19, 6729:16, 6730:1, 6732:12, 6733:6, 6738:21

**potentially** [3] - 6673:10, 6679:3, 6727:19

**pout** [1] - 6741:17

**practice** [1] - 6684:22

**preceded** [1] - 6688:1

**precise** [1] - 6754:20

**precluded** [3] - 6704:5, 6746:17, 6747:4

**prefer** [3] - 6640:1, 6642:8, 6763:1

**prejudices** [1] - 6687:16

**preliminary** [1] - 6681:25

**prepare** [1] - 6772:8

**prepared** [3] - 6722:7, 6722:8, 6769:20

**prerecorded** [1] - 6648:9

**presence** [25] - 6638:1, 6638:10, 6638:20, 6639:1, 6639:11, 6639:13, 6639:20, 6639:23, 6640:2, 6640:6, 6640:11, 6640:19, 6640:25, 6641:1, 6641:5, 6641:6, 6641:19, 6641:22, 6642:13, 6643:13, 6724:3, 6724:12, 6724:14, 6724:15, 6724:18

**present** [11] - 6624:2, 6624:4, 6625:24, 6632:2, 6632:8, 6642:9, 6751:18, 6753:15, 6763:9, 6763:13, 6763:23

**presentations** [3] - 6693:2, 6693:5, 6693:6

**presented** [7] - 6641:15, 6658:20, 6693:3, 6700:10, 6723:24, 6727:7, 6756:4

**preserve** [1] - 6765:18

**president** [9] - 6739:10, 6739:19, 6741:11, 6741:12, 6742:3, 6743:2,

6743:15, 6745:11, 6745:20

**President** [4] - 6740:9, 6742:8, 6744:1, 6744:7

**president's** [10] - 6740:3, 6741:23, 6741:24, 6742:3, 6743:5, 6743:6, 6743:7, 6744:22, 6764:4, 6764:9

**pressed** [1] - 6703:20

**presumption** [3] - 6703:1, 6703:12, 6703:14

**pretty** [2] - 6696:1, 6731:24

**prevent** [2] - 6736:3, 6753:9

**preventing** [1] - 6725:7

**previously** [4] - 6625:2, 6626:20, 6647:17, 6729:7

**primarily** [3] - 6655:13, 6656:7, 6656:13

**Princeton** [1] - 6644:19

**principle** [5] - 6638:10, 6638:13, 6638:16, 6724:20, 6725:5

**principles** [4] - 6634:9, 6637:18, 6638:9, 6642:12

**printed** [1] - 6772:13

**private** [1] - 6706:18

**privately** [1] - 6771:3

**probable** [2] - 6755:13, 6755:20

**problem** [7] - 6628:3, 6652:18, 6656:19, 6666:6, 6670:24, 6724:17, 6737:18

**problem-solving** [1] - 6652:18

**problems** [2] - 6655:3, 6697:22

**proceed** [1] - 6745:6

**proceeding** [15] - 6627:25, 6638:2, 6638:4, 6638:15, 6736:2, 6753:8, 6754:7, 6754:11, 6755:8, 6755:11, 6755:14, 6755:22, 6760:7, 6761:4, 6761:12

**proceedings** [5] -

6641:1, 6641:6, 6642:25, 6759:22, 6774:4

**Proceedings** [2] - 6622:24, 6773:17

**process** [3] - 6645:9, 6649:19, 6740:25

**processes** [1] - 6684:4

**produced** [2] - 6622:25, 6647:21

**producing** [1] - 6658:23

**profession** [4] - 6645:2, 6646:7, 6695:16, 6697:3

**professional** [3] - 6648:23, 6679:1, 6693:14

**Professional** [1] - 6645:15

**pronoun** [2] - 6637:19, 6637:21

**proof** [6] - 6628:4, 6630:5, 6630:13, 6631:12, 6632:14, 6636:19

**proper** [1] - 6686:20

**properly** [1] - 6743:2

**property** [15] - 6678:20, 6734:20, 6735:7, 6735:9, 6735:20, 6735:21, 6736:4, 6736:6, 6736:7, 6737:6, 6737:12, 6737:16, 6756:1, 6756:5, 6756:8

**proposal** [3] - 6742:21, 6745:15, 6750:22

**proposed** [4] - 6641:14, 6734:17, 6745:21, 6748:25

**proposing** [2] - 6627:15, 6627:16

**prosecution** [9] - 6646:22, 6688:23, 6689:17, 6692:21, 6692:22, 6692:24, 6695:13, 6695:14, 6705:11

**prosecutors** [3] - 6685:4, 6685:11, 6685:15

**prosody** [1] - 6702:3

**protected** [2] - 6759:13, 6759:17

**protection** [1] - 6713:18

**protest** [1] - 6668:16

**prove** [24] - 6731:9, 6751:18, 6751:19, 6751:21, 6752:11, 6752:18, 6752:25, 6753:7, 6753:11, 6753:13, 6754:5, 6754:7, 6754:9, 6754:12, 6754:14, 6754:18, 6755:3, 6757:12, 6757:13, 6758:10, 6759:2, 6759:4, 6760:5, 6761:2

**proved** [2] - 6632:10, 6756:3

**proven** [6] - 6743:2, 6756:6, 6757:3, 6758:15, 6759:8, 6759:23

**proves** [1] - 6639:3

**provide** [8] - 6654:4, 6654:5, 6722:20, 6740:15, 6753:17, 6763:25, 6764:13, 6764:23

**provided** [3] - 6624:14, 6687:7, 6694:8

**provides** [2] - 6630:12, 6740:16

**providing** [1] - 6741:1

**proving** [1] - 6639:20

**proximity** [1] - 6729:18

**prudent** [1] - 6724:24

**psychiatry** [1] - 6704:22

**psychological** [3] - 6663:21, 6684:13, 6684:22

**psychologist** [8] - 6644:12, 6645:6, 6672:25, 6673:23, 6674:7, 6683:19, 6704:25, 6705:2

**psychologists** [2] - 6694:1

**psychology** [14] - 6644:24, 6644:25, 6645:10, 6645:12, 6646:4, 6647:8, 6673:1, 6684:18, 6684:20, 6684:21, 6704:18, 6704:19, 6704:21

**Psychology** [3] - 6645:15, 6682:5, 6682:6

**psychopathy** [1] -

6702:9
**public** [16] - 6692:10, 6738:25, 6739:3, 6739:17, 6739:22, 6740:2, 6740:20, 6740:25, 6741:2, 6742:5, 6742:20, 6743:1, 6743:10, 6745:10, 6745:14, 6745:21
**publications** [2] - 6693:8, 6693:11
**publish** [3] - 6708:18, 6710:20, 6717:19
**pull** [9] - 6641:19, 6647:11, 6667:12, 6717:18, 6719:5, 6719:6, 6725:15, 6766:9, 6767:13
**pull-ups** [1] - 6667:12
**punctuate** [1] - 6685:1
**purpose** [7] - 6639:11, 6640:21, 6730:18, 6731:4, 6731:11, 6745:8, 6765:6
**purposes** [2] - 6673:15, 6728:13
**pursuant** [1] - 6739:24
**push** [2] - 6667:12, 6735:17
**push-ups** [1] - 6667:12
**pushed** [1] - 6669:11
**put** [30] - 6627:2, 6631:6, 6634:3, 6639:9, 6640:16, 6643:7, 6653:14, 6661:2, 6661:22, 6663:24, 6687:24, 6700:19, 6710:8, 6725:17, 6729:15, 6733:24, 6736:13, 6738:1, 6738:20, 6740:6, 6740:13, 6745:9, 6749:5, 6751:20, 6756:11, 6765:2, 6765:3, 6766:24, 6769:10, 6769:19
**puts** [1] - 6741:20
**putting** [3] - 6663:5, 6739:11, 6746:24

## Q

**QRF** [1] - 6630:11
**qualifications** [3] - 6645:17, 6648:14, 6648:16
**qualified** [2] - 6648:4,

6648:24
**qualify** [1] - 6648:11
**quantify** [1] - 6676:12
**quest** [1] - 6761:24
**questionable** [1] - 6676:24
**questioning** [1] - 6690:2
**Questionnaire** [1] - 6661:8
**questionnaire** [3] - 6657:8, 6661:7, 6675:24
**questionnaires** [1] - 6652:19
**questions** [20] - 6626:19, 6626:21, 6639:8, 6652:11, 6662:1, 6663:11, 6671:25, 6672:20, 6678:6, 6684:23, 6684:25, 6704:12, 6705:7, 6705:18, 6715:5, 6720:8, 6722:2, 6740:6, 6740:7, 6745:9
**queues** [3] - 6666:14, 6666:22, 6701:25
**quick** [1] - 6700:24
**quickly** [1] - 6650:16
**quite** [6] - 6653:10, 6666:11, 6672:2, 6687:25, 6703:24, 6735:7
**quote** [2] - 6641:23, 6749:7
**quoting** [4] - 6642:11, 6663:3, 6740:7, 6758:19

## R

**raise** [3] - 6734:5, 6739:8, 6770:6
**raised** [2] - 6631:7, 6743:2
**Rakoczy** [5] - 6724:5, 6724:8, 6724:9, 6743:12, 6755:17
**RAKOCZY** [49] - 6621:15, 6624:22, 6627:14, 6627:23, 6628:14, 6628:16, 6629:15, 6629:20, 6632:1, 6632:6, 6633:9, 6634:6, 6635:12, 6637:6, 6637:17, 6638:7, 6639:19, 6641:17, 6642:8, 6722:8,

6723:7, 6724:10, 6726:17, 6727:6, 6730:20, 6734:10, 6735:24, 6736:21, 6737:5, 6740:1, 6741:9, 6742:13, 6742:16, 6747:4, 6747:19, 6748:23, 6752:9, 6752:22, 6754:1, 6754:17, 6754:25, 6755:9, 6755:18, 6756:15, 6756:24, 6757:7, 6761:7, 6769:2, 6772:21
**rally** [6] - 6739:18, 6763:14, 6763:19, 6764:5, 6764:9, 6765:7
**ran** [1] - 6708:10
**range** [5] - 6659:9, 6659:14, 6661:13, 6675:20, 6675:21
**rate** [1] - 6654:11
**rather** [7] - 6646:24, 6697:21, 6739:2, 6747:3, 6751:19, 6752:11, 6753:14
**reach** [3] - 6661:23, 6724:8, 6771:9
**reached** [1] - 6753:12
**reaching** [1] - 6768:21
**reaction** [1] - 6742:21
**read** [31] - 6629:17, 6632:9, 6660:12, 6666:21, 6683:14, 6686:10, 6696:16, 6696:19, 6696:20, 6698:14, 6699:19, 6699:23, 6699:24, 6700:5, 6700:8, 6701:11, 6701:15, 6702:3, 6703:12, 6704:6, 6747:24, 6748:15, 6748:17, 6751:10, 6751:17, 6755:17, 6757:22, 6758:25, 6760:20, 6760:23, 6769:3
**reading** [7] - 6664:8, 6671:3, 6762:18, 6762:21, 6764:25, 6768:23, 6768:24
**reads** [2] - 6634:8, 6701:13
**ready** [2] - 6643:20, 6685:5
**real** [2] - 6633:14, 6700:24
**realized** [1] - 6668:18

**really** [9] - 6625:4, 6642:10, 6680:14, 6691:2, 6699:24, 6700:19, 6710:11, 6735:19, 6768:5
**realm** [1] - 6704:18
**reason** [6] - 6632:18, 6668:21, 6677:9, 6699:3, 6727:2, 6738:14
**reasonable** [30] - 6632:11, 6635:16, 6640:13, 6725:10, 6733:14, 6736:1, 6738:6, 6738:15, 6751:20, 6752:13, 6752:19, 6753:1, 6753:7, 6754:5, 6754:8, 6754:9, 6754:14, 6756:3, 6756:6, 6757:3, 6757:12, 6757:14, 6758:10, 6758:16, 6759:3, 6759:4, 6759:8, 6759:24, 6760:5, 6761:2
**reasonably** [4] - 6736:5, 6736:8, 6736:23, 6737:12
**reasoning** [2] - 6630:25, 6652:18
**reasons** [5] - 6638:8, 6648:22, 6649:2, 6713:6, 6752:5
**rebuttal** [3] - 6624:10, 6747:3, 6768:10
**receive** [1] - 6677:14
**received** [3] - 6647:25, 6769:12, 6772:6
**RECEIVED** [1] - 6623:10
**receives** [1] - 6677:13
**receiving** [1] - 6675:2
**recent** [1] - 6679:16
**Recess** [1] - 6672:10
**reciprocal** [1] - 6653:19
**recognize** [9] - 6664:17, 6671:16, 6707:24, 6718:18, 6719:1, 6721:7, 6721:12, 6721:16
**recognized** [2] - 6673:4, 6695:16
**recognizing** [1] - 6664:20
**recollection** [4] - 6715:19, 6719:10, 6739:14, 6739:16
**recommendations** [1]

- 6682:20
**record** [9] - 6663:3, 6692:10, 6696:15, 6708:25, 6723:19, 6723:22, 6723:23, 6725:17, 6774:4
**recorded** [1] - 6622:24
**records** [19] - 6646:10, 6646:12, 6649:20, 6649:23, 6650:3, 6650:5, 6650:11, 6651:17, 6661:14, 6661:16, 6661:20, 6662:3, 6662:6, 6662:22, 6662:25, 6663:2, 6679:5, 6680:12, 6771:25
**recovered** [1] - 6748:16
**Red** [2] - 6724:11, 6747:17
**redact** [1] - 6711:16
**redacted** [2] - 6711:19, 6771:24
**redactions** [1] - 6647:18
**redden** [1] - 6767:9
**REDDEN** [11] - 6622:15, 6760:2, 6760:10, 6760:12, 6760:15, 6760:18, 6760:22, 6760:24, 6761:14, 6761:19, 6767:10
**Redden** [3] - 6622:16, 6760:21, 6761:13
**REDIRECT** [2] - 6704:15, 6721:5
**Redirect** [2] - 6623:5, 6623:7
**redirect** [5] - 6627:4, 6704:14, 6720:23
**redline** [4] - 6624:15, 6626:16, 6751:14, 6773:7
**reduced** [1] - 6770:7
**redundant** [1] - 6659:19
**refer** [2] - 6676:23, 6696:24
**reference** [2] - 6627:12, 6726:15
**referenced** [1] - 6732:5
**references** [1] - 6637:18
**referencing** [1] - 6662:21
**referrals** [2] - 6646:10,

6673:25
**referred** [2] - 6649:10, 6655:24
**refers** [1] - 6700:17
**reflects** [2] - 6655:13, 6734:3
**reframe** [1] - 6670:22
**refute** [2] - 6752:25, 6756:4
**regard** [2] - 6628:19, 6667:15
**regarding** [13] - 6628:20, 6652:11, 6658:1, 6661:9, 6661:11, 6661:23, 6663:14, 6664:11, 6668:7, 6668:10, 6702:25, 6746:9, 6759:25
**regardless** [1] - 6687:1
**regular** [1] - 6673:22
**relate** [1] - 6631:19
**related** [8] - 6646:18, 6647:8, 6653:17, 6656:21, 6661:3, 6678:15, 6734:14, 6762:6
**relationship** [2] - 6636:20, 6684:3
**relatively** [1] - 6667:2
**reliance** [1] - 6742:17
**relief** [1] - 6688:4
**rely** [6] - 6661:19, 6687:19, 6695:19, 6697:3, 6703:11, 6763:2
**relying** [1] - 6687:9
**remaining** [4] - 6633:21, 6643:3, 6643:5, 6757:1
**remedied** [1] - 6758:6
**remedy** [3] - 6686:21, 6686:23, 6686:24
**remember** [6] - 6637:14, 6656:18, 6669:6, 6705:7, 6709:14, 6709:16
**remembered** [2] - 6669:21, 6719:8
**remembering** [1] - 6669:7
**remembers** [1] - 6670:9
**remind** [1] - 6648:19
**reminder** [1] - 6629:2
**remote** [1] - 6687:6
**remove** [1] - 6771:12
**removed** [4] - 6624:20, 6625:25,

6760:4, 6760:25
**removing** [1] - 6627:7
**renew** [1] - 6723:11
**renewing** [1] - 6723:16
**rent** [1] - 6678:17
**repeat** [3] - 6635:13, 6675:7, 6751:23
**repeating** [1] - 6720:19
**repetitive** [2] - 6640:10, 6655:5
**rephrase** [2] - 6650:7, 6721:10
**replicating** [1] - 6629:23
**report** [23] - 6651:2, 6651:3, 6651:8, 6651:10, 6651:14, 6651:18, 6657:6, 6657:14, 6657:16, 6661:7, 6662:13, 6662:18, 6664:7, 6666:19, 6670:8, 6670:10, 6671:23, 6675:15, 6675:25, 6677:7, 6680:15, 6707:7
**reported** [1] - 6657:5
**REPORTER** [2] - 6774:1, 6774:9
**Reporter** [1] - 6622:21
**reporter** [1] - 6672:2
**reports** [1] - 6650:24
**represent** [1] - 6715:15
**representation** [1] - 6729:6
**reputation** [1] - 6649:11
**request** [7] - 6635:4, 6724:3, 6728:23, 6728:24, 6733:17, 6734:6, 6765:3
**requested** [6] - 6687:20, 6694:7, 6726:23, 6738:22, 6739:1, 6741:8
**requesting** [3] - 6636:5, 6636:23, 6734:18
**require** [4] - 6655:19, 6655:20, 6763:3, 6763:12
**required** [12] - 6635:14, 6638:18, 6641:22, 6642:1, 6642:2, 6642:17, 6642:18, 6642:20, 6725:12, 6751:18,

6751:21
**requirement** [3] - 6655:14, 6655:15, 6742:9
**requires** [1] - 6736:14
**requisite** [2] - 6725:11, 6762:5
**research** [3] - 6691:25, 6698:23, 6700:17
**resemble** [1] - 6704:3
**reserve** [1] - 6648:15
**Reserve** [1] - 6644:22
**resolve** [4] - 6746:3, 6748:13, 6773:15, 6773:16
**respect** [19] - 6626:12, 6632:21, 6633:12, 6634:5, 6638:13, 6640:13, 6668:23, 6687:22, 6727:13, 6732:24, 6738:16, 6739:12, 6742:10, 6759:22, 6760:3, 6760:24, 6761:7, 6761:8, 6762:6
**respectful** [1] - 6769:23
**respectfully** [2] - 6740:1, 6756:2
**responding** [1] - 6708:11
**response** [2] - 6712:15, 6741:6
**responses** [2] - 6662:2, 6748:3
**responsibility** [2] - 6749:5, 6749:17
**responsible** [3] - 6756:18, 6756:20, 6756:21
**rest** [7] - 6698:1, 6698:10, 6698:14, 6722:7, 6722:8, 6761:16, 6765:15
**rested** [1] - 6773:1
**restricted** [4] - 6633:21, 6633:22, 6757:2, 6762:6
**restrictive** [1] - 6655:4
**restroom** [1] - 6706:2
**rests** [1] - 6722:14
**result** [8] - 6676:1, 6754:10, 6754:19, 6755:4, 6755:7, 6756:13, 6757:5, 6762:7
**results** [1] - 6657:21
**resume** [5] - 6672:4, 6690:9, 6690:22,

6771:23
**returned** [1] - 6770:12
**revealed** [1] - 6658:16
**review** [11] - 6646:11, 6646:12, 6647:24, 6649:19, 6649:25, 6657:16, 6662:3, 6679:5, 6680:13, 6680:15
**reviewed** [8] - 6626:18, 6645:18, 6650:3, 6650:5, 6650:11, 6657:14, 6662:7, 6680:12
**reviewing** [2] - 6651:16, 6687:3
**revised** [1] - 6624:9
**revisit** [1] - 6709:4
**rewording** [1] - 6752:24
**rhetoric** [1] - 6745:1
**Rhodes** [17] - 6727:18, 6727:25, 6728:4, 6728:14, 6729:22, 6730:12, 6730:22, 6732:7, 6732:8, 6732:10, 6732:14, 6732:22, 6732:23, 6732:24, 6752:1, 6752:6, 6770:9
**rid** [1] - 6750:20
**rifle** [1] - 6707:20
**rifles** [1] - 6730:2
**rightful** [1] - 6747:13
**rigid** [4] - 6665:21, 6665:25, 6666:4, 6666:11
**rioters** [6] - 6710:13, 6711:25, 6712:14, 6713:8, 6713:20, 6721:23
**risk** [4] - 6725:14, 6770:17, 6770:19, 6770:21
**road** [1] - 6739:21
**Road** [1] - 6622:5
**rob** [1] - 6736:18
**robbery** [1] - 6736:23
**Robertson** [1] - 6621:22
**roll** [3] - 6707:11, 6769:20, 6770:1
**Room** [1] - 6622:22
**room** [1] - 6770:20
**Rossi** [11] - 6687:10, 6715:6, 6739:13, 6740:5, 6741:18, 6745:13, 6767:2, 6769:7, 6769:25,

6771:22, 6772:4
**ROSSI** [43] - 6622:10, 6624:5, 6715:8, 6719:24, 6720:21, 6734:8, 6739:12, 6739:15, 6739:17, 6741:22, 6742:12, 6743:18, 6745:15, 6746:1, 6746:4, 6746:6, 6746:23, 6747:21, 6749:2, 6749:9, 6749:14, 6749:20, 6749:25, 6750:8, 6750:15, 6750:17, 6750:19, 6750:22, 6751:1, 6751:4, 6751:7, 6752:15, 6762:13, 6765:22, 6766:4, 6766:7, 6767:3, 6767:7, 6769:8, 6769:22, 6771:8, 6771:23, 6772:3
**Rossi's** [1] - 6739:8
**Rotunda** [2] - 6668:17, 6721:20
**rough** [1] - 6766:8
**row** [1] - 6771:8
**RPR** [1] - 6622:21
**Rule** [3] - 6723:12, 6723:17, 6735:4
**rule** [4] - 6686:14, 6686:20, 6686:23, 6708:20
**ruled** [2] - 6629:23, 6767:23
**Rules** [1] - 6748:18
**rules** [1] - 6687:1
**ruling** [6] - 6627:4, 6723:20, 6725:24, 6762:15, 6762:17, 6762:20
**run** [3] - 6667:12, 6768:6, 6769:17
**running** [1] - 6716:21
**RUTH** [1] - 6621:6

**S**

**sad** [7] - 6660:11, 6660:12, 6660:13, 6660:14, 6702:1, 6731:4
**sadness** [2] - 6662:15, 6664:17
**sample** [1] - 6645:21
**samples** [1] - 6645:23
**Sandra** [7] - 6628:20, 6752:16, 6758:24, 6758:25, 6759:8,

6765:2, 6765:4
**SANDRA** [1] - 6621:6
**Sandra's** [1] - 6640:22
**SARA** [1] - 6622:21
**Sara** [2] - 6774:3, 6774:8
**saw** [5] - 6662:11, 6673:21, 6714:6, 6714:7, 6721:19
**scale** [1] - 6659:11
**scare** [1] - 6730:3
**scene** [4] - 6638:10, 6641:22, 6642:13, 6717:2
**scheduled** [1] - 6769:13
**school** [7] - 6649:20, 6650:3, 6651:17, 6661:16, 6662:22, 6662:25, 6663:2
**science** [4] - 6648:23, 6663:4, 6673:1, 6684:3
**scientist** [3] - 6672:24, 6673:3, 6684:14
**scope** [1] - 6717:5
**score** [1] - 6654:13
**scored** [2] - 6661:13, 6675:19
**scores** [1] - 6659:4
**scoring** [1] - 6680:16
**screen** [5] - 6647:11, 6647:13, 6708:1, 6718:21, 6721:16
**search** [1] - 6628:8
**searchable** [1] - 6772:14
**seat** [4] - 6723:6, 6769:12, 6770:4, 6770:5
**seated** [1] - 6672:12
**second** [15] - 6632:14, 6633:4, 6633:19, 6635:12, 6669:12, 6699:15, 6701:23, 6708:12, 6718:13, 6743:19, 6746:6, 6748:24, 6758:13, 6768:3, 6769:10
**seconds** [1] - 6709:10
**section** [8] - 6640:2, 6641:10, 6641:24, 6642:12, 6652:13, 6662:13, 6724:14, 6726:12
**sections** [1] - 6657:2
**security** [13] - 6736:19, 6736:20, 6736:24, 6737:3,

6753:16, 6753:17, 6763:11, 6763:17, 6763:18, 6763:24, 6763:25, 6764:13, 6764:14
**sedition** [1] - 6728:2
**seditious** [4] - 6727:23, 6728:1, 6730:22, 6731:19
**see** [38] - 6630:25, 6636:10, 6646:12, 6647:19, 6653:22, 6662:6, 6662:25, 6663:24, 6665:13, 6666:7, 6666:9, 6668:14, 6672:5, 6673:15, 6678:9, 6680:18, 6681:16, 6684:15, 6687:16, 6697:15, 6703:25, 6704:7, 6710:5, 6714:6, 6714:11, 6717:11, 6717:13, 6718:3, 6718:25, 6719:19, 6724:11, 6725:18, 6725:25, 6726:19, 6730:11, 6747:10, 6773:4
**seed** [1] - 6728:2
**seeing** [4] - 6709:16, 6722:17, 6722:18, 6723:3
**seek** [4] - 6688:4, 6708:18, 6727:11, 6772:17
**seeking** [3] - 6729:24, 6733:20, 6740:3
**seem** [1] - 6635:19
**select** [3] - 6692:6, 6693:8, 6693:11
**selected** [3] - 6692:8, 6692:12, 6692:15
**self** [7] - 6657:5, 6657:6, 6661:7, 6743:21, 6743:22, 6743:23, 6761:15
**self-defense** [3] - 6743:21, 6743:22, 6743:23
**self-explanatory** [1] - 6761:15
**self-report** [2] - 6657:6, 6661:7
**self-reported** [1] - 6657:5
**sell** [2] - 6690:11, 6690:14
**semicircular** [1] - 6718:11
**send** [5] - 6697:8,

6697:10, 6746:3, 6751:13, 6765:4
**sense** [5] - 6708:13, 6710:11, 6731:24, 6733:9, 6733:12
**sent** [16] - 6624:16, 6695:22, 6695:24, 6696:2, 6697:7, 6697:12, 6699:4, 6700:8, 6700:14, 6702:12, 6726:1, 6733:20, 6747:23, 6751:15, 6763:8
**sentence** [38] - 6632:8, 6633:19, 6635:8, 6635:12, 6635:24, 6636:1, 6636:7, 6636:11, 6639:18, 6640:19, 6641:14, 6688:19, 6698:12, 6699:25, 6701:10, 6701:12, 6702:24, 6703:12, 6703:13, 6703:19, 6703:23, 6704:2, 6704:6, 6729:2, 6749:16, 6749:20, 6750:24, 6752:21, 6755:23, 6756:9, 6758:5, 6758:13, 6758:14, 6761:15, 6762:11, 6762:12, 6763:4, 6763:13
**sentences** [4] - 6748:12, 6751:17, 6752:4, 6752:8
**sentencing** [1] - 6688:11
**sentiment** [1] - 6639:22
**separate** [12] - 6659:6, 6660:3, 6726:3, 6727:8, 6729:7, 6729:14, 6732:15, 6736:16, 6737:3, 6738:16, 6738:17, 6754:3
**separation** [1] - 6667:16
**sequestration** [4] - 6686:14, 6686:20, 6686:23, 6687:2
**seriously** [1] - 6730:20
**service** [2] - 6667:15, 6715:25
**services** [2] - 6690:12, 6694:6
**Services** [1] - 6682:6
**serving** [1] - 6706:21

**SESSION** [1] - 6621:11
**set** [1] - 6735:13
**settings** [1] - 6666:20
**seven** [3] - 6692:23, 6701:8, 6767:5
**Seven** [1] - 6701:3
**several** [7] - 6626:21, 6645:11, 6658:2, 6677:18, 6724:19, 6748:15, 6750:12
**severe** [2] - 6655:22, 6675:23
**severity** [1] - 6675:23
**shape** [1] - 6725:7
**sheet** [1] - 6629:23
**shift** [2] - 6652:10, 6666:9
**Shipley** [3] - 6626:20, 6629:2, 6747:7
**shoehorn** [1] - 6738:12
**shoehorned** [1] - 6736:17
**shoes** [4] - 6660:25, 6661:2, 6663:24, 6700:20
**shoot** [2] - 6736:20, 6737:3
**shooting** [1] - 6736:25
**shoots** [1] - 6736:19
**short** [1] - 6672:1
**shorter** [2] - 6672:4, 6768:2
**shorthand** [1] - 6622:24
**shortly** [2] - 6672:5, 6767:16
**shot** [1] - 6716:15
**show** [10] - 6635:16, 6655:2, 6679:13, 6696:8, 6696:10, 6716:1, 6716:2, 6716:10, 6716:14, 6717:17
**showed** [3] - 6711:12, 6719:4
**shown** [2] - 6719:18, 6733:3
**shows** [2] - 6735:7, 6756:13
**side** [4] - 6646:19, 6659:19, 6674:9, 6770:20
**sides** [4] - 6646:19, 6646:21, 6646:23, 6646:25
**sight** [2] - 6714:10, 6714:11
**sign** [1] - 6770:20

**Signal** [1] - 6752:14
**SIGNATURE** [1] - 6774:9
**significance** [1] - 6739:6
**significant** [8] - 6675:16, 6675:18, 6675:20, 6675:21, 6675:22, 6676:2, 6676:3, 6692:16
**similar** [1] - 6665:16
**simply** [4] - 6701:11, 6724:24, 6748:14, 6759:20
**simultaneous** [1] - 6639:11
**single** [6] - 6629:23, 6684:13, 6690:17, 6698:4, 6719:12
**sit** [2] - 6645:5, 6667:11
**sit-ups** [1] - 6667:11
**site** [1] - 6653:3
**sits** [1] - 6627:9
**sitting** [1] - 6773:13
**situation** [6] - 6665:8, 6666:22, 6668:9, 6669:4, 6669:14, 6719:14
**situational** [1] - 6684:8
**situations** [2] - 6665:6, 6666:14
**six** [5] - 6633:20, 6652:1, 6652:23, 6654:18, 6771:24
**skills** [6] - 6652:18, 6656:14, 6656:16, 6659:16, 6663:5
**slightly** [2] - 6659:18, 6672:4, 6718:7
**slipped** [2] - 6670:25, 6671:3
**small** [2] - 6634:6, 6721:20
**smaller** [4] - 6692:25, 6704:20, 6714:18, 6714:21
**smile** [1] - 6664:16
**smiling** [2] - 6665:13, 6665:18
**smoother** [1] - 6703:7
**Snow** [1] - 6701:2
**social** [9] - 6655:4, 6655:6, 6660:17, 6660:24, 6661:15, 6662:13, 6662:17, 6666:14, 6666:20
**sold** [1] - 6738:15
**sole** [1] - 6765:6

solution [1] - 6656:19
solving [2] - 6652:18, 6666:6
someone [13] - 6655:11, 6655:18, 6660:3, 6660:10, 6660:25, 6665:8, 6665:10, 6665:12, 6682:1, 6684:5, 6749:12, 6750:6, 6750:10
sometimes [8] - 6639:7, 6653:2, 6654:14, 6664:25, 6676:23, 6742:1
somewhat [2] - 6687:10, 6703:15
soon [2] - 6653:20, 6717:18
SoRelle [2] - 6727:19, 6729:23
sorry [18] - 6628:1, 6628:16, 6628:18, 6634:23, 6651:3, 6660:7, 6670:15, 6694:16, 6720:4, 6726:25, 6738:2, 6739:15, 6754:25, 6759:15, 6762:12, 6762:19, 6765:25, 6772:10
Sorry [1] - 6628:2
sort [14] - 6641:23, 6646:4, 6652:10, 6654:18, 6656:16, 6666:19, 6667:2, 6674:5, 6677:13, 6724:3, 6724:11, 6726:4, 6731:4, 6741:5
Sorting [1] - 6666:5
sorting [1] - 6666:8
sought [1] - 6688:5
sound [3] - 6649:3, 6682:23, 6709:7
sounds [2] - 6679:11, 6682:21
soup [1] - 6671:23
South [1] - 6622:8
Southeast [1] - 6621:23
Speaker [1] - 6708:5
speaker [1] - 6713:25
speaker's [5] - 6713:7, 6713:12, 6713:24, 6721:8, 6721:15
speakers [4] - 6668:16, 6753:18, 6764:1, 6764:14
speaking [2] - 6658:6,

6745:6
special [4] - 6713:7, 6713:19, 6721:19, 6747:12
Special [8] - 6713:15, 6714:5, 6714:14, 6717:1, 6717:6, 6719:2, 6721:17, 6744:20
specialist [1] - 6681:8
specializes [2] - 6644:12, 6684:5
Specialty [1] - 6682:6
specific [14] - 6632:21, 6652:20, 6663:13, 6668:6, 6671:1, 6684:23, 6688:4, 6700:9, 6702:8, 6715:19, 6719:10, 6738:10, 6755:5, 6755:6
specifically [19] - 6642:9, 6645:7, 6645:11, 6660:10, 6662:9, 6662:14, 6663:17, 6664:4, 6687:2, 6694:7, 6702:18, 6742:2, 6752:24, 6753:6, 6756:3, 6757:12, 6759:3, 6763:19, 6765:2
specify [2] - 6642:6, 6735:3
spectrum [8] - 6626:1, 6647:6, 6654:25, 6655:11, 6664:8, 6676:8, 6676:10, 6699:10
speech [5] - 6629:25, 6740:9, 6741:6, 6744:8, 6744:23
spell [1] - 6644:6
spelling [1] - 6706:13
spend [2] - 6654:18, 6685:9
spent [4] - 6651:25, 6680:10, 6685:4, 6764:25
Sperry [8] - 6650:21, 6650:24, 6660:17, 6665:20, 6666:13, 6671:17, 6687:9, 6762:21
Sperry's [7] - 6651:3, 6651:17, 6657:14, 6686:6, 6686:18, 6687:4, 6687:21
spoken [3] - 6665:2, 6669:5, 6718:1

spontaneous [1] - 6654:10
stage [2] - 6766:10, 6767:13
staircase [1] - 6708:6
stairs [1] - 6708:10
stairwell [9] - 6708:8, 6710:10, 6710:12, 6718:7, 6718:9, 6718:10, 6718:11, 6718:12
stamp [1] - 6711:16
stand [10] - 6650:25, 6656:24, 6703:9, 6715:17, 6724:12, 6724:17, 6730:21, 6745:19, 6747:11, 6760:10
stand-alone [3] - 6656:24, 6724:12, 6724:17
standard [4] - 6625:1, 6733:11, 6736:10, 6738:2
standardized [1] - 6645:18
standing [3] - 6708:9, 6718:10, 6720:6
stands [1] - 6690:7
STANLEY [1] - 6622:4
start [9] - 6649:19, 6651:21, 6652:6, 6722:24, 6752:8, 6765:12, 6768:19, 6768:21, 6769:24
started [1] - 6715:22
starting [2] - 6712:4, 6769:2
state [11] - 6638:18, 6641:22, 6642:2, 6642:17, 6642:19, 6642:21, 6644:6, 6645:5, 6723:23, 6725:11, 6747:9
statement [22] - 6627:13, 6627:22, 6627:24, 6628:19, 6628:21, 6628:23, 6630:4, 6630:7, 6638:9, 6639:24, 6640:5, 6643:9, 6643:10, 6670:12, 6671:22, 6697:20, 6697:25, 6698:3, 6712:15, 6725:21, 6729:8, 6754:20
statements [16] - 6626:10, 6626:11, 6626:12, 6627:7, 6627:16, 6627:17,

6741:14, 6742:7, 6742:8, 6742:9, 6742:16, 6742:17, 6742:18, 6743:5, 6743:6, 6743:8
STATES [3] - 6621:1, 6621:3, 6621:12
states [2] - 6638:9, 6681:7
States [14] - 6621:15, 6621:17, 6643:23, 6645:16, 6648:10, 6681:3, 6694:17, 6705:23, 6705:24, 6706:16, 6706:19, 6706:23, 6713:4, 6756:1
stating [4] - 6635:22, 6638:21, 6657:6, 6706:12
Statistical [2] - 6697:19, 6698:22
statistically [2] - 6658:6, 6675:22
statistics [1] - 6698:24
status [2] - 6649:22, 6684:22
stay [3] - 6653:2, 6671:2, 6761:17
steal [1] - 6626:22
stealing [1] - 6671:23
STEELE [1] - 6621:7
Steele [10] - 6622:2, 6752:17, 6757:10, 6758:1, 6759:1, 6759:9, 6759:20, 6759:22, 6759:23, 6759:24
steele [1] - 6625:11
stenotype [1] - 6622:24
STEPHEN [1] - 6621:22
stepped [1] - 6713:10
Steve [1] - 6643:2
stick [1] - 6690:20
still [7] - 6636:24, 6645:24, 6725:9, 6749:15, 6749:16, 6768:24, 6771:5
stipulation [2] - 6628:21, 6628:22
stood [1] - 6713:6
stop [9] - 6718:19, 6731:14, 6732:11, 6766:25, 6767:17, 6767:19, 6768:13, 6768:15, 6768:16
stopping [1] - 6626:22
stormed [1] - 6642:24

story [2] - 6701:2, 6701:7
straight [1] - 6723:1
strategies [2] - 6666:8, 6666:10
Street [5] - 6621:17, 6621:20, 6622:2, 6622:11, 6622:14
stress [1] - 6646:17
strictly [1] - 6766:9
strike [3] - 6661:17, 6686:13, 6686:21
struggling [1] - 6640:8
stuck [1] - 6665:25
student [1] - 6663:4
stuff [2] - 6682:14, 6691:12
sub [1] - 6726:11
sub-conspiracy [1] - 6726:11
subheading [2] - 6636:4, 6636:8
subject [5] - 6627:12, 6647:18, 6647:22, 6647:23, 6708:20
subjects [1] - 6648:25
submit [2] - 6640:7, 6753:3
submits [3] - 6723:24, 6760:3, 6760:25
subpar [3] - 6676:22, 6676:23, 6677:8
subsequent [1] - 6652:20
substantive [1] - 6724:19
substitute [1] - 6761:5
subtle [1] - 6702:2
successful [1] - 6634:19
sufficient [5] - 6638:12, 6639:21, 6642:15, 6649:2, 6735:25
suggest [4] - 6729:5, 6735:5, 6741:10, 6769:22
suggested [2] - 6746:20, 6771:19
suggesting [4] - 6638:5, 6687:13, 6732:13, 6750:25
suggestion [2] - 6634:15, 6634:16
suite [1] - 6721:8
Suite [5] - 6621:20, 6622:3, 6622:8, 6622:11, 6622:17
suits [1] - 6713:19

summarize [2] -
6662:24, 6719:13
summarizing [1] -
6633:15
summary [13] -
6629:10, 6632:12,
6633:2, 6633:4,
6633:12, 6633:18,
6634:3, 6694:2,
6695:12, 6708:16,
6708:18, 6710:20,
6733:22
summation [1] -
6739:5
Superior [1] - 6768:13
supervised [2] -
6645:5, 6645:10
supervision [1] -
6645:20
supplement [1] -
6651:4
supplemental [4] -
6733:18, 6734:7,
6746:6, 6748:25
support [14] - 6629:5,
6638:12, 6642:15,
6655:14, 6655:16,
6677:6, 6677:11,
6677:13, 6677:15,
6678:22, 6686:19,
6725:5, 6728:16,
6733:13
supported [2] -
6733:12, 6755:6
supporting [1] -
6649:2
suppose [4] -
6728:18, 6731:22,
6737:2
supposed [5] -
6634:22, 6634:25,
6636:25, 6671:6,
6691:2
surface [1] - 6704:3
surprise [1] - 6727:17
suspect [2] - 6728:22,
6731:23
sustain [3] - 6654:1,
6671:10, 6704:9
sustained [3] -
6671:13, 6673:12,
6675:13
swept [1] - 6738:7
switch [3] - 6652:14,
6666:8, 6666:11
SWORN [2] - 6643:24,
6706:6
symptoms [10] -
6652:19, 6652:20,
6655:2, 6655:14,

6655:15, 6655:17,
6656:3, 6657:7
system [1] - 6694:7
systems [1] - 6689:8

**T**

talks [3] - 6632:15,
6697:5, 6763:9
tampering [3] -
6757:24, 6759:21,
6759:25
tapping [1] - 6653:11
tasks [1] - 6659:19
team [2] - 6741:18,
6745:16
tempt [1] - 6767:7
ten [14] - 6662:18,
6680:13, 6709:10,
6714:24
tend [1] - 6694:24
term [8] - 6658:5,
6673:7, 6675:21,
6696:23, 6700:9,
6700:13, 6701:19,
6702:21
termination [1] -
6636:10
terms [15] - 6631:18,
6632:12, 6632:20,
6646:7, 6654:5,
6659:9, 6659:20,
6661:11, 6663:22,
6664:4, 6664:7,
6664:19, 6665:9,
6670:23, 6725:4
Test [1] - 6666:5
test [14] - 6657:1,
6657:9, 6657:12,
6657:22, 6658:9,
6659:7, 6659:8,
6661:11, 6662:1,
6666:5, 6666:12,
6675:15, 6676:1
testified [27] -
6624:17, 6625:23,
6629:11, 6636:15,
6648:2, 6648:8,
6665:20, 6666:13,
6680:21, 6680:24,
6681:22, 6688:13,
6688:17, 6689:3,
6689:13, 6692:20,
6692:23, 6694:3,
6694:6, 6694:21,
6695:1, 6695:4,
6695:7, 6695:10,
6747:14, 6750:11
testify [5] - 6648:20,
6679:4, 6679:5,

6735:8, 6748:7
testifying [9] -
6625:11, 6648:4,
6650:23, 6651:11,
6670:2, 6670:4,
6679:3, 6681:12,
6688:11
TESTIMONY [1] -
6623:3
testimony [32] -
6624:19, 6627:20,
6649:10, 6670:16,
6672:9, 6678:4,
6685:24, 6686:1,
6686:6, 6686:14,
6686:15, 6686:16,
6686:18, 6687:4,
6687:5, 6687:15,
6687:17, 6687:19,
6687:21, 6687:23,
6688:9, 6693:25,
6694:9, 6694:13,
6705:20, 6722:4,
6742:7, 6743:24,
6744:2, 6747:25,
6748:14, 6762:21
testing [11] - 6652:2,
6652:4, 6652:14,
6652:15, 6652:22,
6654:11, 6654:12,
6658:16, 6659:17,
6662:12
tests [13] - 6656:21,
6656:23, 6656:24,
6657:17, 6657:19,
6657:22, 6657:25,
6658:3, 6659:4,
6661:3, 6661:6,
6666:3, 6675:19
Texas [1] - 6622:17
text [5] - 6686:10,
6746:16, 6760:4,
6761:1, 6761:6
textbook [1] - 6697:15
texted [1] - 6642:24
thanked [1] - 6653:21
THE [250] - 6621:1,
6621:1, 6621:11,
6624:3, 6624:6,
6624:23, 6625:10,
6625:17, 6625:21,
6626:7, 6626:9,
6627:1, 6627:6,
6627:18, 6628:3,
6628:15, 6628:17,
6628:22, 6628:25,
6629:17, 6629:22,
6630:14, 6630:20,
6631:3, 6631:6,
6631:10, 6631:15,

6632:3, 6632:7,
6632:18, 6632:25,
6633:7, 6633:10,
6633:17, 6633:25,
6634:21, 6634:24,
6635:4, 6635:9,
6635:25, 6636:9,
6637:3, 6637:8,
6637:12, 6637:22,
6640:8, 6643:7,
6643:16, 6643:19,
6643:24, 6643:25,
6644:1, 6647:23,
6648:17, 6650:7,
6650:16, 6650:18,
6661:19, 6669:19,
6669:20, 6669:25,
6670:2, 6670:14,
6670:19, 6671:10,
6671:13, 6672:1,
6672:8, 6672:12,
6673:12, 6675:6,
6675:7, 6675:13,
6678:14, 6678:23,
6683:7, 6687:12,
6689:20, 6693:21,
6696:5, 6696:16,
6703:4, 6703:6,
6703:7, 6704:7,
6704:9, 6704:13,
6705:19, 6705:21,
6705:22, 6706:3,
6706:6, 6708:22,
6711:15, 6711:20,
6715:6, 6716:25,
6717:11, 6717:21,
6719:22, 6720:22,
6721:10, 6722:3,
6722:5, 6722:7,
6722:9, 6722:11,
6722:15, 6723:6,
6723:9, 6723:13,
6723:16, 6723:19,
6724:1, 6725:1,
6725:25, 6726:14,
6726:19, 6726:22,
6727:1, 6727:16,
6728:8, 6729:4,
6729:8, 6729:13,
6730:6, 6731:6,
6731:17, 6731:22,
6732:17, 6733:8,
6733:10, 6734:1,
6734:13, 6734:16,
6735:23, 6736:10,
6736:12, 6737:1,
6738:3, 6738:12,
6739:7, 6739:13,
6739:16, 6741:3,
6742:6, 6742:15,

6744:5, 6745:23,
6746:2, 6746:5,
6746:8, 6748:9,
6748:24, 6749:8,
6749:10, 6749:18,
6749:22, 6750:6,
6750:13, 6750:16,
6750:18, 6750:25,
6751:3, 6751:6,
6751:8, 6751:15,
6752:2, 6752:7,
6752:10, 6752:16,
6752:23, 6753:5,
6753:25, 6754:2,
6755:1, 6755:16,
6755:24, 6756:11,
6756:17, 6756:21,
6756:25, 6757:9,
6757:20, 6758:21,
6758:24, 6759:14,
6759:19, 6760:1,
6760:8, 6760:11,
6760:13, 6760:17,
6760:20, 6760:23,
6761:5, 6761:13,
6761:16, 6761:20,
6762:11, 6762:19,
6762:23, 6763:7,
6763:22, 6764:6,
6764:8, 6764:11,
6764:18, 6764:25,
6765:9, 6765:17,
6765:20, 6765:24,
6766:3, 6766:6,
6766:8, 6766:13,
6766:16, 6766:20,
6766:24, 6767:2,
6767:5, 6767:8,
6767:13, 6767:19,
6767:25, 6768:7,
6768:15, 6768:23,
6769:1, 6769:4,
6769:10, 6769:24,
6770:4, 6770:11,
6770:16, 6770:24,
6771:7, 6771:9,
6771:21, 6772:1,
6772:4, 6772:9,
6772:11, 6772:14,
6772:24, 6773:3,
6773:13
themselves [3] -
6732:15, 6732:23,
6737:12
theories [1] - 6738:10
theorizing [1] -
6731:17
theory [18] - 6625:19,
6697:19, 6700:18,
6701:22, 6703:3,
6724:20, 6724:21,

6724:22, 6728:11, 6736:22, 6737:2, 6737:8, 6737:23, 6752:5, 6761:22, 6764:22, 6764:23, 6765:5

**thereafter** [1] - 6636:24

**therefor** [1] - 6686:24

**therefore** [2] - 6626:16, 6729:18

**they've** [3] - 6648:22, 6685:21, 6772:14

**thinking** [14] - 6637:12, 6644:14, 6652:16, 6655:7, 6656:12, 6666:1, 6666:2, 6682:18, 6684:4, 6684:7, 6700:3, 6742:13, 6748:9, 6750:3

**third** [9] - 6633:18, 6672:20, 6726:3, 6748:13, 6755:9, 6755:11, 6755:19, 6758:13, 6771:8

**Thomas** [1] - 6622:11

**thoughtful** [1] - 6664:18

**thoughts** [6] - 6625:6, 6626:13, 6652:12, 6660:6, 6663:14, 6668:8

**thousand** [1] - 6689:9

**threads** [3] - 6760:4, 6761:1, 6761:6

**three** [16] - 6634:10, 6634:12, 6638:17, 6640:14, 6655:12, 6676:16, 6676:18, 6677:1, 6677:2, 6714:7, 6714:9, 6729:2, 6745:16, 6752:8, 6770:18

**throughout** [4] - 6653:20, 6681:9, 6685:11, 6715:2

**throwing** [1] - 6744:3

**thrust** [1] - 6743:4

**thumb** [2] - 6772:9, 6772:11

**Thursday** [2] - 6769:18, 6770:12

**tied** [1] - 6730:4

**title** [2] - 6632:19, 6706:17

**today** [15] - 6628:14, 6631:22, 6650:23, 6651:11, 6679:7, 6679:9, 6685:7,

6685:8, 6705:15, 6722:22, 6722:23, 6747:3, 6747:7, 6747:23

**together** [9] - 6651:25, 6652:1, 6652:3, 6652:24, 6653:4, 6663:6, 6750:14

**tomorrow** [11] - 6722:24, 6722:25, 6723:4, 6723:8, 6767:18, 6768:1, 6768:9, 6768:22, 6771:2, 6772:7, 6773:9

**tonight** [5] - 6629:16, 6746:3, 6772:21, 6773:6, 6773:15

**took** [5] - 6637:4, 6637:5, 6652:3, 6653:12, 6735:10

**top** [4] - 6675:25, 6708:10, 6711:10, 6718:12

**Toronto** [1] - 6661:8

**total** [2] - 6679:11, 6679:25

**touch** [1] - 6685:11

**toward** [1] - 6745:7

**towards** [4] - 6632:24, 6642:4, 6729:24, 6743:25

**track** [1] - 6628:11

**tracking** [2] - 6738:11, 6761:18

**tracks** [3] - 6640:1, 6743:9, 6761:17

**training** [7] - 6645:5, 6656:5, 6691:12, 6691:17, 6706:24, 6706:25, 6707:2

**trains** [1] - 6707:1

**trait** [1] - 6749:12, 6749:23, 6749:24

**traits** [9] - 6675:17, 6675:18, 6675:20, 6676:2, 6750:6, 6750:10, 6752:12, 6762:14, 6763:3

**Transcript** [1] - 6622:25

**transcript** [11] - 6626:15, 6626:18, 6626:24, 6626:25, 6627:2, 6629:3, 6686:10, 6687:4, 6687:7, 6729:12, 6774:4

**TRANSCRIPT** [1] - 6621:11

**transcription** [1] - 6622:25

**transcripts** [1] - 6629:4

**transitioning** [1] - 6701:21

**transparency** [1] - 6752:3

**traumatic** [2] - 6646:16, 6646:17

**travel** [3] - 6679:23, 6771:3, 6771:5

**traveled** [2] - 6761:23, 6765:6

**treating** [2] - 6676:6, 6689:12

**treatise** [4] - 6695:16, 6695:17, 6696:22, 6696:23

**treatment** [3] - 6673:15, 6673:21, 6675:2

**treatments** [1] - 6673:21

**trial** [11] - 6624:14, 6624:20, 6642:23, 6648:9, 6682:1, 6685:12, 6685:16, 6685:22, 6687:3, 6687:19, 6729:22

**TRIAL** [1] - 6621:11

**trials** [6] - 6631:7, 6726:23, 6738:22, 6769:17, 6770:10, 6773:1

**tried** [5] - 6668:25, 6711:8, 6735:13, 6741:9, 6747:5

**trouble** [3] - 6664:20, 6665:9, 6732:18

**TROY** [1] - 6621:16

**true** [3] - 6640:19, 6728:8, 6737:1

**truly** [1] - 6735:19

**Trump** [4] - 6740:9, 6742:8, 6744:1, 6744:8

**trust** [1] - 6733:25

**try** [1] - 6700:23

**trying** [18] - 6628:11, 6634:18, 6634:20, 6640:25, 6665:11, 6668:23, 6669:2, 6700:2, 6708:11, 6710:14, 6710:15, 6724:17, 6726:14, 6727:11, 6743:4, 6754:22, 6765:17, 6768:12

**turn** [1] - 6734:17

**tweak** [1] - 6742:11

**twice** [2] - 6680:6, 6695:13

**two** [37] - 6625:22, 6626:1, 6636:21, 6638:7, 6645:7, 6645:9, 6645:20, 6646:1, 6657:3, 6677:1, 6678:6, 6689:5, 6689:8, 6689:10, 6694:23, 6698:5, 6714:7, 6717:5, 6724:18, 6726:9, 6729:1, 6729:4, 6732:22, 6734:2, 6734:15, 6738:18, 6748:12, 6751:5, 6751:17, 6752:4, 6761:20, 6769:8, 6769:20, 6769:21, 6769:23, 6770:17, 6770:23

**two-year** [3] - 6645:7, 6645:9, 6645:20

**type** [6] - 6635:24, 6659:19, 6683:4, 6691:8, 6694:3, 6724:3

**types** [1] - 6666:22

**typically** [1] - 6646:14

**typo** [1] - 6753:23

**typos** [3] - 6752:11, 6757:18, 6758:23

## U

**U.S** [1] - 6708:7

**ultimately** [1] - 6649:11

**unable** [2] - 6702:19, 6746:21

**unbiased** [1] - 6646:24

**uncharged** [3] - 6727:8, 6727:21, 6728:10

**uncomfortable** [1] - 6666:20

**under** [25] - 6627:8, 6627:17, 6632:16, 6633:4, 6633:18, 6634:8, 6636:7, 6683:4, 6686:23, 6687:1, 6688:2, 6691:16, 6691:21, 6692:3, 6693:6, 6693:17, 6701:23, 6724:19, 6724:20, 6735:13, 6736:21, 6737:2, 6737:6,

6737:8

**undergrad** [1] - 6644:18

**underneath** [2] - 6665:14

**Understood** [1] - 6767:1

**understood** [1] - 6738:8

**undoubtedly** [1] - 6728:8

**unfortunately** [3] - 6631:16, 6631:17, 6726:15

**uniforms** [1] - 6713:18

**unintended** [4] - 6638:2, 6639:13, 6639:23, 6640:7

**unintentional** [1] - 6649:9

**UNITED** [3] - 6621:1, 6621:3, 6621:12

**United** [14] - 6621:15, 6621:17, 6643:22, 6645:16, 6648:10, 6681:3, 6694:17, 6705:23, 6705:24, 6706:16, 6706:19, 6706:23, 6713:4, 6756:1

**University** [2] - 6644:19, 6644:22

**unlawful** [5] - 6630:6, 6631:8, 6639:10, 6728:13, 6736:16

**unless** [7] - 6660:11, 6723:11, 6726:8, 6768:1, 6769:19, 6770:5, 6770:19

**unlikely** [2] - 6731:20, 6767:25

**unusual** [2] - 6666:6, 6697:21

**up** [39] - 6627:2, 6631:3, 6647:11, 6647:13, 6653:3, 6666:8, 6670:20, 6680:1, 6680:19, 6688:3, 6697:14, 6700:6, 6700:9, 6703:9, 6707:22, 6708:15, 6710:18, 6713:16, 6715:17, 6717:18, 6717:22, 6719:5, 6719:6, 6720:6, 6720:25, 6723:21, 6724:23, 6730:21, 6731:24, 6732:4, 6732:8, 6733:2, 6738:20,

6746:14, 6747:11,
6747:19, 6752:4,
6768:23, 6769:1
**updating** [1] - 6676:11
**upper** [1] - 6746:18
**ups** [4] - 6646:11,
6667:11, 6667:12
**upset** [1] - 6712:11
**uses** [2] - 6636:1,
6701:19
**usual** [1] - 6686:23
**utilities** [1] - 6678:21

## V

**Vallejo** [1] - 6729:23
**variation** [1] - 6659:15
**variations** [1] - 6676:6
**various** [6] - 6625:8,
6681:12, 6681:20,
6753:17, 6763:25,
6764:14
**Venn** [1] - 6733:2
**verbal** [4] - 6656:14,
6658:3, 6658:19,
6659:16
**verbally** [1] - 6663:6
**verdict** [3] - 6770:10,
6770:12, 6773:10
**version** [9] - 6624:9,
6631:21, 6631:22,
6631:25, 6633:18,
6638:8, 6757:22,
6757:23, 6771:24
**versus** [1] - 6660:15
**video** [19] - 6629:6,
6653:13, 6653:15,
6709:2, 6709:4,
6709:21, 6710:1,
6710:6, 6711:3,
6711:11, 6711:23,
6712:5, 6712:19,
6717:1, 6717:12,
6733:21, 6745:10,
6772:18, 6772:19
**Video** [8] - 6709:8,
6709:11, 6710:3,
6710:24, 6712:2,
6718:15, 6718:22,
6721:4
**videos** [2] - 6680:15,
6720:10
**view** [2] - 6700:20,
6727:22
**viewed** [1] - 6631:8
**views** [1] - 6734:21
**violates** [1] - 6686:20
**violation** [4] -
6686:14, 6686:23,
6686:24, 6687:1

**VIP** [1] - 6764:7
**Virginia** [1] - 6630:10
**visual** [5] - 6656:13,
6656:14, 6658:4,
6658:20, 6659:16
**visually** [1] - 6656:15
**visuospatial** [1] -
6658:25
**vitae** [1] - 6690:7
**voice** [1] - 6706:11
**voir** [1] - 6648:13
**voluntary** [1] -
6743:19
**volunteer** [1] - 6765:8
**vote** [2] - 6639:2,
6729:19
**vs** [1] - 6621:5

## W

**wait** [1] - 6773:8
**waive** [2] - 6624:5,
6648:13
**walk** [3] - 6739:20,
6741:25, 6744:21
**walked** [3] - 6653:21,
6743:25, 6745:4
**walking** [2] - 6740:12,
6744:17
**walls** [1] - 6733:5
**wants** [4] - 6632:16,
6637:19, 6637:21,
6704:6
**War** [1] - 6730:2
**war** [2] - 6712:7,
6712:10
**warning** [1] - 6767:15
**warrants** [3] - 6628:8,
6738:16
**Washington** [16] -
6621:7, 6621:18,
6621:21, 6621:23,
6622:3, 6622:6,
6622:9, 6622:12,
6622:22, 6630:15,
6753:15, 6761:23,
6763:10, 6763:14,
6763:23, 6765:6
**watch** [2] - 6687:6,
6744:22
**water** [1] - 6678:17
**Watkins** [2] - 6728:19,
6765:7
**Watkins's** [1] -
6636:17
**weapons** [2] -
6707:19, 6736:25
**wear** [1] - 6713:18
**wearing** [4] - 6665:10,
6665:12, 6665:15,

6685:21
**website** [8] - 6673:24,
6681:20, 6682:10,
6682:13, 6682:14,
6682:16, 6683:10,
6683:21
**week** [1] - 6769:18
**weeks** [1] - 6769:12
**weight** [1] - 6649:7
**welcome** [3] -
6643:19, 6643:25,
6719:22
**West** [1] - 6622:11
**Western** [2] - 6644:22,
6645:1
**whatsoever** [1] -
6687:11
**whereas** [1] - 6711:12
**White** [1] - 6701:2
**whole** [8] - 6639:18,
6640:10, 6683:20,
6685:14, 6697:10,
6699:6, 6699:7,
6700:5
**whoops** [1] - 6718:24
**WI-6** [1] - 6679:13
**WI-7** [1] - 6683:9
**WI-8** [1] - 6689:21
**WI-9** [1] - 6693:24
**Wick** [2] - 6774:3,
6774:8
**WICK** [1] - 6622:21
**willfully** [1] - 6755:25
**William** [19] - 6649:16,
6663:7, 6674:16,
6674:18, 6676:16,
6677:4, 6677:13,
6677:16, 6677:23,
6678:12, 6678:22,
6685:21, 6686:15,
6705:15, 6720:2,
6720:4, 6745:12,
6752:17, 6757:10
**WILLIAM** [1] - 6621:7
**William's** [2] -
6662:14, 6686:1
**Williams** [1] - 6759:1
**willing** [1] - 6770:20
**wing** [2] - 6708:6,
6721:15
**Wisconsin** [1] -
6666:5
**wishes** [2] - 6725:4,
6734:5
**withdrawing** [1] -
6636:12
**withdrew** [1] -
6636:14
**WITNESS** [11] -
6643:24, 6644:1,

6669:20, 6675:7,
6678:14, 6696:16,
6703:6, 6705:21,
6706:6, 6719:22,
6722:5
**witness** [21] -
6624:24, 6643:21,
6648:19, 6650:25,
6669:24, 6679:1,
6679:2, 6679:14,
6683:6, 6686:25,
6693:20, 6696:4,
6705:22, 6708:25,
6716:2, 6716:14,
6717:6, 6746:18,
6748:6, 6748:21
**witnesses** [5] -
6629:11, 6648:21,
6722:11, 6722:18,
6740:6
**witnesses'** [1] -
6746:9
**woman** [1] - 6715:15
**wonder** [1] - 6739:3
**WOODWARD** [44] -
6622:4, 6635:1,
6636:5, 6642:5,
6643:2, 6643:5,
6723:14, 6727:4,
6727:14, 6727:17,
6729:20, 6730:7,
6731:13, 6731:21,
6732:1, 6733:25,
6734:23, 6734:25,
6736:11, 6738:1,
6738:4, 6739:2,
6740:17, 6746:12,
6746:14, 6747:1,
6747:17, 6751:10,
6751:25, 6752:3,
6754:21, 6755:15,
6755:17, 6755:23,
6756:10, 6756:19,
6756:23, 6757:25,
6758:7, 6758:15,
6766:21, 6767:1,
6768:5, 6771:5
**Woodward** [13] -
6622:5, 6730:20,
6734:13, 6740:5,
6740:8, 6746:13,
6751:16, 6752:14,
6763:8, 6765:15,
6765:17, 6765:19,
6766:20
**word** [22] - 6633:3,
6633:11, 6635:14,
6636:1, 6636:6,
6638:24, 6640:20,
6654:6, 6654:8,

6684:10, 6684:15,
6687:14, 6691:9,
6691:16, 6691:21,
6692:3, 6693:6,
6693:11, 6693:17,
6701:24, 6745:18,
6749:5
**worded** [1] - 6741:15
**wording** [2] - 6632:4,
6752:23
**words** [22] - 6637:1,
6640:9, 6663:3,
6665:2, 6665:4,
6676:1, 6676:2,
6682:24, 6736:12,
6736:18, 6739:11,
6740:3, 6740:7,
6741:7, 6741:19,
6741:23, 6741:24,
6743:13, 6745:11,
6749:10, 6750:2,
6761:5
**world** [10] - 6690:4,
6692:8, 6692:16,
6698:1, 6698:5,
6698:10, 6700:20,
6703:24, 6730:11,
6742:23
**worried** [1] - 6743:12
**worse** [1] - 6658:8
**wound** [1] - 6746:24
**write** [3] - 6646:11,
6682:13, 6694:1
**write-ups** [1] -
6646:11
**writes** [1] - 6700:1
**written** [8] - 6635:17,
6635:19, 6645:21,
6665:4, 6684:21,
6701:9, 6725:22,
6773:1
**wrongdoing** [1] -
6746:21
**wrote** [5] - 6698:20,
6726:1, 6752:14,
6757:23, 6769:6

## Y

**year** [5] - 6645:4,
6645:7, 6645:9,
6645:20, 6706:21
**year's** [1] - 6694:10
**years** [6] - 6645:11,
6662:12, 6662:19,
6694:23, 6694:25,
6714:17
**yelling** [1] - 6720:15
**yesterday** [4] -
6685:8, 6685:9,

6685:10, 6697:8
**young** [1] - 6739:10
**yourself** [20] - 6651:8,
6660:25, 6661:2,
6674:18, 6675:12,
6682:11, 6682:14,
6690:4, 6690:11,
6692:16, 6706:12,
6707:24, 6708:1,
6709:21, 6709:23,
6711:4, 6711:24,
6712:4, 6714:3

## Z

**Zello** [4] - 6729:6,
6729:12, 6729:15,
6729:16